## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-01708

ESTATE OF CHAD ALEXANDER BURNETT;

      Plaintiff,

v.

CITY OF COLORADO SPRINGS, a municipality;
SERGEANT MICHAEL INAZU, in his individual capacity;
OFFICER JOSEPH DAIGLE, in his individual capacity;
OFFICER MATTHEW FLEMING, in his individual capacity; and
OFFICER CAROLINE BARTH, in her individual capacity;

      Defendants.

---

### COMPLAINT AND JURY DEMAND

---

Plaintiff, by and through its attorneys Siddhartha H. Rathod, Felipe Bohnet-Gomez, and Benjamin DeGolia of RATHOD | MOHAMEDBHAI LLC, alleges as follows:

### I.    <u>INTRODUCTION</u>

This case involves a story that is becoming all too familiar in Colorado and across the Nation: Police respond to a 911 call about an individual experiencing a mental health crisis; instead of involving a crisis intervention team, police respond with force; and instead of receiving psychiatric treatment, the individual is killed. The officers' actions in this case not only resulted in tragedy, however—they were also clearly unlawful. On May 24, 2020 Colorado Springs Police Department Sergeant Michael Inazu and Officers Joseph Daigle, Matthew Fleming, and Caroline Barth entered the home of Chad Burnett without a warrant, and absent

1

circumstances giving rise to an exception to the warrant requirement. Three of the officers immediately restrained Mr. Burnett, who was unarmed, in his living room. The fourth officer, Caroline Barth—who had been instructed to use her taser long before the arrest was initiated—charged into the house seconds later. Although Mr. Burnett was already restrained by the other three officers and offered only passive resistance, Officer Barth immediately discharged her taser into Mr. Burnett's abdomen. Less than sixty seconds later, as Mr. Burnett lay on the ground clearly in severe distress as he asked the officers to "just kill me now," Officer Barth discharged her taser twice more in rapid succession.

Two minutes later, as officers were removing Mr. Burnett from his home, Mr. Burnett braced himself and fell backwards through the doorway, back into the house. Officer Daigle flipped Mr. Burnett onto his stomach and got on top of him. Plainly angered by the situation, Officer Daigle shouted, "I told you to relax, didn't I? Didn't I? You didn't want to listen, did you?" Officer Daigle told Mr. Burnett as he knelt on his back: "Now we're going to do it our way. The easy way is over with."

Moments later, Mr. Burnett lost consciousness and stopped breathing. Despite these clear signs of a medical emergency, the officers failed to take appropriate responsive action; instead, they placed a spit sock over his head, further exacerbating his respiratory distress. Officers waited several minutes after Mr. Burnett had lost consciousness and ceased breathing before requesting emergent medical response. Officers let Mr. Burnett lie dying for an additional five minutes before initiating CPR, well after it was obvious that he was experiencing a serious

deterioration in his health. Those minutes were the difference between life and death for Mr. Burnett.

Mr. Burnett's death was wholly avoidable. If officers had acted appropriately, within the bounds of the law, he would still be alive today. Instead, officers unlawfully entered his home, employed force far in excess of what was necessary or constitutionally permitted, and then consciously disregarded clear signs of a medical emergency, standing by as Mr. Burnett, limp and unconscious, died on his living room floor.

## II.   <u>JURISDICTION</u>

1.   This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331. Jurisdiction supporting Plaintiffs' claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988.

2.   Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All the events and omissions alleged herein occurred within the State of Colorado, and all the defendants reside in this district.

## III.   <u>PARTIES</u>

3.   The decedent, Chad Alexander Burnett, was a citizen of the United States of America and a resident of the State of Colorado. At all relevant times, Millicent Kay Spears, Mr. Burnett's aunt, was and is the personal representative of the Estate of Chad Alexander Burnett.

4.     Defendant City of Colorado Springs ("Colorado Springs") is a municipality organized under Colorado law, and is a "person" subject to suit under 42 U.S.C. § 1983. The Colorado Springs Police Department ("CSPD") is a law enforcement agency that is part of Colorado Springs.

