# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No: 21-cv-1708-KMT

ESTATE OF CHAD ALEXANDER BURNETT,

    Plaintiff,

v.

CITY OF COLORADO SPRINGS, a municipality;
SERGEANT MICHAEL INAZU, in his individual capacity;
OFFICER JOSEPH DAIGLE, in his individual capacity;
OFFICER MATTHEW FLEMING, in his individual capacity; and
OFFICER CAROLINE BARTH, in her individual capacity,

    Defendants.

## MOTION TO DISMISS

Defendants, City of Colorado Springs, ("City"), Sergeant Michael Inazu, Officer Joseph Diagle, Officer Matthew Fleming, and Officer Caroline Barth (individual officers, collectively "officers"), by and through the Office of the City Attorney, hereby move to dismiss the Complaint.

**I. Introduction**

When officers responded to two 911 calls on May 24, 2020, they were confronted with one of the most difficult situations any officer must face—an individual experiencing an acute psychotic episode acting very dangerously. They talked to Chad A. Burnett at length. They gathered facts. They acted reasonably in balancing the safety of Mr. Burnett's neighbors with the safety of Mr. Burnett. They are entitled to qualified immunity.

## II. Allegations

Around 9:00 a.m. on May 24, 2020, multiple 911 calls were made reporting an individual who was threatening his neighbors with a knife. (Doc. No. 1 [Compl.], ¶¶ 18-20) This individual was Mr. Burnett. (*Id.*, ¶¶ 19-20) Around 10:00 a.m., Officers Daigle and Fleming arrived at Mr. Burnett's house with Sgt. Inazu responding twenty minutes later. (*Id.*, ¶¶ 22-23) Over the next hour and a half, officers asked, ordered and demanded that Mr. Burnett exit his residence. (*Id.*, ¶¶ 24, 30) Mr. Burnett refused to exit. (*Id.*, ¶ 31) Unsuccessful in coaxing Mr. Burnett out of his house, officers contacted neighbors to confirm the 911 reports of Mr. Burnett's previous threats with a knife. (*Id.*, ¶ 27) While speaking with neighbors, Mr. Burnett reappeared outside his front door and began throwing various items into the yard including the knife he used to threaten his neighbors. (*Id.*, ¶¶ 28-29) Officers Inazu, Fleming, and Daigle contacted Mr. Burnett there and chased him when he turned to run inside. (*Id.*, ¶¶ 34-37)

Inside the house, Officers Inazu, Fleming and Daigle attempted to restrain Mr. Burnett and ordered him to the ground. (*Id.*, ¶ 39) Mr. Burnett ignored the officers' order and braced himself. (*Id.*, ¶ 40) Officer Barth discharged her taser which caused Mr. Burnett to fall to the floor. (*Id.*, ¶¶ 43, 45) As officers attempted to handcuff him, Mr. Burnett continued to resist by tensing his arms. (*Id.*, ¶ 47) Due to Mr. Burnett's continued resistance, Officer Barth arced her taser twice more. (*Id.*, ¶ 48) After deploying the taser, officers were finally able to place Mr. Burnett in handcuffs. (Id., ¶ 51) They then attempted to carry him out of the house (*Id.*, ¶ 53) As officers carried him out of the house, Mr. Burnett, again, braced himself on the doorframe to the front door in an effort to prevent officers from taking him to a nearby police cruiser. (*Id.*, ¶ 54) A struggle ensued where officers had to forcibly move him out of the house. (*Id.*, ¶ 55) The struggle caused Mr. Burnett to

fall onto the landing just outside the front door. (*Id.*, ¶ 55) The officers, yet again, attempted to move Mr. Burnett to a police cruiser. (*Id.*, ¶ 57) Mr. Burnett continued his resistance and flung himself backwards into the entryway of the residence (*Id.*, ¶ 58)

