## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-01708-WJM-KMT

ESTATE OF CHAD ALEXANDER BURNETT;

      Plaintiff,

v.

CITY OF COLORADO SPRINGS, a municipality;
SERGEANT MICHAEL INAZU, in his individual capacity;
OFFICER JOSEPH DAIGLE, in his individual capacity;
OFFICER MATTHEW FLEMING, in his individual capacity; and
OFFICER CAROLINE BARTH, in her individual capacity;

      Defendants.

---

## FIRST AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiff, by and through its attorneys Siddhartha H. Rathod, Felipe Bohnet-Gomez, and Benjamin DeGolia of RATHOD | MOHAMEDBHAI LLC, alleges as follows:

## I.    INTRODUCTION

This case involves a story that is becoming all too familiar in Colorado and across the Nation: Police respond to a 911 call about an individual experiencing a mental health crisis; instead of involving a crisis intervention team, police respond with force; and instead of receiving psychiatric treatment, the individual is killed. The officers' actions in this case not only resulted in tragedy, however—they were also clearly unlawful. On May 24, 2020, Colorado Springs Police Department Sergeant Michael Inazu and Officers Joseph Daigle, Matthew Fleming, and Caroline

1

Barth entered the home of Chad Burnett without a warrant, and absent circumstances giving rise to an exception to the warrant requirement. Three of the officers immediately restrained Mr. Burnett, who was unarmed, in his living room. The fourth officer, Caroline Barth—who had been instructed to use her taser long before the arrest was initiated—charged into the house seconds later. Although Mr. Burnett was already restrained by the other three officers and offered only passive resistance, Officer Barth immediately discharged her taser into Mr. Burnett's abdomen. Less than sixty seconds later, as Mr. Burnett lay on the ground clearly in severe distress as he asked the officers to "just kill me now," Officer Barth discharged her taser twice more in rapid succession.

Two minutes later, as officers were removing Mr. Burnett from his home, Mr. Burnett braced himself and fell backwards through the doorway, back into the house. Officer Daigle flipped Mr. Burnett onto his stomach and got on top of him. Plainly angered by the situation, Officer Daigle shouted, "I told you to relax, didn't I? Didn't I? You didn't want to listen, did you?" Officer Daigle told Mr. Burnett as he knelt on his back: "Now we're going to do it our way. The easy way is over with."

Moments later, Mr. Burnett lost consciousness and stopped breathing. Despite these clear signs of a medical emergency, the officers failed to take appropriate responsive action; instead, they placed a spit sock over his head, further exacerbating his respiratory distress. Officers waited several minutes after Mr. Burnett had lost consciousness and ceased breathing before requesting emergent medical response.

Officers let Mr. Burnett lie dying for an additional five minutes before initiating CPR, well after it was obvious that he was experiencing a serious deterioration in his health. Those minutes were the difference between life and death for Mr. Burnett.

Mr. Burnett's death was wholly avoidable. If officers had acted appropriately, within the bounds of the law, he would still be alive today. Instead, officers unlawfully entered his home, employed force far in excess of what was necessary or constitutionally permitted, and then consciously disregarded clear signs of a medical emergency, standing by as Mr. Burnett, limp and unconscious, died on his living room floor.

## II.   **JURISDICTION**

1.     This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331. Jurisdiction supporting Plaintiff's claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988.

2.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All the events and omissions alleged herein occurred within the State of Colorado, and all the defendants reside in this district.

## III.   **PARTIES**

3.     The decedent, Chad Alexander Burnett, was a citizen of the United States of America and a resident of the State of Colorado. At all relevant times,

Millicent Kay Spears, Mr. Burnett's aunt, was and is the personal representative of the Estate of Chad Alexander Burnett.

4. Defendant City of Colorado Springs ("Colorado Springs") is a municipality organized under Colorado law and is a "person" subject to suit under 42 U.S.C. § 1983. The Colorado Springs Police Department ("CSPD") is a law enforcement agency that is part of Colorado Springs.

5. At all times relevant to the subject matter of this litigation, Colorado Springs was responsible for the oversight, supervision, discipline, and training of the officers employed by the CSPD.

6. At all times relevant to the subject matter of this litigation, Defendants Michael Inazu, Joseph Daigle, Matthew Fleming, and Caroline Barth were citizens of the United States and residents of Colorado and were acting under color of state law in their capacity as law enforcement officers employed by the CSPD.

## IV. FACTUAL BACKGROUND

### MR. BURNETT'S LIFE AND THE LOSS TO HIS COMMUNITY

7. Mr. Burnett was born on August 16, 1970, in Ft. Collins, Colorado.

8. Mr. Burnett was raised by his mother, Sarah Harper Burnett, and his stepfather, John Reynolds "Renny" Borchert.

9. Mr. Burnett was diagnosed with clinical depression as a teenager and continued to struggle with mental illness throughout his life. Mr. Burnett's mental illnesses substantially limited him in several major life activities, including but not

limited to mentally processing current events, thinking, learning, concentrating, comprehending, interacting with others, sleeping, and effectively coping with anxiety and stress.

10. Despite combatting severe depression, Mr. Burnett was beloved by his family and friends. He was described by friends as having a "huge heart."

11. Mr. Burnett's passions included cycling and hockey. Mr. Burnett spent over twenty years working as Product Manager at The Colorado Cyclist, a popular bike shop in Colorado Springs.

