IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No: 21-cv-1708-WJM-KMT

ESTATE OF CHAD ALEXANDER BURNETT,

    Plaintiff,

v.

CITY OF COLORADO SPRINGS, a municipality;
SERGEANT MICHAEL INAZU, in his individual capacity;
OFFICER JOSEPH DAIGLE, in his individual capacity;
OFFICER MATTHEW FLEMING, in his individual capacity; and
OFFICER CAROLINE BARTH, in her individual capacity,

    Defendants.

---

## MOTION TO DISMISS OR, ALTERNATIVELY, PARTIAL EARLY MOTION FOR SUMMARY JUDGMENT

---

Defendants hereby move to dismiss the Amended Complaint or alternatively, pursuant to WJM Revised Practice Standard III.D.2 and Fed. R. Civ. P. 56, move for early summary judgment.

**Certification Pursuant to D.C.COLO.LCivR 7.1(b)(2) and WJM Rev. P. Stand. III.D:**

Undersigned has conferred with opposing counsel. This motion is opposed.

**I. Introduction**

When officers responded to two 911 calls on May 24, 2020, they were confronted with one of the most difficult situations any officer must face—an individual experiencing an acute psychotic episode acting very dangerously. They acted reasonably in balancing the safety of Mr. Burnett's neighbors with the safety of Mr. Burnett. They are entitled to qualified immunity.

**II. Nature of the Case**

**A. Allegations**

Around 9:00 a.m. on May 24, 2020, multiple 911 calls were made reporting an individual who was threatening his neighbors with a knife. (¶¶ 18-20)[1] This individual was Mr. Burnett. (¶¶ 19-20) Around 10:00 a.m., Officers Daigle and Fleming arrived at Mr. Burnett's house with Sgt. Inazu responding twenty minutes later. (¶¶ 23-24) Over the next hour and a half, officers asked, ordered and demanded that Mr. Burnett exit his residence. (¶¶ 25, 32) Mr. Burnett refused to exit. (¶ 33) Unsuccessful in coaxing Mr. Burnett out of his house, officers contacted neighbors to confirm the 911 reports of Mr. Burnett's previous threats with a knife. (¶ 29) While officers were speaking with neighbors, Mr. Burnett reappeared outside his front door and began throwing various items into the yard, including the knife he used to threaten his neighbors. (¶¶ 30-31) Officers Inazu, Fleming, and Daigle contacted Mr. Burnett there and chased him when he turned to run inside. (¶¶ 37-41)

Inside the house, Officers Inazu, Fleming and Daigle attempted to arrest Mr. Burnett and ordered him to the ground. (¶¶ 46-47) Officer Barth discharged her taser which caused Mr. Burnett to fall to the floor. (¶ 51) Due to Mr. Burnett's continued resistance, Officer Barth arced her taser twice more. (¶ 56) After deploying the taser, officers were finally able to place Mr. Burnett in handcuffs. (¶ 59) They then attempted to move him to a nearby cruiser. (¶ 61) A struggle ensued where officers had to forcibly move him out of the house. (¶¶ 61-62) The struggle caused Mr. Burnett to fall onto the landing just outside the front door. (¶ 62) The officers, yet again, attempted to move Mr. Burnett to a police cruiser. (¶ 64) Mr. Burnett flung himself backwards into the entryway of the residence. (¶ 65)

---

[1] Citations to paragraph numbers, without more, e.g. (¶ __), refer to paragraphs in the Amended Complaint (ECF No. 29).

