IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-1708-WJM-STV

ESTATE OF CHAD ALEXANDER BURNETT,

    Plaintiff,

v.

CITY OF COLORADO SPRINGS, a municipality;
SERGEANT MICHAEL INAZU, in his individual capacity;
OFFICER JOSEPH DAIGLE, in his individual capacity;
OFFICER MATTHEW FLEMING, in his individual capacity; and
OFFICER CAROLINE BARTH, in her individual capacity,

    Defendants.

---

**Plaintiff's Response to Defendants' Motion to Dismiss [ECF No. 33]**

---

This case arises out of Colorado Springs Police Department ("CSPD") officers failing to *protect*, and instead deliberately *choosing to prey on*, a person with mental disabilities. On May 24, 2020, CSPD Officers Fleming, Daigle, and Barth, along with their supervisor Sergeant Inazu (collectively "Defendant officers"), responded to a call involving Chad Burnett—a man they knew to have severe mental disabilities. When they arrived, Mr. Burnett was inside his own home. For an hour-and-a-half, Defendant officers repeatedly asked Mr. Burnett to either let them inside his house or for him to come outside, but Mr. Burnett consistently refused and repeatedly requested that the officers get off his property. The officers disagreed among themselves about whether there was any probable cause to arrest Mr. Burnett, and Defendant Sergeant Inazu—the supervising officer—recognized that there was not any exigency confronting the officers. Indeed, he expressly

stated "**we're probably going to need to get a warrant to go in there and grab [Mr. Burnett] if he doesn't fall prey to one of our tricks**." Defs. Ex. C, at 1:02:00-1:02:28. (emphasis added). But the officers never attempted to get a warrant, despite having ample time to do so. Instead, they chose to prey on Mr. Burnett's vulnerabilities and persisted in trying to "trick" Mr. Burnett out of his home, against his will. The officers also agreed ahead of time that there was **"no doubt"** that they would "**tas[e]" this guy if he gets within 21 feet,"** regardless of Mr. Burnett's conduct. *Id.* at 1:01:43-1:01:55. Sergeant Inazu went so far as to instruct Defendant Barth to "sneak around to [the] side of the house, taser out, ready to tase him." Defs.' Ex. A, at 0:40:07–0:40:13.

Ultimately, Defendant officers charged Mr. Burnett as he stood just outside his door. When Mr. Burnett went back inside, Defendants kicked his door open, and immediately tased and tackled him in his living room. They did this without any warning whatsoever. After subduing Mr. Burnett, the officers continued to use force on him as he lay prone, with a spit sock covering his face. When Mr. Burnett eventually became limp and unresponsive, the officers opined that he was just pretending, and continued to forcibly restrain him. But Mr. Burnett was not pretending, and died in the entryway of his home, as a result of the officers' conduct.

As discussed fully herein, the Defendant officers' conduct violated clearly established law prohibiting warrantless seizures, excessive force, and inadequate medical care. In addition, Mr. Burnett has plausibly stated a claim under the Americans with Disabilities Act, and for municipal liability.

### STANDARD OF REVIEW

Plaintiff agrees that this motion should be determined under the plausibility standard of Rule 12(b)(6), under which the Court must "assume the truth of all well-pleaded facts in the complaint, and draw all reasonable inferences therefrom in the light most favorable to the

plaintiff[]." *Dias v. City and County of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009). In that light, a complaint survives "if it alleges a plausible claim for relief—that is, the factual allegations must be enough to raise a right to relief above the speculative level." *Id.* (quotation marks and citations omitted).

### STATEMENT REGARDING THE FACTS TO BE CONSIDERED BY THE COURT

Defendants have provided (at 2-3)[1] their own recharacterized version of Plaintiff's factual allegations, have attached several hours of body-worn camera ("BWC") footage to their motion to dismiss, and have also included (at 4-6) a partial "Statement of Material Facts." Given the Rule 12(b)(6) standard, the Court should decline to consider or adopt Defendants' version of Plaintiffs' allegations, as well as their "Statement of Material Facts," and instead draw the relevant facts directly from the well-pleaded factual allegations of Plaintiffs' complaint.[2]

