**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 21-cv-1708-WJM-MDB

ESTATE OF CHAD ALEXANDER BURNETT,

      Plaintiff,

v.

CITY OF COLORADO SPRINGS;
JOSEPH DAIGLE, in his individual capacity;
MICHAEL INAZU, in his individual capacity;
MATTHEW FLEMING, in his individual capacity; and
CAROLINE BARTH, in her individual capacity,

      Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION TO DISMISS**

---

      Plaintiff Estate of Chad Alexander Burnett ("the Estate") brings this action under 42 U.S.C. § 1983 for alleged violations of Chad Burnett's civil rights under the U.S. Constitution and Americans with Disabilities Act ("ADA") against Officer Joseph Daigle, Sergeant Michael Inazu, Officer Matthew Fleming, and Officer Caroline Barth (collectively, the "Officers") individually and the City of Colorado Springs (collectively, "Defendants").

      Before the Court is Defendants' Motion to Dismiss ("Motion") (ECF No. 33), the Estate's Response (ECF No. 41), and Defendants' Reply (ECF No. 42).  For the reasons explained below, the Motion is granted in part and denied in part.

# I. LEGAL STANDARDS

1.    Rule 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim in a complaint for "failure to state a claim upon which relief can be granted."  "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (internal quotation marks omitted).

The Rule 12(b)(6) standard requires the Court to "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff."  *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).  Thus, in ruling on a Motion to Dismiss under Rule 12(b)(6), the dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice."  *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotation marks omitted).  "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'"  *Id.* (quoting *Twombly*, 550 U.S. at 556).  However, "[t]he burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief."  *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556).

"[C]omplaints that are no more than 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action,' . . . 'will not do.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555).

2.    Consideration of Body-Worn Camera Videos

Well-settled authority provides that the Court "may consider a document outside the pleadings, even in a Rule 12(b)(6) analysis, if the document is (1) mentioned in the complaint, (2) central to the claims at issue, and (3) not challenged as inauthentic." *Ramirez v. Hotel Equities Grp., LLC*, 2019 WL 5964968, at *1 (D. Colo. Nov. 13, 2019) (quotation marks and alterations omitted) (quoting *Toone v. Wells Fargo Bank, N.A.*, 716 F.3d 516, 521 (10th Cir. 2013)).

Defendants attach to the Motion body-worn camera ("BWC") footage from the Officers.  (ECF Nos. 33-1, 33-2, 33-3, 33-4.)  They argue the Court may consider the videos without converting the Motion to a motion for summary judgment under Rule 12(d) because they "clearly contradict" allegations in the Amended Complaint (ECF No. 33 at 3.)  In the Motion, Defendants have used the video evidence to include a section entitled "BWC Video/Movant's Statement of Material Facts," in which Defendants analyze and interpret the video evidence.  (*Id.* at 4–6.)  They assert that in light of their analysis of the BWC footage, the Officers did not act in violation of clearly established law and are therefore entitled to qualified immunity.  (*Id.* at 6–12.)

The Estate argues the Court should not consider the BWC footage because neither is it "attached to or referenced in the complaint" nor does it leave the allegations in the complaint "utterly discredited."  (ECF No. 41 at 3 (quoting *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1103 (10th Cir. 2017); *Scott v. Harris*, 550 U.S. 372, 380 (2007).)  Because of the procedural posture of the Motion and the BWC

footage's susceptibility to multiple interpretations, the Estate argues the BWC footage "should be considered only in the light most favorable to [it], and otherwise disregarded." (ECF No. 41 at 3.)

The Court has considered the parties' arguments, and in its discretion, concludes it will not consider the BWC footage at this time. Nor will the Court consider Defendants' "BWC Video/Movant's Statement of Material Facts" section. While the Court will not consider the video footage in ruling on the Motion, nothing precludes Defendants from raising these arguments and referencing these materials in summary judgment motion practice.

      3.   <u>Qualified Immunity</u>

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). "The judges of the district courts . . . [may] exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Once the qualified immunity defense is raised, the burden shifts to the plaintiff to demonstrate that the law was clearly established at the relevant time. *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014). "A right is clearly established in this circuit when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." *Id.* (internal quotation marks omitted). Nonetheless, the clearly

established prong

> involves more than a scavenger hunt for prior cases with
> precisely the same facts.  The more obviously egregious the
> conduct in light of prevailing constitutional principles, the less
> specificity is required from prior case law to clearly establish
> the violation.  The Supreme Court has cautioned [lower]
> courts not to define clearly established law at a high level of
> generality, but to focus on whether the violative nature of
> particular conduct is clearly established.

*Perea v. Baca*, 817 F.3d 1198, 1204 (10th Cir. 2016) (internal quotation marks and

citations omitted).

## II. BACKGROUND[1]

On the day Chad Burnett died, the Colorado Springs Police Department

("CSPD") responded to two phone calls alleging Burnett had threatened a neighbor with

a knife.  (ECF No. 29 ¶¶ 19–20.)  By the time CSPD Officers Daigle and Fleming

arrived, Burnett had returned to his home.  (*Id.* ¶¶ 22–23.)  Sergeant Inazu arrived 20

minutes later.  (*Id.* ¶ 24.)  Inazu and Fleming approached Burnett's front door and

repeatedly asked him to come outside.  (*Id.* ¶ 25.)  Burnett refused.  (*Id.*)  Inazu and

Fleming asked Burnett to exit his home approximately fifty times over the course of

more than an hour and a half.  (*Id.* ¶ 32.)  Burnett continued to refuse to come outside.

(*Id.* ¶ 33.)  Burnett told the Officers to leave, and at one point called 911 demanding the

Officers leave.  (*Id.* ¶ 34.)

