## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No:  21-cv-1708-WJM-MDB

ESTATE OF CHAD ALEXANDER BURNETT,

      Plaintiff,

v.

CITY OF COLORADO SPRINGS, a municipality;
SERGEANT MICHAEL INAZU, in his individual capacity;
OFFICER JOSEPH DAIGLE, in his individual capacity;
OFFICER MATTHEW FLEMING, in his individual capacity; and
OFFICER CAROLINE BARTH, in her individual capacity,

      Defendants.

---

## INDIVIDUAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Defendants, Sergeant Michael Inazu, Officer Joseph Daigle, Officer Matthew Fleming and Officer Caroline Barth, hereby move for summary judgment.

### I.    Movants' Statement of Material Facts

1.    On May 24, 2020, Chad Burnett ("Burnett") was approximately 6'7" and weighed 250 pounds. (Ex. R, Deposition of Joseph Daigle, 95, lns. 23-25; Ex. S, Deposition of Caroline Barth, 83, ln. 6; Ex. R, 135, ln. 16; Ex. O, Discovery Res., p. 32, Req. for Admission #13 ("RFA"))

2.    On May 24, 2020, multiple elderly neighbors called 911 to report Burnett had threatened them with a knife. (Ex. O, RFA 5 and 6)

3.     Burnett lived at 2749 Ashgrove Street in Colorado Springs, Colorado. (Ex. T, Deposition of Matthew Fleming, 29, lns. 9-12; Ex. J, Affidavit of Caroline Romine, p. 2, ¶ 5, Ex. M, Map; Ex. K, Affidavit of Matthew Fleming, p. 1-2, ¶¶ 3-4; Ex. L, Affidavit of Joseph Daigle, p. 1-2, ¶¶ 3-4)

4.     Officers Fleming and Daigle were dispatched to the neighborhood. (Ex. T, 25, lns. 13-25)

5.     All the officers were wearing standard Colorado Springs Police Department ("CSPD") uniforms. (Ex. F, Body Worn Camera ("BWC") footage of Matthew Fleming 3:24-3:27; Ex. E, BWC footage of Joseph Daigle 2:04-2:05; Ex. G, BWC footage of Michael Inazu 40:35)

6.     They were first contacted by Broadmoor security who informed them that it had been an "ongoing situation," likely captured in police records from prior callouts. (Ex. F 4:11)

7.     Sergeant Inazu joined them shortly after. (Ex. T, 30, lns. 19-25; 31, lns. 1-5)

8.     On the date, Sgt. Inazu was aware that the Crisis Response Team ("CRT") had previously been at Burnett's residence and Burnett had refused services or refused to communicate. (Ex. U, Deposition of Michael Inazu, 31, lns. 19-25; 32, lns. 1-2, 18-24; 33 lns. 1-12; Ex. T, 34, lns. 13-22)

9.     CRT consisted of a mental health clinician, medically trained fire fighter and police officer. (Ex. T, 36, lns. 9-17)

10.    On the date, Sgt. Inazu did not know about Burnett's history of mental health treatment. (Ex. U, 34, lns. 1-2)

11.    The security officer also informed Officers Fleming and Daigle that Burnett was "harassing the entire neighborhood over the last few months," harassing two other members of the homeowners' association, who were actively seeking a restraining order against Burnett and that Burnett had "some family issues." (Ex. F 4:11-4:40; Ex. D, BWC footage of Joseph Daigle 16:13-16:20)

12.     The security officer provided an overview of the events which lead to the calls for service that morning, where Burnett approached neighbors, raised a knife over his head and threatened them. (Ex. F 5:15-5:55)

13.     The security officer advised the officers that firearms were possibly in Burnett's house. (Ex. R, 21, lns. 9-12; 40, lns. 20-22; Ex. U, 61, lns. 4-5)

14.     Sgt. Inazu was aware of prior calls for service and a Be-On-The-Look-Out ("BOLO") associated with Burnett and his address. (Ex. U, 29, lns. 12-17; 31, lns. 9-25; 32, lns. 1-2; Ex. T, 34, lns. 6-8; Ex. F 07:38)

15.     After speaking with security, Officer Daigle interviewed Mr. and Mrs. Shaw and Ms. Silver, where he learned that the incident started when neighbors saw Burnett's dog roaming the neighborhood alone. Linda Silver retrieved the dog from a neighbor and took her to John and Carolyn Shaw's house because the Shaws had a good relationship with Burnett. (Ex. E 5:11-10:29)

16.     Officer Daigle learned Burnett approached the Shaws around the same time as Ms. Silver was handing the dog to the Shaws. Burnett seemed oblivious to the presence of the dog and attempted to hand Mr. Shaw a stack of valuable family items. (Ex. E 06:40-10:29)

17.     According to Mr. Shaw, when Mr. Shaw declined to accept the items, Burnett became upset, pulled out a knife, raised it over his head and threatened Mr. Shaw. (Ex. E 08:15; Ex. R, 24, lns. 1-21; 26, lns. 3-8, 14-17; Ex. U, 38, lns. 13-25; 39, lns. 1-23)

18.     As Officer Daigle spoke with Ms. Silver and the Shaws, Officer Fleming observed Burnett throwing items out of his house and radioed the information to the other officers. (Ex. F 18:09-18:17) Officer Daigle ended his interview. (Ex. E 10:30)

19.     With Burnett back inside the house, Sgt. Inazu and Officer Fleming approached the front door and engaged Burnett in conversation. They asked him to talk with them. From inside, Burnett

approached the front door with a beer in hand. (Ex. F 21:09-21:13; Ex. H, BWC footage of Michael Inazu 02:12-02:25)

20.     While talking with the officers, Burnett picked up and opened a retractable knife which was one of two sitting on the entryway table. (Ex. H 03:10-03:48, 09:00-09:20; Ex. F 22:07-22:46)

21.     As the officers continued to talk with him, Burnett told officers that he knew Pete Tomitsch, a police officer. (Ex. F 22:10-22:12, 30:22-30:34; Ex. T, 52, lns. 21-25; 53, ln. 1) In response, Sgt. Inazu told Burnett that he, too, was an officer and showed Burnett his badge. (Ex. F 22:59-23:32)

22.     During their contact, Burnett told the officers that he was a Roman Catholic priest, a member of the Dutch army (Ex. F 32:31-32:51), and a member of Van Halen. (Ex. H 06:28-07:10; Ex. F 25:53-26:05)

23.     The officers asked multiple times for Burnett to open the door and come outside. (Ex. H 06:47, 07:34, 07:40, 07:44, 07:47, 07:56)

24.     The officers decided to end their interaction with Burnett, who appeared to be drinking scotch, because they believed he was escalating. (Ex. F 35:24-35:59)

25.     After discussion, Sgt. Inazu and Officer Daigle determined they did not have probable cause for felony menacing. (Ex. F 38:42-40:53; Ex. U, 42, lns. 18-25; 43, lns. 1-22)

26.     Sgt. Inazu and Officer Fleming reapproached Burnett's door; told him that he was going to be issued a ticket; and asked him to come out. Burnett responded "no." (Ex. F 40:54-42:15; Ex. U, 54, lns. 4-15)

27.     After leaving the property, Sgt. Inazu spoke with the Shaws, and Officer Fleming briefly joined Officer Daigle who was speaking with Ms. Maytag. (Ex. F 43:15-43:21)

28.     Burnett emerged from his house, threatened his next-door neighbor who was walking her dog, (Ex. F 43:21-45:10; Ex. U, 68, lns. 8-11, 69, lns. 13-14), threw knives out of his house, (Ex.

