Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil No. 21-cv-1708-WJM-MDB
_____
DEPOSITION OF                                May 10, 2023
OFFICER JOSEPH DAIGLE
_____
ESTATE OF CHAD ALEXANDER BURNETT,

        Plaintiff,

vs.

CITY OF COLORADO SPRINGS, a municipality;
SERGEANT MICHAEL INAZU, in his individual capacity;
OFFICER JOSEPH DAIGLE, in his individual capacity;
OFFICER MATTHEW FLEMING, in his individual capacity;
OFFICER CAROLINE BARTH, in her individual capacity,

        Defendants.

_____

      The deposition of OFFICER JOSEPH DAIGLE, taken before Leeann Stellor, a Registered Merit Reporter, Certified Realtime Reporter, and a Notary Public in and for the County of Summit and the State of Colorado, at 2701 Lawrence Street, Denver, Colorado, on Wednesday, May 10, 2023, at the hour of 9:57 a.m.



Page 21

1    Q.    Okay.  And then you get to the house.
2  Walk me through what happens next.
3    A.    So as soon as we got there, that's when
4  we were met with Broadmoor security.
5    Q.    Okay.
6    A.    And so since they were already there, he
7  comes out of the car and he gave me -- go ahead.
8    Q.    Go ahead.
9    A.    He gave me the information saying that,
10  A, there might be some possible weapons in the
11  house, and he kind of gave me a brief description of
12  what Chad looks like.
13    Q.    And when you said "he," you're referring
14  to the Broadmoor security person?
15    A.    Correct.  I -- I don't recall his name.
16    Q.    So once you learned this information from
17  the Broadmoor security person, what did you do?
18    A.    After that, from what I recall, Officer
19  Fleming was with me.  And I don't remember exactly
20  what we did afterwards, but I believe I went over to
21  the neighbor's house and tried to get a story of
22  what happened.
23    Q.    What did you learn from -- and so you
24  went to the neighbor's before you went and tried to
25  approach Mr. Burnett; is that accurate?



```
 1        A.    And the story was Mr. Burnett had come
 2   out of his home with personal items, such as like
 3   books and Bibles and stuff like that, and walked
 4   over to the neighbor's house and met that neighbor
 5   in their driveway and had dropped the items that he
 6   was carrying on the neighbor's driveway.  So then
 7   the neighbor bends down to start picking up the
 8   items to help out Mr. Burnett, and as he was doing
 9   that, he was kneeling down.  Mr. Burnett then
10   produced a knife and held it over to the
11   neighbor's -- above the neighbor as he was bending
12   down, picking up the items, and said, "Drop my
13   items.  I'm going to kill you."
14        Q.    And what happened -- what did the
15   neighbors say after Mr. Burnett reportedly had a
16   knife?
17        A.    So the neighbor told me that after, once
18   he saw the knife, he tried to talk Mr. Burnett down,
19   tried to say, "Hey, I thought we were friends.  I
20   thought we were cool."  And then the neighbor then
21   told me he realized, I'm fearing for my life.
22        Q.    You never personally observed Mr. Burnett
23   with a knife, right?
24        A.    Later in the call, he had knives.
25        Q.    You never personally observed him hold a
```



Page 26

```
 1   knife?
 2        A.    Correct.
 3        Q.    Okay.  Did you -- at that point after
 4   speaking with the neighbors the first time, had you
 5   determined that there was probable cause to arrest
 6   Mr. Burnett?
 7        A.    No.  We kept going back to the neighbor's
 8   house to clear more details on the story.
 9        Q.    Okay.  So at that point there was no
10   probable cause to arrest him, correct?
11              MR. LAMPHERE:  Objection.  Form.
12   Foundation.
13              You can answer.
14        A.    At that point we were still trying to
15   gather our probable cause by clearing up the story
16   with those neighbors and then talking to other
17   neighbors around.
18        Q.    Okay.  So you mentioned that you were
19   going to try to talk to Mr. Burnett.  Did you do
20   that?
21        A.    Sergeant Inazu and Officer Fleming
22   attempted to.  I was kind of staying behind them a
23   little bit just to kind of keep an eye out.
24        Q.    Okay.
25        A.    More of like scene security.  Sergeant
```



