**EXHIBIT S**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil No. 21-cv-1708-WJM-MDB

_____

DEPOSITION OF                              June 28, 2023
OFFICER CAROLINE BARTH (ROMINE)

_____

ESTATE OF CHAD ALEXANDER BURNETT,

        Plaintiff,

vs.

CITY OF COLORADO SPRINGS, a municipality;
SERGEANT MICHAEL INAZU, in his individual capacity;
OFFICER JOSEPH DAIGLE, in his individual capacity;
OFFICER MATTHEW FLEMING, in his individual capacity;
OFFICER CAROLINE BARTH, in her individual capacity,

        Defendants.

_____

      The deposition of CAROLINE BARTH (ROMINE),
taken before Leeann Stellor, a Registered Merit
Reporter, Certified Realtime Reporter, and a Notary
Public in and for the County of Summit and the State
of Colorado, at 2701 Lawrence Street, Denver,
Colorado, on Wednesday, June 28, 2023, at the hour
of 9:09 a.m.



1     Q.     Can you explain that?

2     A.     So I believe the investigator had asked

3     how many times I had walked away from Mr. Burnett,

4     or some similar type of question.  After we had that

5     discussion, the topic had come up again.  And as I

6     was thinking through the situation, I had recalled

7     leaving to move my car several times, so I know I

8     corrected that.

9                     But in watching the interview, I

10    don't believe that I recalled every time that I had

11    actually left him, which was multiple.  So initially

12    I think I had discussed leaving him maybe twice, and

13    then I corrected it during the investigation or

14    during the interview to a third time.  But I believe

15    I actually left that general vicinity of where he

16    was more times than what I remembered during the

17    interview.

18    Q.     So in the interview you discussed leaving

19    the vicinity of Mr. Burnett three times, and now you

20    recall at least one other time that you left?

21    A.     Correct.

22    Q.     What is the additional time or times that

23    you recall?

24    A.     The additional times would be going to

25    move my vehicle.  Initially it had been parked in



Page 13

1   the cul-de-sac, so I had left to move it closer to

2   the house.  And then I had left to move it further

3   away from the house for medical personnel, so they

4   could come in more quickly and respond more quickly

5   and render aid.

6                    And then I also had gone -- after

7   I had moved it away from the house, I believe I went

8   back to the vicinity of where he was.  And then I

9   left again to try to flag medical personnel in more

10  quickly so they knew exactly where they were and

11  they could respond as quickly as possible.

12       Q.    So those times that you left, are those

13  all the times that you recall leaving his vicinity?

14       A.    There was another time I left his

15  vicinity when we were doing a sweep through the

16  house, to make sure it was safe for medical

17  personnel when we -- or when they arrived.

18       Q.    Any other times that you recall leaving

19  Mr. Burnett's vicinity?

20       A.    There were several other times I had

21  stepped away from the foyer of the house, I guess,

22  or just directly in the entryway, where I had

23  actually stepped outside of the house and I was

24  standing there waiting.  I don't recall how many

25  times I had actually walked out of the house and for



Page 37

1   impression that I was going to be headed that

2   direction.

3        Q.    So the call mentioned that they were

4   code 4 at Mr. Burnett's location?

5        A.    I don't recall specifically if I knew

6   when they said they were code 4, what address they

7   were at or what type of call they were on.  I just

8   recall an officer saying over the radio, "We're

9   code 4, but we could use another unit."

10       Q.    And code 4 means what?

11             MR. LAMPHERE:  Objection.

12   Foundation.

13             You can answer.

14       A.    Code 4 just means they're okay.  They're

15   not in -- they don't have an immediate or imminent

16   threat at the time.  But if they're asking for

17   another unit, it means that they're concerned the

18   situation could be escalating and they may need

19   additional units for help.

20       Q.    And so that's what you understood from

21   the call?

22       A.    From the transmission.

23       Q.    And you said you looked at the unit

24   status screen to see what the other units were

25   doing?



Page 67

1    right?

