Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO


Civil No. 21-cv-1708-WJM-MDB

_____
DEPOSITION OF                          June 12, 2023

OFFICER MATTHEW FLEMING

_____
ESTATE OF CHAD ALEXANDER BURNETT,

          Plaintiff,

vs.

CITY OF COLORADO SPRINGS, a municipality;

SERGEANT MICHAEL INAZU, in his individual capacity;

OFFICER JOSEPH DAIGLE, in his individual capacity;

OFFICER MATTHEW FLEMING, in his individual capacity;

OFFICER CAROLINE BARTH, in her individual capacity,


          Defendants.


_____


        The deposition of MATTHEW FLEMING, taken

before Leeann Stellor, a Registered Merit Reporter,

Certified Realtime Reporter, and a Notary Public in

and for the County of Summit and the State of

Colorado, at 2701 Lawrence Street, Denver, Colorado,

on Monday, June 12, 2023, at the hour of 9:03 a.m.



Page 25

1  boundary of the city as it goes up into the Pikes

2  Peak foothills.  And the eastern boundary is

3  South 8th Street.

4           So when you're assigned a sector,

5  you are primarily responsible for calls of service

6  within that sector, and then very frequently you'll

7  be called to other sectors.  You'll be called to,

8  you know, back up another officer on another call

9  sometimes in other divisions, just depending on what

10  the staffing situation is.

11      Q.    Let me pause you.

12      A.    Sure.

13      Q.    In responding to Mr. Burnett's, were you

14  the initial officer or were you called as backup?

15      A.    So I was dispatched pretty shortly after

16  clearing line-up that morning with Officer Joe

17  Daigle.  I think Officer Daigle was Sector 9.  I was

18  Sector 5.  And the address is Ashgrove Circle, I

19  think.  It's -- I'm sure you've got it somewhere.  I

20  forget if that's north or south of Lake, but that

21  would be either Sector 5 or Sector 9.

22           So one of us would have been

23  primarily responsible, and we were dispatched

24  together.  We were the only two officers dispatched

25  initially to that call.



Page 29

1    think he referenced it was in the wee hours of the

2    morning -- where Mr. Burnett showed up at a house on

3    or near Lake Avenue, tried to get into the house,

4    and referenced that he had been acting crazy and

5    causing problems for a lot of the neighbors in the

6    area.

7                    Okay.  So that's what we're

8    starting with.  And he tells us that he went back in

9    the house.  As we're initially standing there, I'm

10   looking at the house 2749 Ashgrove, which is

11   Mr. Burnett's house that he has reportedly gone back

12   inside.  From my perspective there's a garage, an

13   attached garage on the right, with two garage doors.

14   The furthermost-to-my-right garage door is slightly

15   open by maybe a foot or so.  The garage door closer

16   to the house is completely closed, and then there's,

17   you know, a walkway that leads up to the front door.

18                    The front door is closed.  There's

19   two strips, maybe 6 to 8 inches wide, of vertical

20   windows on either side of the front door.  And in

21   the -- for me, the left window pane I can see red,

22   what looks like a red sports jersey with what

23   appears to be the number 3 in that window.

24                    And then Officer Daigle is talking

25   to the security guy.  And given what we had about



Page 30

1    the initial behavior of this person, I'm just kind

2    of monitoring the front of the house.  And I see

3    that red jersey in the window, to my left of the

4    front door, and I think I recalled somewhere in the

5    initial description this guy had some kind of red

6    shirt on or a shirt with red on it.

7                    And I said, "Hey, there's like a

8    red jersey in the window, and you're saying he's a

9    big, tall guy.  Is that him standing in the window

10   watching us?  I can't tell from here."

11                   And the security guy looks and

12   says, "Yeah, that's going to be him.  You can't miss

13   him.  He's a big, tall guy."

14                   So he's telling me he believes

15   that's him standing in the window.  I'm like okay,

16   this guy's standing in the window watching us,

17   that's fine, but prudent to keep an eye on the front

18   of the house.

