Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil No. 21-cv-1708-WJM-MDB

_____

DEPOSITION OF                          June 23, 2023
LIEUTENANT MICHAEL INAZU

_____

ESTATE OF CHAD ALEXANDER BURNETT,

        Plaintiff,

vs.

CITY OF COLORADO SPRINGS, a municipality;
SERGEANT MICHAEL INAZU, in his individual capacity;
OFFICER JOSEPH DAIGLE, in his individual capacity;
OFFICER MATTHEW FLEMING, in his individual capacity;
OFFICER CAROLINE BARTH, in her individual capacity,

        Defendants.

_____

        The deposition of LIEUTENANT MICHAEL INAZU,
taken before Leeann Stellor, a Registered Merit
Reporter, Certified Realtime Reporter, and a Notary
Public in and for the County of Summit and the State
of Colorado, at 2701 Lawrence Street, Denver,
Colorado, on Friday, June 23, 2023, at the hour of
9:00 a.m.



Page 29

1   word switch.  He kind of came in and relieved me so

2   I could go out.

3        Q.    I see.  And it was after that, after you

4   were relieved there, that you would have learned

5   about the call to Mr. Burnett's residence?

6        A.    Correct.

7        Q.    Can you tell me what you remember about

8   the call and how you learned about it?

9        A.    I was aware that there was a concern

10   related to a citizen in that area who was

11   experiencing some increasing mental health

12   instability.  This had been discussed in e-mail or

13   in a meeting with supervisors who worked in the

14   division.  There were not a lot of specifics, more

15   just there is a general concern here, we've

16   responded numerous times prior, that type of

17   information.  I --

18        Q.    You had not been there yourself at that

19   point, right?

20        A.    I had not.  When the call came in, I was

21   able to review the details on my computer.  I made

22   the association, and then I responded as well.

23              MR. BOHNET-GOMEZ:  Let me mark this.

24   I apologize.  It's not stapled, but it's only two

25   pages.  Let's mark this Exhibit 10.



1          You can answer.

2     A.    Those included in the e-mail, as far as

3 who it's addressed to and who are copied, are the

4 supervisors, yes.

5     Q.    Is there any other communication or

6 information, other than this e-mail chain in

7 Exhibit 10, that you were aware of about Mr. Burnett

8 before you headed over there?

9     A.    The information would be the prior calls

10 for service at the residence.

11     Q.    You had reviewed those?

12     A.    I believe I briefly reviewed the calls in

13 my car after the call came in, to get some

14 foundational knowledge of how many times we had been

15 out and what those previous incidents looked like.

16     Q.    So you would have searched for the

17 address and what type of calls at that address?

18     A.    Correct.

19     Q.    And what do you recall reviewing or

20 learning in terms of prior calls?

21     A.    This was a long time ago, and I know that

22 I learned certain things after the fact.  But I

23 believe prior to my response, I was aware that the

24 CRT had been out.  And the notes, I believe, in the

25 call said that Mr. Burnett refused services or



1   refused to communicate with them, or something along

2   those lines.

3                    I also recall some sort of

4   situation where there was an individual, not

5   Mr. Burnett, but somebody different, who was in the

6   area, maybe knocking on neighbors' doors and perhaps

7   had a weapon or was mentioning something about a

8   weapon, and this was at a strange time of night

9   maybe.  These are pretty vague recollections, but

10  that's what I believe I remember reviewing prior to

11  the response that day.

12       Q.    Okay.  So that plus the information in

13  Exhibit 10 was sort of the base of information that

14  you arrived at the location with?

15                    MR. LAMPHERE:  Objection.  Form.

16                    You can answer.

17       A.    Correct.

18       Q.    Just so we have a clear record, you

19  mentioned CRT.  What is CRT?

20       A.    CRT stands for Crisis Response Team.

21  That is the team that is a collaborative group made

22  up of a fire department paramedic, a police officer,

23  and then some sort of clinician or mental health

24  service provider.

