**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No: 21-cv-1708-WJM-MDB

ESTATE OF CHAD ALEXANDER BURNETT,

    Plaintiff,

v.

CITY OF COLORADO SPRINGS, a municipality;
SERGEANT MICHAEL INAZU, in his individual capacity;
OFFICER JOSEPH DAIGLE, in his individual capacity;
OFFICER MATTHEW FLEMING, in his individual capacity; and
OFFICER CAROLINE BARTH, in her individual capacity,

    Defendants.

---

**CITY OF COLORADO SPRINGS' MOTION FOR SUMMARY JUDGMENT**

---

    Defendant, the City of Colorado Springs ("City"), hereby moves for summary judgment.

**I.    Movant's Statement of Material Facts**

1. The City provides training through its academy, in-service training program, patrol tactical lineup training, video-produced roll call training, line-up training, call-for-service debriefs and one-on-one remedial training. (Ex. L, Deposition of 30(b)(6) Designee Marcus VanOoyen, 24, lns. 16-25; 25, lns. 1-7; 33, lns. 1-13; 34, lns. 1-4; 49, lns. 7-11, 19-23; 73, lns. 8-12; Ex. N, Deposition of Officer Matthew Fleming, 17, lns. 11-25; 18, lns. 1-15)

2. The City trains its officers on all policies. (Ex. L, 15, lns. 3-5; 22, lns. 22-24; 23, lns. 2-19)

3. Colorado Peace Officer Standards and Training ("POST") mandated the City's training provided in the police academy and yearly in-service training. (Ex. L, 8, lns. 24-25; 9, ln. 12; 25, lns. 17-21; 73, lns. 16-18)

4. Training in the academy was provided by subject-matter experts, who develop the curriculum, which was reviewed and approved by a supervisor and POST. (Ex. L, 25, lns. 21-25; 26, lns. 1-3)

5. In the academy, recruits received 17 ½ hours of formal training on arrest warrants, search and seizure. (Ex. L, 70, lns. 22-25; 71, lns. 1-3; 89 lns. 22-25; 90, lns. 1-13)

6. In the academy, recruits received 100 hours of training on arrest control, which covers topics such as use of force, searches, detentions and frisks. (Ex. L, 71, lns. 7-11; 22, lns. 15-19)

7. In the academy, officers were trained on when to obtain an arrest warrant. (Ex. L, 59, lns. 21-25; 60, lns. 1-6, 14-24; 78, lns. 5-10; 79, lns. 20-25; 80, lns 1-25; 81 lns. 1-23; 83, lns. 9-25; 84, lns. 1-15)

8. In the academy, officers were trained on how to obtain an arrest warrant. (Ex. L, 83, lns. 3-25; 84 lns. 1-15)

9. In the academy, officers received at least four hours of CPR training. (Ex. L, 187, lns. 21-25, 188, lns. 1-2)

10. In the academy, officers were taught a minimum of three hours on custodial care and sudden custody death syndrome. (Ex. L, 156, lns. 3-7)

11. In the academy, recruits were given scenario-based training. (Ex. L, 57, lns. 23-25; 58, lns. 1-4; Ex. O, Deposition of Caroline Barth, 25, lns. 13-25; 26, lns. 1-2)

12. In the academy, training included testing. (Ex. L, 79, lns. 2-9)

13. After the academy, the City provided ongoing training. (Ex. L, 17, lns. 2-4)

2

14. After the police academy, officers were field trained for four months where they partnered with two or three certified police field trainers. (Ex. L, 17, lns. 9-15; 73, lns. 20-22)

15. When officers were field-trained, topics such as the arrest warrant exception based on exigent circumstances were discussed. (Ex. L, 71, lns. 22-25; 73, lns. 7-12)

16. When officers were field-trained, they were taught the process of obtaining arrest warrants. (Ex. L, 78, lns. 5-17)

17. After field training, officers are required to complete a minimum of twenty-four hours of in-service training every year. (Ex. L, 17, lns. 16-22; 18, lns. 14; 20, lns. 1-4)

