**EXHIBIT L**

Page 1

                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO

Case No. 21-cv-1708-WJM-MDB

_____
ESTATE OF CHAD ALEXANDER BURNETT,
Plaintiff,
v.
CITY OF COLORADO SPRINGS, a municipality;
SERGEANT MICHAEL INAZU, in his individual
capacity; OFFICER JOSEPH DAIGLE, in his
individual capacity; OFFICER MATTHEW
FLEMING, in his individual capacity; and
OFFICER CAROLINE BARTH, in her individual
capacity,
Defendants.

_____

                  RULE 30(B)(6) DEPOSITION OF
                    CITY OF COLORADO SPRINGS
                   Sergeant Marcus VanOoyen
                     September 26, 2023

_____

        PURSUANT TO NOTICE, the above-entitled
deposition was taken on behalf of the Plaintiff at
2701 Lawrence Street, Denver, Colorado 80205, on
September 26, 2023, at 10:15 a.m., before Karen S.
Fogle, Registered Professional Reporter and Notary
Public within Colorado.



Page 8

1  Colorado Springs Police Department and El Paso County

2  Sheriff's Office.  Before that I was a patrol sergeant

3  for Gold Hill patrol and Falcon patrol, two of our

4  subdivisions.

5              Prior to that I was an instructor, both

6  recruit and in-service for the CSPD Training Academy

7  for six years.  Prior to that I was on the SWAT team

8  for 9 1/2 years as an officer/tactical officer.  Prior

9  to that I was a patrol officer for 3 1/2 years.

10          Q.  How long have you been with the Colorado

11  Springs Police Department?

12          A.  23 years.

13          Q.  How long have you been the in-service

14  training sergeant?

15          A.  A little over six months.  I started

16  March 1st of this year.

17          Q.  Before that you were the sergeant of the

18  bomb squad?

19          A.  Correct.

20          Q.  What are your duties as the in-service

21  training sergeant?

22          A.  I'm responsible for all continuing

23  education for all incoming employees for the CSPD.

24          Q.  You said that you're responsible for all

25  the continuing education; is that right?



Page 9

1          A.   For the POST-mandated, CALEA, and CRS

2   mandates for all sworn members of the department.

3          Q.   Who do you report to?

4          A.   Lieutenant Korey Hutchison.

5          Q.   What do you have to report to Lieutenant

6   Hutchison?

7          A.   That all of our training mandates have been

8   met for in-service training at the end of every year.

9          Q.   Do you supervise employees as well?

10         A.   I do.

11         Q.   Who do you supervise?

12         A.   I supervise right now four employees,

13  Officer Bryce Macomber; Officer Nathan Hefty; Officer

14  Tracy Tomchek; and Officer Anthony Boltz.

15         Q.   What are their positions?

16         A.   They are in-service instructors.

17         Q.   So your duties as far as training is to

18  oversee and make sure all of the requirements are met?

19              MR. LAMPHERE:   Objection; scope.   You can

20  answer.

21         A.   Yes.

22         Q.   (BY MS. ANDERSON)   You mentioned at the

23  beginning that you had testified on behalf of the City

24  and County of Colorado Springs in the past.   What did

25  that testimony relate to?



Page 15

1  train on its formal policies of the police department?

2          A.  It does.

3          Q.  Does it train on all of the formal policies

4  of the police department?

5          A.  It does.

6          Q.  When are officers trained on the formal

7  policies?

8              MR. LAMPHERE:  Objection; scope.  You can

9  answer.

10         A.  So throughout the academy they are required

11  to -- we have a program called Power DMS.  That's where

12  all of our policies are online.  And they are assigned

13  to read all of those policies.  And it keeps track of

14  which policies they have or have not read.  They have

15  to digitally sign each one that they read.  I'm not

16  sure exactly when it is during the academy, but they

17  have a date they have to have all that completed, and

18  they have a policy and procedure written test.

19         Q.  (BY MS. ANDERSON)  So once they read

20  through the policies in the academy, they are then

21  tested on those policies; is that right?

22         A.  Correct.

23         Q.  Is that one test during the academy?

24         A.  Yes, I believe so.

25         Q.  Does that exam cover all of the policies?



Page 17

1          A.   To be honest, I'm not sure.

2          Q.   After the academy training is there ongoing

3    training?

4          A.   There is.

5          Q.   How frequent is the ongoing training the

6    officers just --

7               MR. LAMPHERE:   Objection; scope.   You can

8    answer.

9          A.   So after the academy they go through field

10   training.   It's called police officer training program,

11   which is approximately four months long.   They ride

12   with a police training officer, certified police

13   officer.   So someone who is a certified field trainer.

14   And that will switch probably two to three times

15   throughout the field training process.

16               And it's basically to show the officers how

17   to take what they learned in the academy and apply in

18   the field.   After they complete field training, they

19   are required to attend in-service training every year,

20   and they have to complete 24 hours of in-service

21   training, 12 of those hours for POST mandate has to be

22   skills training.

23               So they have to complete 12 hours of

24   firearms, driving, and arrest control training.   The

25   other 12 hours can be various other kinds of training.



Page 18

1   We also have CALEA standards and CRS standards that we
2   have to meet each year.  Some of those standards
3   include medical treatment, interacting with people with
4   disabilities, interacting with the community -- I'm
5   trying to think of some of the other mandates we
6   have -- CPR, anti-violence training, anti-harassment
7   training.  That's all I can remember, off the top of my
8   head.
9           Q.  (BY MS. ANDERSON)  With the in-service
10  training -- just making sure I understand correctly --
11  it's 24 hours in-service total each year?
12          MR. LAMPHERE:  Objection; scope.  You can
13  answer.
14          A.  I should have said a minimum of 24 hours.
15          Q.  (BY MS. ANDERSON)  A minimum 12 of those
16  hours are devoted to skills training which includes the
17  fire, driving, and arrest training?
18          MR. LAMPHERE:  Objection; scope.  You can
19  answer.
20          A.  Yes, firearms training.
21          Q.  (BY MS. ANDERSON)  Every other year
22  officers are required to go through the CPR training;
23  correct?
24          A.  Yes, that is correct.  The CPR
25  certification expires every other year.  And we by POST



Page 19

1    have to maintain the CPR certification.

2         Q.   So for the other 12 hours that are not

3    skills training, do the officers get to choose which

4    trainings they attend?

5              MR. LAMPHERE:  Objection; scope.  You can

6    answer.

7         A.   No.  That curriculum is designed by the in-

8    service staff.  We have an in-service committee

9    meeting, which is comprised of representatives from all

10   the divisions around the department.  We present our

11   proposal for in-service training to them, and they

12   determine whether or not to approve that curriculum.

13             Once that committee approves the

14   curriculum, then I submit a memo requesting approval up

15   to the chief of police who then signs off whether that

16   curriculum is acceptable.  Once that is signed off,

17   then we design the curriculum for the following year.

18   Whatever curriculum is assigned, the officers are

19   mandated to attend.

20        Q.   (BY MS. ANDERSON)  How does the committee

21   determine which training should go into the curriculum

22   for the following year?

23             MR. LAMPHERE:  Objection; scope.  You can

24   answer.

25             A.   A lot of it goes back to what we talked



Page 20

1   about with the mandates.  We do know there has to be a

2   certain number of firearms, arrest control, and driving

3   training.  The POST says there has to be a minimum of

4   12 hours of skills training.

5          There has to be at least one hour in each

6   of those categories, but there is no mandate from that

7   point on.  So we can have 1 hour of arrest control and

8   driving and 10 hours of firearm.  We can mix it up

9   however we want based -- as long as we are meeting the

10   minimum standards.

11          Again, we have to look at the CALEA

12   requirements and mandates through CRS to determine what

13   is required on any given year.  So some of those

14   mandates are every other year requirements, some are

15   every year, so we have to make sure we are including

16   those in our curriculum as well.

17          We look at the needs of the department,

18   look at any new legislation.  That is another mandate,

19   legal updates every year, look at legislation and see

20   if there is anything new that our officers need to know

21   about that is applicable to their jobs.

22          Q.  (BY MS. ANDERSON)  The in-service

23   training -- how does Colorado Springs test the

24   officer's understanding of what they have learned in

25   the training?



Page 22

1   does Colorado Springs train on the formal policies of

2   the police department?

3           MR. LAMPHERE:  Objection; scope.  You can

4   answer.

5       A.  Yes, on certain policies we will.

6       Q.  (BY MS. ANDERSON)  Which policies?

7           MR. LAMPHERE:  Same objection.

8       A.  So one example would be vehicle pursuits.

9   We try to make sure we train on that policy each and

10  every year.

11      Q.  (BY MS. ANDERSON)  Any other policies that

12  Colorado Springs trains on every year?

13          MR. LAMPHERE:  Objection; scope.  You can

14  answer.

15      A.  I would say specifically not so much

16  that -- for example, if we are talking about doing a

17  arrest control skills training, we'll talk about use of

18  force.  And our use of force policy, CRS legislation,

19  that is case law.  We'll talk about those.  But from a

20  formal perspective, do we have a class dedicated to

21  certain policies, no.

22      Q.  (BY MS. ANDERSON)  How does Colorado

23  Springs know that officers understand its policies

24  through the training?

25          MR. LAMPHERE:  Objection; scope.  You can



Page 23

1    answer.

2         A.   I would say it's not just the training;

3    again, that Power DMS program that I spoke of earlier

4    doesn't go away.  If there is an updated policy or

5    procedure, it's put out through that Power DMS system,

6    which automatically notifies our officers via email

7    that they have policies that have been updated and they

8    need to read and sign.  These officers then have to log

9    on to their Power DMS account, digitally read and sign

10   that they understand the policies and procedures.

11        Q.   (BY MS. ANDERSON)  So it's an email and

12   then they sign they have read it; is that right?

13             MR. LAMPHERE:  Objection; scope.  You can

14   answer.

15        A.   Yes.  That is, whether or not they have

16   signed is tracked also.  There are times our chain of

17   command will send emails down saying certain officers

18   have or have not read certain policies and the

19   supervisors need to ensure that they do so.

20        Q.   (BY MS. ANDERSON)  Is there ever a test on

21   those policies after the academy?

22             MR. LAMPHERE:  Objection; scope.  You can

23   answer.

24        A.   No.

25        Q.   (BY MS. ANDERSON)  I think we spoke on this



Page 24

1    a little bit.  In your role who is responsible for

2    developing the training program for Colorado Springs?

3                MR. LAMPHERE:  Objection; scope.  You can

4    answer.

5         A.  So I guess I would have to ask for

6    clarification.  Is there a specific training program or

7    are you talking about recruit training, in-service

8    training, patrol tactical lineup training?  We have a

9    myriad of training programs within CSPD, so I would

10   have to ask do you want all of those or --

11        Q.  (BY MS. ANDERSON)  Let's start with what

12   are the different types of training programs within

13   Colorado Springs?

14               MR. LAMPHERE:  Objection; scope.  You can

15   answer.

16        A.  Again, I mentioned before we have recruit

17   training, that's our police academy that new hires have

18   to attend, the in-service training program which all of

19   our incumbent officers have to attend each year.  We

20   have patrol tactical lineup training where sergeants in

21   our department will teach to their officers and lineup.

22               We have roll call training which is video-

23   produced training for updates that go out to all of our

24   officers and at times civilian staff.  We have a lot of

25   informal training as well.  We have lineup training



Page 25

1    conducted by sergeants who are on duty every day.

2           We have debriefs of any calls that our

3    officers go on.  We have just ad hoc debriefs and

4    training that officers will conduct after different

5    types of calls.  I have one-on-one remedial training

6    that can occur as well when officers aren't performing

7    up to standards.

8           Q.  (BY MS. ANDERSON)  So let's go through

9    those one by one.  Who is responsible for developing

10   the recruit and academy training?

11          MR. LAMPHERE:  Objection; scope.  You can

12   answer.

13          A.  So the recruit academy staff -- and that

14   includes the lieutenant and sergeants for the training

15   academy and all the recruit academy instructors -- they

16   also have to meet mandates that -- four to five posts.

17   So a POST is actually fairly responsible for a lot of

18   the training that is developed in our academy.

19          We have specific parameters that we have to

20   stay within when we are teaching the POST-mandated

21   classes.  The individual curriculums can be taught by

22   subject-matter experts, so different detectives or

23   sergeants from around the department sometimes even

24   lieutenants and commanders, and they are responsible

25   for developing their own curriculum for that as well.



Page 26

1  Ultimately, all of the training once it's produced is

2  vetted and approved by the training academy supervisor

3  who is the lieutenant.

4           Q.  (BY MS. ANDERSON)  And who's that

5  lieutenant?

6           A.  Lieutenant Hutchison.

7           Q.  Who is responsible for developing the

8  in-service training programs for Colorado Springs?

9               MR. LAMPHERE:  Objection; scope.

10          A.  That goes back to what we just talked

11  about, the in-service staff and I develop a curriculum

12  that's brought to the in-service training committee who

13  then determines whether or not they approve that

14  training or if they have any feedback or they want to

15  see any other training included instead of some of the

16  training we have come up with.

17              Then once the committee determines what

18  that curriculum is going to be, we submit the memo up

19  to the chief of police who signs off on it.  Then the

20  in-service staff -- once we know what we are

21  teaching -- develops the curriculum for in-service

22  training.

23          Q.  (BY MS. ANDERSON)  So the in-service staff

24  who is developing the -- helping to develop the

25  curriculum, are they also developing the educational



Page 33

1   training programs we talked about, the remedial

2   training.

3            If it's identified they are not applying

4   what they have been taught to their job and they are

5   not adhering to policies and procedures, then they are

6   investigated by their chain of command and it's

7   determined whether they need remedial training.

