IN THE UNITED STATES DISTRICT COURT

                  FOR THE DISTRICT OF COLORADO

_____

Case No: 21-CV-1708-WJM-MDB

_____


ESTATE OF CHAD ALEXANDER BURNETT,


Plaintiff,


v.


CITY OF COLORADO SPRINGS, a municipality;
SERGEANT MICHAEL INAZU, in his individual
capacity; OFFICER JOSEPH DAIGLE, in his
individual capacity; OFFICER MATTHEW FLEMING,
in his individual capacity; and OFFICER
CAROLINE BARTH, in her individual capacity,
Defendants,

_____

                  DEPOSITION OF JOHN KOCH

_____

        PURSUANT TO SUBPOENA, the above-titled
deposition was taken on behalf of the Plaintiff
on Wednesday, September 27, 2023 at 10:00 a.m., before Sandra
Schramm, Certified Shorthand Reporter, Magna Legal Services,
866-624-6221.



Page 19

1      A    Yes.  As I previously answered, Ms. Terrell-Orr is

2  considered a high-level supervisor within the police

3  department.  I spoke with her about policies, what we

4  gathered, things like that.

5      Q    Okay.  What is Ms. Terrell-Orr's title?

6      A    She is the, I believe manager or program manager

7  for research and development related to the police

8  department.

9      Q    Okay.  So what is Colorado Springs's policy with

10  respect to hot pursuit?

11      A    You'll have to ask that a little bit more

12  specifically.

13      Q    Does Colorado Springs have a policy with respect to

14  hot pursuit?

15      A    Well, yes.  When you're talking about making

16  arrests, and assuming you're talking about exigency

17  exceptions to search warrants and things like that, hot

18  pursuit is considered -- it's outlined in the policy when you

19  look as an escaping person, but it addresses hot pursuit or

20  fresh pursuit, and that is that hot pursuit or fresh pursuit

21  is under certain circumstances an exception to the search

22  warrant requirement that's outlined.  It is one for the

23  recognized exceptions and that's our new policy.

24      Q    And so what -- when can a person -- when can an

25  officer engage in hot pursuit within Colorado Springs's



Page 21

1            If you have an arrest warrant and it's in a

2   third-party's home as outlined in policy, then you generally

3   are required to have a search warrant or those exigencies.

4   And so we outlined to the officers in a policy.

5        Q    So if you'll flip to Exhibit 1.

6        A    Okay.

7        Q    Do you recognize this policy?

8        A    Exhibit 1, okay.  This is the physical arrest

9   policy.

10       Q    Okay.  And going to the page that's Bates labeled

11   City Defendants 005159, at the top there you see subsection

12   .25, exigent circumstances?

13       A    Correct.

14       Q    Is this the policy you were referring to that

15   outlines hot pursuit within policy?

16       A    Yes.

17       Q    Okay.  And so it says that entry in hot pursuit

18   where the suspect flees into his or her own home to escape

19   the police or to evade an arrest on the street; you see that?

20       A    Yes, that is what I was referring to.

21       Q    Okay.  Has this policy been updated, to your

22   knowledge?

23       A    As of today or during the period that's outlined in

24   your complaint?

25       Q    Between 2018 and 2020 was this policy updated?



Page 24

1          All department employees have a Power DMS log in

2     and they are required to go in and look at updates to

3     policies.  So when a policy is updated, that policy is

4     published to the employees that are responsible for reviewing

5     it, that it's part of their work function, and then they have

6     a list of policies saying these have been updated, you're

7     required to read them.

8          And depending on the updates, the policy is either

9     required as a full revision, the employee has to read the

10    entire policy.  There are plenty of times that we make minor

11    revisions to policy, so we'll identify those minor revisions

12    in the policy and ensure that the employee reads those as

13    well.  But it's all done in an electronic system that tracks

14    compliance.

15    Q    (By Ms. Anderson) And the policy -- are policies

16    updated when -- with updates with the law?

17    A    Yes.

18    Q    Okay.  You can close that.

19          Is it Colorado Springs's practice that when an

20    arrest is initiated in a public place, that officers may rely

21    upon the hot pursuit doctrine to enter a home without a

22    warrant?

23    A    It can be.  It's dependent on the situation.

24    Q    What is it dependent on?

25    A    Well, there are a number of factors that can



Page 25

1    determine whether or not an officer engages in the hot

2    pursuit of someone.  Whether there are victims that need

3    medical attention, whether there is a higher priority safety

4    threat that exists for them to address at that point in time,

5    what circumstances surround the encounter.

