Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil No. 21-cv-1708-WJM-MDB

_____
DEPOSITION OF                                June 12, 2023
OFFICER MATTHEW FLEMING
_____
ESTATE OF CHAD ALEXANDER BURNETT,

    Plaintiff,

vs.

CITY OF COLORADO SPRINGS, a municipality;
SERGEANT MICHAEL INAZU, in his individual capacity;
OFFICER JOSEPH DAIGLE, in his individual capacity;
OFFICER MATTHEW FLEMING, in his individual capacity;
OFFICER CAROLINE BARTH, in her individual capacity,

    Defendants.

_____

    The deposition of MATTHEW FLEMING, taken before Leeann Stellor, a Registered Merit Reporter, Certified Realtime Reporter, and a Notary Public in and for the County of Summit and the State of Colorado, at 2701 Lawrence Street, Denver, Colorado, on Monday, June 12, 2023, at the hour of 9:03 a.m.



Page 17

1  thing I've done in my police career, and so I just
2  wanted more of that.
3      Q.   Okay.
4      A.   I tested for it a couple times, got
5  picked up the second time, and it's great.
6      Q.   Thanks.  And you mentioned that you
7  became a training officer in 2020?
8      A.   Yes.
9      Q.   What's the difference between being a
10 training officer and what you're doing now?
11     A.   So for a new police recruit, you know,
12 you go through the police academy and you graduate
13 and you're sworn in and you're an officer, but you
14 have what you learned in the academy.
15             So there's on-the-job training.
16 In a lot of departments it's been known as FTO,
17 which is the field training period.  CSPD uses a
18 program called PTO, where you have PTOs or police
19 training officers, and there's a number of phases to
20 recruit graduates to the academy.  They're assigned
21 to a police training officer.
22             And initially they're pretty much
23 just observing that officer go about the work of
24 patrol.  Gradually, as the weeks go by, the
25 responsibilities for their two-person unit are



Page 18

1  handed over to the recruit, with coaching from the
2  PTO. And then the reigns are let out more and more.
3  The recruit becomes more accustomed to the work, and
4  all the while the PTO is evaluating the recruit
5  along a variety of standards and reporting to the
6  PTO sergeant, who reports to the PTO lieutenant.
7             Decisions are made along the way
8  to whether the recruit is ready to move on to the
9  next phase of training, and new PTO, and ultimately
10 whether they're ready to be released to solo patrol,
11 whether they need additional training, whether
12 there's a need for, you know, an extension of a
13 training phase with an emphasis on an area of maybe
14 shortcomings that they have. So it's not only a
15 training, but it's an evaluative role as a PTO.
16     Q.   Okay. And in 2020 when you were the
17 training officer, it was mostly field trainings,
18 right? Is my understanding correct?
19     A.   That's what it is. That's one parlance
20 for it. A field training denotes, you know,
21 on-the-job training, in a police car, handling calls
22 for service with the experienced training officer
23 there. PTO is one particular scheme of how that
24 works, but that's what it is.
25     Q.   Okay. And in your position as training



Page 22

```
 1   additional two hours they wanted instruction given
 2   to recruits on this topic of interacting with
 3   persons with disabilities.  So when I got over there
 4   they said, you know, you've got this class.  It's
 5   not actually built yet.  You're going to have to
 6   deliver it in X number of weeks.  We did go ahead
 7   and find some videos that outline each topic that,
 8   you know, we think would be helpful to use as a
 9   starting point.
10                  So then using those, you know, I
11   pulled key points from those, built a PowerPoint,
12   and then embedded the videos.  And delivering it, it
13   was roughly two hours of instruction using the
14   videos and then, you know, talking points on a
15   PowerPoint.
16      Q.    Okay.  So it sounds like you're pretty
17   familiar with policies and training, given your two
18   roles with Colorado Springs; is that accurate?
19                  MR. LAMPHERE:  Objection to form.
20   Foundation.
21                  You can answer.
22      A.    So I would say, you know, in my role as a
23   PTO and now in my role as an academy instructor,
24   it's definitely required attention to policies.  And
25   I would say it's incumbent on the instructor to know
```



```
                                                    Page 23
 1   the material when you teach it because these are
 2   what these kids are going to go out and operate on.
 3        Q.    And then going back to your time in
 4   patrol, which was between 2018 and 2023; is that
 5   right?
 6        A.    In Colorado Springs.
 7        Q.    In Colorado Springs?
 8        A.    Yes, ma'am.
 9        Q.    Did you ever receive any disciplinary
10   actions during your time that you were on patrol in
11   Colorado Springs?
12        A.    No.
13        Q.    Okay.  So I want to talk about May 24th,
14   2020 and your encounter with Mr. Chad Burnett.
15        A.    Sure.
16        Q.    And I just want to kind of walk through
17   what you recall about that incident.
18              So do you recall how that
19   interaction began?
20        A.    I do.
21        Q.    Okay.  What happened?
22        A.    So I'll -- I'll start telling the story.
23   And if you get to a point where you want me to stop,
24   just let me know.  And I'll just kind of tell it
25   step by step, if that works for you.  That's kind of
```



