Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil No. 21-cv-1708-WJM-MDB
_____

DEPOSITION OF                              June 28, 2023
OFFICER CAROLINE BARTH (ROMINE)
_____

ESTATE OF CHAD ALEXANDER BURNETT,

      Plaintiff,

vs.

CITY OF COLORADO SPRINGS, a municipality;
SERGEANT MICHAEL INAZU, in his individual capacity;
OFFICER JOSEPH DAIGLE, in his individual capacity;
OFFICER MATTHEW FLEMING, in his individual capacity;
OFFICER CAROLINE BARTH, in her individual capacity,

      Defendants.

_____

      The deposition of CAROLINE BARTH (ROMINE), taken before Leeann Stellor, a Registered Merit Reporter, Certified Realtime Reporter, and a Notary Public in and for the County of Summit and the State of Colorado, at 2701 Lawrence Street, Denver, Colorado, on Wednesday, June 28, 2023, at the hour of 9:09 a.m.



```
                                                          Page 10
 1       Q.    So you said in the interview you had said
 2   you used an X26 taser?
 3       A.    Correct.
 4       Q.    But you since learned that it was a
 5   different model?
 6       A.    Correct.
 7       Q.    How did you come to that realization?
 8       A.    I don't recall.  It was shortly after the
 9   interview that I realized, when looking at my
10   equipment, that I actually had the X2 taser.  The
11   model was the X2 and not the X26.
12       Q.    Do you have -- well, at the time did you
13   use both models?
14       A.    I don't recall which model I was trained
15   on, but I do recall discussing the X26 model during
16   training when I was going through the police
17   academy.  I don't recall if I was then reissued --
18   or if I was issued the X26 initially and then that
19   was swapped out with the X2 taser during the time
20   that I had been out of the academy and we had since
21   gotten the X2.
22       Q.    As far as you know, are there any
23   significant differences between those two models?
24       A.    No significant differences that I can
25   think of off the top of my head.
```



MAGNA LEGAL SERVICES

```
                                                     Page 20
 1        Q.   Okay.  And we've talked about the
 2   interview you gave to the El Paso County Sheriff's
 3   Office.  Did you give any other interviews or
 4   statements about the encounter with Mr. Burnett on
 5   May 24th, 2020?
 6        A.   No.
 7        Q.   Did you ever prepare any written
 8   statements or reports about it?
 9        A.   No.
10        Q.   I want to switch gears a little bit and
11   just go over your professional background.
12                  How long have you been in law
13   enforcement?
14        A.   I have been in law enforcement since July
15   of 2015.
16        Q.   Did you start at the Colorado Springs
17   Police Department?
18        A.   Yes.
19        Q.   Where did you receive your initial POST
20   certification training?
21        A.   I received my initial POST certification
22   at the Colorado Springs Police Department Training
23   Academy in 2018.
24        Q.   So you were not POST certified between
25   2015 and 2018?
```



Page 24

1  assigned to the Stetson Hills patrol division.
2  That's where I completed another, approximately,
3  four months of on-the-job training.  As soon as I
4  finished that I went down to the Sand Creek
5  division, and I worked in Sand Creek for one year.
6  And then after working in Sand Creek for one year, I
7  went to the Gold Hill division, and I've been in
8  Gold Hill since 2020.
9       Q.   The incident with Mr. Burnett, that's the
10 subject of this case, occurred in the Gold Hill
11 division, right?
12      A.   Yes.
13      Q.   How long had you been with the Gold Hill
14 division when the incident with Mr. Burnett
15 occurred?
16      A.   Since day one, period one of the 2020
17 year.  And so I can't say January because I don't
18 recall if the year, our calendar year for our patrol
19 schedule started at the end of December or if it was
20 at the beginning of January.  But since day one,
21 period one of 2020 all through up until the
22 incident.  So approximately five months and
23 three-quarters.
24      Q.   I see.  And you mentioned you were
25 assigned to the training academy or worked with the



Page 25

```
 1   training academy; is that right?
 2        A.    I was not assigned.  I've never been
 3   assigned to the training academy, but I have gone
 4   over there to assist.
 5        Q.    And you said you assisted with physical
 6   fitness testing?
 7        A.    I assisted with physical fitness testing
 8   and also some of the role playing, scenario-based
 9   training that the recruits currently in the academy
10   go through.
11        Q.    Can you describe what that role playing
12   training is about?
13        A.    One of the parts or pieces of the
14   training in the CSPD training academy is
15   scenario-based training.  There's several days
16   throughout the, approximately, six-month academy
17   where these days occur, where officers actually come
18   in.
19                    And they've got their duty belt on
20   and their vests and a police shirt without any
21   markings or anything, and they respond with another
22   recruit to mock calls for service, to get experience
23   working through the things that they've recently
24   learned in the training academy and get experience
25   using the radio, get experience driving the police
```



