**EXHIIT P**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil No. 21-cv-1708-WJM-MDB

_____

DEPOSITION OF                                May 10, 2023
OFFICER JOSEPH DAIGLE

_____

ESTATE OF CHAD ALEXANDER BURNETT,

        Plaintiff,

vs.

CITY OF COLORADO SPRINGS, a municipality;
SERGEANT MICHAEL INAZU, in his individual capacity;
OFFICER JOSEPH DAIGLE, in his individual capacity;
OFFICER MATTHEW FLEMING, in his individual capacity;
OFFICER CAROLINE BARTH, in her individual capacity,

        Defendants.

_____

      The deposition of OFFICER JOSEPH DAIGLE, taken before Leeann Stellor, a Registered Merit Reporter, Certified Realtime Reporter, and a Notary Public in and for the County of Summit and the State of Colorado, at 2701 Lawrence Street, Denver, Colorado, on Wednesday, May 10, 2023, at the hour of 9:57 a.m.



Page 10

```
 1      A.    Yes.
 2      Q.    What was your understanding of the
 3   factual allegations against you?
 4      A.    When you say the factual allegations, do
 5   you want the details of the event, or?
 6      Q.    So what's your understanding of what --
 7   why you're being sued?
 8      A.    Oh.
 9            MR. LAMPHERE:  Objection.  Sorry.
10   Objection.  Form.  Foundation.
11                  You may answer.
12            THE WITNESS:  You said I can answer?
13            MR. LAMPHERE:  You can.
14            THE WITNESS:  Okay.
15      A.    My understanding is because Mr. Burnett
16   had passed away.
17      Q.    And are you under the -- or is it your
18   understanding that you're being sued because you
19   played a role in his passing away?
20      A.    Yes.
21      Q.    So let's talk about your professional
22   background.
23                  How long have you been in law
24   enforcement?
25      A.    I started in law enforcement in 2015.
```



Page 12

1  essentially a write-up.  It was, like, one below.
2       Q.    So it was, like, a verbal reprimand?
3       A.    Yeah, it was a verbal.
4       Q.    What was that for?
5       A.    We were going after a suspect who was
6  wanted for motor vehicle theft and a lot of other
7  felony charges, and I had initiated a pursuit and
8  then stopped the pursuit.  And that was a verbal
9  because it broke policy.
10      Q.    Okay.  What was the break in policy?
11      A.    That I initiated the pursuit on a suspect
12 who was wanted for motor vehicle theft.
13      Q.    Okay.  Was there any use of force in that
14 incident?
15      A.    No.
16      Q.    Other than the verbal incident where you
17 initiated that pursuant in Commerce City, did you
18 ever receive any other discipline?
19      A.    No.
20      Q.    Okay.  And you were trained to be an
21 officer with Commerce City, correct?
22      A.    Correct.
23      Q.    How long was that training?
24      A.    So I went through Pikes Peak Community
25 College, and it ran from January of 2015 to August



Page 13

```
 1   of 2015.
 2        Q.    Okay.  And when did you become an officer
 3   at Colorado Springs?
 4        A.    July -- July 2017.
 5        Q.    And did you have to go through training
 6   again to be an officer for Colorado Springs?
 7        A.    I did, yes.
 8        Q.    How long was that training?
 9        A.    It was about 26 weeks.  It went from July
10   to January.
11        Q.    Okay.  And was that through a different
12   academy?
13        A.    It was.  It was through Colorado Springs
14   Academy.
15        Q.    So let's talk about your career while at
16   Colorado Springs Police Department.
17                    You started as an officer,
18   correct?
19        A.    Correct.
20        Q.    Are you still an officer?
21        A.    Right now I work for the State.  I work
22   for the State Police as an investigator.
23        Q.    Okay.  So you no longer work for Colorado
24   Springs Police Department?
25        A.    I don't.
```



```
                                                       Page 86
 1        Q.    Do you only go through the training in
 2   the academy for CPR?
 3        A.    In CSPD it was every -- I believe it was
 4   every two years, was when you got recertified.
 5        Q.    For CPR training?
 6        A.    For CPR.
 7        Q.    How long had it been since your last CPR
 8   training when you encountered Mr. Burnett on
 9   May 24th, 2020?
10        A.    I don't remember.
11        Q.    Okay.  You went through the academy in
12   2017, right?
13        A.    Yes.
14        Q.    Had you received additional training
15   since the academy before 2020?
16        A.    We had got CPR certified in the academy.
17        Q.    Okay.
18        A.    And I don't -- I don't remember if we got
19   certified after the academy.  I can't recall.
20        Q.    Sitting here today, when was the last
21   time you were recertified for CPR?
22        A.    It was about -- about a month ago.
23        Q.    So pretty recently?
24        A.    Yes.
25        Q.    And you don't recall the training you
```



