Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil No. 21-cv-1708-WJM-MDB

_____

DEPOSITION OF                     June 23, 2023
LIEUTENANT MICHAEL INAZU

_____

ESTATE OF CHAD ALEXANDER BURNETT,

            Plaintiff,

vs.

CITY OF COLORADO SPRINGS, a municipality;
SERGEANT MICHAEL INAZU, in his individual capacity;
OFFICER JOSEPH DAIGLE, in his individual capacity;
OFFICER MATTHEW FLEMING, in his individual capacity;
OFFICER CAROLINE BARTH, in her individual capacity,

            Defendants.

_____

        The deposition of LIEUTENANT MICHAEL INAZU,
taken before Leeann Stellor, a Registered Merit
Reporter, Certified Realtime Reporter, and a Notary
Public in and for the County of Summit and the State
of Colorado, at 2701 Lawrence Street, Denver,
Colorado, on Friday, June 23, 2023, at the hour of
9:00 a.m.



Page 17

1     Q.     And is that the division that covers the

2   area where the Ashgrove Street address was located?

3     A.     It is.

4     Q.     Where did you receive your training as a

5   police officer?

6     A.     Colorado Springs has its own police

7   academy, and anyone who becomes a police officer in

8   Colorado Springs is required to attend that academy.

9   That is where I went.

10     Q.     And then you received training on an

11   ongoing basis, I imagine?

12     A.     Correct.

13     Q.     How much additional training do you get

14   on a year-to-year basis?

15               MR. LAMPHERE:  Objection.

16   Foundation.

17               You can answer, if you know.

18     A.     The amount of training varies year to

19   year, depending on what elective training an

20   individual officer chooses to attend or is

21   authorized to attend.  The required training every

22   year typically -- typically consists of a few days

23   of in-service training and a few days of range

24   training, plus various web trainings that are

25   ongoing throughout the year.



1    Q.   Is there a number of hours of training

2   that's required, or is it a set curriculum that's

3   required?

4    A.   I believe there is a required number of

5   hours.  I do not know what that hour number is.

6    Q.   And if I'm understanding you correctly,

7   some of the particular trainings are elective,

8   meaning that the officer can choose what they're

9   interested in or feels is appropriate for their

10  particular assignment?

11    A.   Yes.  There are certain trainings that

12  are required for certain assignments as well.

13    Q.   When you were promoted to sergeant, did

14  that involve additional training that you were

15  required to take?

16    A.   Yes.

17    Q.   Can you tell me about that training?

18    A.   There was an orientation class that may

19  have been one or two days.  I don't recall.  There

20  is also a new sergeant on-the-job-type training,

21  where mostly it's task oriented and situation

22  oriented, where another sergeant will be paired up

23  with you and there's a checklist of situations that

24  you're either able to verbalize you have

25  understanding of or debrief because you've responded



Page 19

1   to a similar situation since being promoted.

2       Q.     And you mentioned you were a crisis

3   negotiator; is that right?

4       A.     That's correct.

5       Q.     Did that assignment involve any training

6   or certification?

7       A.     I don't believe it required a

8   certification.  I did attend the FBI negotiator's

9   school that was offered.  That was a week-long

10  training.  We also had some informal trainings with

11  the team.

12               Additionally, I went to a

13  conference specifically for crisis negotiation.  I

14  also attended the department's crisis intervention

15  training.

16      Q.     And when did you become certified or

17  assigned as a crisis negotiator?

18      A.     I don't recall the exact date.  It was

19  prior to my promotion.  And then after I was

20  promoted, having served in the position for a few

21  years, I elected to give it up, mostly because as a

22  supervisor being pulled to a crisis situation would

23  leave no supervision on the road.

24      Q.     So it was a few years before your

25  promotion to sergeant in 2011, is when you became a



Page 20

1    crisis negotiator?

2        A.    I believe it was maybe four years prior

3    to.

4        Q.    So 2007, give or take?

5        A.    (Nodding head.)

6        Q.    And that would have been when you

7    attended the FBI negotiation school and participated

8    in the department's crisis intervention training?

9        A.    Thereabouts.

10        Q.    What, at a summary level, does the crisis

11   intervention training involve?

12                MR. LAMPHERE:  Foundation.

13                    You can answer.

14        A.    The training is a five-day course, I

15   believe.  The -- there is a fair amount of classroom

16   structured lessons, where various professionals in

17   mental health come in to talk about different

18   aspects of mental health and crisis.  There is also

19   a practical scenario-type element, where actors come

20   in.  There is a set scenario, and those attending

21   the training are expected to implement some of the

22   tools and strategies that were taught earlier in the

23   week as they complete the scenarios.

24        Q.    And what tools or strategies are those?

25        A.    There are various tools and strategies



1    avoid, try to avoid the trigger points and try to

2    use the hooks; is that right?

