IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No: 21-cv-1708-WJM-MDB

ESTATE OF CHAD ALEXANDER BURNETT,

    Plaintiff,

v.

CITY OF COLORADO SPRINGS, a municipality;
SERGEANT MICHAEL INAZU, in his individual capacity;
OFFICER JOSEPH DAIGLE, in his individual capacity;
OFFICER MATTHEW FLEMING, in his individual capacity; and
OFFICER CAROLINE BARTH, in her individual capacity,

    Defendants.

---

**OPPOSED Fed. R. Evid. 702 MOTION TO EXCLUDE AND LIMIT THE TESTIMONY OF EXPERT STEVEN B. BIRD**

---

Defendants move pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) to exclude and limit the testimony of Steven B. Bird, M.D.

**Certification Pursuant to D.C.COLO.LCivR 7.1(a)**

The undersigned has conferred with counsel for Plaintiff and is authorized to state the Plaintiff opposes the motion.

**I.  Introduction**

Dr. Bird opines:

- "Mr. Burnett certainly developed tremendously elevated concentrations of norepinephrine and epinephrine, placing him at risk for sudden death." Exhibit A, Report of Steven B. Bird, M.D, p. 5.

- "By virtue of the restraint by the officers and the decreased ventilatory capability, Mr. Burnett was unable to maintain $pCO_2$ and pH within values needed to avoid cardiac arrest." Exhibit A, p. 6

- "The physical exertion of Mr. Burnett during his active whole-body restraint and beating by the officers certainly met or exceeded the exertion in these clinical studies." Exhibit A, p. 6.

- "A metabolic acidosis due to his restraint and struggle killed Mr. Burnett." Exhibit A, p. 8

Because his opinions fail to comply with Rule 702 of the Rules of Evidence, they should be excluded.

## II.  Argument

Rule 702 of the Rules of Evidence states an expert may provide opinion testimony when:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

*Id.* Because Dr. Bird's opinions fail to meet (b)-(d), the opinions fail (a).

As a gatekeeper, the Court's role is to "assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003). Plaintiff, as the proponent, must shoulder the burden to show the expert testimony is admissible under Rule 702 and meets the standards under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See In re Breast Implant Litig.*, 11 F. Supp. 2d 1217, 1222 (D. Colo. 1998).

"To be reliable under *Daubert,* an expert's scientific testimony must be based on scientific knowledge, which 'implies a grounding in the methods and procedures of science' based on actual knowledge, not 'subjective belief or unsupported speculation.'" *Dodge*, 328 F.3d at 1222 (quoting

2

in part *Daubert*, 509 U.S. at 592-93); *see also First Specialty Insurance Corp. v. Ward North America Holding, Inc.,* 2006 WL 6225115, at *1 (D. Kan. 2006) ("All proffered expert testimony must be properly grounded, well-reasoned, and not speculative before it may be admitted."). "Conjectures that are probably wrong are of little use, however, in the project of reaching a quick, final, and binding legal judgment—often of great consequence—about a particular set of events in the past." *Daubert*, 509 U.S. at 597.

To show an opinion is reliable, a plaintiff "must show the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirements." *Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 781 (10th Cir. 1999).

In his expert report, Dr. Bird describes, during a strenuous activity, a process where "epinephrine (also known as adrenaline) and norepinephrine" are released. Exhibit A, p. 5. "At the same time, there is constriction of the coronary arteries with reduction of blood flow, and therefore oxygen, to the heart muscle." *Id.* Dr. Bird opines "concentrations may reach ten-fold higher than base concentrations." *Id.* "During physical activity, blood potassium also increases." *Id.* "Elevated levels of norepinephrine and epinephrine . . . neutralize the arrhythmogenic potential of . . . elevated blood potassium." *Id.* According to Dr. Bird, another condition, hypokalemia, reduction of blood potassium "can drop dramatically" as well. *Id.* Dr. Bird concludes "Mr. Burnett certainly developed tremendously elevated concentrations of norepinephrine and epinephrine, placing him at risk for sudden death." *Id.* Dr. Bird concluded Mr. Burnett "certainly" developed "tremendously elevated" concentrations of norepinephrine and epinephrine without knowing Mr. Burnett's norepinephrine and epinephrine levels at any point before (Mr. Burnett's base concentrations),

during or after the struggle with the officers.[1] Nor does Dr. Bird describe how exertive or extensive a "struggle" would need to be; how long it would take for elevated concentrations of norepinephrine and epinephrine to be present; when those values become "elevated[;]" or "tremendously elevated." *Id.* The same is true for the possibility of hypokalemia. Dr. Bird opines blood potassium "can drop dramatically." He does not describe the particular circumstances when hypokalemia can occur or identify the corresponding blood potassium values which can drop so "dramatically" as to be defined as hypokalemic. Most critically, he does not possess any blood potassium values which would show that Mr. Burnett experienced hypokalemia. Dr. Bird's opinions on the chemical makeup of Mr. Burnett and the effects on his health are pure speculation and not grounded in any discernible, specific factual basis or reliable scientific method.

