Steven B. Bird, MD
6 Laurel Ridge Ln
Shrewsbury, Massachusetts 01545

July 10, 2023

Ciara M. Anderson
Rathod Mohamedbhai LLC
2701 Lawrence Street, Suite 100
Denver, CO 80205

**RE: report in the Chad Burnett case**

Dear Attorney Anderson,

I will begin my report by briefly summarizing the details of the case, then analyze and discuss the relevant issues and render my opinions. My opinions are based on my knowledge, experience and training in the field of emergency medicine and medical toxicology, and a review of available records. They are, of course, subject to revision should further information become available.

I earned my Bachelor of Science degree in biology *cum laude* in 1991 from Yale University, where I was named a Yale University Richter Fellow. I worked in the laboratory of Professor Sydney Altman, Dean of Yale College and winner of the 1989 Nobel Prize in Chemistry. I was awarded my Doctor of Medicine degree by Northwestern University in 1995 and was also elected to the *Alpha Omega Alpha* national medical honor society (generally awarded to the top 10% of medical students nationally). Following medical school, I gained post-graduate training through residencies with the Naval Hospital San Diego (surgery) and the University of Massachusetts Medical School (emergency medicine). In addition, I completed a two-year fellowship in medical toxicology at the University of Massachusetts Medical School in 2004. Medical toxicology is officially recognized as a medical subspecialty by the American Board of Medical Specialties. Physicians trained in medical toxicology provide professional services in a variety of clinical, industrial, educational, forensic, and public health settings.

I began my independent clinical career in the Department of Emergency Medicine at the University of Massachusetts Medical School in 2002. I was promoted to Assistant Professor of Emergency Medicine in 2004, to Associate Professor in 2010, and to full Professor in 2016. In addition, I formerly served as Program Director of the Emergency Medicine Residency Program and as Vice Chair of Education for the Department of Emergency Medicine at the University of Massachusetts Medical School. I work as an Attending Emergency Physician at the University of Massachusetts Medical Center, Marlborough Hospital, and Clinton Hospital. I am actively involved with numerous professional committees within the UMass Chan Medical School and its Department of Emergency Medicine and Division of Medical Toxicology, and in national and international scientific organizations, such as the Society for Academic Emergency Medicine, the American College of Emergency Physicians, and the American College of Medical Toxicology. I previously served on the Board of Directors of the Society for Academic Emergency Medicine and am a

1

**EXHIBIT A**

former President of that Society. I was also formerly President of the Medical Staff of UMass Memorial Health.

During my professional career, I have received several awards, including the Navy and Marine Corp Achievement Medal, the Society for Academic Emergency Medicine ("SAEM") Best Resident Basic Science Presentation Award, the SAEM New England Regional Research Directors Excellence in Research Award, a Young Investigator Award from the Society for Academic Emergency Medicine, as well as Teacher of the Year (twice) from the UMass emergency medicine residency.

I am a reviewer for several scientific journals, including the *New England Journal of Medicine; JAMA; Annals of Emergency Medicine; Academic Emergency Medicine; Journal of Medical Toxicology; Clinical Toxicology; BMC Emergency Medicine*; and *Toxicology*. I currently serve on the Editorial Board of *Academic Emergency Medicine* and was a founding editorial board member of the *Journal of Medical Toxicology*. I am certified by the American Board of Emergency Medicine and the American Board of Medical Toxicology. I currently hold a license to practice medicine in Massachusetts.