5.     At all times relevant to the subject matter of this litigation, Colorado Springs was responsible for the oversight, supervision, discipline, and training of the officers employed by the CSPD.

6.     At all times relevant to the subject matter of this litigation, Defendants Michael Inazu, Joseph Daigle, Matthew Fleming, and Caroline Barth were citizens of the United States and residents of Colorado and were acting under color of state law in their capacity as law enforcement officers employed by the CSPD.

## IV.    <u>FACTUAL BACKGROUND</u>

### MR. BURNETT'S LIFE AND THE LOSS TO HIS COMMUNITY

7.     Mr. Burnett was born on August 16, 1970, in Ft. Collins, Colorado.

8.     Mr. Burnett was raised by his mother, Sarah Harper Burnett, and his stepfather, John Reynolds "Renny" Borchert.

9.     Mr. Burnett was diagnosed with clinical depression as a teenager, and continued to struggle with mental illness throughout his life.

10.    Despite combatting severe depression, Mr. Burnett was beloved by his family and friends. He was described by friends as having a "huge heart."

11.     Mr. Burnett's passions included cycling and hockey. Mr. Burnett spent over twenty years working as Product Manager at The Colorado Cyclist, a popular bike shop in Colorado Springs.

12.     In late 2018, Mr. Burnett moved into the home of his sick mother and stepfather to serve as their caretaker and to help around the house.

13.     Mr. Burnett's stepfather Renny died of a fatal heart attack on January 2, 2019. Mr. Burnett's mother Sarah died in her sleep the following week, on January 10, 2019.

14.     In November 2019, Mr. Burnett began his own business as a professional bicycle fit technician for high-end bicycles. Mr. Burnett was certified as a professional bicycle fit technician through the International Bike Fitting Institute.

15.     In addition to cycling, Mr. Burnett loved hockey, cooking, gardening, reading, and playing the guitar. Mr. Burnett cared for his mother's dog, Abby, until his death.

## THE HOMICIDE OF CHAD BURNETT

### CSPD Officers Enter Mr. Burnett's Home and Arrest Him Without a Warrant

16.     CSPD officers had several prior interactions with Mr. Burnett, and knew he suffered from mental illness.

17.     By April 23, 2020, the CSPD had issued a "BOLO" notice—which stands for "be on the lookout"—for Mr. Burnett's residence. The "BOLO" noted that Mr. Burnett's mental health was declining, and that he suffered from delusions.

18.     The morning of May 24, 2020, Mr. Burnett was in the throes of a mental health emergency.

19.     Around 9 o'clock in the morning, a neighbor called 911 after allegedly witnessing Mr. Burnett threaten her husband with a knife on their cul-de-sac.

20.     A few minutes later, another neighbor called 911 to report she also had seen Mr. Burnett on the street with a knife.

21.     Shortly after allegedly threatening a neighbor with a knife, Mr. Burnett returned to his house and closed the front door.

22.     Defendant CSPD Officers Joseph Daigle and Matthew Fleming arrived at Mr. Burnett's house around 10:00 a.m.

23.     Defendant CSPD Sergeant Mike Inazu arrived on the scene some twenty minutes later.

24.     For approximately 23 minutes, Sergeant Inazu and Officer Fleming attempted to speak to Mr. Burnett through his front door, repeatedly asking or ordering him to come outside. Mr. Burnett declined to leave his home.

25.     Sergeant Inazu was familiar with Mr. Burnett due to CSPD's Crisis Response Team's prior contact with Mr. Burnett. Sergeant Inazu reviewed CSPD's prior calls related to Mr. Burnett, and he was aware Mr. Burnett had a history of mental illness.

26.     Upon making contact with Mr. Burnett, Sergeant Inazu and Officer Fleming quickly recognized Mr. Burnett was experiencing a mental health crisis; Mr. Burnett was making nonsensical statements.