At this point, given Mr. Burnett's continuous resistance, officers pinned Mr. Burnett to the ground. (*Id.*, ¶ 62) Flex cuffs were placed on Mr. Burnett's legs and officers decided that leg shackles were necessary. (*Id.*, ¶¶ 64-65) Mr. Burnett lost consciousness and stopped breathing. (*Id.*, ¶¶ 69-70) Officers Fleming and Daigle immediately recognized that something had changed. (*Id.*, ¶ 70) They began checking for signs of consciousness and pushed the hood of Mr. Burnett's sweatshirt away from his face. (*Id.*) Officer Daigle checked Mr. Burnett's pulse and confirmed that he, in fact, had one. (*Id.*, ¶ 74) Shackles were placed on Mr. Burnett's legs and Officer Daigle checked Mr. Burnett, again, for a pulse and, again, found one. (*Id.*, ¶¶ 76-77) Officers expressed concern that Mr. Burnett, given his significant resistance throughout the encounter, was playing possum. (*Id.*, ¶ 78) The officers checked Mr. Burnett again and found that he was not breathing. (*Id.*, ¶ 79) Officers then requested that paramedics expedite their arrival. (*Id.*, ¶ 80) The officers attempted to resuscitate Mr. Burnett, but neither they nor the paramedics could revive him. (*Id.*, ¶¶ 83, 88) A portion of the coroner's report described Mr. Burnett's death as "sudden" and "associated with[,]" among other things, cardiac hypertrophy with myocardial fibrosis. (*Id.*, ¶ 90)

### III. Standard of Review—Fed. R. Civ. P. 12(b)(6)

The plausibility requirement "serves not only to weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success, but also to inform the defendants of the actual grounds of the claim against them." *Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008). Thus, to survive a motion to dismiss for failure to state a claim, the Complaint must

"state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Reliance on "labels and conclusions, and a formulaic recitation of the elements of a cause of action's elements will not do." *Twombly*, 550 U.S. at 545.

## IV. Argument

### A. Qualified Immunity

The officers are shielded from the warrantless entry, excessive force and failure to render medical aid claims by qualified immunity. "The qualified-immunity doctrine protects public employees from both liability and from the burdens of litigation arising from their exercise of discretion." *Cummings v. Dean*, 913 F.3d 1227, 1239 (10th Cir. 2019) (quotation marks omitted). "[W]hen [the qualified immunity] defense is raised, the onus is on the plaintiff to demonstrate '(1) that the official violated a statutory or constitutional right, *and* (2) that the right was 'clearly established' at the time of the challenged conduct.'" *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015) (quoting in part *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)) (emphasis in *Quinn*).

#### 1. Warrantless Entry

The officers did not violate clearly established law when they chased Mr. Burnett into his house. They were in hot pursuit of a felon. They are entitled to qualified immunity.

A police officer "who attempt[s] to arrest [a] felon outside [of her] home may pursue her if she takes refuge inside." *U.S. v. Aquino*, 836 F.2d 1268, 1271 (10th Cir. 1988); *see also U.S. v. Santana*, 427 U.S. 38, 43 (1976) ("[A] suspect may not defeat an arrest which has been set in motion in a public place . . . by the expedient of escaping to a private place."). Probable cause

exists "when there are 'facts and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense.'" *U.S. v. Shelton*, 817 F. App'x 629, 632–33 (10th Cir. 2020) (unpublished) (quoting in part *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975)). "[W]hen a warrantless arrest or seizure is the subject of a § 1983 action, the defendant is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to arrest or detain the plaintiff." *Cortez v. McCauley*, 478 F.3d 1108, 1120 (10th Cir. 2007). An "officers' reasonable suspicion ripen[s] into more than sufficient probable cause when [a] defendant, who the officers already reasonably suspected of a crime, r[uns] away from the officers." *Shelton*, 817 F. App'x at 633 (internal quotation marks omitted). "Hot pursuit occurs when an officer is in 'immediate or continuous pursuit' of a suspect from the scene of a crime." *U.S. v. Cruz*, 977 F.3d 998, 1009 (10th Cir. 2020), *cert. denied,* 209 L. Ed. 2d 537 (Apr. 5, 2021).