12. In late 2018, Mr. Burnett moved into the home of his sick mother and stepfather to serve as their caretaker and to help around the house.

13. Mr. Burnett's stepfather Renny died of a fatal heart attack on January 2, 2019. Mr. Burnett's mother Sarah died in her sleep the following week, on January 10, 2019.

14. In November 2019, Mr. Burnett began his own business as a professional bicycle fit technician for high-end bicycles. Mr. Burnett was certified as a professional bicycle fit technician through the International Bike Fitting Institute.

15. In addition to cycling, Mr. Burnett loved hockey, cooking, gardening, reading, and playing the guitar. Mr. Burnett cared for his mother's dog, Abby, until his death.

## THE HOMICIDE OF CHAD BURNETT

### CSPD Officers Enter Mr. Burnett's Home and Arrest Him Without a Warrant

16.     CSPD officers had several prior interactions with Mr. Burnett, and knew he suffered from mental illness.

17.     By April 23, 2020, the CSPD had issued a "BOLO" notice—which stands for "be on the lookout"—for Mr. Burnett's residence. The "BOLO" noted that Mr. Burnett's mental health was declining, and that he suffered from delusions.

18.     The morning of May 24, 2020, Mr. Burnett was in the throes of a mental health emergency.

19.     Around 9 o'clock in the morning, a neighbor called 911 after allegedly witnessing Mr. Burnett threaten her husband with a knife on their cul-de-sac.

20.     A few minutes later, another neighbor called 911 to report she also had seen Mr. Burnett on the street with a knife.

21.     Both neighbors reported that Mr. Burnett had well-known mental health struggles.

22.     Shortly after allegedly threatening a neighbor with a knife, Mr. Burnett returned to his house and closed the front door.

23.     Defendant CSPD Officers Joseph Daigle and Matthew Fleming arrived at Mr. Burnett's house around 10:00 a.m.

24.     Defendant CSPD Sergeant Mike Inazu arrived on the scene some twenty minutes later.

25.     For approximately 23 minutes, Sergeant Inazu and Officer Fleming attempted to speak to Mr. Burnett through his front door, repeatedly asking or ordering him to come outside. Mr. Burnett declined to leave his home.

26.     Sergeant Inazu was familiar with Mr. Burnett due to CSPD's Crisis Response Team's prior contact with Mr. Burnett. Sergeant Inazu reviewed CSPD's prior calls related to Mr. Burnett, and he was aware Mr. Burnett had a history of mental illness.

27.     Upon making contact with Mr. Burnett, Sergeant Inazu and Officer Fleming quickly recognized Mr. Burnett was experiencing a mental health crisis; Mr. Burnett was making nonsensical statements.

28.     Sergeant Inazu and Officer Fleming did not call mental health services. Instead, they ignored Mr. Burnett's obvious mental health crisis and attempted to order him out of his home, against his will.

29.     After being unable to persuade Mr. Burnett to leave his home, Sergeant Inazu and Officer Daigle made contact with Mr. Burnett's neighbors. Sergeant Inazu was informed at this time that Mr. Burnett had been placing books in one of his neighbor's yards.

30.     While Sergeant Inazu and Officer Daigle were contacting the neighbors, Mr. Burnett made several trips into the curtilage of his home, throwing books, clothes, and other miscellaneous items into his front yard.

31.     Among the items Mr. Burnett threw into his yard was a knife, which the CSPD officers believed was the knife Mr. Burnett used to allegedly threaten his neighbors.

32.     In total, Sergeant Inazu and Officer Fleming demanded Mr. Burnett exit his home approximately 50 times over the course of the approximately hour-and-a-half-long encounter.

33.     Mr. Burnett repeatedly and unequivocally refused to exit his home while the officers were nearby.

34.     At one point, Mr. Burnett called 911, and demanded that the officers get off his property.

35.     Despite the fact the officers spent nearly two hours outside Mr. Burnett's residence, at no point did they attempt to secure a warrant for his arrest.

36.     No officer, including supervisor Sergeant Inazu, called for backup from people with more experience in crisis intervention with respect to people exhibiting mental distress, such as members from the Crisis Intervention Team.

37.     Mr. Burnett eventually stood at his front door, on the curtilage of his home, peacefully speaking to the officers but specifically instructed the officers to stop and not come on his property.

38.     As Mr. Burnett continued to speak to the officers, Sergeant Inazu asked Officers Daigle and Burnett if they "were ready," to which they responded in the affirmative.

8

39.     Sergeant Inazu then informed Officers Daigle and Burnett that he was "going to go."

40.     Immediately thereafter, at approximately 11:39 a.m., Officers Inazu, Fleming, and Daigle charged Mr. Burnett as he stood outside his front door, on the curtilage of his home. The Defendant Officers' conduct recklessly and unnecessarily created a hostile situation.

41.     Mr. Burnett immediately ran back inside his home and closed the door.

42.     Sergeant Inazu kicked open the front door and charged into the house; Officers Fleming and Daigle followed right behind him.

43.     There was no need to rush Mr. Burnett in an aggressive and threatening manner, particularly when these officers new Mr. Burnett was experiencing mental health distress.

44.     Mr. Burnett was unarmed when the officers followed him into his home.

45.     The officers did not give Mr. Burnett any commands until they were inside his home.

46.     Once inside his home, Sergeant Inazu and Officers Fleming and Daigle restrained Mr. Burnett in his living room and ordered him to get on the ground.