At this point, given Mr. Burnett's continuous resistance, officers pinned Mr. Burnett to the ground. (¶ 69) Flex cuffs were placed on Mr. Burnett's legs and officers decided that leg shackles were necessary. (¶¶ 73-74) At some point, Mr. Burnett lost consciousness and stopped breathing. (¶¶ 78, 80) Officers Fleming and Daigle immediately recognized that something had changed. (¶ 79) They began checking for signs of consciousness and pushed the hood of Mr. Burnett's sweatshirt away from his face. (*Id.*) Officer Daigle checked Mr. Burnett's pulse and confirmed that he, in fact, had one. (¶ 83) Shackles were placed on Mr. Burnett's legs and Officer Daigle checked Mr. Burnett, again, for a pulse and, again, found one. (¶¶ 85-87) Officers expressed concern that Mr. Burnett, given his significant resistance throughout the encounter, was playing possum. (¶ 88) The officers checked Mr. Burnett again and found that he was not breathing. (¶ 89) Officers then requested that paramedics expedite their arrival. (¶ 90) Officers were still able to find Mr. Burnett's pulse. (¶ 93) The officers attempted to resuscitate Mr. Burnett, but neither they nor the paramedics could revive him. (¶ 102)

**B. Body Worn Camera ("BWC") Footage**

While a Rule 12(b)(6) challenges the legal sufficiency of the complaint alone, the Court may consider "documents attached to or referenced in the complaint if they are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1103 (10th Cir. 2017). The BWC footage is authentic and "shows what it shows." *Pittman v. City of Aurora*, No. 19-CV-01947-PAB-NRN, 2020 WL 6586659, at *4 (D. Colo. Oct. 23, 2020). The Court may consider the footage without converting the motion to one for summary judgment. *Id.*; *Kennedy v. Taylor*, No. 21-CV-0901-WJM-KMT, 2021 WL 6050279, at *3 (D. Colo. Dec. 21, 2021) (considering footage when it clearly contradicts the allegations in the complaint).

### 1. Motion for Partial Early Summary Judgment

To the extent the Court does not consider the BWC footage for purposes of the motion to dismiss, it is requested that the motion be converted to one for early summary judgment.

### 2. BWC Video[2]/ Movant's Statement of Material Facts

1. Burnett fled into house with officers chasing. (Exhibit D, 1:09-1:14)[3]; (Exhibit C, 1:29:11-13);

2. Burnett attempted to close door on officers. (Exhibit C, 1:29:13-14); (Exhibit A, 46:10-46:12)

3. Officers ordered Burnett on the ground. Burnett stiffened and responded "no, no." (Exhibit D, 1:15-1:18); (Exhibit C, 1:29:13-1:29:19); (Exhibit A, 46:13-46:18)

4. Officer Barth deployed her taser. (Exhibit B, 5:19-5:24) (Exhibit C, 1:29:19-1:29:25)

5. Officers struggled to handcuff Burnett because he refused to put his hands behind him. (Exhibit B, 5:24-5:45); (Exhibit A, 46:26-47:44); (Exhibit D, 1:25-2:42)

6. Taser was cycled twice during the struggle. (Exhibit B, 5:46-5:49); (Exhibit D, 1:45-1:47)

7. Burnett, curled on his side, tensed his arms, and held his hands near his navel. (Exhibit B, 5:55-6:11); (Exhibit D, 1:48-2:42)

8. Handcuffed, Burnett stopped walking and pushed against officers as they attempted to walk him out of the house. (Exhibit B, 7:32-7:54); (Exhibit D, 3:29-3:55); (Exhibit C, 1:29-55)

9. On the landing outside the front door, Burnett is lifted to his feet before he propelled himself back into the house. (Exhibit A, 50:20-50:28); (Exhibit D, 5:25-5:30)

---

[2] *See* Affidavit of Katherine Wolf, attached as Exhibit E.
[3] BWC footage from Sgt. Michael Inazu is attached as Exhibit A; Officer Caroline Barth is attached as Exhibit B; Officer Matthew Fleming is attached as Exhibit C; and Officer Joseph Daigle is attached as Exhibit D.