As to the BWC footage, it was not "attached to or referenced in the complaint," *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1103 (10th Cir. 2017). It also does not "blatantly contradict" Plaintiff's allegations. *See Scott v. Harris*, 550 U.S 372, 380 (2007) (to blatantly contradict, the evidence must leave a party's version of events "utterly discredited"). Nonetheless, as discussed further herein, the BWC footage does, in relevant part, strongly support Plaintiff's claims, particularly with respect to the warrantless entry and excessive force claims. As such, the videos should be considered only in the light most favorable to Plaintiff, and otherwise disregarded. *See Kennedy v. Taylor*, No. 21-CV-0901-WJM-KMT, 2021 WL 6050279, at *3 (D. Colo. Dec. 21, 2021).

---

[1] Plaintiff uses this convention to refer to Defendants' Motion to Dismiss [ECF No. 33].
[2] Accordingly, Plaintiff has omitted a resposive Statement of Facts.

## ARGUMENT

**I.  Mr. Burnett's Warrantless Arrest in His Home Violated Clearly Established Law**

Defendants do not dispute that they forcibly entered Mr. Burnett's house to effect a warrantless arrest. Instead, they claim (at 6) they "were in hot pursuit of a felon."[3] But the 'hot pursuit' exception to the Fourth Amendment's warrant requirement does not apply here because: (1) Defendants lacked probable cause for a felony arrest, (2) the pursuit of Mr. Burnett was clearly not "immediate or continuous," and (3) under clearly established law, Mr. Burnett was already seized before the officers charged at him, and "[a] factor that develops post-seizure cannot be used to justify exigency." *United States v. Reeves*, 524 F.3d 1161, 1170 (10th Cir. 2008).

To begin with, the Court should not credit Defendants' bare assertion that they had probable cause to arrest Mr. Burnett for *felony* menacing (as opposed to 'ordinary' menacing—a misdemeanor). *See* C.R.S. § 18-3-206. Neither the relevant allegations of the complaint, (¶¶ 19-20)[4], nor the BWC, viewed in the light most favorable to Plaintiff, provide the necessary evidentiary basis for conclusively establishing that such probable cause in fact existed. Indeed, Defendants' BWC reveals that the officers themselves disagreed and debated over the course of over an hour and half as to whether they had any probable cause. Defs.' Ex. C, at 0:13:58-0:14:12, 0:39:30-0:39:37; 0:51:10-0:51:18; 0:55:46-0:55:55. It is also reasonable to infer the lack of probable cause from the fact that the officers made no attempt to obtain a warrant over the course of nearly two hours (¶ 35), and instead opted to 'trick' Mr. Burnett into coming out of his house.

---

[3] Defendants also claim (at 7) they had "arguable probable cause to follow Mr. Burnett into his house to arrest him," but this misstates the applicable legal standard. While an arrest in public may be supported solely by probable cause, a seizure in an individual's home requires probable cause *and* either a warrant or a clearly defined exigency—all of which Defendants lacked here. *See Manzanares v. Higdon*, 575 F.3d 1135, 1142-3 (10th Cir. 2009).

[4] Citations to paragraph numbers, without more, e.g. (¶ __), refer to paragraphs in the Amended Complaint [ECF No. 29].

And "[w]hile hot pursuit of a felon might be sufficient, neither the Supreme Court nor [the Tenth Circuit] has ever found an entry into a person's home permissible based merely on the pursuit of a misdemeanant." *Mascorro v. Billings*, 656 F.3d 1198, 1209 (10th Cir. 2011).

Second, the Tenth Circuit has rejected the notion that, "once a person has committed a felony, he is fair game for 'hot pursuit' whenever he is spotted," calling it a "a gross misunderstanding of the law." *Attocknie v. Smith*, 798 F.3d 1252, 1257 (10th Cir. 2015). Instead, "clearly established law on hot pursuit require[s] an 'immediate or continuous' pursuit of a suspect from the crime scene." *Id.* Here, the requirements of immediacy and continuity cannot be met.[5] First, Mr. Burnett's alleged crime had occurred hours earlier. When police arrived, Mr. Burnett was in his home with his door shut (¶¶ 22, 25). *See Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984) (no hot pursuit where suspect "had already arrived home"). And as Defendant Inzau candidly admitted, over an hour in, the encounter was at a "stalemate" and a warrant was likely required:

> **I would love to say we have some sort of hot pursuit** [. . .]. **But I think because of the time we've been here, the courts would not look too happily upon that** because we've kind of established a status quo for our interaction with him. So, I think all said and done, **we're probably going to need to get a warrant to go in there and grab him if he doesn't fall prey to one of our tricks**.