During this time, Burnett was suffering from a mental health crisis and was

making nonsensical statements. (*Id.* ¶¶ 26–27.)  Sergeant Inazu was familiar with

---

[1] The following factual summary is drawn from the Estate's Amended Complaint (ECF No. 29), except where otherwise stated.  The Court assumes the allegations in the Amended Complaint are true for the purposes of deciding the Motion to Dismiss.  *See Ridge at Red Hawk*, 493 F.3d at 1177.  All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

Burnett and his mental illness.  (*Id.* ¶ 26.)  Despite this familiarity, neither Inazu nor any of the other Officers called CSPD's Crisis Intervention Team, which is specially trained to deescalate situations involving citizens experiencing mental health crises.  (*Id.* ¶ 36.)  Nor did the Officers seek a warrant to arrest Burnett.  (*Id.* ¶ 35.)  Instead, the Officers waited for Burnett to step outside.  (*Id.* ¶¶ 37–38.)   Once he did, the Officers began to speak with Burnett while he was near his front door.  (*Id.* ¶¶ 37–38.)  Burnett was unarmed and instructed the Officers to stay off his property.  (*Id.* ¶ 37.)

During this conversation, Inazu, Fleming, and Daigle ran at Burnett in order to arrest him.  (*Id.* ¶¶ 38–39.)  Burnett ran back into his home and attempted to close the door, but Inazu, Fleming, and Daigle charged into the house after him.  (*Id.* ¶¶ 40–42.)  Inazu, Fleming, and Daigle tackled Burnett and physically restrained him.  (*Id.* ¶ 40.)  Officer Barth followed with her Taser drawn and, immediately upon entering Burnett's home, deployed her Taser.  (*Id.* ¶¶ 48–51.)  As Burnett was on his back, held down by Inazu, Fleming, and Daigle, Barth discharged her Taser two more times.  (*Id.* ¶ 56.)  After these additional Taser deployments, the Officers restrained Burnett in a prone position and placed their body weight on his back as they handcuffed him.  (*Id.* ¶ 59.)  As the Officers struggled to remove Burnett from his home, his breathing noticeably worsened.  (*Id.*)  While laying prone, Fleming placed his knee on Burnett's back, despite his difficulty breathing.  (*Id.* ¶ 59.)  Daigle and Barth also placed weight on Burnett's neck, shoulders, and back.  (*Id.* ¶ 70.)  Burnett remained lying prone in the entryway to his home while the Officers restrained his legs with "flex cuffs"; when non-defendant Officer Jacob Carrol arrived, he placed leg shackles on Burnett.  (*Id.* ¶¶ 73, 85.)

Burnett laid motionless for minutes before the Officers noticed something had

changed.  (*Id.* ¶ 79.)  Daigle checked and found Burnett's pulse but did not check

whether Burnett was breathing.  (*Id.* ¶ 83.)  Daigle then placed a "spit sock" over

Burnett's head.  (*Id.* ¶ 84.)  Daigle checked Burnett's pulse several more times, and the

Officers noticed Burnett was not breathing.  (*Id.* ¶¶ 87, 89, 93.)  For the next several

minutes, the Officers stood over Burnett's limp, unconscious body, and at one point

speculated that Burnett might be "playing possum."  (*Id.* ¶¶ 88, 91.)  Carrol indicated he

was not concerned about Burnett's breathing so long as he had a "good, strong pulse"

and his chest was visibly rising and falling.  (*Id.* ¶ 92.)  The Officers acknowledged they

could not see Burnett's chest rise and fall, and his pulse was faint.  (*Id.* ¶ 93.)  The

Officers did not remove the spit sock or move Burnett onto his back to facilitate his

breathing.  (*Id.* ¶ 97.)  About eight minutes after Burnett stopped breathing, the Officers

noticed and began CPR, but neither the Officers nor the emergency medical response

team were able to resuscitate him.  (*Id.* ¶¶ 96, 102.)

Burnett died in the entryway of his home.  (*Id.* ¶ 103.)

### III. ANALYSIS

The Estate asserts the Officers violated Burnett's rights in four ways.  (*Id.* ¶¶

133–204.)  Three of its claims assert violations of constitutional rights and one claim

asserts discrimination in violation of the ADA.  (*Id.*)  The alleged constitutional violations

are: (1) entering Burnett's home without a warrant in violation of the Fourth Amendment;

(2) using excessive force to effect Burnett's arrest in violation of the Fourteenth

Amendment; and failing to provide adequate medical care in violation of the Fourth

Amendment.[2]  The Estate asserts municipal liability on the basis that the violations of

---

[2] The parties dispute the proper Amendment under which to analyze this claim.
(*Compare* ECF No. 34 at 9–12 *and* ECF No. 42 at 4–7 *with* ECF No. 41 at 9–11.)  As discussed

Burnett's constitutional rights are the result of Colorado Springs's policy and custom. (*Id.* at ¶¶ 184–196.)

Defendants' Motion seeks dismissal of the Amended Complaint in full.  (ECF No. 33 at 1.)  The Officers assert they are shielded from liability for the alleged constitutional violations by qualified immunity.  (*Id.* at 6.)  Colorado Springs asserts the allegations in the Amended Complaint related to municipal liability are conclusory and therefore insufficient to state a claim.  (*Id.* at 14.)  Defendants assert that because the Estate has failed to allege the Officers knew Burnett's needed an accommodation, they have failed to state a plausible claim.  (*Id.* at 12–14.)  The Court first considers the Officers' entitlement to qualified immunity for each alleged constitutional violation in turn, using the two-prong test established by the Supreme Court.  *al-Kidd*, 563 U.S. at 735.  The Court next considers Colorado Springs's liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  Finally, the Court considers the viability of the Estate's ADA claim.

## A.    Constitutional Violations – Qualified Immunity

### 1.    Warrantless Entry

#### a.    *Constitutional Violation*

Defendants assert they did not violate Burnett's Fourth Amendment rights, despite arresting him in his home without a warrant, on the basis that the Officers were in "hot pursuit."  (ECF No. 33 at 6.)  Defendants argue the Officers had reasonable suspicion Burnett had committed felony menacing, which ripened into probable cause when Burnett ran into his home.  (*Id.* at 7.)  Therefore, the Officers could legally enter

---

below in Section III.C.1, the Court does not need to resolve this dispute to rule on the Motion.