F 45:15-45:28), and threatened the officers with a dowel rod. (Ex. F 46:20-47:07; Ex. T, 96, lns. 12-18) The officers were standing in the cul-da-sac at these times. (*Id.*)

29.     After Burnett ran into his house, the officers collected the knives and left the property. (Ex. F 47:35-47:40, 47:43-47:47 (picking up knives); Ex. F 47:47-48:13 (leaving property)

30.     Officer Daigle, later joined by Officer Fleming, recontacted Ms. Maytag at her house and explained the officers' charging decision. (Ex. C, BWC footage of Joseph Daigle 2:57-7:12) Ms. Maytag expressed shock over the officers' inability to arrest Burnett and concern that Burnett will come out with a gun (Ex. F 51:37-51:47) and eventually kill someone. (Ex. F 57:02-57:04)

31.     Officer Fleming's conversation with Ms. Maytag was interrupted when Burnett exited his house ranting (Ex. F 57:11) with a fire poker in hand. (Ex. G 13:25-13:42)

32.     Sgt. Inazu, who was standing on the opposite side of the cul-de-sac, responded to Burnett by asking, "What? Can you come tell me what you are talking about? You're going to kill me?" (Ex. G 14:09-14:17)

33.     The three officers convened in the cul-de-sac near Ms. Maytag's driveway, where they discussed their understanding of the underlying interaction and, specifically, the location of the incident.  (Ex. G 15:07-16:28; Ex. U, 42, lns. 18-25; 43, lns. 1-22)

34.     During the discussion, Sgt. Inazu described the significance of finding probable cause for felony menacing, "Because if we do [find probable cause], that absolutely changes the game in how our approach is going to be with [Burnett]."  (Ex. G 17:21-17:30)

35.     Sgt. Inazu instructed Officers Fleming and Daigle to conduct separate interviews of Mr. and Mrs. Shaw to better understand the incident between Burnett and the Shaws. (Ex. G 16:44-17:02; Ex. F 59:38-1:00:05)

36.     While Officers Fleming and Daigle were interviewing the Shaws separately at the Shaw residence (Ex. F 1:05:57-1:26:07; Ex. C 19:10-40:31), Sgt. Inazu repositioned his patrol vehicle in the middle of the cul-de-sac, (Ex. G 22:59-23:46), readied his shotgun (Ex. G 23:50-24:28, 25:26-25:40), requested one additional unit (Ex. G 25:52-25:58; Ex. S, 37, lns. 16-19; Ex. U, 64, lns. 8-11) and readied his ballistic shield. (Ex. G 25:59-26:15; Ex. U, 61, lns. 3-24)

37.     Burnett exited his house with a bike and engaged Sgt. Inazu in conversation. (Ex. G 27:19-29:33). During the conversation, Burnett states, "I'm not a criminal." (Ex. G 28:41-28:44)

38.     While speaking with Sgt. Inazu, Burnett pushed the bike into the front yard, (Ex. G 29:21-29:30) picked up a knife and dropped it on the ground, after Sgt. Inazu asked him to do so, (Ex. G 29:54-30:01) before running back into the house. (Ex. G 30:05-30:09)

39.     After Burnett was back in the house, Sgt. Inazu moved the bike closer to the street and returned to his vehicle in the middle of the cul-de-sac. (Ex. G 31:11-31:30)

40.     Minutes later, Burnett exited the house with items in hand, yelled that he wanted CSPD Officer Pete Tomitsch before disappearing into his house. (Ex. G 32:58-33:48)

41.     A short time later, Officer Barth arrived. She was briefed and asked to contact the neighbors to the east (and to the left) of Burnett's house. (Ex. G 37:27-40:38; Ex. U, 64, lns. 12-20)

42.     Burnett briefly exited his house, moved items and reentered his house. (Ex. G 42:19-42:35)

43.     During his interview of Mrs. Shaw, Officer Fleming learned that another neighbor, Ms. Silver came over with Burnett's dog. Burnett came out while Mrs. Shaw was talking to Ms. Silver. He walked over with items in his hands. Mrs. Shaw and Ms. Silver met Burnett two feet into the cul-de-sac near the mailboxes. Burnett attempted to hand the items to them, which they declined. In response, Burnett threw the items. Burnett, angry, walked over to Ms. Maytag's house and threw something at her window, breaking it. While this was happening, John Shaw began picking up the

items from a flowerbox on his property. Burnett pulled out a knife from his pocket, raised it up and told Mr. Shaw, who was crouched down, "I'm going to kill you." (Ex. F 1:07:35-1:26:00)

44.    After speaking with Officer Barth (Ex. G 42:42-43:20), Sgt. Inazu spoke with Officer Fleming. Officer Fleming informed Sgt. Inazu that he believed probable cause existed for felony menacing. (Ex. F 1:26:28-1:26:32; Ex. U, 59, lns. 3-15)

45.    The officers did not obtain an arrest warrant because of the report of firearms in Burnett's house, the risk of Burnett barricading, the threats to neighbors, and the time it would take to obtain a warrant. (Ex. R, 38, lns. 22-25; 39, lns. 1, 25, 40, lns. 9-11; 41, lns. 13-20)

46.    Officer Daigle joined Sgt. Inazu and Officer Fleming in the middle of the cul-de-sac. (Ex. F 1:27:00-1:27:01)

47.    As the officers spoke, Burnett appeared outside his house and started talking to Sgt. Inazu. (Ex. G 44:54-45:07)

48.    Burnett, who was now wearing a Toronto Maple Leafs sweatshirt, told Sgt. Inazu that he plays for the team. (Ex. G 45:09-45:13)

49.    Sgt. Inazu, along with the other officers, approached the house. Sgt. Inazu asked if he could see the shirt. (Ex. G 45:14-45:19)

50.    Officers Fleming and Daigle walked with Sgt. Inazu up the driveway at the front of the house as Officer Barth approached from the house to the left of Burnett's residence. (Ex. A, BWC footage of Caroline Barth 4:09-4:54; Ex. U, 100, lns. 9-10)

51.    As the casual conversation continued, Burnett moved from the front steps of his house to near the middle of the walkway closer to the officers. (Ex. G 45:38-45:48; Ex. A 4:58-5:00)

52.     Officers Inazu, Fleming and Daigle stopped on Burnett's driveway, feet from a walkway which ran from the driveway to the front door, after Burnett told them to stop. (Ex. F 01:28:49; Ex. A 04:49; Ex. G 45:45-45:48) Officer Barth stopped in Burnett's front yard. (Ex. A 4:45-5:08)

53.     Sgt. Inazu asked Burnett why they needed to stop. Burnett, holding a packaged shirt, responded by stating "it's your Miranda as a San Diego police officer." (Ex. G 45:46-45:53)

54.     As Burnett continued to talk, Sgt. Inazu asked Officer Fleming if his ankle was healthy enough to sprint towards Burnett. (Ex. F 1:29:02-1:29:05; Ex T., 98, lns. 4-8)

55.     After Officer Fleming confirmed it was, Sgt. Inazu said to Officer Fleming, "I'm going to go." (Ex. G 46:06-46:07)