Page 38

1      Q.    So throughout the incident he never came
2    out, opened his door, while the officers were on his
3    porch, right?
4            MR. LAMPHERE:  Objection.  Form.
5    Foundation.
6                  You can answer.
7      A.    While we were on his porch, no, he kept
8    the door shut, from what I remember.
9      Q.    Okay.  And he never opened the door
10   whenever you guys were knocking on his door and
11   asking him to, correct?
12     A.    Correct.
13     Q.    Okay.  And so despite this knowledge, the
14   plan, whenever you made the decision to arrest him,
15   was to try to get him to come out of the house and
16   then talk him into handcuffs; is that right?
17     A.    Yes.
18     Q.    Okay.  Did you take any steps to get a
19   warrant?
20     A.    No.
21     Q.    Why not?
22     A.    Because we had probable cause to arrest
23   him.  And since we had information that there was
24   possibly weapons in the house, we didn't -- at the
25   time we did not feel like we had time to get a



Page 39

```
 1   warrant.
 2        Q.    But you had time to wait for him to come
 3   out of his house, right?
 4        A.    Yeah, at the time we felt like we did not
 5   have time to get a warrant for him.
 6        Q.    Okay.  How much time does it take to get
 7   a warrant?
 8        A.    It depends.
 9        Q.    How much time does it typically take to
10   get a warrant under the circumstances that you were
11   facing that day?
12        A.    It could take a couple hours or more.
13        Q.    But did you -- but you all had agreed
14   that you were going to be there for a while, right?
15              MR. LAMPHERE:  Objection.  Form.
16   Foundation.
17              THE WITNESS:  Do you want me to
18   answer?
19              MR. LAMPHERE:  You can answer.
20        A.    We had already been there for a while,
21   and we knew we had to get the situation resolved.
22        Q.    Okay.  Could you have gotten a warrant?
23              MR. LAMPHERE:  Objection.  Form.
24              You can answer.
25        A.    We -- we didn't seek the warrant because
```



```
                                                      Page 40
 1   of the amount of time that it was going to take.
 2       Q.   Okay.  How much time did you think it was
 3   going to take that prevented you from -- from taking
 4   that step?
 5            MR. LAMPHERE:  Objection.  Asked and
 6   answered.
 7                 You can answer.
 8       Q.   You can answer.
 9       A.   Several hours.  It could have taken up to
10   several hours.  It's kind of hard to determine
11   exactly how long.
12       Q.   Okay.  Have you ever gotten a warrant in
13   30 minutes?
14       A.   Me?  No.
15       Q.   Okay.  Was it your responsibility to --
16   did you ever -- have you ever sought a warrant in
17   your career as a police officer?
18       A.   After the fact.  It was generally after
19   an incident had already happened.
20       Q.   What weapons did you believe Mr. Burnett
21   had in his house?
22       A.   We were told possibly firearms.
23       Q.   Possible firearms.
24                 He had come out of his house over
25   the course of an hour, though, and never brandished
```



Page 41

```
 1   a firearm, correct?
 2        A.    Not that we saw.
 3        Q.    And why was that important in the fact to
 4   not getting a warrant?
 5        A.    I'm sorry?
 6              MR. LAMPHERE:  Objection.  Form and
 7   foundation.
 8              Go ahead.
 9        A.    I'm sorry, can you rephrase that?
10        Q.    Why was the fact that there were possible
11   firearms, what did that play in your decision to not
12   get a warrant?
13        A.    Since we had the knowledge that there was
14   possible firearms in the house, I think it was felt
15   that if we had waited and went and got a warrant
16   later, then we don't know what would have happened.
17   Maybe those firearms would have been used.  Maybe
18   they wouldn't.  We didn't know, and we didn't want
19   to prevent -- and we wanted to prevent any harm to
20   the public, to him, to officers.
21        Q.    Okay.  Is there a risk of harm if
22   officers are waiting outside of someone's house,
23   that they might come out of the house after being
24   repeatedly told to go away, and that person might
25   use a firearm?
```



```
                                                       Page 95
 1   clarifies exigent circumstances.  Do you see that?
 2        A.    Yes.
 3        Q.    And the policy outlines exigency to
 4   include an imminent danger to life.  Do you see
 5   that?
 6        A.    Yes.
 7        Q.    And the escape of a suspect as well.  Do
 8   you see that?
 9        A.    Yes.
10        Q.    Or a destruction of evidence.  Do you see
11   that?
12        A.    Yes.
13        Q.    Okay.  In your encounter with Mr. Burnett
14   on May 24th, was there an imminent danger to life
15   whenever you chased him into his home?
16        A.    Well, Mr. Burnett, we didn't know if he
17   had weapons in his home.  We didn't know if anyone
18   else was in the home, and we also -- the -- the
19   sheer -- the size of Mr. Burnett as well.
20        Q.    How did those -- how did his size
21   contribute to whether there was an imminent danger
22   to life?
23        A.    Well, as we were running in there --
24   Mr. Burnett is approximately 6 feet, 7 inches tall,
25   250 pounds.  So while we were pursuing him into the
```