2         A.    To the best of my recollection, I believe

3    I had my taser in my right hand.  I believe I had

4    approached the situation with my left hand.  I don't

5    know to the extent that I had any interaction or

6    significant contact even with Mr. Burnett or another

7    officer, but then I had backed away from the four of

8    them.

9         Q.    And what did you do next?

10        A.    So at that point I believe I kneeled onto

11   the ground.  I believe I was kneeling at this point,

12   or I had tried to get to a lower position.  And I

13   had my taser out and it was on, so I pulled the

14   trigger of my taser, which deployed a cartridge or

15   two probes in the direction of Mr. Burnett.

16        Q.    Did you see whether the taser probes hit

17   Mr. Burnett?

18        A.    I did not see specifically if or where

19   they hit him.  But based on the reaction that I

20   heard, it seemed to me or it appeared to me that

21   there had been contact with Mr. Burnett with the

22   taser probes.

23        Q.    And what was the reaction that you saw or

24   heard?

25        A.    This is not verbatim by any means, but I



Page 68

1  believe he said, "Ow," and he made another comment,

2  which would be indicative of being in contact with

3  the electricity coming through the taser.

4      Q.    So based on what you observed, you

5  believed that the electricity was discharged into

6  Mr. Burnett?

7      A.    At least partially.

8      Q.    You said in your interview with the

9  El Paso County's Sheriff's Office that the taser was

10  not effective.  Do you recall that?

11      A.    Yes.

12      Q.    What do you mean by not effective?

13      A.    So the hopes with the taser is that when

14  it's deployed, the two probes create a connection

15  through the body to create NMI, which is the

16  neuromuscular incapacitation.  That hope would be

17  that that neuromuscular incapacitation, the term I

18  guess is, locks up the muscles in a way that

19  officers are able to effectively and safely gain

20  control of the individual.

21                  And so when I said that it wasn't

22  effective, my intention or my meaning behind that

23  was saying that he did not receive a full lockup,

24  other than he did experience some pain.

25      Q.    And what do you base your assessment that



Page 69

1    the taser was not effective on?

2         A.    I base that on the fact that he was still

3    resisting the controls of three grown men and still

4    able to fight against the officers and their

5    control, and the fact that he was still able to

6    move, what appeared to be, freely versus a full

7    neuromuscular incapacitation, which would not even

8    allow somebody to stop screaming coming out of their

9    mouth or be able to bend their fingers willingly.

10        Q.    After you discharged the taser, what did

11   you do next?

12        A.    After I discharged the taser, I knew it

13   wasn't completely effective, again, but I did

14   believe it was -- did have some sort of effect

15   because he did say "Ow."  And at that point I

16   believe he fell to the ground, which both the

17   officers, the other officers were continuing to

18   struggle.

19              And so because he was on the

20   ground, I re-approached the four of them, and at

21   that point I was basically in his leg area where he

22   was kicking.

23        Q.    So you saw Mr. Burnett fall to the ground

24   after he was tased?

25        A.    Yeah.  I -- yes.



1       Q.      And then you approached?

2       A.      To the best of my recollection, yes.

3       Q.      What did you do then?

4       A.      So once he was on the ground I, of

5  course, had to get back down to that level because

6  standing up would not be helpful in this situation.

7       Q.      Uh-huh.

8       A.      So I believe I also got down onto the

9  ground.  I had set my taser to my right kind of onto

10 the ground, and I tried to gain control of his legs

11 that were kicking back and forth and kind of

12 throwing me off of him.  So I re -- or I had set my

13 taser on the ground at that point, I guess.

14      Q.      Did you gain control of his legs?

15      A.      No.  They were kicking too strongly for

16 me to be able to gain control, in like a positive

17 control in which he wasn't able to kick any longer.

18      Q.      What did you do next?

19      A.      I believe I verbalized at that point that

20 I was going to arc my taser so the other officers

21 knew.  Because part of our taser training is that

22 when the wires that carry the electricity from the

23 device, when they're exposed, if you -- anybody else

24 is touching them, they can deliver a shock to

25 somebody.