19                   We get some more information.

20   Based on, you know, the nature of him pulling a

21   knife on the neighbor, you know, the ongoing

22   irrational behavior and the problems they've been

23   having and his physical stature, and the fact that

24   maybe he's in the window watching us, and the

25   potential for weapons inside, I thought probably



1  wouldn't be a bad idea to get a supervisor headed

2  this way.

3           I essentially had that thought,

4  and I looked and Sergeant Mike Inazu has arrived on

5  scene.  I was happy to see him.

6       Q.    Can I pause you?

7       A.    Please.

8       Q.    So what made you -- why -- what initiated

9  the thought for thinking that it would be a good

10  idea to have a sergeant on scene?

11      A.    So, you know, we hadn't done the full

12  investigation yet.  But taken on face value, pulling

13  a knife on somebody is a frightening matter, is very

14  likely a felony menacing situation.  That is a

15  violent felony when you add on to it a pattern of

16  unstable irrational behavior, this idea that he's

17  been causing problems for the entire neighborhood,

18  the knowledge that there are knives and guns

19  potentially inside the house, this guy's physical

20  stature, the vulnerability in a cul-de-sac with some

21  older folks and people coming and going, in the

22  presence of mental health issues, you know, all of

23  that tells me more resources is better.  And, you

24  know, someone in a supervisory role would probably

25  be prudent to have, you know, on scene or at the



Page 34

1    A.    But he was there as a supervisor, so

2  ultimately he would be the one in authority to make

3  overarching decisions, yes.

4    Q.    Okay.  And so once Sergeant Inazu came on

5  the scene, then what happened?

6    A.    So he mentioned that apparently there was

7  some kind of BOLO or -- which is a be on the

8  lookout, some kind of note there.  Or at least if

9  not that, some knowledge that there had been some

10  issues there.  He referenced some premise history

11  about Mr. Burnett had been acting irrational.  I'm

12  trying to remember exactly.

13              At some point he referenced that

14  our CRT, which is our -- I forget if it's Crisis

15  Response Team or Community Response Team.  It's

16  changed.  But they deal with specifically with

17  mental health concerns.  They had been out there on

18  a previous call.  Evidently, you know, whatever

19  resources they had to cover, Mr. Burnett had not

20  availed himself of and they were unable to get him

21  help.  So there was some history here with

22  irrational and escalating behavior.

23              Sergeant Inazu also referenced

24  seeing an e-mail or e-mails come out to at least

25  some segment of the department about Mr. Burnett's



Page 36

1    Q.    Okay.  And so once Sergeant Inazu arrives

2  to the scene and kind of gives the background of the

3  BOLO and the e-mails that you've mentioned, then

4  what happened?

5    A.    So, you know, there's that initial

6  discussion and that we -- you know, we -- sounds

7  like we have a situation with a person threatened

8  with a knife.

9              I would add that, you know, the

10  purpose of CRT, just for context and clarity, is

11  that's a team comprising a mental health clinician,

12  a medical person from the fire department, and a

13  Colorado Springs police officer who arrive in

14  tandem.  They typically ride around in an unmarked

15  minivan.  And their purpose is to offer mental

16  health resources to persons in crisis when there is

17  not a criminal aspect at the forefront.

18              That officer is essentially there

19  as, you could call it, security for the clinician

20  and the medical person from the fire department.

21  Their role is not enforcement.  It is to connect

22  people with resources.

23              Therefore, when you have a call

24  involving someone who has committed -- is suspected

25  of committing a crime of violence or, you know, is



Page 52

1    illnesses or other crisis make irrational

2    statements.  It was not clear to me which of these

3    was a factor, or both or neither, you know.

4        Q.    At the point that you realized that he

5    was making irrational statements and it might have

6    been because of a mental illness or substance abuse,

7    did you consider calling for the CRT team?