25       Q.    What was the significance of learning



1    that CRT had been out there before, if any?

2         A.    CRT, when responding out as a request by

3    an officer or as a referral-type situation, when

4    someone who's not, like, in an active moment of

5    crisis, where there would be enough to, you know,

6    put someone on some sort of hold, their ability to

7    provide services is limited entirely by the level of

8    cooperation from the individual that they're

9    attempting to provide services to.

10                  So in this instance, the

11   information told me that Mr. Burnett was not wanting

12   services, at least at the time when CRT responded.

13        Q.    And at that prior call-out, there was not

14   enough for an involuntary hold either?

15        A.    I wasn't there, but that is my

16   understanding.

17        Q.    So we talked about the e-mails in

18   Exhibit 10 and the prior contacts that you reviewed.

19   Before you -- before the encounter with Mr. Burnett,

20   did you know about any disputes Mr. Burnett may have

21   had with his family?

22        A.    I don't believe I was made aware of those

23   until afterwards.

24        Q.    And prior to the encounter with

25   Mr. Burnett on May 24th, 2020, did you know anything



1   about his prior mental health treatment history?

2       A.    No.

3       Q.    Prior to the encounter with Mr. Burnett

4   on May 24th, 2020, did you know anything about

5   Mr. Burnett's medication history or status?

6       A.    No.

7       Q.    So just to back up a little bit.

8             You were relieved of the desk

9   duty, right, and then you -- how did you learn of

10  the call to the Ashgrove Street?  Did it come out

11  over the radio?

12      A.    Yes.  I heard it dispatched on the radio.

13      Q.    And why did you sort of decide to look

14  into it more?

15      A.    My general practice, while out on the

16  road as a supervisor, is to review the details in

17  the call for service on my computer for any type of

18  weapons calls or serious, more serious type of call.

19            So because this one, there was an

20  allegation of weapons involvement, I pulled it up on

21  my computer and I reviewed more of the details, more

22  so than what was just dispatched over the air.  And

23  that's when I made the association with the e-mails

24  in Exhibit 10.  And because of that, I chose to

25  respond.



Page 38

1    to get him to come out and talk with us.

2       Q.    How long did you spend trying to get him

3    to come out of his house?

4       A.    I know we left, had some other

5    discussions, and came back.  There were periods

6    where I was waiting for other officers to -- you

7    know, Flaigle -- or Fleming and Daigle to fine tune

8    some questions.  And I know we were out there for

9    over an hour.  How much of that time we spent in

10   verbal communication with Mr. Burnett, I have to add

11   it all up by reviewing the camera footage.  I don't

12   know exactly how long.

13      Q.    What was the -- can you describe your

14   investigation into the alleged brandishing that

15   occurred after you arrived?

16      A.    When I was initially briefed by Officer

17   Daigle, my understanding was that Mr. Burnett had

18   thrown some books out in the cul-de-sac, and the

19   neighbor who was threatened with the knife went out

20   to pick up the books.  And that's when Mr. Burnett

21   took out his knife, held it over his head, and

22   threatened to kill the neighbor.

23                  Initially some of the specifics

24   had not been gleaned from the victim.  And with my

25   understanding of, you know, Mr. Burnett and that



Page 39

1    area and that there was -- you know, the neighbors

2    were aware that he was having some erratic behavior,

3    I was thinking that perhaps this neighbor should

4    have just stayed inside and not come out. And I

5    really wanted to get my own understanding of what

6    happened from his perspective. So I went to talk to

7    him as well and asked some specific questions, which

8    brought me to a different understanding than what

9    had been initially communicated to me.

10                   So the location of the incident

11   was on the victim's property. Mr. Burnett and the

12   victim were within close proximity to each other,

13   close enough to where had Mr. Burnett chose to

14   attack the victim with a knife after threatening to

15   kill him, he would have had every opportunity to do

16   so and potentially kill him.