18. Twelve of the twenty-four hours every year are required to cover firearms, driving, and arrest control. (Ex. L, 17, lns. 23-24)

19. In addition to POST, the Commission on Accreditation for Law Enforcement Agencies ("CELEA") and state law mandate yearly training as well. (Ex. L, 17, lns. 20-22; 18, lns. 1-8; 20, lns. 11-13)

20. Supervisors within CSPD received an additional forty hours of training. (Ex. L, 34, lns. 17-25; 35, lns. 1-8)

21. Officers are trained on the parameters of a dwelling and warrantless entry. (Ex. L, 64, ln. 25; 65, lns. 1-18; 94, lns. 3-16)

22. The City provided training on the circumstances when a warrant is necessary outside of the house. (Ex. L, 66, lns. 6-25; 67, lns. 5-9)

23. The City provided training on hot pursuit. (Ex. L, 93, lns. 11-18, 22-25; 94, lns. 1-23; 95, lns. 8-23; 96, 12-16; 99, lns. 8-25; 100, lns. 1-5, 16-25; 101, lns. 1-25; 102, lns. 19-25; 103, lns. 1-4; 105, lns. 14-20; 106, lns. 2-21; 108, lns. 5-7, 10-16; 111, lns. 21-24; 112, lns. 1-7, 22-25; 113, lns. 1-8)

24. The City had a policy on hot pursuit. (Ex. M, Deposition of 30(b)(6) Designee John Koch, 19, lns. 13-15; 21, lns. 5-16)

25. Officers in the department would regularly discuss case law, including hot pursuit, at line-ups and other times. (Ex. M, 33, lns. 13-25; Ex. L, 104, lns. 12-20)

26. When assessing the use of exigent circumstances to justify warrantless entry into a residence, the City had a practice of evaluating the safety priorities of the circumstances, including the protection of citizens, victims, the involvement of weapons and seriousness of the underlying offense. (Ex. M, 24, lns. 19-23; 25, lns. 10-25; 27, lns. 6-12)

27. The City provided training on lawful seizures. (Ex. L, 69, lns. 11-19)

28. The City provided training on warrant exceptions. (Ex. L, 89, lns. 24-25; 90, lns. 1-13)

29. The City provided training on avoiding police-created exigencies. (Ex. L, 115, lns. 21-25; 116, lns. 1-16; 118, lns. 23-25; 120, lns. 4-7)

30. The City provided training on de-escalation tactics. (Ex. L, 120, lns. 12-19)

31. The City provided training on protective sweeps. (Ex. L, 128, lns. 13-16, 25; 129, lns. 1-10; 130, lns. 18-24)

32. The City provided training on excited delirium, positional asphyxia, and sudden custody death syndrome. (Ex. L, 133, lns. 14-18)

33. CSPD provided training on its general order for physical arrests. (Ex. P, Deposition of Joseph Daigle, 94, lns. 2-7)

34. Every officer with the police department was certified in CPR. (Ex. L, 18, lns. 24-25; 19, ln. 1)

35. In their CPR training, officers were taught to check for breathing and to start CPR if no breathing is observed. (Ex. L, 41, lns. 6-12, 13-15)

4

36. In their training, officers were taught to look for signs of distress in a subject. (Ex. L, 55, lns. 20-25; 56, lns. 1-3, 9-16)

37. In their medical care training, officers were taught to place a suspect in the recovery position after they are arrested, provide medical attention and to request professional medical assistance. (Ex. L, 42, lns. 2-17; 45, lns. 15-20)

38. Officers were taught to place a subject on their side, known as the recovery position, when it is safe and practical to do so. (Ex. L, 42, lns. 18-25; 43 lns. 1-4, 9-11, 14-25; 54, ln. 25; 55 lns. 1-11; Ex. P, 107, lns. 9-16)