8            If they feel they are not performing at a

9   satisfactory level, they are sent back to us, the

10  in-service staff, to make sure they are understanding

11  that material, and we give them more training on that

12  material and make sure they understand what they are

13  supposed to do.

14       Q.   (BY MS. ANDERSON)   Are you familiar with

15  how often officers have to receive remedial training?

16            MR. LAMPHERE:   Objection; scope.   You can

17  answer.

18       A.   I am.   It varies, so there are times where

19  we receive a lot of requests for remedial training and

20  there are times we don't.   If we start receiving

21  multiple requests for the same officer, we keep track

22  of that and ensure that they start performing better.

23  If not, it's up to their chain of command.

24            They use the documentation that we provide

25  for them and the lesson plans and evaluations of



Page 34

1    remedial training to determine if that officer needs to

2    be put on a performance improvement plan or are now

3    performing at a satisfactory level and that's dealt

4    with the individual.

5            Q.  (BY MS. ANDERSON)  How often are officers

6    given a review?

7                 MR. LAMPHERE:  Objection; scope.  You can

8    answer.

9            A.  Twice a year.

10           Q.  (BY MS. ANDERSON)  For the individuals

11   within Colorado Springs who were promoted to a

12   supervisor position, are they provided additional

13   training?

14                MR. LAMPHERE:  Objection; scope.  You can

15   answer.

16           A.  Yes, they are.

17           Q.  (BY MS. ANDERSON)  What types of training

18   are provided to supervisors?

19                MR. LAMPHERE:  Objection; scope.

20           A.  So it's going to be a wide variety of

21   training.  They have to go through a supervisor school,

22   40 hours, that covers a wide variety of topics, how to

23   successfully complete a performance evaluation all the

24   way to high risk, high liability types of calls and

25   managing those calls, critical incidents, when to call



Page 35

1    our proper specialized units on any given call.

2              And there is some leadership training

3    involved in there as well.  There is also the -- it

4    used to be annual, it's kind of going semi-annual,

5    quarterly, supervisor conferences in which the

6    department will identify areas our supervisors need to

7    be aware, legislative updates or policy reviews that

8    have impact in our department, things of that nature.

9         Q.  (BY MS. ANDERSON)  Are the supervisors

10   trained to know whether a certain officer conduct falls

11   within Colorado Springs training?

12             MR. LAMPHERE:  Objection; scope.

13        A.  I would say a lot of that training would

14   be -- yes, I would say they are.  As part of the

15   testing process there is a test on policies and

16   procedures and, again, go through assessment centers

17   where you are getting practical scenarios and you have

18   to answer how you would handle those types of

19   situations.

20             The testing process is a training to make

21   sure you are up to the standards required by the

22   department to be a supervisor.  Can you repeat the

23   question one more time?  I lost my train of thought.

24        Q.  (BY MS. ANDERSON)  Whether the supervisors

25   are trained to know whether an officer's conduct falls



Page 41

1    time breathing in that training as well, checking

2    airways, if they are in any kind of cardiac arrest as

3    well.

4            Q.  How are officers taught to check for

5    breathing?

6            A.  So in CPR and TCCC they are taught to look

7    at the suspect from head to stomach to observe to see

8    if they can see any breaths, determine if they do see

9    breathing what kind of breathing, is it short gasps, is

10   it slow breathing, is it shallow breathing.  And they

11   are taught to look -- in CPR for 10 seconds, and in

12   TCCC for two breaths.

13           Q.  If they can't see the breathing, what are

14   officers trained to do?

15           A.  To initiate CPR.

16           Q.  Does it matter if the person has a pulse?

17           A.  So the CPR video says if they are not

18   breathing or gasping for breath, to start CPR.

19           Q.  You mentioned that the hold and restraints

20   and the officer takedown also touches on the need for

21   medical care; is that right?

22           A.  Yes.

23           Q.  That training is also a 30-minute portion

24   of this itinerary.  Do you see that?  I'm sorry, an

25   hour.



Page 42

1          A.   Yes.

2          Q.   So in that training what are officers

3   taught to do to identify whether somebody needs medical

4   care?

5          A.   So that training specifically talks about

6   somebody who is in a state of excited delirium or other

7   names for it, cocaine psychosis, or something along

8   those lines.  To look for the symptoms of that -- if

9   they identify the symptoms of that, they are taught to

10  not go one-on-one with that suspect if at all possible.

11             If it's practical to do so to wait for

12  other officers to arrive on scene but they should take

13  the suspect down, get him in custody as quickly as

14  possible, get them to a recovery position and get

15  medical attention as soon as possible because, if that

16  person is in a state of excited delirium or in the

17  process of a medical episode, it could be deadly.

18         Q.   When you say get them and take them down

19  and get into a recovery position, what do you mean by

20  "recovery position"?

21         A.   Once they are handcuffed and secure -- and

22  that's going to depend on the situation.  Some

23  people -- they will be able to do that more quickly

24  than others, but once it's secure and safe for them to

25  do so, when they roll them on their side or to a seated



Page 43

1   position and maintain control of their head so it

2   doesn't drop down forward or backward and their airway

3   stays open to get them off their stomach so they don't

4   succumb to positional asphyxia.

5           Q.  Remaining on the stomach after the person

6   has been taken down and handcuffed, arrest could be

7   positional asphyxia?

8           A.  It could be a risk.  Again, nothing is a

9   hundred percent but there's a chance.  That's why we

10  teach to remove them to a recovery position as soon as

11  it's safe and practical to do so.

12          Q.  How are officers taught to determine

13  whether it's safe and practical to do so?

14          A.  So, again, it's going to be based on the

15  totality of the circumstances.  Are there other people

16  in the area that are actively fighting with the

17  officers, is the suspect under control, do they have

18  them handcuffed, do they have his legs under control,

19  is he still trying to kick, is he head butting,

20  actively fighting.  Basically, we teach them once they

21  feel they have control of the situation and they feel

22  safe, that they feel others are safe because of the

23  amount of control they have in the situation, then they

24  can move the person into a recovery position.  There is

25  no hard and fast rule as to when that would be.



Page 44

1          Q.   Are officers taught of any risks of

2     prolonged -- of keeping somebody on their stomach for a

3     prolonged amount of time?

4          A.   Yes.

5          Q.   What are those risks?

6          A.   Just the longer that they are in that

7     position the higher the risks.

8          Q.   What are the risks?

9          A.   So positional asphyxia is a condition

10    where -- if memory serves the way it was explained to

11    me -- that a person inhales but due to the position

12    they are in, their body is physiologically incapable of

13    exhaling the air in their lungs.

14               And so every time they take a breath, more

15    and more air fills their lungs and they can't expel the

16    air and, ultimately, that can cause a lot of pressure

17    on their heart and lungs so they have a difficult or

18    impossible time breathing or the heart can stop.

19         Q.   Other than positional asphyxia, are there

20    any other risks of remaining in a prone position for a

21    prolonged period of time?

22         A.   I think it would depend on the

23    circumstances, where are you on location.  If somebody

24    is in the prone position in a puddle, they can drown.

25    So there are risks that could be in play but that would



Page 45

1   be environmentally driven.

2          Q.  Is positional hypoxia the same as

3   positional asphyxia?

4          A.  Not a hundred percent sure on that, but I

5   think so.

6          Q.  Is that what the training is, that they are

7   similar?

8              MR. LAMPHERE:  Objection; scope.

9          A.  The training -- I have never used that term

10  positional hypoxia, but if it has to do with

11  respiratory distress, I would say yes because

12  ultimately that's what we are discussing in the

13  training that it's difficult for them to breathe in

14  that position.

15         Q.  (BY MS. ANDERSON)  Anything else about the

16  holds and restraints training as it relates to training

17  officers on the need for medical care?

18         A.  One other thing I would say is they are

19  trained to ensure they get medical started to the scene

20  as soon as possible.  To the point I can think of a

21  couple situations where I was on those types of calls

22  and I told medical to start to the scene before I

23  arrived and stage away from the scene.

24             So once we had the situation secured, they

25  could respond appropriately.  Because ultimately we can



Page 49

1    are other types of training that officers can complete

2    on any given notice.  It's just the minimum mandated

3    that we as the training academy provide.

4         Q.  Is there a document that shows all of the

5    training that was provided in 2019 by Colorado Springs?

6         A.  No.  A lot of it is going to be informal

7    and not documented.  Like I said, there are some

8    training like with PTO they could have -- if there is a

9    rookie officer that might have finished a call and the

10   training officer may debrief that call with them to

11   learn what they did well, what they didn't do well.

12            That's not going to be documented on any

13   formal lesson plan anywhere.  I can tell you from my

14   officers as a patrol sergeant, if we had a call that

15   our officers did well or not so well the night before,

16   I would conduct informal training lineup the next night

17   to discuss how we could better perform on those types

18   of calls.

19            Peers are constantly debriefing each other

20   and reviewing their performance on different calls for

21   service.  There is some officers that will attend

22   training that is put on by outside agencies and travel

23   to other states to complete training.

24            I can tell you that when I got my bomb tech

25   certification, I did six weeks of training in



Page 53

1   utilize the Taser, then they should start medical to

2   ensure the person doesn't experience any kind of

3   medical emergency, not saying that they would but just

4   as a precaution and, again, the Taser training -- if I

5   remember the exact wording -- says you want to check

6   the subject for signs of distress.

7           Q.   The Taser training that you're referring

8   to, this is a video that is 25 hours; correct?

9           A.   It's either -- yes, that year it was a

10  video.

11          Q.   How does Colorado Springs test the

12  understanding -- the officer's understanding of the

13  video trainings?

14               MR. LAMPHERE:   Objection; scope.   You can

15  answer.

16          A.   So, again, it goes back -- if it's a video

17  training -- and it says it on the title here, completed

18  through NeoGov Learn.   That's the program that we used

19  before, so it's documented the same way as the roll

20  call videos.   So it's assigned to the phone numbers of

21  the department.   They are required to watch the video

22  and affirm they have watched the video and understand

23  the contents.

24          Q.   (BY MS. ANDERSON)   Is there any other

25  measures in place by Colorado Springs to test the



Page 54

1    officer's understanding of video trainings?

2              MR. LAMPHERE:  Objection; scope.

3         A.   There have been in the past specific online

4    classes or have tests -- you can also put test

5    questions at the end.  On this one specifically I don't

6    believe there was on that one.

7         Q.   (BY MS. ANDERSON)  You also mentioned the

8    holds and restraints training would provide training on

9    identifying whether someone is breathing.  How does

10   that training do that?

11        A.   That training specifically on the form says

12   one-hour holds and restraints-carotid restraint.  In

13   that specific training we were teaching our officers --

14   I should qualify this is 2019, so we were actually

15   teaching our officers how to apply carotid restraint on

16   somebody.  So anytime you apply that, you would, again,

17   put them in -- you would render them unconscious, place

18   them in handcuffs, make sure the scene is secure, and

19   move them to a recovery position and check them for

20   signs of distress.

21        Q.   How soon after the person has been

22   handcuffed are officers trained to move the person to a

23   recovery position?

24        A.   So I talked about this before, it's going

25   to be based on the totality of the circumstances.



Page 55

1    Ultimately, it comes down to when it's safe and

2    practical to do so.  So there's a variety of variables

3    that go into making that determination, how many people

4    on the scene, are they in danger, is the suspect

5    actively fighting, are officers having a difficult time

6    controlling the subject even though they are in

7    handcuffs, what state is the subject in, how many

8    officers are on scene, do they have control.  It comes

9    back to when it is safe for them to do so.  I can't

10   really put a specific time on that.  It's going to vary

11   depending on the circumstances.

12        Q.  Do any of the trainings listed in

13   Exhibit 15 provide formal training as to identifying a

14   person's need for medical care?

15        A.  So yes, I would say both of those classes.

16   That is part of the curriculum -- or it was when we

17   taught carotid restraints and it is on Taser as part of

18   the curriculum to check the person for signs of

19   distress.

20        Q.  In training officers to check a person for

21   signs of distress, what are you training the officers

22   to do?

23        A.  So it's going to vary in monitor or CPR

24   training to check to make sure -- move them into the

25   recovery position and check to make sure they are still



Page 56

1  breathing, they have a pulse.  And that's basically the

2  extent of it -- if there are any sign of distress as it

3  relates to their physical well-being.

4          Q.  So other than checking for breathing and

5  checking for a pulse and possibly moving them to a

6  recovery position, are there any other things that

7  Colorado Springs trains its officers to do to identify

8  whether somebody is in medical distress?

9          A.  That goes back to tactical combat casualty

10  care, do they have gunshot, are they bleeding, are they

11  suffering any signs of blunt force trauma.  Basically,

12  are they in any -- for example, Taser training -- have

13  they been struck in a sensitive area with a Taser

14  probe.  There's a wide variety of things they can look

15  for to determine if a person is seriously injured or in

16  danger of dying.

17          Q.  So does the training just distinguish

18  between injury, serious injury, and danger of dying?

19          A.  That's going to be -- yes, a lot of that is

20  going to be the definition of serious injury and -- CRS

21  is the way we teach that.  It can cause permanent

22  disfigurement, broken bones, penetrating trauma, things

23  like that.  When you look at it, we talk about the

24  formal part of it, but informal when I teach a class, I

25  talk about that in a wide variety of topics that we



Page 57

1   cover.

2          Q.   You can set that exhibit to the side.

3   Exhibits 14 and 15 have been in-service exhibits for

4   2018 and 2019.  Did you review any documents that

5   listed the in-service training for 2020?

6          A.   To be honest with you, I can't remember.  I

7   reviewed a lot of the documents.  If it was in that

8   list of documents that was provided, I looked at it.