6                    It's very hard to answer generically for all

7    situations, because in law enforcement every call evolves

8    differently and officers generally assess situations based on

9    safety priorities.

10       Q    What types of circumstances that are involved in

11   the call would allow -- would justify a hot pursuit?

12                  MR. LAMPHERE:  Objection, scope.  You can answer.

13                  THE DEPONENT:  Well, the safety priorities that

14   officers engage in would.  And those are that highest mission

15   we have is the protection of citizens of crime victims and

16   making sure the situations are safe.

17                  So the safety of people that are involved in that

18   situation is one of the primary things that dictates how

19   officers choose to act.

20                  But another thing can be is there a weapon

21   involved, is there a serious threat to citizens around there,

22   again, do people need medical attention, is the seriousness

23   of the offense, is this a serious felony weapons crime or is

24   it a misdemeanor shoplifting offense or a City ordinance

25   violation.



Page 27

1    pursuit is immediate?

2          MR. LAMPHERE:  Objection, scope, form.  You can

3    answer.

4          THE DEPONENT:  Well, I think when you look at again

5    the factors that exist for an officer, we would expect

6    officers to base that determination upon when they believe

7    that they have probable cause to arrest someone for an

8    offense.

9          Immediate pursuit and -- is a factor in that, but I

10   believe there are Court decisions that have said that it all

11   relates to what an officer knows at that point in time when

12   they engage in the pursuit of that person.

13      Q    (By Ms. Anderson) Okay.  So is it immediate from

14   the start of the chase or the probable cause determination?

15         MR. LAMPHERE:  Objection, scope, form.  You can

16   answer.

17         THE DEPONENT:  If I'm understanding the question

18   correctly, the pursuit of an individual is based on factors

19   that the officer has at that time, at what point they believe

20   somebody committed an offense and are engaging in an effort

21   to apprehend that person.

22      Q    (By Ms. Anderson) Okay.  So the point that they've

23   engaged in an offense and are attempting to apprehend that

24   person, under Colorado Springs's policy, what constitutes an

25   apprehension of a person?



Page 33

1    officers.

2        A    Yes.

3            MR. LAMPHERE:  Same objections.

4        Q    (By Ms. Anderson) Okay.  Tell me about those.

5        A    So we have the constitutional training committee

6    that was set up several years ago, several -- probably two to

7    three years ago now.  That committee provides department-wide

8    training to all sworn personnel in matters that are related

9    to constitutional rights, constitutional protections, what

10   officers can and can't do, things like hot pursuit, threshold

11   arrest, et cetera.

12       Q    Okay.

13       A    Any other times that you recall having

14   conversations about hot pursuit within the department?

15           MR. LAMPHERE:  Objection, asked and answered.  You

16   can answer.

17           THE DEPONENT:  We've -- for example, as a detective

18   when, I was a detective, we would discuss case law all the

19   time.  We have lineups with police officers all the time

20   where we talk about matters related to this.

21           I know in the past that I've spoken with my lineups

22   about things like hot pursuit, fresh pursuit, other topics.

23   It's pretty common for us to speak about constitutional

24   issues and case law informally in the police department with

25   our personnel.



Page 60

1  customs and practices related to positional restraint and

2  asphyxiation between January 2018 and May 24th, 2020,

3  correct?

4      A    I am, but not to specific instances that are

5  outlined outside of what is in the complaint that you

6  provided us.

7      Q    Okay.  And so in part of the preparation, you

8  didn't speak with other personnel to determine whether there

9  were instances in this time frame related to positional

10  restraint or positional asphyxiation; is that correct?

11          MR. LAMPHERE:  Objection, scope, form.  You can

12  answer.

13          THE DEPONENT:  That is correct, because when I

14  reviewed the complaint and the information that would be

15  discussed, I saw no information requesting specific instances

16  investigated internally by the police department regarding

17  those matters except for those which are outlined, I believe,

18  in bullet 23.

19      Q    (By Ms. Anderson) Next topic is related to sudden

20  custody death syndrome; are you familiar with sudden custody

21  death syndrome?

22      A    Yes.

23      Q    And what did you do to prepare to testify on behalf

24  of Colorado Springs on this topic 14?

25      A    Again I spoke with Ms. Terrell-Orr to ensure that



Page 61

1   we obtained any relevant policies regarding that.  I spoke

2   with the City Attorney's Office in preparation for this

3   hearing, and then I reviewed policies that are relevant to or

4   address the potential for sudden death in custody.