Page 84

1    A.    It was a short amount of time between
2 establishing probable cause and discussing that and
3 the attempt to place him in custody outside his
4 house.  It was a matter of probably a few minutes, I
5 would say.
6    Q.    Do you recall discussing with Sergeant
7 Inazu that you all had time before arresting
8 Mr. Burnett?
9           MR. LAMPHERE:  Objection.  Form.
10 Foundation.
11    A.    Could you -- had time?  Can you say for
12 what?  Just to narrow that down.
13    Q.    Yeah.  Do you recall having a
14 conversation where Sergeant Inazu was discussing the
15 possibility of needing a warrant, or a hot pursuit,
16 the different angles you could go about arresting
17 Mr. Burnett?
18    A.    I recall earlier in the investigation
19 there was some discussion about, you know, hot
20 pursuit and the length of time that had gone by.  I
21 believe that was before we had established
22 absolutely that there was probable cause for felony
23 menacing.
24    Q.    Okay.  And what's your understanding of
25 hot pursuit?



Page 85

```
 1        A.    So if you have probable cause that
 2   someone has committed a felony, particularly a
 3   violent felony, and you attempt to apprehend that
 4   person while they're in a public place and they give
 5   chase and you pursue them not necessarily
 6   continuously, but contemporaneously from that public
 7   place you encountered them, being within the context
 8   of hot pursuit allows you to make, more or less,
 9   entry into private property, to include private
10   residences.
11        Q.    Okay.  And is that explanation based on
12   your training and experience as a Colorado Springs
13   Police Department officer?
14        A.    Yes.
15        Q.    Okay.  Is there anything else that would
16   be required in order to justify a warrantless entry
17   on a hot pursuit, other than what you've already
18   referenced?
19        A.    Off the top of my head, I would say best
20   practice is to consider the totality of the
21   circumstances.  You need to consider the severity of
22   the crime.  You need to consider, you know, does the
23   danger of chasing that person outweigh or not the
24   danger that person poses to, you know, the public.
25   And it should be an objectively reasonable decision.
```



Page 110

1  started to pull Mr. Burnett's sweatshirt up, I
2  believe to get a better look at his torso itself, to
3  see if that allowed a greater visibility for visible
4  respiration.  And then I think again at some point I
5  said, "He was breathing hard and now I don't see his
6  breathing hard."
7              Continued to check for a pulse.
8  Sergeant Inazu came over and noted that he was
9  blinking his eyes at this point.  And as Sergeant
10 Inazu and Officer Daigle continued to check for a
11 pulse, there came a point where there was no
12 discernible pulse.  And at that point our
13 life-saving efforts began immediately.
14      Q.    Is it -- are you trained that checking
15 for a pulse will determine if somebody's breathing?
16              MR. LAMPHERE:  Objection.  Form.
17 Foundation.
18      A.    My understanding is that pulse and
19 respiration are generally linked.  So if there's the
20 presence of one, there's typically the presence of
21 the other.  And I would say my training is you're
22 looking for both, and a visible look at a torso for
23 respiration is a limited window into that status.  A
24 tangible check for a pulse is another limited window
25 of that status, albeit a greater one because it