Page 26

1  cars in controlled settings, conducting interviews,
2  that sort of thing.
3       Q.    And what you did was act as one of the
4  people calling for service or --
5       A.    I --
6       Q.    -- involved with the -- with the
7  scenarios?
8       A.    I've done both.  I've done the actual
9  role playing, as acting as somebody in either
10 distress or having a question, or acting, role
11 playing as a citizen that needed something from the
12 officers.
13                 I've also done the evaluating side
14 of watching the recruits handle call for service,
15 staying back and watching them problem solve and
16 work through, and then debriefing their responses
17 afterwards.
18      Q.    Uh-huh.  Other than the physical therapy
19 fitness testing and this role play training, did you
20 do any other work at the training academy?
21      A.    Recently, since I went to a light duty
22 position, I believe I taught in-service for this
23 2023 year.  I taught two classes, I believe, and
24 they were four-hour blocks.  So that's on -- that's
25 with the training academy, but it's not -- it's the



Page 50

1  arrest warrant, based on if it's the individual with
2  the arrest warrant, whether it's their residence or
3  a third person's.  So there's, I guess, a couple
4  different dynamics that could be at play for
5  exigency.
6      Q.    And were you trained on exigency?
7            MR. LAMPHERE:  Objection.
8  Foundation.
9            You can answer.
10     A.    Yes.
11     Q.    Can you describe that training?
12     A.    The training specifically, no.
13     Q.    What do you recall learning about
14  exigency?
15     A.    There are certain situations where there
16  are exceptions to the search warrant requirement,
17  including protection or immediate protection of
18  life, or some sort of destruction of evidence that
19  you're trying to prevent, or a hot pursuit
20  situation.
21     Q.    And based on your training, did you
22  believe any of those applied to the entry into
23  Mr. Burnett's house?
24     A.    Yes, I believe the hot pursuit exception
25  to the search warrant requirement would apply.



```
                                                          Page 112
 1                    (Break from 12:16 p.m. to
 2                     12:25 p.m.)
 3   BY MR. BOHNET-GOMEZ:
 4       Q.   Officer, we just took a break.  Before
 5   the break, I had asked you about Sudden Custody
 6   Death Syndrome.  Do you recall that?
 7       A.   Yes.  It's not a term that I have -- I'm
 8   familiar with, unless it's a substitute term with
 9   another medical condition or something.
10       Q.   So let me have you turn to Exhibit 8 in
11   the binder that you have in front of you.
12                    So this is a PowerPoint that has
13   been previously marked as Exhibit 8 in another
14   deposition.  And you've never seen this PowerPoint,
15   I take it?
16       A.   Not --
17                MR. LAMPHERE:  Form.  Foundation.
18                You can answer.  Sorry, you can
19   answer.
20                THE WITNESS:  No, you're fine.
21       A.   I don't know that I recall every
22   PowerPoint I've seen in the last five years of my
23   career.  I recognize the term "excited delirium,"
24   so.
25       Q.   Okay.  So you were -- have you been
```



Page 113

```
 1   trained on excited delirium?
 2       A.    Yes.
 3       Q.    What is excited delirium?
 4       A.    This is by no means a medical definition.
 5   But my understanding of things you'd be looking for
 6   are when people are experiencing some sort of
 7   significant strength, outburst, like super human
 8   strength almost.  They might be sweating profusely.
 9   A lot of times one of the things we were taught to
10   look for is people, like, stripping off their
11   clothes because they're sweating, their body is kind
12   of overheating.
13                  And they might not be making a
14   whole lot of sense as they're talking, so they may
15   not -- like, if you try to communicate with them and
16   say something, they're not just going to respond,
17   you know, with an appropriate yes or a no or
18   something like that.
19       Q.    Were you trained about any risks
20   associated with excited delirium?
21             MR. LAMPHERE:  Foundation.
22                  You can answer.
23       A.    I don't recall specifically the risks we
24   were taught about, if we were.  It's just not
25   something that I can recall at this time.
```



```
                                                          Page 135
 1               REPORTER'S CERTIFICATE
 2          I, LEEANN L. STELLOR, Registered Merit
 3   Reporter and Certified Realtime Reporter within
 4   Colorado, ID 200401669, appointed to take the
 5   deposition of OFFICER CAROLINE BARTH (ROMINE), do
 6   hereby certify that before the deposition she was duly
 7   sworn by me to testify to the truth; that the
 8   deposition was taken by me then reduced to typewritten
 9   form herein; that the foregoing is a true transcript of
10   the questions asked, testimony given and proceedings
11   had.
12
13          I further certify that I am not related to
14   any party herein or their Counsel, and have no interest
15   in the result of this litigation.
16
17          In witness hereof I have hereunto set my
18   hand this 11th day of July, 2023.
19
20                    _____
                      Leeann L. Stellor
21                    Registered Merit Reporter
                      Certified Realtime Reporter
22                    and Notary Public
23
24   My commission expires June 8, 2024
25
```