Page 89

1  if you're holding your head up, you still have --
2  you're still breathing and have a pulse?
3             MR. LAMPHERE:  Objection.  Form.
4  Foundation.
5             You can answer.
6       A.    Yes.
7       Q.    Okay.  And were you trained on Colorado
8  Springs Police Department policies?
9       A.    We were.
10      Q.    And what is your understanding of your
11 training on making -- what is your training on
12 making arrests within the home?
13      A.    Do you have a copy of the policy?
14      Q.    Yeah, I do.  Just before I give you the
15 policy, we'll go over it in greater depth, but I
16 want to talk about what you recall about the
17 specific trainings and policies.
18      A.    Okay.
19      Q.    So what is it that you -- what is your
20 training on making arrests within a person's home?
21      A.    If you have probable cause to make the
22 arrest and you're inside that person's home, you can
23 make the arrest.
24      Q.    Okay.  Does it matter -- what's your
25 training on how you get inside that person's home to



Page 90

```
 1   make the arrest?
 2       A.    There's a couple things.  If you were --
 3   if you have consent to go in the home, you can make
 4   the arrest.  If you have hot pursuit, which like we
 5   had talked about earlier, if it's a crime that
 6   happens in a public place, it's a felony.  And
 7   you're pursuing that person and they go inside their
 8   home and you're in immediate pursuit, you can go in
 9   there and make the arrest.
10       Q.    So consent, hot pursuit.  Any other times
11   you can enter a home to make an arrest?
12       A.    I think warrant's on there as well.
13       Q.    So warrant, consent, and hot pursuit.
14   Are those the only times you can enter a home to
15   make an arrest?
16             MR. LAMPHERE:  Objection.  Form.
17   Foundation.
18                  You can answer.
19       A.    Without reviewing the policy, that's my
20   recollection of the policy, yes.
21       Q.    Okay.  And then I know we've covered
22   this.  You didn't have a warrant for Mr. Burnett's
23   home, right?
24       A.    Correct.
25       Q.    And you didn't have consent?
```



Page 91

1    A.    Correct.
2    Q.    So is it your testimony that the only
3  justification that you had to enter his home to make
4  an arrest was hot pursuant?
5    A.    Correct.
6          MR. LAMPHERE:  Objection.  Form.
7  Foundation.
8    Q.    And what's your training on hot pursuit?
9    A.    The training was we had classes in the
10 academy we attended, and then reviewing of policy.
11   Q.    Okay.  What's your understanding of what
12 hot pursuit is?
13         MR. LAMPHERE:  Objection.  Asked and
14 answered.
15              You can answer again.
16   A.    You have a felony crime that happened in
17 a public place.  You're in immediate vicinity of
18 your suspect or the person you are trying to arrest,
19 and you are pursuing them.
20   Q.    Okay.  Are there any other requirements
21 that you're trained for hot pursuit?
22   A.    At this time, not that I remember.
23   Q.    Okay.  And then what's your understanding
24 of Colorado Springs' knock and talk policy?
25   A.    I don't remember their knock and talk



Page 94

```
 1      Q.    What is it?
 2      A.    This is the General Order for Physical
 3   Arrests.  That's one of Colorado Springs PD's
 4   policies.
 5      Q.    And were you trained on this general
 6   order?
 7      A.    We were.  I was, yes.
 8      Q.    Okay.  And were you expected to follow
 9   this general order while you were employed at
10   Colorado Springs Police Department?
11      A.    Yes.
12      Q.    Okay.  So if you'll turn to, it's page 4
13   out of 10.  It's Bates labeled 005158.  Do you see
14   at the top it says "Enter without an arrest
15   warrant"?
16      A.    Yes.
17      Q.    Could you please read what that says?
18      A.    "Entry Without an Arrest Warrant."  It
19   states, "Officers must have an arrest warrant or
20   consent to arrest a suspect in his home unless
21   exigent circumstances exist.  In order to arrest a
22   suspect in a third party's home, officers must have
23   both an arrest warrant and a search warrant, or
24   consent, unless exigent circumstances exist."
25      Q.    Okay.  And then on the next page it
```