3         A.    Correct, because the overall goal is to

4    end any encounter without having to use force.

5         Q.    That's the overall goal of the crisis

6    intervention training?

7                   MR. LAMPHERE:  Objection.

8    Foundation.

9                   You can answer.

10        A.    That's one of the overall goals.  Part of

11   the training also is to be aware and to offer

12   resources.

13        Q.    What kind of resources?

14        A.    Various mental health services that may

15   be available within the community or to be a bridge

16   for resources that may be already utilized by an

17   individual who is in crisis.

18        Q.    So you were a crisis negotiator for about

19   four years, you said, roughly?

20        A.    Roughly, three to four years.

21        Q.    How many crisis negotiations would you

22   estimate that you were involved with during that

23   time?

24        A.    There would be a need to distinguish

25   between, like, a full call-out, where the tactical



Page 66

1   should comply?

2          MR. LAMPHERE:  Form.

3            You can answer.

4     A.   Yes.  Someone rational would have a

5   greater likelihood, in my experience, of complying

6   with a request like that.  I didn't rule it out as a

7   possibility with him.  I just thought it was

8   unlikely.

9     Q.   Yeah.  But during, through your

10  interactions with him, that's -- that's what you

11  intended to communicate, that he should come out and

12  surrender himself?

13    A.   Yes.

14    Q.   Whether or not he was going to do that,

15  that's a different matter, right?

16         MR. LAMPHERE:  Form.

17          You can answer.

18    A.   I'm not quite sure I understand what

19  you're asking.

20    Q.   He -- I'll ask -- I'll move on to

21  something else.  Let me shift gears a little bit and

22  ask you about warrantless entry.  You mentioned it

23  before.

24         Are you familiar with the

25  Fourth Amendment's warrant requirement?



Page 67

1       A.    I am.

2       Q.    Would you agree that generally you can't

3    enter someone's home without a warrant?

4              MR. LAMPHERE:  Form.

5                   You can answer.

6       A.    Without a warrant or one of the warrant

7    exceptions.

8       Q.    And were you trained on those exceptions?

9       A.    I was.

10      Q.    Can you describe the training that you

11   received on the warrant exceptions?

12             MR. LAMPHERE:  Objection.

13   Foundation.

14                  You can answer.

15      A.    There's formal training on the exceptions

16   in the academy.  There's continual training and

17   discussions, both informal and formal, throughout a

18   police officer's career, certainly at the Colorado

19   Springs Police Department, when it comes to warrants

20   and warrantless entries.

21      Q.    And did you cover the warrant exceptions

22   in your academy training?

23      A.    I believe we did.  It was over 20 years

24   ago.

25      Q.    And did you cover warrant exceptions in



Page 68

1    your continuing training after that?

2          A.    Yes.

3          Q.    How often?

4                MR. LAMPHERE:  Objection.  Form.

5                You can answer.

6                Foundation too.

7          A.    There's not necessarily a specific

8    schedule.  Warrantless entries come up as a topic of

9    conversation as situations are encountered in your

10   work as a police officer.  And there's typically

11   some discussion about the exceptions; and not just

12   the exceptions, but even if there is an exception,

13   is this the right choice to make.

14         Q.    And so those are -- those discussions,

15   are those informal discussions about cases that

16   you're involved with?

17         A.    Mostly, yes.

18         Q.    Was the -- was training on warrant

19   exceptions ever part of the formal continuing

20   training that you received?

21                MR. LAMPHERE:  Objection.

22   Foundation.

23                You can answer.

24         A.    Perhaps.  But I can't recall specifically

25   any trainings.



Page 69

1    Q.    So the last specific recollection you

2  have of the training on warrant exceptions would be

3  during the academy?

4    A.    If we define formal as something that is

5  on your training record, the last specific formal

6  training I can think of covering the exceptions

7  would be in the academy.  But that being said, there

8  very well likely may have been trainings that

9  covered specifically the exceptions that I've

10  attended since or have been part of since that I

11  don't recall.

12                Warrants and warrant exceptions

13  are frequently spoken of in other trainings, but the

14  trainings aren't necessarily specific to warrant and

15  warrant exceptions.

16    Q.    I see.  So it might be referred to in

17  trainings on other topics?

18    A.    Correct.  And briefly discussed, but not

19  necessarily the topic of the training.

20    Q.    So what, based on the training that you

21  did receive, what was your understanding of what the

22  warrant exceptions were?