Dr. Bird takes a similar approach in rendering an opinion on Mr. Burnett's lactic acid levels. Dr. Bird, in his report, describes a "dramatic" increase in lactic acid in the blood during any "strenuous activity or struggle" which causes blood acidity to drop "dramatically." *Id.* Dr. Bird explains "[a]s the amount of lactic acid increases and the blood pH drops, the body's natural response is to increase the rate and depth of breathing." *Id.* This allows, according to Dr. Bird, carbon dioxide in the blood to be decreased through exhalation. *Id.* The decrease in blood carbon dioxide "partially offsets the increased acidity of blood and works to bring the pH back towards the normal range." *Id.* at 6. Dr. Bird concludes "[b]y virtue of the restraint by the officers and the decreased ventilatory capability, Mr. Burnett was unable to maintain $pCO_2$ and pH within values needed to avoid cardiac arrest." *Id.*

---

[1] Dr. Bird does not cite, and the Defendants are not aware of, any medical or laboratory testing demonstrating Mr. Burnett's norepinephrine, epinephrine or blood potassium levels.

Dr. Bird's report demonstrates the speculative nature of his opinion and the absence of critical data in support thereof. Dr. Bird describes a normal blood pH value of 7.40 and a normal range (7.35 to 7.45). *Id.* at 5. Critically missing in support of his opinion that "Mr. Burnett was unable to maintain . . . pH", is a baseline pH value. The same is true for his conclusion that Mr. Burnett was unable to maintain $pCO_2$ (carbon dioxide in the blood). Dr. Bird describes how a decrease in carbon dioxide can be determined—in his words, it is "measured by blood gas analysis as the partial pressure of carbon dioxide . . . ." *Id.* at 6. No blood gas analysis for Mr. Burnett was measured.

The "illustrative" examples in medical literature noted by Dr. Bird drive home the point. In those studies, as relayed by Dr. Bird, "Ho *et al.* measured blood pH, lactate, and other biochemical marks during various exercises"; "In a subsequent study by Ho *et al.*, they examined the pH, lactate, and catecholamine concentrations in volunteers . . . "; "In the one fatality in which the patient was not intubated and ventilated . . . , and blood gas analysis immediately upon cardiac arrest revealed a pH of less than 6.8, $pCO_2$ of more than 100 mm Hg, and a non-detectable serum bicarbonate." *Id.* (emphasis added). Again, none of these markers exist for Mr. Burnett.

Too, the studies themselves have questionable applicability to the underlying facts. *See Dodge v. Cotter Corp.*, 328 F.3d at 1221. The Ho, *et al.* Acidosis and Catecholamine Evaluation drew from studies based on "hitting/ kicking a boxing heavy bag for 45 seconds or running a 150-meter sprint followed by jumping over a 44-inch wall." Exhibit A, p. 6. No evidence suggests Mr. Burnett *sprinted* the equivalent of 150 meters or, said differently, over a football field and a half or over 9/10th of a mile. The lack of symmetry between the events of May 24, 2020 and punching/ kicking a boxing heavy bag is also evident. Despite the lack of data and studies which lack the requisite fit, Dr. Bird concludes "[t]he physical exertion of Mr. Burnett during his active whole-

5

body restraint and beating by the officers *certainly* met *or exceeded* the exertion in these clinical studies." *Id.* at 6 (emphasis added). Dr. Bird's opinion is speculative and, because of the lack of data, is not derived by scientific method.

For these reasons, the following conclusions—and reasoning for them—of Dr. Bird should be excluded:

- "Mr. Burnett certainly developed tremendously elevated concentrations of norepinephrine and epinephrine, placing him at risk for sudden death." *Id.* at 5.

- "By virtue of the restraint by the officers and the decreased ventilatory capability, Mr. Burnett was unable to maintain $pCO_2$ and pH within values needed to avoid cardiac arrest." *Id.* at 6.

- "The physical exertion of Mr. Burnett during his active whole-body restraint and beating by the officers certainly met or exceeded the exertion in these clinical studies." *Id.* at 6.

- "A metabolic acidosis due to his restraint and struggle killed Mr. Burnett." *Id.* at 8.

- Any information underlying the medical/metabolic principles for the opinions listed above to discourage speculation by the jury as to their applicability in Mr. Burnett's death.

WHEREFORE, for the foregoing reasons, Defendants respectfully request exclusion of the opinions of Dr. Steven B. Bird as described above.

Respectfully submitted this 22nd day of December, 2023.

OFFICE OF THE CITY ATTORNEY
Wynetta P. Massey, City Attorney

*/s/ W. Erik Lamphere*
W. Erik Lamphere
Martha E. McKinney
30 S. Nevada Ave., Suite 501
Colorado Springs, Colorado 80903
Telephone: (719) 385-5909

> Facsimile: (719) 385-5535
> erik.lamphere@coloradosprings.gov
> martha.mckinney@coloradosprings.gov

### CERTIFICATE OF SERVICE (CM/ECF)

      I hereby certify that on the 22nd day of December, 2023, I electronically filed the foregoing **OPPOSED Fed. R. Evid. 702 MOTION TO EXCLUDE AND LIMIT THE TESTIMONY OF EXPERT STEVEN B. BIRD** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following via email:

Felipe Bohnet-Gomez (fbg@rmlawyers.com)
Siddhartha H. Rathod (sr@rmlawyers.com)
Benjamin DeGolia (bd@rmlawyers.com)
Ciara M. Anderson (ca@rmlawyers.com)
Matthew J. Cron (mc@rmlawyers.com)
*Attorneys for Plaintiff*

> */s/ Amy McKimmey*
> Amy McKimmey
> Legal Assistant