I have reviewed the medical records and depositions that you sent me. These include:

1. First Amended Complaint and Jury Demand (ECF No. 29)
2. First Amended Answer to Complaint (ECF No. 59)
3. Defendant's Rule 26 Disclosures (listing all disclosed documents)
4. Plaintiff's Rule 26 Disclosures (listing all disclosed documents)
5. El Paso County Coroner's Office Records (CONFIDENTIAL-BURNETT_001104-001213)
6. Autopsy CORA Response (BURNETT_000732-000769)
7. X-rays (CONFIDENTIAL-BURNETT_001096-001103)
8. CSPD Police Reports (CITY-DEFS-000001-000125)
9. Fire Medical Recording (CITY-DEFS-000169)
10. AMR Radio Dispatch Call (CITY-DEFS-0000170)
11. Barth Taser Information (CITY-DEFS-000180-000188)
12. Colorado Springs Fire Dept. (CSFD) Duty Report (CITY-DEFS-000189)
13. El Paso Sheriff Office – Officer Reports (CITY-DEFS-000202-000244)
14. Metro Crime Lab Report (CITY-DEFS-000390-000401)
15. Incident Details Report (CITY-DEFS-000449-457)
16. CSFD Patient Care Report (CITY-DEFS-000583-000586)
17. AMR Patient Care Report (CITY-DEFS-000587-000593)
18. Autopsy Report (CITY-DEFS-000594-000604)
19. District Attorney Reports (CITY-DEFS-000713-724)
20. Death Certificate (CONFIDENTIAL - BURNETT_001088-001089)
21. 2020.08.25 DA Email re Investigation ((BURNETT_000249-000255)
22. 2019 Aspen Pointe Records (CONFIDENTIAL - BURNETT_000913-000917)
23. 2019.08.14 Karly Powell ND Records (CONFIDENTIAL - BURNETT_000918-000921)
24. Barth body worn camera (BWC) Footage (CITY-DEFS-000127)

2

**EXHIBIT A**

25. Daigle BWC Footage (CITY-DEFS-000129)
26. Fleming BWC Footage (CITY-DEFS-000133)
27. Inazu BWC Footage (CITY-DEFS-000134)
28. Pitchford BWC Footage (CITY-DEFS-000136)
29. Reid BWC Footage 8 (CITY-DEFS-000144)
30. Deposition transcript of Matthew Fleming
31. Deposition transcript of Joseph Daigle
32. MartinCorrespondenceAndRecords_Redacted (CITY-DEFS-005552-005591)
33. WalMartPharmacyRecords_Redacted (CITY-DEFS-005593-005607)
34. ComfortDentalRecords_Redacted (CITY-DEFS-005608-005614)
35. Optum Prescription records
36. RockyMountainMensClinic-Redacted (CITY-DEFS- 012102-012152)

CASE SUMMARY

On May 26, 2020, Mr. Chad Burnett was a 49-year-old male who lived in Colorado Springs, Colorado. Colorado Springs Police Department (CSPD) officers were dispatched Mr. Burnett's home following two 911 calls from neighbors.

CSPD Officers Joseph Daigle and Matthew Fleming arrived at the neighborhood. Soon thereafter, CSPD Sergeant Michael Inazu also arrived. CSPD Officer Caroline Barth also arrived shortly thereafter.

Officers attempted to contact Mr. Burnett at his home. Mr. Burnett came to his front door and, through the glass near the front door, officers saw Mr. Burnett holding a knife and a bottle of alcohol that he set down on a table by the door. Mr. Burnett refused to open his door and come outside. Officers then left Mr. Burnett's home to contact other witnesses. After speaking with neighbors, officers concluded to arrest Mr. Burnett for menacing against his neighbor.

After Mr. Burnett exited his house and stood in his front yard, Sergeant Inazu and Officers Daigle, Fleming, and Barth ran at Mr. Burnett to arrest him. Mr. Burnett ran into the house, but the CSPD officers were able to prevent the front door from closing and then began to actively restrain him on the floor inside the house.

Officers physically struck Mr. Burnett when holding him down and attempting to place cuffs on his wrists and ankles. As can be seen in the body worn cameras, about 3 seconds into the restraint, Officer Barth deployed her taser on Mr. Burnett with a 5 second shock. About 20 to 25 seconds afterwards, Officer Barth applied two more taser shocks of 1 second. About 30 seconds after deploying her taser, Officer Barth requested emergency medical service (EMS) respond to the scene (EMS was contacted at 11:41:59 a.m. regarding use of the taser, asked to be stepped-up at 11:48:45, and ultimately dispatched at 11:49:21 a.m.).