27.     After being unable to persuade Mr. Burnett to leave his home, Sergeant Inazu and Officer Daigle made contact with Mr. Burnett's neighbors. Sergeant Inazu was informed at this time that Mr. Burnett had been placing books in one of his neighbor's yards.

28.     While Sergeant Inazu and Officer Daigle were contacting the neighbors, Mr. Burnett made several trips into the curtilage of his home, throwing books, clothes, and other miscellaneous items into his front yard.

29.     Among the items Mr. Burnett threw into his yard was a knife, which the CSPD officers believed was the knife Mr. Burnett used to allegedly threaten his neighbors.

30.     In total, Sergeant Inazu and Officer Fleming demanded Mr. Burnett exit his home approximately 50 times over the course of the approximately hour-and-a-half-long encounter.

31.     Mr. Burnett repeatedly and unequivocally refused to exit his home while the officers were nearby.

32.     At one point, Mr. Burnett called 911, and demanded that the officers get off his property.

33.     Despite the fact the officers spent nearly two hours outside Mr. Burnett's residence, at no point did they attempt to secure a warrant for his arrest.

34.     At approximately 11:39 a.m., Officers Inazu, Fleming, and Daigle charged Mr. Burnett as he stood outside his front door, on the curtilage of his home.

35.     Mr. Burnett immediately ran back inside his home and closed the door.

7

36.     Sergeant Inazu kicked open the front door and charged into the house; Officers Fleming and Daigle followed right behind him.

37.     Mr. Burnett was unarmed when the officers followed him into his home.

38.     The officers did not give Mr. Burnett any commands until they were inside his home.

39.     Once inside his home, Sergeant Inazu and Officers Fleming and Daigle restrained Mr. Burnett in his living room and ordered him to get on the ground.

40.     Mr. Burnett offered only passive resistance; Mr. Burnett appeared confused and braced himself, but he did not swing his arms or threaten the officers.

41.     Approximately three seconds after Officers Inazu, Fleming, and Daigle entered Mr. Burnett's home, Officer Caroline Barth charged in with her taser drawn.

42.     Officer Barth had unholstered her taser before Officers Inazu, Fleming, and Daigle decided to charge Mr. Burnett.

43.     After arriving inside Mr. Burnett's home, Officer Barth immediately deployed her taser.

44.     Officer Barth did not warn Mr. Burnett prior to deploying her taser.

45.     Mr. Burnett immediately fell to the floor and began stating that he did not do anything wrong.

46.     Mr. Burnett repeatedly cried for help and asked the officers, "Why are you doing this to me?"

8

47. As the officers attempted to handcuff him, Mr. Burnett continued to passively resist by tensing his arms.

48. Although the three male officers were on top of Mr. Burnett and he was immobilized and effectively subdued, Officer Barth discharged her taser two more times on "arc" mode, again without warning.

49. Defendant Inazu encouraged Officer Barth to execute these additional taser discharges.

50. At no time after the officers pursued Mr. Burnett into his home did the officers' actions or statements indicate they believed Mr. Burnett posed a safety threat.

51. After the second round of taser deployments, the officers restrained Mr. Burnett in a prone position, and placed their weight on his back as they handcuffed him. Mr. Burnett's breathing became obviously labored.

52. At no point during the encounter did the officers discuss the possibility of involving a medical or psychiatric unit to help remove Mr. Burnett from his home.

53. The officers then attempted to carry Mr. Burnett out of his home.

54. As the officers carried Mr. Burnett through the threshold of his house, Mr. Burnett braced himself to prevent them from removing him from his home.

55. The officers forcibly removed Mr. Burnett from his house; during the struggle, Mr. Burnett was thrown face-first onto the concrete landing and began bleeding from his head.

56.     While lying face down on the concrete landing, Mr. Burnett began to say, "Please let me sit here until my . . . ." Mr. Burnett gasped for air and was unable to finish his sentence.