Here, Mr. Burnett was suspected of committing felony menacing when he turned to run into his house in an effort to flee officers and thwart his arrest. *See* C.R.S. § 18-3-206. Before officers gave chase, two 911 calls had been placed—one where a neighbor reported witnessing Mr. Burnett threaten the caller's husband with a knife in their cul-de-sac (Compl., ¶ 19) and another by a second neighbor reporting seeing Mr. Burnett in the street with a knife (*Id.*, ¶ 20). While on scene, officers discovered that Mr. Burnett had thrown the knife into his yard "which the CSPD officers believed was the knife Mr. Burnett used to allegedly threaten his neighbors" (*Id.*, ¶ 29). Prior to giving chase, officers asked, and Mr. Burnett refused, to exit his house roughly fifty times over an hour and a half (*Id.*, ¶ 30). When officers finally approached Mr. Burnett, he fled into his house (*Id.*, ¶¶ 34-35). In light of these circumstances, officers had the authority to pursue Mr.

Burnett into his house to arrest him. Officers had probable cause, or at a minimum arguable probable cause, to arrest Mr. Burnett for a felony and were in hot pursuit of him when they entered his house to make an arrest. As such, qualified immunity shields them from the warrantless entry claim.

### 2. Excessive Force Involving a Taser

Officer Barth acted reasonably and was not on notice that her conduct could possibly be unlawful when she tased Mr. Burnett.[1] Thus, she is entitled to qualified immunity.

"Excessive force claims are governed by the Fourth Amendment's 'objective reasonableness' standard." *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 664 (10th Cir. 2010). "Reasonableness is evaluated under a totality of the circumstances approach which requires that [the court] consider[s] the following factors: 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Weigel v. Broad*, 544 F.3d 1143, 1151–52 (10th Cir. 2008) (quoting in part *Graham v. Conner*, 490 U.S. 386, 396 (1989)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "Furthermore, officers are not required to use alternative, less intrusive means if their conduct is objectively reasonable." *Jiron v. City of Lakewood*, 392 F.3d 410, 414 (10th Cir. 2004).

---

[1] Although the claim is asserted against all defendants, the Complaint alleges that only Officer Barth used a taser. The Complaint makes cursory reference to the participation of other officers and their failure to intervene. (Compl., ¶ 129) These conclusory allegations are insufficient to state a claim against the other officers.

6

Here, officers were seeking to arrest Mr. Burnett for felony menacing with a knife when he continually and actively evaded arrest. Not only had Mr. Burnett, one, refused to surrender in the preceding hour and a half and, two, sprinted into the house when officers approached, he then "braced himself" after entering the residence and refused a lawful order to place himself on the ground. (Compl., ¶¶ 30, 35, 39-40). After the first taser deployment, Mr. Burnett continued to resist by tensing his arms while officers attempted to handcuff him. (*Id.*, ¶ 47). Unable to restrain him even with "three male officers . . . on top of Mr. Burnett[,]" Officer Barth "discharged her taser two more times on 'arc' mode . . . ." (*Id.*, ¶ 48). Only "[a]fter the second round of taser deployments" did "the officers [restrain] Mr. Burnett in a prone position . . . [and] handcuff[ ] him." (*Id.*, ¶ 51). Even after being handcuffed, Mr. Burnett continued to "struggle" with four officers as they "attempted to carry [him] out of his home." (*Id.*, ¶¶ 53, 55) Mr. Burnett "braced himself to prevent them from removing him from his home." (*Id.*, ¶ 54). After falling on the landing just outside the front door, Mr. Burnett flung himself "backwards into the entryway of his home." (*Id.*, ¶ 58).

There is no reason to believe a lesser use of force—such as verbal commands—would have resulted in compliance. As demonstrated by the Complaint, Mr. Burnett first avoided and then resisted arrest at every turn. Moreover, officers "recognized Mr. Burnett was experiencing a mental health crisis" (*Id.*, ¶ 26; *see also Id.*, ¶ 18) and may have known of a BOLO that noted "Mr. Burnett's mental health was declining, and that he suffered from delusions" (*Id.*, ¶ 17). Mr. Burnett was "making nonsensical statements" (*Id.*, ¶ 26) and "called 911, and demanded that the officers get off his property" (*Id.*, ¶ 32). Thus, providing a warning was impractical and unnecessary.