47.     Mr. Burnett offered only passive resistance; Mr. Burnett appeared confused, but he did not swing his arms or threaten the officers.

48.     Approximately three seconds after Officers Inazu, Fleming, and Daigle entered Mr. Burnett's home, Officer Caroline Barth charged in with her taser drawn.

49.     Officer Barth had unholstered her taser outside before Officers Inazu, Fleming, and Daigle decided to charge Mr. Burnett.

50.     While running across Mr. Burnett's yard, Officer Barth held her taser in front of her in ready position with her finger on the trigger.

51.     After arriving inside Mr. Burnett's home, Officer Barth immediately deployed her taser.

52.     Officer Barth did not warn Mr. Burnett prior to deploying her taser.

53.     Officer Barth did not make any attempts to use any alternative, less intrusive means before deploying her taser.

54.     Mr. Burnett immediately fell to the floor and began stating that he did not do anything wrong.

55.     Mr. Burnett repeatedly cried for help and asked the officers, "Why are you doing this to me?"

56.     Although the three male officers were on top of Mr. Burnett and he was immobilized and effectively subdued, Officer Barth discharged her taser two more times on "arc" mode, again without warning.

57.     Defendant Inazu encouraged Officer Barth to execute these additional taser discharges.

58.     At no time after the officers pursued Mr. Burnett into his home did the officers' actions or statements indicate they believed Mr. Burnett posed a safety threat.

59.     After the second round of taser deployments, the officers restrained Mr. Burnett in a prone position, and placed their weight on his back as they handcuffed him. Mr. Burnett's breathing became obviously labored.

60.     At no point during the encounter did the officers discuss the possibility of involving a medical or psychiatric unit to help remove Mr. Burnett from his home.

61.     The officers then attempted to carry Mr. Burnett out of his home.

62.     The officers forcibly removed Mr. Burnett from his house; during the struggle, Mr. Burnett was thrown face-first onto the concrete landing and began bleeding from his head.

63.     While lying face down on the concrete landing, Mr. Burnett began to say, "Please let me sit here until my . . . ." Mr. Burnett gasped for air and was unable to finish his sentence.

64.     The officers stood Mr. Burnett up and again tried to carry him to the street.

65.     Mr. Burnett fell backwards into the entryway of his home.

66.     At this time, Officer Fleming became clearly angry.

67.     While on top of Mr. Burnett, Officer Fleming shouted: "I told you to relax, didn't I? Didn't I? You didn't want to listen, did you? So now we're gonna do it our way. The easy way is over with."

68.     The laceration on Mr. Burnett's head worsened around this time.

69.     Despite the fact Mr. Burnett had been tased multiple times only moments earlier, the officers left Mr. Burnett lying prone, and Officer Fleming knelt on Mr. Burnett's back.

70.     Officers Daigle and Barth also placed weight on Mr. Burnett's neck, shoulders, and back. Defendant officers exceeded constitutional limitations on the use of force by using excessive force on a man they knew to be experiencing a mental health crisis.

71.     Defendants failed to reasonably accommodate Mr. Burnett by failing to employ tactics that would have been more likely to resolve the situation without resulting in Mr. Burnett's death, such as calling trained mental health professionals or using de-escalation techniques.

72.     Defendant officers denied Mr. Burnett the proper police protection and fair treatment he was required to receive on the basis of his mental health.

73.     The officers then placed "flex cuffs" on Mr. Burnett's legs.

74.     Even though Mr. Burnett was fully restrained at this point, the officers decided to leave Mr. Burnett lying prone in his entryway until he could be further restrained with leg shackles.

75.     Meanwhile, Mr. Burnett's face was pressed onto the bunched-up fabric of the hood of his sweatshirt, and the folds of a rolled-up entryway carpet, compounding Burnett's struggle to respirate.

76.     As Mr. Burnett lay prone on the floor, dying, Sergeant Inazu commented, "I can't breathe in these stupid masks," referring to the facemasks the officers wore due to COVID-19.

77.     As he lay face down with officers putting bodyweight and pressure on his back, Mr. Burnett made gasping and moaning noises. Such noises are a clear sign of agonal breathing, an involuntary brainstem reflex caused by heart failure or respiratory arrest.

78.     Immediately after Mr. Burnett made audible sounds indicative of agonal breathing, he ceased breathing altogether and lost consciousness.

79.     After Mr. Burnett laid motionless for minutes, Officers Fleming and Daigle recognized something had changed in Mr. Burnett's behavior; the officers lifted Mr. Burnett slightly and moved his sweatshirt hood out of the way of his face, checking for signs of consciousness. The officers took no responsive action at that time.

80.     Approximately one minute after he lost consciousness, the officers discovered that Mr. Burnett had become completely unresponsive.

81.     The officers appeared unconcerned that Mr. Burnett had lost consciousness.

82.     As Mr. Burnett lay on the ground unconscious, the officers laughed and joked about how successfully Sergeant Inazu had executed the warrantless entry into Mr. Burnett's home.

83.   Officer Daigle checked Mr. Burnett's pulse and noted that he still had a pulse; Officer Daigle did not check Mr. Burnett's breathing.

84.   Officer Daigle then placed a "spit sock" over Mr. Burnett's head, despite the fact he had been recently tased multiple times and despite the fact Mr. Burnett had lost consciousness, ceased breathing, and had previously demonstrated clear signs of agonal breathing, indicative of sudden cardiac arrest and/or respiratory arrest.