10. Inside the house, Burnett continued to resist officers' efforts to control him and place leg restraints on him. (Exhibit A, 50:28-52:29)

11. Officer Fleming asked Burnett if he is "doing alright" and asked "if he is breathing." He is rolled on his side; chested patted; and pulse checked. (Exhibit D, 8:47-9:00); (Exhibit C, 1:36:47-1:37:01)

12. Officers inquired and checked his pulse again, noting that "it's light, but I can feel it." (Exhibit D, 10:00-10:09); (Exhibit C, 1:38:04-1:38:10)

13. While Burnett is on his side, other officers inquired about his breathing. (Exhibit D, 10:09-10:26); (Exhibit C, 1:38:10-1:38:29)

14. After struggling to find a pulse, Officer Daigle located one. (Exhibit D, 10:20-10:32)

15. While Burnett is still on his side, officers surmised that Mr. Burnett was either unconscious or playing possum. (Exhibit D, 10:36-10:42); (Exhibit C, 1:38:35-1:38:43)

16. Sgt. Inazu stated, "he's on his stomach, but he's not overweight so I'm not overly concerned about his respirations as long as you can see a chest rise and fall." (Exhibit D, 11:05-11:10)

17. Another officer responded "I just had a pulse. I have not had much of a chest rise and fall. I haven't seen the chest, but we've checked the pulse repeatedly." (Exhibit D, 11:12-11:19)

18. Officers felt his chest and noted that Burnett is blinking. An officer asked if a gate needed to be opened for "medical." (Exhibit D, 11:20-11:41); (Exhibit C, 1:39:19-1:39:42)

19. Officers asked one another if they see a chest rise. (Exhibit C, 1:40:32-1:40:33)

20. Officers noted that Burnett is holding his head up. (Exhibit D, 12:49-12:53)

21. Officers checked for vital signs again and stated, "he's got a good strong pulse." (Exhibit D, 13:00-13:02); (Exhibit C, 1:41:00-1:41:05)

22. Officers patted Burnett on the chest and back. (Exhibit D, 13:36-13:44)

23. Officer Fleming noted Burnett's eyes were dilated and did not constrict with light. (Exhibit D, 13:49-14:00); (Exhibit C, 1:41:58-1:42:02)

24. Seconds later, an officer indicated that he cannot find a pulse. (Exhibit D, 14:21-14:32)

25. Officers rolled Burnett onto his back and checked his pulse again. (Exhibit D, 14:37-14:57)

26. Officers started compressions. (Exhibit D, 14:58)

## III. Standard of Review—Fed. R. Civ. P. 12(b)(6)

To survive the motion to dismiss for failure to state a claim, the Amended Complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## IV. Argument

### A. Qualified Immunity

The officers are shielded from the warrantless entry, excessive force and failure to render medical aid claims by qualified immunity. "[W]hen [the qualified immunity] defense is raised, the onus is on the plaintiff to demonstrate (1) that the official violated a statutory or constitutional right, *and* (2) that the right was clearly established at the time of the challenged conduct." *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015) (quotation marks omitted) (emphasis in *Quinn*).

#### 1. Warrantless Entry

The officers did not violate clearly established law when they chased Mr. Burnett into his house. They were in hot pursuit of a felon. They are entitled to qualified immunity.

A police officer "who attempt[s] to arrest [a] felon outside [of her] home may pursue her if she takes refuge inside." *U.S. v. Aquino*, 836 F.2d 1268, 1271 (10th Cir. 1988). "[W]hen a warrantless arrest or seizure is the subject of a § 1983 action, the defendant is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to arrest or detain the plaintiff." *Cortez v. McCauley*, 478 F.3d 1108, 1120 (10th Cir. 2007). An "officers' reasonable suspicion ripen[s] into more than sufficient probable cause when [a] defendant, who the officers already reasonably suspected of a crime, r[uns] away from the officers." *U.S. v. Shelton*, 817 F. App'x 629, 633 (10th Cir. 2020) (unpublished) (internal quotation marks omitted). "Hot pursuit occurs when an officer is in 'immediate or continuous pursuit' of a suspect from the scene of a crime." *U.S. v. Cruz*, 977 F.3d 998, 1009 (10th Cir. 2020).