Defs.' Ex. C, at 1:02:00-1:02:28. (emphasis added).

Finally, even if the officers had probable cause for a felony arrest, and even if their pursuit otherwise met the requirements for the hot pursuit exigency, they are still not entitled to qualified immunity. Under clearly established law, the officers' persistent conduct during the encounter amounted to a seizure of Mr. Burnett *before* officers charged at him, and events occurring *after* an individual is seized cannot support an exigency.

---

[5] *United States v. Cruz* is distinguishable because the officers suspected Cruz "possessed drugs and was fleeing with them"; thus the 'crime scene' was either on his own person, or wherever he was last spotted. 977 F.3d 998, 1007 (10th Cir. 2020).

5

By the time the officers decided to charge at Mr. Burnett, they had, for an hour and a half, persistently ordered Mr. Burnett to come out of his house over fifty times, despite Mr. Burnett's objections and his refusal to let them in his home. (¶¶ 25, 32-34, 37). Meanwhile, the officers deliberately tried to get Mr. Burnett to "fall prey to one of our tricks" – i.e., coerce him out of his house against his will – to circumvent the Fourth Amendment's warrant requirement. Defs.' Ex. C, at 1:02:00-1:02:28. Under these circumstances, "a reasonable person would have believed that he was not free to leave," and Mr. Burnett was therefore seized. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

In *Reeves*, the Tenth Circuit applied *Mendenhall* to find that "several police officers consistently knocking and yelling at their door for twenty minutes in the early morning hours" was coercive enough to affect a seizure. 524 F.3d at 1169. "As a result, when Reeves answered his door, he did so in response to a show of authority by the officers and he was seized inside his home." *Id.* The same is true here: Mr. Burnett stepped outside of his home due to the officers' show of authority. No reasonable person in similar circumstances would feel free to terminate the encounter. As such, Mr. Burnett was already seized before the officers charged him.

The *Reeves* court further found that Reeves' subsequent warrantless arrest in his home was unlawful. In particular, the Tenth Circuit held that an "event" that "occurred only after Reeves had submitted to the officers show of authority and was seized" could not supply the required exigency because "[a] factor that develops post-seizure cannot be used to justify exigency." *Id*. at 1170. Again, the same is true here, where Mr. Burnett was unable to terminate the encounter and eventually submitted to the officers' attempts to lure him out of his home.

As Defendant Inazu candidly admitted, the officers were not in hot pursuit of Mr. Burnett, and the circumstances Defendants rely upon to claim exigency were deliberately manufactured by

the officers' 'tricks.' Defs.' Ex. C, at 1:02:00-1:02:28. "As a consequence, no exigent circumstances existed to provide an exception to the warrant requirement," and Plaintiff has plausibly alleged the Defendant officers' conduct violated clearly established law prohibiting his warrantless arrest inside the home. *Reeves*, 524 F.3d at 1170.

Construing the facts in the light most favorable to Plaintiff, in combination with the clearly established law outlined above, the Defendant officers are not entitled to qualified immunity.

## II. Defendants' Force after Their Warrantless Entry Violated Clearly Established Law

Because Defendants illegally entered Mr. Burnett's home in violation of the Fourth Amendment, their subsequent use of force was objectively unreasonable.[6] Nonetheless, Fourth Amendment excessive force claims are analyzed based on the totality of the circumstances using an objective reasonableness test that weighs: (1) the severity of the crime; (2) the level of any threat to an officer or third party; and (3) whether the plaintiff was resisting or attempting to evade arrest. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). These factors are not exclusive, and courts, in determining whether force is excessive, may identify other potentially relevant considerations, *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015), including "whether the officers' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Asten v. City of Boulder*, 652 F. Supp. 2d 1188, 1203–04 (D. Colo. 2009).