Burnett's home without a warrant and forcibly arrest him.  (*Id.*)  Defendants rely on *Cortez v. McCauley*, 478 F.3d 1108, 1120 (10th Cir. 2007), and *United States v. Shelton*, 817 F. App'x 629, 633 (10th Cir. 2020), to support the legality of arresting Burnett in his home.

The Estate argues Burnett's warrantless arrest in his home violated his constitutional rights because the Officers were not in "hot pursuit of a felon."  (ECF No. 41 at 4.)  The Estate posits three theories why the "hot pursuit" exception does not apply: (1) the Officers lacked probable cause that Burnett had committed a felony; (2) the Officers' pursuit of Burnett was not "immediate or continuous"' and (3) Burnett had already been seized before the Officers charged at him.  (*Id.*)

The Estate argues the Officers had probable cause of, at most, "ordinary" (*i.e.*, misdemeanor) menacing.  (*Id.*)  Therefore, according to the Estate, the warrantless entry into Burnett's home was unlawful under Supreme Court and Tenth Circuit precedent.  (*Id.* at 5 (citing *Mascorro v. Billings*, 656 F. 3d 1198, 1209 (10th Cir. 2011)).)  The Court disagrees.  The Amended Complaint is clear that CSPD had received two calls from Burnett's neighbors reporting that he had threatened a neighbor with a knife.[3] (ECF No. 29 ¶¶ 19–20.)  Under Colorado law, a person is guilty of menacing "if, by threat or physical action, he or she knowingly places or attempts to place another person in fear of imminent serious bodily injury."  Colo. Rev. Stat. § 18-3-206.  Menacing is generally a misdemeanor; but it is a felony if "committed by the use of a firearm, knife, or bludgeon or a simulated firearm, knife, or bludgeon."  *Id.*  Therefore, the Officers had probable cause to believe that Burnett had committed a felony.

---

[3] After the Officers arrived on the scene, Burnett threw two knives into his front yard. (ECF No. 29 ¶ 31.)

The Estate argues that even if the Officers had probable cause to believe Burnett had committed a felony, the warrantless arrest in his home was unlawful because the hot pursuit exception "require[s] an 'immediate or continuous' pursuit of a suspect from the crime scene."  (ECF No. 41 at 5 (quoting *Attocknie v. Smith*, 798 F.3d 1252, 1257 (10th Cir. 2015)).)  Defendants argue the crime scene was Burnett's yard, so "in contrast to *Attocknie*, [the] pursuit occurred while officers and Mr. Burnett stood feet from a fresh crime scene outside the front door."  (ECF No. 42 at 3.)  The Court is unconvinced.  Just as Defendants here, the officers in *Attocknie* relied on *United States v. Santana*, 427 U.S. 38 (1976), a case "featur[ing] a pursuit that began in a public place and immediately continued into private property."  *Attocknie*, 798 F.3d at 1257–58.  Here, as pleaded in the Amended Complaint, the Burnett was within his home and its curtilage for the entirety of his encounter with CSPD.  (ECF No. 29 ¶¶ 22, 30, 37, 40.)  The area Burnett occupied when the brief chase ensued was "part of the home itself for Fourth Amendment purposes."  *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (citing *Oliver v. United States*, 466 U.S. 170, 180 (1984)).  Taking the Estate's allegation that Burnett remained within the curtilage of his home for the entirety of the encounter with the Officers as true, the Estate has pleaded a plausible Fourth Amendment violation.

The Estate also argues that Burnett's seizure for Fourth Amendment purposes occurred long before the Officers chased him into his home and any exigency resulting from that chase cannot support their warrantless entry into his home.  (ECF No. 41 at 6 (citing *United States v. Reeves* 524 F.3d 1161, 1170 (10th Cir. 2008)).)  People can be seized inside their home, even when they open the door to meet officers waiting outside, if the decision to open the door was coerced.  *United States v. Reeves*, 524

F.3d 1161, 1167–69 (10th Cir. 2008); *see also United States v. Flowers*, 336 F.3d 1222, 1227 n.2 (10th Cir. 2003) (holding that people who open their door involuntarily are arrested in their home).  The Estate argues the timing of Burnett's seizure is relevant because a "factor that develops post-seizure cannot be used to justify exigency."  *Id.* at 1169.

Defendants distinguish *Reeves* by arguing Burnett voluntarily left his home to engage with the Officers who had been outside his home—in and out of his front yard, and at his front door—for more than an hour and a half.  (ECF No. 42 at 3; *see* ECF No. 29 ¶¶ 25, 31, 37, 40.)  Defendants point out that unlike in *Reeves*, "no one was on Mr. Burnett's property" when he left his house prior to being chased inside, and it was not the middle of the night.  (ECF No. 42 at 3; *see also Reeves*, 524 F.3d at 1169 (describing an "encounter [that] began between 2:30 and 3:00 in the morning, a time which must be taken into consideration when analyzing the coerciveness of the encounter").)

These factual distinctions ring hollow.  The relevant question is whether "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).  And while the *Reeves* court explained the late hour of the arrest in that case "must be taken into consideration when analyzing the coerciveness of the encounter," it did not suggest that such a seizure could not occur during the day.  *Reeves*, 524 F.3d at 1169.  The Estate alleges that four officers waited outside Burnett's home for more than an hour and half while repeatedly ignoring his instruction to leave.  (ECF No. 29 ¶¶ 32–35.)  During the time the Officers were outside Burnett's home, they approached his

door several times and asked him to open it more than 50 times.  (*Id.* at 32.)  And when Burnett walked just outside his door, the Officers charged at him and chased him into his home.  (*Id.* at 37–42.)  Considering the allegations in the Amended Complaint in the light most favorable to the Estate, the Court finds that it has plausibly alleged that a reasonable person in Burnett's position would not feel that they were free to leave.