56.     The officers ran towards Burnett. (Ex. U, 101, lns. 2-6; Ex. G 46:08-46:12)

57.     At the sight of the officers running towards him, Burnett immediately turned, sprinted to his front entry, and attempted to close the door. (*Id.*; Ex. U, 102, lns. 5-8)

58.     Sgt. Inazu used his body to prevent the door from closing. (Ex. G 46:11)

59.     Burnett continued to run away from officers inside the house. (Ex. G 46:12-46:14)

60.     The officers, while attempting to gain control of Burnett, ordered him to "Get on the ground." (Ex. G 46:13-46:14; Ex. U, 103, lns. 13-14)

61.     Burnett, standing, responded "No, no." (Ex. G 46:14-46:15)

62.     The officers repeated the order twice more. (Ex. G 46:15-46:16)

63.     Sgt. Inazu was behind Burnett, Officer Fleming was attempting to control Burnett's left arm, and Officer Daigle was attempting to control Burnett's right arm. The officers struggled to get Burnett to the ground. (Ex. B, BWC footage of Joseph Daigle 1:15-1:19)

64.     Officer Barth discharged her taser. (Ex. F 1:29:18-1:29:20; Ex. A 5:18-5:24; Ex. S, 67, lns. 10-15)

65.     In response, Burnett said "Ow" and went to the ground. (Ex. F 1:29:20-1:29:25; Ex. A 5:20-5:24; Ex. U, 103, lns. 5-8)

66.     On the ground, Officer Fleming instructed Burnett twice to "put your hands behind your back." (Ex. A 5:24-5:27; Ex. B 1:24-1:29; Ex. F 01:29:26-01:29:28)

67.     Despite Officer Fleming's orders, Burnett curled his body (Ex. G 46:28-46:44; Ex. U, 102, lns. 20-25; l03, lns. 1-12) and grabbed his left arm with his right arm while his left arm was being pulled by Officer Daigle simultaneously. (Ex. A 5:24-5:29; Ex. S, 68, ln. 25; 69, lns. 1-9, 12-18)

68.     Sgt. Inazu saw Burnett reach for Fleming's firearm. (Ex. U, 103, lns. 23-25; 104, lns. 1-5)

69.     Officers ordered Burnett to "stop resisting" and "give us your hands." (Ex. A 5:29-5:34)

70.     Burnett, while continuing to physically resist, in part, by holding one hand with the other (Ex. B 1:32-1:36; 1:44-1:49), curling and turning his body (Ex. B 1:36-2:01) (Ex. U, 103, lns. 9-12; 23-25; 104, lns. 1-5), stated "kill me" and "kill me now." (Ex. A 5:33-5:39)

71.     Sgt. Inazu responded "we're not going to kill you; you need to stop resisting." (Ex. A 5:34-5:36) Officer Fleming stated "relax." (Ex. F 01:29:36)

72.     Burnett continued to resist by kicking (Barth 5:30-5:34; Ex. S, 70, lns. 8-17) and tensing his arms (Ex. G 46:28-46:53; Ex. O, p. 30, RFA # 7).

73.     Officer Barth stated, "I'm going to arc it." An officer stated "Yep," while another officer stated "Ok." (Ex. A 5:40-5:42; Ex. S, 70, lns. 19-21; 71 lns. 11-14; 73 lns. 8-10)

74.     Officer Barth arced her taser for another second. (Ex. A 5:46-5:47; Ex. S, 71, lns. 15-16)

75.     Officer Barth arced her taser again. (Ex. S, 74, lns. 20-22)

76.     Officer Barth used her taser a total of three times. (Ex. S, 75, ln. 5)

77.     Lt. Patrick David reviewed the taser logs from Officer Barth's taser. (Ex. N, Affidavit of Patrick David, p. 2, ¶ 7)

78.     The logs showed a five-second cycle when Officer Barth deployed her taser. (Ex. N, p. 2, ¶ 7)

79.     During the five second cycle, the taser probes only had a good connection for one second. (Ex. N, p. 2, ¶ 7)

80.     The first arc lasted one second and Officer Barth came in contact with the wires in the course of the arcing. (Ex. N, p. 2, ¶ 7; Ex. S, 73, lns. 7-19)

81.     The second arc lasted one second and the log showed some connection. (Ex. N, p. 2, ¶ 7)

82.     Officer Barth abandoned her use of the taser because she did not believe that it was having any effect on Burnett. Ex. S, 75, lns. 23-25; 76, lns. 1-3.

83.     In response, Burnett grunted and stated, "Goddamn it. Fuck you." (Ex. A 5:50-5:54)

84.     Officers continued to order Burnett to give them his hands. (Ex. S, 74, lns. 1-10; Ex. A 6:07-6:11)

85.     Burnett kicked his legs, stiffened his body and stated, "Kill me now" and "No." (Ex. A 5:46-6:11; Ex. B 1:33-1:39)

86.     Officer Barth requested a medical response to the taser deployment. (Ex. A 6:01-6:05; Ex. S, 80, lns. 22-23; 81, lns. 7-11; Ex. U, 118, lns. 16-18)

87.     Burnett continued to make statements such as "Help me. No." (Ex. A 6:03-6:05)

88.     As officers struggled with Burnett, (Ex. S, 77, lns. 17-25; 78, lns. 1-25; 79, lns. 1-2), Officer Fleming ordered Burnett to "put your hands behind your back, Chad; we don't want to hurt you." Burnett stated, "No. No." (Ex. A 6:08-6:11; Ex. F 1:30:08-1:30:11)

89.     An officer stated, "Stop resisting." Burnett responded "Ok. I'm stopped." (Ex. A 6:25-6:27; Ex. F 1:30:25-1:30:27)

90.     The officers were able to place Burnett's arms behind his back. (Ex. A 6:32-6:44)

91.     The officers then brought Burnett to his feet. (Ex. A 6:45-7:24) Once on his feet, Officer Fleming told him, "We are going to walk this way." Burnett responded "No, you're not taking me out of my house. You're not taking me out of my house. No, you're not. No, you're not! This is my house! Fuck you!" (Ex. F 1:31:29-1:31:37; Ex. T, 105, lns. 5-15; Ex. B 3:28-3:36)

92.     As Burnett continued to make similar statements (Ex. B 3:33-3:46), he became stiff-legged and pushed back against officers' efforts to walk him outside the house. (Ex. A 7:35-7:42; Ex. G 48:30-48:45; Ex. S, 81, lns. 22-25; 82, ln. 1)

93.     Officers attempted to pull Burnett towards the front door. (Ex. A 7:43-7:48)

94.     At the front door, Burnett leaned to his left in an effort to prevent the officers from walking him out of the house. (Ex. A 7:48-7:51; Ex. O, p. 28, 30-31, RFA 1 and 8)

95.     With Burnett leaning to his left and the officers attempting to pull him out of the house, Burnett, along with Officers Fleming, Daigle and Inazu, landed outside the front door. (Ex. A 7:52-7:56)

96.     The officers did not fall on Burnett. (Ex. A 7:52-7:56)

97.     Officer Barth went to her patrol car and moved it to the driveway. (Ex. A 7:57-8:50; Ex. S, 83, ln. 25; 84, lns. 1-3, 21-24)

98.     Sgt. Inazu walked to his patrol vehicle, grabbed gloves and flex cuffs before returning to the house. (Ex. G 48:56-50:06)