Page 105

```
 1      A.    Nonemergency.  No lights or sirens.
 2      Q.    What's a code 3?
 3      A.    That's emergent, so you drive with your
 4   lights and sirens.
 5      Q.    Did you call for a medical emergency for
 6   Mr. Burnett?
 7      A.    Me personally, no, but medical was called
 8   for him.
 9      Q.    Okay.
10      A.    And I want to note too that medical was
11   called as soon as the taser was deployed.
12      Q.    What code was medical called when the
13   taser was deployed?
14      A.    For taser deployments, medical response
15   code 2.
16      Q.    And then did the medical call ever get
17   moved up to a code 3?
18      A.    It did.  So after the initial struggle
19   was done and Mr. Burnett was -- we were in the front
20   foyer of the house and he was lying on his side,
21   that's when we bumped medical up to code 3.
22      Q.    Okay.
23      A.    I don't remember who exactly called
24   medical code 3.
25      Q.    Was Mr. Burnett still conscious whenever
```



Page 106

```
 1   it was bumped to a code 3?
 2        A.    He was, yes.
 3        Q.    Okay.  So what required the change in
 4   status for Mr. Burnett's case specifically?
 5        A.    It was after the struggle.  So he had
 6   been putting up the fight.  He had been tased, and
 7   then he was just kind of -- he was calm at that
 8   moment, but he was still tense, so we wanted medical
 9   to get there sooner.  We figured if they were there
10   at the call sooner rather than later, it would be
11   better.
12        Q.    Okay.  He was still conscious.  So were
13   you -- were any of the officers giving him any
14   medical aid?
15        A.    At that point, we were still monitoring.
16        Q.    Okay.  How long did you monitor
17   Mr. Burnett?
18        A.    I don't recall the exact time.  It might
19   have been a few minutes.
20        Q.    And how could you tell he was still
21   conscious?
22              MR. LAMPHERE:  Objection.  Form.
23   Foundation.
24              You can answer.
25        A.    He was still holding his head up on his
```



```
                                                              Page 135
 1   Mr. Burnett's back Officer Fleming?
 2        A.    Yes, that's Officer Fleming.
 3        Q.    And Mr. Burnett is handcuffed during this
 4   struggle?
 5        A.    He is.
 6        Q.    Okay.  And you are holding his shoulder
 7   and -- between his shoulder blades and his back?
 8              MR. LAMPHERE:  Objection.  Form.
 9   Foundation.
10              You can answer.
11        A.    Yes, that's where my hands are.
12        Q.    Okay.  And you're holding Mr. Burnett
13   down?
14        A.    We're attempting to control him at this
15   point.  He had just -- I mean, as I said earlier,
16   he's 6'7", 250 pounds, and he just -- as we were
17   trying to walk him to the car after we fell on the
18   front porch, he refused and didn't want to.  And all
19   his body weight, he took all his body weight and
20   just launched us back into the house.
21                   And that's when he -- as I said
22   before, that's where he threw me into the back wall.
23   I hit the table that was behind.  In the video you
24   can hear glass crashing.
25        Q.    I'm going to pause you because you
```