Page 71

1              So I verbalized for everybody to
2    know, hey, I'm going to arc my taser again.  And at
3    that point I arced my taser again.
4         Q.    Did you verbalize any sort of warning
5    before you discharged the taser for the first time?
6         A.    Not that I recall, no.
7         Q.    So you verbalized that you are going to
8    arc the taser at this point; is that right?
9         A.    As I was on the ground and I had already
10   tased him once, yes, that was the...
11        Q.    Yeah.  So you give a warning at that
12   point?
13        A.    Yes, that I said I was going to arc it
14   again.
15        Q.    And then did you arc it again?
16        A.    Yes.
17        Q.    What is meant by arcing a taser?
18        A.    So there's a few different ways the taser
19   can be deployed.  The most obvious way would be
20   pulling the trigger, which would -- there's two
21   cartridges in the taser.  Each cartridge has two
22   probes.  So when you pull the trigger, only one
23   cartridge is deployed, and one cartridge has the two
24   probes that come out.  So that would be the most
25   obvious way you would deploy a taser.



Page 73

1    this case?

2         A.    Correct.    That would be the arc in this

3    case.    When I said arcing the taser, that would be

4    sending the electricity through the wires.

5         Q.    And did you observe any effect on

6    Mr. Burnett after you arced the taser?

7         A.    I don't recall observing any effect in

8    the moment.    Because when I gave the warning that I

9    was going to arc the taser, I believe Sergeant Inazu

10   said, "Okay.    Watch out for the wires."

11                    And, unfortunately, I did not

12   watch out for the wires.    I was in contact with

13   them.    So I actually ended up exposing myself to the

14   electrical current, which was rather shocking and

15   uncomfortable and painful, to be blunt about it.

16   It's not a comfortable feeling.    And so I don't

17   believe that I was paying attention to his reaction

18   at that time when I arced it, and it was such a

19   short time frame.

20        Q.    I see.    Yeah.    So in the moment you were

21   not observing Mr. Burnett as closely.    But did you

22   observe any reaction in your review of the body-worn

23   camera or at any other time?

24        A.    Not that I can recall right now, from

25   watching it.    But I do know that he -- or I do



Page 74

1   recall that he continued to resist officers as we

2   were trying to control -- like, as I was down by his

3   legs and the other officers were up towards the

4   upper part of his body, he was still not complying,

5   giving us his hands at that point, giving oral

6   commands to give him -- I think I said twice, "Give

7   us your hands."  Or I think I made a mistake and

8   said, "Give me my hands," but then I corrected

9   myself and said, "Give us your hands."  So he was

10  still not doing that, I guess would be a reaction.

11       Q.   Okay.  So you -- after you arced the

12  taser, at some point you went and tried to control

13  Mr. Burnett's hands?

14       A.   I don't believe I was trying to control

15  his hands, but I could tell that the other officers

16  still did not have control of his hands because they

17  hadn't verbalized anything.  And they, as far as I

18  can recall, were still giving very similar commands,

19  and so yeah.

20       Q.   Did you deploy your taser again after

21  arcing it?

22       A.   I did.  And so that's actually

23  interesting.  So that does bring me back to one

24  thing I should have, and I failed to mentioned

25  during the -- when we were talking about my DFIT



Page 75

1    interview.  At the time I believed I had only

2    deployed my taser twice.  But I did recall, after

3    the fact, that I did try to arc switch it or do the

4    arc one more time during -- during that struggle.

5    So that would be a total of three times.

6            Q.    Okay.

7            A.    So I apologize, I did fail to mention.

8    That was one of the things that I forgot during the

9    DFIT interview.

10           Q.    I appreciate that clarification.

11                 Did you -- so the first time you

12   deployed the taser, you did so by pulling the

13   trigger and it fired the probes, right?

14           A.    Correct.

15           Q.    And the second deployment you hit the arc

16   switch and it sent a current through the wires,

17   right?

18           A.    Correct.

19           Q.    And then the third deployment, you hit

20   the arc switch again, and the taser would have again

21   sent the current through the wires; is that right?