8        A.    Not that I recall, no.

9        Q.    Okay.  And when you mentioned that

10   Mr. Burnett had the two folding knives, did he

11   threaten you with the knives at all?

12       A.    No.

13       Q.    No?

14       A.    No.

15       Q.    And did he threaten Sergeant Inazu with

16   those folding knives?

17       A.    Not that I recall.  I don't remember

18   every word or phrase he said.  But I don't recall

19   anything overtly threatening in content to us that

20   he said to us.

21              He mentioned to us at one point he

22   knew Pete Tomich, who is a Colorado Springs police

23   officer who I've worked with.  I attempted to speak

24   with him about Pete and mentioned that we worked

25   together and we get along.  That didn't really gain



Page 53

1   any traction with him.

2        Q.    Did he say how he knew Pete Tomich?

3        A.    I don't recall specifically, no.

4        Q.    Okay.

5        A.    I don't know if he said anything about

6   how he knew him.  I'm trying to remember if there

7   was anything else noteworthy about what he said.

8                  I think in our discussion at the

9   door, when we were, you know, discussing I don't

10  know if this guy's going to open the door for us,

11  Sergeant Inazu mentioned that Mr. Burnett had read

12  his Miranda Rights to him, being Sergeant Inazu.

13  Again, not a rational thing to say in that context,

14  and he never opened the door for us.

15                 At one point it looked like he was

16  going to maybe open up the door, and I don't

17  remember if he still had a knife in his hand or if

18  they were just nearby.  And, of course, you don't

19  know of what all someone has on them.  His size, the

20  report of behavior, how he's presenting now and the

21  presence of weapons, I thought, well, if this guy

22  does come out, this could go a number of ways, and

23  I -- I don't want this to turn into something out of

24  control.

25                 I remember I was to the left of



Page 68

1                    One of the neighbors, who was

2    outside earlier during the call, was an older female

3    who was using a walker.  This is a neighborhood

4    where, despite Mr. Burnett's ongoing erratic

5    behavior and violent behavior earlier that day,

6    people weren't sheltering in place.  People were out

7    and about.

8                    At one point while Mr. Burnett was

9    outside, a woman came walking down a path very close

10   to Mr. Burnett's house and he started yelling

11   obscenities very loudly and nastily at her.  It was

12   apparent to us that Mr. Burnett was unstable, was

13   dangerous, and had the potential to inflict great

14   violence, given his physicality and the availability

15   of weapons to him to a particularly vulnerable

16   population, being his older neighbors.

17        Q.    At the time that you guys had determined

18   that there was probable cause to arrest, how long

19   had you been on the scene?

20        A.    So I had -- I had a close to the previous

21   answer.  I can provide that to kind of bring that

22   home for you.

23        Q.    Okay.

24        A.    If that's okay.

25        Q.    Okay.



Page 69

1      A.      So due to everything I talked about and

2  due to Mr. Burnett's demonstrated unwillingness to

3  cooperate with our request at that point to come

4  outside and talk to us, to get a ticket for criminal

5  mischief, what have you, looking at that as a whole

6  picture we had to consider, okay, there is a very

7  credible and ongoing threat to the safety of the

8  people in this neighborhood.  There is no

9  demonstration from him that he's going to cooperate

10  with our processes.  There is no demonstration from

11  him that he's done being violent, that the knife

12  pulling was a one-off.  He came out with a dowel.

13  He's yelling nasty things.  He's yelling at the

14  woman walking by.  He's continuing to act erratic.

15  He has weapons available to him.  He potentially has

16  firearms available to him inside the house.

17                    To get a warrant requires

18  significant time.  The warrant has to be drafted.

19  It's probably not going to be drafted at the scene.

20  Somebody typically is going to go to the substation

21  and write the warrant.  That will take time.

22                    The warrant then has to be

23  reviewed by a supervisor.  Oftentimes supervisors

24  make corrections or ask for more information.  So

25  multiple drafts of a warrant are often completed



Page 96

1    temporary presence.