17                   And this led me to redirect

18   Officer Fleming and Officer Daigle to separate the

19   victim and his wife, because the wife was there at

20   the time, and obtain a more detailed statement from

21   each of them to get a better understanding of

22   everything that transpired related to them and

23   Mr. Burnett.

24        Q.   So the first time the neighbors were

25   spoken to, it was not by you. It was by Officers



Page 42

1        Q.    So I just want to make sure I understand
2    that process for you.
3                    So is it correct that you -- I
4    guess I'm just confused.  Did you -- you were
5    continuing to investigate, obviously, at that point,
6    right?  You wanted to learn more from not only
7    Mr. Burnett, but more specifics from the neighbors,
8    right?
9        A.    (Nodding head.)
10       Q.    Is it the case that you just wanted to be
11   sure about what was going on, or was it the case
12   that you thought you didn't have probable cause at
13   that point?
14                    MR. LAMPHERE:  Objection.  Form.
15                    You can answer.
16       A.    There was a little bit of both at the
17   initial stages.
18       Q.    So is it your testimony that you did
19   believe you had probable cause initially and just
20   wanted to investigate more, to firm that up?
21                    MR. LAMPHERE:  Objection.  Form.
22                    You can answer.
23       A.    On a very fundamental level, based only
24   on the statement initially made by the victim to
25   Officer Daigle, I could articulate probable cause in



Page 43

1   my head.  I did not feel like I was satisfied with

2   enough information.  I wanted to learn more.

3                    I also, in my head and verbally,

4   talked about mitigating-type circumstances that

5   might be a reason why probable cause might not be

6   there.  So as stated before, I wanted to keep my

7   options open and not put myself in an outcome

8   biased-type situation by saying yes, we do or, no,

9   we don't have probable cause at the early stages of

10  the investigation.

11      Q.   So it was your judgment that you might

12  learn more facts through further investigation that

13  would, as you said, mitigate or eliminate the

14  probable cause that you believed was present?

15                    MR. LAMPHERE:  Form.

16                    You can answer.

17      A.   Correct.  Probable cause can be somewhat

18  fluid, and there are definitely all sorts of new

19  evidence that can be found or introduced during an

20  investigation, which can change things.  And we all

21  know this and experience this not just as police

22  officers, but this happens.

23      Q.   So you -- just in sum.  You wanted to

24  learn more to satisfy yourself that this was

25  something you should act on; is that fair?



Page 54

 1              I had no intent of leaving him

 2   there in the cul-de-sac or in his residence, you

 3   know, if we could avoid it.

 4        Q.    Did you communicate to him at some point

 5   that you intended to cite him for the -- for the

 6   damage charge?

 7              MR. LAMPHERE:  Objection.  Form.

 8              You can answer.

 9        A.    My implication, when I said, "Come get

10   your ticket," was that he was going to get a ticket

11   for damage.  I don't specifically recall whether I

12   said come get your ticket for damage, or something

13   along those lines.

14        Q.    He did not come get his ticket, correct?

15        A.    He did not.

16        Q.    And what did you do next?

17        A.    I honestly am not sure at this point

18   where we were, if I had talked with neighbors yet or

19   not.

20              MR. BOHNET-GOMEZ:  Well, why don't we

21   cue Exhibit 9 up at 40 minutes and 50 seconds.

22   We'll watch a little bit of it together.

23              (Video played.)

24              MR. BOHNET-GOMEZ:  We can pause it

25   here.



Page 59

1  and having discussions with him about, hey, what are

2  your thoughts based on what I've heard versus what

3  he initially told you. And then what really kind of

4  cemented it in my head afterwards was a conversation

5  I had with Officer Fleming after he and Officer

6  Daigle interviewed the couple.

7  Q.  Tell me about that conversation. What do

8  you recall about that one?

9  A.  So I know I was muted for the

10 conversation. I'm not sure if Fleming was or not.

11 But I recall just really kind of his agreement with

12 me that once we kind of parsed out the particulars

13 of what transpired according to the victim and his

14 wife, that we certainly did have enough to arrest

15 Mr. Burnett and we needed to do something.

16 Q.  So at that point you had resolved to not

17 leave without arresting Mr. Burnett?