39. Officers were taught of the risks, including positional asphyxiation, of placing a subject on their stomach for prolonged periods of time. (Ex. L, 44, lns. 1-4, 8-18; 134, lns. 9-14; 135, lns. 14-16; 136, lns. 7-13, 17-20; 137, lns. 9-17, 20-25; 138, lns. 1-10, 13-16; 143, lns. 9-15, 19-25; 144, lns. 1-22; 151, lns. 8-15; 152, lns. 12-20; 154, lns. 2-6)

40. Officers were taught in the academy and in-service, to put a subject who is not breathing, in a position to open the airway, and provide chest compressions. (Ex. L, 197, lns. 21-22; 198, lns. 1-5)

41. Officers were taught to request professional medical assistance after they use a taser. (Ex. L, 53, ln. 25; 54, lns. 1-6)

42. Officers were taught on sudden custody death syndrome. (Ex. L, 145, lns. 19-25; 146, lns. 1-22; 158, lns. 24-25; 159, lns. 1-19)

43. CSPD had a policy on sudden custody death, medical care after taser usage, de-escalation and use of force. (Ex. M, 60, lns. 19-22; 61, lns. 21-24; 79, lns. 12-13; 80, lns. 2-8)

44. To prevent sudden custody death syndrome, officers were taught to place the subject into custody quickly and safely, to move the subject into a recovery position when it was safe and

5

practical to do so, and to call professional medical services if the subject is in a medical crisis. (Ex. L, 159, lns. 3-11)

45. Officers were taught, when in doubt, to get professional medical services on the scene. (Ex. L, 160, lns. 12-13; 161, lns. 4-6; 181, lns. 1-4)

46. Officers were taught on respiratory compromise. (Ex. L, 147, lns. 2-24)

47. Officers were taught to look head-to-stomach for signs of breathing, watch for two breaths, and to perform CPR if no breathing was observed. (Ex. L, 147, lns. 18-21; 148, lns. 2-12; 178, lns. 4-17; 185, lns. 7-13, 16-22)

48. Looking for signs of breathing from head-to-stomach was taught at the academy, in-service, peer-to-peer, PTO, lineup training and sergeant debriefings. (Ex. L, 148, lns. 13-25; 178, lns. 18-20)

49. Officers were taught on positional hypoxia. (Ex. L, 149, lns. 23-25; 150, lns. 1-3)

50. Officers were taught to identify the need for medical care. (Ex. L, 168, lns. 13-25; 169, lns. 1-6; 182, lns. 11-20)

51. Officers were taught to look for signs of a medical crisis, including looking for consciousness, breathing, responsiveness, and pulse. (Ex. L, 169, lns. 10-18; 170, lns. 16-25; 171, lns. 6-11; 180, lns. 21-25)

52. Sgt. Inazu received his training through the police academy and in-service training from the department. (Ex. Q, Deposition of Michael Inazu, 17, lns. 4-25)

53. Sgt. Inazu received additional training when he was promoted to sergeant. (Ex. Q, 18, lns. 13-25; 19, ln. 1)

54. Sergeant Inazu owned and regularly used a police field manual which describes warrantless entry and the hot pursuit doctrine. (Exhibit E, Affidavit of Michael Inazu, p. 2, ¶ 8)

55. Sergeant Inazu attended a weeklong FBI negotiator's training, a conference for crisis negotiators and the police department's 5-day crisis intervention training. (Ex. Q, 19, lns. 8-15; 20 lns. 14-23)

56. Sergeant Inazu was a trained crisis negotiator for three to four years. (Ex. Q, 23, lns. 18-20)

57. Sgt. Inazu was familiar with the Fourth Amendment's warrant requirement. (Ex. Q, 66, lns. 24-25; 67, lns. 1-7)

58. Sgt. Inazu has received training on warrant exceptions and hot pursuit. (Ex. Q, 67, lns. 10-25; 68, lns. 1-13; 69, lns. 1-15; 71, lns. 2-20)