9          Q.   I want to talk specific to Topic 2, which

10  is Colorado Springs training, educational materials,

11  between 2018 and May 24, 2020, pertaining to arrest

12  warrants.  What did you do to prepare to testify on

13  behalf of Colorado Springs on Topic 2?

14         A.   The material that was taught in the recruit

15  academy.  And then I looked through the lesson plans or

16  the curriculum for the in-service in those years.

17         Q.   For the recruit academy documents that you

18  reviewed, what were those?

19         A.   So specific to arrest warrants there is

20  basic law classes; arrest search and seizure,

21  specifically, was the class that I focused on.

22         Q.   How long is that class?

23         A.   So if I remember correctly, that class

24  is -- between the classroom portion and the

25  reality-based scenarios that pertain to search and



Page 58

1   seizure is 17 1/2 hours.

2          Q.   So you mentioned there is a reality-based

3   and than a classroom portion; is that right?

4          A.   Yes.

5          Q.   Any other aspect of the training other than

6   reality-based and classroom?

7          A.   So, again, I have talked about this.  I

8   know when I taught arrest control in the academy, we

9   covered arrest search and seizure at length during that

10  class.  I know that is covered during a wide variety of

11  different topics, especially when recruits would have

12  questions related to arrest search and seizure as it

13  related to different topics taught at the academy.  I

14  know it's covered in more than just those formal

15  classes in the academy as well.

16         Q.   The formal training in the academy is the

17  classroom portion and reality-based scenarios; is that

18  right?

19         A.   Yes.

20         Q.   Did you review any videos in preparation

21  for testifying on behalf of Colorado Springs training

22  and education for arrest warrants?

23         A.   I did review some of the roll call videos

24  as well.

25         Q.   Which roll call videos?



Page 59

1          A.   I would have to look; there were several.

2     If I remember correctly, there were some relating to

3     the first and second amendment auditors, the relations

4     advisory committee, and some legal updates, if I

5     remember as well.

6          Q.   How did the legal updates, roll call video,

7     relate to training on arrest warrants?

8          A.   To be honest, I can't remember.

9          Q.   The MRAC, how did that relate to arrest

10    warrants?

11         A.   It did not.

12         Q.   The first and second amendment auditors,

13    how did that relate to arrest warrants?

14         A.   From the standpoint of whether or not there

15    is probable cause to make an arrest based on first and

16    second auditors actions, that was probably the extent

17    of it.

18         Q.   Is that related to making arrests in a

19    person's home?

20         A.   No.

21         Q.   So in the recruit academy what does the

22    academy teach officers as to when they need to obtain

23    an arrest warrant?

24         A.   So it teaches officers when they can make

25    an arrest and specifically when arrest warrants were



Page 60

1    needed.  So if you want to arrest somebody in their

2    house and the arrest warrant exception doesn't exist,

3    you need to get an arrest warrant that covers the

4    exceptions to the arrest warrant rule, and then it also

5    again talks about what the process is and how to get an

6    arrest warrant.

7            Q.  You mentioned you need a warrant whenever

8    you're going to enter someone's house, and there is no

9    exception in the process of getting an arrest warrant

10   should you need one; is that right?

11           A.  Yes.

12           Q.  What else does the academy teach recruits

13   about arrest warrants?

14           A.  The fact that you have to have the who,

15   what, where, when, and how in the arrest warrant and

16   that information has to equal probable cause to make an

17   arrest.  And that the warrant has to be signed or

18   notarized, it has to be approved by a supervisor, it

19   has to go before a judge, and swear before a judge that

20   the information that we provide is true.

21               And once the arrest warrant is signed, it

22   has to be filed, and then the -- what you can do, when

23   you can make an arrest in somebody's house or someone

24   else's house for that matter.

25           Q.  But in order to make an arrest in someone's



Page 64

1   persons in private dwellings, talking about when a

2   lawful entry into a private dwelling has been made and

3   officers observe a violation committed by a person

4   inside the private dwelling, or establish probable

5   cause that a person has committed an offense, that

6   person can be arrested.

7            And it gives several examples of lawful

8   entry, "Pursuant to a search warrant; pursuant to an

9   arrest warrant for a different offense; pursuant to

10  consent of an occupant, and absent any contemporaneous

11  objection from any co-occupant; pursuant to a routine

12  investigation of a crime; pursuant to a citizen's call

13  for assistance."

14           So other than those exceptions if you are

15  going to arrest somebody in their dwelling or in a

16  third party's dwelling, we are taught we have to have a

17  search warrant.

18           Q.  My question is specific to when time

19  permits, so it's your testimony absent those exigent

20  circumstances and warrantless reasons that are listed

21  in subsection 25 and 26, the exigent circumstances

22  permit obtaining a warrant?

23           A.  Yes.

24           Q.  The policy also references a person's

25  dwelling.  What is Colorado Springs trainings on the



Page 65

1    parameters of what a person's dwelling is?

2           A.   The key word I think is the threshold.  So

3    anything beyond the threshold or on the threshold in

4    somebody's residence.

5           Q.   When you say threshold, what is the

6    training as to what constitutes the threshold?

7           A.   Any entry point into a person's house or

8    the doors, window frames, of those would be considered

9    the threshold.  Points of egress and ingress of the

10   residence.

11          Q.   Is it that an officer cannot cross the

12   threshold without a warrant unless an exigent

13   circumstance exist?

14          A.   That is my understanding, yes.  Exigent

15   circumstance or if they are legally present so given

16   consent -- a search warrant or arrest warrant for a

17   different offense consent, routine investigation of a

18   crime or a citizen's call for assistance.

19          Q.   So other than the threshold, is there any

20   other training that Colorado Springs provides on the

21   parameters of a person's dwelling?

22          A.   Can you clarify that or be more specific?

23   As it relates to search and seizure or arrest, as far

24   as a person's dwelling goes?

25          Q.   I'm asking what constitutes a person's



Page 66

1    dwelling as it relates to the fourth amendment.

2          A.  So it can be -- it could be a tent, it

3    could be a house or an apartment, it could be the place

4    where they dwell or live, where they have a right to

5    privacy.

6          Q.  Does Colorado Springs provide any training

7    on needing a warrant in the context of someone outside

8    their door?

9          A.  There are certain -- it depends on the

10   door, I guess, the area outside the person's dwelling

11   we teach.  And there are different levels of rights to

12   privacy in somebody's curtilage, depending on how open

13   that is to the parkway.  We have taught that before.

14   If it's a wide open area and everybody can see that

15   area from the street, then there is going to be a

16   significantly less right to privacy than if it's a

17   backyard that has a wall around it where you have to

18   jump up to look into.

19              There is going to be some gray area there

20   as it relates to a person's right to privacy on the

21   area outside the home.  Is there a porch; is it

22   enclosed; is the door shut.  There's a lot of different

23   circumstances that can change their right to privacy or

24   if that counts -- the area they would have right to

25   privacy as it relates to their dwelling.



Page 67

1          Q.   What is Colorado Springs training as it

2     relates to the curtilage of a person's home?

3               MR. LAMPHERE:   Objection; form.   You can

4     answer.

5          A.   Again, it's going to be dependent on the

6     circumstance.   So if they are in the open -- an area

7     that anybody can see from the street and they are

8     away -- they are over the threshold in that area, you

9     don't need an arrest warrant in that area.

10          Q.   (BY MS. ANDERSON)   On the curtilage of

11     their home?

12          A.   Correct.

13          Q.   Under Colorado Springs training when is a

14     person considered to be seized?

15               MR. LAMPHERE:   Objection.   Scope; form.

16          A.   That's going to depend on the circumstances

17     as well.   There is some training that says we have to

18     have -- when we do train, we have to have an arrest

19     warrant in hand.   If somebody is in their house and

20     it's a contained call and we are giving them a lawful

21     order to leave the residence, that could be considered

22     a seizure by giving them a lawful order.   And so

23     it's -- how do I word this -- basically, once a person

24     is detained or under arrest and the officer has control

25     of that person, depending on the circumstances of the



Page  69

1    would also be a form of custody as well for giving a

2    lawful orders to move someplace where they either

3    haven't given consent or against their will, that would

4    constitute custody.

5            Q.   (BY MS. ANDERSON)  Does Colorado Springs

6    provide any other training other than the physical

7    control and lawful order, things we just spoke about as

8    to when a person is seized?

9            MR. LAMPHERE:  Objection; scope.  You can

10   answer.

11           A.   Yeah, we do.  And it's a gray area of the

12   law.  There are all kinds of arguments when we talk

13   about the different case law in which a person may be

14   considered in custody.  What we talked about is the

15   main -- if you have somebody under control and you have

16   given them lawful orders they are not allowed to leave

17   and you move them against their will or they are not

18   free to leave, that either constitutes detention or

19   arrest.

20           Q.   (BY MS. ANDERSON)  Can police presence

21   constitute a seizure under Colorado Springs training?

22           MR. LAMPHERE:  Objection; scope.  You can

23   answer.

24           A.   They can.  So if you stand in somebody's

25   way and prevent them from leaving the area that they



Page 70

1    want to leave, that could be considered custody.  An

2    example we give in training is the DEA did a sweep of a

3    bus and told people they were free to leave, but the

4    people didn't feel they were free to leave because they

5    couldn't move past the DEA agents on the bus, and they

6    determined that that was a custodial issue and it

7    violated their rights.

8         Q.  (BY MS. ANDERSON)  So is it fair to say

9    that a person who doesn't feel free to leave an area

10   can be seized?

11             MR. LAMPHERE:  Objection; scope.  You can

12   answer.

13        A.  I think it's a reasonable person.  If a

14   reasonable person in the same situation would not feel

15   they are free to leave, that could constitute custody,

16   yes.

17        Q.  (BY MS. ANDERSON)  So what training does

18   Colorado Springs provide to its officers on arrest

19   warrants in the academy?

20             MR. LAMPHERE:  Objection.  Scope; form.

21   You can answer.

22        A.  I discussed that in the previous question

23   and that's all in the arrest search and seizure class

24   that -- the 17 1/2 hours of training that they receive

25   in the academy.  That's the formal side of the training



Page 71

1  where they are taught about search warrants and arrest

2  warrants.  They also have to read policy and sign off

3  on the policy.

4          And then those topics are also discussed

5  throughout the academy in a wide variety of different

6  classes.  And, again, that's more of an informal -- not

7  part of the lesson plans.  But I can tell you for

8  certain it is covered extensively in arrest control,

9  which is about a hundred hours of training because we

10 talk about taking people into custody and conducting

11 person searches, detentions, conducting frisks.

12          Then on top of that when they go into field

13 training as well and they are one-on-one with another

14 officer at any time a -- comes up and they have to

15 apply that knowledge in the debriefing that -- they are

16 taught that by their PTO.

17          Q.  (BY MS. ANDERSON)  Did the training change

18 substantively as it relates to arrest warrants between

19 2018 and 2020?

20          A.  I don't know.  It did not; I don't believe

21 so.

22          Q.  You testified earlier that unless an

23 exigency exists officers are trained in order to arrest

24 in their home they must have probable cause or one of

25 the exceptions to the warrant requirement; correct?



Page 73

1          MR. LAMPHERE:  Objection; form.

2       A.  I'm sorry.  Can you repeat that?

3       Q.  (BY MS. ANDERSON)  Colorado Springs doesn't

4   require those trainings that you just referenced, peer

5   conversations, and things like that; correct?

6          MR. LAMPHERE:  Objection.  Form; scope.

7       A.  It's not mandated, no.  I should back that

8   up.  If you're in PTO, six months of the academy and

9   four months of training with field training officer,

10  then those types of topics -- that is going to be

11  discussed in that training and that is mandated

12  training they have to complete.

13      Q.  (BY MS. ANDERSON)  That's when the person

14  is becoming an officer, the six months and four months?

15      A.  The way the process works is they recruit

16  for six months.  When they complete the academy, they

17  have met their POST-mandated training requirements so

18  they are sworn in.

19          Technically speaking, they are a police

20  officer at that point.  In order to be a police officer

21  on their own on the streets, then they have to complete

22  that additional four months of training.  That is all

23  part of their initial training, but technically they

24  are police officers during that four months of field

25  training.



Page 78

1   person to be arrested.  So just this point 1.0, the

2   authority to arrest, there are times when an officer

3   can make an arrest of a person without an arrest

4   warrant.

5          Q.  What training does Colorado Springs provide

6   to its officers on the procedure for obtaining an

7   arrest warrant?

8          A.  So it's discussed in the classroom but the

9   procedure is really demonstrated when they get to PTO.

10  In the classroom in the academy they discuss it.  To

11  make sure they understand it, it's part of the PTO

12  where they go through the process of actually -- if

13  they have the opportunity to do an arrest warrant, they

14  go through the process, and if they don't have that

15  opportunity, then their PTO will demonstrate and walk

16  them through the process of how to get an arrest

17  warrant written and signed.

18         Q.  So as it relates to the classroom, this

19  training is provided by PowerPoint?

20         A.  Yes.

21         Q.  Did you review the PowerPoint in

22  preparation for today?

23         A.  I did.

24         Q.  What PowerPoint did you review?

25         A.  The arrest, search, and seizure PowerPoint



Page 79

1   and basic law class of the recruit training academy.

2          Q.   How is it tested in the classroom portion

3   of the training?

4          A.   So it's going to be part of those written

5   exams that I talked about before where the recruits

6   will complete several weeks of training and then they

7   will be given written tests on all the material that

8   they have covered throughout the entire academy to that

9   point can be part of that test.

10          Q.   It's also covered in the PTO portion after

11   they pass the academy; correct?

12          A.   Correct.

13          Q.   And are all officers trained on the process

14   of obtaining a warrant on the PTO portion?