5       Q    Okay.  What information did Ms. Terrell-Orr provide

6   you?

7       A    She provided the policies that -- let me back up.

8            Ms. Terrell-Orr, as the research and

9   development coordinator, is the responsible for the policy

10  function of the police department, overall policy.

11           So as that coordinator, she and I walked

12  through each bullet ensuring that the information that we had

13  provided out of policy was what was requested.  And then out

14  of that information that was provided to the City Attorney's

15  Office and you, I reviewed those policies.

16           But my meetings with Ms. Terrell-Orr were to

17  ensure that the information provided was relevant to the

18  points at hand.

19      Q    And were the policies relevant to the points?

20      A    Yes.

21      Q    Okay.  What relevance did they have?

22      A    Specifically General Order 705.50 pertaining to use

23  of force and medical considerations discussed the potential

24  for death during arrest.

25      Q    Okay.  And were there any other policies that were



Page 79

1              EXAMINATION (Cont'd)

2    BY MS. ANDERSON:

3        Q    Commander, we just went on a lunch break.  Before

4    we went off, we were talking about some of the topics that

5    you've been designated to.

6                   And now I want to move on to topic 17, which

7    is related to Colorado Springs policies, practices, customs

8    and orders with respect to providing medical care.

9                   Which policies did you review specific to --

10   preparing to testify on providing medical care?

11       A    General Order 705.50, which is related to medical

12   considerations.  General Order 500-01, which relates to the

13   use of a Taser and the provision of medical care for that.

14   And I believe it's General Order 773, which is sick or

15   injured prisoners that really -- specific policy deals with

16   post-custody and treatment at a hospital.

17       Q    Okay.

18       A    So in the field, the first two.

19       Q    Okay.  Did you review General Order 1301?

20       A    That's treatment of the public, yes, I did.

21       Q    Okay.  And the SOP, P1-126?

22       A    Is that medical trauma kits?

23       Q    It's field medical clearance.

24       A    Yes.

25       Q    Okay.  And the Taser one and the medical trauma



Page 80

1    kits you referenced.

2              So on behalf of Colorado Springs, what is the

3    policy with respect to providing medical care after a Taser

4    has been deployed?

5        A    So after a Taser has been deployed, the policy is

6    that officers will seek the responsive medical personnel to

7    the location so that medical personnel can assess the person

8    that had a Taser used against them.  And that's also, just

9    for knowledge, applicable to the use of a baton, Oleo Resin

10   Capsicum, OC spray, O-l-e-o, R-e-s-i-n, C-a-p-s-i-c-u-m.  And

11   then the use of batons for special impact, those four areas

12   require a field medical response.

13       Q    Okay.  Is there -- I understand that there are

14   different codes that a medical response can be called; is

15   that correct?

16       A    Yes.

17       Q    Is there a specific code designation that the

18   medical should be called to in response to a Taser?

19       A    No, it's dependent on circumstances, but it could

20   either be an emergent or non-emergent response.

21       Q    Okay.  So just, I don't want to say typical, but a

22   Taser deployment that might not have been effective, would

23   that be a non-emergent medical response call?

24       A    Yes.  That's called a 40A or 40 Alpha, and an

25   emergent call is called a 40D or 40 Delta.



Page 159

```
 1                   CERTIFICATE
 2   STATE OF COLORADO        )
                              )ss.
 3   CITY AND COUNTY OF DENVER)
 4          I, SANDRA SCHRAMM, Registered Professional
     Reporter, Certified Realtime Reporter, and Notary Public for
 5   the State of Colorado, do hereby certify that previous to the
     commencement of the examination, the said JOHN KOCH was duly
 6   sworn by me to testify to the truth in relation to the
     matters in controversy between the said parties.
 7
            I further certify that said deposition was taken in
 8   shorthand by me and was reduced to typewritten form by
     computer-aided transcription, that the foregoing is a true
 9   transcript of the questions asked, testimony given, and
     proceedings had.
10
            I further certify that I am not an attorney, nor
11   counsel, nor in any way connected with any attorney or
     counsel for any of the parties to said action or otherwise
12   interested in its event.
13          IN WITNESS WHEREOF, I have affixed my signature
     this 9th day of October, 2023.
14
15
16                    Sandra Schramm
17                    Sandra Schramm
18                    Sandra Schramm
                      Registered Professional Reporter
19                    Certified Realtime Reporter
                      Notary Public
20
21
22
23
24
25
```