Page 111

1  allows for a direct touch.
2              And while a pulse was felt,
3  particularly I think a good, strong pulse was
4  described at least once by, I think it was, Sergeant
5  Inazu, you know, that -- and the blinking of the
6  eyes, that is indicative that this person is alive,
7  these processes are continuing.  And again, at that
8  point we have medical en route, emergent responding.
9      Q.   And I just want to understand.  Does a
10  pulse tell you if somebody's breathing?
11           MR. LAMPHERE:  Objection.  Form.
12  Foundation.
13      A.   I would say -- I'll try and answer this
14  as best as possible.
15              A pulse is indicative of the heart
16  beating.  That's what you're feeling, is the
17  pressure from that.  If there is a pulse, that
18  person has vital processes that are continuing.  If
19  there are vital processes continuing coincident with
20  that, in my understanding, is that there is also
21  respiration.  That respiration may or may not be
22  visible to someone watching someone's torso while
23  you're wearing a sweatshirt.
24      Q.   Okay.  So is it your testimony that a
25  pulse is indicative of breathing?



Page 113

1  pulse is not exactly -- is not checking for exactly
2  the same and strictly limited to checking to see if
3  the lungs are drawing breath or not; semi colon, the
4  presence of a pulse implies, in my training and
5  experience, the presence of breathing because both
6  are vital processes.  And in the absence of one
7  vital process, I don't believe the other vital
8  process continues for very long.
9              So with the presence of a pulse,
10 along with the blinking, at that point we continue
11 to monitor and ensure that medical is en route,
12 code 3.
13      Q.   And if the process of one doesn't last
14 very long without the other, is it fair to say that
15 if Mr. Burnett was not breathing, then he would lose
16 pulse?
17              MR. LAMPHERE:  Objection.  Form.
18 Foundation.
19              You can answer.
20      A.   I -- I don't know.
21      Q.   Okay.  But it's your training and
22 experience that having a pulse is breathing, right?
23              MR. LAMPHERE:  Same objections.
24      A.   That's -- that's not what I said.  Those
25 are -- those are two different things.



Page 117

1  Foundation.
2              You can answer.
3      A.   Yes.
4      Q.   Okay.  What's your training on providing
5  care for people who are not breathing?
6      A.   So we receive the -- the CPR and first
7  aid AED training in the academy, and I believe
8  there's a refresher periodically.  I don't remember
9  what the span of time is.  I believe it might be
10 every two years.
11     Q.   So you mentioned three trainings.  What's
12 your training when it comes to CPR?
13     A.   So I've learned pretty much what
14 everyone's gone to now, compression-only CPR, which
15 is to provide chest compressions, once there is no
16 breathing and no pulse, until emergency medical help
17 arrives.
18     Q.   So my question is whenever there's -- is
19 specific to providing care to people who are not
20 breathing.  Is that -- is it that you would provide
21 CPR?
22          MR. LAMPHERE:  Objection.  Form.
23 Foundation.
24     A.   I believe CPR is contingent on pulse and
25 breathing not being present.  So I would say it's



```
                                                       Page 120
 1   with his hands handcuffed behind his back, I would
 2   say yes.
 3        Q.    Okay.  Did having his hands handcuffed
 4   behind his back mean that you could not fully move
 5   him into the recovery position that you're trained
 6   to put him in?
 7             MR. LAMPHERE:  Objection.  Form.
 8   Foundation.
 9        A.    I think the -- you know, the recovery
10   position involves someone being on their side, which
11   he was.  It involves their -- it's either one or
12   both of their legs being bent up, which ultimately
13   they were.  And then I think typically what you're
14   shown is someone lying with, if I'm remembering
15   correctly, one of their arms bent and up with their
16   head resting on their arm.  This, of course, was not
17   possible with him handcuffed behind his back.
18                  So as far as we could, being
19   handcuffed, he was placed in that position.  But
20   yes, the textbook recovery position does not include
21   someone being in a handcuffed position.
22        Q.    And then you also mentioned that you --
23   one of the things you do is ensuring no positional
24   asphyxiation.  What is your training on positional
25   asphyxiation?
```