Page 101

```
 1     Q.    Okay.
 2     A.    And that initiated the investigation.
 3     Q.    So is it protocol that whenever somebody
 4  dies during a police encounter, that an
 5  investigation is opened and reports don't need to be
 6  written?
 7           MR. LAMPHERE:  Objection.  Form.
 8  Foundation.
 9              You can answer.
10     A.    Reports are written by the investigating
11  agency and the Internal Affairs division.
12     Q.    Okay.  But not the people who are on
13  scene, the officers themselves, right?
14     A.    No.  They are then interviewed.
15     Q.    Okay.  How long after an incident occurs
16  does it take for you to be interviewed?
17     A.    I don't know the exact time.  It was --
18  generally, it's approximately 48-ish hours.
19     Q.    Okay.  Would you agree that unless you
20  have a warrant, consent, or exigency, you should not
21  enter a person's home to arrest them?
22           MR. LAMPHERE:  Objection.  Form.
23  Foundation.
24     A.    Yes.  Unless you have a warrant,
25  exigency, or consent.
```



Page 102

1 Q. Okay.
2 A. Those are your three.
3 MS. ANDERSON: I'm going to hand the
4 court reporter another document, and ask her to mark
5 it as Exhibit 2.
6 (Exhibit No. 2 was marked.)
7 Q. I'm handing you the document that's been
8 marked as Exhibit 2. This is another General Order
9 from the Colorado Springs Police Department.
10 Do you recognize this document?
11 A. I do.
12 Q. Okay. What is it?
13 A. This is General Order 705, Colorado
14 Springs Police Department's policy for Use of Force.
15 Q. And are you trained on this policy?
16 A. Yes.
17 Q. And if you'll turn to the page that's
18 Bates labeled CITY DEFENDANTS 005172. Do you see on
19 this page the subsection .50, "Medical
20 Considerations"?
21 A. Yes.
22 Q. And were you trained on this policy as
23 well?
24 A. I was, yes.
25 Q. And can you read the second paragraph



Page 107

1  own.  He was blinking.  Other officers were
2  announcing they were still seeing his chest rise and
3  fall, and myself and other officers could still feel
4  his pulse.
5      Q.   And all of these things, were they in
6  place consistently?  He was blinking, feeling pulse,
7  seeing the chest, right?
8      A.   Yes.
9      Q.   Okay.  What's your understanding of the
10 training on restraining someone on their stomach?
11 What's your training on restraining people on their
12 stomach?
13     A.   As soon as you make an arrest or you
14 place handcuffs on them, take them off their stomach
15 immediately, roll them onto their side, and put them
16 in a seated position, if you can.
17     Q.   Okay.  And so for Mr. Burnett, he was
18 handcuffed and on his stomach.  At what point did
19 you -- did you ever roll him on his stomach -- or
20 roll him on his side and try to put him in a seated
21 position?
22     A.   We rolled him on his side.  But due to
23 sheer size and still being tensed, he was not able
24 to go into a seated position at that time.  So we --
25 after, right after we -- he threw Officer Fleming



Page 110

```
 1   struggle, right?
 2      A.   Yes.
 3              MS. ANDERSON:  I don't know if you
 4   guys want to take a lunch?  This is the kind of
 5   natural break.
 6              MR. LAMPHERE:  I think we're okay.
 7   Yeah, we're okay.
 8              MS. ANDERSON:  Okay.  Well, then
 9   let's just take a ten-minute break really quick and
10   come back.
11              MR. LAMPHERE:  Okay.
12              THE WITNESS:  All right.
13                  (Break from 12:15 p.m. to
14                   12:38 p.m.)
15   BY MS. ANDERSON:
16      Q.   Officer Daigle, before we went off the
17   record we had talked about quite a few things,
18   including the timeline of things that occurred with
19   Mr. Burnett on May 24th and then the policies, and
20   then your training on when medical care is needed,
21   and exigent circumstances.
22                  And so I just wanted to, before we
23   move on, talk about, you mentioned that the exigent
24   circumstances are what justified going into
25   Mr. Burnett's house without a warrant, right?
```