23    A.    Warrant exceptions would be those

24  situations where you can, if we're talking about a

25  residence in particular, enter a residence without a



Page 71

```
 1        A.    Yes.

 2        Q.    What do you recall about that?

 3        A.    I recall -- and I don't remember how it

 4    was disseminated.  It could have been, like, a video

 5    that's publicly accessible or it could have been,

 6    like, a newsletter that was attached to an e-mail.

 7    But I know that in my career, we've had discussions

 8    about report sections in those types of trainings

 9    that usually happen in a line-up type situation.  So

10    they're more informal, but they're -- so they're not

11    on your training record, but it's considered

12    training.

13        Q.    And by line-up, you mean kind of the -- a

14    meeting among officers, not a identification

15    line-up?

16        A.    Yes.  Correct, the briefing before shift,

17    a patrol shift, when the officers assemble to have

18    pertinent information passed on or discuss new

19    changes in policy, or case law, or law, or relevant

20    incidents.

21        Q.    You might discuss something about hot

22    pursuit in that line-up that would never make it

23    onto your training record?

24        A.    Correct.

25        Q.    And you recall discussing hot pursuit in
```



Page 78

1      Q.    So the -- when the crime occurred, is

2  that a factor, as far as you know?

3            MR. LAMPHERE:  Form.

4                 You can answer.

5      A.    In this particular situation, no.  And it

6  had been recently reported, so it was not something

7  in my head that I was concerned about at all as far

8  as a separation from the time of the crime to the

9  fresh pursuit.

10     Q.    You mentioned fresh pursuit a couple of

11 times.  Is that the same as hot pursuit?

12     A.    That's my understanding, yes.  I know

13 there's another element of fresh/hot pursuit where,

14 you know, it has to do with jurisdictional-type

15 things, but this -- my understanding is they're used

16 somewhat interchangeably.

17     Q.    Let me -- you've still got Exhibit 10 in

18 front of you, so you can put that aside.  Let me

19 direct your attention to what's been previously

20 marked as Exhibit 1.

21            MR. BOHNET-GOMEZ:  And I apologize, I

22 don't have extra copies of this.

23     Q.    Do you recognize, Lieutenant, the

24 document that's been marked as Exhibit 1?

25     A.    I do.



1       Q.    What is it?

2       A.    It's some version of the CSPD policy

3   related to physical arrest.

4       Q.    And you're trained on this policy?

5       A.    Correct.

6       Q.    Can I have you flip to Section 25 of the

7   policy.  It's labeled Exigent Circumstances.  Do you

8   see that?

9       A.    I do.

10      Q.    And are you familiar with the policy as

11   written here?

12                  (Witness peruses document.)

13      A.    I am.

14      Q.    Are you aware of any other written policy

15   that addresses exigent circumstances within the

16   department?

17      A.    There are numerous policies that use that

18   term.

19      Q.    What do you recall about those other

20   policies?

21      A.    Typically, it has to do with the choice

22   an officer uses for an intervention.  For instance,

23   there are certain things that an officer is required

24   to get supervisory approval before using as a tool.

25   And often there is a little caveat that says unless



Page 80

1    exigent circumstances dictate otherwise, that kind

2    of reference.

3         Q.    I see.  So there's -- okay.  Let me

4    rephrase the question then.

5              This policy here, Section 25,

6    addresses the warrantless arrest in the home like we

7    were discussing, right?

8         A.    Yes.

9         Q.    Are you aware of any other department

10   policies that cover warrantless arrests in the home,

11   other than this one that we're looking at here?

12        A.    Not off the top of my head.  There may

13   be.  Their policies are quite extensive.  If I

14   wanted to look at them, I would have to do a search.

15        Q.    And how would you go about that search?

16   Is that like a keyword search?

17        A.    Correct.

18        Q.    Okay.  But you're not aware of any other

19   policies.  You just don't have them all in your

20   head, I suppose?

21        A.    Correct.

22        Q.    Okay.  Are you aware of whether the area

23   surrounding an individual's home is considered part

24   of the home for Fourth Amendment purposes?

25        A.    It depends on what part of the area



Page 81

1   around the home and how it's structured.

2       Q.    Have you received any training on that

3   concept?

4       A.    Yes.

5       Q.    Tell me about the training you've

6   received.

7       A.    So as previously stated, unless

8   restricted by some sort of barrier, like a fence,

9   the front area of the residence, the driveway, the

10  sidewalk leading up to the front door, and the front

11  stoop or deck would be considered public access,

12  private property.

13      Q.    And that's what your training covered?

14           MR. LAMPHERE:  Objection.

15      Q.    Relative to whether the area surrounding

16  the home can be part of the home for Fourth

17  Amendment purposes?

18           MR. LAMPHERE:  Objection.

19  Foundation.  Form.

20           You can answer.

21      A.    There's various nuances, but that's not

22  the entirety of it.  Some of it has to do with

23  surveillance, what part of the residence you can

24  look at, what part can you go to -- so the backyard

25  of a residence is typically not a place you can go



Page 82

1   without an exception.  However, if you're able to

2   see through it, that's not unreasonable, you know,

3   depending on how a door is structured, where the

4   windows are, what the windows look like.