About 1 minute after the officers entered Mr. Burnett's house and began restraining him, the officers were able to handcuff Mr. Burnett and begin walking him to the front door of his house. Another struggle ensued during which Mr. Burnett fell face-down on the front concrete step. He

can be heard yelling, "Help me" several times. Mr. Burnett partially stood up, and another struggle ensued during which Mr. Burnett fell backwards into the house, and he can again be heard yelling "Help me" as well as "fake police!" The active restraint continued in the entryway of the house, and Officer Fleming used one or more knee strikes on Mr. Burnett's right side while he was lying handcuffed in prone position on the floor. At some point during the restraint, Officer Jacob Carroll arrived and assisted with applying leg restraints to Mr. Burnett while Officer Daigle held Mr. Burnett down by his back and neck, and Officer Fleming appeared to place weight on Mr. Burnett's back. All of the officers are captured audibly breathing very heavily after the struggle.

Approximately 1 minute and 30 seconds after the restraint in the entryway, Mr. Burnett stopped moving entirely and became quiet. No further vocalizations are ever heard from him again.

About 2 minutes after Mr. Burnett stopped moving and making any vocalizations, one of the police officers can be heard asking, "Is he breathing?" Roughly 10 seconds later Officers Daigle and Fleming respond simultaneously "He's got a pulse." But no one checked if Mr. Burnett was breathing, and Mr. Burnett was not responsive to the officers' attempts to engage him. It was around this time that they placed a spit hood on Mr. Burnett. Around this time (when discussing his pulse), Officer Daigle again confirmed that Mr. Burnett had a pulse before he actually checked. Once Officer Daigle did check for Mr. Burnett's pulse, he stated, "It's light, but I can feel it."

Just over 3 minutes from when Mr. Burnett stopped moving and vocalizing, one of the officers toward Mr. Burnett's feet can be heard asking, "He's still breathing?" And someone immediately responds, "yeah" – without taking any time or effort to actually determine if he was in fact breathing. About 7 seconds later, someone asks, "How's his breathing?", and Officer Fleming responds, "He was breathing hard . . . he's not breathing hard now." In fact, he was not breathing at all. Officer Fleming can also be heard saying, "I haven't had much of a chest rise and fall." Around the time that Officer Fleming announced that Mr. Burnett did not appear to be breathing hard, Officer Daigle verbalized that he struggled to find Mr. Burnett's pulse. Officer Daigle announced that Mr. Burnett was unconscious. The officers believed that he might be "playing possum" and did not turn him supine, remove any restraints, or attempt to determine if he was breathing.

Approximately 8 minutes after the restraint began, an officer noted that Mr. Burnett had lost a pulse and was not breathing. CPR was started at that point. EMS arrived on scene at 11:54:00. Resuscitative efforts were unsuccessful, and Mr. Burnett was pronounced dead.

An autopsy was performed at 8:00 a.m. on May 26, 2020. Mr. Burnett's height is listed as 6' 8" and weighing 220 pounds (yielding a body surface area of approximately 2.30 $m^2$. Evidence of blunt force injuries found at autopsy included bilateral temporalis muscular hemorrhage and left frontotemporal subscalpular/subgaleal hemorrhage. A number of other superficial injuries were also identified.

Internal examination demonstrated cardiac hypertrophy (heart weight = 500 gm) with left ventricular hypertrophy (1.7 cm), and evidence of a remote myocardial infarction of the interventricular septum. Findings consistent with resuscitative efforts included anterior fractures of the right seventh and eighth ribs, left third through fifth ribs, and left seventh and eighth ribs. In

addition, there was a superoanterior left liver 6.5 cm subcapsular hematoma with an inferoanterior left liver 3.5 cm subcapsular hematoma. Toxicology testing on vitreous humor demonstrated a ethanol concentration of 91 mg/dL and iliac blood ethanol of 76 mg/dL. Urine drugs of abuse testing was positive only for marijuana metabolites. Qualitative urine GC-MS testing revealed the presence of ibuprofen and bupropion metabolites. Quantification of drugs from iliac blood demonstrated THC at 12.4 ng/mL; 11-OH-THC at 4.9 ng/mL; and THC-COOH at 32 ng/mL. No bupropion was detected. The opinion of the medical examiner was that Mr. Burnett "died as a result of sudden death associated with physical altercation, taser deployment, cardiac hypertrophy with myocardial fibrosis, and bipolar disorder featuring acute psychotic episode."