57.     The officers stood Mr. Burnett up and again tried to carry him to the street.

58.     Mr. Burnett fell backwards into the entryway of his home.

59.     At this time, Officer Fleming became clearly angry.

60.     While on top of Mr. Burnett, Officer Fleming shouted: "I told you to relax, didn't I? Didn't I? You didn't want to listen, did you? So now we're gonna do it our way. The easy way is over with."

61.     The laceration on Mr. Burnett's head worsened around this time.

62.     Despite the fact Mr. Burnett had been tased multiple times only moments earlier, the officers left Mr. Burnett lying prone, and Officer Fleming knelt on Mr. Burnett's back.

63.     Officers Daigle and Barth also placed weight on Mr. Burnett's neck, shoulders, and back.

64.     The officers then placed "flex cuffs" on Mr. Burnett's legs.

65.     Even though Mr. Burnett was fully restrained at this point, the officers decided to leave Mr. Burnett lying prone in his entryway until he could be further restrained with leg shackles.

66.     Meanwhile, Mr. Burnett's face was pressed onto the bunched-up fabric of the hood of his sweatshirt, and the folds of a rolled-up entryway carpet, compounding Burnett's struggle to respirate.

67.     As Mr. Burnett lay prone on the floor, dying, Sergeant Inazu commented, "I can't breathe in these stupid masks," referring to the facemasks the officers wore due to COVID-19.

68.     As he lay face down with officers putting bodyweight and pressure on his back, Mr. Burnett made gasping and moaning noises. Such noises are a clear sign of agonal breathing, an involuntary brainstem reflex caused by heart failure or respiratory arrest.

69.     Immediately after Mr. Burnett made audible sounds indicative of agonal breathing, he ceased breathing altogether and lost consciousness.

70.     Officers Fleming and Daigle immediately recognized something had changed in Mr. Burnett's behavior; the officers lifted Mr. Burnett slightly and moved his sweatshirt hood out of the way of his face, checking for signs of consciousness. The officers took no responsive action at that time.

71.     Approximately one minute after he lost consciousness, the officers discovered that Mr. Burnett had become completely unresponsive.

72.     The officers appeared unconcerned that Mr. Burnett had lost consciousness.

73.     As Mr. Burnett lay on the ground unconscious, the officers laughed and joked about how successfully Sergeant Inazu had executed the warrantless entry into Mr. Burnett's home.

74.     Officer Daigle checked Mr. Burnett's pulse and noted that he still had a pulse; Officer Daigle did not check Mr. Burnett's breathing.

75.     Officer Daigle then placed a "spit sock" over Mr. Burnett's head, despite the fact he had been recently tased multiple times and despite the fact Mr. Burnett had lost consciousness, ceased breathing, and had previously demonstrated clear signs of agonal breathing, indicative of sudden cardiac arrest and/or respiratory arrest.

76.     CSPD Officer Jacob Carrol then arrived on scene, and placed leg shackles on Mr. Burnett's obviously limp legs.

77.     A few moments later, Officer Daigle noted that he could no longer find a pulse, before noting that it was faint but present.

78.     The officers expressed their belief that Mr. Burnett might be "playing possum"—i.e., feigning death.

79.     The officers then noted that Mr. Burnett was no longer breathing.

80.     The officers waited approximately three and one-half minutes after Mr. Burnett had showed clear signs of agonal breathing, and after Mr. Burnett had stopped breathing altogether, before requesting the emergency medical response team expedite its arrival.

81.     For the next several minutes, the officers simply stood over Mr. Burnett's limp, unconscious body.

82.     As he lay dying in the entryway of his home, Sergeant Inazu told Mr. Burnett: "We're sorry this happened, but you have to listen to the police."

83.     The officers did not attempt to resuscitate Mr. Burnett until approximately eight minutes after he had demonstrated clear signs of agonal breathing and ceased respirating altogether.