The number of taser deployments was also reasonable. It was Mr. Burnett's noncompliance with an order to place himself on the ground which prompted Officer Barth to first use her taser. (*Id.*, ¶ 39) After Officer Barth's taser deployment, Mr. Burnett continued to resist "by tensing his arms" while officers attempted to handcuff him. (*Id.*, ¶ 47). As officers continued to struggle with Mr. Burnett, Officer Barth deployed her taser twice more in arc mode. (*Id.*, ¶ 48). It was only after the subsequent uses of the taser that officers were able to handcuff Mr. Burnett. (*Id.*, ¶ 51). Even then, Mr. Burnett continued to fight with officers and "braced himself to prevent them from moving him from his home." (*Id.*, ¶ 54). Thus, the use of the taser, under the particular circumstances here, was reasonable.

Additionally, no factually analogous case puts Officer Barth on notice that use of the taser in these circumstances violated the constitution. The clearly established inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015). In the Tenth Circuit, it may be clearly established that

> the use of disproportionate force to arrest an individual who is not suspected of committing a serious crime and who poses no threat to others constitutes excessive force. … [I]t is likewise clearly established that officers may not continue to use force against a suspect who is effectively subdued.

*Perea v. Baca*, 817 F.3d 1198, 1204 (10th Cir. 2016) (internal citations omitted). Neither of these principles establish the law in the circumstances here. The allegations in the Complaint reflect that the officers had probable cause to arrest Mr. Burnett for a felony involving threats with a knife, an undoubtedly serious crime. As officers attempted to arrest him for this felony, Mr. Burnett first fled then resisted both before and after he was placed in handcuffs. Thus, *Perea* does not put Officer Barth on notice. *See White v. Pauly*, — U.S. —, 137 S. Ct. 548, 552 (2017) ("[C]learly established law must be 'particularized' to the facts of the case."). If anything, the law in the Tenth

8

Circuit indicates that the use of the taser was reasonable. *See Hinton v. City of Elwood*, 997 F.2d 774, 781 (10th Cir. 1993). Thus, the circumstances laid out in the Complaint "however viewed . . . do not *clearly* indicate [the officer's] conduct was unlawful. And to know that much is to know [the Court] must grant qualified immunity." *Wilson v. City of Lafayette*, 510 F. App'x 775, 779 (10th Cir. 2013) (unpublished) (Gorsuch, J.) (emphasis in original).

### 3. Medical Care

The officers monitored Mr. Burnett appropriately while he was in their custody[2] and were not deliberately indifferent to a serious medical need.

"A claim for inadequate medical attention will be successful if the plaintiff shows 'deliberate indifference to serious medical needs.'" *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (quoting in part *Estate of Hocker v. Walsh*, 22 F.3d 995, 998 (10th Cir. 1994)). "The Supreme Court has established a two-pronged test for deliberate indifference claims. Under this test, a plaintiff must satisfy an objective prong and a subjective prong. The objective prong concerns the severity of a plaintiff's need for medical care; the subjective prong concerns the defendant's state of mind." *Rife v. Oklahoma Dep't of Pub. Safety*, 854 F.3d 637, 647 (10th Cir. 2017). "The objective component of the test is met if the harm suffered rises to a level sufficiently serious to be cognizable under the Cruel and Unusual Punishment Clause of the Eighth Amendment." *Beggs*, 563 F.3d at 1088. "To prevail on the subjective component, the prisoner must show that the defendants knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th

---

[2] Plaintiff brings a Fourth Amendment claim. It appears the Fourteenth Amendment is the appropriate vehicle to bring the medical care claim. *See Beggs*, *supra*.