85.   CSPD Officer Jacob Carrol then arrived on scene, and placed leg shackles on Mr. Burnett's obviously limp legs.

86.   As he shackled Mr. Burnett's legs, Officer Carrol asked Officers Daigle and Fleming how Mr. Burnett's breathing was.

87.   A few moments later, Officer Daigle noted that he could no longer find a pulse, before noting that it was faint but present.

88.   The officers expressed their belief that Mr. Burnett might be "playing possum"—i.e., feigning death.

89.   The officers then noted that Mr. Burnett was no longer breathing.

90.   The officers waited approximately three and one-half minutes after Mr. Burnett had showed clear signs of agonal breathing, and after Mr. Burnett had stopped breathing altogether, before requesting the emergency medical response team expedite its arrival.

91.     For the next several minutes, the officers simply stood over Mr. Burnett's limp, unconscious body.

92.     Officer Carrol indicated he was not concerned about Mr. Burnett's breathing so long as the officers saw Mr. Burnett's chest rise and fall. Officer Carrol informed the other officers Mr. Burnett needed a good, strong pulse and solid respiration.

93.     The officers acknowledged not seeing Mr. Burnett's chest rise and fall, indicating he was not breathing. The officers only checked Mr. Burnett's pulse, which was difficult to find and reportedly light.

94.     The officers also acknowledged that Mr. Burnett's pupils were dilated and would not constrict with light.

95.     As he lay dying in the entryway of his home, Sergeant Inazu told Mr. Burnett: "We're sorry this happened, but you have to listen to the police."

96.     The officers did not attempt to resuscitate Mr. Burnett until approximately eight minutes after he had demonstrated clear signs of agonal breathing and ceased respirating altogether.

97.     Throughout this episode, even after officers noted Mr. Burnett had a light or transient pulse and had ceased breathing, the officers did not remove the spit sock from Mr. Burnett's head or move Mr. Burnett onto his back.

98.     Had they removed the spit sock from Mr. Burnett's head, the officers would have seen discoloration on Mr. Burnett's face due to lack of oxygen.

99.    Had the officers requested expedited arrival when Mr. Burnett first lost consciousness and ceased breathing, his chances of survival would have been significantly improved.

100.    Had the officers begun CPR when Mr. Burnett first lost consciousness and ceased breathing, his chances of survival would have been significantly improved.

101.    The officers were aware, or should have been aware, that a person who has a physical encounter with multiple officers, as Mr. Burnett did, are at an increased risk of sudden death. Indeed, officer Carrol expressed concern that Mr. Burnett might experience delirium.

102.    Neither the officers nor the emergency medical response team were able to resuscitate Mr. Burnett.

103.    Mr. Burnett died in the entryway of his home at around 12:00 p.m. on May 24, 2020.

104.    Mr. Burnett's death was a homicide, caused by the force used by Defendants, and their failure to provide adequate medical care, as alleged herein.

## ALLEGATIONS ESTABLISHING MUNICIPAL LIABILITY

105.    The Defendant officers' entry into Mr. Burnett's home, use of excessive force, and inadequate medical care were conducted pursuant to Colorado Springs Police Department's custom, policy and/or practice of conducting warrantless home entries, using excessive force through multiple taser discharges against unarmed and

non-threatening suspects, and declining to request urgent medical care or to attempt life-saving measures even after a suspect is unresponsive and not breathing.

106.    Colorado Springs has a custom, policy, and/or practice of: (1) entering a home to arrest individuals without a warrant or circumstances suggesting the suspect poses an imminent threat of harm to himself or others; (2) discharging tasers immediately and indiscriminately on unarmed, non-threatening arrestees who offer only passive resistance; and (3) declining to request emergent medical services after an arrestee has become unresponsive and ceased breathing, and making such a request and/or implementing life-saving resuscitation efforts only after an arrestee's heart has fully stopped beating.

107.    For example, on April 17, 2019, CSPD officers entered a hospital room where Carl Andersen Jr. was waiting with his 19-month-old daughter. Upon entry, officers immediately attempted to unlawfully seize Mr. Andersen's cell phone without a warrant. Then, without any warning, and without telling Mr. Andersen he was under arrest, CSPD officers forcefully took Mr. Andersen down and shot him multiple times with a taser.

108.    On April 26, 2018, CSPD officers threw Mr. Jeffrey Melvin to the ground, held him down, and deployed a taser on him no less than five (5) times in two (2) minutes. The taser use was so excessive that Mr. Melvin went into Lactic Acidosis, releasing so much lactic acid into Mr. Melvin's body that it and killed him. The coroner ruled Mr. Melvin's death a homicide.

109.    On March 25, 2015, CSPD officers pulled brothers Ryan and Joey Brown over. CSPD officers did not have any grounds on which to pull the Browns over, and officers did not tell the brothers why they had been pulled over. Rather, CSPD officers held them at taser and gunpoint, frisked them, threw Ryan to the ground and threw his phone away to stop him from recording the interaction. The officers wrongfully arrested both brothers, and CSPD responded to the brothers' complaint about their mistreatment by determining that the officers conduct was justified.