Here, Mr. Burnett was suspected of committing felony menacing when he turned to run into his house to flee officers and thwart his arrest. *See* C.R.S. § 18-3-206. Before officers gave chase, two 911 calls had been placed—one where a neighbor reported witnessing Mr. Burnett threaten the caller's husband with a knife in their cul-de-sac (¶ 19) and another by a second neighbor reporting seeing Mr. Burnett in the street with a knife (¶ 20). While on scene, officers discovered that Mr. Burnett had thrown the knife into his yard "which the CSPD officers believed was the knife Mr. Burnett used to allegedly threaten his neighbors" (¶ 31). Prior to giving chase, officers asked, and Mr. Burnett refused, to exit his house roughly fifty times over an hour and a half (¶ 32). When officers finally approached Mr. Burnett, he fled into his house (¶¶ 40-42). In light of these circumstances, officers had, at a minimum, arguable probable cause to follow Mr. Burnett into his house to arrest him. As such, they are entitled to qualified immunity.

**2. Excessive Force**

Officer Barth acted reasonably and was not on notice that her conduct could possibly be unlawful when she tased Mr. Burnett.[4] Thus, she is entitled to qualified immunity.

"Excessive force claims are governed by the Fourth Amendment's 'objective reasonableness' standard." *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 664 (10th Cir. 2010). "Reasonableness is evaluated under a totality of the circumstances approach which requires that [the court] consider[s] the following factors: 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Weigel v. Broad*, 544 F.3d 1143, 1151–52 (10th Cir. 2008) (quoting in part *Graham v. Conner*, 490 U.S. 386, 396 (1989)).

The Amended Complaint makes several allegations that are blatantly contradicted by the BWC footage. Not only had Mr. Burnett, one, refused to surrender in the preceding hour and a half and, two, sprinted into the house and attempted to slam the door on officers when they chased after him, he also refused a lawful order to place himself on the ground. (¶¶ 32, 40-42, 46); (Exhibit D, 1:15-1:18); (Exhibit C, 1:29:13-1:29:19); (Exhibit A, 46:13-46:18) Once on the floor, Mr. Burnett continued to forcefully resist attempts by officers to place his hands behind his back. (Exhibit B, 5:24-5:45); (Exhibit A, 46:26-47:44); (Exhibit D, 1:25-2:42) Even after Officer Barth cycled her taser twice, officers continued to struggle to get Mr. Burnett's hands behind his back. (Barth 5:55-6:11); (Daigle 1:48-2:42) The BWC shows that Mr. Burnett was being arrested for a felony involving a weapon, took flight and actively resisted throughout his arrest.[5] Thus, the use of force, under the particular circumstances here, was reasonable.

---

[4] Plaintiff alleges that only Officer Barth used a taser. The Amended Complaint makes cursory reference to the participation of other officers and their failure to intervene. (¶ 157)
[5] Officer Fleming placed his body weight on Mr. Burnett for brief periods of time as he resists. He takes removes his weight promptly after resistance stops. *See, e.g.*, (Exhibit D, 5:30-7:00)

Additionally, no factually analogous case puts Officer Barth or another officer on notice that use of the taser or any other force used in these circumstances violated the Constitution. In the Tenth Circuit, it may be clearly established that

> the use of disproportionate force to arrest an individual who is not suspected of committing a serious crime and who poses no threat to others constitutes excessive force. … [I]t is likewise clearly established that officers may not continue to use force against a suspect who is effectively subdued.

*Perea v. Baca*, 817 F.3d 1198, 1204 (10th Cir. 2016) (internal citations omitted). Neither of these principles show that the force here was unreasonable. The allegations in the Amended Complaint reflect that the officers had probable cause to arrest Mr. Burnett for a felony involving threats with a knife. As officers attempted to arrest him for this felony, Mr. Burnett first fled then resisted both before and after he was placed in handcuffs. Thus, *Perea* does not put any officer on notice. *See White v. Pauly*, — U.S. —, 137 S. Ct. 548, 552 (2017) ("[C]learly established law must be 'particularized' to the facts of the case."). If anything, the law in the Tenth Circuit indicates that the use of force was reasonable. *See Hinton v. City of Elwood*, 997 F.2d 774, 781 (10th Cir. 1993). Thus, the officers are entitled to qualified immunity.