Officer Barth tased Mr. Burnett, without warning and within seconds of entering his home, in violation of the Fourth Amendment. None of the *Graham* factors support a conclusion that Officer Barth acted reasonably. First, as explained above, nothing in the complaint permits the

---

[6] A reasonable jury could determine that the unlawful entry was the probable cause of excessive force, and thus the Court need not determine whether the defendants used excessive force or failed to render medical aid. *Attocknie v. Smith*, 798 F.3d 1252, 1258 (10th Cir. 2015).

inference that Mr. Burnett committed a felony or was violent toward the officers. *See Casey v. City of Fed. Heights,* 509 F.3d 1278, 1285 (10th Cir.2007) (a misdemeanor reduces the level of force that is reasonable). Second, Mr. Burnett did not pose an immediate threat to the safety of the officers or others. Mr. Burnett was not armed when Defendants charged him (¶ 44), he never threatened the officers (¶ 45), and he offered passive resistance, at most (¶ 47). Defendants do not argue that they feared Mr. Burnett had a weapon, nor could they. ¶ 31 (Mr. Burnett did not have a knife); Defs.' Ex. C, at 1:02:50 (officer Fleming had the knife from Mr. Burnett's yard before officers charged into the house; Defs.' Ex. A, at 29:56 (Mr. Burnett immediately complied with Inazu's order to drop a knife he (nonthreateningly) was showing him).[7]

Finally, Mr. Burnett was not actively resisting arrest because he was never told he was under arrest (¶¶ 45, 52). In fact, officers told Mr. Burnett he was *not* under arrest before they unlawfully entered his home. Defs.' Ex. C, at 0:23:30–0:24:19. Based on this set of facts, it is clear that, "to the extent that any force was needed, it resulted from [the officers'] decision to forcibly enter and seize [Mr. Burnett] rather than employing other means." *Asten*, 652 F. Supp. at 1204; *see also* ¶¶ 28, 36, 38-43.

---

[7] Defendants brush off Sergeant Inazu, Officer Daigle, and Officer Fleming's failure to intervene and wholly ignore Plaintiff's claim that these officers also used unconstitutional excessive force. However, the *Graham* factors also disfavor these officers' force, and they are not entitled to qualified immunity. First, the officers used excessive force by placing continued weight on Mr. Burnett's prone, limp body (¶¶ 59, 70, 77, 153, 171, and 174). Since at least 2008, the law has been clearly established that putting substantial or significant pressure on a prone suspect's back after being subdued constitutes excessive force. *Weigel v. Broad*, 544 F.3d 1143, 1146-49, 1151-53 (10th Cir. 2008) (finding a constitutional violation where, as here, suspect died of asphyxiation associated with the crushing weight applied by officers while in prone position). Second, Daigle, Fleming, and Inazu failed to intervene in Officer Barth's taser deployments in violation of clearly established law (¶¶ 57, 157). S*ee Mascorro v. Billings*, 656 F. 3d 1196, 1204 n. 5 (10th Cir. 2011).

The immediacy of Officer Barth's taser deployment is significant, and the law was clearly established that such conduct was objectively unreasonable and amounted to excessive force. In *Asten*, the court denied qualified immunity where an officer responded to a call for a woman in a mental health crisis, and when she refused to let the officer into her home, the officer immediately and without warning tased the woman. *Asten,* 652 F. Supp. 2d at 1203–04; *see also Casey,* 509 F.3d at 1285 ("The absence of any warning—or of facts making clear that no warning was necessary—makes the circumstances of this case especially troubling." Because Officer Barth violated clearly established law by tasing Mr. Burnett immediately and without warning, she is not entitled to qualified immunity.