Therefore, the Court finds the Estate has alleged facts sufficient to state a violation of Burnett's Fourth Amendment rights.

> b.   *Clearly Established*

Defendants do not argue that even if the Officers did violate Burnett's constitutional rights, the violation was not clearly established.  (ECF No. 33 at 6–7.) Although Defendants failed to meaningfully develop their argument with respect to the second prong of the qualified immunity analysis, the Court will briefly analyze whether the Estate's well-pleaded constitutional violation was clearly established in 2020.

The factual distinctions between *Reeves* and *Flowers* and this case do not preclude those cases from clearly establishing that the Officers' conduct violated Burnett's rights.  The Court's task is not to engage in a scavenger hunt for cases with the same factual pattern as the case before it.  *Perea*, 817 F.3d at 1204 (10th Cir. 2016).  The Tenth Circuit has commented: "'[G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers' that their conduct violates a constitutional right, and that such statements provide the required notice when 'the unlawfulness' of their conduct is 'apparent' from the pre-existing law." *Stevenson v. City of Albuquerque*, 446 F. Supp. 3d 806, 854 (D.N.M. 2020) (quoting *A.N. ex rel. Ponder v. Syling*, 928 F.3d 1191, 1198 (10th Cir. 2019)).  According to the Tenth Circuit, "[i]n other words, '[g]eneral statements of the law can clearly establish a

right for qualified immunity purposes if they apply with obvious clarity to the specific conduct in question.'  And this is so 'even though the very action in question has not previously been held unlawful.'"  *Id.* (quoting *A.N. ex rel. Ponder*, 928 F.3d at 1198).

*Reeves* and *Flowers* make clear that coercive police conduct directed at people within their homes can effect a seizure upon them, even if they open the door in response to a show of authority.  Defendants contend that Burnett left his home voluntarily, and the Officers only chased Burnett after he began to run.  (ECF No. 42 at 2–3.)  Findings by the trier of fact on these factual questions will ultimately determine whether Defendants are entitled to qualified immunity.  If the Defendants' factual assertions are credited, they will be entitled to qualified immunity on the warrantless entry claim.  But, at this stage of the litigation, the Court must read the Amended Complaint in the light most favorable to the Estate and draw all reasonable inferences in its favor.  *Ridge at Red Hawk*, 493 F.3d at 1177.   And if, as he alleges, Burnett had already been seized for Fourth Amendment purposes by the time the Officers charged at him, then the fact that he ran back into his home and attempted to close the door cannot provide the basis of a "hot pursuit" exception to the Fourth Amendment's warrant requirement.  *Reeves* 524 F.3d at 1170.

Therefore, the Court finds the Estate has alleged facts that, if found by the jury to be true, are sufficient to allege a constitutional violation which was clearly established at the time Burnett was arrested.

　　　2.　　Excessive Force

　　　　　a.　　*Constitutional Violation*

"[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen

should be analyzed under the Fourth Amendment and its 'reasonableness' standard
. . . ."  *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis removed).  Under this
standard, "the question is whether the officers' actions are objectively reasonable in light
of the facts and circumstances confronting them, without regard to their underlying
intent or motivation."  *Morris v. Noe*, 672 F.3d 1185, 1195 (10th Cir. 2012).

Applying this standard "requires careful attention to the facts and circumstances
of each particular case, including [1] the severity of the crime at issue, [2] whether the
suspect poses an immediate threat to the safety of the officers or others, and
[3] whether he is actively resisting arrest or attempting to evade arrest by flight."
*Graham*, 490 U.S. at 396; *see also Lundstrom v. Romero*, 616 F.3d 1108, 1126 (10th
Cir. 2010) (referring to the *Graham* factors as the "three, non-exclusive factors relevant
to [an] excessive force inquiry").  The Court may further consider whether "the officers'
own reckless or deliberate conduct during the seizure unreasonably created the need to
use such force."  *Cordova v. Aragon*, 569 F.3d 1183, 1188 (10th Cir. 2009) (internal
quotation marks and citation omitted).

Relying on the BWC footage, Defendants argue that "all three *Graham* factors tilt
in the officers' favor."  (ECF No. 42 at 4.)  As an initial matter, the Court agrees with the
Defendants with respect to the first *Graham* factor.  While the Estate correctly points out
that less force is reasonable when the suspected crime is a misdemeanor (ECF No. 41
at 7–8 (citing *Casey v. City of Fed. Heights*, 590 F.3d 1278, 1285) (10th Cir. 2007))), as
discussed above in Section III.A.1, the Officers had probable cause to believe Burnett
had committed felony menacing.  This assessment can be made solely based on the
allegations in the Amended Complaint.  (ECF No. 29 ¶¶ 19–20.)  Therefore, viewing the

Amended Complaint in the light most favorable to the Estate, the first *Graham* factor cannot favor the Estate.

Defendants make no argument addressing the second *Graham* factor other than asserting it supports the Officers' use of force based on the BWC footage.[4]  (ECF No. 33 at 7–9; ECF No. 42 at 3–4.)  This lack of argument is reason enough to find this factor favors the Estate.[5]  Moreover, the Estate plausibly alleges that Burnett was not an immediate threat to the safety of the Officers or others because he was unarmed and did not threaten the Officers.  (ECF No. 41 at 8.)  And while the Officers had reason to believe Burnett had threatened a neighbor with a knife, they knew that that alleged event had occurred several hours earlier.  (ECF No. 29 ¶¶ 19, 40.)  Therefore, viewing the Amended Complaint in the light most favorable to the Estate, the Court finds that the second *Graham* factor favors the Estate.