99.     While Officer Barth moved her patrol car, the other officers attempted to calm Burnett down. Officer Fleming told Burnett to "breathe and catch your breath. Getting amped up is not going to help you. I want you to take deep breaths. Slow everything down. Alright? Help us keep this low key for you." (Ex. F 1:32:20-1:32:37)

100.    Officers Fleming and Daigle attempted to bring Burnett to his feet. (Ex. A 9:20-9:25)

101.    While the officers were doing so, Burnett stated "Just so you know, you're not getting me out of my house. It's my house. No. Chad Burnett's house." (Ex. A 9:20-9:27; Ex. F 1:33:21-1:33:28)

102.    Once on his feet, Burnett launched back inside the residence. (Ex. A 9:25-9:28; Ex. B 5:26-5:29; Ex. S, 86, lns. 10-11, 18-22; 87, lns. 21-25; 88, lns. 1-5, 8; 100, lns. 9-12, 24-25; 101, lns. 1-4)

103.    After forcing himself back inside, Burnett, on the floor, stated "No, you're not. No, you're not." (Ex. A 9:27-9:30)

104.    Officer Fleming stated, "I told you to relax, didn't I? Didn't I?" (Ex. A 9:32-9:34)

105.    Officers Fleming and Daigle attempted to control Burnett's body above his waist. (Ex. A 9:33-9:48)

106.    Burnett kicked his legs (Ex. A 9:34-9:38; 9:54-10:01; Ex. S, 88, lns. 10-19; Ex. T, 175 lns. 16-25; 178, lns. 5-10) and turned his body. (Ex. B 5:32-5:38)

107.    The officers ordered Burnett to stop resisting and to stop fighting. (Ex. U 120, lns. 7-21; Ex. B 6:28-6:31).

108.    Sgt. Inazu attempted to place flex cuffs on Burnett's legs. (Ex. A 9:52-9:56; Ex. G 50:50-51:59)

109.    As Sgt. Inazu attempted to place flex cuffs on his legs, Burnett continued to kick and move around. (Ex. G 51:29-51:59; Ex. U, 117, lns. 3-10)

110.    Officer Barth used some of her weight on Burnett's legs between his knees and below his hips to control Burnett's legs. (Ex. S, 88, lns. 10-19, 22-24; 103, lns. 22-25; 104, lns. 4-5; Ex. A 5:50-06:01)

111.    Burnett continued to scream "Fake police!" (Ex. A 10:12-10:22; Ex. B 6:12-6:20)

112.    Burnett continued to express his refusal to comply with orders, often with a response of "No, fuck you." (Ex. A 10:23-10:32; Ex. B 6:22-6:31; Ex. S, 93, lns. 12-23)

113.    Burnett continued to move his legs. (Ex. G 50:36-50:44; Ex. A 10:18-10:55)

114.    Officer Fleming asked, "Still resisting?" Burnett responded, "Yes." Officer Fleming ordered Burnett to stop resisting and attempted to hit him with his knee. (Ex. F 1:34:34-1:34:41)

115.    As Burnett continued to move his legs and hips, Officer Barth ordered Burnett to "knock it off." (Ex. F 1:34:48-1:34:49; Ex. A 10:46-10:49)

116.    Officer Daigle attempted to control Burnett's right arm as he struggled. Ex. R, 138, lns. 17-20; 139, lns. 1-8; 140, lns. 4-12.

117.    Officer Fleming attempted to control Burnett's left arm as he struggled. Ex. T, 180, lns. 2-9.

118.    Officer Fleming, who was kneeling next to Burnett, hit him with his knee. (Ex. F 1:34:49-1:34:50; Ex. B 6:46-6:50)

119.    Sgt. Inazu was able to secure Burnett's legs in the flex cuffs. (Ex. G 52:26)

120.    The officers caught their breath and discussed carrying Burnett out of the house. (Ex. B 6:59-8:38)

121.    Once Burnett stopped resisting, Officer Daigle was kneeling with one hand on Burnett's back and another on his right arm. (Ex. B 6:54-7:50; Ex. T, 184, ln. 25; 185, lns. 1-14)

122.    Once Burnett stopped resisting, Officer Fleming was on his feet, crouching, with his right hand on Burnett's left arm and left hand on his shoulder and later on his back. (Ex. B 6:53-8:20; Ex. R, 144, lns. 24-25; 145, lns. 6-10)

123.    No officer laid on Burnett after he stopped resisting. (Ex. B 6:53-8:14; Ex. F 1:36:00-1:36:08; Ex. U, 125, lns. 21-25; 126, lns. 6-10)

124. Officer Daigle removed his hands repeatedly (Ex. B 7:34-7:36, 7:50-8:18; Ex. F 1:36:00-1:36:09) and did not put pressure on Burnett (Ex. R, 152 lns. 7-9; Ex. T, 185, lns. 8-14, 189, lns. 11-23).

125. Officer Fleming removed his hands repeatedly and did not put pressure on Burnett. (Ex. B 7:14-7:31, 7:57-8:02, 8:35-8:47; Ex. T, 189, lns. 11-23)

126. Officers Fleming and Daigle kept their hands on Burnett in case he attempted to physically resist once again. (Ex. T, 185, lns. 8-19; 189, lns. 24-25; 190, lns. 1-16; Ex. R, 140, lns. 23-25; 141, lns. 1-4)

127. The side profile of Burnett's face was visible, his left shoulder was off the ground. (Ex. F 1:36:01-1:36:09)

128. Officer Fleming asked Burnett if he was doing alright. (Ex. F 1:36:47-1:36:50; Ex. B 8:46-8:50)

129. Officer Daigle asked if he was breathing. (Ex. B 8:49-8:51)

130. The officers rolled Burnett on his right side. (Ex. F 1:36:51-1:36:54)

131. Officer Barth patted Burnett on the chest and spoke to him. (Ex. F 1:36:54-1:37:00)

132. While Officer Barth was patting Burnett on the chest, Officer Daigle checked Burnett's pulse and stated that he had a pulse. (Ex. F 1:36:55-1:37:03; Ex. B 8:55-9:00)

133. After checking and confirming he had a pulse, the officers continued to hold Burnett's left shoulder up. (Ex. F 1:37:00-1:37:26)

134. Officer Fleming was handed a spit sock and placed it on Burnett. (Ex. F 1:37:07-1:37:25)

135. Officer Daigle checked Burnett's pulse and stated "I can feel it. It's light, but I can feel it." (Ex. F 1:37:02-1:38:08; Ex. B 10:03-10:09)

136.   Sgt. Inazu asked about Burnett's breathing. Officer Fleming stated that he was breathing hard, but was not breathing hard at that moment. (Ex. F 1:38:09-1:38:15)

137.   Sgt. Inazu asked about a "good strong pulse and solid respirations." (Ex. F 1:38:15-1:38:19)

138.   Officer Fleming stated that Officer Daigle felt a pulse, but he had not noticed breathing. Officer Fleming then placed his hand over the sweatshirt near Burnett's rib cage and pulled up the sweatshirt. (Ex. F 1:38:20-1:38:31)

139.   As Officer Fleming pulled down the sweatshirt, Officer Daigle stated Burnett had a pulse. (Ex. F 1:38:26-1:38:33; Ex. B 10:25-10:33)