Page 138

```
 1      Q.    Okay.  So at this point where you're
 2   holding him down by -- and he's on his -- by his
 3   back, you're holding him down on his back, this is a
 4   use of force, right?
 5      A.    This is a use of force, yes.
 6      Q.    Okay.  And so we'll continue to play
 7   Exhibit 4 and pause it at 6 minutes and 2 seconds.
 8                  (Video played.)
 9      Q.    So we've stopped Exhibit 4 at 6 minutes
10   and 2 seconds.
11                  And you are still holding him by
12   his neck in this video, correct?
13      A.    I --
14            MR. LAMPHERE:  Objection.  Form.
15   Foundation.
16                  You can answer.
17      A.    With my left hand, I was trying to
18   control his arm because he kept moving around.  And
19   with my right hand, it was more placed as kind of
20   like a guide.
21      Q.    And with your right hand, you're guiding
22   him by the neck?
23            MR. LAMPHERE:  Objection.  Form.
24   Foundation.
25                  Go ahead and answer.
```



Page 139

```
 1      A.    We're trying control him.  He's still
 2   struggling with us.  We're trying to get him under
 3   control and get him to stop struggling with us.
 4      Q.    At this point Mr. Burnett is on his
 5   stomach, correct?
 6      A.    Correct.  He's still -- he's still
 7   struggling with us, and we're trying to recover, as
 8   we were thrown in the house and thrown around.
 9      Q.    And in the video that we just played from
10   Exhibit 4, and where we've paused it at 6 minutes
11   and 2 seconds, you cannot see Mr. Burnett's face.
12   Do you agree?
13      A.    I can't see his face in the video.
14      Q.    Okay.  And this video is captured from
15   your body-worn camera, which is on your chest,
16   right?
17      A.    Correct.
18      Q.    Okay.  At 6 minutes and 2 seconds, is
19   your right hand on Mr. Burnett's neck?
20            MR. LAMPHERE:  Objection.  Form.
21   Foundation.
22                 You can answer.
23      A.    My right hand is.
24      Q.    Okay.  We'll play Exhibit 4 until
25   6 minutes and 45 seconds.
```



Page 140

```
 1                    (Video played.)
 2        Q.   Okay.  We've paused at 6 minutes and
 3   45 seconds.
 4                    And you hear multiple officers
 5   saying "stop resisting," but in the video, what the
 6   video captures, what resistance did you see?
 7        A.   Well, he was tense.  He wouldn't -- he
 8   kept trying to get away from us.  He kept trying to,
 9   you know, kind of wiggle out of where we were, just
10   trying to get away from us.  So we wanted him to be
11   calm and compliant so we can get him back up and try
12   and get him out to the car again.
13        Q.   Okay.  And the video that -- Exhibit 4
14   until 6 minutes and 45 seconds, the clip we just
15   played, you said that him being tense was the
16   resistance.  But is being tense alone resistance?
17                    MR. LAMPHERE:  Objection.  Form.
18   Foundation.
19                    You can answer.
20        A.   It can be a sign of resistance.  And
21   especially what we had just -- we had just struggled
22   with him for the past, you know, 6 minutes.  So --
23   and he would -- he kind of had this pattern where he
24   would calm down, and then we would struggle with him
25   again, and then he would calm down, and we would
```



Page 141

1  struggle with him again.  And in this case we didn't
2  know what was going to happen, especially since he
3  was still tensed up and he was trying to get away
4  from us.
5      Q.   Mr. Burnett was in handcuffs at this
6  point, correct?
7      A.   He was.
8      Q.   Okay.  And you were holding him down on
9  his back, correct -- or with your hand on his back,
10 right?
11     A.   My hand's on the back of his left arm,
12 kind of trying to control that arm, to keep it from
13 moving.  My then right hand is kind of more of a
14 guide.  As you can see in the video, I keep taking
15 my hand off of him to move the furniture away, to
16 reposition it, and pat him on the back too to say
17 everything -- hey, calm down, you know, relax.
18     Q.   Did you observe Officer Fleming use force
19 on Mr. Burnett's back in the clip I just played of
20 Exhibit 4?
21          MR. LAMPHERE:  Objection.  Form.
22 Foundation.
23          You can answer.
24     A.   I observed Officer Fleming tell him to
25 relax and tug on his shirt (indicating).