22           A.    Correct.

23           Q.    Do you recall observing any effect on

24   Mr. Burnett from the third deployment of the taser?

25           A.    Not that I recall.  Which is why that was



Page 76

1   about the point in my mind where I was abandoning

2   that option as a viable use of force, with us being

3   in close contact.  I don't recall any effect.

4        Q.    How close in time was the third taser

5   deployment to the second taser deployment?

6        A.    I don't recall the exact amount of

7   seconds that passed.  I don't believe it was any

8   more than 30 seconds, but I don't know the exact

9   amount of time.

10       Q.    What did you do after the third

11  deployment of the taser?

12       A.    After the third deployment, I left my

13  taser sitting off to the side, kind of outside, like

14  away from his feet and everything.  And at that

15  point I refocused my attention back on his lower

16  body, where his kind of hips and below were, to try

17  to control them.

18              I believe in a fairly short period

19  of time we were -- I was able to -- and I don't

20  recall if I was able to get my hand under his arm

21  and pull it up so that we could get a handcuff on it

22  at that point.

23       Q.    So after the third taser deployment, you

24  set it aside and joined the other officers in trying

25  to control Mr. Burnett?



Page 77

1      A.    Yeah.  I abandoned the taser as an

2  option, or as an effective option at that point

3  during the struggle, and I went back to Mr. Burnett

4  to try to gain control of him.

5      Q.    You said that you gave a warning before

6  the second deployment, before you arced the taser

7  for the first time.  Did you give a warning before

8  arcing the taser the second time?

9            MR. LAMPHERE:  Objection.  Form.

10           You can answer.

11     A.    I don't recall.

12     Q.    So in your interview with the El Paso

13 County Sheriff's Office, I believe you said that it

14 was your handcuffs that were used on Mr. Burnett; is

15 that correct?

16     A.    Yes.

17     Q.    Can you describe how Mr. Burnett came to

18 be handcuffed?

19     A.    I -- so he came to be handcuffed because

20 after I had abandoned the taser, again I went back

21 and I was in his lower body vicinity.  Eventually we

22 were able to get one of his hands -- his arms were

23 really, like, tensing and pulling away from us

24 towards the front of his body, and we only kind of

25 had access at that point to a little bit of the side



Page 78

1    and rear of his body, from what I can see down from

2    his lower half.

3                    At one point one of his -- I

4    believe it was his right arm, we were able to

5    overpower his strength and, you know, it was the

6    four of us trying to overpower him.  We were able to

7    gain control of that.  Somebody said, "Get a

8    handcuff on."  And so I said, "I got it."

9                    At that point I didn't really have

10   anything, any other arms or anything in my hand that

11   I was trying to use to maintain control of him, so

12   it seemed most appropriate that I would be able to

13   use my hands for another task.

14        Q.    Uh-huh.  What happened after Mr. Burnett

15   was handcuffed?

16        A.    So after the handcuff was on his right

17   hand, he was still continuing to struggle and kind

18   of tense and pull his arms -- or his arms, like,

19   towards the front still.  Eventually we were able to

20   get his left hand behind his back and handcuffed as

21   well.

22                    At that point I believe his state

23   of escalation and his not following the commands of

24   the officers or not being cooperative did recede

25   slightly, and so I had got off or away from



Page 79

1    Mr. Burnett, I guess, or off of his lower body or

2    away from it at that point.

3         Q.    Uh-huh.

4         A.    And then I think I was pulling the wire

5    out of the taser and struggling.  For whatever

6    reason, the cartridge wouldn't come out and I was

7    trying to eject it.  So at that point I ended up

8    just ripping the wires out because it was

9    frustrating me.

10        Q.    And what do you recall next after that?

11        A.    After -- with him, or with me, or?

12        Q.    What did you do after that?

13        A.    So I was pulling the wires out and then I

14   was trying to disconnect, take the cartridge out of

15   my taser.  Just it was jammed or stuck in there or

16   something.  So I kind of just pulled the wires out

17   and I reholstered my taser.