2         Q.    Okay.  But the decision to arrest

3    Mr. Burnett hadn't been made whenever he came out

4    with the dowel, correct?

5                   MR. LAMPHERE:  Objection.  Form.

6         A.    To arrest him for menacing?

7         Q.    To arrest him at all.

8         A.    Not for felony menacing of the neighbor.

9    I don't recall if we were quite there with the

10   criminal mischief or not.  But the menacing with the

11   dowel happened, you know, earlier than establishing

12   probable cause for the menacing of the neighbor.  I

13   will say that.

14        Q.    And between those two times, had

15   Mr. Burnett come out of his house?

16                   MR. LAMPHERE:  Objection.  Form.

17   Foundation.

18        A.    Between the dowel and the final

19   conversation with Sergeant Inazu?

20        Q.    Yes.

21        A.    I think so because I think after the

22   dowel, he was outside again with the gas tool.  I

23   think that happened after the dowel, if I'm

24   remembering correctly, yes.

25        Q.    Okay.  And Mr. Burnett wasn't placed



Page 98

1   like a preparatory, establishing that was I ready to

2   close the distance with Sergeant Inazu to try to

3   place Mr. Burnett custody.

4                    I remember him asking me how is

5   your ankle or is your ankle okay.  Sidebar, I had

6   ankle surgery coming up, like, a week after that.

7   It was functional.  I just couldn't run long

8   distance.  So I said, "Yeah, it's fine."  And then I

9   think he said -- finally said, "I'm going," or

10  something like that.  And that was the impetus to

11  close the distance to Mr. Burnett.

12       Q.    Okay.  And in closing the distance, did

13  you run toward Mr. Burnett?

14       A.    Yes.

15       Q.    And when you ran toward Mr. Burnett, he

16  then tried to go back into his house; is that right?

17       A.    Yes, he did.

18       Q.    Okay.  And what did Sergeant Inazu do?

19       A.    So Mr. Burnett turned and ran back toward

20  his front door.  I believe he got through the door

21  and attempted to throw it shut behind him.  I think

22  Sergeant Inazu was in front and contacted the door

23  before it fell shut and latched and was able to

24  enter through the unsecured door.  I followed, and

25  then inside we made contact with Mr. Burnett and



Page 105

1   how is -- describe that for me.

2       A.    So as opposed to supine.  So prone means

3   laying face-down.

4       Q.    Okay.

5       A.    Usually on a horizontal surface.

6       Q.    And multiple officers were restraining

7   Mr. Burnett while he was in this position; is that

8   right?

9           MR. LAMPHERE:  Form.  Foundation.

10              You can answer.

11      A.    So officers were attempting to prevent

12  Mr. Burnett from continuing to resist and from

13  continuing to be out of physical control while he

14  was in a more or less prone position.

15      Q.    Okay.  And he was handcuffed this whole

16  time, right?

17      A.    At this point he was handcuffed, yes.

18      Q.    At any point did -- at what point did you

19  turn Mr. Burnett from the prone position?

20      A.    So I don't recall exactly.  I know, you

21  know, from the prone position as the situation, as

22  it continued, we started to roll him more onto his

23  right side.  Particularly after his resistance had

24  ceased and we were trying to engage him in

25  conversation and ultimately started to monitor his



Page 108

1   his well-being when he was not providing responses?

2        A.    So not providing responses, in my mind,

3   could have a host of reasons.  As he continued to

4   not provide responses, we started to discuss

5   monitoring his vital signs to ensure that there

6   wasn't, you know, a medical emergency happening.

7                    I would also point out that at

8   that point medical was responding I believe for the

9   taser deployment, and they had been stepped up to a

10  code 3 response, which is an emergency response with

11  lights and sirens.  There's no response above

12  code 3.

13       Q.    When you were discussing monitoring

14  Mr. Burnett because of a medical emergency, what

15  were you looking for to determine whether there was,

16  in fact, a medical emergency?