18 MR. LAMPHERE: Objection. Form.

19 You can answer.

20 A.  I knew it was going to play out in one of

21 several ways, or one of at least a few ways.

22 Either we would have an

23 opportunity to take him into custody, or we would

24 then have to get a warrant. If he's locked himself

25 inside his home, then likely the tactical team would



Page 61

1    Q.    Do you recall what you were doing at that

2    time?

3    A.    I know I repositioned my vehicle in the

4    cul-de-sac.  I had concerns that he might have a

5    firearm because Broadmoor security mentioned it.

6    But certainly there was nothing that told me he for

7    sure had a firearm.  He hadn't been speaking about

8    one to me or to any of the other officers.

9               But he had presented himself out

10   in the driveway, in his lawn, with weapons.  So I

11   was kind of keeping an eye on him to see -- you

12   know, basically to protect everyone who was there at

13   the time, to communicate if he were to come out and

14   start using one of those weapons against somebody or

15   some property.

16              So I positioned my vehicle to have

17   that barrier, some sort of barrier, but also then to

18   be available, were he to present himself with a

19   firearm, to have some shielding.  The cruiser itself

20   has a ballistic shield, and then the engine block is

21   a pretty good cover.  And then I also readied my

22   patrol rifle, were it to turn into the type of

23   situation where he -- you know, where he exited the

24   residence with a firearm.

25   Q.    So while you do those things, Officers



Page 64

1  point and would have to come out further from his

2  house?

3       A.    Correct.

4       Q.    At what point do you call for additional

5  officers?

6                 MR. LAMPHERE:  Objection.  Form.

7                 You can answer.

8       A.    Sometime after repositioning my vehicle,

9  while Officer Fleming and Officer Daigle were

10 interviewing the couple, I called for an additional

11 officer.

12      Q.    Okay.  So you had called for backup and

13 repositioned in front of Mr. Burnett's house.  Can

14 you walk me through what you recall happening next?

15      A.    I'm out there for a little while by

16 myself.  Officer Barth shows up.  I brief her on the

17 situation and task her with being the person to use

18 the taser if he presents himself and we're safe to

19 do so and, you know, if -- if it's required based on

20 his behaviors.

21                 You know, clearly if he were to

22 just walk out and say, "Okay.  All right.  We're

23 good.  I'll come with you guys," you know, nothing

24 along those lines would happen.

25                 But if his behavior were to



Page 68

1   your continuing training after that?

2       A.    Yes.

3       Q.    How often?

4               MR. LAMPHERE:  Objection.  Form.

5                   You can answer.

6                   Foundation too.

7       A.    There's not necessarily a specific

8   schedule.  Warrantless entries come up as a topic of

9   conversation as situations are encountered in your

10  work as a police officer.  And there's typically

11  some discussion about the exceptions; and not just

12  the exceptions, but even if there is an exception,

13  is this the right choice to make.

14      Q.    And so those are -- those discussions,

15  are those informal discussions about cases that

16  you're involved with?

17      A.    Mostly, yes.

18      Q.    Was the -- was training on warrant

19  exceptions ever part of the formal continuing

20  training that you received?

21              MR. LAMPHERE:  Objection.

22  Foundation.

23                  You can answer.

24      A.    Perhaps.  But I can't recall specifically

25  any trainings.



Page 88

1      Q.     And as you said, you don't know what

2  Mr. Burnett understood or didn't understand about

3  being under arrest, correct?

4      A.     Not entirely, no.  And it was evident

5  that he had that as a concern because he had said

6  things like, "Are you going to arrest me?"  But my

7  understanding of what that looked like in his mind

8  is not clear.

9      Q.     And regardless of what was in his mind or

10 not, that was something that you believed you

11 communicated in your interactions with him, that he

12 would be under arrest for something?

13     A.     Yes.

14     Q.     And you then say, "We've got time."

15            Do you recall that in the clip we

16 played?