59. Sgt. Inazu was trained on General Order 107, Physical Arrests. (Ex. Q, 78, lns. 23-25; 79, lns. 1-13)

60. Sgt. Inazu was trained on the Fourth Amendment's application to the home. (Ex. Q, 80, lns. 22-25; 81, lns. 1-25; 82, lns. 1-10)

61. Sgt. Inazu was taught to place a resistant suspect into the recovery position when it was safe and practical. (Ex. Q, 118, lns. 23-25; 119, lns. 1-7)

62. Sgt. Inazu was trained on sudden death syndrome. (Ex. Q, 110, lns. 8-24)

63. Officer Barth has been trained on how to use a Taser and when to deploy it. (Ex. O, 10, lns. 14-17; Ex. G, Affidavit of Caroline Romine, p. 2, ¶ 11)

64. Officer Barth was trained through the training academy in 2018 and was part of the 68th recruit class. (Ex. O, 20, lns. 19-23)

65. After graduating the academy, Officer Barth received four months of on-the-job training through the PTO program. (Ex. O, 24, ln. 24; Ex. G, Affidavit of Caroline Romine, p. 2, ¶ 6.

66. Officer Barth was trained on excited delirium. Ex. O, 112, ln. 25; 113, lns. 1-2)

67. Officer Barth was trained on the Fourth Amendment's warrant requirements and exceptions, including hot pursuit. (Ex. G, p. 2, ¶ 8; Ex. O 50, lns. 15-20)

68. Officer Barth was trained on constitutional use of force. (Ex. G., p. 2, ¶ 7)

69. Officer Barth was certified in CPR. (Ex. G, p. 2, ¶ 9)

70. Officer Daigle started in law enforcement in 2015 where he completed eight months of training to become an officer with Commerce City. (Ex. P, 10, ln. 25; 12, lns. 20-25; 13, ln. 1)

71. After leaving Commerce City, Officer Daigle completed a 26-week training with the City. (Ex. P, 13, lns. 5-10)

72. Officer Daigle received CPR training and maintained his certification while employed with CSPD. (Ex. P, 86, ln. 16; 169, lns. 10-12; Ex. A, Affidavit of Joseph Daigle, p. 2, ¶ 12)

73. Officer Daigle was trained on determining when medical care is needed. (Ex. P, 111, lns. 16-20)

74. Officer Daigle was trained on CSPD policies. (Ex. P, 89, lns. 7-9; 102, lns. 13-24)

75. Officer Daigle received training on legal authority to enter a residence. (Ex. P, 89, lns. 19-25; 90, lns. 1-12; 101, lns. 19-25)

76. Officer Daigle received training on the hot pursuit doctrine. (Ex. P, 91, lns. 9-10; 111, lns. 6-11)

77. Officer Fleming was trained to look for a pulse and breathing. (Ex. N, 110, lns. 14-25; 111, ln. 1; 113, lns. 3-8)

78. Officer Fleming was trained on the hot pursuit doctrine. (Ex. N, 84, lns. 24-25; 85, lns. 1-14)

79. Officer Fleming received CPR training in the academy and has maintained his certification. (Ex. N, 117, lns. 4-10, 11-17; Ex. C, Affidavit of Matthew Fleming, p. 2, ¶ 9)

80. Officer Fleming was trained on avoiding positional asphyxiation. (Ex. N, 120, lns. 24-25; 121, lns. 4-13; 125, lns. 18-25; 126, lns. 1-2; 128, lns. 6-16; 154, lns. 4-9)

81. Officer Fleming was trained on CSPD policies. (Ex. N, 22, lns. 16-25; 23, lns. 1-2)

82. Officer Fleming was trained on sudden custody death syndrome. (Ex. N, 146, lns. 23-25; 147, lns. 1-12; 154, lns. 4-9)