15          A.   Can you repeat that?

16          Q.   Are all officers trained on obtaining a

17   warrant in the PTO portion?

18               MR. LAMPHERE:  Objection; form.

19          A.   They are supposed to be, for sure.

20          Q.   (BY MS. ANDERSON)  Let's talk about what is

21   the process for obtaining an arrest warrant that

22   officers are trained on.

23          A.   They have to -- initially, they have to

24   complete an investigation and determine whether or not

25   they have probable cause to arrest a specific person



Page 80

1   for the time they are investigating.  Once they have

2   that information and it's determined an arrest warrant

3   is needed, generally they go back to their cars and the

4   substation and use the arrest warrant template to write

5   an arrest warrant.

6              So the arrest warrant has to include the

7   person's identity that they are going to submit the

8   arrest warrant for, it has to have an affidavit

9   describing the circumstances of their investigation and

10  why they feel they have probable cause to make an

11  arrest of that person for that crime.

12             They then have to -- once they complete

13  that, they have to have the warrant approved by a

14  supervisor.  Once the supervisor approves the warrant,

15  they have to have it notarized and sign it in the

16  presence of a notary.  Once that's complete, they have

17  to either take it to a judge at the courthouse or if

18  it's after hours, they have to go through a process

19  with an iPad to have the judge read the warrant.

20             If they can't -- many times the judges

21  can't get the iPads to work.  And if they can't get it

22  to work, they have to go to the Judge's house.  If the

23  Judge agrees with the warrant, they have to swear to

24  the judge all the information in the arrest warrant is

25  true to the best of their ability and the Judge signs



Page 81

1   it.

2           Once they have the arrest warrant signed by

3   the Judge, they can bring it back to the scene or file

4   it with the courthouse.  And then it goes into the

5   system and the rest of the officers -- when they run

6   that person's information in the system, it comes back

7   to them as having a warrant.

8       Q.  How much time does it take to obtain an

9   arrest warrant to arrest someone in their home?

10      A.  Again, it depends.  I have seen some

11  warrants written fairly quickly and all the technology

12  work and the judge is able to sign it.  They can run --

13  the quickest I have seen one written and signed is a

14  couple hours.  I have been on scene sometimes waiting

15  for a warrant to be signed up to six to eight hours.

16          So it depends on the circumstances of the

17  case, the availability of judges, whether the person is

18  experienced writing a warrant, the supervisor wants

19  more information added, taken away.  Every step of that

20  process can take longer or shorter.  I have had it

21  before where I've had a hard time finding a notary to

22  sign the warrants.  I don't know -- I'd say between two

23  and eight hours is what I have seen.

24      Q.  Does Colorado Springs train its officers on

25  how much time it takes to procure a warrant?



Page 83

1   you saying are they trained that once they are on scene

2   of a call that they can't go get a warrant or --

3        Q.   (BY MS. ANDERSON)  I'm asking if there is

4   training on obtaining a warrant even if they are on

5   scene.

6            MR. LAMPHERE:  Objection.  Form; asked and

7   answered.

8        A.   Yes.

9        Q.   (BY MS. ANDERSON)  What is that training?

10       A.   So if a person -- if he needed an arrest

11  warrant -- somebody is in their house, there is no

12  exigency or any of the exceptions to the warrant

13  requirement and the person has to be arrested

14  immediately, then a warrant has to be obtained.

15       Q.   What training does Colorado Springs provide

16  in obtaining a warrant in that scenario?

17       A.   Again, it's going to depend on the

18  circumstances.  So if the person is a danger to the

19  public, if they absolutely have to be arrested

20  immediately, generally speaking, they are going to be

21  trained to maintain a certain number of officers on the

22  scene to isolate and contain the situation or the

23  residence, while someone has the information on the

24  investigation goes back to the substation to write the

25  warrant and goes through the entire process to write



Page 84

1   the warrant, have a supervisor approve it, get it

2   notarized, and then find a judge and have the judge

3   read and sign it.

4           And then once that warrant is signed,

5   depending on the circumstances, different tactics can

6   be used to take a person into custody.  If the person

7   can't be found, then they are writing an arrest warrant

8   and submit it into the system, file it in the court,

9   and then the person -- next time they are contacted by

10  law enforcement they can arrest them then.

11          Depending on the circumstances sometimes if

12  there is no immediate danger to anybody, they could

13  write a warrant and submit it even if they know the

14  person is in the house and delay enforcement on that

15  one as well.

16      Q.  So is the training that Colorado Springs

17  provides in a scenario where they have determined that

18  somebody needs to be arrested in order to obtain that

19  warrant, somebody has to go back to the station to

20  write the warrant?

21          MR. LAMPHERE:  Objection; form.

22      A.  They could write the warrant and the

23  technology being what it is, they can do it in the car.

24  There would have to be an email back and forth to the

25  supervisor to get approved.  And at some point they



Page 89

```
 1            Q.  (BY MS. ANDERSON)  The roll call as it
 2  relates to the MRAC, how are those related to the
 3  arrest warrant exceptions?
 4            A.  They don't cover arrest warrant exceptions.
 5            Q.  So they don't cover hot pursuit either; is
 6  that right?
 7            A.  That's correct.
 8            Q.  The use of force roll calls -- did those
 9  cover the arrest warrant exceptions?
10            A.  They did not.
11            Q.  So they also didn't cover the hot pursuit
12  doctrine; is that correct?
13            A.  That's correct.
14            Q.  For the policies, which policies did you
15  review in preparation to testify about the arrest
16  warrant exceptions?
17            A.  Physical arrest in Exhibit 1, General
18  Order 1.07, Physical Arrest.
19            Q.  Did you review any other policies in
20  preparation for testifying on Topic 3?
21            A.  No.
22            Q.  What training does Colorado Springs provide
23  to its officers other than the words that are on
24  Exhibit 1's policy?  What training does Colorado
25  Springs provide on arrest warrant exceptions?
```



Page 90

1         A.  So, again, the -- in the arrest search and

2    seizure portion of the recruit training it covers

3    arrest warrants, search warrants, when they are

4    required, the exceptions to those warrants.  Again,

5    except for words that are specifically in this

6    policy -- they are trained to this policy as well.

7             A lot of the training is going to be not

8    included in specific lesson plans.  I talked about that

9    before.  I taught arrest control; we discussed that as

10   well.  In the curriculum response they also discuss

11   when warrants are needed, when exigent circumstances

12   exist, and the exceptions to those warrants as well

13   with hot pursuit and when people's lives are in danger.

14        Q.  Specifically to the critical incident

15   response training that Colorado Springs provides, what

16   does it teach the officers as it relates to hot

17   pursuit?

18        A.  As far as hot pursuit, it teaches that you

19   can arrest somebody.  If you start the arrest outside

20   of somebody's residence and they run into the

21   residence, you can chase them in that.  Training

22   specifically deals with should you.  And we talk about

23   you can, but should you.  We talk about the dangers of

24   the circumstance, totality of the circumstance, and how

25   dangerous they are, and if you should pursue somebody



Page 93

1    are classroom -- vehicle pursuits and how to

2    participate in vehicle pursuits, and I created a

3    practical exercise portion of that training.

4            Q.   Is there anything in the critical incident

5    response training specific to hot pursuit into a

6    person's home?

7            A.   There is as far as you can do it or should

8    you do it.  It all relates back to the risk benefit

9    model, should you do it.  So they talk about when you

10   can in hot pursuit but should you do it.

11           Q.   What is the training on when hot pursuit --

12   when you can do it?

13           A.   So when an arrest starts outside somebody's

14   house in a place where an officer can legally conduct

15   an arrest and a person tries to defeat that arrest by

16   fleeing into their home and the officer is following

17   them and they can chase that person into their house to

18   prevent them from escaping or destroying evidence.

19           Q.   Does if matter where they are outside the

20   house?

21                MR. LAMPHERE:  Objection; form.

22           A.   So they have to be beyond the threshold of

23   the house.  So if they are on -- even if they are on

24   the threshold but expose themselves to the public, then

25   that can count as well.  If they are inside the



Page 94

1   threshold of the house and haven't presented themselves

2   to the public, then hot pursuit does not apply.

3           Q.   (BY MS. ANDERSON)   Is it the training that

4   once somebody is beyond the threshold, officers can

5   then pursue them into the house and place them under

6   arrest?

7           A.   Again, it depends on the circumstances.  We

8   talked about it before -- in the backyard -- and

9   officers aren't legally present in their backyard that

10  may not count.  If they are in an area that is open to

11  the public and the public can see them, they have a

12  lower expectation of privacy, so if they start the

13  arrest then, they can chase the person.  I specifically

14  talk about a case, USC v. Santana, where the officers

15  begin an arrest right at the threshold and chase them

16  in the house.

17          Q.   So what do you teach the officers with

18  respect to the Santana case?

19          A.   If the arrest starts in an area that an

20  officer can legally make the arrest without a search

21  warrant and the person flees from them into the house

22  and they chase them into the house, then the hot

23  pursuit exception applies.

24          Q.   Is anything else taught about when hot

25  pursuit applies?



Page 95

1          A.   Again, from the standpoint of the can I,

2     should I, we go into that in great detail, making sure

3     our officers don't put themselves or others in

4     dangerous positions by chasing a suspect into a

5     residence.

6          Q.   The can I, should I, you go into great

7     detail.  What detail is that they are trained on?

8          A.   You have to look at the totality of the

9     circumstances.  Again, when you're on the way to the

10    call, what kind of call is it, when you're on your way

11    to the call what information have you been given, what

12    information are you currently receiving, is it a cold

13    call, when you arrive on scene how many officers are

14    there with you, what's the status of the suspect, is it

15    a misdemeanor crime or is it a felony.  If it's a

16    felony, is it a violent felony, does this person have a

17    warrant for his arrest, is there a criminal history, do

18    we know any other information about what is inside the

19    house, are there other occupants in the house

20    potentially in danger, complete and total risk versus

21    benefit analysis, safety priorities, known and unknown

22    threats, what is probable and what is possible, and

23    making their decision based on those factors.

24         Q.   What about the requirements of the hot

25    pursuit doctrine?  Is there any other training



Page 96

1   provided?

2            MR. LAMPHERE:  Objection.  Form;

3   foundation.

4        A.  Not that I know of.

5        Q.  (BY MS. ANDERSON)  My understanding is that

6   the training on the hot pursuit doctrine is that when a

7   person presents outside of their house and officers can

8   then chase them into the house and place them under

9   arrest; is that correct?

10           MR. LAMPHERE:  Objection.  Scope; form;

11  foundation.

12       A.  If the arrest begins in an area the

13  officers are lawfully present and the person is open to

14  the public and they attempt to flee by fleeing into

15  their house and officers are immediately in pursuit

16  they can follow into the house.

17       Q.  (BY MS. ANDERSON)  There is no other --

18  nothing else is taught about when hot pursuit applies;

19  is that correct?

20           MR. LAMPHERE:  Objection.  Scope; form.

21  You can answer.

22       A.  I'm trying to think of whether any classes

23  that we teach -- we give examples of when hot pursuit

24  doesn't apply where officers have tried to utilize that

25  argument and it doesn't apply as well.  We give them



MAGNA
LEGAL SERVICES

Page 99

1  answered.

2           A.   So formally none that I can think of.

3  There is going to be a variety of other training that

4  goes on with the PTO process, the lineup training, the

5  debriefs in lineups, peer-to-peer reviews, those type

6  of training as well.  The elective trainings may cover

7  these topics as well that I don't know about.

8           Q.   (BY MS. ANDERSON)  Does Colorado Springs

9  provide training as to cases that have discussed hot

10  pursuit out of the 10th Circuit?

11           A.   Can you repeat that?

12           Q.   Does the training that Colorado Springs

13  provides include cases on hot pursuit out of the 10th

14  Circuit?

15           A.   Yes, it does.  And I'm trying to remember

16  what they are, and I can't remember off the top of my

17  head.

18           Q.   Does Colorado Springs establish that hot

19  pursuit requires immediate or continuous pursuit?

20           A.   It does.

21           Q.   What's the training of what immediate or

22  continuous pursuit is?

23           A.   It has to be -- when the arrest occurs, the

24  officers -- it goes back to objective reasonableness.

25  When the officers are chasing a suspect, would an



Page 100

1    objectively reasonable officer believe that enough time

2    has passed for hot pursuit no longer applies or is it

3    continuous from the standpoint of once the suspect fled

4    from them -- an objectively reasonable officer -- they

5    are still in pursuit of that person into the residence.

6         Q.  So what is the training as to what an

7    objectively reasonable officer would consider immediate

8    or continuous pursuit?

9         A.  So the training as far as objective

10   reasonableness is kind of the same across the board

11   with every area of the law where objectively

12   reasonableness applies in that if you had a group of

13   officers in a room and they were asked to determine if

14   your actions were reasonable, would they agree or would

15   they say that's outside the scope of reasonableness.

16        Q.  So are there examples given as to what a

17   reasonable officer would consider immediate pursuit?

18        A.  Am I chasing somebody from the scene of a

19   crime or did I just tell them they were under arrest

20   and they ran from me, I can see them running into a

21   house versus a felony crime committed four days earlier

22   and I know they are in this house and I want to go into

23   that house and say it's hot pursuit, that would be way

24   outside the scope of reasonableness.  That would not be

25   hot pursuit.



Page 101

1          Q.   So you mentioned four days before, are

2    there any other times that Colorado Springs trains as

3    to reasonableness for hot pursuit?

4          A.   So it's going to be somewhat of a gray

5    area, and that's a lot of what we teach because

6    ultimately -- have struggled with that as well

7    determining is something hot pursuit, has too much time

8    passed, what is a specific amount of time, and there is

9    really no hard and fast rule based on the totality of

10   the circumstances.  Ultimately, that's what we tell

11   them, we can never give you a hard and fast rule there

12   is a two-minute time period or ten-second time period

13   or anything like that.  It's going to be based on the

14   totality of the circumstances and you have to do what

15   an objectively, reasonable officer would do.