Page 121

1         MR. LAMPHERE:  Objection.  Form.
2   Foundation.
3              You can answer.
4       A.    So my understanding is once someone is
5   handcuffed behind their back and they're laying
6   prone, if they stay in that position for a long
7   period of time there is a risk of them having
8   difficulty breathing and becoming, potentially
9   becoming unable to breathe.  So it's important to
10  minimize, you know, applying weight or significant
11  pressure on someone's back when they're prone and to
12  move them more into a position on their side when
13  possible.
14                 Furthermore, my understanding is
15  the risk is more increased the more overweight
16  somebody else.
17      Q.    You mentioned a prolonged amount of time.
18  What is a prolonged amount of time for somebody to
19  be handcuffed in a prone position?
20      A.    I think that's all relative and that's
21  just going to come down to not leaving them in a
22  prone position any longer than you need to to get
23  them under control, keep them under control.
24      Q.    Do you have any training based on when --
25  based on how long a person might -- who's in a prone



Page 125

1  a then if those things are present -- or, I'm sorry,
2  if -- if those vital signs are not present, it's
3  potentially a medical emergency.  In some cases
4  where is those are not present, that may be a result
5  of positional asphyxia.
6              However, if you have avoided the
7  triggers for positional asphyxia and taken steps to
8  minimize that risk, then it is likely that medical
9  emergency, if there is one, is not related to
10 positional asphyxia.
11      Q.    Okay.
12              MR. LAMPHERE:  Is this a good time
13 for a break?
14              MS. ANDERSON:  Just a few more
15 questions, and then we can take a break pretty
16 quickly.
17              MR. LAMPHERE:  Thanks.
18      Q.    So once you have determined that somebody
19 might be suffering from positional asphyxia, what
20 are you trained to do?
21      A.    I think the big thing is to alleviate
22 that position that's creating that.  And, you know,
23 harkening back to what is positional asphyxia, it is
24 a position that renders breathing difficult.  So if
25 you get rid of the position, then likely you get rid



Page 126

1   of the cause for asphyxia and you allow easier
2   breathing.
3        Q.    Okay.  And if somebody stops breathing,
4   what do you do?
5              MR. LAMPHERE:  Objection.  Form.
6   Foundation.
7        A.    So if someone stops breathing, that is
8   indicative of a potential medical emergency.  And so
9   you make sure you call medical and have them respond
10  emergent at that point, continue to monitor for
11  vital signs.
12       Q.    Is that all you do?  Do you do anything
13  else?
14       A.    So if you -- my understanding is if you
15  monitor for vital signs and you don't have a pulse,
16  then you should perform CPR to artificially create
17  that pulse and circulate the blood until emergency
18  medical help arrives.
19       Q.    But in situations where a person is not
20  breathing, do you just continue to monitor vitals
21  and wait for medical to come?
22             MR. LAMPHERE:  Objection.  Form.
23  Foundation.
24       A.    I think you're -- you're still trying to
25  get a full picture of what's going on.  And I think



Page 128

1  Or, I mean, help me out and get me --
2        Q.   I'm just trying to understand what your
3  training is on whenever somebody's not breathing,
4  what you're trained to do?
5             MR. LAMPHERE:  Form.  Foundation.
6        A.   So my -- my understanding is that if
7  there is any signs someone's having a medical
8  emergency, you get medical en route to help them.
9  They have the training to appropriately deal with
10 these things.
11                 If you have an absence of vital
12 signs, being pulse and respiration taken as a whole,
13 then it is appropriate to begin CPR because CPR
14 compresses the chest, which forces the blood to
15 continue to circulate oxygen via the blood stream
16 until emergency help arrives.
17                 So back to your question, is if I
18 just encountered you on a Denver afternoon not
19 breathing, I'm obviously looking for context of why
20 are you not breathing?  Were you at lunch and you've
21 got a sandwich lodged in your throat?  Are you not
22 breathing because you are dead and you don't have a
23 pulse?  And that would inform my response.
24                 As I indicated, if it was the
25 latter, if you had not obviously been dining or had