Page 111

```
 1      A.    Yes.
 2      Q.    Okay.  Was there any other policy that
 3   justified going into Mr. Burnett's house without a
 4   warrant?
 5      A.    Not that I recall, no.
 6      Q.    Okay.  And your training on hot pursuit
 7   and exigency, did that include a PowerPoint when you
 8   were trained on it?
 9      A.    It -- I can't remember exactly how it was
10   presented to us, but we did go over it in the
11   academy.
12      Q.    Okay.  Did you go over it ever after the
13   academy within Colorado Springs Police Department?
14      A.    Possibly, but I can't remember exactly.
15   It would have happened during in-service training.
16      Q.    Okay.  And then you also testified about
17   your training for determining a medical, when people
18   need medical care, and you mentioned that you were
19   trained on the CPR training.  Do you recall that?
20      A.    Yes.
21      Q.    Okay.  Are there any other trainings that
22   you received for when a person requires medical
23   care, other than your CPR training?
24      A.    It was CPR and first aid.  That was our
25   training.
```



Page 113

```
 1              MR. LAMPHERE:  You can answer, if you
 2   know.
 3        A.    I don't -- I know she's on this one
 4   because I can see it.  I don't know if she's on all
 5   the others.
 6        Q.    Let me rephrase.
 7              Is this what typically body worn
 8   cameras look like when you upload them from your
 9   camera?
10        A.    It will have your e-mail at the top.
11        Q.    Okay.
12        A.    Identifying that that's that person's
13   camera, generally.
14        Q.    Does it usually have a time stamp on it?
15        A.    I don't remember.
16        Q.    Okay.
17        A.    It's been three years since I've used
18   body cameras, so.
19        Q.    But this doesn't have your e-mail on it,
20   identifying it, so something -- this isn't how you
21   would have uploaded it, right?
22        A.    No.  No.  And they get uploaded
23   automatically.
24        Q.    So we are going to play Exhibit 3.  It's
25   cued up at the 16 minutes.  We're going to play it
```



```
                                                         Page 169
 1   at his chest or watching his chest rise or anything
 2   like that.  I was checking his pulse.  So I can't
 3   attest if the other officers were watching or
 4   monitoring his breathing or not.
 5        Q.    Because that wasn't what you were doing?
 6        A.    I was checking his pulse.
 7        Q.    Is CPR designed to restore breathing?
 8              MR. LAMPHERE:  Objection.  Form.
 9   Foundation.
10        A.    From my understanding, CPR is designed to
11   get your pulse back or to get a pulse, pump blood
12   through the heart.
13        Q.    So your understanding, based on your
14   training and experience, is that CPR is designed to
15   pump blood.  Got it.
16              We can play from the 10-minute
17   mark and 27 -- 10 minute, 27 mark to the 10 minute,
18   34 mark.
19              (Video played.)
20        Q.    Okay.  So you've confirmed that he has a
21   pulse.  Has anybody confirmed that Mr. Burnett is
22   breathing?
23        A.    I didn't hear anyone announce it.
24        Q.    Okay.  We are going to continue playing
25   Exhibit 4.
```



Page 193

```
 1                REPORTER'S CERTIFICATE
 2            I, LEEANN L. STELLOR, Registered Merit
 3    Reporter and Certified Realtime Reporter within
 4    Colorado, ID 200401669, appointed to take the
 5    deposition of OFFICER JOSEPH DAIGLE, do hereby certify
 6    that before the deposition he was duly sworn by me to
 7    testify to the truth; that the deposition was taken by
 8    me then reduced to typewritten form herein; that the
 9    foregoing is a true transcript of the questions asked,
10    testimony given and proceedings had.
11
12            I further certify that I am not related to
13    any party herein or their Counsel, and have no interest
14    in the result of this litigation.
15
16            In witness hereof I have hereunto set my
17    hand this 22nd day of May, 2023.
18
19                      Leeann L. Stellor
                        Leeann L. Stellor
20                      Registered Merit Reporter
                        Certified Realtime Reporter
21                      and Notary Public
22
23    My commission expires June 8, 2024
24
25
```