5                   It's looking through a window may

6   or may not be, you know, protected space or

7   protected view.  There's numerous different type of

8   scenarios that are discussed relatively regularly

9   for Fourth Amendment-type situations regarding

10   someone's residence.

11       Q.    And in terms of the training you've

12   received about that, did it come in the form of

13   formal training that you attended?

14                   MR. LAMPHERE:  Objection.

15   Foundation.  Form.

16                   You can answer.

17       A.    I don't recall.

18       Q.    But you do recall covering that in some

19   sort of training?

20       A.    Yes.

21                   MR. BOHNET-GOMEZ:  It's a little bit

22   early, but this might be a good time for a lunch

23   break.

24                   MR. LAMPHERE:  That sounds good.  We

25   can go off the record.



Page 110

1    Mr. Burnett, and I believe we had basically left off

2    at he had fallen forward onto the porch and is now

3    going back into the house.  Do you recall that?

4         A.    Yes.

5         Q.    I want to, you know, go through with you

6    what happened next.  But first I'm going to ask you

7    a little bit about some other topics.

8                   Are you familiar with Sudden

9    Custody Death Syndrome?

10        A.    I am.

11        Q.    What is it?

12        A.    So in a police encounter, often when

13   someone is under the influence of alcohol or drugs,

14   after a struggle an individual dies in police

15   custody.

16        Q.    And have you been trained on Sudden

17   Custody Death Syndrome?

18        A.    To the extent that I'm aware, it exists.

19   Every situation is somewhat different, and there's

20   always different factors that play into it.  So I'm

21   aware of it as a phenomenon.

22        Q.    But was it part of training that you

23   received?

24        A.    At some point, yes.

25        Q.    You mentioned there's various factors



Page 118

1    place the flex cuffs on his ankles.

2        Q.    And can you describe the position of

3    Mr. Burnett's body during this time?

4        A.    So at this particular frame, where we've

5    paused, he has the left leg up a little bit.  So

6    he's mostly prone, but it looks like he's got his

7    weight primarily on his right side.

8        Q.    And at the particular point where we

9    paused, it seems like you finished putting the flex

10   cuffs on him, correct?

11       A.    Yes.

12       Q.    And now you're standing up, and can you

13   describe what you recall doing from this point on?

14       A.    From this point, we make the decision

15   that we're not going to try and get him out of the

16   residence until medical arrives on scene.  Medical

17   was called earlier, shortly after the taser

18   deployment, as is part of our policy.

19               So knowing they were en route, we

20   chose to mitigate any further struggle with him

21   prior to medical arriving by leaving him where he

22   was.

23       Q.    As part of your training, are you trained

24   regarding placing individuals into a recovery

25   position after a struggle?



Page 119

1      A.     Recovery position is taught.  The timing

2   on when to do that, there's some subjectivity based

3   on the totality of the circumstances.

4                  In this particular situation,

5   immediately placing him in a recovery position would

6   be tactically disadvantageous for us, were he to

7   choose suddenly he wants to fight again.

8      Q.     So that is why you did not place

9   Mr. Burnett into a recovery position?

10     A.     Correct.

11          MR. BOHNET-GOMEZ:  Let's switch to

12   Exhibit 9 and cue it up to -- and we'll cue that

13   up at 1 minute -- sorry, an hour, 33 minutes, and

14   20 seconds.

15              (Video played.)

16          MR. BOHNET-GOMEZ:  Let's pause there.

17     Q.     We paused it at an hour, 35 minutes and

18   5 seconds.

19              Lieutenant, what did you observe

20   in the portion of the video that we just played?

21     A.     This clip begins with Mr. Burnett, as

22   previously described, throwing him back -- himself

23   back into the residence, into the entryway area.  He

24   is already handcuffed.  He verbalizes numerous times

25   that he's not going to comply, but then he does say



Page 148

```
 1                    REPORTER'S CERTIFICATE
 2              I, LEEANN L. STELLOR, Registered Merit
 3    Reporter and Certified Realtime Reporter within
 4    Colorado, ID 200401669, appointed to take the
 5    deposition of LIEUTENANT MICHAEL INAZU, do hereby
 6    certify that before the deposition he was duly sworn by
 7    me to testify to the truth; that the deposition was
 8    taken by me then reduced to typewritten form herein;
 9    that the foregoing is a true transcript of the
10    questions asked, testimony given and proceedings had.
11
12              I further certify that I am not related to
13    any party herein or their Counsel, and have no interest
14    in the result of this litigation.
15
16              In witness hereof I have hereunto set my
17    hand this 6th day of July, 2023.
18
19                    Leeann L Stellor
                      Leeann L. Stellor
                      Registered Merit Reporter
20                    Certified Realtime Reporter
21                    and Notary Public
22
23    My commission expires June 8, 2024
24
25
```