It was learned that CSPD sent their mental health Community Response Team (CRT) to Mr. Burnett's house on two occasions in May 2020. On May 9, 2020, the CRT went to Mr. Burnett's house on a welfare check and spoke to him briefly at his door. They later spoke to him on the phone and advised him about available mental health resources in the community. Then, on May 18, 2020, the CRT attempted another check the welfare call after a family member expressed concerns for his welfare. Officers saw him inside of his house and spoke to him briefly. Apparently the CRT called him and left him voicemails.

ANALYSIS AND DISCUSSION

Chad Burnett was killed due to his restraint by the Colorado Springs Police Department. During a period of strenuous activity or struggle, there is activation of the sympathetic nervous system with release of epinephrine (also known as adrenaline) and norepinephrine. These chemicals cause the heart to beat harder and faster and to raise the blood pressure. At the same time, there is constriction of the coronary arteries with reduction of blood flow, and therefore oxygen, to the heart muscle. Peak concentrations of norepinephrine and epinephrine are interestingly reached not during the physical activity but after cessation of the activity, and these concentrations may reach ten-fold higher than the base concentrations. This is Dimsdale's "period of peril", when the heart is most sensitive to cardiac dysrhythmias (Dimsdale JE. Postexercise peril. Plasma catecholamines and exercise. JAMA 1984;251:630-2). During the physical activity, blood potassium also increases. Elevated levels of norepinephrine and epinephrine in the blood neutralize the arrhythmogenic potential of the elevated blood potassium. During the "period of peril" the blood potassium concentration can drop dramatically. Hypokalemia, like hyperkalemia, is arrhythmogenic, but its effects are not protected by elevated blood catecholamine concentrations. Hypokalemia predisposes to cardiac conduction abnormalities and can lead to sudden cardiac death. During his beating, restraint, and with the taser application, Mr. Burnett certainly developed tremendously elevated concentrations of norepinephrine and epinephrine, placing him at risk for sudden death.

During strenuous activity or struggle there is also a dramatic increase in lactic acid in the blood, as the formation of lactic acid exceeds the body's ability to remove it. As lactic acid increases, a metabolic acidosis ensues. In this situation, the pH of the blood (this can be thought of as the acidity of the blood) drops dramatically. A normal blood pH is 7.40. The human body has complex homeostatic systems to maintain the blood pH very tightly around 7.40 (normal values are between 7.35 and 7.45). As the amount of lactic acid increases and the blood pH drops, the body's natural response is to increase the rate and depth of breathing. By doing this, the amount of carbon dioxide exhaled by the lungs is increased, and the amount therefore measurable in the blood is decreased.

The decreased amount of blood carbon dioxide (measured by blood gas analysis as the partial pressure of carbon dioxide, or $pCO_2$) then partially offsets the increased acidity of blood and works to bring the pH back towards the normal range. A normal $pCO_2$ is 40 mm Hg. Hyperventilation can lower the $pCO_2$ only to approximately 15 mm Hg. And despite the increased ventilation (breathing) during strenuous exertion, the decreased $pCO_2$ can only partially correct for the low blood pH. This increased ventilation is *critical* to maintaining blood pH in a life-sustaining range. By virtue of the restraint by the officers and the decreased ventilatory capability, Mr. Burnett was unable to maintain $pCO_2$ and pH within values needed to avoid a cardiac arrest.