84.     Throughout this episode, even after officers noted Mr. Burnett had a light or transient pulse and had ceased breathing, the officers did not remove the spit sock from Mr. Burnett's head, or move Mr. Burnett onto his back.

85.     Had they removed the spit sock from Mr. Burnett's head, the officers would have seen discoloration on Mr. Burnett's face due to lack of oxygen.

86.     Had the officers requested expedited arrival when Mr. Burnett first lost consciousness and ceased breathing, his chances of survival would have been significantly improved.

87.     Had the officers begun CPR when Mr. Burnett first lost consciousness and ceased breathing, his chances of survival would have been significantly improved.

88.     Neither the officers nor the emergency medical response team were able to resuscitate Mr. Burnett.

89.     Mr. Burnett died in the entryway of his home at around 12:00 p.m. on May 24, 2020.

90.    An autopsy performed by the El Paso County Coroner's Office states that Mr. Burnett's death was a homicide, and that he "died as a result of sudden death associated with physical altercation, taser deployment, cardiac hypertrophy with myocardial fibrosis, and bipolar disorder featuring acute psychotic episode."

## ALLEGATIONS ESTABLISHING MUNICIPAL LIABILITY

91.    The Defendant officers' entry into Mr. Burnett's home, use of excessive force, and inadequate medical care were conducted pursuant to Colorado Springs Police Department's custom, policy and/or practice of conducting warrantless home entries, using excessive force through multiple taser discharges against unarmed and non-threatening suspects, and declining to request urgent medical care or to attempt life-saving measures even after a suspect is unresponsive and not breathing.

92.    Colorado Springs has a custom, policy, and/or practice of: (1) entering a home to arrest individuals without a warrant or circumstances suggesting the suspect poses an imminent threat of harm to himself or others; (2) discharging tasers immediately and indiscriminately on unarmed, non-threatening arrestees who offer only passive resistance; and (3) declining to request emergent medical services after an arrestee has become unresponsive and ceased breathing, and making such a request and/or implementing life-saving resuscitation efforts only after an arrestee's heart has fully stopped beating.

93.    These customs, policies, and/or practices were consciously permitted, authorized, or executed by the City of Colorado Springs. They reflect an intentional

decision to choose from among various alternative courses of action and were a cause of the violations of constitutional rights described herein.

94.    Defendant Colorado Springs has a responsibility to supervise and train its employees. Colorado Springs employees unlawfully entered Mr. Burnett's home without a warrant because they believed they were executing Colorado Springs Police Department policy with respect to warrantless home searches. Subsequently, Colorado Springs employees used excessive force against Mr. Burnett, and recklessly left Mr. Burnett in a prone position after a taser had been repeatedly deployed against him and after he was already fully restrained and in handcuffs. Finally, Colorado Springs employees failed to request an expedited medical response despite clear signs that Mr. Burnett had lost consciousness and that his health was at risk. Each defendant violated Mr. Burnett's constitutional rights during this encounter because they lacked proper training and supervision.

95.    The Defendant officers received inadequate training on warrantless home entries, on examining detainees for signs of acute medical distress including agonal breathing, on proper positioning of restrained individuals, on timely calls for expedited medical response, and on when to begin appropriate lifesaving measures such as CPR.

96.    Sergeant Inazu recklessly overlooked and failed to properly counsel and supervise his officers throughout the duration of the encounter. Sergeant Inazu failed to supervise his officers to properly exercise restraint prior to pursuing Mr. Burnett into his home without a warrant, to check Mr. Burnett for signs of medical

distress, to place Mr. Burnett in an appropriate recovery position, and to call for expedited medical response after Mr. Burnett had lost consciousness.

97.     No disciplinary action was taken against any of the Defendant officers. The decision to refrain from any disciplinary action against officers who engage in unlawful conduct is part of a custom or practice of declining to discipline officers for constitutional violations. By declining to discipline Defendant officers for their unlawful actions, Colorado Springs ratified those actions. This ratification demonstrates that actions are pursuant to the City's training, and that such conduct is standard practice within the City's Police Department.