Cir. 2006) (internal quotation marks omitted); *see also Strain v. Regalado*, 977 F.3d 984, 992 (10th Cir. 2020) ("[D]eliberate indifference requires an official to subjectively disregard a known or obvious, serious medical need."). However, "'an inadvertent failure to provide adequate medical care' does not rise to a constitutional violation." <u>Beggs</u>, 563 F.3d at 1088 (quoting in part *Estelle v. Gamble*, 429 U.S. 104, 105-06 (1976)). The Complaint does not sufficiently allege the officers knew Mr. Burnett faced a substantial risk of harm and disregarded it.

The Complaint alleges that Mr. Burnett died of "sudden death associated with physical altercation, taser deployment, cardiac hypertrophy with myocardial fibrosis, and bipolar disorder featuring acute psychotic episode." (Compl., ¶ 90). The Complaint alleges that while Mr. Burnett was handcuffed, officers did not remove a spit sock in a timely manner, failed to call paramedics and begin CPR quickly enough despite "gasping and moaning noises" coming from Mr. Burnett. (*Id.*, ¶¶ 68, 85-87).

First, the Complaint does not allege that the officers were aware that Mr. Burnett suffered from cardiac hypertrophy with myocardial fibrosis or that the officers caused the condition. *See Beggs*, 563 F.3d at 1090 (discussing the necessity of awareness the specific underlying serious medical condition and finding awareness of acute intoxication is not awareness of a heart attack and death). Mr. Burnett is not alleged to have complained of a heart condition, chest pain or any other medical condition before his "sudden" death. (*Id.*, ¶ 90). Second, the Complaint alleges the officers repeatedly checked Mr. Burnett's vital signs. When Mr. Burnett lost consciousness, Officers Fleming and Daigle "immediately recognized something had changed in Mr. Burnett's behavior . . . [and] lifted Mr. Burnett slightly and moved his sweatshirt hood out of the way of his face, *checking for signs of consciousness*." (*Id.*, ¶ 70) (emphasis added). Then "Officer Daigle

checked Mr. Burnett's pulse and noted that he still had a pulse . . . ." (*Id.*, ¶ 74). "A few moments" after another officer arrived on scene and placed leg shackles on Mr. Burnett, "Officer Daigle noted that he could no longer find a pulse, before noting that it was faint but present." (*Id.*, ¶ 77). After confirming that Mr. Burnett had a pulse and was breathing, officers grew concerned that Mr. Burnett, who was vigorously resisting officers minutes before, was "playing possum," i.e., lying still in hopes that officers would let their guard down. (*Id.*, ¶ 78). The officers checked Mr. Burnett again because they "then noted that Mr. Burnett was no longer breathing."[3] (*Id.*, ¶ 79).

In sum, in the first three and a half minutes after Mr. Burnett lost consciousness (*Id.*, ¶ 80), Officer Daigle and "the officers" checked to see if Mr. Burnett had a pulse or was breathing four times. (*Id.*, ¶¶ 70, 74, 77, 79). The officers then asked the previously requested "emergency medical response team" to "expedite its arrival." (*Id.*, ¶ 80). Four and a half minutes after requesting that paramedics accelerate their response, officers began performing CPR. (*Id.*, ¶ 84).

Further, the law is not clearly established that the officers' conduct, here, would violate Mr. Burnett's rights. Defining clearly established law "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Hagen*, 543 U.S. 194, 198 (2004) (*per curiam*). The circumstances described by the Complaint stand in contrast to those set forth in *Estate of Booker v. Gomez*, 745 F.3d 405 (10th Cir. 2014). In *Estate of Booker*, a suit arising from a death caused by positional asphyxiation, the Tenth Circuit held "any reasonable

---

[3] Two inferences can be drawn from this allegation. First, Mr. Burnett was breathing up and until that moment since he "was no longer breathing." Second, the Complaint makes no mention that officers lost Mr. Burnett's pulse—which they were actively monitoring—at this time. The Complaint does not state when Mr. Burnett's pulse was lost. Thus, the officers did not refuse "to verify underlying facts that [they] strongly suspected to be true, or declined to confirm inferences of risk that [they] strongly suspected to exist." *Mata v. Saiz*, 427 F.3d 745, 752 (10th Cir. 2005) (quoting *Farmer v. Brennan*, 511 U.S. 825, 843 n. 8 (1994)).