110.    On June 2, 2009, CSPD officers came to Douglas Sellier's home to take Mr. Sellier's grandson to another person. When Mr. Sellier informed CSPD officers that the man to whom the officers were bringing the child was a sex offender, the officers grabbed Mr. Sellier and caused him to lose consciousness. While Mr. Sellier was pinned to the ground, officers punched him and deployed a taser on him twice. Mr. Sellier filed an excessive force claim against the police department. Colorado Springs ultimately settled Mr. Sellier's claims for $50,000; however, Colorado Springs argued the officers' conduct was appropriate. Colorado Springs never disciplined or counseled the officers for their unlawful conduct, nor did CSPD institute additional training requirements.

111.    These customs, policies, and/or practices were consciously permitted, authorized, or executed by the City of Colorado Springs. They reflect an intentional decision to choose from among various alternative courses of action and were a cause of the violations of constitutional rights described herein.

112.   CSPD's longstanding training and supervising deficiencies are exemplified by: the failure to utilize regular stress inoculation training (which foreseeably leads to officers becoming over-adrenalized during stressful, or non-stressful, situations and overreacting to any actual or perceived resistance/noncompliance); the failure to teach appropriate de-escalation tactics (such as the use of words in lieu of force to defuse potentially volatile situations); the failure to train and require officers to timely seek mental health services; and the failure to appropriately discipline officers who engage in misconduct (which foreseeably emboldens officers to violate the law).

113.   CSPD employs practices that escalate the use of force rather than de-escalate situations by responding to calls with specialized crisis intervention personnel or those trained in such techniques.

114.   CSPD fails to properly train its officers how to appropriately respond to citizens experiencing mental health crises. CSPD has persisted in its deliberate indifference to the rights of citizens with mental health disabilities even though it is certain Colorado Springs police will regularly interact with citizens with mental health disabilities as part of their employment.

115.   CSPD's training defects relating to its officers' interactions with individuals who have psychological disabilities include but are not limited to: the failure to properly train its officers regarding interaction with people suffering from mental health issues; the failure to properly train officers to recognize symptoms of

disability under title II of the ADA and from excluding qualified individuals, such as Mr. Burnett, from participation in or denial of benefits of services provided by Defendant Colorado Springs, or in otherwise discriminating against such individuals; the failure to provide most of its deputies with adequate, effective, and appropriate Crisis Intervention Training (CIT); the failure to properly train its officers to request assistance from a mental health professional or other specialized mental health training when responding to individuals known to have psychological disabilities; the failure to properly train its officers to assume a non-threatening manner when interacting with individuals they regard as having mental health crises; and the failure to properly train its officers to attempt to use words, not physical or deadly force, to de-escalate situations involving individuals experiencing mental health crises.

116.   As a result, persons who have mental illness and are in crisis are subjected to unnecessary or excessive force, as Mr. Burnett experienced.

117.   In light of the duties and responsibilities of CSPD personnel, the need for specialized training, supervision, and discipline regarding interacting with people experiencing mental health crises is so obvious, Defendant Colorado Springs is liable for its failure to properly train, supervise, and/or discipline its subordinate employees and agents.

118.   The inadequacy of appropriate training and/or supervising is so likely to result in a violation of constitutional rights such as those described herein, Defendant

Colorado Springs is liable for its failure to properly train, supervise, and/or discipline its subordinate employees and agents.

119.   Such failures to properly train and supervise were the moving force behind and proximate cause of the violations to Mr. Burnett's federally protected rights described herein, and constitutes an unconstitutional policy, procedure, custom, and/or practice.

120.   Colorado Springs delegates authority to CSPD Internal Affairs to investigate complaints about officers' conduct. All CSPD officers may be subject to internal affairs investigations. CSPD Internal Affairs personnel are authorized final policymakers regarding the determination of whether CSPD employees' actions comport with CSPD policy and the law.

121.   Defendant Colorado Springs has a responsibility to supervise and train its employees. Colorado Springs employees unlawfully entered Mr. Burnett's home without a warrant because they believed they were executing Colorado Springs Police Department policy with respect to warrantless home searches. Subsequently, Colorado Springs employees used excessive force against Mr. Burnett, and recklessly left Mr. Burnett in a prone position after a taser had been repeatedly deployed against him and after he was already fully restrained and in handcuffs. Finally, Colorado Springs employees failed to request an expedited medical response despite clear signs that Mr. Burnett had lost consciousness and that his health was at risk. Each

defendant violated Mr. Burnett's constitutional rights during this encounter because they lacked proper training and supervision.

122.   The Defendant officers received inadequate training on warrantless home entries, on examining detainees for signs of acute medical distress including agonal breathing, on proper positioning of restrained individuals, on timely calls for expedited medical response, and on when to begin appropriate lifesaving measures such as CPR.

123.   Sergeant Inazu recklessly overlooked and failed to properly counsel and supervise his officers throughout the duration of the encounter. Sergeant Inazu failed to supervise his officers to properly exercise restraint prior to pursuing Mr. Burnett into his home without a warrant, to check Mr. Burnett for signs of medical distress, to place Mr. Burnett in an appropriate recovery position, and to call for expedited medical response after Mr. Burnett had lost consciousness. Sergeant Inazu ratified the actions of the officers he supervised.

124.   No disciplinary action was taken against any of the Defendant officers. The decision to refrain from any disciplinary action against officers who engage in unlawful conduct is part of a custom or practice of declining to discipline officers for constitutional violations. By declining to discipline Defendant officers for their unlawful actions, Colorado Springs, through CSPD's Internal Affairs, ratified those actions. This ratification demonstrates that actions are pursuant to the City's

training, and that such conduct is standard practice within the City's Police Department.