### 3. Medical Care

The officers monitored Mr. Burnett appropriately while he was in their custody[6] and were not deliberately indifferent to a serious medical need.

"A claim for inadequate medical attention will be successful if the plaintiff shows deliberate indifference to serious medical needs." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (internal quotation marks omitted). "The Supreme Court has established a two-pronged test for deliberate indifference claims. Under this test, a plaintiff must satisfy an objective prong

---

[6] This claim is brought under the Fourth Amendment. (¶¶ 168-83) The Fourteenth Amendment appears to be the appropriate amendment to assert the claim. *See Beggs*, *supra*.

and a subjective prong. The objective prong concerns the severity of a plaintiff's need for medical care; the subjective prong concerns the defendant's state of mind." *Rife v. Oklahoma Dep't of Pub. Safety*, 854 F.3d 637, 647 (10th Cir. 2017). "[A] medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). "Moreover, a delay in medical care only constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm." *Id.* (internal quotation marks omitted). "To prevail on the subjective component, the prisoner must show that the defendants knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006) (internal quotation marks omitted); *see also Beggs*, 563 F.3d at 1089 (finding plaintiffs were required to show deliberate indifference to the *specific* injury-causing risk) (emphasis added).

Plaintiff does not sufficiently allege the officers knew Mr. Burnett faced a substantial risk of harm and disregarded it. There is no description of a specific risk mentioned in the Amended Complaint. A medical cause of death is not described. The Amended Complaint alleges that Mr. Burnett's death was "sudden" (¶ 101) and only speculates that had CPR been performed earlier, Mr. Burnett's "chances of survival would have been significantly improved." (¶¶ 99-100)

Further, the Amended Complaint makes allegations in support of the claim that are blatantly contradicted by the BWC footage. Specifically, the Amended Complaint describes a scene where officers are completely oblivious to or unconcerned with Mr. Burnett's wellbeing. The BWC footage tells a drastically different story.

Shortly after Mr. Burnett finally stopped fighting officers and they catch their breath; officers ask how Mr. Burnett is doing. (Exhibit D, 8:47-9:00); (Exhibit C, 1:36:47-1:37:01) While

they know that Mr. Burnett has stopped fighting, unknown is if Mr. Burnett is simply resting, playing possum, passed out, or something else entirely is happening. There is no obvious sign of a need for medical care. Less than two minutes after he stops resisting, Officer Daigle checked and found Mr. Burnett's pulse. (Exhibit D, 7:00-8:55) Officers rolled Mr. Burnett on his side and kept him there. (Exhibit D, 9:00-10:58) In the time after Mr. Burnett stopped actively fighting officers, they checked his pulse no less than 6 times, finding a pulse each time until the end. They observed Mr. Burnett blinking at one point. (Exhibit D, 11:20-11:27); (Exhibit C, 1:39:19-1:39:30) They became concerned when they did not observe his chest rise and fall, and a lack of pupil constriction. (Exhibit D, 13:49-14:00); (Exhibit C, 1:41:58-1:42:02) They promptly began chest compressions. Consequently, the officers did not act with deliberate indifference.

The officers did not violate clearly established law. Defining clearly established law "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Hagen*, 543 U.S. 194, 198 (2004) (*per curiam*). In the Tenth Circuit, it is clearly established that "when an arrestee not only informs an arresting officer of the internal symptoms of a serious medical condition but also displays outward signs of the need for medical attention, the arresting officer violates the Fourteenth Amendment by failing to seek such care." *Rife v. Jefferson*, 742 F. App'x 377, 386 (10th Cir. 2018) (unpublished). It may also be clear that "failing to check [an individual's] vital signs, perform CPR, or seek medical care for three minutes when he [or she] was limp and unconscious as a result of the Defendants' use of force could violate the Constitution." *Est. of Booker v. Gomez*, 745 F.3d 405, 434 (10th Cir. 2014). The actions captured on BWC stand in stark contrast to those in *Rife* and *Est. of Booker*.