### III. Defendants Violated Clearly Established Law When They Failed to Ensure Reasonable Safety and Provide Adequate Medical Care

Defendants are likewise not entitled to qualified immunity for their failure to adequately ensure Mr. Burnett's safety and provide medical care (¶¶ 184-196). The Fourth Amendment's "objectively unreasonable" standard applies to medical care claims brought by arrestees who have not yet had a probable cause hearing. *Currie v. Chhabra*, 728 F.3d 626, 630-1 (7th Cir. 2013) (citing cases); *Austin v. Hamilton,* 945 F.2d 1155, 1160 (10th Cir. 1991).[8]

Viewed in the light most favorable to him, Mr. Burnett has stated a claim for failure to ensure his safety and provide adequate medical care under the Fourth Amendment, in violation of clearly established law. Officers Fleming and Daigle observed Mr. Burnett lay motionless for minutes, and even after noticing something had changed, failed to take any responsive actions, and put a spit sock on his unconscious, limp body (¶¶ 79, 81, 84, 92-101). Indeed, after acknowledging

---

[8] *See also McCowan v. Morales*, 945 F.3d 1276, 1290 n.11 (10th Cir. 2019) (distinguishing between cases where, as here, officers killed or injured a plaintiff "while seizing him" and cases like *Rife v. Oklahoma Dep't of Pub. Safety,* 854 F.3d 637, 641 (10th Cir. 2017), where an arrestee was deprived of medical care while in police custody).

9

that Mr. Burnett had a light pulse, the officers opined that Mr. Burnett might be "playing possum"—i.e., feigning death (¶ 88). **It is reasonable to infer from the officers' belief that Mr. Burnett was feigning death, that he was in fact dying, and reasonable officers should have immediately taken appropriate action**.

Even if the Court were to apply the Fourteenth Amendment, the Defendant officers are also not entitled to qualified immunity under the deliberate indifference standard. To succeed on a Fourteenth Amendment claim, Mr. Burnett must show "deliberate indifference to his serious medical needs," by alleging facts showing that Defendants know of and disregarded an excessive risk to his health or safety. *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (internal quotations and citations omitted).

Viewing the facts in the light most favorable to Mr. Burnett, the complaint sufficiently alleges facts that withstand the scrutiny of the Fourteenth Amendment. Indeed, the officers knew that Mr. Burnett *appeared* dead (¶ 88). The officers also knew that Officer Carrol was not concerned about Mr. Burnett's breathing *so long as the officers saw Mr. Burnett's chest rise and fall*, and Mr. Burnett had a *good, strong pulse* (¶ 92). However, the officers disregarded obvious signs that Mr. Burnett was not breathing and even acknowledged that they did not see Mr. Burnett's chest rise and fall (¶ 93). Additionally, Mr. Burnett's pupils were not restricting with light, indicating he was dying; yet the officers did not act with any urgency (¶¶ 94, 96). Given Mr. Burnett's obvious health deterioration, any officer should have expedited medical response and immediately began life-saving measures (¶¶ 59, 85, 172, 173). But defendants ignored the obvious signs before them, failed to ever check Mr. Burnett's breathing, and kept him on his stomach so that they couldn't see any chest rise and fall, and failed to update medical personnel about changes to Mr. Burnett's medical condition (¶¶ 172, 174, 175).

Regardless of which constitutional amendment the Court applies, the law was clearly established that Defendant officers' refusal to administer reasonable and adequate medical care violated Mr. Burnett's constitutional rights. *See Estate of Booker*, 745 F.3d at 428 (officers are not entitled to qualified immunity based simply on the argument that courts had not agreed on one verbal formulation of the controlling standard). Since at least 2014, it has been clearly established that officers cannot delay seeking medical care for an arrestee, particularly when their own conduct creates the need for medical care:

> A brief delay in care is particularly problematic when, as here, the Defendants were responsible for placing [the arrestee] in his vulnerable state and engaged in activity (an eight second taser cycle after he had been placed in a carotid neck hold for over two minutes while in a prone position) that could produce foreseeable, rapid, and deadly consequences.

*Id* at 432. The result should be no different here, where Officer Barth tased Mr. Burnett for several seconds and the other officers placed their body weight on Mr. Burnett while in a prone position, which ultimately resulted in foreseeable, deadly consequences.[9] Defendants were on notice that their conduct was objectively unreasonable and violated Mr. Burnett's constitutional rights.