The third *Graham* factor—whether Burnett actively resisted arrest or attempted to evade arrest by flight—is properly considered in light of the Officers' deliberate conduct.  *See Cordova*, 569 F.3d at 1188.  The Amended Complaint alleges Burnett "offered only passive resistance" to the Officers' efforts to arrest him.  (ECF No. 29 ¶47.)  Defendants disagree with this characterization, arguing that Burnett attempted to run, refused to be handcuffed, and attempted to go back into his house after being walked outside by the Officers.  (ECF No. 33 at 2.)  The Estate argues that, even if Burnett's resistance was

---

[4] Though they claim "[t]he videos make clear" that each of the *Graham* factors support the officers' use of force, Defendants do not even cite which portions of the footage are relevant to the second (or any other) factor.  As noted above, the Court does not consider the BWC footage at this time.  The Court notes the lack of citation here, merely to illustrate that Defendants did not develop their argument.

[5] *United States v. Hunter*, 739 F.3d 492, 495 (10th Cir. 2013) (cursory argument not meaningfully developed by any analysis or citation is deemed waived).

not passive (which it does not concede), to the extent force was required to overcome Burnett's resistance or flight, it was the result of the Officers' decision to charge at Burnett and chase him into his home.  (ECF No. 41 at 9.)  This factor could weigh in favor of the Estate or the Defendants, depending on whether the Officers created the need to use force (including three Taser cycles and placing body weight on Burnett while he was prone).  (ECF No. 29 ¶¶ 48–57.)

Excessive force claims require assessing the totality of the circumstances, and not simply tallying factors on two sides of a ledger.  *Weigel v. Broad*, 544 F.3d 1143, 1151–52 (10th Cir. 2008).  Still, two of the three factors could plausibly favor the Estate, and the Amended Complaint is consistent with both the Estate's and Defendants' view of the events.  The Court must consider the allegations in the Amended Complaint in the light most favorable to the Estate, and therefore, the Court finds the Estate has alleged facts sufficient to state a violation of Burnett's Fourth Amendment rights.

b.   *Clearly Established*

As the Tenth Circuit has explained, "*Graham* establishes that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest." *Casey*, 509 F.3d at 1285 (citation omitted); *see also Morris v. Noe*, 672 F.3d 1185, 1198 (10th Cir. 2012) (citing *Thornton v. City of Macon*, 132 F.3d 1395, 1400 (11th Cir. 1998) (holding where arrestees had not committed a serious crime, posed no immediate threat, and did not actively resist arrest, "the officers were not justified in using any force, and a reasonable officer thus would have recognized that the force used was excessive") (emphasis in original).  Similarly, in *York v. City of Las Cruces*, the Tenth Circuit denied qualified immunity where there was no evidence that the plaintiff, who struck his head and shoulder on pavement following an officer's execution of an "arm-

16

bar takedown," was "attempting to evade arrest by flight," and the allegation that he was resisting arrest was disputed.   523 F.3d 1205, 1209, 1211 (10th Cir. 2008).

In *McCoy v. Meyers*, the Tenth Circuit reiterated that cases need not be "factually identical" to find clearly established law, and "factually analogous" cases may suffice. 887 F.3d 1034, 1052 (10th Cir. 2018) (citing *Dixon v. Richer*, 922 F.2d 1456 (10th Cir. 1991) and *Weigel*, 544 F.3d 1143 (10th Cir. 2008) in finding that "it was 'clearly established [on March 21, 2011] that officers may not continue to use force against a suspect who is effectively subdued") (alterations in original); *see also McCowan v. Morales*, 945 F.3d 1276, 1289 (10th Cir. 2019) ("gratuitous application of force to McCowan, a fully subdued, compliant and non-threatening misdemeanant arrestee, violated the Fourth Amendment").   None of the cases cited above squarely fit the facts presented here, but a federal court "cannot find qualified immunity whenever [it] find[s] a new fact pattern."   For this sound reason, the Tenth Circuit has "adopted a sliding scale to determine when law is clearly established" in which '[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.'"   *Reeves*, 745 F.3d at 427 (quoting *Casey*, 509 F.3d at 1284) (alteration in original).

If Defendants' characterization of the events is true—that Burnett was suspected of a felony, that the Officers only put body weight on Burnett when he was actively resisting, and that Burnett was not subdued when Officer Barth cycled her Taser three times—then the Officers would be entitled to qualified immunity.   However, if the allegations viewed in light most favorable to the Estate are true—that Burnett only offered passive resistance, that the Officers continued to apply their body weight to his

back while he was prone and subdued, and that Burnett had already been subdued by the time Barth entered his home and tased him—then the Officers' use of force would be in violation of clearly established law.  The reasonableness of the Officers' force is especially suspect if whatever resistance Burnett offered was provoked by the Officers' deliberate decision to trick Burnett into leaving his home to circumvent the warrant requirement.  (ECF No. 41 at 2; *see Cordova*, 569 F.3d at 1188.)

Therefore, the Court finds the Estate has alleged facts that, if true, are sufficiently analogous to prior cases to show that the alleged constitutional violation was clearly established at the time Burnett was arrested.

    3.    Failure to Provide Medical Care

        a.    *Constitutional Violation*

The parties dispute which amendment applies to the Estate's inadequate medical care claim.  The Estate argues that because Burnett was arrested without a warrant and had not yet had a probable cause hearing, his claim is governed by the Fourth Amendment.  (ECF No. 41 at 9.)  Defendants argue that published Tenth Circuit opinions establish that the Fourteenth Amendment applies.  (ECF No. 42 at 5.)

This disagreement is not purely academic; the standard that will apply under each amendment is different.  *Lanman v. Hansen*, 529 F.3d 673, 679–80 (10th Cir. 2008).  Under the Fourth Amendment, the "objectively unreasonable" standard applies, and under the Fourteenth Amendment, the "deliberate indifference" standard applies. *Id.*  Traditionally, the "deliberate indifference" standard includes both an objective and subjective element—and therefore presents a higher bar for a plaintiff to clear.  *See Strain v. Regaldo*, 977 F.3d 984, 989–90 (2020), *cert. denied*, 142 S. Ct. 312 (2021).  In 2015, the Supreme Court eliminated the subjective component of deliberate indifference

claims based on excessive force.  *See Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).  Since *Kingsley*, "the circuits are split on whether *Kingsley* eliminated the subjective component of the deliberate indifference standard by extending to Fourteenth Amendment claims outside the excessive force context."  *Regaldo*, 977 F.3d at 990 (2020).  The Tenth Circuit declined to extend *Kingsley* to Fourteenth Amendment claims beyond those based on excessive force.  *Id.* at 991.  Therefore, if the Estate's claim is rooted in a violation of Burnett's Fourteenth Amendment rights, it must allege facts sufficient to satisfy both the objective and subjective prongs.