140.   Officer Daigle stated that he believed Burnett was unconscious. (Ex. B 10:33-10:37; Ex. F 1:38:32-1:38:38)

141.   Officer Barth, who was standing outside the house, moved her police cruiser out of the driveway and into the street so emergency medical could respond more quickly. (Ex. A 14:45-15:20; Ex. S, 12, ln. 25; 13, lns. 1-5)

142.   As the officers repositioned Burnett briefly, Sgt. Inazu stated to make sure no weight was placed on Burnett's back. (Ex. B 10:52-11:02; Ex. F 1:38:53-1:39:02)

143.   The officers then discussed their observations with Sgt. Inazu stating that Burnett was not overweight and, if other officers could see a chest rise and fall, he was not overly concerned about respirations. (Ex. B 11:02-11:10)

144.   Officer Daigle stated he just had a pulse. (Ex. B 11:10-11:14)

145.   Officer Fleming stated that Officer Daigle had a pulse, but he had not noticed much of a chest rise and fall. Officer Daigle stated he had just felt a pulse. (Ex. B 11:10-11:16; Ex. F 1:39:12-1:39:16)

146.    Sgt. Inazu walked from where he was standing near the front door. With Burnett on his side, Sgt. Inazu felt his chest and abdomen, asked him how he was doing, stated Burnett's eyes were open, he was blinking. (Ex. B 11:16-11:37; Ex. F 1:39:22-1:39:29)

147.    Sgt. Inazu attempted to talk to Burnett, stating "Hey Chad, we're sorry this happened, but you have to listen to the police, ok? You understand that?" (Ex. B 11:44-11:50)

148.    The officers' conversation continued. Officer Fleming stated "we can always step them up." To which another officer stated, "They're coming Code 3." Officer Fleming replied "Oh they are? Ok." (Daigle 12:20-12:24; Fleming 1:40:20-1:40:25; Ex. R, 105 lns. 16-21, 25; 106, lns. 1-2)

149.    Code 3 is the highest level of response. (Ex. T, 108, lns. 7-12)

150.    Officer Fleming lifted Burnett's sweatshirt to reveal his abdomen. An officer asked if they saw a chest rise and placed their hands on Burnett's back and abdomen. (Ex. B 12:28-12:33; Ex. F 1:40:28-1:40:39)

151.    The officers repositioned Burnett with his knees bent. (Ex. B 12:36-12:48)

152.    Officer Fleming stated that Burnett was holding his head up. (Ex. B 12:49-12:54; Ex. F 1:40:49-1:40:54)

153.    Officer Inazu continued to observe and feel Burnett's abdomen. (Ex. G 57:32-58:19; Ex. F 1:40:58-1:41:13)

154.    Officer Inazu attempted to talk to Burnett while patting him on the chest. Officer Daigle patted Burnett on the back. (Ex. Q, BWC footage of Thomas Pitchford 06:15-06:21; Ex. B 13:13-13:44)

155.    Officer Fleming shined a flashlight in Burnett's eyes and stated his pupils dilated and did not constrict with light. (Ex. B 13:49-13:59; Ex. F 1:41:49-1:42:01)

156.   With Officer Fleming's hand on Burnett's side, an officer stated, "I heard a little breathing." (Ex. F 1:42:12-1:42:14; Ex. B 14:11-14:14)

157.   Sgt. Inazu checked Burnett's pulse. (Ex. B 14:22-14:34; Ex. G 59:18-59:31)

158.   The officers repositioned Burnett on his back. (Ex. B 14:35-14:52)

159.   The officers attempted additional conversation with Burnett, asking him to "wake up." (Ex. B 14:50-14:54)

160.   Officers checked his pulse again and lifted the spit sock up. (Ex. B 14:54-14:58)

161.   An officer stated, "Start compressions." (Ex. B 14:56-14:57)

162.   Officer Fleming started chest compressions. (Ex. B 14:58-15:09)

163.   Chest compressions continued until emergency medical took over. (Ex. B 14:58-19:20)

## II.   Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Plaintiff must shoulder the burden to show qualified immunity should not be granted. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).

## III.   Argument

### A. The officers are entitled to qualified immunity

Qualified immunity should be "appl[ied] . . . broadly[,]" *Wilson v. City of Lafayette*, 510 Fed. Appx. 775, 780 (10th Cir. 2013) (unpublished) (Gorsuch, J.), and shields government from liability when "their conduct does not violate clearly established statutory or constitutional rights which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). To overcome "an assertion of qualified immunity in a summary judgment motion, a plaintiff must properly allege [1] a deprivation of a constitutional right and must further show that [2] the

constitutional right was clearly established at the time of the violation." *Kaufman v. Higgs*, 697 F.3d 1297, 1300 (10th Cir. 2012).

Analysis under the first prong requires that the officers' actions be viewed from the perspective of a reasonable officer on scene and not through the lens of 20/20 hindsight. *See Graham v. Conner*, 490 U.S. 386, 396 (1989). Analysis under the second prong requires that "[t]he contours of the right . . . be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 540 (1987). Said differently, clearly established law should not be defined at high levels of generality. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). "[E]xisting precedent must [place] the statutory or constitutional question beyond debate." *Id.* at 741. Otherwise, if the law is not clearly established, the officers are entitled to qualified immunity.

### 1. The warrantless entry was lawful

"[A] suspect may not defeat an arrest which has been set in motion in a public place." *United States v. Santana*, 427 U.S. 38, 43 (1976). Rather, "police who attempt to arrest a felon outside her home may pursue her if she takes refuge inside." *United States v. Cruz*, 977 F.3d 998, 1009 (10th Cir. 2020). "Hot pursuit occurs when an officer is in immediate or continuous pursuit of a suspect from the scene of a crime." *United States v. Jackson*, 139 F. App'x 83, 86 (10th Cir. 2005) (unpublished) (internal quotation marks omitted). While "'hot pursuit' means some sort of a chase, . . . it need not be an extended hue and cry in and about the public streets." *Santana*, 427 U.S. at 42-43; *see also United States v. Thompson*, 2016 WL 3881099, at *4 (W.D. Okla. July 13, 2016) ("Research reveals no decision of the court of appeals or the Supreme Court . . . holding that the exception applies only when a law enforcement officer witnesses criminal activity and pursues the suspect for the purpose of making a warrantless arrest."). Finally, "[a]n action is 'reasonable'

under the Fourth Amendment, regardless of the individual officer's state of mind . . . ." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404 (2006).

Hot pursuit justified the officers' entry into the residence. Probable cause for felony menacing was established minutes prior to when officers contacted Burnett on a walkway between the driveway and front steps. (Ex. F 1:07:35-1:26:00). It was also adjacent to the front yard where Burnett had previously thrown items from the house, including knives. (Ex. F 45:15-45:28, 47:35-47:40, 47:43-47:47). Prior to contacting Burnett on the walkway, Sgt. Inazu had advised Burnett of a ticket they needed to serve on him. (Ex. F 40:54-42:15; Ex. U, 54, lns. 4-15). Burnett, for his part, expressed concern he was going to be arrested. (Ex F 40:54-42:15; Ex. G 28:40-28:43 ("I'm not a criminal."); Ex. U, 54, lns. 4-15; 88, lns. 1-8 ("Are you going to arrest me?")).