Page 144

```
 1   5 seconds.
 2                     And did you hear Mr. Burnett make
 3   a swallowing noise in the video, in that clip?
 4       A.    I -- I didn't hear him.
 5       Q.    But he's still handcuffed, correct?
 6       A.    He's still handcuffed, yes.
 7       Q.    Okay.  And your hands are still holding
 8   him down, correct?
 9       A.    Correct.  We're still trying to gain
10   control of him.
11       Q.    And Mr. Burnett is on his stomach still,
12   correct?
13                     MR. LAMPHERE:  Objection.  Form.
14   Foundation.
15                     Go ahead.
16       A.    It's honestly kind of hard to tell at
17   this angle where the body camera is facing right
18   now.
19       Q.    But you can't see his face in this video,
20   correct?
21       A.    I can't see his face, and it looks like
22   my arm is partially -- at the angle my arm was, it's
23   partially blocking that view.
24       Q.    And your hand is on Mr. Burnett's neck
25   still?
```



Page 145

```
 1      A.   No.
 2           MR. LAMPHERE:  Objection.  Form.
 3   Foundation.
 4                Sorry.
 5           THE WITNESS:  I'm sorry.
 6      A.   It looks more like it's kind of on his --
 7   like, kind of where his collarbone meets his
 8   shoulder, kind of like where -- it's also hard to
 9   tell in the video, but it almost kind of looks like
10   it's like this (indicating).
11      Q.   Okay.
12      A.   Yeah.
13      Q.   So we've paused Exhibit 4 at 7 minutes
14   and 5 seconds.  We're going to play it again until
15   7 minutes and 45 seconds.
16                (Video played.)
17      Q.   We've paused Exhibit 4 at 7 minutes and
18   45 seconds.
19                Mr. Burnett is no longer -- was
20   Mr. Burnett speaking in that video?
21      A.   I heard heavy breathing.
22      Q.   Okay.  Well, were you breathing -- who
23   was breathing heavily?
24      A.   We all were.
25      Q.   And is that because there was a struggle
```



```
 1                 MR. LAMPHERE:  Objection.  Form.
 2   Foundation.
 3                 You can answer.
 4        A.    Yes.
 5        Q.    You're still holding Mr. Burnett down by
 6   his -- with your hands on his back, correct?
 7        A.    Yeah.  It looks like my right hand is
 8   kind of more just lightly there, kind of like a
 9   guide, but my left arm is still under his armpit.
10        Q.    Okay.  And another officer's hands are
11   also on his back, holding him down?
12        A.    Other officers' hands are on his back,
13   holding his back.  I don't know how much pressure
14   those other officers are putting down, but they are
15   touching him.
16        Q.    Would Officer -- based on this video, are
17   you at all concerned that Mr. Burnett cannot
18   breathe?
19        A.    At this point, it seemed like he was just
20   trying to catch his breath after fighting with us
21   for eight minutes.
22        Q.    Did you hear Mr. Burnett making a humming
23   sound in the video that I just played, Exhibit 4?
24                 MR. LAMPHERE:  Objection.  Form.
25   Foundation.
```



```
                                                           Page 193
 1                    REPORTER'S CERTIFICATE
 2               I, LEEANN L. STELLOR, Registered Merit
 3    Reporter and Certified Realtime Reporter within
 4    Colorado, ID 200401669, appointed to take the
 5    deposition of OFFICER JOSEPH DAIGLE, do hereby certify
 6    that before the deposition he was duly sworn by me to
 7    testify to the truth; that the deposition was taken by
 8    me then reduced to typewritten form herein; that the
 9    foregoing is a true transcript of the questions asked,
10    testimony given and proceedings had.
11
12               I further certify that I am not related to
13    any party herein or their Counsel, and have no interest
14    in the result of this litigation.
15
16               In witness hereof I have hereunto set my
17    hand this 22nd day of May, 2023.
18
19                       Leeann L. Stellor
                         Leeann L. Stellor
20                       Registered Merit Reporter
                         Certified Realtime Reporter
21                       and Notary Public
22
23    My commission expires June 8, 2024
24
25
```