18             And at that point the other

19   officers, I'm not 100 percent sure what they were

20   saying or doing to him -- or doing with him, I

21   guess, at that point because I was focused on

22   manipulating my taser and not deploying it again or

23   anything.  But I do know at some point he was

24   standing up and we were walking out of the house.

25                  MR. LAMPHERE:  Felipe, can we take



Page 80

1   five minutes?

2                    MR. BOHNET-GOMEZ:  Yeah.

3                    MR. LAMPHERE:  Okay.  Thank you.

4                    (Break from 11:13 a.m. to

5                    11:25 a.m.)

6   BY MR. BOHNET-GOMEZ:

7        Q.    Officer Romine, we just took a little

8   break.  I think before the break we were discussing

9   what occurred in the encounter with Mr. Burnett up

10  until the point that he was handcuffed.  Do you

11  recall that?

12       A.    Yes.

13       Q.    And then you were describing that you

14  were pulling the wires out of your taser and trying

15  to eject the cartridge?

16       A.    Yeah, I was trying to eject it.

17       Q.    And you observed the other officers get

18  Mr. Burnett up and try to walk him out of the house;

19  is that correct?

20       A.    Yes.  So when I was messing with my

21  taser, my focus was mainly on that because it's a

22  still less lethal tool or a weapon.  But I called

23  for medical shortly after he was handcuffed, so I

24  already knew they were on the way.  So my goal was

25  to put my taser, put my weapon away while they were



Page 81

1  escorting or trying to escort him out of the house.

2       Q.    What do you recall happening after that

3  point?

4       A.    After I had called for the medical when

5  we were getting him out, or as we were walking him

6  out, or trying to walk him out, I guess?

7       Q.    So the call for medical, when did that

8  happen?

9       A.    That happened after I had both handcuffs

10  applied to him.  Or not both handcuffs, but it's one

11  pair of handcuffs, like one on each hand.

12       Q.    So you called for medical at that point,

13  and then trying to get the wires out of your taser

14  after that?

15       A.    After I had separated myself, yes.

16       Q.    And what do you recall happening next?

17       A.    I recall Mr. Burnett not walking

18  casually, like you or I have been walking out of

19  this room, but still giving some resistance, leaning

20  off to the side a little bit as the officers were

21  trying to get him out of the house.

22       Q.    So he was not walking upright.  He was

23  leaning one way or the other?

24       A.    He wasn't walking normally, the way you

25  and I would walk unassisted.  He was, like, leaning



Page 82

1    into where the officers were.

2        Q.    And at that point he was being walked out

3    of the house?

4        A.    He was walking on his own two feet,

5    being -- trying to be controlled by the other

6    officers.

7        Q.    And what did you observe happen after

8    that?

9        A.    After that I recall Mr. Burnett -- we got

10   to about the threshold of the door, and I recall

11   him, like, lunging face forward pretty forcefully

12   onto his front stoop or his front porch area.

13       Q.    And where were you when that happened?

14       A.    I was behind everybody, so I don't -- I

15   think I was the last one out of the house at that

16   point.

17       Q.    You were further inside the house as

18   people were going out?

19       A.    Yeah.  So I don't recall the exact order.

20   If I -- if I'm recalling correctly, I believe Inazu

21   left first and then Officers Daigle and Fleming were

22   trying to get Mr. Burnett out of the house.  That's

23   when he lunged out of the house face forward, and

24   then I was the last person behind all of them.

25       Q.    You say he lunged out of the house.  What



Page 83

1    do you mean by that?

2         A.    From my perspective, it appeared he

3    pretty forcefully, like, threw himself onto the

4    ground.

5         Q.    Did you see how that occurred?

6         A.    He was a very tall, big person.  So just

7    his momentum, his body weight, of engaging his

8    muscles and being able to use some momentum to break

9    away or what would appear that he's making a lunging

10   motion, it would probably appear to be attempting to

11   break away from the officers' control.

12        Q.    And you saw him fall then onto his front

13   porch?

14        A.    Yeah.  When he lunged, he fell forward

15   onto the front porch.