17       A.    So where I was positioned, kind of by his

18  arm and by his torso, I think somebody asked if

19  there was visible signs of breathing or visible sign

20  of a rise and fall.  I couldn't see any noticeable

21  rise and fall of the chest or the torso at that

22  point.  However, Officer Daigle was positioned up by

23  his head and had the ability to check for a pulse.

24                    When you -- in my mind, when you

25  compare visibly looking for respiration by looking



Page 175

1      A.    It's a very short clip.  More context

2  would help.  But I think this is after he falls out

3  the door and then pulls back in and is back in the

4  entryway again.

5      Q.    Yes.

6      A.    Okay.

7      Q.    I agree.

8      A.    Okay.  All right.

9      Q.    And I'll play more of the clip as well,

10  so we can --

11      A.    Sure.

12      Q.    And he was handcuffed this entire time?

13      A.    Yes.

14      Q.    Okay.  What was he doing that was -- that

15  was resisting?

16      A.    So during this time when he started to

17  stand up and then kind of walked backwards and

18  leaned back, pulling all of us back into the house

19  and getting out of our control, I gave him some more

20  direct commands to try and get compliance.

21              We then got him on the floor

22  again, and he was -- I could feel him tensing and

23  trying to pull out of our control.  His -- somebody

24  asked for leg shackles, I think, and his legs are

25  kind of flailing and thrashing around.



Page 178

1      Q.    In the portion of Exhibit 9 that I just

2   played up to the 1 hour, 35 minute mark, did you

3   observe Mr. Burnett -- what did you observe

4   Mr. Burnett doing that was resisting?

5      A.    So that was a continuation of that same

6   behavior and concern with the thrashing legs, my

7   concern that one of the officers on -- back by his

8   legs could be kicked and seriously injured, and

9   continuing to feel him to tense and pull away and

10  not stop his physical resistance.  And this

11  continued after that first knee strike that, as I

12  described, I believe was ineffective, as the

13  resistance continued and I felt my leg be hung up on

14  someone next to me, so I then gave a second command

15  to stop resisting while delivering a second knee

16  strike to his right side.

17     Q.    Okay.

18     A.    And then the video stops.

19     Q.    Okay.  And in the portion I've played of

20  Exhibit 9, Mr. Burnett is on the ground on his

21  stomach.  Do you agree?

22              MR. LAMPHERE:  Objection.  Form.

23  Foundation.

24     A.    So he's -- he's on the ground in, you

25  know, I'll call it a somewhat prone position.  But



Page 180

1    Foundation.

2         A.    No.   I'm -- I'm holding his -- his right

3    arm and attempting to stop him from pulling out of

4    our control by, from what I can see, maintaining the

5    best control I can of his -- I'm sorry, his left

6    arm.   Scratch that to left arm, based on where I'm

7    positioned.

8                   So I'm controlling his arm.   I'm

9    not pinning him to the floor.

10        Q.    Okay.   Mr. Burnett's handcuffed at this

11   time?

12        A.    Yes.

13        Q.    And there's another officer on

14   Mr. Burnett's shoulder.   Do you see that?

15        A.    I see another arm, and I would point out

16   that that arm is holding what appears to be his

17   right upper arm.   It is not placed on his torso, but

18   on his limb.

19        Q.    Okay.   But Mr. Burnett's being held down?

20                   MR. LAMPHERE:   Objection.

21        A.    I think held down is -- is not the most

22   accurate way to describe that.   I think he's

23   being -- we're attempting to hold him in position so

24   that he doesn't pull out of our control again while

25   officers attempt to secure his legs.



Page 184

1      Q.    Okay.  And in the 40-second clip that I

2    played of Exhibit 9 up to the 1 hour and 35 minute

3    and 45 second mark, did you hear Mr. Burnett speak?

4      A.    So that's the last clip we just played?

5      Q.    Yes.

6      A.    No, I don't believe so.

7      Q.    Okay.  Did you observe anything in the

8    clip of Exhibit 9 that I just played that caused you

9    to be concerned for Mr. Burnett's health?