17     A.     I do.

18     Q.     What did you mean by that?

19     A.     That there was nothing exigent in that

20 particular moment in time that required us to walk

21 over to the door right then, kick it down, chase him

22 into a back room, and take him into custody.

23     Q.     I see.  So there wasn't any urgent need

24 at that time to enter the house and grab him?

25     A.     At that particular moment, with him



Page 100

1    that occurred.

2          A.    At that point in time?

3          Q.    Yeah.  How did the events unfold leading

4    to you chasing him in the house?

5          A.    Mr. Burnett comes out of the house.  He

6    is wearing that Maple Leafs jersey.  He engages us

7    in conversation.  We approach.  Fleming is with me.

8    I think Daigle is a little bit farther back.

9    Officer Barth is I think to the left side of the --

10   if you're looking at it, the front door.

11                    I am attempting to get Mr. Burnett

12   to come closer to me.  I whisper something to the

13   effect of, "Are you ready," to Officer Fleming.  I

14   was aware that he had injured his ankle or knee, or

15   he was -- he had some sort of ailment that he had

16   told me about earlier or the previous day, so I

17   wanted to make sure that he was physically capable

18   of engaging in a struggle.  He told me he was.

19                    So when we got to the point where

20   I felt I was close enough to Mr. Burnett and he was

21   far enough away from the door so that we would

22   either be able to beat him to the door, so get to

23   the door before he could get back inside, or we

24   would be close enough on his heels so that he

25   wouldn't be able to close the door behind him, when



Page 101

1    we were at that point, I made a move to arrest him.

2         Q.    And what do you mean by made a move?

3    What specifically did you do to arrest him at that

4    point?

5         A.    I changed my momentum from a casual walk

6    to running as fast as I could after him.

7         Q.    Other than whispering to Officer Fleming,

8    did you say anything to Mr. Burnett at that point?

9         A.    At that point, I believed it would be

10   ineffective and would alert him to the chase.  And

11   if I were to say, "Hey, you need to come with us

12   now," he would simply run back in the residence.  I

13   was calculating the ability to beat him to the door

14   off of counting on his delayed reaction time to my

15   immediate change of stride.

16        Q.    So no, you did not say anything to him at

17   that point?

18        A.    Correct.

19        Q.    You didn't say, "You're under arrest," or

20   "Stop," or anything else?

21              MR. LAMPHERE:  Objection.  Form.

22                   You can answer.

23        A.    Within seconds all of those commands were

24   coming out.  The -- again, the idea was to not give

25   him that, a little bit of reaction time necessary,



Page 102

1    to get back inside.

2        Q.    But the first time you issued commands to

3    him was inside the house?

4        A.    I believe so, yes.

5        Q.    Okay.  So you pick up your momentum, as

6    you said, and are running towards Mr. Burnett.  What

7    happens next?

8        A.    He immediately turns and runs inside.

9        Q.    And how did you get inside Mr. Burnett's

10   home?

11       A.    He begins to try and close the door, so I

12   turned a little sideways and directed my momentum

13   and upper body weight onto the door, to push through

14   the door before he could close it.

15       Q.    So you pushed it with your left side or

16   left shoulder?

17       A.    I believe so.

18       Q.    And then what do you recall happening

19   next?

20       A.    At that point it gets pretty chaotic

21   because Mr. Burnett shows no signs of complying with

22   our ability to take him -- or, you know, our orders

23   to take him into custody.  He is -- was a large man,

24   very tall, had a fair amount of a weight advantage,

25   so -- and he was actively fighting, like with all of



Page 103

1    his strength it felt like.

2                    I ended up taking his left arm.

3    And for the majority of the time of the struggle,

4    while we were trying to place him in handcuffs, the

5    left arm was my priority.  We -- he went to the

6    ground pretty quickly.  We ordered him to the

7    ground, but it -- he -- he went because we took him

8    to the ground.

9                    But because he was big, strong, we

10   weren't able to quickly get him into handcuffs.  So

11   he kind of was moving around, and all of us were

12   moving with him as he was struggling on the ground.