83. Officer Fleming and Officer Daigle were part of the 67th recruit class in 2017. (Ex. A, p. 1, ¶ 5; Ex. C, p. 2, ¶ 5; Ex. I, Affidavit of Korey Hutchison, p. 2, ¶ 8; Ex. J, 67th Recruit Class Training Schedule)

84. Officer Barth was part of the 68th recruit class in 2018. (Ex. G, p. 2, ¶ 5; Ex. I, p. 2, ¶ 8; Ex. K, 68th Recruit Class Training Schedule)

85. Officer Barth continued to receive training after the academy. (Ex. G, p. 2-3, ¶¶ 6-13; Ex. H, Officer Barth Training Record)

86. Officer Daigle continued to receive training after the academy. (Ex. A, p. 2, ¶¶ 7-13; Ex. B, Officer Daigle Training Record)

87. Officer Fleming continued to receive training after the academy. (Ex. C, p. 2, ¶¶ 6-11; Ex. D, Officer Fleming Training Record)

88. Sgt. Inazu continued to receive training after the academy. (Ex. E, p. 2, ¶¶ 5-14; Ex. F, Sgt. Inazu Training Record)

## II.     Standard of Review

Summary judgment should be granted when no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513,

1518 (10th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "The mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a dispute of fact that is 'genuine'; an issue of material fact is genuine only if the nonmovant presents facts such that a reasonable jury could find in favor of the nonmovant." *Lawmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir. 1997) (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)).

### III.   Argument

#### A.  Failure to Train

"[U]nder § 1983, local governments are responsible only for their *own* illegal acts. They are not vicariously liable under § 1983 for their employees' actions." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (internal quotation marks and citations omitted) (emphasis in original). Consequently, '[t]o prove municipal liability under § 1983, the plaintiff must show: (1) a municipality enacted or maintained a policy, (2) the municipality was deliberately indifferent to the resulting constitutional violations, and (3) the policy caused the underlying constitutional violation." *Arnold v. City of Olathe*, 35 F.4th 778, 795 (10th Cir. 2022).

"As [Supreme Court] precedent makes clear, proving that a municipality itself actually caused a constitutional violation by failing to train the offending employee presents difficult problems of proof, and [courts] must adhere to a stringent standard of fault, lest municipal liability under § 1983 collapse into *respondeat superior*." *Connick*, 563 U.S. at 70 (internal quotation marks omitted). Because a failure-to-train theory is "far more nebulous, and a good deal further removed from the constitutional violation, than . . . [a] policy . . . [,]" *Oklahoma City v. Tuttle*, 471 U.S. 808, 822-23 (1985), when the theory is a failure to train, only "limited circumstances . . . can be the basis for [municipal] liability under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 387

10

(1989). This is why "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61. A failure to train must result "from a 'deliberate indifference' to the injuries that may be caused." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189-90 (10th Cir. 2010).

At all times, "the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *City of Canton*, 489 U.S. at 390. "[P]roving that an injury or accident could have been avoided if an employee had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct will not suffice." *Connick*, 563 U.S. at 68. Too, "inadequacies in a particular officer's training would not trigger municipal liability because that 'officer's shortcomings may have resulted from factors other than a faulty training program.'" *Murphy v. City of Tulsa*, 950 F.3d 641, 652 (10th Cir. 2019) (quoting in part *City of Canton*, 489 U.S. at 391). Equally, it is not enough "to show that there were general deficiencies in the [municipality's] training program." *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010).

1. **An underlying violation is not present**

A constitutional violation must be shown before liability can be attached to a municipality. *See Crowson v. Washington Cnty. Utah*, 983 F.3d 1166, 1186 (10th Cir. 2020) (collecting cases). As argued extensively in the individual officers' motion for summary judgment, the officers, individually and collectively, did not violate the constitution. As such, the claims against the City should fail for lack of a constitutional violation.