16         Q.   What is the training on the continuous

17   aspect of the pursuit?

18              MR. LAMPHERE:  Objection.  Asked and

19   answered; form.

20         A.   A continuous is just that, are you

21   continuing to pursue or has there been a lull in the

22   action or long pause or anything like that that would

23   create a break in that pursuit.

24         Q.   (BY MS. ANDERSON)  When is the training

25   provided as to what an immediate or continuous pursuit



Page 102

1  is?

2          A.  So that's going to be the basic law when

3  they talk about arrest warrants and arrest warrant

4  exceptions.

5          Q.  Is there in the training materials any

6  explanation of immediate or continuous pursuit?

7          A.  In the training materials, no.  They write

8  the -- the thing is with the training materials of the

9  PowerPoints that are provided -- I can tell you I use

10  those when I teach a class and the other instructors do

11  the same thing, a PowerPoint is an outline of what

12  needs to be talked about so you're not writing

13  everything you're talking about on the PowerPoint.

14          So from that standpoint they have a search

15  warrant, arrest warrant labeled on the PowerPoints and

16  what is required in the search warrants.  And they talk

17  about those exceptions when they are discussing the

18  search warrants and arrest warrant.

19          Q.  Who provides the training on hot pursuit?

20          A.  It would be the instructor in charge of

21  arrest search and seizure.

22          Q.  That training is provided in the academy?

23          A.  It is, part of it.  It goes back to

24  in-service training.  It could be provided in

25  in-service training; it could be provided in any other



Page 103

1 classes in the academy.  It can be provided in lineup

2 training; it could be provided in PTO training; it

3 could be provided in peer-to-peer debriefs; even

4 supervisors debrief on certain calls as well.

5          Q.  Is there any other outline covering the

6 requirements of the immediacy and continuous pursuit?

7          A.  None that I can think of.

8          Q.  Are there any specific examples that you

9 can provide to the in-service training that covers the

10 hot pursuit doctrine as it relates to the immediacy and

11 continuous pursuit?

12          A.  None come to mind.  Again, just because

13 it's not written in the lesson plans, doesn't mean it

14 wasn't discussed at any point during any of that

15 training.

16          Q.  How does Colorado Springs know that it's

17 covered in the training?

18          A.  It's upon its instructors to answer any

19 questions that come up related to hot pursuit or if

20 it's part of a specific topic and they need to expound

21 upon different points that they do so accurately.

22          Q.  So Colorado Springs relies on its

23 instructors to know hot pursuit is covered in the

24 training?

25          A.  Instructors, PTOs, supervisors.



Page 104

```
 1          Q.  Do you have personal knowledge that it was
 2    covered?
 3              MR. LAMPHERE:  Objection.  Form; scope.
 4    You can answer.
 5          A.  I do know we have talked about hot pursuit
 6    in the academy.
 7          Q.  (BY MS. ANDERSON)  Do you have personal
 8    knowledge it was covered in in-service training?
 9              MR. LAMPHERE:  Same objections.
10          A.  Yes.  We have talked about hot pursuit in
11    in-service before.
12          Q.  (BY MS. ANDERSON)  When did you talk about
13    hot pursuit in in-service?
14          A.  Again, I can think of specifically when we
15    were discussing critical incidents, discussing exigent
16    circumstances, and other exceptions to the warrant
17    requirements related to safety priorities, risk versus
18    benefit, known versus unknown threats, possibilities
19    versus probabilities, and how those all relate to those
20    exceptions.
21          Q.  Not just hot pursuit being covered, but how
22    does Colorado Springs know that the immediate scene,
23    continuous pursuit of a suspect was covered in its
24    academy training?
25              MR. LAMPHERE:  Objection.  Form; scope;
```



Page 105

1  asked and answered.

2         A.  Same as before.  Same answer as the hot

3  pursuit doctrine, that the officers cover those topics,

4  that they can answer questions for recruits.  When they

5  need to expound upon the hot pursuit exception, they

6  can talk about that with authority.

7         Q.  (BY MS. ANDERSON)  So how do you know that

8  the immediacy and continuous pursuit of a person is

9  asked of an instructor during the academy?

10         MR. LAMPHERE:  Form; scope.  You can

11  answer.

12         A.  Again, I don't know.  I couldn't answer to

13  whether it was or was not asked in specific classes.

14         Q.  (BY MS. ANDERSON)  Did you speak with any

15  of the instructors to determine whether they covered

16  the requirements of immediacy and "continuancy"?

17         MR. LAMPHERE:  Form; asked and answered.

18         A.  So I know in debriefs there are classes

19  that have been taught.  I do know the instructors have

20  brought up those points in the past.

21         Q.  (BY MS. ANDERSON)  So there may be classes

22  where it wasn't taught; correct?

23         MR. LAMPHERE:  Form.  You can answer.

24         A.  Again, I can't speak authoritatively

25  towards that, so I guess it's possible.



Page 106

1          Q.   (BY MS. ANDERSON)   You can't speak

2    authoritatively towards if it wasn't taught, but you

3    can if it was taught?

4          A.   Authoritatively it wasn't covered in every

5    single class.

6          Q.   Did you speak with any of the instructors

7    in preparing for Topic 3 to determine whether they

8    covered the requirements of immediacy and continuous

9    pursuit?

10          MR. LAMPHERE:   Form; asked and answered.

11          A.   For this, no, I did not.

12          Q.   (BY MS. ANDERSON)   Does Colorado Springs

13    teach officers that hot pursuit requires pursuit from a

14    crime scene?

15          A.   It does not.

16          Q.   You mentioned that one of the measures is

17    that the instructors are able to answer questions on

18    the immediacy and continuous pursuit aspect of hot

19    pursuit.   What does Colorado Springs do to determine

20    that the officers understand hot pursuit?

21          MR. LAMPHERE:   Form.   You can answer.

22          A.   That's going to be part of practical

23    training.   It's really hit on during reality-based

24    training scenarios where our recruits are required to

25    go through scenarios that test their knowledge and



Page 108

1          Q.   The scenarios the officers are trained on,

2     if not specific to the one individual topic being hot

3     pursuit, is hot pursuit a part of any of the scenarios

4     that the officers are trained on?

5          A.   Just from the standpoint of the debriefs,

6     they have to know their legal authority related to

7     arrest warrants and search warrants.

8          Q.   What do you mean by the standpoint it's in

9     the debrief?

10          A.   So in a debrief if an instructor asks them

11     if they need an arrest warrant or search warrant in any

12     given scenario, based on the totality of the scenario,

13     they would have to explain yes or no, why or why not,

14     and pushed by the instructor to give the exceptions as

15     well as the rest of the information related to that

16     topic.

17          Q.   But in the reality-based training do they

18     encompass hot pursuit at all?

19          A.   So I guess I'll ask you to clarify.  Are

20     you asking do any of them involve a suspect running

21     into a house and them chasing the suspect?  Is that

22     what you're asking?

23          Q.   I'm asking whether the officers are trained

24     on reality-based scenarios in which hot pursuits exist.

25          A.   Based on the debriefs, yes.  They have to



Page 111

1  understanding the question because the purpose of hot

2  pursuit is to complete an arrest that has already begun

3  when a suspect flees into their residence after the

4  arrest began outside in a public place when they have

5  no expectation of privacy.

6          Q.  (BY MS. ANDERSON)  For example, if a person

7  is seized inside their home prior to this chase, does

8  Colorado Springs teach that the chase can be a hot

9  pursuit?

10          MR. LAMPHERE:  Form; scope.  You can

11  answer.

12          A.  I guess in that instance if the suspect has

13  already been seized would have to attempt to escape.

14  And if they are escaping, then I would say the hot

15  pursuit applies because they are trying to escape

16  custody.

17          Q.  (BY MS. ANDERSON)  Is that covered in

18  Colorado Springs' training?

19          MR. LAMPHERE:  Objection; scope.

20          A.  So again, not to my knowledge.

21          Q.  (BY MS. ANDERSON)  We talked about the

22  training in the academy, but is there any additional

23  training -- ongoing training -- as it relates to hot

24  pursuit?

25          MR. LAMPHERE:  Form; asked and answered.



Page 112

1          A.  I would say yes.  I know I personally

2  covered it in lineup training with my officers and I

3  know other sergeants do the same.  Again, any time a

4  call like that would come up or officers would respond

5  to a call like that, there would be debriefs and they

6  would talk about it peer-to-peer.  Supervisors would

7  cover it with their officers as well.

8          Q.  (BY MS. ANDERSON)  Is whether that is

9  covered in a lineup training determined by the

10  supervisor?

11          MR. LAMPHERE:  Objection; scope.  You can

12  answer.

13          A.  Sometimes I know that when I was running

14  lineups on patrol that, if an officer wanted to talk

15  about a specific topic, we would discuss that topic as

16  well.  There are times officers might bring up topics

17  for training also.

18          Q.  (BY MS. ANDERSON)  So some officers might

19  train on hot pursuit and lineup training, but some

20  officers may not; is that right?

21          A.  That's possible.

22          Q.  When you covered hot pursuit in the lineup

23  training, what specifically did you train?

24          A.  So going back to what we talked about

25  before, one of the main case laws that we talked about



Page 113

1    was US v. Santana and the other case was as it related

2    to threshold arrests and what constituted hot pursuit,

3    where the arrest begins, can an officer chase somebody

4    into their residence if it arrest started outside the

5    residence.  And then again, I cover a lot of the can I,

6    should I, is it too dangerous to do so, should we back

7    off or try a different tactic as well but discuss when

8    hot pursuit does apply.

9          Q.   In preparation for testifying today, did

10   you discuss with any other supervisors what they talk

11   about in their lineup trainings as it relates to hot

12   pursuit?

13               MR. LAMPHERE:  Scope; form.  You can

14   answer.

15          A.   In preparation for this I did not.

16          Q.   (BY MS. ANDERSON)  So sitting here today

17   you don't know what other supervisors discuss with

18   officers as it relates to hot pursuit and lineup

19   training; is that correct?

20               MR. LAMPHERE:  Objection.  Scope; form.

21          A.   No.  I have discussed with other sergeants

22   what they talk about with their recruits in monitoring

23   as well and comparing notes to see if there is anything

24   else I should be discussing as well.

25          Q.   (BY MS. ANDERSON)  What do other officers



Page 115

1          Q.   (BY MS. ANDERSON)   There is no standard

2    lineup training throughout the department; correct?

3          A.   Other than patrol tactical lineup training

4    that deals with tactics and set curriculums, no.

5          Q.   Are there any training materials that

6    define hot pursuit?

7          A.   Other than training on policies and

8    procedures -- and in the policies there are -- they

9    explain what exigent circumstances are and specifically

10   defines the escape of the suspect and gives an example

11   of what hot pursuit is.

12         Q.   The example in Exhibit 1's policy, is that

13   the only definition of hot pursuit?

14         A.   I'm pretty sure it appears in other areas

15   in policy, but I can't think of the ones off the top of

16   my head.  But I have seen it in other areas as well.

17         Q.   Do any of the training and education

18   materials define hot pursuit?

19         A.   In my review of the training materials that

20   I looked at, I did not see that anywhere.

21         Q.   Does Colorado Springs train its officers

22   that they may not create an exigency?

23         A.   Yes.

24         Q.   What is that training?

25         A.   So that goes back to some of the training I



Page 116

1    talked about before, critical incidents.  One of the

2    cases I talk a lot about is Quezada v. Bernalillo where

3    officers stood behind -- they confronted a suicidal

4    woman in a parking lot -- multiple officers -- when she

5    produced a gun and fell back to her position of cover,

6    one officer stayed up by the B pillar and continued to

7    talk to her from that position, had his gun out not

8    pointed at her, stayed up there for several minutes.

9             She pointed her gun at him and he shot and

10   killed her.  It was determined that he created the

11   exigency that led to that shooting.  We talk about that

12   and how important it is to not create exigency or not

13   create an incident where you're trying to justify a

14   higher level of force by putting yourself in a bad

15   position because the Court could deem that you have

16   created this exigency.

17        Q.  Does Colorado Springs provide training to

18   police officers to avoid creating a hot pursuit

19   scenario?

20             MR. LAMPHERE:  Objection; scope.

21        A.  So, again, that goes back to the same

22   training with the critical incidents.  And any time you

23   talk about any kind of tactical incident it goes

24   back -- we have implemented this -- model.  But before

25   we used to teach the tactical question of what do I do



Page 118

1   about that -- I remember talking to recruits and alike,

2   that's a person's castle, you don't know what they have

3   done in there, the booby traps or how many people are

4   inside, what could potentially be the risks in certain

5   situations.  And other situations it might be worth

6   chasing somebody into their own house.  It would be

7   based on the totality of the circumstances.

8          Q.  But other instructors may not have covered

9   that; correct?

10          MR. LAMPHERE:  Objection.  Form and

11   foundation; asked and answered.

12          A.  It's going to depend on the class as to

13   whether that applies or not.  I can think of -- if

14   you're talking about traffic stops, you're not going to

15   talk about hot pursuit in the house -- chasing somebody

16   in their house on foot.

17          Q.  (BY MS. ANDERSON)  If you're talking about

18   the arrest, search and seizure, and the tactical

19   training you referenced, one of the other instructors

20   may not have done the same training as you; correct?

21          MR. LAMPHERE:  Objection.  Form;

22   foundation; scope.  You can answer.

23          A.  They should, actually.  That's a main

24   topic.  Any time you talk about creating your own

25   exigency, that's going to be a big part of that topic.