Page 146

1  parameters of that.
2       Q.    Okay.  And in being trained on hot
3  pursuit, was it based on a PowerPoint, or what did
4  the training look like?
5             MR. LAMPHERE:  Form.  Foundation.
6       A.    I don't recall specifically.  Yeah, I
7  couldn't tell you for sure.
8       Q.    In your position as a trainer, sitting
9  here today, what do you -- do you provide the
10 training on when people can enter a home to
11 effectuate an arrest?
12      A.    So I don't teach that class, so no.
13      Q.    Okay.  And did you say that you were part
14 of the 68th or the 67th?
15      A.    67th.
16      Q.    Okay.  I'm going to hand the court
17 reporter a document and ask her to mark it as
18 Exhibit 8.
19            (Exhibit No. 8 was marked.)
20      Q.    Do you recognize this document?
21      A.    It appears to be a slide about Sudden
22 Custody Death Syndrome.
23      Q.    Are you trained on Sudden Custody Death
24 Syndrome?
25      A.    Yes.



Page 147

1    Q.    What is your training on Sudden Custody
2  Death Syndrome?
3    A.    So there are instances in which -- that
4  have been documented where someone experienced a
5  medical emergency leading to death shortly after
6  being placed in police custody.  And this is my
7  understanding typically related to a short list of
8  causes.
9              I know they taught about it,
10  excited delirium.  They used to teach cocaine
11  psychosis, but I think cocaine has kind of gone away
12  so they don't harp on that as much.
13    Q.    Did you say cocaine's gone away?  I'm
14  sorry, I didn't hear you.
15    A.    Relative to years gone by, yeah.  It's
16  all relative.
17              But back to the point, is excited
18  delirium where someone is in an extremely excited
19  state, very commonly characterized by being naked or
20  removing their clothes while you're in contact with
21  them, having super human strength, being high on PCP
22  or something of that nature.  There are situations
23  where someone may suddenly die while in police
24  custody.
25    Q.    Okay.  And if you'll turn to CITY



```
                                                         Page 154
 1   of any other training that you've been provided on
 2   Sudden Custody Death Syndrome?
 3              MR. LAMPHERE:  Form.  Foundation.
 4       A.   I believe it was covered in my first
 5   police academy from 2006 to 2007.  I don't recall
 6   the specifics of that beyond kind of the foundation
 7   that I laid out, which is this occurs sometimes.
 8   And I believe positional asphyxia was mentioned in
 9   that training as well.
10       Q.   Okay.
11              MS. ANDERSON:  So we can go off the
12   record for a short break while I get the videos set
13   up.
14              THE WITNESS:  Sure.
15              MS. ANDERSON:  And then I just need
16   to confer really quickly.
17                  (Break from 1:06 p.m. to
18                   1:14 p.m.)
19   BY MS. ANDERSON:
20       Q.   Okay.  Officer Fleming, we are back from
21   a break, and we're going to go over some sections of
22   your body camera.
23       A.   Sure.
24       Q.   I'm going to introduce Exhibit 9, which
25   is Bates labeled 000133 at Flemming BWC footage.
```



Page 243

```
 1                REPORTER'S CERTIFICATE
 2             I, LEEANN L. STELLOR, Registered Merit
 3   Reporter and Certified Realtime Reporter within
 4   Colorado, ID 200401669, appointed to take the
 5   deposition of OFFICER MATTHEW FLEMING, do hereby
 6   certify that before the deposition he was duly sworn by
 7   me to testify to the truth; that the deposition was
 8   taken by me then reduced to typewritten form herein;
 9   that the foregoing is a true transcript of the
10   questions asked, testimony given and proceedings had.
11
12             I further certify that I am not related to
13   any party herein or their Counsel, and have no interest
14   in the result of this litigation.
15
16             In witness hereof I have hereunto set my
17   hand this 22nd day of June, 2023.
18
19                           _____
                              Leeann L. Stellor
20                            Registered Merit Reporter
                              Certified Realtime Reporter
21                            and Notary Public
22
23   My commission expires June 8, 2024
24
25
```