Some examples from the medical literature are illustrative of the extreme changes in pH associated with exertion. Ho *et al*. measured blood pH, lactate, and other biochemical markers during various exercises (Ho JD. Acidosis and catecholamine evaluation following simulated law enforcement "use of force" encounters. Acad Emerg Med 2010;17:e60-8). They found that with modest exertion (hitting/kicking a boxing heavy bag for 45 seconds or running a 150-meter sprint followed by jumping over a 44-inch wall), there was a rapid, prolonged, and severe metabolic acidosis. In the heavy bag group, the mean (average) pH immediately after the 45-second exertion was 7.04 and after 2 minutes of rest the mean pH had decreased to just 7.01. At 10-minutes of rest the pH had recovered to just 7.06. In the sprint group the pH immediately after the exertion was 7.16. The mean pH increased to 7.17 and 7.22 at 2- and 10-minutes, respectively. The physical exertion of Mr. Burnett during his active whole-body restraint and beating by the officers certainly met or exceeded the exertion in these clinical studies. Changes in lactic acid were also observed. In the heavy bag group, the baseline lactate was 1.44, which increased to 15.46 immediately after exercise, 17.22 at 2-minutes, and 17.33 at 10-minutes. In the sprint group the values were 1.19 at baseline, 10.98 immediately afterward, 12.74 at 2-minutes, and 11.47 at 10-minutes.

In a subsequent study by Ho *et al,* they examined the pH, lactate, and catecholamine concentrations in volunteers who were subjected to a taser application or some varying degrees of sprinting (Ho JD. Markers of acidosis and stress in a sprint versus a conducted electrical weapon. Forensic Sci Inter 2013;233:84-9). Again, significant metabolic derangements occur with physical exertion. In the volunteers who were only subjected to the taser, less pronounced derangements occur, that generally resolve after about 4-6 minutes.

In 1999 Hick *et al*. published a case series of 5 restraint-associated deaths and briefly described 5 cases in which the person did not die (Hick JL. Metabolic acidosis in restraint-associated cardiac arrest: a case series. Acad Emerg Med 1999;6:239-43). In the one fatality in which the patient was not intubated and ventilated (that is, put on a breathing machine), and blood gas analysis immediately upon cardiac arrest revealed a pH of less than 6.8, $pCO_2$ of more than 100 mm Hg, and a non-detectable serum bicarbonate. Data from their other cases revealed similar severe acidosis, but because the patients were placed on breathing machines (or the blood gas analysis was done several minutes later), one cannot reliably comment on the $pCO_2$ results.

The method of restraint, particularly when prone and with force or pressure placed on the back of an individual, may impede a person's ability to adequately ventilate. Both Reay *et al*. (Reay DT. Positional asphyxia during law enforcement transport. Am J Foren Med Pathol 1992;13:90-7) and Bell *et al.* (Bell MD. Positional asphyxiation in adults. A series of 30 cases from the Dade and Broward County Florida Medical Examiner Offices from 1982 to 1990. Am J Foren Med Pathol

1992;13:101-7) have described the phenomenon of ''positional asphyxiation'' in which patients suffer a cardiac arrest while restrained. Although simply lying in the prone position with hands and feet tied together does not significantly change respiratory dynamics, it is important to consider the violence with which Mr. Burnett was restrained - Mr. Burnett had several deputies actively restraining him and striking him and was subjected to approximately 3 taser applications.

Police department reports mention that Mr. Burnett continued to struggle during the restraint. This is expected during restraint of an individual with a severe metabolic acidosis who cannot adequately ventilate. Moments befor,\e, Mr. Burnett stopped speaking and bodyworn camera captured agonal breathing. Mr. Burnett likely felt as if he were being suffocated and killed, and it is expected that in such an instance an individual would struggle. When someone has a severe metabolic acidosis, 1.5 minutes of poor or absent ventilation is more than enough time for the pH to drop precipitously and cause cardiac arrest. That is precisely what occurred in this case.

No drugs of abuse other than marijuana were detected on any blood or urine tests done on Mr. Burnett. His blood alcohol concentration was 76 mg/dL, which is within the legal limits to operate a motor vehicle.