98.     The City's failure to uphold its obligation to train its officers is a root cause of its officers' unconstitutional conduct. Due to the City's failure to train and discipline its officers, similar unconstitutional acts can be expected in the future.

99.     Defendant Colorado Springs carried out an internal affairs investigation to determine whether its employees' conduct was lawful and concordant with the City's policies.

100.    During the pendency of Colorado Springs' internal affairs investigation surrounding Mr. Burnett's death, counsel for Mr. Burnett's estate specifically complained to CSPD's internal affairs division that the Defendant officers had (1) unlawfully entered Mr. Burnett's home and arrested him without a warrant, in violation of the Fourth Amendment; (2) used an unlawful and excessive degree of force to restrain Mr. Burnett; (3) violated CSPD policy by failing to use CSPD's Community Response Team in a circumstance in which an individual was clearly

experiencing a mental health crisis and posed no immediate safety threat; and (4) provided Mr. Burnett inadequate medical care by leaving Mr. Burnett handcuffed in a prone position after he was repeatedly tased, by placing a "spit sock" on his head after he had exhibited difficulty breathing, and by waiting nearly ten minutes after Mr. Burnett became unconscious to expedite an emergency medical response.

101.    CSPD's internal affairs investigation concluded that Defendant Officers had followed appropriate policy and procedures.

102.    Upon the conclusion of its internal affairs investigation, Defendant Colorado Springs explicitly affirmed that it reviewed "all aspects of this case," and that it "conducted a formal review of the entirety of the incident to ensure officers followed appropriate policy and procedures." Defendant Colorado Springs further attested that "all areas of concern" raised by Plaintiff had been thoroughly investigated and addressed.

103.    Defendant Colorado Springs' determination that the conduct of Defendants Inazu, Barth, Daigle, and Fleming with respect to Mr. Burnett did not violate any Colorado Springs policies or procedures constitutes ratification of those actions. By approving the Defendant officers' acts, Defendant Colorado Springs acknowledges that those acts were conducted pursuant to official Colorado Springs customs, policies, and/or practices.

104.    The actions approved, condoned, and ratified by Defendant Colorado Springs deprived Plaintiff of the rights, privileges, liberties, and immunities

17

secured by the Constitution of the United States of America, and resulted in Mr.

Burnett's substantial injuries and death.

## V.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fourth Amendment Unlawful Warrantless Entry
### (Against All Defendants)

105.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if set forth herein.

106.    All individual Defendants to this claim, at all relevant times hereto, were acting under color of state law in their capacities as Colorado Springs law enforcement officers.

107.    At the time of his arrest, Mr. Burnett had a clearly established right under the Fourth Amendment to the United States Constitution to be secure in his person against unreasonable intrusions into his home.

108.    Defendants Inazu, Fleming, Daigle, and Barth entered Mr. Burnett's home without permission.

109.    Defendant officers had no warrant authorizing entry into Mr. Burnett's home.

110.    No legally recognizable exigent circumstances existed which would have permitted Defendants to enter Mr. Burnett's home, and there was no valid legal justification for Defendant officers to enter Mr. Burnett's home.

111.    Defendant officers' pursuit of Mr. Burnett into his home was objectively unreasonable under the circumstances.

112.    Defendant officers' conduct violated clearly established rights belonging to Mr. Burnett of which any reasonable law enforcement officer knew or should have known.

113.    Defendants' actions, as described herein, were motivated by malice and/or involved reckless or callous indifference to Mr. Burnett's federally protected rights, and they engaged in these actions and omissions intentionally, willfully, and/or wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Mr. Burnett's constitutionally protected rights.

114.    The unlawful acts herein described were carried out pursuant to the customs, practices, policies, and/or training of the Colorado Springs Police Department.

115.    Defendant Colorado Springs has a custom, policy, and practice of accepting, condoning, ratifying, and even encouraging unlawful warrantless home entries like Defendant officers' actions here.