11

officer in the Defendants' position (and with their training) would have known that failing to check Mr. Booker's vital signs, perform CPR, or seek medical care for three minutes when he was limp and unconscious as a result of the Defendants' use of force could violate the Constitution." *Id.* at 434. Here, the officers not only continuously checked for vital signs, but called for medical care twice in the first three and a half minutes after Mr. Burnett lost consciousness. Thus, the officers were not deliberately indifferent to Mr. Burnett's medical condition and were not on notice of the potentially violative nature of their conduct. As such, the claim alleging inadequate medical care should be dismissed.

**B. *Monell* Liability**

The Complaint does little more than allege municipal liability in conclusory terms. *See Griego v. City of Albuquerque*, 100 F. Supp. 3d 1192, 1213 (D.N.M. 2015) ("[A]t the pleading stage, the existence of a *Monell* policy is a 'conclusion' to be built up to, rather than a 'fact' to be baldly asserted."). The allegations are insufficient to a state a claim against the City.

The Complaint does not allege a particular policy was unlawful. It does not allege a series of incidents supporting a persistent and widespread practice. *See Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010) (When an unlawful custom is alleged, Plaintiff must show that it "amounts to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law." (internal quotation marks omitted)). The Complaint does not provide any factual allegations related to any supervision and training. *See Carr v. Castle*, 337 F.3d 1221, 1228 (10th Cir. 2003) (In order to allege a failure to train, a plaintiff must, first, show "the training was in fact inadequate."). The ratification theory set forth in the Complaint based on

the internal affairs investigation into the events does not allege the involvement of a policymaker and suffers a temporal problem since it happened after the alleged injury. *See Dempsey v. City of Baldwin*, 143 F. App'x 976, 986 (10th Cir. 2005) ("The final policymaker must not only approve the decision, but also adopt the basis for the decision, and the ratification must be the moving force, or cause, of the alleged constitutional violation."). Because the municipal liability claim is no more than multiple naked assertions lacking factual detail, they are insufficient to state a claim against the City. *See Soto for estate of Jimenez v. Bd. of Cty. Commissioners of Caddo Cty., Okla.*, 748 F. App'x 790, 794 (10th Cir. 2018) (Noting the "well-established Tenth Circuit precedent holding a § 1983 municipal liability claim must include factual allegations that a particular municipal custom or policy was the moving force behind the constitutional injury in order to withstand a Rule 12(b)(6) dismissal."). As such, the municipal liability claim should be dismissed.

WHEREFORE, for the foregoing reasons, Defendants respectfully request that this Honorable Court enter an order dismissing the Complaint with prejudice, and for any other relief this Court deems appropriate.

Respectfully submitted this <u>30th</u> day of <u>August</u>, 2021.

OFFICE OF THE CITY ATTORNEY
Wynetta P. Massey, City Attorney

*/s/ W. Erik Lamphere*
W. Erik Lamphere, Division Chief - Litigation
30 S. Nevada Ave., Suite 501
Colorado Springs, Colorado 80903
Telephone: (719) 385-5909
Facsimile: (719) 385-5535
erik.lamphere@coloradosprings.gov

<b><u>CERTIFICATE OF SERVICE (CM/ECF)</u></b>

I hereby certify that on the <u>30th</u> day of <u>August</u>, 2021, I electronically filed the foregoing **MOTION TO DISMISS** with the Clerk of the Court using the CM/ECF system which will send notification of such filing. I further certify that a true and correct copy of the same was mailed to the following party via U.S. Mail, postage pre-paid, addressed as follows:

Benjamin DeGolia (bd@rmlawyers.com)
Felipe Bohnet-Gomez (fbg@rmlawyers.com)
Siddhartha H. Rathod (sr@rmlawyers.com)
*Attorneys for Plaintiff*

<u>*/s/Donnielle Davis*</u>
Donnielle Davis