125.   The City's failure to uphold its obligation to train its officers is a root cause of its officers' unconstitutional conduct. Due to the City's failure to train and discipline its officers, similar unconstitutional acts can be expected in the future.

126.   Defendant Colorado Springs carried out an internal affairs investigation to determine whether its employees' conduct was lawful and concordant with the City's policies.

127.   During the pendency of Colorado Springs' internal affairs investigation surrounding Mr. Burnett's death, counsel for Mr. Burnett's estate specifically complained to CSPD's internal affairs division that the Defendant officers had (1) unlawfully entered Mr. Burnett's home and arrested him without a warrant, in violation of the Fourth Amendment; (2) used an unlawful and excessive degree of force to restrain Mr. Burnett; (3) violated CSPD policy by failing to use CSPD's Community Response Team in a circumstance in which an individual was clearly experiencing a mental health crisis and posed no immediate safety threat; and (4) provided Mr. Burnett inadequate medical care by leaving Mr. Burnett handcuffed in a prone position after he was repeatedly tased, by placing a "spit sock" on his head after he had exhibited difficulty breathing, and by waiting nearly ten minutes after Mr. Burnett became unconscious to expedite an emergency medical response.

128.   CSPD's internal affairs investigation concluded that Defendant Officers had followed appropriate policy and procedures. In other words, CSPD affirmatively approved the subordinate Defendant Officers' conduct.

129.   Upon the conclusion of its internal affairs investigation, Defendant Colorado Springs explicitly affirmed that it reviewed "all aspects of this case," and that it "conducted a formal review of the entirety of the incident to ensure officers followed appropriate policy and procedures." Defendant Colorado Springs further attested that "all areas of concern" raised by Plaintiff had been thoroughly investigated and addressed.

130.   Defendant Colorado Springs' determination that the conduct of Defendants Inazu, Barth, Daigle, and Fleming with respect to Mr. Burnett did not violate any Colorado Springs policies or procedures constitutes ratification of those actions. By approving the Defendant officers' acts, Defendant Colorado Springs acknowledges that those acts were conducted pursuant to official Colorado Springs customs, policies, and/or practices.

131.   The decision to refrain from any disciplinary action against officers who engage in unlawful conduct is part of a custom or practice of declining to discipline officers for constitutional violations. For example, in June 2021, CSPD Internal Affairs investigated complaints about use of force on a 29-year-old protester. Video evidence showed officers holding a man down after tackling him and putting him in handcuffs. Several officers were recorded striking the man as he lay on the ground.

Nonetheless, Colorado Springs determined the subordinate officers' use of force was in line with CSPD policy.

132.   The actions approved, condoned, and ratified by Defendant Colorado Springs deprived Plaintiff of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, and resulted in Mr. Burnett's substantial injuries and death.

## V.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fourth Amendment Unlawful Warrantless Entry
### (Against All Defendants)

133.   Plaintiff hereby incorporates all other paragraphs of this Complaint as if set forth herein.

134.   All individual Defendants to this claim, at all relevant times hereto, were acting under color of state law in their capacities as Colorado Springs law enforcement officers.

135.   At the time of his arrest, Mr. Burnett had a clearly established right under the Fourth Amendment to the United States Constitution to be secure in his person against unreasonable intrusions into his home.

136.   Defendants Inazu, Fleming, Daigle, and Barth entered Mr. Burnett's home without permission.

137.   Defendant officers had no warrant authorizing entry into Mr. Burnett's home.

138.   No legally recognizable exigent circumstances existed which would have permitted Defendants to enter Mr. Burnett's home, and there was no valid legal justification for Defendant officers to enter Mr. Burnett's home.

139.   Defendant officers' pursuit of Mr. Burnett into his home was objectively unreasonable under the circumstances.

140.   Defendant officers' conduct violated clearly established rights belonging to Mr. Burnett of which any reasonable law enforcement officer knew or should have known.

141.   Defendants' actions, as described herein, were motivated by malice and/or involved reckless or callous indifference to Mr. Burnett's federally protected rights, and they engaged in these actions and omissions intentionally, willfully, and/or wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Mr. Burnett's constitutionally protected rights.

142.   The unlawful acts herein described were carried out pursuant to the customs, practices, policies, and/or training of the Colorado Springs Police Department.

143.   Defendant Colorado Springs has a custom, policy, and practice of accepting, condoning, ratifying, and even encouraging unlawful warrantless home entries like Defendant officers' actions here.

144.   Defendant Colorado Springs's failure to adequately train and supervise its officers with respect to warrantless entry exhibited deliberate indifference to a known and obvious risk of harm to Mr. Burnett and others.

145.   The acts or omissions of each Defendant, including the unconstitutional custom, policy, and practices described herein, were a legal and proximate cause of Plaintiff's injuries, damages, and losses.

146.   In addition, because Defendant Colorado Springs has ratified the misconduct of Defendants Inazu, Daigle, Fleming, and Barth, their misconduct is chargeable to the municipality.

147.   As a direct result of Defendants' unlawful actions described here, Mr. Burnett suffered actual physical and emotional injuries leading up to and including his death.

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fourth Amendment Excessive Force
### (Against All Defendants)

148.   Plaintiff hereby incorporates all other paragraphs of this Complaint as if set forth herein.

149.   All individual Defendants to this claim, at all relevant times hereto, were acting under color of state law in their capacities as Colorado Springs law enforcement officers.