In *Rife*, the Tenth Circuit denied qualified immunity because Rife made the arresting officer aware of subtle symptoms of his injuries and displayed physical injuries consistent with

those complaints. 742 F. App'x at 384-85. In *Est. of Booker*, a suit arising from a death caused by positional asphyxiation, the Tenth Circuit held "any reasonable officer in the Defendants' position (and with their training) would have known that failing to check Mr. Booker's vital signs, perform CPR, or seek medical care for three minutes when he was limp and unconscious as a result of the Defendants' use of force could violate the Constitution." *Id.* at 434.

Here, officers were unaware of any underlying medical condition that could pose a risk to Mr. Burnett. Mr. Burnett is not alleged to have complained of a heart condition, chest pain or any other medical condition before his "sudden" death. (¶ 101). They continually checked his vital signs to determine whether he needed medical attention. Officers began checking his pulse shortly after Mr. Burnett finally stopped physically fighting them. Throughout that time, officers continued to check his pulse and discuss his health. They applied minimal force and repositioned Mr. Burnett. Once they confirm that they have lost his pulse, they begin compressions. Thus, the officers were not deliberately indifferent to Mr. Burnett's medical condition. As such, the claim alleging inadequate medical care should be dismissed.

### B. The ADA claim should be dismissed for lack of awareness of a specific disability

An ADA claim has not been plausibly alleged. In order to state a claim under the ADA, a plaintiff must prove:

> (1) that he or she is a qualified individual with a disability;
> (2) that he or she was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and
> (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.

*Gohier v. Enright*, 186 F.3d 1216, 1219 (10th Cir. 1999). "Based on the second element, courts have recognized two types of claims: (1) exclusion from or denial of benefits and (2) discrimination." *J.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1295 (10th Cir. 2016).

12

Here, the Amended Complaint only alleges a failure to accommodate.[7] (¶ 71) Plaintiff alleges officers should have "called for backup from people with more experience in crisis intervention with respect to people exhibiting mental distress, such as members from the Crisis Intervention Team." (¶ 36). The ADA does not require such action, and the allegation that officers should have done something else is nothing more than second guessing informed by 20/20 hindsight suggesting that a different outcome might have resulted from different action.

The Tenth Circuit has made clear, "[a] public entity must provide a reasonable accommodation under the ADA when it *knows* that the individual is disabled and requires an accommodation of some kind to participate in or receive the benefits of its services." *J.V.*, 813 F.3d at 1299 (internal quotation marks omitted) (emphasis added). The need for an accommodation must either be obvious or requested by the individual. *Id.* There is no allegation that Mr. Burnett requested an accommodation. The Amended Complaint falls short of alleging that the officers were on notice of the need to accommodate Mr. Burnett.

Plaintiff alleges that Mr. Burnett was in the midst of a "mental health crisis" (¶¶ 27-28) and Sergeant Inazu was aware that Mr. Burnett "had a history of mental illness." (¶ 26) But, the Amended Complaint stops short of alleging that any officer had knowledge of Mr. Burnett's specific mental illness. "Mental illness" covers a wide array of afflictions. Without knowledge of Mr. Burnett's specific disability, officers could not have provided an accommodation. *See Robertson v. Las Animas Cnty. Sheriff's Dep't,* 500 F.3d 1185, 1196 (10th Cir. 2007) ("Before a public entity can be required under the [ADA] to provide a disabled individual an auxiliary aid or service, a public entity *must have knowledge* of the individual's disability and the individual's need

---

[7] The Tenth Circuit has yet to find that an ADA claim based on a failure to accommodate is a viable cause of action. *See J.H. ex rel. J.P. v. Bernalillo Cty.*, 806 F.3d 1255, 1261 (10th Cir. 2015).

for an accommodation." (emphasis added)). Further, the ADA does not require officers to diagnosis mental illness on the fly during a stressful, rapidly evolving encounter.

Not only were officers unaware of a disability, but officers were also confronted with exigent circumstances when they were dispatched in response to two 911 calls which reported that Mr. Burnett had feloniously menaced a neighbor (¶ 19) and was in possession of a knife (¶ 20). Under the ADA, an accommodation is not required when an individual "poses a direct threat to the health or safety of others." 28 C.F.R. § 36.208(a).