## IV. Plaintiff Plausibly Pled an Americans with Disabilities Act ("ADA") Claim

Despite Defendants' improper attempt to heighten the pleading standard beyond plausibility to prove a specific disability (at 12), Plaintiff alleges sufficient facts, viewed in the light most favorable to him, for this Court to infer discriminatory conduct by Defendants in support of Plaintiff's ADA claim. First, mental illness is a disability under the ADA. 42 U.S.C. § 12102(1). Defendants' argument (at 13) that they did not have knowledge of Mr. Burnett's mental health disability is patently false. The officers knew there was a 'BOLO' notice in place for Mr. Burnett

---

[9] That the officers eventually provided Mr. Burnett CPR does not entitle them to qualified immunity. *Estate of Booker*, 745 F.3d at 433.

because of his declining mental health (¶ 17). Further, Mr. Burnett's mental health crisis was readily apparent to Sergeant Inazu and Officer Fleming because he was making nonsensical statements. (¶ 27). And contrary to Defendants' argument (at 13) that Mr. Burnett must plead a "specific disability", the regulations to the ADA clarify that the definition of "disability" shall be "*construed broadly* in favor of expansive coverage." 28 C.F.R. § 35.108(a)(2) (emphasis added).

Additionally, Mr. Burnett also plausibly pled that he was denied the benefits of proper police protection, and that CSPD discriminated against him by way of his disability. The lawful exercise of police powers is a "service, program, or activity" within the meaning of the ADA. 28 C.F.R. § 35.102; *see also J.H. ex rel. J.P. v. Bernalillo County*, No. Civ 12-10128 JB/LAM, 2014 WL 3421037, at *83 (D. N.M. July 8, 2014). Federal courts have addressed claims under the ADA arising from arrests under at least two theories: (1) where police properly arrest a suspect but fail to reasonably accommodate his disability during the investigation or arrest, causing him to suffer greater injury or indignity than other arrestees; and (2) where a failure to train officers results in the violation of an individual's rights under the ADA. *See Buben v. City of Lone Tree*, Case No. 08-cv-00127, 2010 WL 3894185, *9 (D. Colo. Sep. 30, 2010). Mr. Burnett has plausibly pled that CSPD discriminated against him and denied him the benefits of its services under both theories, therefore establishing the second and third elements of his ADA claim.

Under the first theory, CSPD denied Mr. Burnett the benefits of proper police protection by failing to accommodate his obvious disability during the investigation and arrest. *See* ¶¶ 17, 18, 21, 26-29, 36. Rather than make any accommodations for Mr. Burnet's obvious mental health disability, Defendants Inazu and Fleming deliberately preyed on Mr. Burnett's obvious mental health disability and attempted to coerce him out of his home, against his will (¶¶ 28, 36). After Defendants 'tricked' Mr. Burnett far enough out of his home, they recklessly and unnecessarily

created a hostile situation that ultimately caused Mr. Burnett to suffer great indignity and death (¶¶ 40, 43, 70, 198-204). Under the second theory, CSPD denied Mr. Burnett the benefit of proper police protection by failing to train its officers in how to appropriately respond to people with psychological disabilities (¶¶ 72, 112, 114-19, 188, 202, 203). Notably, CSPD "knew that it was highly likely that defendant officers would encounter citizens suffering from mental illness or agitation, and that citizens suffering from such disorder are at a heightened risk of death from law enforcement use of force methods to restrain them." (¶ 186).

### V. Mr. Burnett Has Plausibly Alleged Municipal Liability

Plaintiff sufficiently alleges facts establishing Colorado Springs' municipal liability for Colorado Springs' Police Department's misconduct based on the custom and policy evidenced by the Internal Affairs ("IA") findings, a ratification theory, and a failure to train theory. *See Quintana v. Sante Fe County Bd. of Com'rs*, 973 F.3d 1022, 1034 (10th Cir. 2020) (holding "the plaintiffs alleged enough to explore their *Monell* claim in the discovery process" given "the low bar for surviving a motion to dismiss").[10]

CSPD's IA division reviewed Defendants' unconstitutional conduct outlined above and determined Defendant officers' conduct with respect to Mr. Burnett was in line with CSPD policies and procedures (¶¶ 130-132). The IA finding are significant for two reasons. First, the IA findings