The Court need not decide which amendment applies and declines to do so unnecessarily.  Even under the two-pronged deliberate indifference standard, the Court finds that the Estate has pleaded a plausible claim.  The Tenth Circuit explained the two-prong test as below:

> The objective inquiry asks whether "the harm suffered rises to a level sufficiently serious to be cognizable under the Cruel and Unusual Punishment Clause of the Eighth Amendment."  *Id.* (quoting *Mata v. Saiz*, 427 F.3d 745, 752–53 (10th Cir. 2005) (quotation marks omitted)).  The subjective inquiry, in turn, asks whether "the defendants knew [the detainee] faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it."  *Id.* (quoting *Callahan*, 471 F.3d at 1159 (quotation marks omitted)).

*Quintana v. Santa Fe Cnty. Bd. Comm'rs*, 973 F.3d 1022, 1029 (2020) (quoting *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009)).

The Amended Complaint has pleaded sufficient facts to satisfy the objective prong.  A "medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Id.* (quoting *Sealock v.*

*Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (alteration in original).  The Amended Complaint alleges Burnett "ceased breathing and lost consciousness."[6]  (ECF No. 29 ¶ 77).  The Officers acknowledged that they could not see physical signs that Burnett was breathing.  (*Id.* ¶ 93.)  It does not take a medical degree to recognize that someone who is not breathing requires a doctor's attention.

The Estate has also pleaded sufficient facts to satisfy the subjective prong.  To satisfy that prong, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Quintana*, 973 F.3d 1029 (noting "the Supreme Court has insisted upon actual knowledge").  A factfinder may conclude an official "'knew of a substantial risk from the very fact that the risk was obvious' . . . to the so-called 'reasonable man.'"  *Id.*; *accord Mata*, 427 F.3d at 752.  Again, when someone stops breathing, it is obvious that there is a problem.  A reasonable jury could find that when Burnett showed visible signs he was no longer breathing, there existed a substantial risk to Burnett's health that was so obvious that the Officers had actual knowledge of the risk.

The Amended Complaint further alleges facts sufficient for a jury to conclude the Officers delayed meeting that obvious need and, in doing so, caused Burnett substantial harm.  *See Mata*, 427 F.3d at 752.  The Estate alleges that, while Burnett "laid motionless for minutes," the Officers "laughed and joked about how successfully Sergeant Inazu had executed the warrantless entry into Mr. Burnett's home."  (ECF No.

---

[6] The Amended Complaint also alleges Burnett "made gasping and moaning noises . . . [, which] are a clear sign of agonal breathing, an involuntary brainstem reflex caused by heart failure or respiratory arrest."  (ECF No. 29 ¶ 77; *see also id.* ¶¶ 78, 84, 90, 96, 122, 172.)  The Tenth Circuit has noted that the symptoms of heart failure are "subtle[.]"  *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1317 (10th Cir. 2002).

29 ¶¶ 79, 82.)  It alleges that, despite visible signs Burnett was no longer breathing, Daigle placed a "spit sock" over his head.  (*Id.* ¶ 84.)  Though the Defendants assert Burnett was "holding his head up" (ECF No. 33 at 4), the Amended Complaint clearly alleges that for "several minutes, the Officers simply stood over Mr. Burnett's limp, unconscious body."  (ECF No. 29 ¶ 91.)  The Estate alleges the Officers did not request expedited medical response until after Burnett stopped breathing, and "[t]he officers did not attempt to resuscitate Mr. Burnett until approximately eight minutes" later.  (*Id.* ¶ 96.)

Therefore, the Court finds the Estate has alleged facts sufficient to state a violation of Burnett's Fourteenth Amendment rights.

b.   *Clearly Established*

The Estate agues the delay the Officers caused violated clearly established law, relying on *Estate of Booker v. Gomes*, 745 F.3d 405 (10th Cir. 2014).  (ECF No. 41 at 11.)  In *Estate of Booker*, "the Defendants actively participated in producing Mr. Booker's serious condition through their use of force against him, which included a carotid neck hold, considerable weight on his back, and a taser."  745 F.3d at 431.  The defendants in *Estate of Booker* "conced[ed] they failed to check Mr. Booker's vitals or even look at his face after the incident" in an attempt to avoid liability.  *Id.*  The Tenth Circuit held "the contours of the right are clearly established such that any reasonable officer in the Defendants' position (and with their training) would have known that failing to check Mr. Booker's vital signs, perform CPR, or seek medical care for three minutes when he was limp and unconscious as a result of the Defendants' use of force could violate the Constitution."  *Id.* at 434.  The Estate argues *Estate of Booker* put the Defendants on notice that participating in producing Burnett's serious medical condition and then failing to check his breathing, perform CPR, or seek medical care promptly

was a violation of Burnett's constitutional rights.  (ECF No. 41 at 11.)

The Defendants argue *Estate of Booker* is distinguishable and did not put the Officers on notice.  (ECF No. 42 at 6–7.)  Defendants also note the following factual distinctions from *Estate of Booker*: (1) the Officers did not put Burnett in a carotid hold; (2) there is no allegation of positional asphyxiation; (3) the causal chain between the Taser deployment and when Burnett stopped breathing is broken; (4) the Officers repeatedly checked Burnett's pulse; and (5) the encounter occurred in Burnett's home rather than a jail.  (*Id.* at 7.)  Defendants also cite *Crittenden v. City of Tahlequah*, 786 F. App'x 795, 804 (10th Cir. 2019), an unpublished case in which the Tenth Circuit explained that it was an "open question" whether officers have a duty to provide medical care during "a chaotic situation [during which they] could reasonably be concerned about the presence of additional armed individuals."  *Id.* at 803.