Public and officer safety concerns also supported the entry. Neighbors, including the victims of Burnett's menacing and criminal mischief, were elderly and vulnerable. *See Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984) ("[A]n important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made."). Burnett was unpredictable. Burnett appeared, unprovoked, several times at the front of his house only to retreat inside. (Ex. F 18:09-18:17; 43:21-45:10; 45:15-45:28; 46:20-47:07; Ex. G 14:09-17; 27:19-29:33; 32:58-33:48; 42:19-42:35; 44:54-45:07). When outside, he yelled at officers and, at least twice, hurled death threats. (Ex. F 46:20-47:07; Ex. T, 96, lns. 12-18; Ex. G 14:09-17). When he appeared, Burnett did not come outside empty-handed. He armed himself with a dowel rod at one point (Ex. F 46:20-47:07; Ex. T, 96, lns. 12-18) and later with a fire poker. (Ex. G 13:25-13:42). Having personally seen knives just inside the front door, (Ex. F 22:07-22:46) and hearing Broadmoor security's earlier reports of firearms in the home, officers were aware of Burnett's access to weapons. (Ex. R, 21, lns. 9-12; 40, lns. 20-22; Ex. U, 61, lns. 4-5).

Understanding the volatility of Burnett's actions, Sgt. Inazu repositioned his vehicle and readied his long shield and shotgun as Officers Fleming and Daigle determined whether they had probable cause for felony menacing. (Ex. U, 61, lns. 3-24). Sgt. Inazu requested additional officers and Officer Barth responded. (Ex. S, 37, lns. 16-19; Ex. U, 64, lns. 8-11). Officer Fleming returned from interviewing Mrs. Shaw at her residence and advised Sgt. Inazu probable cause existed for felony menacing. (Ex. F 1:26:28-1:26:32; Ex. U, 59, lns. 3-15). When Burnett walked outside on his own accord and engaged Sgt. Inazu in conversation moments later, Sgt. Inazu saw an opportunity to bring order to the situation. He and the other officers were not required to end their foot chase at the front door. Rather, Burnett could not defeat his arrest by retreating into the home. The officers did not violate the Constitution.

### 2. The warrantless entry did not violate clearly established law

The officers did not violate clearly established law when they continued their pursuit of Burnett into the residence. Importantly, the Supreme Court's seminal hot pursuit decision, *United States v. Santana*, 427 U.S. 38 (1976), supports the officers' entry. In *Santana*, an undercover officer and a woman traveled to Santana's house, where the woman purchased drugs and was arrested after the two drove away from the house. *Id.* at 39-40. The undercover officer told other officers that Santana had the buy funds. *Id.* at 40. The other officers drove back to the house, two blocks away, where they saw Santana standing in the doorway. *Id.* at 40. Santana retreated into the house, the officers followed and arrested her inside. *Id.* The Court found that Santana—when standing at the threshold of her house—was in a public place. *Id.* at 42. The facts here are a far cry from *Attocknie v. Smith*, 798 F.3d 1252 (10th Cir. 2015). There, the Tenth Circuit found a warrantless entry was not supported by hot pursuit when officers were attempting to execute a year-old bench warrant. *Id.* at 1257. No other Supreme Court or Tenth Circuit opinion indicates

that the officer ran afoul of clearly established law. *See, e.g.*, *U.S. v. Aquino*, 836 F.2d 1268 (10th Cir. 1988) (upholding a warrantless entry and search more than an hour and a half after a drug transaction occurred and at a residence in a different town). As such, the officers are entitled to qualified immunity on the warrantless entry claim.

### 3. The officers used objectively reasonable force

"To establish a constitutional violation, the plaintiff must demonstrate the force was objectively unreasonable." *Est. of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2008). "[T]he reasonableness of an officer's use of force [is assessed] by applying the three nonexclusive factors first set forth by the Supreme Court in *Graham*, 490 U.S.[at 396]: [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Andersen v. DelCore*, 79 F.4th 1153, 1163 (10th Cir. 2023) (bracketed numbers in original). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. "In cases of physical resistance to an arrest . . . officers may employ the amount of force necessary to complete the arrest." *Youbyoung Park v. Gaitan*, 680 F. App'x 724, 739 (10th Cir. 2017) (unpublished).

### i. Use of the taser was reasonable

"[T]he first *Graham* factor weighs against the plaintiff when the crime at issue is a felony, irrespective of whether that felony is violent or nonviolent." *Vette v. K-9 Unity Deputy Sanders*, 989 F.3d 1154, 1170 (10th Cir. 2021). When Officer Barth deployed her taser, the officers had

established probable cause for menacing with a knife.[1] Menacing with a knife is a felony under Colorado law. C.R.S. § 18-3-206. Consequently, the first *Graham* factor weighs in the officers' favor.

The second factor weighs in favor of Officer Barth. When Officer Barth deployed her taser, Burnett had fled into the house; officers had given orders to get on the ground; Burnett did not comply with the orders; and he was actively resisting officers' lesser force to take him into custody, specifically verbal orders and grabbing him. (Ex. G 46:08-46:16; Ex. B 1:15-1:19; Ex. F 1:29:18-1:29:20; Ex. A 5:18-5:24). Confronted with an actively resistive felony suspect, Officer Barth was not required to warn Burnett. He fled officers and refused to comply with the officers' orders to get on the ground. Refusal would indicate to a reasonable officer that further orders or warnings would have gone unheeded and been unnecessary. While outnumbered, neither Officer Barth nor the other officers had Burnett, a large strong individual, under control, subdued, or submitted. At the precise moment the taser was used, Burnett was actively resisting by physically resisting efforts to bring him to the ground. On the ground, and when the taser was used again, Burnett was physically fighting the officers' efforts to place handcuffs on him. (Ex. G 46:28-46:44; Ex. A 5:24-5:29; Ex. B 1:32-2:01; Ex. U, 103, lns. 9-12, 23-25; 104, lns. 1-5; Ex. S, 68, ln. 25; 69, lns. 1-9, 12-18; 102, lns. 20-25, l03, lns. 1-12). Even after the taser usage, multiple minutes elapsed before officers placed Burnett in handcuffs and, for a time, under control. (Ex. A 6:08-6:11; 6:25-6:27; Ex. F 1:30:08-1:30:27; Ex. U, 104, lns. 17-23; Ex. S, 77, lns. 17-25; 78, lns. 1-25; 79, lns. 1-2). As such, the second factor favors Officer Barth.

---

[1] Plaintiff does not allege an unlawful arrest. Probable cause for felony menacing must be assumed. *Anderson v. DelCore*, 79 F.4th 1153, 1162 n. 4 (10th Cir. 2023); *see also Youbyoung Park*, 680 Fed. App'x. at 738.

The third factor favors deployments of the taser. The "third factor . . . weigh[s] in favor of some degree of physical coercion or threat, when an individual refuses to obey an officer's lawful orders." *Andersen*, 79 F.4th at 1165 (internal quotation marks and citations omitted). "Otherwise, an officer's power to give lawful orders would be hollow." *Id.* Burnett was fleeing and resistive. He disregarded repeated commands to stop resisting. (Ex. A 5:24-5:34, 6:08-6:11; Ex. F 01:29:26-01:29:28, 1:30:08-1:30:11; Ex. B 1:24-1:29). As described above, at the time of the first deployment, Burnett had just fled his arrest outside the house, slammed a door on pursuing officers and was physically fighting efforts to place him in custody. *See Huntley v. City of Owasso*, 497 F. App'x 826, 832 (10th Cir. 2012) (unpublished) ("Resistance satisfies the third *Graham* factor, and [the Tenth Circuit] has held that a forceful takedown is objectively reasonable when a suspect struggles with police."). Burnett continued to resist when Officer Barth cycled her taser. (Ex. A 5:30-5:41; Ex. G 46:28-46:53; Ex. S, 70, lns. 8-17). At the time, Burnett physically resisted by kicking his legs, tensing his arms and refusing to place his hands behind his back. The third factor weighs in Officer Barth's favor.