16        Q.    What happened next?

17        A.    When he lunged on the front porch, the

18   officers I believe still had control of his arms.  I

19   was still behind everybody and was trying to think

20   how, you know, we can again minimize injury to

21   everybody, minimize injury to Mr. Burnett and

22   minimize injury to the officers, so this just

23   continuous struggle that we were having wouldn't

24   continue.

25                    So based on what I was seeing, I



Page 84

1   figured it would probably be a good idea to go get

2   my cruiser and actually move it closer to his house,

3   or to where I was located.  It's less steps and less

4   struggle for, you know, him and his body to have to

5   go through.  It's less struggle for the officers to

6   have to kind of control if we're shortening the

7   distance.  So why walk a mile when you can walk

8   15 feet to a car.

9       Q.     Okay.  So the plan at that point was to

10  take him out to your cruiser?

11      A.     Yeah, to escort him out to.

12      Q.     And so after he falls to the front porch,

13  you, after that point, leave his vicinity and go get

14  your car to pull it closer?

15      A.     Correct.  I believe I ran over there.  I

16  was pretty out of breath just because of the pretty

17  intense struggle for what seemed like one to two

18  minutes, which is a pretty long time if you've ever

19  been in a fight.

20      Q.     Uh-huh.

21      A.     So I believe I started running, and then

22  I was kind of out of breath so I slowed down, walked

23  the rest of the way to my cruiser, but pretty

24  promptly backed it up into his driveway.

25      Q.     So you were out of breath from the



Page 86

1    to go with us willingly.

2         Q.    And what happened after that?

3         A.    He had said something along the lines of

4    he wanted to ask a question.  And then I don't

5    recall what that question was.  He wanted maybe to

6    sit on his front porch.  We told him no, that wasn't

7    an option at the moment.  Through -- and I wasn't

8    involved in having him stand up.  But through the

9    process of getting him back to a standing position,

10   I recall him, like, bracing himself and throwing

11   himself back inside of the house.

12        Q.    Did you observe how -- how that occurred?

13        A.    Yeah.  Again, I don't know how much

14   effort it took from officers.  I believe it was

15   Daigle and Fleming who were on either side of him.

16   I don't know how much effort they had to have put

17   into getting him up onto his feet.

18                     I just recall, again, trying to

19   think when he lunged forward he, like, braced his

20   feet against the concrete there and used, again, his

21   muscles, like whatever momentum his muscles were

22   creating to like lunge himself back into the house.

23        Q.    I'm sorry, maybe I misunderstood.

24        A.    Sure.

25        Q.    Did you say that you were or were not



Page 87

1   involved with lifting him up from the porch?

2        A.    I don't believe I was recall -- or sorry.

3   I don't recall.  I don't believe I was involved with

4   lifting him or trying to physically move him.  I

5   believe I just verbally encouraged him like, hey,

6   let's walk to the car.

7        Q.    So it was Officers Fleming and Daigle who

8   were lifting him?

9        A.    They were in contact with him.  Again,

10  how much force they had to apply in the actual sense

11  of lifting versus -- I couldn't speak to how much

12  power each person was using.

13       Q.    But you saw them on each side of him?

14       A.    They were in the vicinity.  They were

15  involved in that process.

16       Q.    Where were you at that time?

17       A.    I was still outside of the house.  I

18  don't know if I was in the concrete area or the

19  front porch or on the grassy area, mulchy area, but

20  in that front porch vicinity, I guess.

21       Q.    So at that point then Mr. Burnett falls

22  back inside the house; is that right?

23              MR. LAMPHERE:  Objection.  Form.

24              You can answer.

25       A.    Fall is really not the right word again.



Page 88

1    I think to me, a fall would indicate, like, an

2    accident or not intentional.  To me it was more of a

3    resistant movement where he was physically bracing

4    himself and he was lunging himself back into the

5    house.

6         Q.    Okay.  But in any case, he ends up back

7    inside the house, right?