10     A.    No.

11     Q.    Okay.  In the clip that I just played,

12   would you agree that at this point you all had fully

13   restrained Mr. Burnett?

14           MR. LAMPHERE:  Form.  Foundation.

15     A.    I'm not sure exactly when they -- the

16   officers by his legs got his legs completely under

17   control.  It does appear in this clip that the

18   noticeable resistance in the video in his upper body

19   that I could note in earlier clips has subsided.

20     Q.    Okay.  I'm going to continue playing

21   Exhibit 9.

22           (Video played.)

23     Q.    Okay.  I've paused Exhibit 9 at 1 hour,

24   36 minutes, and 5 seconds.

25           And do you observe an officer



Page 185

1   holding Mr. Burnett by his neck?

2             MR. LAMPHERE:  Objection.  Form.

3   Foundation.

4        A.    No, I don't.

5        Q.    Okay.  What's your observation of the --

6   I believe it's Officer Daigle, his hand in the video

7   I just played?

8        A.    So from what I can see, and from what I

9   recollect, Officer Daigle is here with his left hand

10  apparently holding Mr. Burnett by his right upper

11  arm or rear shoulder.  His right hand at times is

12  placed on Mr. Burnett's kind of upper back or left

13  trap area.  It doesn't appear to be exerting

14  significant pressure.

15            It's -- it's not my place to say

16  what Officer Daigle's thoughts were.  However, it

17  does appear to me maintaining physical contact, to

18  be prepared for another escalation of resistance as

19  we've seen at multiple points up to this time stamp.

20       Q.    Okay.  And what I've played of Exhibit 9,

21  you agreed that Mr. Burnett did not speak in the

22  following clip beginning at 1 minute -- or 1 hour

23  and 35 minutes.  And did you observe Mr. Burnett

24  speak in the clip I just played?

25       A.    I didn't observe him speak any words, no.



Page 189

1    the upper back or I guess left trap area of

2    Mr. Burnett.

3         Q.    Officer Daigle has his hand on

4    Mr. Burnett, correct?

5         A.    Yes.

6         Q.    And you are -- you don't have -- are you

7    guessing that he's applying a light touch to

8    Mr. Burnett?

9              MR. LAMPHERE:  Objection.  Form.

10   Foundation.

11        A.    I'm not guessing.  With the information

12   available, both my recollection of the incident, the

13   absence of any impression at all that Officer Daigle

14   or anyone else was applying significant pressure to

15   his torso during this time, and the fact that in the

16   video here I note that Officer Daigle's right hand

17   appears to be positioned in such a way that his four

18   fingers are flexed backwards, such that his full

19   palm does not appear to be in contact with

20   Mr. Burnett, only the length of his four fingers and

21   possibly his thumb, which is out of view, that

22   doesn't indicate that any meaningful downward force

23   is being applied.

24        Q.    What's the point of keeping hands on

25   Mr. Burnett if no force is being applied?



Page 243

1                    REPORTER'S CERTIFICATE

2              I, LEEANN L. STELLOR, Registered Merit

3    Reporter and Certified Realtime Reporter within

4    Colorado, ID 200401669, appointed to take the

5    deposition of OFFICER MATTHEW FLEMING, do hereby

6    certify that before the deposition he was duly sworn by

7    me to testify to the truth; that the deposition was

8    taken by me then reduced to typewritten form herein;

9    that the foregoing is a true transcript of the

10   questions asked, testimony given and proceedings had.

11

12             I further certify that I am not related to

13   any party herein or their Counsel, and have no interest

14   in the result of this litigation.

15

16             In witness hereof I have hereunto set my

17   hand this 22nd day of June, 2023.

18

19                            _____
                              *Leeann L. Stellor*

                              Leeann L. Stellor

20                            Registered Merit Reporter

                              Certified Realtime Reporter

21                            and Notary Public

22

23   My commission expires June 8, 2024

24

25