13       Q.    So you recall ordering him to the ground?

14       A.    I do.

15       Q.    Do you recall any other commands to

16   Mr. Burnett?

17       A.    Commands that I made specifically, I

18   don't recall.  They would likely be -- I mean, they

19   would be on the body-worn camera.  I recall hearing

20   numerous orders from Officer Fleming, similar, "Get

21   on the ground.  Stop resisting."  These kinds of

22   orders.

23                    Mr. Burnett was cursing and in

24   some way or form saying that he was not going to

25   comply.  There is a point where he's twisting his



Page 104

1    body, we're all kind of on the floor with him, and

2    it looks like he's going for Officer Fleming's gun.

3    Officer Fleming was kind of closer to his upper

4    torso, and he made a movement towards that way.

5    That was very concerning to me.

6                        I remember Officer Barth deploying

7    the taser.  I remember hearing it.  It was

8    ineffective.  I mean, the idea of the taser is to

9    get full lockup so that the nerve -- you know, so

10   the body can't move at all, and then that way the

11   resistance stops and provides the officer enough

12   time to get the handcuffs on.  She deployed the

13   taser twice during this struggle, and neither one

14   gained the compliance that we were hoping for, the

15   lockup we were hoping for, so that we could get him

16   safely into handcuffs.

17        Q.    So you're struggling on the floor with

18   Mr. Burnett.  Do you eventually get him handcuffed?

19        A.    We do.  I'm on that left arm, and I think

20   it took maybe all three of them, but two of them to

21   get the right arm behind his back.  And then once

22   they had that cuffed, we were able to get that left

23   arm back there as well.

24        Q.    And then what do you recall happening

25   next after that?



Page 117

1    officer's body that are placed on Mr. Burnett's back

2    to control his movement.

3         Q.    And is Mr. Burnett resisting your efforts

4    to put the flex cuffs on him?

5         A.    Yes.

6         Q.    What is he doing?

7         A.    Basically, he's tensing and pulling his

8    legs up off the floor by bending at the knee, to

9    keep me from holding them still enough to place the

10   flex cuffs on his ankles.

11             MR. BOHNET-GOMEZ:  All right.  We

12   paused Exhibit 11 at 50 minutes and 57 seconds.  Why

13   don't we keep playing that through for a bit.

14             (Video played.)

15             MR. BOHNET-GOMEZ:  All right.  Let's

16   pause.

17        Q.    We paused at 52 minutes, 29 seconds of

18   Exhibit 11.

19             Lieutenant, can you describe what

20   you were doing in that portion of the video we just

21   saw?

22        A.    During that time I am placing the flex

23   cuffs on his ankles.  Initially he is struggling.

24   Towards the end it looks as if there's less of a

25   struggle with his legs.  I am able to successfully



Page 118

1   place the flex cuffs on his ankles.

2       Q.    And can you describe the position of

3   Mr. Burnett's body during this time?

4       A.    So at this particular frame, where we've

5   paused, he has the left leg up a little bit.  So

6   he's mostly prone, but it looks like he's got his

7   weight primarily on his right side.

8       Q.    And at the particular point where we

9   paused, it seems like you finished putting the flex

10  cuffs on him, correct?

11      A.    Yes.

12      Q.    And now you're standing up, and can you

13  describe what you recall doing from this point on?

14      A.    From this point, we make the decision

15  that we're not going to try and get him out of the

16  residence until medical arrives on scene.  Medical

17  was called earlier, shortly after the taser

18  deployment, as is part of our policy.

19                  So knowing they were en route, we

20  chose to mitigate any further struggle with him

21  prior to medical arriving by leaving him where he

22  was.

23      Q.    As part of your training, are you trained

24  regarding placing individuals into a recovery

25  position after a struggle?



Page 120

1    that he will, but then he says he won't.

2                    He has some expletives in there.

3    The officers are attempting to control his upper

4    body.  Officer Fleming discusses we were trying to

5    do this the easy way.  Now we're doing it the hard

6    way.