2. **The officers were adequately trained**

"To establish the causation element, the challenged policy or practice must be closely related to the violation of the plaintiff's federally protected right." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013) (internal quotation marks omitted). "To

11

do so, the plaintiff must prove that the municipality was the moving force behind the alleged injury." *Arnold*, 35 F.4th at 795 (internal quotation marks omitted). "The causation element is applied with especial rigor when the municipal policy or practice is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training, supervision, and deficiencies in hiring." *Schneider*, 717 F.3d at 770.

No direct, causal link exists. The officers, individually, and CSPD officers, generally, were trained on warrantless entry, force, responding to medical crisis, de-escalation, and providing medical care.

### i. Avoiding excessive force

Officers within CSPD receive training. (Ex. A, p. 2, ¶¶ 7-13; Ex. B; Ex. G, p. 2-3, ¶¶ 6-13; Ex. H; Ex. C, p. 2, ¶¶ 6-11; Ex. D; Ex. E, p. 2, ¶¶ 5-14; Ex. F). They received training on the constitutional bounds of force and de-escalation. (Ex. L, 22, lns. 15-19; 71, lns. 7-11; 120, lns. 12-19; Ex. I, p. 2, ¶ 8; Ex. J; Ex. K). Officers are trained on all policies, including the use-of-force policy. (Ex. L, 15, lns. 3-5; 22, lns. 22-24; 23, lns. 2-19). Officer Barth received training on the constitutional use of her taser and the taser policy. (Ex. G; Ex. O, 10, lns. 14-17). The City provided training on avoiding police-created exigencies. (Ex. L, 115, lns. 21-25; 116, lns. 1-16; 118, lns. 23-25; 120, lns. 4-7). Officers were taught of the risks, including positional asphyxiation, of placing a subject on their stomach for prolonged periods of time. (Ex. L, 44, lns. 1-4, 8-18; 134, lns. 9-14; 135, lns. 14-16; 136, lns. 7-13, 17-20; 137, lns. 9-17, 20-25; 138, lns. 1-10, 13-16; 143, lns. 9-15, 19-25; 44, lns. 1-22; 151, lns. 8-15; 152, lns. 12-20; 154, lns. 2-6).

### ii. Warrantless entry

The officers understood the Fourth Amendment and its warrant requirements. More broadly, the Fourth Amendment, its requirements and exceptions, are taught by CSPD. (Ex. L, 64,

ln. 25; 65, lns. 1-18; 94, lns. 3-16; 66, lns. 6-25; 67, lns. 5-9). Specifically, the department addressed hot pursuit in policy and in training. (Ex. L, 93, lns. 11-18, 22-25; 94, lns. 1-23; 95, lns. 8-23; 96, lns. 12-16; 99, lns. 8-25; 100, lns. 1-5, 16-25; 101, lns. 1-25; 102, lns. 19-25; 103, lns. 1-4; 105, lns. 14-20; 106, lns. 2-21; 108, lns. 5-7, 10-16; 111, lns. 21-24; 112, lns. 1-7, 22-25; 113, lns. 1-8; Ex. M, 19, lns. 13-15; 21, lns. 5-16). When assessing the use of exigent circumstances to justify warrantless entry into a residence, the City had a practice of evaluating the safety priorities of the circumstances, including the protection of citizens, victims, the involvement of weapons and seriousness of the underlying offense. (Ex. M, 24, lns. 19-23; 25, lns. 10-25; 27, lns. 6-12). The City has trained its officers on warrantless entry.