Page 120

1  train officers to mitigate the creation of an exigency?

2          MR. LAMPHERE:  Scope; form; asked and

3  answered.

4          A.  So we teach our officers not to create

5  their own exigency.  So based on that, I would say,

6  yes, we tell them not to based on that -- that creating

7  their own exigency is a bad thing.

8          Q.  (BY MS. ANDERSON)  Is there training on

9  preventing or mitigating an exigency even if it's not

10  their own creation?

11          MR. LAMPHERE:  Same objections.

12          A.  Officers are taught de-escalation tactics

13  and rules and, ultimately, we go over every -- to

14  resolve it peacefully whenever possible.  So even in a

15  hostage situation, our officers are taught to try to

16  slow things down and not push the threat and create an

17  exigency and try to calm the situation down so it can

18  be negotiated to a peaceful surrender whenever

19  possible.

20          Q.  (BY MS. ANDERSON)  Are officers taught on

21  barricade situations?

22          MR. LAMPHERE:  Objection.  Form; scope.

23          A.  Yes.

24          Q.  (BY MS. ANDERSON)  Is there any training as

25  it relates to the hot pursuit doctrine and barricade



Page 128

1   provide specific information related to protective

2   sweeps?

3           A.   Not that I can remember.

4           Q.   What training materials did you review as

5   it relates to protective sweeps?

6           A.   The same materials for the arrest, searches

7   and seizure PowerPoint, the in-service lesson plans and

8   curricula, and the PowerPoints related to those

9   training topics.

10          Q.   Does the PowerPoint -- does it specifically

11  reference protective sweeps?

12          A.   It does not.

13          Q.   So who's responsible for teaching officers

14  in the academy about protective sweeps?

15          A.   The officer in charge of this class, the

16  arrest, searches and seizures.

17          Q.   If it's not in the written materials, how

18  does the person responsible for teaching arrest,

19  searches and seizures teach on protective sweeps?

20          A.   It's part of the legal authority related to

21  searches and arrest for that matter as well.  So when

22  the officer teaches this class and they cover those

23  topics, it's incumbent on them to cover the entirety of

24  the topic, and that includes protective sweeps.

25          Q.   What is the training on protective sweeps?



Page 129

1          A.   Protective sweeps we teach as it relates to

2    a residence.  The officers, if they make an arrest

3    inside a residence, they have the legal authority to do

4    a protective sweep of all adjoining rooms to ensure

5    their safety, make sure there is nobody or anybody in

6    the adjoining rooms that could harm them or others.  If

7    they have a reasonable articulable reason to believe

8    there is something beyond those adjoining rooms, they

9    can conduct a protective sweep of areas they can

10   articulate there can be a danger to them or others.

11         Q.  Is a protective sweep permissible even if

12   the officers do not believe anybody else is in the

13   home?

14         A.  Can you repeat the first part of it?

15         Q.  Is it permissible under Colorado Springs

16   training even if the officers don't believe anyone else

17   is in the home?

18         A.  For the adjoining rooms it is.  If they

19   made an arrest inside the house, they can -- legally

20   speaking -- do a protective sweep of the adjoining

21   rooms.  If they don't have a reasonable, articulable

22   suspicion there is anything beyond that, then they

23   cannot do a protective sweep beyond that.

24         Q.  So I'm understanding the officers are

25   permitted pursuant to Colorado Springs training to do a



Page 130

1   protective sweep in the adjoining rooms even if they

2   don't have a reasonable or articulable suspicion of

3   anyone being there?

4          A.   Correct.

5          Q.   How are officers tested on protective

6   sweeps?

7          A.   Again, it would be part of their tests in

8   the academy where they are able to be tested on any

9   topic that has been covered throughout the academy up

10  to the point they are being tested.  And then in-

11  service goes back to participation in classroom and/or

12  practical drills and their ability to articulate if

13  they warrant that topic and perform to a satisfactory

14  level.  And, ultimately, what I said earlier when they

15  are in the field their supervisors need to monitor that

16  as well to make sure they are trained and feel

17  confident.

18         Q.   Are there any trainings on protective

19  sweeps outside of the academy?

20         A.   Yes.

21         Q.   What is that training?

22         A.   So currently we do constitutional training.

23  And protective sweeps is one of the main topics in the

24  constitutional training.

25         Q.   How is the constitutional training



Page 133

1          A.   Correct.

2          Q.   (BY MS. ANDERSON)   The next topic that you

3    have been designated to testify on behalf of Colorado

4    Springs is Topic 5, which is the training and education

5    materials pertaining to positional restraint and

6    positional asphyxiation; do you agree?

7          A.   Yes.

8          Q.   You're prepared to testify on behalf of

9    Colorado Springs on this topic?

10         A.   Yes.

11         Q.   What documents did you review that

12   specifically prepared you for this topic in preparation

13   for today?

14         A.   I reviewed a class that I taught in the

15   academy when I was an instructor on excited delirium,

16   which included positional asphyxia, sudden custody

17   death syndrome, and arrest control, a practical lesson

18   plan regarding the same topics.

19         Q.   You mentioned that you reviewed the course

20   that you taught during the academy.   When did you teach

21   it?

22         A.   From 2014 through 2019.

23         Q.   Are you the only person that taught that

24   course in the academy between 2014 and 2019?

25         A.   No.   I had assistant instructors that



Page 134

1   helped with that training as well.

2          Q.  Who were they?

3          A.  There was a lot of them, Eric Oglesby,

4   David Whitlock, Mark Abbotts, Shawn Compton.

5          Q.  Let me pause you.  Was the training that

6   you and the assistants that you had teaching the course

7   uniform?

8          A.  Yes.

9          Q.  At least between 2014 and 2019 you received

10  the same training as it relates in the academy on

11  excited delirium, positional asphyxiation and

12  positional restraint; is that correct?

13         A.  The recruits in the academy received the

14  same training.

15         Q.  Other than the PowerPoint and the lesson

16  plan that you referenced, did you review any other

17  materials in preparation to testify on positional

18  restraint and positional asphyxiation?

19         A.  I did not.

20         Q.  Any videos?

21         A.  The videos that were in there were attached

22  to the class.

23         Q.  I know there are separate roll call videos

24  that you referenced previously in your testimony?

25         A.  The PowerPoint included some videos that



Page 135

1  were part of the classroom portion of that class.

2       Q.  How many videos are part of the classroom

3  portion?

4       A.  Two, maybe three.

5       Q.  What did those videos cover?

6       A.  They showed suspects in various states of

7  excited delirium or as is known cocaine psychosis, and

8  the officers' attempts to take those people into

9  custody.  And some were successful; some were not.

10       Q.  With those videos it sounds like they were

11  related to excited delirium and cocaine psychosis, but

12  what relation does positional restraint have to the

13  materials you review?

14       A.  That class also discusses when you handcuff

15  somebody or put them into specific positions, how that

16  can be detrimental especially in that state.

17       Q.  Are there any training materials that

18  Colorado Springs provides related to positional

19  restraint that are unrelated to excited delirium?

20       A.  That class -- when we talk about it, it is

21  specific to excited delirium but it also applied to

22  people who weren't in excited delirium.  For example,

23  it talks about not hogtying people in there and that

24  related to anybody.  I repeated that.  And that's why

25  it's typically an example.  I remember teaching they



Page 136

1   are not allowed to hogtie anybody.  It related more

2   that class -- while it's specific to excited delirium,

3   it didn't relate to just people in that state.

4        Q.  Did anyone -- are you aware of anyone else

5   teaching any trainings on positional restraint that are

6   unrelated to excited delirium?

7        A.  So I would say when we go back to the

8   previous exhibit from the in-service curriculum where

9   it says the five-person takedown, that class also

10  discussed positional restraint.  But, again, it also

11  talked about positional asphyxia and sudden custody

12  death syndrome.  Those two were taught in conjunction

13  with each other.

14       Q.  You reference specific positions and that

15  could be detrimental.  What training does Colorado

16  Springs provide on proper positional restraint?

17       A.  So that class does the same thing, it

18  teaches how not to press and hold them and the risks

19  therein and teaches recovery position, which are good

20  to get them out of those positional asphyxia positions.

21       Q.  What are officers taught to restrain

22  someone?

23       A.  Again, I should clarify -- do you mean as

24  it relates to these types of takedowns or just in

25  general?



Page 137

1          Q.   Generally speaking, I'm trying to get an

2    understanding on what the proper positional restraint

3    is after a takedown?

4                MR. LAMPHERE:   Scope; form.

5          A.   So the officers are taught in these

6    situations where excited delirium, people in mental

7    crisis, try not to go one-on-one with these people

8    because they could have super-human strength,

9    basically.  Once they have enough people on scene they

10   are to perform a takedown as quickly as possible,

11   ideally get the person on the stomach, apply the

12   handcuffs.  Once they have the scene secure, they roll

13   the person because you don't want them on their chest.

14   You roll the person to their side and hold them there

15   or you move them to a seated position and have somebody

16   that can control their head and make sure their head

17   doesn't dangle forward or backwards.

18         Q.   You said that you don't want people on

19   their chest.  Why is that?

20         A.   So if they are flat on their chest on the

21   ground, it can be difficult to breathe.  And depending

22   if they are, for example, in a state of excited

23   delirium, have a medical emergency, it could be

24   difficult for them to breathe and there can be

25   positional asphyxiation.



Page 138

1        Q.   What is the training on what positional

2   asphyxiation is?

3        A.   The training is that, if they are put in

4   that position, there is weight on -- it can be higher

5   risk if there is weight on their chest than their back.

6   I talked about this earlier today, as they take a

7   breath in, their body is physiologically unable to

8   exhale the air in the lungs and chest cavity.  Every

9   time they take a breath in, the pressure continues to

10  build in their chest which could stop their heart.

11       Q.   Is there training on when a person is in

12  that position without weight on their back?

13       A.   Yeah.  When it is safe to do so, you want

14  to move the person into a recovery position which is

15  rolling them up to their side so they are not on their

16  chest or moving them into a seated position.

17       Q.   What is the training on when it's safe to

18  do so?

19       A.   So that all depends on the totality of the

20  circumstances.  I can't give you a hard-and-fast rule

21  on that.  There is no specific answer because every

22  situation is going to be different based on the suspect

23  all the way down to officer-subject factors is this

24  person significantly stronger; how many officers are on

25  scene; are there other people there actively fighting



Page 143

1  positional asphyxiation?

2          A.   So there is the practical portion of that

3  class I haven't talked about.  I have talked about the

4  classroom, but we do a practical exercise where they do

5  a five-person takedown and put the person in a full

6  body -- and move them into a recovery position.  And

7  then I do know that was covered in in-service in 2019

8  as well.

9          Q.   That practical portion, does it

10  specifically provide training on identifying whether a

11  person is at risk for positional asphyxiation?

12          A.   Yes.  Everybody has to be treated as if

13  they are at risk, which is why we teach people when

14  it's safe and practical to get them to a recovery

15  position.

16          Q.   Other than safer and practical to do so, is

17  there any other training as to what an officer should

18  do to avoid a positional asphyxiation scenario?

19          A.   Yeah.  The classroom and the practical

20  portion we talk about the fact that, if somebody is

21  exhibiting signs of a medical emergency not seen, if

22  they have information even prior to my call, for

23  example, somebody running naked down the street,

24  sweating profusely, showing signs of -- it goes back to

25  their belief as to whether or not there's a medical



Page 144

1   emergency and they believe there is going to be.  And

2   then after the takedown, if they get the person into a

3   recovery position, if they feel medical is needed, they

4   should call medical.

5          Q.  Other than for the individual running down

6   the street or experiencing excited delirium, is there

7   training on the risk of positional asphyxiation to

8   other individuals?

9          A.  Yes.  Like I mentioned before, it's one of

10  the reasons why it's such a big topic in that class

11  because anybody that is put in certain positions could

12  be at risk of positional asphyxia.

13         Q.  People who are at risk of positional

14  asphyxia, do they show signs of it?

15             MR. LAMPHERE:  Objection; form.  You can

16  answer.

17         A.  Other than signs that -- this goes back to

18  what we talked about in CPR, those are the signs you

19  should be looking at, checking to make sure they are

20  breathing and have a pulse and making sure they are

21  still conscious and talking to you, that they are not

22  exhibiting some signs of a medical emergency.

23         Q.  (BY MS. ANDERSON)  Other than the signs

24  you're looking at for CPR that you just listed, any

25  other signs that officers are trained to look out for



Page 146

1  terms identified with SCDS and demonstrate basic

2  techniques in dealing with such problems"?

3         A.  Yes.

4         Q.  What basic techniques does Colorado Springs

5  train officers to use in dealing with such problems?

6         A.  Again, we teach them when they take

7  somebody into custody, if they are on the ground, and

8  there is weight on their chest, roll them off of the

9  chest and in a side-lying position or a seated position

10 to use the basics that they learn in CPR as far as

11 monitoring the person, make sure they are not in some

12 sort of medical emergency.  And if they are, to call

13 medical personnel to the scene.

14        Q.  Other than rolling off the chest, using

15 basic CPR techniques, and calling medical to the scene,

16 is there any other techniques that Colorado Springs

17 teaches officers in dealing with such problems?

18        A.  Going back to CPR, if the person is in

19 that -- if they do start to experience those types of

20 symptoms and become unresponsive, if they lose a pulse,

21 stop breathing, then the treatment is for CPR until

22 medical personnel can arrive on scene.

23        Q.  On Exhibit 19 under the learning goals, the

24 associated syndromes -- one of those is respiratory

25 compromise.  Do you see that?



Page 147

1          A.   Yes.

2          Q.   What is Colorado Springs training its

3     officers as to respiratory compromise?