The District Attorney reports indicate that the coroner, Dr. Daniel Lingamfelter, clarified "that, while all of the listed factors in the autopsy opinion were potential contributors to the death, the most likely causal factors of this sudden death were heart failure due to severe heart disease and a rapid heart rate brought on by agitation from the stress of the physical altercation with the officers." [CITY-DEFS-000723]. The report further states, that "Dr. Lingamfelter informed that Mr. Burnett had a severely diseased heart, which would not have been apparent to non-physicians, and Dr. Lingamfelter would not have expected a person with a healthy heart to have died from this incident." "Dr. Lingamfelter opined that the taser was less likely to have been a primary causal factor of the death due to Mr. Burnett's continuous and repeated physical resistance towards officers after the taser deployment and the approximately nine-to-ten minute break between the taser deployment and Mr. Burnett's first noted loss of pulse. Dr. Lingamfelter saw no evidence that officers had used any chokeholds or asphyxiating techniques." "Without Mr. Burnett's severe heart disease, which was unknown to the officers and would not have been physically apparent to them, the evidence indicates that Mr. Burnett would not have died from this encounter. [CITY-DEFS-000724].

There was nothing noted in the autopsy which indicated that Mr. Burnett was not healthy. Mr. Burnett's heart weighed 500 g. However, it is important to realize that Mr. Burnett was 6'8" tall. And heart size proportional to body height/body surface area. Mr. Burnett was also an avid cyclist and hockey player. Nothing in the medical records noted any difficulty doing these activities or suggested that he suffered from any sort of physical limitations.

According to the medical literature, Mr. Burnett's heart was not enlarged for someone of his size. For example, according to a 2011 study by Gaitskell *et al*., Mr. Burnett's heart weight of 500 g and his body surface area of 2.3 $m^2$ places his heart weight in roughly the 75th percentile – that is just a little over the average for his size of 450 gm (Gaitskell K et al. J Clin Pathol 2011;64:358-62).

7

**EXHIBIT A**



Similar results are found in other medical studies. For instance, in a study from Sweden, Wingren and Ottosson found a significant correlation between body surface area and heart weight found in more than 27,000 medico-legal autopsies. They provide an online calculator for determine heart size (available at http://lundforensicmedicine.com/). Entering data for Mr. Burnett of height of 203 cm and weight of 91 kg yields an average heart weight of 454 g, with heart weight within 1 standard deviation of the mean of 525 g. That is, Mr. Burnett's heart was again just slightly higher than average for his body size.

People may at times develop agitation and delirium, typically while suffering a mental health disturbance. Oftentimes drugs of abuse such as cocaine or amphetamines are implicated in the mental disturbance, but that is not always the case (as exemplified by Mr. Burnett). Because people in the throes of an acute mental health disorder may behave strangely, police are often called. When police are improperly trained or use increasingly aggressive restraint and taser applications to people suffering a mental health breakdown, restraint associated death due to metabolic acidosis can occur (such as with Mr. Burnett). By minimizing the aggressive restraint and with the isolation and/or sedation of these patients, the danger of restraint related and metabolic acidosis death will abate without consequence. A metabolic acidosis due to his restraint and the struggle killed Mr. Burnett. The officers present at the scene did not properly check if Mr. Burnett was breathing. By failing to properly check if he was breathing, medical care was delayed, which contributed to Mr. Burnett's death. Had the officers properly evaluated if Mr. Burnett were breathing or had a pulse, and CPR been performed, that would have made it more likely that he would have survived.

## SUMMARY & OPINION

Based upon all available records, my education, my training, and my experience, it is my opinion with a reasonable degree of medical certainty, that the Colorado Springs Police Department personnel killed Mr. Chad Burnett due to application of restraint and the resultant struggle. It is also my opinion with a reasonable degree of medical certainty that no substances were present or affecting Mr. Burnett at the time of his death other than alcohol and marijuana. Lastly, contrary to

the opinion of the coroner and the District Attorney's report, Mr. Burnett's heart was of expected weight for his body size. Mr. Burnett's heart size should not be interpreted to represent "severe heart disease."

Sincerely,

Steven B. Bird, MD

9

**EXHIBIT A**