116.    Defendant Colorado Springs's failure to adequately train and supervise its officers with respect to warrantless entry exhibited deliberate indifference to a known and obvious risk of harm to Mr. Burnett and others.

117.    The acts or omissions of each Defendant, including the unconstitutional custom, policy, and practices described herein, were a legal and proximate cause of Plaintiff's injuries, damages, and losses.

118.    In addition, because Defendant Colorado Springs has ratified the misconduct of Defendants Inazu, Daigle, Fleming, and Barth, their misconduct is chargeable to the municipality.

119.    As a direct result of Defendants' unlawful actions described here, Mr. Burnett suffered actual physical and emotional injuries leading up to and including his death.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fourth Amendment Excessive Force**
**(Against All Defendants)**

120.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if set forth herein.

121.    All individual Defendants to this claim, at all relevant times hereto, were acting under color of state law in their capacities as Colorado Springs law enforcement officers.

122.    At the time of his arrest, Mr. Burnett had a clearly established right under the Fourth Amendment to the United States Constitution to be secure in his person against unreasonable searches and seizures, including through the use of excessive force in carrying out a seizure of his person.

123.    Defendant Barth's deployment of her taser less than one second after entering Mr. Burnett's home was objectively unreasonable under the circumstances.

124.    Defendant Barth's second and third deployments of her taser after Mr. Burnett was restrained and lying on the floor were objectively unreasonable under the circumstances.

125.    Defendant Daigle and Fleming's use of their body weight to press on Mr. Burnett while he was restrained in a position compromising his breathing, was objectively unreasonable under the circumstances.

126.    At no time during the course of the arrest did Mr. Burnett threaten officers. Mr. Burnett was unarmed throughout the course of the arrest.

127.    Despite the absence of any threat or resistance, Defendant Inazu, as supervising officer, approved and condoned Defendant Barth's second and third taser deployments.

128.    Despite the absence of any threat or resistance, Defendant Inazu participated in or, as supervising officer, approved and condoned of Defendant Daigle and Fleming's continued use of force on Mr. Burnett after he was fully restrained.

129.    Defendants Inazu, Daigle, Fleming, and Barth were either active participants or failed to intervene in the excessive use of force that was objectively unreasonable in light of the facts and circumstances surrounding them, violating Mr. Burnett's Fourth Amendment rights.

130.    Defendant officers' conduct violated clearly established rights belonging to Mr. Burnett of which any reasonable law enforcement officer knew or should have known.

131.    Defendants' actions, as described herein, were motivated by malice and/or involved reckless or callous indifference to Mr. Burnett's federally protected rights, and they engaged in these actions and omissions intentionally, willfully,

21

and/or wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Mr. Burnett's constitutionally protected rights.

132.    The unlawful acts herein described were carried out pursuant to the customs, practices, policies, and/or training of the Colorado Springs Police Department.

133.    Defendant Colorado Springs's failure to adequately train and supervise its officers with respect to warrantless entry exhibited deliberate indifference to a known and obvious risk of harm to Mr. Burnett and others.

134.    Defendant Colorado Springs has a custom, policy, and practice of accepting, condoning, ratifying, and even encouraging excessive force.

135.    The acts or omissions of each Defendant, including the unconstitutional custom, policy, and practice described herein, were a legal and proximate cause of Plaintiff's damages.

136.    In addition, because Defendant Colorado Springs has ratified the misconduct of Defendants Inazu, Daigle, Fleming, and Barth, their misconduct is chargeable to the municipality.

137.    As a direct result of Defendants' unlawful actions described here, Mr. Burnett suffered actual physical and emotional injuries leading up to and including his death.

## THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fourth Amendment Failure to Ensure Reasonable Safety and Provide Adequate Medical Care
### (Against All Defendants)

138.   Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

139.   All individual Defendants to this claim, at all relevant times hereto, were acting under color of state law in their capacities as Colorado Springs law enforcement officers.