150.   At the time of his arrest, Mr. Burnett had a clearly established right under the Fourth Amendment to the United States Constitution to be secure in his

27

person against unreasonable searches and seizures, including through the use of excessive force in carrying out a seizure of his person.

151.   Defendant Barth's deployment of her taser less than one second after entering Mr. Burnett's home was objectively unreasonable under the circumstances.

152.   Defendant Barth's second and third deployments of her taser after Mr. Burnett was restrained and lying on the floor were objectively unreasonable under the circumstances.

153.   Defendant Daigle and Fleming's use of their body weight to press on Mr. Burnett while he was restrained in a position compromising his breathing, was objectively unreasonable under the circumstances.

154.   At no time during the course of the arrest did Mr. Burnett threaten officers. Mr. Burnett was unarmed throughout the course of the arrest.

155.   Despite the absence of any threat or resistance, Defendant Inazu, as supervising officer, approved and condoned Defendant Barth's second and third taser deployments.

156.   Despite the absence of any threat or resistance, Defendant Inazu participated in or, as supervising officer, approved and condoned of Defendant Daigle and Fleming's continued use of force on Mr. Burnett after he was fully restrained.

157.   Defendants Inazu, Daigle, Fleming, and Barth were either active participants or failed to intervene in the excessive use of force that was objectively

unreasonable in light of the facts and circumstances surrounding them, violating Mr. Burnett's Fourth Amendment rights.

158.   Defendant officers' conduct violated clearly established rights belonging to Mr. Burnett of which any reasonable law enforcement officer knew or should have known.

159.   Defendant officers' conduct clearly exceeded constitutional limitation on the use of force.

160.   Defendants' actions, as described herein, were motivated by malice and/or involved reckless or callous indifference to Mr. Burnett's federally protected rights, and they engaged in these actions and omissions intentionally, willfully, and/or wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Mr. Burnett's constitutionally protected rights.

161.   The unlawful acts herein described were carried out pursuant to the customs, practices, policies, and/or training of the Colorado Springs Police Department.

162.   Defendant Colorado Springs's failure to adequately train and supervise its officers with respect to warrantless entry exhibited deliberate indifference to a known and obvious risk of harm to Mr. Burnett and others.

163.   Defendant Colorado Springs has a custom, policy, and practice of accepting, condoning, ratifying, and even encouraging excessive force.

164. The acts or omissions of each Defendant, including the unconstitutional custom, policy, and practice described herein, were a legal and proximate cause of Plaintiff's damages.

165. In addition, because Defendant Colorado Springs has ratified the misconduct of Defendants Inazu, Daigle, Fleming, and Barth, their misconduct is chargeable to the municipality.

166. As a direct result of Defendants' unlawful actions described here, Mr. Burnett suffered actual physical and emotional injuries leading up to and including his death.

### THIRD CLAIM FOR RELIEF
**42 U.S.C. § 1983 – Fourth Amendment Failure to Ensure Reasonable Safety and Provide Adequate Medical Care**
**(Against All Defendants)**

167. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

168. All individual Defendants to this claim, at all relevant times hereto, were acting under color of state law in their capacities as Colorado Springs law enforcement officers.

169. At the time of his arrest, Mr. Burnett had a clearly established right under the Fourth Amendment to the United States Constitution to be kept reasonably safe and to receive adequate medical care while in the custody of CSPD.

170.   At all times relevant to the allegations in this Complaint, Defendants were acting pursuant to a municipal custom, policy, or practice in their actions pertaining to Mr. Burnett.

171.   Defendants had notice of Mr. Burnett's life-threatening condition resulting from Defendants' use of multiple restraints, including taser discharges, against him, as well as Defendants' placement of Mr. Burnett in a prone position, and Defendants' act of placing their body weight on top of Mr. Burnett in that position.

172.   Defendants ignored obvious and substantial risks to Mr. Burnett's health as he experienced serious symptoms, such as agonal breathing and unconsciousness, stemming from Defendants' use of force.

173.   The deterioration in Mr. Burnett's condition was so obvious that any officer should have recognized it and immediately requested expedited medical response as well as immediately attempting life saving measures, including CPR.

174.   Instead, Defendant officers failed to adequately respond to Mr. Burnett's worsening condition, and senselessly continued to further restrain a limp, unconscious, and obviously dying individual, with their hands and body weight, leg shackles, and a spit sock.

175.   Defendants' acts and omissions exhibited deliberate indifference to Mr. Burnett's constitutional right not to be denied necessary medical care. Defendants' deliberate indifference extends to their failure to request an expedited medical

response after Mr. Burnett showed clear and obvious symptoms of an acute medical emergency.

176.   Defendants' actions and omissions, as described herein, were motivated by malice and/or involved reckless or callous indifference to Mr. Burnett's federally protected rights, and they engaged in these actions and omissions intentionally, willfully, and/or wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Mr. Burnett's constitutionally protected rights.

177.   Defendants' actions and omissions, as described herein, were objectively unreasonable under the circumstances.

178.   The unlawful acts and omissions herein described were carried out pursuant to the customs, practices, policies, and/or training of the Colorado Springs Police Department.

179.   Defendant Colorado Springs's failure to adequately train and supervise its officers with respect to the safety and medical care of detainees—particularly detainees who have been tased and exhibit difficulty breathing—exhibited deliberate indifference to a known and obvious risk of harm to Mr. Burnett and others.