Finally, it is unclear how a response from a Crisis Intervention Team or other officers more versed in crisis intervention were reasonable accommodations. Any officer is still ultimately left guessing about the root cause of Mr. Burnett's actions with no corresponding reduction in the danger posed by him.

In total, the Amended Complaint falls short of alleging plausible facts that officers should have perceived a need for a special accommodation. As such, the ADA claim must be dismissed.

### C. *Monell* Liability

The Amended Complaint does little more than allege municipal liability in conclusory terms. *See Griego v. City of Albuquerque*, 100 F. Supp. 3d 1192, 1213 (D.N.M. 2015) ("[A]t the pleading stage, the existence of a *Monell* policy is a 'conclusion' to be built up to, rather than a 'fact' to be baldly asserted."). The allegations are insufficient to a state a claim against the City.

Plaintiff proffers four instances in support of an alleged unlawful custom. (¶¶ 107-110) None of the instances involve medical treatment or a warrantless arrest at a home. Paragraph 109 does not involve deployment of a taser, home entry or medical care. Paragraphs 107 and 108 do not allege whether the individual was unarmed or non-threatening. Only paragraph 110—alleging an event occurring in 2009—alleges an outcome. In sum, the allegations are insufficient to allege

14

a persistent and widespread custom of conduct in particular circumstances. *See Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010).

Plaintiff alleges a stand-alone training and supervision claim, but fails to build out either theory. It says nothing about the training of the officers, individually or collectively. *See Carr v. Castle*, 337 F.3d 1221, 1228 (10th Cir. 2003) (In order to allege a failure to train, a plaintiff must, first, show "the training was in fact inadequate."). It relies on allegations of post-incident actions to support an allegation of a lack of supervision. *See Dempsey v. City of Baldwin*, 143 F. App'x 976, 986 (10th Cir. 2005) ("The final policymaker must not only approve the decision, but also adopt the basis for the decision, and the ratification must be the moving force, or cause, of the alleged constitutional violation."). The claim, in sum, is entirely devoid of any factual allegations.

The municipal liability claim is no more than multiple naked assertions lacking factual detail, and they are insufficient to state a claim against the City. *See Soto for estate of Jimenez v. Bd. of Cty. Commissioners of Caddo Cty., Okla.*, 748 F. App'x 790, 794 (10th Cir. 2018) (Noting the "well-established Tenth Circuit precedent holding a § 1983 municipal liability claim must include factual allegations that a particular municipal custom or policy was the moving force behind the constitutional injury in order to withstand a Rule 12(b)(6) dismissal."). As such, the municipal liability claim should be dismissed.

WHEREFORE, for the foregoing reasons, Defendants respectfully request that this Honorable Court enter an order dismissing the Amended Complaint with prejudice.

Respectfully submitted this <u>14th</u> day of <u>January</u>, 2022.

                                OFFICE OF THE CITY ATTORNEY
                                Wynetta P. Massey, City Attorney

*/s/ W. Erik Lamphere*
W. Erik Lamphere, Division Chief
30 S. Nevada Ave., Suite 501
Colorado Springs, Colorado 80903
Telephone: (719) 385-5909
Facsimile: (719) 385-5535
erik.lamphere@coloradosprings.gov

**CERTIFICATE OF SERVICE (CM/ECF)**

I hereby certify that on the 14th day of January, 2022, I electronically filed the foregoing **MOTION TO DISMISS OR, ALTERNATIVELY, PARTIAL EARLY MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing. I further certify that a true and correct copy of the same was sent to the following party via Sharefile:

Felipe Bohnet-Gomez (fbg@rmlawyers.com)
Siddhartha H. Rathod (sr@rmlawyers.com)
Benjamin DeGolia (bd@rmlawyers.com)
Ciara M. Anderson (ca@rmlawyers.com)
Matthew J. Cron (mc@rmlawyers.com)
*Attorneys for Plaintiff*

*/s/Donnielle Davis*
Donnielle Davis