---

[10] "In the context of municipal liability . . . it is exceedingly rare that a plaintiff will have access to (or personal knowledge of) specific details regarding the existence or absence of internal policies or training procedures prior to discovery." *Thomas v. City of Galveston*, Texas, 800 F. Supp. 2d 826, 842 (S.D. Tex. 2011); *see also Taylor v. RED Dev., LLC*, No. 11-2178-JWL, 2011 WL 3880881, at *4 (D. Kan. Aug. 31, 2011) (failure to plead "additional instances" of wrongdoing "is not fatal under *Iqbal* because it is unlikely that plaintiffs would have access to such information at the pleading stage"). Thus, the pleading requirement for a municipal liability can be satisfied by "past incidents of misconduct to others . . . the involvement of multiple officials in the misconduct, or the specific topic of the challenged policy or training inadequacy . . . or any other minimal elaboration a plaintiff can provide." *Thomas*, 800 F. Supp. 2d at 843–44 (quotations omitted).

13

reveal that CSPD policies permit warrantless entries, excessive force, declining to request urgent medical care or attempt life-saving measures even after a suspect is unresponsive and not breathing, and failure to accommodate mental health disabilities under the circumstances here. (¶¶ 105, 106). Second, the IA findings support municipal liability under a ratification theory. To establish a municipal policy via ratification, a plaintiff must demonstrate that "a final decisionmaker ratifie[d] an employee's specific unconstitutional actions, as well as the basis for these actions." *Bryson*, 627 F.3d at 790. Here, Colorado Springs delegates authority to CSPD Internal Affairs to investigate complaints about officer conduct, making CSPD IA final policymakers on employees' actions (¶ 120). Where, as here, the municipality acts in lockstep with the officer and approves both his conduct and his reason for such conduct, the municipality tethers itself to the officer and thus can be held liable for the constitutional offenses. *Cf. Waller v. City and County of Denver*, 932 F.3d 1277, 1291 (10th Cir. 2019) (inquiring as to the municipality's after-the-fact conduct and finding no ratification because the defendant officer "was criticized and suspended" following the incident); *Bryson*, 627 F.3d at 790 (finding no ratification because the defendant official was disciplined "once the City learned of these particular actions").

Defendants are also liable under a failure-to-train theory, which requires Plaintiff to allege "a specific deficiency that was obvious and closely related to [the plaintiff's] injury." *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010). When a plaintiff alleges such a deficiency, "it might fairly be said that the official policy or custom was both deliberately indifferent to [the plaintiff's] constitutional rights and the moving force behind the injury." *Id.* As to a specific deficiency, Plaintiff alleged that Defendant officers were not trained on how to appropriately respond to citizens experiencing mental health crises (¶¶ 112-115), proper use of force (¶ 113), and warrantless entries (¶¶ 141-146). These deficiencies against people with mental illness implicate

a usual and recurring situation. Although Colorado Springs has a Crisis Intervention Team ("CIT"), officers failed to call CIT when interacting with an obviously mentally ill man (¶ 115). The reasonable inference from the existence of a CIT team and the officers' failure to call such, is that the Defendant officers recurringly interact with people with mental illnesses. Thus, to not train on interacting with a person with mental illness is to be deliberately indifferent (¶ 114). Finally, these deficiencies are "closely related" and thus caused Plaintiff's injuries. (*See, e.g.* ¶¶ 111, 119, 125) ("The City's failure to uphold its obligation to train its officers is a root cause of its officers' unconstitutional conduct. Due to the City's failure to train and discipline its officers, similar unconstitutional acts can be expected in the future."). For these reasons, Colorado Springs is liable for the Defendant Officers constitutional violations.

## CONCLUSION

For the reasons set forth above, Defendants' motion should be denied in its entirety.

DATED this 18th day of February 2022

RATHOD | MOHAMEDBHAI LLC

*s/ Ciara M. Anderson*
Ciara M. Anderson
Felipe Bohnet-Gomez
Benjamin DeGolia
Matthew Cron
2701 Lawrence Street, Suite 100
Denver, Colorado 80205
(303) 578-4400
ca@rmlawyers.com
fbg@rmlawyers.com
bd@rmlawyers.com
mc@rmlawyers.com