The distinctions between *Estate of Booker* and the instant case are not as stark or material as Defendants suggest.  First, their suggestion that there is no allegation of positional asphyxiation is simply false.  The Estate alleges that "Daigle and Fleming's use of their body weight to press on Mr. Burnett while he was restrained *in a position compromising his breathing*" was "objectively unreasonable."  (ECF No. 29 ¶ 153 (emphasis added).)  While the parties agree the Officers checked Burnett's pulse, this shifts the conversation from checking "vital signs" to a "pulse," and the Amended Complaint alleges the Officers failed to check whether Burnett was breathing, despite visible signs that he was not.  (ECF No. 29 ¶¶ 83, 93.)  And, regardless of Defendants' characterization of the Taser use in this case, the Amended Complaint alleges that two of the three Taser cycles were while Burnett was "immobilized and effectively subdued."

(ECF No. 29 ¶ 56.)  The Amended Complaint also alleges that Burnett was "limp" while the Officers stood directly over him—a fact that the Defendants contest.  (*Id.* at 91; ECF No. 33 at 5.)

The Court notes that the remaining distinctions the Defendants point to— particularly, that there was no carotid neck hold—are indeed present.  Nonetheless, if the allegations as set forth in the Amended Complaint are determined by the jury to be true, these differences would not preclude a finding that the Officers were on notice that their conduct violated Burnett's rights.  *Estate of Booker* clearly established failing to check Burnett's breathing, perform CPR, or seek medical care while he was limp, unconscious, and not breathing for three and a half minutes because of their use of force was a violation of Burnett's rights.  745 F.3d at 434.

Therefore, the Court finds the Estate has alleged facts that, if true, are sufficiently factually analogous to prior cases to show that the alleged constitutional violation was clearly established at the time Burnett was arrested.

## B.    Municipal Liability

A local government unit can be liable for damages under 42 U.S.C. § 1983 only when its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."  *Monell*, 436 U.S. 658, 694 (1978).  The Supreme Court has thus "required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury," thereby "ensur[ing] that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality," rather than holding the municipality liable simply because it employed a constitutional

wrongdoer.  *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403–04

(1997).

The relevant policy or custom can take several forms, including:

> (1) a formal regulation or policy statement; (2) an informal
> custom amounting to a widespread practice that, although
> not authorized by written law or express municipal policy, is
> so permanent and well settled as to constitute a custom or
> usage with the force of law; (3) the decisions of employees
> with final policymaking authority; (4) the ratification by such
> final policymakers of the decisions—and the basis for
> them—of subordinates to whom authority was delegated
> subject to these policymakers' review and approval; or
> (5) the failure to adequately train or supervise employees, so
> long as that failure results from deliberate indifference to the
> injuries that may be caused.

*Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (internal quotation

marks omitted; alterations incorporated).  But, whatever species of policy or custom is

alleged,

> [t]he plaintiff must also demonstrate that, through its
> *deliberate* conduct, the municipality was the "moving force"
> behind the injury alleged.  That is, a plaintiff must show that
> the municipal action was taken with the requisite degree of
> culpability and must demonstrate a direct causal link
> between the municipal action and the deprivation of federal
> rights.

*Bryan Cnty.*, 520 U.S. at 404 (emphasis in original).

The Estate asserts municipal liability on three theories: informal custom,

ratification, and failure to train.  (ECF No. 41 at 13.)  The Defendants argue none of

these theories are plausible because "[t]he Amended Complaint does little more than

allege municipal liability in conclusory terms."  For the reasons discussed below, the

Court finds the Estate has alleged a plausible claim against Colorado Springs.

1.    <u>Informal Custom</u>

"[A]n act performed pursuant to a custom that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Bryan Cnty.*, 520 U.S. at 404 (internal quotation marks omitted); *see also City of St. Louis v. Prapotnik*, 485 U.S. 112, 127 (1988) (establishing an informal policy or custom requires the plaintiff to show that the misconduct was widespread—*i.e.*, that it involved a series of decisions).  "With formal, unwritten policies, customs, or practices, the plaintiff can plead a pattern of multiple similar instances of misconduct; 'no set number is required, and the more unique the misconduct is, and the more similar the incidents are to one another, the smaller the required number will be to render the alleged policy plausible.'" *Arakji v. Hess*, 2015 WL 7755975, at *6 (D. Colo. Dec. 2, 2015) (quoting *Griego v. City of Albuquerque*, 100 F. Supp. 3d 1192, 1213 (D.N.M. 2015)).

The Amended Complaint alleges multiple instances of CSPD officers engaging in conduct similar to the alleged civil rights violations in this case.  (ECF No. 29 ¶¶ 106–10.)  The Motion attempts to undercut these allegations by drawing factual distinctions between them and the events that led to Burnett's death.  (ECF No. 33 at 14.)  But, despite the superficial distinctions Defendants point out, in the Court's view the prior incidents identified by the Estate have much more than a passing similarity to each other and to the allegations in the Amended Complaint.  These prior incidents include unlawful seizures and arrests, excessive use of body weight restricting breathing, and excessive use of Tasers resulting in death.  (ECF No. 29 ¶¶ 106–110.)  While these facts alone may not be enough to show an informal custom by a preponderance of the evidence, they are numerous enough and similar enough to the instant case to plead a

plausible claim.  Additionally, courts have held that the existence of a widespread policy is sufficient to support the inference that a municipality was on notice of the rights violations, thereby satisfying the deliberate indifference prong of the municipal liability analysis.  *See Trujillo v. City & Cnty. of Denver*, 2017 WL 1364691, at *7 (D. Colo. Apr. 14, 2017) (citing *McComb v. Ross*, 202 F. Supp. 3d 11, 18 (D.D.C. 2016)).

Therefore, the Court denies the Motion with respect to the Estate's informal custom theory.