### ii. Reasonable force was used while attempting to escort Burnett out of the house.

As stated in Section III.A.3.i., the first *Graham* factor indicates the force was appropriate. Officers were lawfully taking Burnett into custody for felony menacing. Additionally, the first factor requires consideration of "more than just whether the crime was a misdemeanor or a felony. It also requires a broader assessment of the reasons why the officers initiated an encounter." *Anderson*, F.4th at 1164. The officers were not only aware of the felony menacing of an elderly neighbor that morning, but Burnett's physical and mental unpredictability—appearing multiple times outside the house with various items, including weapons (knives, dowel rod, fire poker), various attire, and temperament. (Ex. G 14:09-14:17) (from conversational to threatening—Sgt.

Inazu, "You're going to kill me?"); (Ex. F 48:57-45:10, Ex. T, 68 lns. 8-11, 69, lns. 13-14) (threatening a woman walking her dog). Sgt. Inazu was aware of a BOLO on Burnett's residence, prior police contacts, security's belief Burnett possessed firearms and Burnett's history of terrorizing the neighborhood. All of these points made arresting Burnett crucial and permitted the force used by officers.

The second *Graham* factor also tilts in the officers' favor. The officers used measured, proportionate force when Burnett resisted under "tense, uncertain, and rapidly evolving" circumstances. *Graham*, 490 U.S. at 396-97. Being placed in handcuffs did not stop Burnett from physically fighting officers. When Burnett resisted walking out of his house, the officers countered by simply pushing and pulling. (Ex. A 7:35-7:42). In moments of calm, such as when Burnett was lying just outside the front door, officers verbally encouraged Burnett to "slow things down" and "breath." (Ex. F 1:32:20-1:32:37). In contrast, Burnett repeatedly refused to leave. (Ex. F 1:33:21-1:33:28) ("Just so you know, you're not getting me out of my house. It's my house. No. Chad Burnett's house."). When Burnett flung himself back into the house, the officers attempted to gain control by grabbing his arms and legs, limiting his thrashing, controlling his legs, and using knee strikes when Burnett refused to allow Sgt. Inazu to place cuffs on his legs.

The officers' force was commensurate with Burnett's active resistance. "When an officer lawfully uses force but an individual resists that initial use of force, . . . it [is] obvious that the officer may use a greater degree of force than would have initially been appropriate to subdue the individual, obtain peace, and ensure that the officers had control over the situation." *Id.* at 1168. The use of body weight ended prior to when resistance ceased. (Ex. R, 152 lns. 7-9; Ex. T, 185, lns. 8-14, 189, lns. 11-23). All force concluded when Burnett stopped physically resisting.

After Burnett became non-resistant, the officers kept their hands on Burnett to be well-positioned should Burnett recover enough to start fighting again. (Ex. R, 140, lns. 23-25; 141, lns. 1-4) The concern that he might start fighting again was not unfounded. He had, after all, started to resist, first, when he was placed on his feet after handcuffing and, second and more recently, just outside the front door. They did not place significant weight on Burnett. Even when he was resisting, the officers did not hold him down for a significant time. Further, Burnett never gasped or complained about an inability to breathe. The officers used reasonable force.

### 4. Use of the taser under the circumstances did not violate clearly established law

Under Tenth Circuit precedent, "it is excessive to use a Taser to control a target without having any reason to believe that a lesser amount of force—or a verbal command—could not exact compliance." *Casey v. City of Federal Heights,* 509 F.3d 1278, 1286 (10th Cir. 2007). Likewise, "it [is] clearly established [that] . . . use [of a] Taser on a nonviolent misdemeanant who did not pose a threat and was not resisting or evading arrest without first giving a warning [is unlawful]." *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 667 (10th Cir. 2010).

As stated above, at the time Officer Barth deployed her taser Burnett, suspected of a felony, first fled, then was noncompliant with orders and actively resisting efforts to bring him to the ground. In addition to being reasonable, Officer Barth did not contravene the principles announced in either *Casey* or *Cavanaugh*. No Supreme Court or Tenth Circuit precedent puts the constitutional question beyond debate.

### 5. All other force used by the officers was reasonable, including the use of body weight

No decisional law from the Tenth Circuit or Supreme Court holds that the use of body weight is unlawful to control a physically resistive suspect. In *Weigel v. Broad*, 544 F.3d 1143 (10th Cir. 2008), a suspect died by mechanical asphyxiation after an officer laid across the upper

torso of a subdued individual for three minutes. *Id.* at 1152. The *Weigel* court held it was "clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." *Id.* at 1155. In *Cruz v. City of Laramie, Wyo.*, 239 F.3d 1183 (10th Cir. 2001) the Tenth Circuit held that hog-tying a suspect whose capacity is diminished was unlawful. *Id.* at 1188. *Est. of Booker v. Gomez*, 745 F.3d 405 (10th Cir. 2014), a "highly contextual decision[,]" *Crittenden v. City of Tahlequah*, 786 F. App'x 795, 804 (10th Cir. 2019) (unpublished), involved an in-custody death after deputies placed Booker in a prone position while one deputy applied a carotid restraint, another applied 50-75% of his total body weight of 190 pounds on Booker's back and another deputy applied a taser in drive stun mode for 8-seconds, all in a span of two minutes and fifty-five seconds. *Est. of Booker*, 745 F.3d at 413. None of these cases put the officers, and particularly Officers Fleming and Daigle, on notice of clearly established law.

Instead, the use of body weight to control a resisting suspect is reasonable. *See Cisneros v. Gomez*, 2022 WL 19073972, at *5 (W.D. Okla. Oct. 19, 2022) (listing cases finding placement of a knee in the back of a resisting arrestee is reasonable); *see also Helvie v. Jenkins*, 66 F.4th 1227, 1242 (10th Cir. 2023); *Waters v. Coleman*, 632 F. App'x 431, 437-38 (10th Cir. 2015) (unpublished) (listing cases granting qualified immunity when the officer faced physical resistance). As noted above, the use of body weight ended prior to Burnett's resistance and all force stopped when Burnett stopped resisting.

**6.   The officers did not violate the Constitution in monitoring and providing aid**

"[T]here is no duty to give, as well as summon, medical assistance, even if the police officers are trained in CPR." *Wilson v. Meeks*, 52 F.3d 1547, 1555 (10th Cir. 1995), *abrogated on other grounds by Saucier v. Katz*, 533 U.S. 194 (2001); *see also Crittenden*, 786 F. App'x at 803-

04 (noting "[n]othing has changed since *Wilson*" and that the duty to perform CPR after an officer-involved shooting is an open question in the Tenth Circuit); *Phillips v. City of Albuquerque*, 1999 WL 35809437, at *12 (D.N.M. July 12, 1999) ("The Tenth Circuit did not establish a duty of officers to provide first aid, although the court also did not foreclose the possibility that officers might have such a duty under certain facts."). The Tenth Circuit in *Wilson* "refused to hold that the Due Process Clause establishes an affirmative duty on police officers to provide medical care (even something as basic as CPR), in any and all circumstances, or to render first aid." *Id.* at 802. Nothing in *Wilson* or *Crittenden* indicate the no-duty-to-perform-first-aid holding in *Wilson* is limited to "a chaotic situation [during which they] could reasonably be concerned about the presence of additional armed individuals." *Crittenden*, 786 F. App'x at 803. *Wilson* did not involve such a scenario. *Id.* at 1550.