8         A.    Yeah.  He lunged back inside the house.

9         Q.    What did you do at that point?

10        A.    So at that point I went back inside the

11   house and I was still at his hip, lower leg area,

12   and I tried to again gain control of him.  He had

13   already used his legs and feet and hips to kind of

14   brace and push back in.  So he was still kind of

15   kicking or struggling with his legs and his hips and

16   just had the ability to motion his hips and his

17   legs.  So I was trying to use my body weight to,

18   like, gain control of that part, the portion of his

19   body.

20        Q.    And you said that part was around his

21   hips?

22        A.    I believe I was, like, in kind of from

23   his waist, like, lower waist area down towards his

24   thigh and, like, just above his knees.  I wasn't all

25   the way at his feet at that time.  I was, I guess,



Page 93

1    would touch their ear area or something.  I knew my

2    hand got to the vicinity.  I just don't recall what

3    part of his face or, like, his ear that I had

4    touched.

5         Q.    I see.  So you don't recall if you

6    applied pressure or not?

7         A.    Correct.  Sorry.

8         Q.    And that was this attempt at the pressure

9    technique, was after you had tried to control his

10   lower waist, or before?  Or when did it occur kind

11   of in that sequence?

12        A.    I think it was all during that sequence.

13   I mean, it was pretty chaotic because I remember

14   there was a -- not a coffee table, but like an entry

15   table or something off to the side.  And so when he

16   had thrown himself back in, the coffee table, there

17   was something glass on it that had gone flying and

18   there was a lot of glass around too.

19                   And so in the middle of trying

20   control him, you know, it wasn't working.  He was

21   continuing to resist us.  Again, at that point I'm

22   pretty sure somebody said like, "Stop resisting."

23   He verbally said, "No."  And then I had reached up

24   at some point, realized that wasn't going to be an

25   effective option either because I didn't have any



Page 100

1                    The portion of the video that we

2    just watched, that occurred after you had moved your

3    car, right?

4         A.    I believe so, yes.

5         Q.    And that's -- this is what you were

6    describing, where Mr. Burnett had fallen on the

7    front porch and then, as you said, lunged back

8    inside the house?

9         A.    So this is after he had lunged out

10   initially, and then you can see where he puts his

11   feet and, like, uses his body weight and his

12   momentum to, like, lunge himself back in the house.

13   That's this clip.

14        Q.    Okay.

15             MR. BOHNET-GOMEZ:  All right.  Let's

16   keep playing from the 9 minute, 30 second mark.

17                  (Video played.)

18             MR. BOHNET-GOMEZ:  Let's pause it

19   there.

20        Q.    We paused at the 10 minute and 20 second

21   mark.

22                  Officer, what did you observe in

23   this portion of the video?

24        A.    So I observed him lunging himself back

25   into the house.  I observed, because of his force,



Page 101

1    it caused this side table or entry table to slam

2    against the wall.  Because of his force, it looks

3    like a flower vases -- or a vase of flowers, sorry,

4    go flying.

5                    I observed Sergeant Inazu applying

6    the zip tie that I had mentioned.  Unfortunately, as

7    I was holding his foot, it looked like he started to

8    kick again.  The officers were telling him, hey,

9    relax.  It's hard to hear some of what's going on

10   because I think we were all breathing so heavily

11   from the struggle.  But at that point that's when I

12   had moved, like, towards that hip, lower -- or upper

13   leg area.

14        Q.    And so -- and that's you're on the --

15   that area here at the 10 minute and 20 second mark

16   where we've paused, right?

17        A.    Correct.  And he's kind of in this, like,

18   semi-prone, side-ish position.

19        Q.    And so it seems like you're using both

20   your hands to hold onto the side table that's

21   visible there in the frame?

22        A.    I mean, I recognize my watch and my

23   bracelet on this hand.  I honestly, I don't know if

24   that's my hand or somebody else's hand, so I -- it

25   very well could be my hand.  But because my body



Page 102

1   camera was on my chest at the time, if one hand was

2   extended out in front of me, that seems like an

3   appropriate position.  It could be my hand being in,

4   like, an awkward downward angle.  But at this time

5   both my hands are up at the table.  Or at least one

6   of them.  Possibly both.  Sorry.