7                    Mr. Burnett continues to struggle,

8    after repeated times of being told stop resisting.

9    It looks like Officer Fleming -- and this is

10   partially based on my knowledge after the fact,

11   because it's not entirely evident in the video, but

12   I can see it because I know it does happen.  He does

13   deliver some knee strikes as an effort to gain

14   compliance.  After one of them, you can hear

15   verbally Mr. Burnett saying, "Okay.  I've stopped."

16   But his behavior doesn't change.  He continues to

17   resist.

18                   The officers are not on top of

19   him.  They are controlling the portions of his body

20   to prevent him from getting back up, such as the

21   arms and the shoulders.

22        Q.    So you said you learned after the fact

23   that there were some knee strikes --

24        A.    Correct.

25        Q.    -- delivered to Mr. Burnett.  Can you



Page 125

1    that particular part of his body.

2        Q.    Uh-huh.  And this was not -- you weren't

3    able to see this in realtime because of where you

4    were standing, right?

5        A.    Correct.  At this point I believe most of

6    my attention is on his legs, trying not to get

7    kicked.

8        Q.    Right.

9              MR. BOHNET-GOMEZ:  Okay.  Let's keep

10   playing for a while longer.

11                  (Video played.)

12             MR. BOHNET-GOMEZ:  Okay.  Let's pause

13   here for a bit.

14       Q.    We paused at an hour, 36 minutes,

15   42 seconds of Exhibit 9.

16                  Lieutenant, what do you observe in

17   the last clip we watched?

18             MR. LAMPHERE:  Objection.  Form.

19   Foundation.

20                  You can answer.

21       A.    Mr. Burnett is no longer resisting.

22   Officers, including myself, are still in a position

23   to readily control his body, should he immediately

24   start resisting.

25                  It sounds as if he's breathing



Page 126

 1   pretty heavily at this point.  I'm not sure if

 2   that's him or if it's an officer.  It sounds like it

 3   might be him.  I'm not positive.  He is lying

 4   semi-prone on -- kind of more on the right side of

 5   his body, as he was earlier.

 6                      It looks like Officer Daigle has

 7   lightly placed his hand on Mr. Burnett's back to

 8   basically sense movement and be ready to respond

 9   should Mr. Burnett choose to start resisting again.

10   Officer Fleming is controlling the left arm.

11        Q.    Did you hear yourself speak in the video

12   we just watched?

13        A.    I did.

14        Q.    If I understood you correctly, you

15   indicated that you would be taking Mr. Burnett out

16   to the car; is that right?

17        A.    We would -- I indicated we would be

18   carrying him.  I don't recall if this was the point,

19   if we had -- if that was in preparation for once the

20   ambulance got there or if we had made that

21   determination yet.

22        Q.    Uh-huh.

23        A.    I also was concerned that should he start

24   fighting again, he might be able to break the flex

25   cuffs.  So I know we had some straps that we put in



Page 148

```
 1                    REPORTER'S CERTIFICATE

 2              I, LEEANN L. STELLOR, Registered Merit

 3  Reporter and Certified Realtime Reporter within

 4  Colorado, ID 200401669, appointed to take the

 5  deposition of LIEUTENANT MICHAEL INAZU, do hereby

 6  certify that before the deposition he was duly sworn by

 7  me to testify to the truth; that the deposition was

 8  taken by me then reduced to typewritten form herein;

 9  that the foregoing is a true transcript of the

10  questions asked, testimony given and proceedings had.

11

12              I further certify that I am not related to

13  any party herein or their Counsel, and have no interest

14  in the result of this litigation.

15

16              In witness hereof I have hereunto set my

17  hand this 6th day of July, 2023.

18

19                    Leeann L Stellor

                      Leeann L. Stellor

                      Registered Merit Reporter

20                    Certified Realtime Reporter

21                    and Notary Public

22

23  My commission expires June 8, 2024

24

25
```