### iii. Medical care

The officers are trained to look for signs of a medical crisis. (Ex. L, 169, lns. 10-18; 170, lns. 16-25; 171, lns. 6-11; 180, lns. 21-25). They are taught to look head-to-stomach for signs of breathing. (Ex. L, 147, lns. 18-21; 148, lns. 2-12; 178, lns. 4-17; 185, lns. 7-13, 16-22). They are instructed to call for a professional medical response when they have any concern that a medical emergency may be ongoing. (Ex. L, 160, lns. 12-13; 161, lns. 4-6; 181, lns. 1-4). The officers are trained in CPR. (Ex. L, 18, ln. 24-25; 19, ln. 1). They are taught about positional hypoxia and asphyxiation. (Ex. L, 149, lns. 23-25; 150, lns. 1-3). Officers were taught about sudden death. (Ex. L, 133, lns. 14-18). They are taught to place a suspect in a recovery position when it is safe and practical. (Ex. L, 159, lns. 3-11).

In sum, no direct causal link exists between CSPD training and any purported violation.

### 3. The City was not deliberately indifferent

A "municipality can incur liability for a failure to train only upon proof of deliberate indifference, which is a stringent standard of fault." *Murphy*, 950 F.3d at 651 (internal citations

13

and quotation marks omitted); *see also Parker v. City of Tulsa*, 745 F. App'x 79, 82 (10th Cir. 2018) ("This standard is difficult to satisfy and generally requires a pattern of tortious conduct.") (unpublished). Deliberate indifference requires "proof that a municipal actor disregarded a known or obvious consequence of his action . . . ." *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019). "The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998). "In most instances, notice can be established by proving the existence of a pattern of tortious conduct. Deliberate indifference may be found absent a pattern of unconstitutional behavior only in a narrow range of circumstances where a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction." *Waller*, 932 F.3d at 1284 (internal citations and quotation marks omitted).

A pattern of tortious conduct by CSPD officers is not present. Plaintiff must show deliberate indifference to a "glaring omission in [the City's] training regimen." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997). Plaintiff cannot meet these demanding standards. Nor is this a case where deliberate indifference is present without a pattern.

### B. No custom of unlawful conduct exists

A municipal custom must be "a widespread practice . . . so permanent and well settled as to constitute . . . usage with the force of law." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 168 (1970). To demonstrate a custom, first, "plaintiffs most commonly offer evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way." *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008) (quotations omitted). Second, a direct

causal link must exist between the practice and injury. *See Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010). Third, "a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Brown*, 520 U.S. at 407; *See also Gates v. Unified Sch. Dist. No. 449 of Leavenworth Cnty., Kan.*, 996 F.2d 1035, 1041 (10th Cir. 1993) (identifying three elements of a custom claim).

No widespread practice existed within the City related to seizures, arrests, use of body weight restricting breathing or the use of tasers. First, a pattern of similarly situated individuals being treated the same way does not exist. Second, no causal connection is present. Third, no evidence indicates that City policymakers were deliberately indifferent to an obvious consequence of a widespread City custom. Accordingly, an unlawful custom has not been demonstrated.

WHEREFORE, for the foregoing reasons, the City respectfully requests that this Honorable Court enter an order dismissing the Amended Complaint with prejudice.

Respectfully submitted this 22nd day of December, 2023.

                OFFICE OF THE CITY ATTORNEY
                Wynetta P. Massey, City Attorney

                */s/ W. Erik Lamphere*
                W. Erik Lamphere
                Martha E. McKinney
                30 S. Nevada Ave., Suite 501
                Colorado Springs, Colorado 80903
                Telephone: (719) 385-5909
                Facsimile: (719) 385-5535
                erik.lamphere@coloradosprings.gov
                martha.mckinney@coloradosprings.gov

### CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on the 22nd day of December, 2023, I electronically filed the foregoing **CITY OF COLORADO SPRINGS' MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following via email:

Felipe Bohnet-Gomez (fbg@rmlawyers.com)
Siddhartha H. Rathod (sr@rmlawyers.com)
Benjamin DeGolia (bd@rmlawyers.com)
Ciara M. Anderson (ca@rmlawyers.com)
Matthew J. Cron (mc@rmlawyers.com)
*Attorneys for Plaintiff*

*/s/ Amy McKimmey*
Amy McKimmey
Legal Secretary