4          A.   What they are taught in -- do you mean to

5     prevent respiratory compromise or if they recognize

6     that somebody is in respiratory compromise?

7          Q.   Let's go through this as if you were

8     teaching this based on this lesson plan.  What do you

9     teach the officers when it comes to this bullet point

10    of respiratory compromise?

11         A.   To move them when it's safe and practical

12    to do so to avoid any respiratory compromise.  If the

13    person does experience respiratory compromise, make

14    sure medical is en route.  If they stop breathing or

15    lose a pulse, to administer CPR.

16         Q.   How are officers trained to identify

17    respiratory compromise?

18         A.   So they are taught in tactical combat

19    casualty care and CPR to look at the person from head

20    to stomach and to monitor two breaths or for 10 seconds

21    to determine whether or not the person is breathing.

22    The one thing I will say is that can be -- in this

23    class we talk about that can be very challenging to

24    see.

25         Q.   What is the training when it is challenging



Page 148

1    to see?

2              A.   To continue to observe and to try to

3    determine if they are, in fact, breathing.

4              Q.   What are officers trained to do whenever

5    they determine someone is, in fact, not breathing?

6              A.   To administer CPR.

7              Q.   Anything else?  Are they taught to do

8    anything else other than CPR?

9              A.   No.  They are taught to adhere to the CPR

10   training because we are not medical professionals.

11   They are taught to make sure medical is en route to the

12   scene.

13             Q.   This is the academy training -- are there

14   any trainings outside of the academy on this topic?

15             A.   So I do know that, for example, I was on

16   two calls like this as a sergeant in Falcon and we

17   debrief those in lineup.  One was a guy overdosing

18   on -- I don't know what drug it was.  The other one was

19   a drug overdose of a person in a hotel.  We debriefed

20   both of those so I know my officers on my shift got

21   that training.  Also, this was taught in in-service

22   training in 2019 as well.  And I do know that officers

23   debrief these type calls -- there is the same informal

24   training that I talked about, peer-to-peer, PTO, lineup

25   training, sergeant debriefing calls.



Page 149

1          Q.   Do you have any personal knowledge of what
2    the informal training that other officers may have
3    received that you didn't provide?

4          A.   I do not.

5          Q.   So is it possible that other officers did
6    not receive the same informal training?

7               MR. LAMPHERE:   Scope; form; foundation.

8          A.   Yes, it's possible.

9          Q.   (BY MS. ANDERSON)   On the next page of
10   Exhibit 19, it lists most common factors, cocaine
11   psychosis, excited delirium, positional restraint
12   asphyxia, and positional hypoxia.   Are these most
13   common factors related to sudden custody death
14   syndrome?

15         A.   Yes.   To back up, that is under the heading
16   custodial care.   And sudden custody death syndrome
17   discusses -- talks about several causes under that.
18   And that's -- it goes on to the next page.   It talks
19   about cocaine-induced excited delirium and neuroleptic
20   malignant syndrome.   But then underneath that it says
21   most common factors, so that's what it is referring to
22   leading to sudden custody death syndrome.

23         Q.   What is the training on positional hypoxia?

24         A.   It is the condition I have been talking
25   about where the lungs continue to fill up with the air



Page 150

1    and the body is unable physiologically to express the

2    air and it causes a person to stop breathing or their

3    heart to stop.

4            Q.   Is that different than positional restraint

5    asphyxia?

6            A.   I think positional restraint asphyxia can

7    lead to positional hypoxia.

8            Q.   What is positional asphyxia pertaining to

9    Colorado Springs training?

10           A.   When a person is restraining a person in a

11   specific position which prevents them from breathing.

12           Q.   So on this page it also says that, if a

13   suspect is hog-tied, positional asphyxia will be listed

14   as a contributing factor, which opens officers up to

15   lawsuits.  Does Colorado Springs teach officers any

16   other conduct that will lead to positional restraint

17   asphyxia?

18           A.   They are taught it could be a potential

19   contributing factor.

20           Q.   Hog-tying?

21           A.   Did you say -- I should clarify that

22   question.  Did you mean are there any other positions

23   that could cause positional asphyxia or is hog-tying --

24   can you repeat your question?

25           Q.   So Colorado Springs teaches that hog-tying



Page  151

1    a person could contribute to positional asphyxia;

2    correct?

3            A.   Correct.

4            Q.   Does it train its officers that any other

5    restraints that are not hog-tying could contribute to

6    positional asphyxia?

7            A.   Yes.

8            Q.   What is that training?

9            A.   Somebody on their chest or stomach that is

10   having a difficult time breathing, that could

11   contribute to positional asphyxia.  If they are

12   restrained where their arms are pulled back or lifted

13   up and there is significant strength placed on the

14   chest cavity area, which is why hog-tying is a problem.

15   That's what that does.

16           Q.   What does Colorado Springs train officers

17   that hog-tying is?

18           A.   So hog-tying is when you handcuff somebody

19   behind their back, you also shackle their legs together

20   and you connect the handcuffs to the leg shackles so

21   their arms and legs are restrained behind their back.

22           Q.   Does Colorado Springs teach officers that

23   handcuffing a person behind their back and shackling

24   their legs without tying them together could also cause

25   positional asphyxia?



Page 152

1          A.   Just having their hands handcuffed behind

2     their back and legs shackled -- if that's all they have

3     done, they are not trained that would cause positional

4     asphyxia.

5          Q.   Handcuffed and shackled while they are

6     laying on their chest -- is their training that could

7     cause positional asphyxia?

8               MR. LAMPHERE:   Form.   You can answer.

9          A.   Yes, it could potentially cause positional

10    asphyxia, which is, again, why they are taught to move

11    them to a recovery position.

12         Q.   (BY MS. ANDERSON)   The training on moving

13    somebody to a recovery position, is that done in a

14    classroom?

15         A.   Can you repeat that?

16         Q.   Is the training provided as it relates to

17    moving somebody to a recovery position done in a

18    classroom?

19              MR. LAMPHERE:   Scope.   You can answer.

20         A.   Yes, it is.

21         Q.   (BY MS. ANDERSON)   How long is that

22    training?

23         A.   This training is three hours long.

24         Q.   The training on moving somebody to a

25    recovery position, how long is that training?



Page 154

1            MR. LAMPHERE:  Scope.  You can answer.

2            A.  Yes.  It is covered in every single class

3   that I've taught.  Anytime we talk about once they

4   check into custody, once they can practically do so --

5   you can do a recovery position, it's taught in the

6   classroom and demonstrated in the practical exercises.

7            Q.  (BY MS. ANDERSON)  Those are the courses

8   that you taught.  Did you speak with any of the other

9   instructors in preparation for your deposition today?

10           A.  I did not.

11           Q.  So they may not have been covered in other

12  courses that other instructors taught; correct?

13           MR. LAMPHERE:  Form; foundation.

14           A.  The classes taught at the academy -- I was

15  the arrest control lead, so if there is an arrest

16  control topic, I generally was the one who taught it.

17  I'm trying to think of a time I didn't teach one of

18  these classes and I can't think of one.

19           Q.  (BY MS. ANDERSON)  So is it your testimony

20  that when you were teaching in the academy, you taught

21  recovery position in all the classes?

22           A.  In the arrest control portion of the

23  classes I did.  A caveat to that is if it arose in a

24  reality-based training scenario, then an evaluator

25  might have debriefed that topic.  But as far as in the



Page 156

1          MR. LAMPHERE:  Scope; form; asked and

2     answered.

3          A.  So I can tell you that there is a minimum

4     of three hours of classroom dedicated to custodial care

5     and sudden custody death syndrome, which is an hour

6     over the minimum-POST required hours, and that was part

7     of this class.

8          Q.  (BY MS. ANDERSON)  You're gathering that

9     from the written materials; correct?

10         A.  Yes.

11         Q.  This training material also says to stage

12    medical for a fast response and evaluation as part of

13    the rules to remember.  Do you see that on the bottom?

14         A.  Yes.  That is relating to the risk

15    indicators listed above, if they recognize there was

16    symptoms of excited delirium, to remove those rules.

17    And one of them is fast response and evaluation.

18         Q.  When are officers trained to stage medical?

19    Is it only when -- let me back up.

20              When are officers trained to stage medical?

21              MR. LAMPHERE:  Scope.

22         A.  They are trained to stage medical when they

23    believe there's a medical emergency at hand and the

24    scene is not yet safe for them to be on scene.

25         Q.  (BY MS. ANDERSON)  Are those the only



Page 158

```
 1          A.   They are.
 2          Q.   Did you review any additional materials in
 3   preparation for sudden custody death syndrome?
 4          A.   I did not.
 5          Q.   What is sudden custody death syndrome?
 6          A.   When a person is taken into custody for
 7   some reason and as a result experience a medical
 8   emergency and the emergency is severe enough to where
 9   they pass away.
10          Q.   Who is at risk for sudden custody death
11   syndrome?
12          A.   People with underlying medical conditions,
13   people that are high on certain narcotics or medication
14   or elicit.  That's about all I can think of.  A lot of
15   times if they have overexerted and have underlying
16   medical conditions.
17          Q.   So people at risk of sudden custody death
18   syndrome are people with underlying medical conditions,
19   a person who's high on certain drugs or somebody who
20   has overexerted and has underlying medical conditions;
21   is that correct?
22          A.   People that are actively going through some
23   sort of medical crisis.
24          Q.   So what training does Colorado Springs
25   provide to officers to prevent sudden custody death
```



Page 159

1   syndrome?

2          A.  That is taught in the same class as the

3   excited delirium and custodial care in that they are

4   taught to get the person into custody as quickly and

5   safely as possible and move them to a recovery position

6   that's safe and practical to do so.

7          And if they recognize that person is

8   in some sort of medical crisis, to have medical

9   respond.  Also, I should say if the suspect requests

10  medical attention, they are taught to give them medical

11  on scene as well.

12         Q.  So if the officer recognizes it or if the

13  person requests medical, those are the trainings that

14  officers are provided to prevent sudden custody death

15  syndrome; is that correct?

16         MR. LAMPHERE:  Objection; form.

17         A.  As I sit here and think about it -- they

18  are taught to have medical respond as a precaution

19  measure as well.

20         Q.  (BY MS. ANDERSON)  You mentioned earlier

21  when someone is overexerted.  What training does

22  Colorado Springs provide to identify when somebody is

23  overexerted and could die?

24         MR. LAMPHERE:  Scope.  You can answer.

25         A.  Again, towards a lot of the same symptoms



Page 160

1   as excited delirium.  So they become unresponsive, they

2   stop breathing, lose pulse, they go back to their CPR

3   training and make sure they observe the suspect and

4   they don't fall under some sort of medical crisis.

5        Q.  (BY MS. ANDERSON)  Is there any training

6   provided by Colorado Springs where there has been

7   people out of breath and that could lead to sudden

8   custody death syndrome?

9             MR. LAMPHERE:  Scope.

10       A.  So it could be a symptom.  The fact of the

11  matter is if that happens, there is probably some sort

12  of underlying medical issue.  The officers are taught

13  when in doubt, get medical on scene.

14       Q.  (BY MS. ANDERSON)  So what specifically is

15  the training to identify whether someone is

16  overexerted?

17            MR. LAMPHERE:  Scope.

18       A.  Again, it goes back to a lot of the exact

19  same risk indicators as excited delirium.  They start

20  sweating profusely, can't catch their breath, lose

21  energy, become lethargic, those types of symptoms.

22       Q.  (BY MS. ANDERSON)  When a person starts

23  sweating profusely, can't catch their breath and

24  becomes lethargic, what are officers trained to do?

25            MR. LAMPHERE:  Scope.  You can answer.



Page 161

1          A.   Start medical.

2          Q.   (BY MS. ANDERSON)   What medical are they to

3    start?

4          A.   Ask dispatch to start medical to the

5    location, AMR and/or fire department to get EMTs and

6    paramedics on scene.

7          Q.   Is there anything else that officers are

8    trained to do?

9          A.   Refer back to their CPR training and ensure

10   the person -- that they don't require CPR and try to

11   maintain that person until medical professionals arrive

12   on scene.

13         Q.   Are there trainings outside of the academy

14   related to identifying the risks for a person to die

15   suddenly in custody?

16         A.   Just the same elective training that

17   officers go to, the tactical combat casualty care, the

18   debriefs, sergeant training, PTO, those trainings.  The

19   same ones I have mentioned earlier today.

20         Q.   Those informal trainings -- are there any

21   written trainings outside of the academy provided to

22   officers on the risk of sudden custody death syndrome?

23              MR. LAMPHERE:   Form.  You can answer.

24         A.   Not that I'm aware of.  I know there's a

25   tactical combat casualty care -- I'm not sure what



Page 168

1   between 2018 and 2020 identifying the need for medical

2   care.  What did you do to prepare to testify on behalf

3   of Colorado Springs on Topic 7?

4        A.  I reviewed the training PowerPoints and

5   lesson plans on tactical conduct casualty care and CPR,

6   and watched the videos that were presented for CPR

7   training.

8        Q.  What year were the training materials that

9   you reviewed for CPR from?

10        A.  They were the same videos that we have been

11   using from about 2014, 2015, on.  I think those are the

12   same videos that we are still using.

13        Q.  What training does Colorado Springs provide

14   on identifying a need for medical care?

15        A.  The classes that we provide.  They are

16   tactical combat casualty care and CPR.

17        Q.  Are those classes in the academy?

18        A.  Yes, they are.

19        Q.  Is there training provided on identifying

20   the need for medical care outside of the academy?

21        A.  Yes.  All of the informal training that we

22   discussed are part of the -- if I remember correctly --

23   part of the patrol tactical lineup training.  They have

24   been tasked with combat casualty care as well in the

25   past.  And there is always the caveat with the informal



Page 169

1    training of tactical combat casualty care.