140.   At the time of his arrest, Mr. Burnett had a clearly established right under the Fourth Amendment to the United States Constitution to be kept reasonably safe and to receive adequate medical care while in the custody of CSPD.

141.   At all times relevant to the allegations in this Complaint, Defendants were acting pursuant to a municipal custom, policy, or practice in their actions pertaining to Mr. Burnett.

142.   Defendants had notice of Mr. Burnett's life-threatening condition resulting from Defendants' use of multiple restraints, including taser discharges, against him, as well as Defendants' placement of Mr. Burnett in a prone position, and Defendants' act of placing their body weight on top of Mr. Burnett in that position.

143.   Defendants ignored obvious and substantial risks to Mr. Burnett's health as he experienced serious symptoms, such as agonal breathing and unconsciousness, stemming from Defendants' use of force.

144.    The deterioration in Mr. Burnett's condition was so obvious that any officer should have recognized it and immediately requested expedited medical response as well as immediately attempting life saving measures, including CPR.

145.    Instead, Defendant officers failed to adequately respond to Mr. Burnett's worsening condition, and senselessly continued to further restrain a limp, unconscious, and obviously dying individual, with their hands and body weight, leg shackles, and a spit sock.

146.    Defendants' acts and omissions exhibited deliberate indifference to Mr. Burnett's constitutional right not to be denied necessary medical care. Defendants' deliberate indifference extends to their failure to request an expedited medical response after Mr. Burnett showed clear and obvious symptoms of an acute medical emergency.

147.    Defendants' actions and omissions, as described herein, were motivated by malice and/or involved reckless or callous indifference to Mr. Burnett's federally protected rights, and they engaged in these actions and omissions intentionally, willfully, and/or wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Mr. Burnett's constitutionally protected rights.

148.    Defendants' actions and omissions, as described herein, were objectively unreasonable under the circumstances.

149.    The unlawful acts and omissions herein described were carried out pursuant to the customs, practices, policies, and/or training of the Colorado Springs Police Department.

150.    Defendant Colorado Springs's failure to adequately train and supervise its officers with respect to the safety and medical care of detainees—particularly detainees who have been tased and exhibit difficulty breathing—exhibited deliberate indifference to a known and obvious risk of harm to Mr. Burnett and others.

151.    Defendant Colorado Springs has a custom, policy, and practice of accepting, condoning, ratifying, and even encouraging unsafe detention practices and the inadequate provision of medical care to arrestees.

152.    The acts or omissions of each Defendant, including the unconstitutional custom, policy, and practice described herein, were a legal and proximate cause of Plaintiff's damages.

153.    In addition, because Defendant Colorado Springs has ratified the misconduct of Defendants Inazu, Daigle, Fleming, and Barth, their misconduct is chargeable to the municipality.

154.    As a direct result of Defendants' unlawful actions described here, Mr. Burnett suffered actual physical and emotional injuries leading up to and including his death.

## V.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment in its favor, and against each Defendant, for the following relief:

a.    All declaratory relief and injunctive relief, as appropriate;

b.    Actual economic damages as established at trial;

c.     Compensatory damages, including but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, medical bills, and other non-pecuniary losses;

d.     Punitive damages for all claims as allowed by law in an amount to be determined at trial;

f.     Pre-judgment and post-judgment interest at the highest lawful rate;

g.     The maximum tax-offset permitted by law;

h.     Attorneys' fees and costs; and

i.     Such further relief as justice requires, and any other relief as allowed by law.

## V.    JURY DEMAND

Plaintiff demands a jury trial on all issues so triable.

DATED this 22nd day of June 2021

RATHOD | MOHAMEDBHAI LLC

Benjamin DeGolia
Felipe Bohnet-Gomez
Siddhartha H. Rathod
2701 Lawrence Street, Suite
100 Denver, Colorado 80205
(303) 578-4400
bd@rmlawyers.com
fbg@rmlawyers.com
sr@rmlawyers.com