180.   Defendant Colorado Springs has a custom, policy, and practice of accepting, condoning, ratifying, and even encouraging unsafe detention practices and the inadequate provision of medical care to arrestees.

181.    The acts or omissions of each Defendant, including the unconstitutional custom, policy, and practice described herein, were a legal and proximate cause of Plaintiff's damages.

182.    In addition, because Defendant Colorado Springs has ratified the misconduct of Defendants Inazu, Daigle, Fleming, and Barth, their misconduct is chargeable to the municipality.

183.    As a direct result of Defendants' unlawful actions described here, Mr. Burnett suffered actual physical and emotional injuries leading up to and including his death.

## FOURTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Deliberately Indifferent Training and Supervision Regarding Mental Health
### (Against Defendant City of Colorado Springs)

184.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

185.    Defendants violated Mr. Burnett's constitutional right to be free from excessive force resulting in death, as set forth above.

186.    Defendants Colorado Springs and CSPD knew that it was highly likely that defendant officers would encounter citizens suffering from mental illness or agitation, and that citizens suffering from such disorder are at a heightened risk of death from law enforcement use of force methods to restrain them.

187.    Defendant Officers knew Mr. Burnett was experiencing a mental health crisis.

188.   Defendant Colorado Springs did not adequately train governing law enforcement response to citizens in mental health crisis and did not train all of their law enforcement officers on what use of force with respect to such citizens were reasonable and constitutional, and were, therefore, deliberately indifferent to the constitutional rights of such citizens.

189.   The deliberately indifferent training and supervision resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendants.

190.   In light of the duties and responsibilities of those police officers that participate in interactions, arrests, or other dealings with individuals experiencing mental illness or emotional disturbance, the need for specialized training and supervision is so obvious, and the inadequacy of training and/or appropriate supervision is so likely to result in the violation of constitutional violations in these recurring situations, that the failure to provide such training and supervision is deliberately indifferent to those rights.

191.   Defendant Colorado Springs was deliberately indifferent to the constitutional rights of individuals with mental illness in the public, knowing that dangerous and potentially fatal consequences could be suffered by such individuals (including Mr. Burnett) by failing to properly train and supervise its employees. Defendant could have and should have pursued reasonable methods for the training and supervising of such employees but failed to do so.

192. The reckless and deliberately indifferent acts and omissions of Defendant Colorado Springs in the training and supervision of its officers, as described herein, were moving forces in the predictable deprivation of Plaintiff's constitutional and statutory rights.

193. Defendant Colorado Springs has a custom, policy, and practice of accepting, condoning, and ratifying the failure to implement crisis intervention for persons experiencing a mental health crisis.

194. The acts or omissions of each Defendant, including the unconstitutional custom, policy, and practice described herein, were a legal and proximate cause of Plaintiff's damages.

195. In addition, because Defendant Colorado Springs has ratified the misconduct of Defendants Inazu, Daigle, Fleming, and Barth, their misconduct is chargeable to the municipality.

196. As a direct result of Defendants' unlawful actions described here, Mr. Burnett suffered actual physical and emotional injuries leading up to and including his death.

## FIFTH CLAIM FOR RELIEF
### 42 U.S.C. § 12132 – Disability Discrimination
### (Against All Defendants)

197. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

198.    At all relevant times, Mr. Burnett was a qualified individual with a disability under the Americans with Disabilities Act of 1990 because he had a mental impairment that substantially limited one or more major life activities, had a record of such impairment, and/or was regarded as having such impairment by Defendants.

199.    Defendant Colorado Springs is a public entity as the term is used in Title II of the ADA.

200.    Defendants were aware of Mr. Burnett's disability.

201.    Mr. Burnett was qualified to receive the services, programs, activities, and benefits provided to citizens of Colorado Springs within the meaning of Title II of the ADA.

202.    Through their conduct, as alleged herein, Defendants excluded Mr. Burnett from participation in, denied Mr. Burnett the benefits of the services, programs, or activities of the City of Colorado Springs, and/or subjected Mr. Burnett to discrimination.

203.    The exclusion, denial of benefits, and/or discrimination against Mr. Burnett was by reason of his disability.

204.    As a direct result of Defendants' unlawful actions described here, Mr. Burnett suffered actual physical and emotional injuries leading up to and including his death.

## V.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment in its favor, and against each Defendant, for the following relief:

a.     All declaratory relief and injunctive relief, as appropriate;

b.     Actual economic damages as established at trial;

c.     Compensatory damages, including but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, medical bills, and other non-pecuniary losses;

d.     Punitive damages for all claims as allowed by law in an amount to be determined at trial;

f.     Pre-judgment and post-judgment interest at the highest lawful rate;

g.     The maximum tax-offset permitted by law;

h.     Attorneys' fees and costs; and

i.     Such further relief as justice requires, and any other relief as allowed by law.

## V.     JURY DEMAND

Plaintiff demands a jury trial on all issues so triable.

DATED this 30th day of September 2021

RATHOD | MOHAMEDBHAI LLC

*s/ Ciara M. Anderson*
Ciara Anderson
Felipe Bohnet-Gomez
Benjamin DeGolia
Siddhartha H. Rathod
2701 Lawrence Street, Suite 100
Denver, Colorado 80205
(303) 578-4400
fbg@rmlawyers.com
bd@rmlawyers.com
sr@rmlawyers.com
ca@rmlawyers.com