### 2.   Ratification

"Ratification can be found when the employees were given authority for the action, subject to the review and approval of a final policymaker, and when the final policymaker approves of the decision and the basis for the decision."  *Cobruno v. Diggins*, 2018 WL 10215848, at *10 (D. Colo. 2018) (citing *Brammer-Hoelter v. Twin Peaks Charter Academy*, 602 F.3d 1175, 1189 (10th Cir. 2010)).  The final decisionmakers' approval must precede the violative action, and the Tenth Circuit has rejected ratification based on conduct after the violation has occurred.  *Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009) ("[B]asic princip[les] of linear time prevent us from seeing how conduct that occurs *after* the alleged violation could have somehow caused that violation.") (emphasis in original).

The Estate's ratification theory fails as presently pleaded because it is entirely based on the findings of CSPD's "Internal Affairs" division.  Even assuming Internal Affairs is a final decisionmaker—which Defendants contest (ECF No. 42 at 9 n.6)—the post-incident investigation concluding "that Defendant Officers had followed appropriate policy and procedures" cannot plausibly form the basis of municipal liability on a ratification theory.  (ECF No. 29 ¶¶ 128–29.)  Therefore, the Court grants the Motion

with respect to the Estate's ratification theory.

     3.   <u>Failure to Train</u>

Defendants assert the Amended Complaint is inadequate because "it says nothing about the training of the officers, individually or collectively.  (ECF No. 33 at 15.) According to Defendants, "[t]he municipal liability claim is no more than multiple naked assertions lacking factual detail, and they are insufficient to state a claim against the City."  In response, the Estate points out paragraphs in the Amended Complaint that allege that CSPD officers were not trained on how to respond to citizens experiencing mental health crises, to deescalate encounters, to avoid the use of excessive force, and to avoid warrantless entry.  (ECF No. 29 ¶¶ 112–115, 141–46.)

Further, the Estate alleges facts tending to show that this failure caused the events that led to Burnett's death.  (*Id.* ¶¶ 26–27, 187–88) (Officers were aware of Burnett's condition and, despite calling for backup, failed to call for CSPD's Crisis Intervention Team).  Further, the Estate alleges that "CSPD's internal affairs investigation concluded that Defendant Officers had followed appropriate policy and procedures" in "all areas of concern" raised directly by the Estate's counsel.  (*Id.* at ¶ 127–29.)  In other words, the Officers acted in accordance with their training.  *See Ortega v. City & Cnty. of Denver*, 944 F. Supp. 2d 1033, 1038–39 (D. Colo. 2013) (finding that law enforcement officers' use of excessive force in accordance with their training established a *Monell* claim for failure to train).

In short, the Estate has pleaded facts sufficient to find that the Officers were inadequately trained and that inadequate training, at least in part, caused Burnett's injuries.  The Defendants raise no other issues with the Amended Complaint's allegations relating to the Estate's failure-to-train theory, therefore the Court denies the

Motion with respect to the Estate's failure-to-train theory.

**C.     Americans with Disabilities Act**

In addition to the constitutional violations discussed above, the Estate asserts the Officers violated Burnett's statutory rights under the ADA.  (ECF No. 29 at 35–36.)  The Tenth Circuit has not decided the viability of an ADA claim for failing to accommodate a disability in the course of making an arrest.  *J.H. ex rel. J.P. v. Bernalillo Cnty.*, 806 F.3d 1255, 1261 (10th Cir. 2015).  But the Court will assume for the purposes of resolving the Motion that such a claim is viable against Colorado Springs.  *See Reyes v. Jensen*, 857 F. App'x 436,439 (10th Cir. 2021) (quoting *Everson v. Leis*, 556 F.3d 484, 501 (6th Cir. 2009)) ("[T]he proper defendant under [an ADA] Title II claim is the public entity or an official acting in his official capacity").

The Court limits its discussion to the issue of knowledge because it is dispositive of this claim.  The Estate emphasizes that CSPD in general, and Sergeant Inazu and Officer Fleming in particular, knew about Burnett's disability.  (ECF No. 41 at 11–12.)  Even granting this as true, the Estate has not pleaded a plausible violation of Burnett's rights under the ADA because "[t]his argument . . . conflates a disability with a need for accommodation."  *J.H. ex rel. J.P.*, 806 F.3d at 1261.  "If a police officer incurs a duty to reasonably accommodate a person's disability during an arrest, this duty [arises] only if [the Officers knew] that [Burnett] needed an *accommodation*."  *Id.* (emphasis added).  There is no allegation in the Amended Complaint the Officers knew Burnett needed an accommodation, only that they knew Burnett had mental illness (*i.e.*, a disability).  (ECF No. 29 ¶¶ 16, 70.)

Therefore, the Court grants the Motion with respect to the Estate's ADA claim.  The ADA claim against the Officers in their individual capacities is dismissed with

prejudice; but because the Estate could possibly plead facts that would plausibly state a claim against Colorado Springs, the ADA claim against it is dismissed without prejudice.

## IV. CONCLUSION

For the reasons set forth above, the Court Orders as follows:

1.      Defendants' Motion to Dismiss (ECF No. 33) is GRANTED with respect to the Estate's ADA claim and its ratification theory of municipal liability as set forth above, and is DENIED in all other respects;

2.      The Stay of this action (ECF No. 35) is hereby LIFTED;

3.      Should the Estate believe it can plausibly plead facts which would cure the pleading deficiencies noted in this Order, it may file an amended complaint reflecting same by no later than **August 19, 2022**.  Any such amended complaint may re-plead an ADA claim ONLY against Colorado Springs; and

4.      Counsel for all parties shall jointly contact the Chambers of Magistrate Judge Dominguez Braswell by no later than **July 27, 2022** to schedule a Status Conference, or such other proceeding as Judge Dominguez Braswell deems appropriate to move this action forward.

Dated this 22nd day of July, 2022.

BY THE COURT:

William J. Martinez
United States District Judge