If a duty exists to provide medical care to an arrestee, and *Wilson* and *Crittenden* hold otherwise, the Tenth Circuit has analyzed detainee claims under Fourteenth Amendment. *See Rife v. Oklahoma Dep't of Pub. Safety*, 854 F.3d 637 (10th Cir. 2017) (analyzing under the Fourteenth Amendment a claim on behalf of a motorcyclist who complained of injuries in transport, and later died in jail); *McCowan v. Morales*, 945 F.3d 1276, 1289-90 (10th Cir. 2019) (analyzing complaints of injury at police station prior to booking at jail as a claim for delayed medical attention under the Fourteenth Amendment). In *McCowan*, Judge Ebel specifically declined to analyze the claim for deprivation of medical care for injuries suffered after McCowan's arrest under the Fourth Amendment. *See id.* at 1290 n. 11.

Under the Fourteenth Amendment, "[a] claim for inadequate medical attention will be successful if the plaintiff shows deliberate indifference to serious medical needs." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (internal quotation marks omitted). "The Supreme

Court has established a two-pronged test for deliberate indifference claims. Under this test, a plaintiff must satisfy an objective prong and a subjective prong. The objective prong concerns the severity of a plaintiff's need for medical care; the subjective prong concerns the defendant's state of mind." *Rife*, 854 F.3d at 647. "[A] medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). "Moreover, a delay in medical care only constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm." *Id.* (internal quotation marks omitted). "To prevail on the subjective component, the prisoner must show that the defendants knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006) (internal quotation marks omitted); *see also Beggs*, 563 F.3d at 1089 (finding plaintiffs were required to show deliberate indifference to the *specific* injury-causing risk) (emphasis added).

Burnett's medical needs were not obvious. *Rife v. Jefferson*, 742 F. App'x 377, 384 (10th Cir. 2018) (unpublished) (noting the subtlety of heart attack symptoms). Once Burnett was non-resistant, officers collected themselves and monitored Burnett. The precise moment Burnett stopped breathing is unknown. Officers repeatedly looked and felt for breathing. (Ex. B 8:46-9:00, 11:16-11:37; 12:28-12:33; 14:11-14:14; Ex. F 1:36:54-1:37:00; 1:38:20-1:38:31; 1:40:58-1:41:13). They checked, multiple times, and found, multiple times, a pulse. (Ex. B 8:55-9:00, 10:03-10:09, 10:25-10:33, 11:10-11:14, 14:22-14:34). They observed other signs of life. (Ex. B 11:16-11:37; 12:49-12:54). They did so well after Officer Barth requested professional emergency medical services. (Ex. A 6:01-6:05; Ex. S, 80, lns. 22-23; 81, lns. 7-11; Ex. U, 118, lns. 16-18). The request for a medical response was accelerated when Burnett's condition deteriorated. (Ex. F

1:40:20-1:40:25). They performed CPR when they lost a pulse. (Ex. B 14:58-15:09). Nothing suggests the officers knew their efforts were insufficient and intentionally failed to do more out of indifference. *See Reed v. Nacogdoches Cnty.*, No. 22-40126, 2023 WL 3563017, at *4 (5th Cir. May 19, 2023) ("[W]here officials elect to do *something* rather than *nothing*, it is difficult or impossible to say they acted with 'indifference' much less deliberate indifference.") (emphasis in original).

In the end, criticism of the officers' efforts amounts to either a claim of negligence or that they mistook facts. If the former, "[n]egligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation." *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999). If the latter, it was a mistake of fact. *See Pearson*, 555 U.S. at 231 (officers are entitled to qualified immunity for mistakes of fact). In either event, no duty existed and, because they acted reasonably and without deliberate indifference, the officers did not violate the Constitution.

### 7. The officers did not violate clearly established law in monitoring and providing aid

In light of *Wilson* and *Crittenden*, and the genuine question whether any duty exists, the law is not clearly established either generally or in a particularized way. Moreover, Supreme Court and Tenth Circuit precedent lacks sufficient factual symmetry to put the constitutional question beyond debate. *Estate of Booker* is "highly contextual[ized.]"[2] *Crittenden*, 786 F. App'x at 804. There, the Court found,

---

[2] The Tenth Circuit in *Estate of Booker* specifically found "any reasonable officer in the Defendants' position—[1] having rendered Mr. Booker unconscious by use of force with at least a two-minute carotid neck hold, [2] roughly 140 pounds of pressure on his back, and [3] an eight-second taser stun—should have known that [4] failing to check Mr. Booker's vitals or [5] seek immediate medical attention could evince deliberate indifference to a serious medical need." *Id.* at 434.

the contours of the right are clearly established such that any reasonable officer in the Defendants' position (and with their training) would have known that <u>failing to check Mr. Booker's vital signs, perform CPR, or seek medical care for three minutes</u> when he was limp and unconscious as a result of the Defendants' use of force could violate the Constitution.

*Estate of Booker*, 745 F.3d at 434 (emphasis added). As stated in Sections III.A.3. and 6, the events here are nothing like *Estate of Booker*. Aside from the dissimilarity in force used, the contrasts in medical monitoring and aid here compared to *Estate of Booker* are stark. Here, the officers sought medical care, checked vital signs, and performed CPR. Accordingly, the law is not clearly established and the officers are entitled to qualified immunity.

WHEREFORE, for the foregoing reasons, Sergeant Inazu, Officers Fleming, Daigle and Barth respectfully request that this Honorable Court enter an order dismissing the Amended Complaint with prejudice.

Respectfully submitted this <u>22nd</u> day of <u>December</u>, 2023.

OFFICE OF THE CITY ATTORNEY
Wynetta P. Massey, City Attorney

<u>*/s/ W. Erik Lamphere*</u>
W. Erik Lamphere
Martha E. McKinney
30 S. Nevada Ave., Suite 501
Colorado Springs, Colorado 80903
Telephone:  (719) 385-5909
Facsimile:  (719) 385-5535
erik.lamphere@coloradosprings.gov
martha.mckinney@coloradosprings.gov

## **CERTIFICATE OF SERVICE (CM/ECF)**

I hereby certify that on the <u>22nd</u> day of <u>December</u>, 2023, I electronically filed the foregoing **INDIVIDUAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following via email:.

Felipe Bohnet-Gomez (fbg@rmlawyers.com)
Siddhartha H. Rathod (sr@rmlawyers.com)
Benjamin DeGolia (bd@rmlawyers.com)
Ciara M. Anderson (ca@rmlawyers.com)
Matthew J. Cron (mc@rmlawyers.com)
*Attorneys for Plaintiff*

<u>*/s/ Amy McKimmey*</u>
Amy McKimmey
Legal Secretary