7        Q.    So at this point you were using your

8   lower body to control Mr. Burnett?

9        A.    I mean, somewhere likely below, from like

10  my stomach down, yeah.

11       Q.    Do you recall if you were kneeling on

12  him?

13       A.    Again, I -- it could have been my hip

14  area that was trying to control his hip area.

15  Generally, you know, physically that's the easiest

16  way to generate power, is from your hips.  That's

17  why in sports they say turn your hips if you're

18  doing something.  So I could have been trying to use

19  my hips to control that.  I don't recall kneeling on

20  him.

21       Q.    You don't recall specifically what you

22  were doing at the 10 minute, 20 second mark here?

23       A.    I was trying to keep myself from

24  face-planting.  As you can see, part of our job is

25  to keep ourselves safe, and so I don't want to cause



Page 103

1    injury to myself.  And, you know, I think that's

2    very reasonable to not want to face-plant into a

3    table, so that's part of what I was doing here.

4                    And I would say the other part is

5    somehow trying to gain control of his bottom part

6    without him being able to throw me off of him.

7        Q.    But you don't recall whether you were

8    using your hips, or your knees, or anything else?

9        A.    My lower body would have been in contact

10   with him.  I don't recall which part of my lower

11   body, but I don't believe I was kneeling on him.

12       Q.    Okay.

13                   MR. BOHNET-GOMEZ:  Let's keep playing

14   here from the 10 minute, 20 second mark.

15                   (Video played.)

16                   MR. BOHNET-GOMEZ:  All right.  Let's

17   pause it there.

18       Q.    We paused at the 10 minute 44 second

19   mark.

20                   Officer, what do you observe in

21   this portion of the video?

22       A.    In this portion, I observe Mr. Burnett

23   yelling, "Fuck you."  Officers giving him commands

24   to stop resisting.  I observed it sounded like we

25   were still out of breath and I was still down in



Page 104

1    his -- like, my body was positioned down by his hip

2    area.

3          Q.    What were you doing during this clip?

4          A.    I believe I was trying to keep him from

5    throwing me off of him.

6          Q.    How were you doing that?

7          A.    With my strength, with my body weight

8    again.

9          Q.    Did you observe any of the officers

10   strike Mr. Burnett with their knee in this clip?

11         A.    I did not.  If I did, I apologize if I

12   missed it.  But I don't believe I saw anybody strike

13   anybody.

14               MR. BOHNET-GOMEZ:  Let's keep playing

15   through here from the 10 minute, 44 second mark.

16                    (Video played.)

17               MR. BOHNET-GOMEZ:  All right.  Let's

18   pause there at the 11 minute, 40 second mark.

19         Q.    Officer, what did you observe in the

20   portion of the video that we just watched?

21         A.    I observed him continuing to struggle and

22   everybody was breathing really hard.

23         Q.    Towards the end of the clip there,

24   Sergeant Inazu orders the officers to hold him down.

25   Do you -- do you recall that?



Page 135

1               REPORTER'S CERTIFICATE

2               I, LEEANN L. STELLOR, Registered Merit

3    Reporter and Certified Realtime Reporter within

4    Colorado, ID 200401669, appointed to take the

5    deposition of OFFICER CAROLINE BARTH (ROMINE), do

6    hereby certify that before the deposition she was duly

7    sworn by me to testify to the truth; that the

8    deposition was taken by me then reduced to typewritten

9    form herein; that the foregoing is a true transcript of

10   the questions asked, testimony given and proceedings

11   had.

12

13               I further certify that I am not related to

14   any party herein or their Counsel, and have no interest

15   in the result of this litigation.

16

17               In witness hereof I have hereunto set my

18   hand this 11th day of July, 2023.

19

20                        _Leeann L. Stellor_
                          Leeann L. Stellor
21                        Registered Merit Reporter
                          Certified Realtime Reporter
22                        and Notary Public

23

24   My commission expires June 8, 2024

25