2              And I should also mention these topics are

3    brought up in a wide variety of other topics.  For

4    example, before the break we were talking about the

5    custodial care and sudden custody death syndrome.  We

6    touched on the CPR and those classes as well.

7         Q.  What do these classes specifically teach

8    the officers on identifying whether someone needs

9    medical attention?

10        A.  Again, they talk about determining if they

11   believe the person is in some sort of medical crisis

12   and looking for the symptoms of those; have they

13   stopped breathing; have they lost a pulse or are they

14   conscious, responsive; are they asking for medical

15   attention; have they been exposed to any less lethal

16   tools, chemical or Taser; did they suffer any injuries

17   as a result of being taken into custody; and, again,

18   when in doubt call medical.

19        Q.  Other than looking if a person is breathing

20   or has a pulse or been subjected to less lethal tools

21   or is bleeding or lost consciousness, is there anything

22   else that an officer is trained to look for with

23   respect to identifying if someone needs medical care?

24        A.  Ultimately, it's just if they feel the

25   person is in some sort of medical emergency.  I'm sure



Page 170

1  there are a thousand different variables that I could

2  mention that I'm not thinking of off the top of my

3  head, but to use their discretion if there is a medical

4  emergency and respond to the scene.

5          Q.  Is there training specific to when multiple

6  officers need to bring a suspect under control?

7          A.  Can you clarify, as it relates to calling

8  medical to the scene?

9          Q.  To identifying if somebody needs medical

10  care.

11         A.  No more than if a single officer has to

12  take somebody into custody, you still need to monitor

13  them and make sure that they are not in need of medical

14  attention.  If at any point they feel medical attention

15  is needed and warranted, they should call medical.

16         Q.  So what are officers specifically trained

17  to do to identify that somebody needs medical care?

18         A.  A lot of it is going to come down to what

19  they are taught in CPR, look at them, ensure they are

20  still conscious.  If they haven't endured any kind of

21  noticeable injury like a bone sticking out of a leg or

22  something along those lines, if they are conscious, if

23  they are responsive, if not, are they breathing, have a

24  pulse, observing them to make sure that they do have

25  those -- breathing or a pulse.



Page  171

1           Q.   Other  than  the  CPR  course  and  the  TCCC

2    course  that  you  have  mentioned,  is  there  any  other

3    formal  training  that  officers  receive  on  identifying

4    the  need  for  medical  care?

5           A.   Not  that  I  know  of.

6           Q.   How  are  officers  trained  to  identify  signs

7    of  life?

8           A.   To  talk  to  a  person,  observe  them,  are  they

9    responsive.   If  they  are  not  responsive,  the  ABC's  is

10   what  CPR  teaches,  airway  breathing,  circulation,  making

11   sure  they  are  breathing  and  have  a  pulse.

12          Q.   What  are  the  signs  of  life  that  officers

13   are  specifically  trained  to  look  for?

14          A.   Same  things  I  just  talked  about,  are  they

15   responsive,  are  they  breathing,  do  they  have  a  pulse.

16          Q.   Are  officers  trained  to  check  for  a  pulse

17   when  they  are  in  gloves?

18          A.   They  can  be.   If  they  are  wearing  --  this

19   goes  back  to  a  lot  of  arrest  control  training  that  we

20   teach.   If  they  are  wearing  leather  gloves,  they  are

21   probably  not  going  to  be  able  to  feel  much.   If  they

22   are  wearing  surgical  gloves,  they  can  probably  feel  a

23   pulse.   Again,  that  is  to  use  best  practices  to  make

24   sure  whatever  gloves  they  are  wearing,  if  they  are

25   checking  for  a  pulse,  they  would  be  able  to  feel  them



Page 178

1  check for breathing?

2          A.   Can you clarify that?  After they have

3  taken somebody into custody?

4          Q.   After a person is handcuffed, are they

5  trained to check for that person's breathing?

6          A.   It's going to depend on the circumstances.

7  If the person becomes unresponsive, they are going to

8  revert back to the CPR training and TCCC training to

9  check for breathing, check for a pulse, see if a person

10 is responsive or not.

11         Q.   How is a person -- what is the training on

12 checking for breathing?

13         A.   Again, the CPR training teaches to monitor

14 the person, observe them visibly from face to stomach

15 for a period of 10 seconds to make sure they are

16 breathing or not.  And the TCCC training class teaches

17 them to watch the person for two breaths.

18         Q.   Are those trainings provided in the

19 academy?

20         A.   Yes.

21         Q.   And how long is the training with respect

22 to identifying whether someone is breathing?

23         A.   That goes back to what we talked about

24 earlier, depending on the class and if there are

25 questions regarding that particular topic or if the



Page 180

1   pulse, and if needed, administer CPR.

2          Q.   Are there practical trainings provided

3   after the academy as to identifying whether someone is

4   breathing?

5          A.   Only in tactical combat casualty care.

6          Q.   Are officers trained on how to determine

7   whether someone is pretending to need medical care or

8   truly needs medical care?

9               MR. LAMPHERE:   Scope.   You can answer.

10         A.   It's talked about in the academy that that

11   could be a possibility with somebody that is trying to

12   lure an officer into complacency by pretending to get

13   medical attention.   And practically that would be

14   discussed and demonstrated in PTO after the academy for

15   a new officer.

16         Q.   (BY MS. ANDERSON)   What specifically is

17   discussed in the academy with respect to whether

18   someone is pretending to need medical care or truly

19   needs medical care?

20              MR. LAMPHERE:   Scope.   You can answer.

21         A.   Again, to observe the person, check for

22   responsiveness, ask them questions, check for pulse,

23   make sure they are breathing.   There are times where

24   they could utilize a sternum rub to see if a person is

25   truly unconscious or if they are trying to fake it.



Page 181

1  And, again, if they are in doubt, they should call

2  medical and have medical respond to the scene to ensure

3  the person isn't in a medical crisis and does need

4  medical attention.

5       Q.  (BY MS. ANDERSON)  So the training on

6  distinction between whether someone truly needs medical

7  care or pretending to need medical care is the sternum

8  rub, checking for breathing, and seeing if they lost

9  consciousness?

10          MR. LAMPHERE:  Scope.  You can answer.

11      A.  Yes.  Ultimately, if they are in doubt,

12  they should call for medical because we are not medical

13  professionals.  Medical professionals are very trained

14  in providing medical treatment, CPR, and blunt force or

15  penetrating trauma that is covered in TCCC.  And

16  usually that's resigned to get somebody as a stopgap to

17  get them the care they need until a medical

18  professional can give them the treatment they need.

19      Q.  (BY MS. ANDERSON)  So just to be clear, I'm

20  not asking about whether the medical care is being

21  provided, I'm asking about the assessment to determine

22  whether medical care needs to be provided.  So I think

23  we discussed with respect to the CPR training, the

24  tactical training, and those practical scenarios are

25  related to whether somebody needs -- the identification



Page 182

1  if somebody needs medical care; correct?

2       A.  Yes.

3       Q.  The training the officers receive is

4  specifically to check for consciousness, to determine

5  whether somebody is breathing, whether they have a

6  pulse, and if they are responsive; is that correct?

7            MR. LAMPHERE:  Form.

8       A.  Yes.

9       Q.  (BY MS. ANDERSON)  Is there anything else

10  that officers are trained to determine whether a

11  person -- to identify whether a person needs medical

12  care?

13       A.  And, again, I talked about this earlier in

14  the day -- they should be looking for blunt force

15  trauma, penetrating trauma, if somebody is bleeding or

16  a bone sticking out of their leg, if there's an obvious

17  medical emergency, they are obviously trained to look

18  for that as well.  If somebody is complaining about

19  pain or some sort of medical issue, they are to get

20  medical attention started for them as well.

21       Q.  The next topic identifying whether someone

22  is breathing, in what scenario do officers train if

23  somebody is breathing?

24       A.  If a person loses consciousness or becomes

25  unresponsive.



Page 185

1   are officers trained in a scenario where -- to check

2   for someone's breathing where they are in a prone

3   position?

4           A.   No.   There is no formal hands-on training

5   to show them how to check breathing in a prone

6   position.

7           Q.   What about when someone is handcuffed but

8   not necessarily on their stomach?   What are officers to

9   do in order to check for breathing?

10          A.   It goes back to the CPR training to watch

11  the suspect from face to waist and observe for

12  10 seconds to determine if they are -- see if the

13  suspect is breathing or not.

14          Q.   What do officers need to do if they cannot

15  see a chest rise and fall?

16          A.   They need to -- if it's because of -- it

17  depends on the circumstances.   If it's because of

18  clothing, something along those lines -- and move the

19  clothing and observe and see if they can determine if

20  the person is breathing or not -- and if they determine

21  the person is not breathing or gasping for breath, to

22  start CPR.

23          Q.   Are officers trained having a pulse means

24  that someone is breathing?

25          A.   CPR does not teach that.   It says to



Page 187

1        A.   I didn't see this document associated with
2   last year's CPR class.

3        Q.   Was there a different document associated
4   with last year's CPR class?

5        A.   It doesn't mean it doesn't exist, but I
6   didn't see one.

7        Q.   Did the training materials change for CPR
8   last year?

9        A.   No.  It's the same video we've used since
10   2015.

11        Q.   Is there a PowerPoint associated with this
12   course?

13        A.   No.

14        Q.   Is this lesson plan for a CPR course that
15   is provided in the academy?

16        A.   It is.

17        Q.   So is the CPR course that is provided in
18   the academy different?

19        A.   It's the friends and family hands-on CPR
20   class.

21        Q.   How long is the friends and family CPR
22   class?

23        A.   An hour and a half.

24        Q.   How long is the lecture portion of the
25   academy training?



Page 188

```
 1            A.  I would have to look again.  I want to
 2   say -- I can't say.  I'm not sure.  Four hours.
 3            Q.  Is the class portion of the training?
 4            A.  Four hours for the lecture -- I'm not sure
 5   how long the class portion is.
 6            Q.  How is this training tested?
 7            A.  I believe there is a written test and
 8   practical test.
 9            Q.  If you turn to the page Bates labeled 7501,
10   you see the adult CPR portion?
11            A.  Yes.
12            Q.  Subsection B references ventilations.  Do
13   you see that?
14            A.  Yes.
15            Q.  Is it the Colorado Springs training to
16   provide CPR compressions and ventilations?
17            A.  The hands-on for adults is just
18   compressions.
19            Q.  So when did this training change?
20            A.  I know for in-service it changed in 2013,
21   2014, somewhere around there.  I'm not sure with the
22   recruit training.
23            Q.  This has been the material that is provided
24   in the recruit training; correct?
25            A.  I believe so.
```



Page 197

1    in-service training?

2         A.  Yes.

3         Q.  But you're not aware of whether this

4    document is used for the academy or in-service

5    training?

6         A.  I can't remember.

7         Q.  Between 2018 and 2020, were the officers

8    trained to provide any ventilation during your

9    training?

10             MR. LAMPHERE:  Objection; asked and

11   answered.

12        A.  For child and infant they were; for adult,

13   no, just compressions.

14        Q.  (BY MS. ANDERSON)  Just to be clear, for

15   adults who are restrained and not breathing, the only

16   training that officers received with respect to

17   providing medical care is chest compressions; is that

18   accurate?

19             MR. LAMPHERE:  Objection.  Form; asked and

20   answered; misstates prior testimony.

21        A.  Yes.  To open the airway and put their head

22   in a good position to breathe.

23        Q.  (BY MS. ANDERSON)  What is the position

24   that officers are trained to put a restrained

25   individual's -- who is not breathing -- head in?



Page 198

1          A.   Chin up to open the airway.

2          Q.   Is that training provided in the academy?

3          A.   It is.

4          Q.   Is it also part of the in-service training?

5          A.   Yes.

6          Q.   How long is the training on positioning a

7    person's head who is not breathing?

8          A.   Again, that is a situation if there are

9    questions, it's going to take longer.  If the students

10   understand the concept, then we can move on.

11         Q.   How does Colorado Springs test a student's

12   understanding of proper head placement for a restrained

13   person who is not breathing in the academy?

14         A.   So the recruits have to do a practical

15   test.  For in-service they have to verify they have

16   watched the training videos in their entirety and

17   understand everything therein.

18         Q.   There is no practical component to the in-

19   service; is that right?

20         A.   That's correct.

21         Q.   Does Colorado Springs provide training to

22   its officers on specifically -- certain circumstances

23   in which medical care should be stepped up?

24              MR. LAMPHERE:  Objection.  Form; scope.

25         A.   So yes, if they feel that the person that



1      REPORTER'S CERTIFICATE

2

3    I, KAREN S. FOGLE, Registered Professional

4 Reporter and Notary Public, State of Colorado, do

5 hereby certify that previous to the commencement of the

6 examination, the deponent was duly sworn by me to

7 testify to the truth in relation to the matters in

8 controversy between the parties hereto; that the said

9 deposition was taken in machine shorthand by me at the

10 time and place aforesaid and was thereafter reduced to

11 typewritten form; that the foregoing is a true

12 transcript of the questions asked, testimony given, and

13 proceedings had.

14    I further certify that I am not related to,

15 employed by, nor of counsel for any of the parties

16 herein, nor otherwise interested in the outcome of this

17 litigation.

18    IN WITNESS WHEREOF, I have affixed my signature

19 this 9th day of October, 2023.

20    My commission expires January 25, 2025.

21

22  **KAREN S. FOGLE**
   **NOTARY PUBLIC**
   **STATE OF COLORADO**

23  **NOTARY ID 20134002930**
  **MY COMMISSION EXPIRES JANUARY 25, 2025**  Karen S. Fogle, RPR

24

25