# Exhibit 1-A

## ROBERT E. KLEINMAN, M.D., P.C.                          PSYCHIATRY

Diplomate, American Board of Psychiatry and Neurology

---

1658 Cole Boulevard, Suite 295
Lakewood, Colorado 80401
Telephone (303) 233 7776
Facsimile (303) 233 2294
kleinmanr@mac.com

July 13, 2023

**SUBJECT TO STIPULATED PROTECTIVE ORDER**

Erik Lamphere
Division Chief-Litigation/Employment
City of Colorado Springs
Erik.lamphere@coloradosprings.gov

RE:   <u>PSYCHIATRIC RECORD REVIEW</u>
        REGARDING:  Chad Burnett
        DOB – 08/16/1970
        DATE OF DEATH:  05/24/2020, at 49 years old.
        CIVIL ACTION NUMBER – 21-cv-1708-WJM-MDB
        Estate of Chad Alexander Burnett v. City of Colorado Springs, et. Al.

Dear Mr. Lamphere:

At your request, I performed a records review regarding Chad Burnett.  My review included records from:

Coroner, Daniel Lingamfelter, DO
Karly Powell, ND
Broadmoor Lake Dental
American Medical Response
Dr. Kriekard
Daniel Fellhauer, MD
Marc VanNess, DDS
Nolan Williams, MD
Rathod Mohamedbhai LLC
Colorado Springs Police Department (CSPD)
Colorado Springs Fire Department
Courtney McCormack
William Alvey
Sergeant Jeffrey Mitchell
Derek Exley
Sergeant Michael Inazu
Kyle Lambert

**<span style="color:red">EXHIBIT 1-A</span>**

July 13, 2023
Re:  Chad Burnett
Page 2

Matthew Kerr

Kyle Sack

Patrick David

Christopher McCleary

Justin Grebenstein

Jon Price

Elisabeth Reid

Christina Sheppard

John Garza

James Jeffcoat

James Kenny

Lisa Montville

Office of the District Attorney

Walgreens

Walmart, Bates stamp 005594

Connexus Pharmacy System, Bates stamp 001491

Optum Prescriptions

Gregory J. Miller, PAC, Rocky Mountain Men's Clinic, Bates stamp 012102

Jay Martin, LMFT, Bates stamp 005552

Center for Families in Transitions

Diversus Health, Bates stamp 001500

AspenPointe

Maria Pawlik, MSW

Nolan Williams, M.D.

Erica Palmer, Psy.D.

*Depositions:*
Officer Joseph Daigle
Officer Matthew Fleming
Officer Caroline Barth
Lieutenant Michael Inazu
Millicent Kay Spears

*Body Camera Video*
Officer Davidson
Officer Ford
Officer Brumm
Officer Wingert
Officer Alvey
Officer Barth
Officer Carroll
Officer Daigle
Officer Fleming
Officer Inazu

*Social media*
Instagram-burnettc6

July 13, 2023
Re:  Chad Burnett
Page 3

Facebook-Chaz Pro
Linked in-Chad Burnett

*Bates stamps*
000126_Alvey BWC
000127_Barth BWC
000128_Carroll BWC
000129_Daigle BWC
000130_Daigle BWC 2
000131_Daigle BWC 3
000132_Daigle BWC 4
000133_Fleming BWC
000134_Inazu BWC
000135_Inazu BWC 2
000136_Pitchford BWC
000137_Reid BWC
000138_Reid BWC 2
000139_Reid BWC 3
000140_Reid BWC 4
000141_Reid BWC 5
000142_Reid BWC 6
000143_Reid BWC 7
000144_Reid BWC 8
000156_CFS20218495Phone Call
000161_CFS20218500PhoneCall
000163_CFS20218547PhoneCall
000175_CFS20219809PhoneCall
000190_CellPhoneVideoBurnettThrowingObject
000201_EPSO_DispatchCall_05-24-20 re CFS20218569
000664_EPSO_Burnett 911 Call
000688_EPSO_Interview_MaureenDavenport
000689_CSPD_Interview_Maureen Davenport
000690_EPSO-Interview_Mark Sather
000691_CSPD_Interview_Mark Sather
000692_EPSO_Interview_MaytagPart1
000693_EPSO_Interview_MaytagPart2
000694_CSPD_Interview_Cornelia Mayta
000695_EPSO_Interview_JohnShaw
000696_CSPD_Interview_John Shaw
000697_EPSO_Interview_Barnett
000698_CSPD_Interview_Judy Barnett
000699_EPSO_Interview_KaySpears
000700_EPSO_Interview_KathrynBurnett
000701_EPSO_JackMcGaferyPhoneCall
000702_EPSO_NonaCopacePhoneCall
000703_EPSO_Interview_RustyGriffith
000704_EPSO_Interview_CarolynShaw

July 13, 2023
Re:  Chad Burnett
Page 4

000705_CSPD-Interview_CAROLYN SHAW
000706_EPSO_Interview_GordonAndLindaSilver
000707_CSPD_Interview_GORDON & LINDA SILVER
000708_EPSO_Interview_LouellaJones
000709_CSPD_Interview_LOUELLA JONES
000710_EPSO_ChadBurnettVoicemailForMarkVanNess
000711_EPSO_Interview_MarkVanNess
001309_2019-06-18_CFS 19270191 Phone Call
001310_2020-04-23_CFS 20171464 Phone Call
001312_2020-05-01_CFS 20183358 Phone Cal
001314_2020-05-01_CFS 20183580 Phone Call
001315_2020-05-06_CFS 20190008 Phone Call
001317_2020-05-07_CFS 20191364 Phone Call
001321_2020-05-18_CFS 20208589 Phone Call
001687_2020-05-07_BrittanyDavidson_BWC_20-1648
001688_2020-05-07_ClintonFord_BWC_20-16485
001689_2020-05-07_ClintonFord_BWC2_20-1648
001690_2020-05-07_ClintonFord_BWC3_20-1648
001691_2020-05-07_ClintonFord_BWC4_20-1648
001692_2020-05-07_IsaacBrumm_BWC_20-16485
001693_2020-05-07_IsaacBrumm_BWC2_20-16485
001694_2020-05-07_IsaacBrumm_BWC3_20-16485
001695_2020-05-07_IsaacBrumm_BWC4_20-16485
001696_2020-05-07_JustinGrebenstein_BWC_20-1648
001697_2020-05-07_MatthewHood_BWC_20-16485
001698_2020-05-07_WilliamWingert_BWC_20-16485
001699_CFS 20190835 Phone Call
001700_CFS 20190835 Radio
001701_CFS 20191059 Phone Call

## QUALIFICATIONS OF EXAMINER:

The qualifications of this examiner are included in a *curriculum vitae* available upon request.

## NARRATIVE:

Mr. Burnett was born on 08/16/1970 and died on 05/24/2020.  He was a 49-year-old male, divorced at the time of his death.  Mr. Burnett had medical problems including but not limited to heart disease and diabetes.

Chad Burnett had some behavioral problems while in school.  He ended up switching schools and went to boarding school in Arizona.

Mr. Burnett had various jobs, including some restaurants, such as Burger King, Bell's Deli, the Hatch Cover, and Popeye's Chicken.  He has also worked at Pikes Peak Mental Health, Cheyenne Mountain Conference Center, and Stand-By Personnel.  For 27 years he was involved in the bicycle industry including at Colorado Cyclist from 1997 to 2019.  He started in the mail room and worked

July 13, 2023
Re:  Chad Burnett
Page 5

his way up to buyer.  He founded and owned Chaz Pro-Bike Fit.  Mr. Burnett started his last business which was up and running a month before it closed down due to COVID.  With that, Mr. Burnett was not working at the time of his death, having quit his job after his mother and stepfather died.

Mr. Burnett has a lengthy history of difficulties with law enforcement before 2020.  Arrests dated back to the late 1980s and early 1990s for drinking in public, shoplifting, criminal mischief and damage to property. In 1997, he was arrested for criminal mischief and menacing with a deadly weapon.  In 2020 there were a string of arrests including:

- 05/04/2020:  Suspect in menacing.
- 05/06/2020:  Felony criminal trespassing in a dwelling.
- 05/07/2020:  Serve & release for 1st degree criminal trespassing.
- 05/24/2020:  Menacing.

His antisocial behaviors were coexisting with his comorbid conditions of mental illness with substance abuse.  The deterioration of his mental health in 2020 was accompanied by more antisocial behaviors.

Interviews were completed with family and longtime friend, and a deposition of Ms. Spears, that provided information useful to understand Mr. Burnett:

- Eugene Griffith, a close friend of Mr. Burnett's stepfather, knew Mr. Burnett since Mr. Burnett was 13 years old.  Mr. Burnett has struggled with drug use and alcohol use throughout his life.  Over the past few years, he had gotten clean and was working in a bicycle shop.   In 2019, stepfather John Borchert passed away.  Mr. Burnett's mother passed away a few days later.  After both deaths, Mr. Burnett received a large estate.  After this occurred, Mr. Burnett left his job at the bike shop and attempted to establish several different businesses that were unsuccessful.  Mr. Burnett was in a constant financial battle over the estate.  Mr. Burnett contacted Mr. Griffith about 3 weeks before his death.  At that time, he claimed his ex-wife had stolen his shotgun.  Mr. Griffith was worried that Mr. Burnett may have been using drugs and alcohol again.  A few weeks later, Mr. Burnett again called Mr. Griffith and was not making any sense during the conversation.
- Mr. Burnett's ex-wife Kathryn said that Mr. Burnett had medical problems with circulatory issues due to being tall.  She said he was secretive about his health.  She said he was diagnosed with bipolar disorder with psychotic tendencies.  She thought Mr. Burnett was seeing a therapist but didn't know who.  Nevertheless, his newest therapist was only treating him for depression, and she felt that wasn't enough.   She said he had Bipolar 1 disorder with auditory hallucinations.  He wasn't in a good state of mind.  Due to COVID 19, he wasn't seeing his therapist and she was afraid he wasn't taking his medication and isolated himself.  He used to use meth.  In 2012, he fell off the wagon and was using cocaine.
- Mark Sather reported that Mr. Burnett had caused the family trouble his whole life.  Burnett has been a nightmare and a timebomb while Mr. Burnett attended public school in Colorado Springs.  His mother kicked him out several times.  He came into the picture 01/02/2019.  He had bouts of homelessness and traveling.  Mr. Burnett has a history of drug use when he was younger.
- Ms. Spears was deposed and testified that Mr. Burnett had lifelong substance use problems, and lifelong mental illness.  He was hospitalized in 1993 and later 2019 for mental health problems.

July 13, 2023
Re:  Chad Burnett
Page 6

She said that his mental health deteriorated after the death of his parents in 2019.  He was supposed to be taking medications in 2019 and 2020 but she thought that he had stopped.  She was aware that he was delusional and had weapons in his home in 2020.

Substance Use:

The excessive use of substances of abuse accompanied Mr. Burnett's mental illness.  Mr. Burnett had a lifelong history of drug use.  He used illicit drugs such as methamphetamine and cocaine.

He was using cannabis at the time of his death.

In addition, alcohol was a problem for Mr. Burnett.  It seems that he had periods of excessive use alternating with periods of sobriety.  More recently, he was using alcohol again.  He was using at the time of his death.

Mental Illness:

Mr. Burnett's life has been notable for mental illness.  He was hospitalized in 1993 for mental illness.  Since then, he has had a lifelong struggle with chronic mental illness.

Mr. Burnett had a Bipolar I disorder.  He had manic episodes with psychotic features.  He  also had depressive episodes.

Mr. Burnett's illness, over time, waxed and waned.  It could have been managed with medications.  The irony is that as a person gets manic, they become grandiose and paranoid, and then they do not believe that they need treatment and do not trust the experts who attempt to treat them.  It becomes a downhill spiral.  That is what happened with Mr. Burnett.

In the months before he died, his mental illness had gotten worse.  At the time of his death, he was in the throes of a severe manic episode with features including an elevated mood, being over energized, agitated, and irritable.  He felt self-important and grandiose, with risk taking.  He had firm fixed delusions and was paranoid.  He was illogical, with a lack of insight, poor reality testing, and lack of judgment.

Mr. Burnett's downhill spiral can be traced back to the aftermath of the deaths of his mother and stepfather in 2019.  Before they died, they needed assistance and Mr. Burnett was living in their home and providing that.  He had responsibility to look after them.  He was accountable.  He had a job.

His stepfather died on 01/02/2019 and his mother died on 01/10/2019.  After their deaths, he became unstable.  There were multiple factors that triggered the worsening of his mental illness.

- He lacked responsibility since he did not have to look after his parents.
- He lacked accountability since he did not have to report to his parents.
- He lapsed in his mental health treatment.
- He was not compliant with medication.
- He was under stress due to having to deal with the estate.

July 13, 2023
Re:  Chad Burnett
Page 7

- • Recall that he was to inherit more than $5 million dollars.
- • He also inherited a Corvette, and his mother's dog.
- He lacked structure after giving up his job.
- There was drugs and alcohol.
- He didn't trust anyone.
- With the loss of his parents, he was more isolated.
- That was complicated by the COVID quarantine causing even more isolation.
- Then there was even more isolation with not working.
- There was grief.

In May 2019, Mr. Burnett tried psychotherapy with Jay Martin, LMFT.  The chief complaint was grief and loss related to the death of his parents.  Mr. Martin was not made aware of the extent of Mr. Burnett's mental illness.  Mr. Burnett's ex-wife knew that the therapy was insufficient.  Despite psychotherapy, Mr. Burnett continued to deteriorate and had a suicide attempt.

Mr. Burnett had a suicide attempt by gunshot on 06/18/2019.  He was put on a mental health hold and was required to have an emergency psychiatric hospitalization in June 2019.  The records from AspenPointe indicated that Mr. Burnett had manic episodes with a thought disorder and mood disorder.  He had auditory and visual hallucinations.  That was accompanied by a substance use disorder with recent use of cannabis.  He treated with a medicine for depression (Wellbutrin), and a medicine for bipolar disorder (Tegretol) and was expected to continue them.  He was told to follow up with psychotherapy.

It is notable that though he was given prescriptions for medicine and was referred to psychotherapy, he was not compliant.  He was referred to Aspen Pointe for outpatient mental health treatment.  He was to have psychotherapy and medicines.

There were pharmacy records that he received Tegretol and Wellbutrin in 2019, but in 2020, he was only taking Wellbutrin.  Regardless, at the time of his death, there were bottles still filled with medication, so he was not taking them as directed.

With that, in 2020, Mr. Burnett was not properly treating his disorder.    There was evidence that he was not compliant with his medication regimen.

- He was not taking the prescribed mood stabilizer (Tegretol) at the time of his death.
- Before his death, he had recently "probably" taken Wellbutrin, since there were "probably" metabolites of Wellbutrin in his system at the time of his death, according to the autopsy report.
  - • Since Wellbutrin can contribute to mood swings and mania, and since Mr. Burnett was not taking anything to counter mania, that could have exacerbated his mania.

Mr. Burnett's non-compliance was a feature of his bipolar disorder.  Recall that as he got energized and grandiose, he didn't believe that he needed treatment and couldn't trust those recommending it.  His non-compliance with treatment became a barrier to recovery and a major contributing factor to his downhill trend leading to the events of 2020.

July 13, 2023
Re:  Chad Burnett
Page 8

- If Mr. Burnett had seen a psychiatrist, it would have been recommended that he stop Wellbutrin and take medications to control mood swings, mania, and psychosis.
- If he was in psychotherapy, the therapist would certainly have recognized his increasing mania and psychosis and told him to see a psychiatrist.

As he was deteriorating, and since it was during the COVID pandemic, Ms. Spears thought that he would do better in Texas with her.  .  That was tried but did not go well.  He was oppositional and not trusting.  He would not accept advice.  After about a week living with his aunt in Texas, he returned to Colorado, which was the first week of April 2020.  She said he was picking a fight with her and felt she couldn't say anything right to him.  He was paranoid regarding neighbors.  She thought he quit his medications before he left her house.  He ended up thinking that she was after his money.  Mr. Burnett's ex-wife said that Mr. Burnett thought that his aunt, Kay Spears, was using him for money.  He was living with her and didn't like the living conditions, so he returned home.

Upon returning to Colorado in April 2020, he was unstable and continued the downhill course with increasing grandiosity, paranoia, and delusions, leading to more erratic and more dangerous behaviors.   In the spring of 2020, Mr. Burnett's mental state rapidly deteriorated. He became increasingly unstable in the months leading up to his death, exhibiting signs of mania and psychosis. There is ample evidence in various sources, including police reports, police body camera footage, legal documents, witness statements from neighbors and relatives, and event logs from Broadmoor Security, that Mr. Burnett was suffering from psychotic symptoms with erratic and dangerous behavior.  The Colorado Springs Police Department conducted interviews that documented that Mr. Burnett displayed symptoms of grandiosity, paranoia, agitation, and threatening behavior. His neighbors witnessed manic and psychotic behavior, noting that he was out of touch with reality.

By reviewing and compiling the evidence from these various sources, the pattern of behavior in the month before he died clearly shows increasingly out of control behavior with dangerousness influenced by delusions, paranoia, and mania.

- April 2020.
  - Mr. Burnett accused Judy Barnett of stealing his trees and he was going to call China.  She told him it was a common area and he called her a bitch.  There was talk about a "Texas Ranger gun."  He believed that someone killed his mother.  Mr. Burnett had never been nasty to Ms. Barnett until the landscaping incident.
- April 23, 2020:
  - Welfare check:  Ms. Spears reported that her nephew, Mr. Burnett, sounded odd and that he had a history of suicide attempts, so police officers responded.
  - Mr. Burnett had weapons in the home.
  - He was suspicious.
  - He was quickly mentally declining and was mixing reality with delusions.
  - It was thought that maybe the death of his parents catapulted him into a mental breakdown.
- May 1, 2020:
  - Theft call:  Mr. Burnett called to report that he had landscaping stolen by Robertson's Landscaping Company.
  - The emergency response technician described Mr. Burnett as rambling.

July 13, 2023
Re:  Chad Burnett
Page 9

- May 2, 2020:
  - The next day, a CSPD patrol officer contacted Mr. Burnett by phone.
  - Mr. Burnett said that the landscaping company hired by his HOA cut down Bonsai trees, which he said were very valuable.
  - He said that cutting down the bonsai trees angered the Country of Japan and created an international incident between countries.
  - He was advised to contact an attorney.
  - He was emotionally disturbed.
- May 5, 2020:
  - Police had responded due to a weapons display.  Mr. Burnett was brandishing a handgun at Luella Jones.
  - He was then issued a Miranda warning.
  - He was issued a felony summons of first-degree criminal trespassing.
  - He was issued the summons but refused to sign it stating he would sign it if the address was changed to 3 Lake Avenue (which was not his home).
  - Mr. Burnett was demonstrating how he held the flashlight at his hip as if he was trying to emphasize that he had a gun and would use it.
- May 6, 2020:
  - Call for burglary and break-in:  Mr. Burnett thought that his mother was murdered.
  - Mr. Burnett had reportedly accused neighbors of stealing a gun and killing his mother.
  - He had lost both of his parents in the past year.
  - He was paranoid.
  - It was noted that he had cameras and lights on the home.
  - The officer believed he had guns in the residence.
  - The officer contacted Mr. Burnett and warned him to leave the neighbors alone.
  - The officer also contacted a neighbor and advised her that she should seek a protection order due to his yelling at her when she takes out the trash.
  - Officer Klos advised Mr. Burnett that he needed to leave the other residents alone and that he needed to stop bothering the neighbors and that there could be charges if he continues.
  - Mr. Burnett advised Officer Klos that he just bought the whole complex as well as owning the Broadmoor Hotel.
  - Mr. Burnett claimed that his neighbor murdered his mother.
- May 7, 2020:
  - Mr. Burnett called and said he owned the Broadmoor.
  - Mr. Burnett, calling himself Mr. Borchert, called to report that there were people pretending to be cops breaking into his house.
  - He said that he owned the Broadmoor Hotel, and he was the only Borchert left.
- May 7, 2020:
  - Burglary:  Mrs. Sather said that Mr. Burnett opened the back kitchen door and entered her residence.
- May 7, 2020:
  - Officers went to Mr. Burnett's home to serve a felony summons.
  - Mr. Burnett could be heard shouting.
  - Mr. Burnett may be armed and, by his own admission, owned knives.

July 13, 2023
Re:  Chad Burnett
Page 10

- He initially started to resist being handcuffed but later complied when officers stated that he may be tased.  Mr. Burnett became emotionally upset and dropped to his knees while putting his head on the ground.  Officer helped Mr. Burnett to his feet and guided him to the living room chair.  He calmed down and began to talk to officers in a friendly tone.
- Officer Brumm, Sergeant Wingert, and Corporal Ford left the home to complete the summons for Mr. Burnett.
- Mr. Burnett made statements that he owned the property of 3 Lake.  He then said he hoped that owner at 3 Lake did not call the police on him.  He said he was visiting since he used to go there as a kid.
- Mr. Burnett had made statements that he often goes outside with a flashlight to look around his property.  Earlier in the week, he had used the flashlight outside and knocked on the window of Ms. Jones' home.  He made statements to the effect that he wanted to check on her to make sure she was okay and that he's known her for years.
- It appears that he was issued a summons and refused to sign.
- Mr. Burnett said that he wasn't crazy.
- Mr. Burnett was told that he was trespassing.  He denied saying that the Sathers' house was actually his.  He also said that he thought they'd be in Belgium.
- Then, while in the living room being handcuffed, he started wailing and crying and went to the floor.  As quickly as the crying started, it stopped.
- He said he didn't have weapons but then he said he had expensive knives including one worth $900 million dollars from the Ming Dynasty.
- May 8, 2020:
  - Colorado Springs Patrol Supervisor, Sergeant Mitchell, contacted the Community Response Team by email regarding a welfare check request for Mr. Burnett, asking for assistance for Mr. Burnett.
  - It appeared that Mr. Burnett was being disruptive to others in the neighborhood.
  - There was information about a gun.
  - There had already been multiple calls for service regarding Mr. Burnett.
- May 9, 2020:
  - Welfare check:  Officer Sack and Officer Uebelhoer responded to Mr. Burnett's home.
  - The Community Response Team (CRT) initiated contact with Mr. Burnett to check his welfare based on a request from the CSPD officer.  The Community Response Team includes a mental health professional, CSFD paramedic, and CSPD officer.
  - Mr. Burnett would not open the door and it was difficult to communicate.  He asked to contact a work phone number.  Ultimately, Mr. Burnett called the officer, denying being suicidal or homicidal.  He denied having any medical or mental health diagnoses and reported being sober.
  - His communication was erratic, and he appeared emotional.
  - Communication then moved from talking to praying and crying and needing to get back to work.
  - Mr. Burnett was then provided with Crisis Resource information, including Aspen Pointe, Parkside, and a Crisis Line.
- May 11, 2020:
  - Marc Sather filed a petition for protection order because of Mr. Burnett's dangerous behaviors and trespassing.

July 13, 2023
Re:  Chad Burnett
Page 11

- Paula Sisson filed a petition for protective order because of Mr. Burnett's dangerous behavior.  She noted that Mr. Burnett threatened neighbors and unlawfully entered her brother's house.  On 05/07/2020 Mr. Burnett called a family friend, Rob Middleton, to scare her.
- May 17, 2020:
  - The CRT made another attempt to contact Mr. Burnett.
  - Mr. Burnett ran to the door and put a chair up against the door, barricading himself inside, and refused to come out.
  - Mr. Burnett spoke with the officers through a glass window in the door and then went to the interior of the residence with his dog.
  - It was noted that Mr. Burnett has a history of bipolar disorder, depression, delusions, and paranoia.  They attempted phone contact with no success.
- May 18, 2020:
  - Patrol Officers requested the Community Response Team's assistance conducting an alarm related welfare check of Mr. Burnett.
  - The reporting party, Kay Spears, called to report that the alarm went off and she was concerned.
  - Mr. Burnett followed his dog into the residence, but he did not open the door for the officers.  A request was made to see Mr. Burnett's hands, but Mr. Burnett responded by picking up his dog and walking away.  They were unable to speak with Mr. Burnett at the front door.
  - CRT members also attempted to contact Mr. Burnett by phone and there was no response.
  - They talked with Mr. Burnett through the door and then placed a link to call CSPD.
  - He asked if the officers were real.
  - When he was told that they were, he said that can't be and hung up.
- May 19, 2020:
  - Burglar alarm.  Responding patrol officers were unsuccessful in contacting Mr. Burnett at the door.
- May 23, 2020:
  - Suspect arrived in vehicle.
  - Caller was in danger.
  - Mrs. Jones opened her garage door.  Mr. Burnett came out of his house and began to yell. He asked if Mrs. Jones was dead.  He then went on to say something to the effect of don't mess with him because he has a gun.  He wasn't making any sense.
- May 23, 2020:
  - Mark VanNess, Mr. Burnett's dentist, said that he had received an email from Mr. Burnett in which Mr. Burnett was talking about Nazis and threatened to cut Mr. VanNess's throat.

Taken together, in May 2020, there was evidence that Mr. Burnett was acting on his paranoid and delusional beliefs.  As he became more paranoid, delusional, and manic, he became less coherent. His reality testing was extremely poor.  He accused a neighbor of murdering his mother.  He claimed to own his neighbors' houses and trespassed.  He was agitated and threatening.

In early May 2020, because of Mr. Burnett's erratic behavior, police attempted to intervene with the Community Response Team, which were ineffective.  CRT interventions were met with disregard, paranoia, and barricading.  He was advised to seek mental health treatment and he did not.  Mr.

July 13, 2023
Re:  Chad Burnett
Page 12

Burnett was also advised to control his behaviors and he did not.  Despite the recommendations and warning, he was unable to change his behavior because he was acting on his delusional beliefs.

In May 2020, Mr. Burnett was in the throes of an untreated manic psychotic episode with limited reality testing and no insight.  He was delusional, paranoid, manic, and psychotic.  His delusions were firm and fixed, and he could not be dissuaded.  He was threatening with weapons.  He did not respond to less intrusive interventions, short of detention.  He could not be deescalated.

By May 24, 2020, Mr. Burnett had further escalated out of control.  On the day of his death, 05/24/2020, his threats had escalated with brandishing a weapon.  Events unfolded quickly.

- Mr. Shaw said that Mr. Burnett had come over to their residence in the late morning and told Mr. Shaw that Mr. Burnett's Corvette had been stolen by Mark [Sather].     Regardless, Mr. Shaw helped get the car back.  Mr. Burnett gave Mr. Shaw some frozen food as a token of appreciation.  Awhile later, Mr. Burnett brought over his mother's wedding ring, his mother's pearls and the title to the Corvette and said he was going to give those items to Mr. Shaw for helping.  Mr. Shaw told Mr. Burnett that he did not want the items, but Mr. Burnett insisted.  Mr. Shaw said he placed the items inside of an envelope and just held onto them for the time being.
- At around the same time, there was an issue with Mr. Burnett's dog.  Mr. Burnett went to Mr. Shaw's residence with a Bible and wanted to give the books to Linda Silver, who seems to have found his dog.
- Mr. Burnett threw books in the yard.  Mrs. Shaw said that when her husband declined to take the books from Mr. Burnett, Mr. Burnett became angry.  It was explained that when her husband knelt to pick the books up, Mr. Burnett stood above him and produced a knife from his back pocket and said that he was going to kill him.  Mr. Burnett raised the knife above his head in a downward motion.
- Mr. Shaw reiterated that Mr. Burnett became agitated and threw items on the ground.  He then threw something else on the ground.  There was kicking of a window and then throwing the silver disc at the window.  Mrs. Shaw went to pick up the items and Mr. Burnett said to leave his "goddamn papers alone or I'm going to kill you" and he pulled out a knife.  Mr. Burnett was saying that the only way they were friends was if Mr. Shaw was a Texas Ranger.

Ms. Shaw called the police for help.  Recall that Mr. Burnett was threatening her husband with a knife.  During the menacing incident, Mr. Burnett threw a silver-colored disc through a neighbor's window breaking the glass.  The police conducted interviews with neighbors which confirmed that Mr. Burnett was psychotic, paranoid and delusional.  They gave the police examples including:

- Mr. Burnett screaming at Ms. Hayes stating that he owned the property, and she does not own her own home.
- Ms. Maytag stated that the family began a litigation case against Mr. Burnett to include a felony criminal charge as he had gone into their residence uninvited.
- Mr. Burnett told Ms. Davenport that he received a check for $1 million dollars, and she asked what it was from, and he said it was from Tour de France.
- Mrs. Silver said that Mr. Burnett's behavior was abnormal and aggressive.  Luella Jones said that Mr. Burnett said, "You stole my Texas Ranger."

July 13, 2023
Re:  Chad Burnett
Page 13

- Carolyn Shaw said that Mr. Burnett said that he just got in from Japan.  His jet was at the Colorado Springs airport, and he claims to be from Japan.  He said there are fake police trying to evacuate.  He said he owned the Broadmoor.  He then yelled "Get the fuck off my property!" and then disconnected.
- At some point, Mr. Burnett had claimed to be a member of the San Diego Police Department and he would not talk to Colorado Springs Police Department because that department was a 'drug ring.'  Mr. Shaw's son, James Shaw, was also involved.

The police attempted to intervene.  Mr. Burnett came out of the house several times and threw things and yelled at the officers.  He rolled a bicycle out the front door onto the lawn.  He came out with a knife once.  He was ordered to drop the knife, which he did.  On one occasion he had a short bat and on another he had a long stick.  When he was holding a wooden dowel and was asked to drop it, he did and then went back in the house.

Mr. Burnett was seen holding a knife in one hand and a beer in the other hand while officers spoke with him (The autopsy report confirmed the presence of alcohol as well as cannabis.).  There were several other knives laying inside the house within his reach.  While talking to the police, he was nonsensical, delusional, and grandiose.

Sergeant Inazu estimated that he asked Mr. Burnett to come outside of the house fifty times.  Mr. Burnett could not be persuaded to go with the police due to his firm, fixed, delusional system with psychosis and paranoia.  Several statements given by Mr. Burnett were weird, like he was a priest and a ranger.  Mr. Burnett said things along the lines of why they don't just kill him.  They noted his odd behavior.  At one point, he said that he was the Pope and they needed authorization from Rome to get him to come outside.

Mr. Burnett made numerous trips outside of the home throwing books, clothes and miscellaneous items in the front yard.  He had a wooden dowel.  He spun the dowel making threats.  He brought out a metal fireplace poker.  He also had a box of knives.

Sergeant Inazu had concerns over Mr. Burnett's state of mind and multiple interactions with neighbors.  During contact with Mr. Burnett in the doorway, Sergeant Inazu observed 2 knives located on the table just inside the home.

Sergeant Inazu determined that there was probable cause for felony menacing-deadly weapon/simulated/aggravated, and criminal mischief.  Sergeant Inazu stated that officers on scene, to include himself, attempted to take the suspect, Mr. Burnett, into custody for felony menacing with a knife.

Officer Barth confirmed that due to Mr. Burnett having a knife and bat and other various items, it was determined that they could no longer let him go in and out of the address with these items to prevent him from hurting anyone.

Mr. Burnett could not be persuaded to go with the police due to his firm, fixed, delusional system with psychosis and paranoia.   Mr. Burnett could not be de-escalated despite police attempts to do so.  They continued to try to engage Mr. Burnett in any type of conversation in the hope that he

July 13, 2023
Re:  Chad Burnett
Page 14

would come out and could be taken into custody.  He came out again wearing different clothing, this time, a Toronto Maple Leaf shirt.  Mr. Burnett told them he was not leaving the house.

It was evident that Mr. Burnett did not respond to police intervention short of restraints.

He then came out to a point where Sergeant Inazu believed they could rush him to take him into custody.  When the officers tried to keep Mr. Burnett from re-entering his house, Mr. Burnett reached the door first.  The officers chase and then Mr. Burnett attempted to close door on them. The officers pushed through, and then Mr. Burnett  retreated to living room and resisted. A taser was deployed.  Mr. Burnett struggled.  At some point, during the fight, Sergeant Inazu saw Mr. Burnett reaching for another officer's gun.  Later, after he was handcuffed, he fell to ground when they were attempting to walk him to the patrol car.  He was actively fighting.

He was still struggling with the officers, pushing with his legs, making all of them fall to the ground.  He fought actively with his legs.  Three officers fell when Mr. Burnett did, while Mr. Burnett was flailing and resisting arrest.  Then he stopped resisting and was nonresponsive. Medical personnel were called.

The American Medical Response notes indicated that he was fighting the officers and then he was tasered and wrestled before being handcuffed.  He then became unresponsive.

## REVIEW OF RECORDS:

*Brackets and italics refer to comments of this examiner; bold refers to emphasis placed by this examiner; bullets added for clarity.*

*EMERGENCY MEDICAL RESPONSE*

American Medical Response:

05/24/2020—
- Medical response team was dispatched at police request.
- The patient was found in the foyer of his home.
  - Handcuffed behind his back.
  - In cardiac and respiratory arrest.
- Handcuffs were removed.
- Passive oxygenation was begun.
- Police stated that the patient was fighting the officers and he was tasered, wrestled before being handcuffed and became unresponsive.
- He had ventricular tachycardia and ventricular fibrillation.
- Defibrillation.  Then asystole.
- Primary Impression:
  - Cardiac arrest.
- Secondary Impression:
  - Electric shock.

July 13, 2023
Re:  Chad Burnett
Page 15

*CORONER REPORT AND INTERVIEW*

Coroner report, Coroner Daniel Lingamfelter, DO:

05/26/2020—
- Date of Death:  05/24/2020.
- History:
  - The subject became unresponsive during physical altercation with law enforcement while resisting arrest.
  - Colorado Springs Police Department responded to the decedent's residence at 9:55 a.m. 05/24/2020.
    - They talked with him while he was walking in and out of the residence.
    - They talked with him for approximately 45 minutes.
    - Decedent had a knife in his hand and carried a dowel rod.
    - They placed him under arrest, and he resisted arrest.
    - They attempted to restrain him by restraining his ankles with a belt and placed a handcuff.
    - They used a taser.
    - He fell to the ground and became unresponsive.
    - Medical was called and worked decedent to no avail.
- Final Diagnosis:
  - Sudden death associated with:
    - Physical altercation.
    - Taser deployment.
    - Cardiac hypertrophy with myocardial fibrosis
    - Bipolar disorder featuring acute psychotic episode.
  - Taser deployment used during the altercation.
  - Cardiac hypertrophy with left ventricular hypertrophy.
  - Remote myocardial infarction.
  - Cerebral and pulmonary edema.
  - Puncture sites from taser.
  - History of bipolar disorder including an apparent acute psychotic episode during the physical altercation.
  - Blunt force injuries:
    - Bilateral temporalis muscle hemorrhage
    - Left frontotemporal subscapular hemorrhage.
    - Generalized abrasions.
  - Ethanol present in post-mortem blood and vitreous.
- Coroner's opinion:
  - Chad Burnett, 49-year-old white male, died as a result of sudden death associated with physical altercation, taser deployment, cardiac hypertrophy with myocardial fibrosis and bipolar disorder featuring acute psychotic episode.
  - Manner of death is homicide (death at the hands of another person or persons)
- Toxicology Report:
  - Ethanol blood 76 mcg/dl.

July 13, 2023
Re:  Chad Burnett
Page 16

- Ethanol vitreous 91 mg/dl.
- THC COOH positive in the urine.
  - *[THC-COOH is a THC metabolite.]*
- Ibuprofen metabolites present.
- Bupropion metabolites probable.
- THC iliac blood 12.4 ng/ml.
- THC—COOH iliac blood 32 ng/ml.
- General Scene Observation:
  - Decedent was lying on the floor of the entrance of the residence.
  - His hands and face had markings appearing to be scrapes and bruises.
  - He had ankle restraints.
  - His right hand was cuffed but not the left.
- Decedent's mental health history:
  - Hallucinations.
  - Bipolar depression.
  - Alcohol abuse.
- Drug inventory list:
  - Medications were prescribed by Dr. Daniel Fellhauer, Dr. Marc VanNess, DDS, and Nolan Williams.
  - Bupropion 150 mg was prescribed November 2019 and there were 90 pills remaining.
  - Bupropion 150 mg was prescribed June 2019 had 30 remaining.
  - Carbamazepine 200 mg was prescribed September 2019 with 180 pills remaining.
  - Testosterone was prescribed and 5 were remaining.
  - Doxycycline was prescribed by Dentist VanNess, and 60 were remaining since 2019 and another 60 were remaining since 2020.

  *[Interim assessment:  The coroner's report is notable for the presence of alcohol and THC.*

  *Also, it appears that Mr. Burnett was not taking the prescribed mood stabilizing psychiatric medication.  Carbamazepine would have been used for bipolar disorder as a mood stabilizer.  There was no indication that he used this based on the toxicology screen.  This medication would have been helpful for agitation, irritability, and instability.*

  *Bupropion is an antidepressant.  Though there were pills remaining, there were some metabolites probably found in his toxicology screen.  Bupropion is known to cause mood swings in a patient with bipolar disorder.*

  *Mr. Burnett was not prescribed and not taking an anti-psychotic, which would have been helpful for the acute psychotic episode.]*

<u>Office of the District Attorney, 4th Judicial District Investigative Report Interview with Coroner, Daniel Lingamfelter</u>:

<u>August 14, 2020</u>:
- Dr. Lingamfelter was interviewed by Gane Firpo.
- Dr. Lingamfelter tried to narrow down the primary cause of death.

July 13, 2023
Re:  Chad Burnett
Page 17

- He said he listed the conditions because he wasn't sure which.
  - That list is on the first page of the Autopsy Report and included sudden death associated with physical altercation, taser deployment, cardiac hypertrophy, myocardial fibrosis and bipolar disorder with acute psychotic episode.
- He said any of those, with the police altercation, led to a rapid heart rate and heart failure.
- He said this might not have happened to a person in good health.
- It was not the specific application of any particular force or technique, but rather the effect of an upsetting episode on Mr. Burnett's heart rate that led the doctor to opine that the physical altercation contributed to the sudden death.
- Other intense physical situations or events, like a 5K run or a tussle on the street---basically anything that gets your heart racing, could have similarly affected Mr. Burnett's heart rate to the point where it could have contributed to heart failure in the way that the police altercation did.
- His heart disease was characterized as severe.
  - The enlarged heart would not have been recognized by a lay person.
  - If it wasn't for the enlarged heart and fibrosis, the outcome might have been different.
- Dr. Lingamfelter said that the taser causing sudden death would be at the lower end of listed causes.
  - There was a time lapse of 9 or 10 minutes between the deployment of the taser and his becoming unresponsive, which places the taser at the low end of the list of causes.
- Regarding bipolar disorder with psychotic episode:
  - He said that being the cause of death would be rare but could happen because of a catecholamine flood into the bloodstream which could have a negative effect on the heart and possibly cause sudden death.
  - He said that catecholamine could cause a rush into the bloodstream, a cardiac arrhythmia, and sudden death.
  - He said the risk of bipolar was higher than the risk for taser but lower than heart disease in physical altercation.
- Dr. Lingamfelter said the use of force as a cause of sudden death because it raised his heart rate.
- Labeling it homicide was a medical determination due to death at the hands of somebody else and not a commentary on any culpability.
- The main cause was the altercation and the heart disease.

*MEDICAL/DENTAL*

Gregory J. Miller, PAC, Rocky Mountain Men's Clinic

Undated Summary—
- Denied alcohol use.
06/19/2017—
- Weight 255 pounds.
- Diagnosis:  Testicular hypogonadism.
06/21/2017—
- Laboratory studies indicated low testosterone.

July 13, 2023
Re:  Chad Burnett
Page 18

<u>Karly Powell, ND, 08/14/2019</u>:

- Dr. Powell is a naturopathic doctor.
- She adjusted his cortisol and probiotic anticipating a follow-up in 3 months.

<u>Broadmoor Lake Dental</u>

11/15/2019
- Review of Systems:  Mr. Burnett did not circle anything and said he had no serious illness including psychiatric care and drug addiction.  He was interested in an implant.

*MENTAL HEALTH  RECORDS*

<u>Jay Martin, LMFT</u>

05/08/2019—
- *Intake forms completed by Mr. Burnett were illegible. Nothing in a list of issues for which he might be having difficulty was circled.*
- Goal:
  - Communicate better.
- Mr. Burnett indicated his father died on 01/02/2019, his mother died 01/10/2019, and his aunt died 04/2019.
04/28/2023, Letter—
- The last contact Mr. Martin had with Mr. Burnett was an office visit dated 02/27/2020.
- During that appointment, Mr. Burnett said that he was moving to Texas to be near his family, and he anticipated no further meetings with Mr. Martin.
Undated Records Summary--
- First appointment with Mr. Burnett was 05/07/2019.
- He presented with symptoms similar to depression including a depressed mood, difficulty focusing and concentrating resulting in short-term memory loss, loss of interest in usual activities, difficulty sleeping, and intense sadness.  He was not suicidal.
- He also reported a midlevel degree of anxiety.
- He was continuing to maintain his activities of daily living and routine functioning just at a slower pace with significant fatigue.
- His symptoms began shortly after the death of his stepfather on 01/02/2019, mother on 01/10/2019, and aunt 04/2019.
  - He had moved into his parents' residence nearly two years before their deaths to take care of them during their illnesses.
- He was being treated by Dr. Daniel Fellhaur with Wellbutrin and Tegretol.
- He did not report any psychiatric history or previous history of counseling.
- Diagnosis:
  - Adjustment disorder with anxiety and depressed mood.
  - Uncomplicated bereavement.
- Mr. Martin met with Mr. Burnett a total of 24 sessions between 05/14/2019 and 02/27/2020.
  - Treatment plan was focused on the grieving process.

July 13, 2023
Re:  Chad Burnett
Page 19

- During these sessions, Mr. Burnett made significant progress relating to dealing with the death of his parents and adjusting to life without them.
- In June 2019, he felt overwhelmed, hopeless, depressed, and suicidal, which frightened him because that was not him.
- Another incident was his dread of dealing with the holiday period between Thanksgiving and New Years, since that would be the first time without his parents.
- He started his own business as a professional bicycle fit technician for high-end bicycles.
- He also reported he was going to live in Texas near his extended family.
  - During the last visit on 02/27/2020 he talked about his new direction with excitement.

*[Interim Assessment:  Dr. Martin was unaware of Mr. Burnett's significant psychiatric symptoms, alcohol use, or drug usage.  With that, he under-diagnosed Mr. Burnett as having an adjustment disorder and bereavement disorder rather than Bipolar disorder.]*

<u>AspenPointe</u>

06/18/2019—
- Mr. Burnett was a 48-year-old male with suicidal ideation and an attempt.  He presented with his fiancée.
- Mr. Burnett was on a mental health hold (M-1 hold).
- It was noted that Mr. Burnett has a history of head injury.
- He said he was suffering from grief and bereavement from the death of his parents and then losing a job in February 2019.
- Suicide ideation, attempt, and history:
  - He attempted to shoot himself two times last night.
  - The first shot misfired and the second shot grazed his hair.
  - He is no longer experiencing suicidal, and the attempt was impulsive.
  - One prior suicide attempt at 17 years old and he was hospitalized for cutting and then taken to residential.
  - After the suicide attempt, he was feeling disappointed that he did not die.
  - One prior suicide attempt as a teenager when he cut his wrist and was hospitalized.
- Medications:
  - Mr. Burnett was interested in medications.
  - Had taken Tegretol and Wellbutrin in the past.
  - Not on medicine now.
- Substance use:
  - He reported past alcohol use and has been clean for three years and attends AA.
  - He reported smoking marijuana/using CBD oil.
  - No current drug or alcohol use, however, he admits he was an alcoholic and has been in recovery for the past three years.  He reports feeling disappointed for using THC to self-medicate.
  - He said he has been sober for three years, but he has had off-and-on drinking problems.
  - He said he has been using THC recently and must reconsider his sober days because of his cannabis use.
  - Also CBD for anxiety and mood, but he is going to stop that.

July 13, 2023
Re:  Chad Burnett
Page 20

- Regarding hard drugs, he said he experimented some years ago, but has not used any recently.
- Hallucinations:
  - He endorsed auditory hallucinations that tell him things, such as, "You are not a good person."
  - Mr. Burnett said … see shapes like ghosts of people in the past.
- Homicidal ideation:
  - He first endorsed homicidal ideation, but then denied it, but said that he just sometimes feels like hurting people. (Bates stamp 001519)
- In November 2018, he and his fiancée broke up.
- Client had four guns, which are now in his fiancée's possession, which were in her car.

*[Interim Assessment:  Mr. Burnett presented after a suicide attempt by gunshot.  He had vague homicidal thoughts with access to guns.  He was agitated, and had aggressive thoughts, with a thought and hallucinations.  That goes towards assessing him as sufficiently dangerous to require a mental health hold and subsequent hospitalization.]*

- Diagnosis/Assessment:
  - Bipolar disorder with psychotic features.
    - Increased agitation and internal aggression.
    - Mr. Burnett said that when he gets agitated or experiences anxiety, he feels like he is in crisis mode.
    - He was found not to be able to make safe decisions and met criteria to be on a mental health hold.
- Diagnosis:  Bipolar II disorder.
- Employment:
  - He has worked in bike shops for 22 years but had to quit when his parents died.
  - Currently working with a friend in their own online apparel business.
  - He was in a cyclist shop but quit six months ago because of the illness with his father.
  - He feels he has not been able to function.
  - He invested in a hockey gear site with a friend but is not currently working at this time.
- He was thinking about his father and the felt like no one loves him or cares about him.
- Trouble sleeping lately.  Energy during the day is good despite poor sleep.
- Initial psychiatric evaluation was done on 06/19/2019.
- Bipolar diagnosis.
  - Bipolar disorder with a suicide attempt by shooting himself in the head.
  - Mr. Burnett endorsed a few manic symptoms that he has had several times per month.
  - He said his sleep tends to go down, not a great deal.  He does sleep maybe four to six hours a night when he is feeling more manic, but he has more energy, is more driven, and sometimes more impulsive with regards to spending money.
  - He also tends to be more spiritual and more religious during those times.  They go on for maybe two to three days.
  - He said sometimes he feels like he hears voices, but sometimes it is people outside and just confuses it with the voices in his head.
  - He has visual hallucinations and sees things, such as ghosts.
  - He discussed phases of the moon and perceptions.

July 13, 2023
Re:  Chad Burnett
Page 21

- • At times he thinks he has nightmares, flashbacks, and hypervigilance, which the doctor believes are soft traumatic symptoms.
- • The doctor feels that Mr. Burnett has bipolar II disorder.
- Plan:
  - • Start carbamazepine and Wellbutrin.  It is estimated that he will need to stay at AspenPointe for three to four days.
  - • He has been on Wellbutrin and Tegretol in the past and he feels like that worked with him.
  - • The doctor and Mr. Burnett discussed Depakote and Lithium but agrees on Tegretol and Wellbutrin.
- Past hospitalization:
  - • He had one previous hospitalization 24 years ago at Pikes Peak.
  - • He was in Penrose Hospital with a diagnosis of bipolar disorder and Post Traumatic Stress Disorder.
  - • His trauma and abuse history was redacted.
- Legal:
  - • He denied legal history and denied military history.
- Marital:
  - • He was married once and is now re-engaged to that woman again.

*[Interim Assessment:  The more accurate diagnosis is Bipolar I Disorder since Mr. Burnett had a manic episode.  If there are psychotic features, it is a manic episode and if it is a manic episode, it is Bipolar I.*

*In addition, he had a mood disturbance sufficiently severe to cause marked impairment in social or occupational functioning.  In addition his disorder necessitated hospitalization to prevent harm to himself or others.  Bipolar II disorder is inaccurate due to the need for hospitalization, the psychotic features, and the presence of mania.  This distinction is very important as it is implicated in his treatment, and there is a worse prognosis.]*

06/20/2019—
- • Doing well today.
- • Mood is improved.
- • Somewhat more stable.
- • He denied being paranoid.

06/21/2019—
- • Doing well and feels better.
- • He has an odd presentation, and he exhibits some cluster-A personality traits.  *(Cluster A includes Paranoid personality disorder, Schizoid personality disorder, and Schizotypal personality disorder.)*

06/22/2019, Discharge Summary—
- • Involuntary hospitalization on 06/18/2019 through 06/21/20109.
- • Feeling much better.
- • Tolerating medications.
- • He feels he has developed more coping skills.
- • Denied psychotic symptoms.
- • Discharge instructions:

July 13, 2023
Re:  Chad Burnett
Page 22

- Mr. Burnett was instructed to follow up with outpatient treatment at Aspen Pointe including DBT therapy and medication management services.
- He was to live at home with his fiancée.
- He was transported by his aunt.
- Medications prescribed by Dr. Nolan Williams. at discharge:
  - Tegretol *(carbamazepine)* 200 mg twice a day.
  - Wellbutrin *(bupropion)* XL 150 mg once a day

## PSYCHIATRIC MEDICATION PRESCRIPTIONS

Walmart

2019—
- In June and July 2019, prescriptions for Epitol *(carbamazepine)* 200 mg b.i.d.
- Prescription for bupropion XL 150 mg q.d.
- Refills of bupropion and Epitol/carbamazepine in August.
- Refill bupropion in March 2020 for 30 tablets with the next refill in April 2020 for 30 tablets.

Optum Rx:

11/16/2019:
- Invoice for carbamazepine *(Tegretol)* 200 mg with a 90-day supply and 1 refill left and Bupropion *(Wellbutrin)* XL 150 mg 90-day supply and no refills.

  *[Interim Assessment:  In the summer of 2019, Mr. Burnett was being treated for a mood disorder with a mood stabilizing medication, carbamazepine, and an antidepressant, bupropion. The next prescription was only for bupropion in March 2020.  The mood-stabilizing medication to treat bipolar disorder was apparently not continued.*

  *Bupropion is an antidepressant and can trigger mood instability, especially in the absence of a mood-stabilizing medication.]*

## PSYCHOSOCIAL RECORDS

Global Subject Activity Report printed 11/10/2022:

- Born in Fort Collins, Colorado.
- Weight 260 pounds, 6'7" tall.

Linked In and Others.

- Education:
  - Pikes Peak State College, 1996 to 1998, Associated Science.
  - St. Mary's High School, 1988 to 1989.
  - Active in varsity hockey.
- Employment history:

July 13, 2023
Re:  Chad Burnett
Page 23

- Self-employed almost 4 years, Colorado Springs.
- Equipment Manager 2019 to PRESENT
- Equipment Specialist 2019 to PRESENT
- Product Manager, Colorado Cyclist, 1997 to 2019.
- Owner/Founder Chaz Pro-Bike Fit In the bicycle industry for 27 years.
- Volunteered at Penrose Hospital 1990.
- List of Employers:
  - Colorado Cyclists
  - Burger King
  - Popeye's Chicken
  - (UNEMPLOYMENT)
  - Pikes Peak Mental Health
  - Cheyenne Mountain Conference Center
  - Stand-By Personnel
  - Self-employed, drywaller

List of Addresses:
- Approximately 15 addresses in Colorado Springs were listed with dates not known.

Vehicle:
- Chevrolet Corvette, 2001

Facebook

- Chad Burnett.  Owner/Founder Chaz Probike Fit and multiple pictures.
- Chaz Probike Fit
- Multiple pictures.

*CRIMINAL RECORDS*

Accidents:
- 02/24/2016, accident type unknown.

Arrests:
- Mr. Burnett had an arrest history noted in the late 1980s and early 1990s for drinking in public, shoplifting, criminal mischief and damage to property.
- 08/29/1989:  Probable cause for drinking in public.
- 03/31/1991:  Shoplifting.
- 04/01/1991:  Criminal mischief.
- 10/23/1992:  Drinking in public.
- 03/16/1993:  Damage to property.
- 12/14/1997:  Criminal mischief. Arrest for menacing with a deadly weapon.
- 11/03/2016:  Exceeding speed limit.
- 01/10/2019:  Death of undetermined origin—He was the reporting party.
- 05/04/2020:  Suspect in menacing.

July 13, 2023
Re:  Chad Burnett
Page 24

- 05/06/2020:  Felony criminal trespassing in a dwelling.
- 05/07/2020:  Serve & release for 1st degree criminal trespassing.
  - Victims were Mark and Cindy Sather.
  - Mr. Burnett is the cousin of Mark Sather.
  - Mr. Burnett had reportedly entered the Sathers' residence without permission and subsequently served a felony summons for first degree criminal trespassing.
- 05/24/2020:  Menacing.

*CASE REPORT REGARDING MOTHER'S DEATH*

CSPD Initial Case Report, 01/10/2019:
- Mother, Sarah, had a fractured hip 14 years ago and had been unable to walk without assistance since then.
- She had been on narcotic pain killers since the surgery.
- She smoked 3 packs of cigarettes a day.
- Chronic dehydration resolved 4 years ago.
- Four months ago, she was hospitalized for overdosing on aspirin.
  - Mr. Burnett did not think that was an attempt to hurt herself.
- Cognitive impairment.
  - Her capacity to think isn't very good.
- She is aware her husband had died.
  - She was heartsick over that.
  - She then declined.
- Mr. Burnett found her dead on the day of this report when he came back from work to feed her lunch.

*COLORADO SPRINGS POLICE DEPARTMENT REGARDING PRIOR CALLS*

Matthew Kerr Supplemental Report:
- Matthew Kerr wrote that there were prior calls for service at the residence, including:
- 01/02/2019:
  - Male party was unconscious.
  - He was identified as John Borchert.  That would be Mr. Burnett's stepfather.
- 01/10/2019:
  - A woman was not responsive and possibly deceased.
  - She was beyond help.  That would be Mr. Burnett's mother.
  - Death of Sarah Borchert.
- 06/18/2019:
  - Suicide attempt of Mr. Burnett.
  - He called and said he attempted suicide the previous night.
- 04/23/2020:
  - Ms. Spears was contacted by the alarm company and contacted Mr. Burnett.
  - Ms. Spears reported that her nephew, Mr. Burnett, sounded odd and he had a history of suicide attempts, so police officers responded.
- 05/01/2020:
  - Theft call.

July 13, 2023
Re:  Chad Burnett
Page 25

- Mr. Burnett called to report that he had landscaping stolen by Robertson's Landscaping Company.
- The emergency response technician described Mr. Burnett as rambling.
- On the following morning, a CSPD patrol officer contacted Mr. Burnett by phone.
- Mr. Burnett said that the landscaping company hired by his HOA cut down Bonsai trees, which he said were very valuable.
- That angered the Country of Japan and created an international incident between countries.
- He was advised to contact an attorney.
- He was emotionally disturbed.
- 05/06/2020:
  - Welfare check.
  - Mr. Burnett had reportedly accused neighbors of stealing a gun and killing his mother.
  - He had lost both of his parents in the past year.
  - It was noted that he had cameras and lights on the home.
  - He was described as paranoid.
  - The officer believed he had guns in the residence.
  - The officer contacted Mr. Burnett and warned him to leave the neighbors alone.
  - The officer also contacted a neighbor and advised her that she should seek a protection order due to his yelling at her when she takes out the trash.
- 05/07/2020:
  - Mr. Burnett, calling himself Mr. Borchert, called to report that there were people pretending to be cops breaking into his house, said he owned the Broadmoor Hotel, and he was the only Borchert left.
- 05/09/2020:
  - The Community Response Team (CRT) initiated contact with Mr. Burnett to check his welfare based on a request from the CSPD officer.

  *[Interim assessment:  The Community Response Team includes a mental health professional, CSFD paramedic, and CSPD officer.]*

  - He would not open the door of his residence but left a phone number.
  - The CRT members left messages.
  - Mr. Burnett later called back denying being suicidal.
  - His communication was erratic.
- 05/17/2020:
  - The CRT made another contact with Mr. Burnett.
  - A male party, possibly Mr. Burnett, ran to the door and barricaded it with a chair.
  - Mr. Burnett spoke with the officers through a glass window in the door and then went to the interior of the residence with his dog.  It was noted that Mr. Burnett has a history of bipolar disorder, depression, delusions and paranoia.
  - They attempted phone contact with no success.
- 05/18/2020:
  - CRT members also attempted to contact Mr. Burnett by phone and there was no response.
  - Reporting party, Kay Spears, called to report that the alarm went off and she was concerned.
  - Ms. Burnett's welfare and that he had guns in the residence.

July 13, 2023
Re: Chad Burnett
Page 26

- They talked with Ms. Burnett through the door and then placed a link to call CSPD.
- He asked if the officers were real.
- When he was told that they were, he said he can't be and hung up.
- He came to the door with the dog and then walked out of sight.
- 05/19/2020:
  - Burglar alarm.
  - Responding patrol officers were unsuccessful in contacting Mr. Burnett at the door.
- 05/24/2020:
  - A male party, probably Mr. Burnett, called and complained that there were fake police telling him to evacuate his residence.
  - He screamed at the emergency response technician to get off his property and hung up.

*COLORADO SPRINGS POLICE DEPARTMENT REGARDING 05/06/20-05/07/20.*

Colorado Springs Police Department, Field Investigation Report:

05/06/2020
- On 05/06/2020, Officer Klos responded to Mr. Burnett's address.  He made contact with Mr. Burnett.
  - He advised Mr. Burnett that he needed to leave the other residents alone.
  - Officer Klos advised Mr. Burnett that he needed to stop bothering the neighbors and that there could be charges if he continues.
  - Officer Klos contacted a neighbor and advised her to get a Protection Order due to Mr. Burnett yelling at her when she takes out the trash.
- While speaking with Mr. Burnett:
  - Mr. Burnett advised Officer Klos that he just bought the whole complex.
  - Mr. Burnett said that he was also the owner of the Broadmoor Hotel.
  - Mr. Burnett claimed that his neighbor murdered her husband.

District Court El Paso County.  The People of the State of Colorado v. Chad Alexander Burnett, Affidavit of Probable Cause, 05/07/2020:

05/07/2020
- This is in reference to a burglary.
- A family member of the reporting party, Mrs. Sather, said that a man opened the back kitchen door and entered her residence.
- She identified the suspect as Mr. Burnett.

Colorado Springs Police Department Case Supplemental Report

- On 05/07/2020, officers went to Mr. Burnett's home to serve a Felony Summons.
- Mr. Burnett could be heard shouting.
- Mr. Burnett may be armed and his own admission that he owned knives.
- He initially started to resist being handcuffed but later complied when officers stated that he may be tased.

July 13, 2023
Re:  Chad Burnett
Page 27

- Mr. Burnett became emotionally upset and dropped to his knees while putting his head on the ground.
- Officer helped Mr. Burnett to his feet and guided him to the living room chair.
  - He calmed down and began to talk to officers in a friendly tone.
  - Officer Brumm, Sergeant Wingert, and Corporal Ford left the home to complete the summons for Mr. Burnett.
  - Officer Davidson and Officer Grebenstein stayed in the home with Mr. Burnett while the Summons was being completed.
- Mr. Burnett said something about the address of 3 Lake.
  - He made statements that he owned the property of 3 Lake.
  - He then said he hoped that Cynthia Sather, at 3 Lake, did not call the police on him.
  - He said he was visiting since he used to go there as a kid.
- Mr. Burnett had made statements that he often goes outside with a flashlight to look around his property.
  - Earlier in the week, he had used the flashlight outside and knocked on the window of Ms. Jones' home.
  - He made statements to the effect that he wanted to check on her to make sure she was okay and that he's known her for years.
  - On 05/05/2020 police had responded due to a weapons display, and he was brandishing a handgun at Luella Jones.
- He was then issued a Miranda warning.
  - He was issued a felony summons of first-degree criminal trespassing.
  - He was issued the summons but refused to sign it stating he would sign it if the address was changed to 3 Lake Avenue.
- Mr. Burnett was demonstrating how he held the flashlight at his hip as if he was trying to emphasize that he had a gun and would use it.

Body camera video 05/07/20

- 05/07/2020:  Brittany Davidson's body camera.
  - Interview with Mr. Burnett while he talked about bicycle races.
  - He appears to be sitting down in his living room, perhaps with his hands handcuffed behind his back.
  - The living room appears to be clean with everything in place.  Not cluttered.
- 05/07/2020:  Body camera of Clinton Ford.
  - Mr. Burnett was handcuffed sitting in the living room.
  - He was later un-handcuffed and seated in the living room.
  - He had a small white dog in his lap.
  - It appears that he was issued a summons and refused to sign.
- 05/07/2020:  Police interviewing a couple in their kitchen.
- 05/07/2020:  Body camera of Isaac Brumm.
  - Interviewed Mr. Burnett regarding getting summons.
  - Mr. Burnett said that he wasn't crazy.
  - Mr. Burnett was told that he was trespassing.
    - He said that he wasn't because the Sathers' house was actually his house.

July 13, 2023
Re:  Chad Burnett
Page 28

- He said that he thought they'd be in Belgium.
- Then, in the middle of this video, while in the living room, being handcuffed, he starts wailing and crying and goes to the floor.
  - As quickly as the crying started, it stopped.
  - He said he didn't have weapons but then he said he had expensive knives including one worth $900 million dollars from the Ming Dynasty.
- 05/07/2020:  Body camera of William Wingert.
  - Officer Wingert was looking in the house, apparently for either a Bible or slippers.
  - The images from the house show the other room to be neat and clean, like the living room. The dining room has nothing on the table.  Kitchen appears neat.  There are no signs of dishes or food left on the counter.  No empty bottles.  The den is equally clean and organized.  The breakfast room is clean.  The bedroom was neat and clean.  The bed was slept in.  Closet was neat.

*[Interim Assessment:  Mr. Burnett was agitated, paranoid, delusional, and psychotic.  He had angry outbursts with neighbors.*

*He was psychotic and manic as evidenced by grandiose delusions.*

*This either started after, or got worse after, the death of his parents and by the expectation or knowledge that he either might or did inherit a substantial amount of money and property. He then conflated that to believe that he owned the property in and around the neighborhood that wasn't his.  That led to him getting aggravated since he thought that the neighbors were transgressors.  He went so far as to enter a neighbor's house without permission.*

*As his paranoia, delusions, and mania persisted and increased, the potential for dangerous behavior increased.  He made references to weapons, such as knives and a gun.*

*His mood showed signs of instability.*

*The combination of paranoia, delusions, mood instability, and a failure of reality testing, along with the threat and presence of weapons, shows the potential for dangerousness.]*

*COLORADO SPRINGS POLICE DEPARTMENT REGARDING CRT RESPONSE*

<u>Kyle Sack Supplemental Report</u>
- Memo 05/09/2020 regarding welfare check.
  - Mr. Burnett responded to the front door but wouldn't open it.
  - He provided a work telephone number to contact him.
  - He then walked away from the front door while CRT was attempting to call him at the provided number.
  - Mr. Burnett contacted CRT by telephone, denied being suicidal or homicidal.  CRT was unable to speak to Mr. Burnett in person on 05/09/2020.
    - *(CRT is the community response team of the CSPD.)*
- Officer Sack indicated that on <u>05/09/2020</u> and <u>05/18/2020</u>, he was along with the <u>Community Response Team.</u>

July 13, 2023
Re:  Chad Burnett
Page 29

- They attempted to contact Mr. Burnett at his home regarding welfare check calls for service requested by the Colorado Springs Police Department.
- Mr. Burnett would not open his door to meet with Sack in person during the welfare check, but he spoke with Sack over the telephone on 05/09/2020.
- *(Sack, along with the Community Response Team, did not respond to the weapons call for service on 05/24/2020.)*

- 05/08/2020:
  - On 05/08/2020, Colorado Springs Patrol Supervisor, Sergeant Mitchell, contacted the Community Response Team by email regarding welfare check request for Mr. Burnett.
  - Sergeant Mitchell advised that it was a call asking for assistance for Mr. Burnett.
  - There was something about a gun from someone who was likely an associate of Mr. Burnett.
  - It also appeared that Mr. Burnett was being disruptive to others in the neighborhood.
  - There had been multiple calls for service regarding Mr. Burnett.
  - Apparently, Mr. Burnett's parents died within the past year and their deaths possibly caused Mr. Burnett mental health concerns.

- 05/09/2020:
  - Officer Sack, on 05/09/2020, along with Officer Uebelhoer, responded to Mr. Burnett's home for a welfare check.
  - Upon arrival, they observed that he was inside the residence with a small white dog.
  - Mr. Burnett would not open the door and he asked to contact a work number.
  - Between the closed door and the windows, it was difficult to communicate.
  - Mr. Burnett walked away from the front door while Officer Sack was attempting to call the provided phone number.
  - Ultimately, Mr. Burnett called the officer, denying being suicidal or homicidal.
  - He denied having any medical or mental health diagnoses and reported being sober.
  - His communication was erratic, and he appeared emotional.
  - Communication then moved from talking to praying and crying and needing to get back to work.
  - Mr. Burnett was then provided with Crisis Resource information, including Aspen Pointe Parkside and a Crisis Line.

- 05/18/2020:
  - On 05/18/2020, Goldhill Patrol Officers requested the Community Response Team's assistance conducting an alarm related welfare check of Mr. Burnett.
  - Mr. Burnett followed his dog into the residence, but he did not open the door for the officers.
  - A request was made to see Mr. Burnett's hands, but Mr. Burnett responded by picking up his dog and walking away.
  - They were unable to speak with Mr. Burnett at the front door.
  - They tried his work phone and his personal phone, but he didn't answer.

Courtney McCormack Supplemental Report:

- Officer McCormack contacted Colorado Springs Police Department, Detective Matthew Kerr, regarding the Community Response Team (CRT).

July 13, 2023
Re:  Chad Burnett
Page 30

- The CRT unit is made up with one officer and one civilian who is a mental health caseworker/clinician.
- The policy for the Community Response Team unit states they are primarily to check welfare calls for service.
- They are unable to take criminal cases and do not respond to individuals that have committed criminal offenses or have warrants for their arrest.
- CRT did not respond to the 05/24/20 incident as Mr. Burnett was involved in the felony menacing incident, which caused officers from CSPD to respond.
- The CRT unit had responded to Mr. Burnett before this incident in attempts to assist Mr. Burnett with his mental health.
  - Their attempts were unsuccessful, and he was unwilling to speak with them or answer the door.
- All CSPD officers involved in this incident have undergone de-escalation training and use of force considerations, verbal communication skills, and interacting with special populations which includes mental health concerns during their employment at CSPD.

*[Interim Assessment:  The CRT were unsuccessful in their several attempts to intervene and in order to get Mr. Burnett to modulate his behavior, prior to the day of his death.*

*The situation of 05/24/20 was beyond the mandate of the CRT.  Police officers were in a better position to handle the situation than a civilian mental health professional.  The civilian mental health professional would have been in harm's way.]*

*COLORADO SPRINGS POLICE DEPARTMENT REGARDING 05/24/2020*

Case report 05/24/2020:
- Occurred Incident:
  - Menacing.
  - Menacing deadly weapon/simulated/aggravated, criminal mischief.
- Based on the initial contact, officers believed that Mr. Burnett may be an emotionally disturbed person.
- Mr. Burnett opened and shut the door while the police were speaking to him in his doorway.
- When Mr. Burnett came to the doorway, he had a wooden dowel and a box of knives.

*[Interim assessment:  Mr. Burnett had threatened his neighbor with a knife.  He was told to put the knife down by Sergeant Inazu at which time he threw it to the ground.]*

- While speaking with Mr. Burnett at the doorway, Sergeant Inazu saw an opportunity to rush Mr. Burnett and get him into custody.
- They rushed towards him, who was now in the house, and tried to get him in handcuffs, utilized some strikes against him for control purposes.
- Officer Barth deployed a taser.  That was not effective.
- During the incident, Mr. Burnett went limp and unconscious.
- During the investigation, the suspect was contacted by police and passed away during the contact.

July 13, 2023
Re:  Chad Burnett
Page 31

Thomas Pitchford Supplemental Report:
- He said Mr. Burnett had a club.
- Taser was deployed.

John Garza Supplemental Report:
- Officer Garza had phone contact with Sergeant Inazu.
- Sergeant Inazu advised Mr. Burnett may be an emotionally disturbed person.
- There was a knife and threats.
- Officers developed probable cause to arrest Mr. Burnett for felony menacing.
- Mr. Burnett was then at the front door but opening and closing the door while speaking with officers.
  - He had a wooden dowel and a box of knives.
- Sergeant Inazu told Officer Garza that he saw an opportunity to rush Mr. Burnett and did so with the other officers to place him in custody.
  - Officers then went hands-on with the suspect, strikes were performed, and Officer Barth deployed the taser.
  - They placed him in handcuffs and then kicked out his legs.
  - Leg restraints were placed.
  - He went limp and unresponsive.

Patrick David Supplemental Report:
- Sergeant Inazu stated that officers on scene, to include himself, attempted to take the suspect Mr. Burnett with a felony menacing with a knife into custody.
- During the arrest attempt, they struggled.  He was tased.  That was not effective.
- He lost consciousness.
- Lifesaving efforts were not successful.

Jon Price Supplemental Report:
- Interview with Sergeant Inazu.
  - On the day of Mr. Burnett's death at around 10 a.m. he went on patrol.
  - Once on patrol, he heard there was a weapons display.
  - He was aware of the frequency of calls referencing Mr. Burnett.
  - He received information regarding the broken window and the knife display.
  - He spent some time looking at previous call screens from responses to the home in order to get a better idea of what they were dealing with.
  - Further briefing from continuing interviews revealed neighbors had dealt with Mr. Burnett several times in the past.
  - Interviews were to determine if legitimate criminal charges were warranted.
  - Sergeant Inazu and another officer had an interaction with Mr. Burnett in the past.
  - They spoke with him through the front door of the residence.
    - Several statements given by Mr. Burnett were weird, like he was a priest and a ranger.
    - Sergeant Inazu asked Mr. Burnett if he had threatened his neighbor with a knife.
      - Mr. Burnett denied that.
    - During that contact with Mr. Burnett at the doorway, Sergeant Inazu observed 2 knives located on the table just inside the home.

July 13, 2023
Re:  Chad Burnett
Page 32

- Sergeant Inazu told Mr. Burnett that he needs to come out of the house to sign for the ticket.
- Sergeant Inazu then had concerns over Mr. Burnett's state of mind and multiple interactions with neighbors.
  - He heard about the books and the picking up of the books.
- Sergeant Inazu determined there was probable cause for felony menacing.
  - He had his officers give more interviews and then called for backup to do the interviews.
  - Mr. Burnett made numerous trips outside of the home throwing books, clothes and miscellaneous items in the front yard.
- He had a wooden dowel.
  - He spun the dowel making threats.
  - He brought out a metal fireplace poker.
- Sergeant Inazu tried to start a conversation about Hawaii.
  - That lasted a short time before Mr. Burnett ran back in the house.
  - Sergeant Inazu estimated that he asked Mr. Burnett 50 times to come outside of the house.
- The officers completed the victim interviews and confirmed they had enough to arrest for menacing.
- They continued to try to engage Mr. Burnett in any type of conversation in the hope that he would come out and could be taken into custody.
- He came out again wearing different clothing, this time Toronto Maple Leaf shirt.
- He came out to a point where Sergeant Inazu believed they could rush him to take him into custody.
  - Sergeant Inazu sprinted towards Mr. Burnett with the full intention of beating him before he could reach the door.
  - Mr. Burnett reached the door and began to shut it and Sergeant Inazu pushes the door open and grabbed Mr. Burnett's left arm.
  - Mr. Burnett went to the ground.
    - He was actively fighting.
    - During the fight, Sergeant Inazu saw Mr. Burnett reaching for another officer's gun.
    - The taser was deployed.  The taser deployment only caused pain compliance.
  - At some point during the fight, Mr. Burnett told them that he is finished and that they've got him handcuffed.
  - They stood up and walked him outside.  He told them he was not leaving the house.
  - He started struggling with the officers, pushing with his legs, making all of them fall to the ground.
    - Sergeant Inazu ended up on Mr. Burnett's legs.
    - He fought actively with his legs.
    - They determined the need for shackles.  Flex cuffs were used.
    - During this time, he stopped fighting.  Medical personnel were called.
- Interview with Officer Barth.
  - Officer Barth said due to Mr. Burnett having a knife and bat and other various items, it was determined that they could no longer let him go in and out of the address with these items to prevent him from hurting anyone.

July 13, 2023
Re:  Chad Burnett
Page 33

- Officer Barth was advised that they may utilize a taser.
- Mr. Burnett said things along the lines of why don't they just kill him?
- He was advised that that's not what they wanted to do.
- He got agitated for running into the house.  Odd behavior.  Possibility of weapons.

*[Interim Assessment:  Mr. Burnett was psychotic accompanied by paranoia and mania.  He was agitated.  He was without insight.  He did not respond to police officers attempting to coax him out of the house and into custody for what appears to be almost an hour.*

*Police officers understood that there was danger if he was let back in the house, which was then confirmed by the presence of multiple weapons including a gun and several knives.  Knives were stabbed into tables and other objects, perhaps to keep them at the ready.]*

## SUPPLEMENTAL REPORTS WITH BACKGROUND FROM AROUND THE DAY OF DEATH:

Derek Exley Supplemental Report
- Colorado Springs Police Department (CSPD) dispatch center received a call for service regarding a weapon violation on Ashgrove Street.
- CSPD patrol officer arrived on scene and began conducting their investigation.
- Reporting party was Mrs. Shaw.
  - Reporting parties neighbor was threatening her husband with a knife.
  - During the menacing incident, Mr. Burnett threw a silver-colored disc through a neighbor's window breaking the glass.
  - When officers went to speak with the reporting party, the neighbor stated that Mr. Burnett threw  books in the yard.  They tried to return the books and Mr. Burnett produced a knife and raised it above his head in a downward motion.
- Officer Exley interviewed John Shaw.
  - Mr. Shaw said that Mr. Burnett had come over to their residence in the late morning and told Mr. Shaw that Mr. Burnett's Corvette had been stolen by Mark [Sather].
    - Mr. Burnett found the vehicle and asked Mr. Shaw about a tow truck.
    - He said that Mark Sather stole the vehicle and the steering column had been broken.
    - The tow truck didn't come, and jumper cables were used, which were successful, and Mr. Burnett drove the car home.
  - Mr. Burnett gave Mr. Shaw some frozen food as a token of appreciation.
  - Mr. Burnett, after putting the Corvette in his garage, went over to Mr. Shaw's residence. They had to look for Mr. Burnett's house keys.
  - Awhile later, Mr. Burnett brought over his mother's wedding ring, his mother's pearls and the title to the Corvette and said he was going to give those items to Mr. Shaw for helping.
    - Mr. Shaw told Mr. Burnett that he did not want the items, but Mr. Burnett insisted.
    - Mr. Shaw said he placed the items inside of an envelope and just held onto them for the time being.
  - At around the same time, there was an issue with Mr. Burnett's dog.
    - Mr. Burnett went to Mr. Shaw's residence with a Bible and wanted to give the books to Linda Silver, who seems to have found his dog.

July 13, 2023
Re:  Chad Burnett
Page 34

- Mr. Shaw stated that Mr. Burnett became agitated and proceeded to throw the items on the ground.
  - He then threw something else on the ground.
  - There was kicking of a window and then throwing the silver disc at the window.
  - Mrs. Shaw went to pick up the items and Mr. Burnett said to leave his "goddamn papers alone or I'm going to kill you" and he pulled out a knife.
  - Mr. Burnett was saying that the only way they were friends was if Mr. Shaw was a Texas Ranger.
- There had also been a confrontation with a neighbor and Mr. Burnett during which Mr. Burnett yelled at that neighbor "Don't shoot me.  I didn't do it."  Broadmoor Security was called.
- Mr. Burnett had claimed to be a member of the San Diego Police Department and he would not talk to Colorado Springs Police Department because that department was a 'drug ring.'
- Mr. Shaw's son, James Shaw, was also involved.  Mr. Burnett was seen as irrational, with a 5-6 inch folding knife and threatening to kill.
- Mr. Shaw said that Mr. Burnett had moved into the residence about a year and a half ago.
- Other neighbors had noticed this odd behavior, including Luella.

*[Interim Assessment:  Mr. Burnett's gift of appreciation to Mr. Shaw was excessive and out of proportion to what Mr. Shaw did.  By Mr. Shaw's rejecting those items, Mr. Burnett was offended.  Mr. Burnett apparently thought that Mr. Shaw was going to become his friend. Feeling slighted, disrespected, and hurt, Mr. Burnett became aggressive.  There was a threat of violence with a weapon.]*

- Officer Exley interviewed Cornelia Maytag.
  - There was one morning Mr. Burnett came out of his residence screaming at Ms. Hayes stating that he owned the property, and she does not own her own home.
    - He was yelling and swearing.
  - Ms. Maytag stated that the family began a litigation case against Mr. Burnett to include a felony criminal charge as he had gone into their residence uninvited.
  - There was another occasion where he had gone into his front yard and was dancing around and throwing his hands up in the air.
  - There was another incident where a neighbor had somebody at her door with a gun and it was thought that it had something to do with Mr. Burnett.
- Officer Exley interviewed Maureen Davenport.
  - Mr. Burnett told Ms. Davenport that he received a check for $1 million dollars, and she asked what it was from, and he said it was from Tour de France.

Kyle Lambert Supplemental Report
- The reporting neighbor said when he tried to return the books, Mr. Burnett produced a knife and raised it over his head.
- Patrol officers considered that felony menacing charges were applicable for Mr. Burnett.

Christopher McCleary Supplemental Report:
- Mrs. Shaw said that when her husband declined to take the books from Burnett, Mr. Burnett became angry.

July 13, 2023
Re:  Chad Burnett
Page 35

- When her husband knelt to pick the books up, Mr. Burnett stood above him and produced a knife from his back pocket and said that he was going to kill him.
- Mrs. Silver said that Mr. Burnett's behavior was abnormal and aggressive.
  - Mrs. Silver went on to say that she could hear parts of a discussion with the officers and Burnett, and she heard that a ticket was going to be issued.
    - Mr. Burnett denied doing anything and went into his residence.
  - Mr. Silver stated that the officers were much more patient than they had to be or that he would have been with Mr. Burnett.
  - Both Mr. & Mrs. Silver described Mr. Burnett trying to retreat into the residence and being pursued by officers.
- Officer McCleary interviewed Luella Jones.
  - She talked about Mr. Burnett saying "You stole my Texas Ranger. You killed my mother, and you killed your husband."
- Officer McCleary was present to observe a handgun in the master bedroom.

*{Interim Assessment:  All of the neighbors interviewed described a man out of touch with reality.  His mania, psychosis, and delusions were increasing accompanied by agitation and dangerousness.*

*Previous attempts at intervention by the Community Response Team with a mental health professional had been unsuccessful.*

*Based on all these calls, leading up to the 05/24/2020 incident, Mr. Burnett was paranoid, psychotic, and delusional.  The attempts made to intervene by the Community Response Team with mental health professionals and were unsuccessful.  On one occasion, he barricaded his door.]*

<u>Other interviews</u>

- Interview with <u>Judy Barnett</u>:
  - Mr. Burnett's mother Sara and stepfather Renny had passed away in January 2019 at which time Mr. Burnett had been living with both of them.
  - He moved into their residence in October 2018.
  - Mr. Burnett's aunt had passed away.  Ms. Burnett stated that Mr. Burnett had a very contentious relationship with his cousins, the Sathers.
  - After his aunt's death, the Sathers were set to inherit substantial assets based on the family of ownership of LVW, a company involved in the development of the space force.
  - Mr. Burnett said that he had been paying his HOA dues.
  - He had asked permission to place a camera at the back of his house to photograph wildlife.
  - In April 2020, she walked the property for fire mitigation.
    - Mr. Burnett accused her of stealing his trees and he was going to call China.
    - She told him it was a common area and he called her a bitch.
    - There was talk about a "Texas Ranger gun."
    - He believed that someone killed his mother.
  - She knew that Mr. Burnett's Corvette had been abandoned on Lake Avenue.
  - Mr. Burnett was staying with his mother because she was an invalid.

July 13, 2023
Re:  Chad Burnett
Page 36

- His parents died 2 weeks apart.
- There was something about a problem at the funerals.
- He had never been nasty to Ms. Barnett until the landscaping incident.
- She thought that Mr. Burnett had recently gone to Texas to visit his aunt first week of April 2020.
- Interview with Mark Sather.
  - Mr. Burnett was the stepson of Mrs. Sather's uncle.
  - Mr. Burnett had caused the family trouble his whole life.
  - Sather thought that his death was some sort of suicide by cop.
  - He did not believe that the officer should bear responsibility for what took place because it was just a matter of time.
  - Burnett has been a nightmare and a timebomb while Mr. Burnett attended public school in Colorado Springs.
    - He then disappeared for a time.
    - His mother kicked him out several times.
    - He came into the picture 01/02/2019.
    - He has had bouts of homelessness and traveling.
  - Mrs. Sather tried to help him after Burnett's mother and stepfather died.
    - Mrs. Sather speculated that the money involved in the estate may have made family members become more interested in things involving Mr. Burnett.
    - Mrs. Sather was afraid of him.
    - Mrs. Sather believed Mr. Burnett had jumped in front of a Broadmoor security vehicle with a bat.
  - Mr. Sather said that things had been especially escalating the last 2 – 3 weeks when he started hearing things from Mr. Burnett's neighbors about incidences.
  - Mr. Burnett does have a history of drug use when he was younger.
  - Mr. Burnett's mother was an opioid shut-in for at least the last decade.
  - Mrs. Sather commented that on the previous Friday night and early Saturday morning, Mr. Burnett's actions had been going on all night.
  - The Corvette had been titled to John Borchert and after his uncle died, he got it retitled to his own name.
    - The DMV was not inclined to do it, but he bullied the DMV into doing it.
- Telephone interview with Mark VanNess:
  - Dr. VanNess is the dentist for Chad Burnett.
  - Dr. VanNess was interviewed by Officer McCormick.
  - He stated that on the previous day, 05/24/2020, he had received a voice message from Mr. Burnett in which Mr. Burnett was talking about Nazis and threatened to cut Mr. VanNess's throat.

Patrick Gallagher Supplemental Report:
- Officer Gallagher noted there was a 911 recording from Carolyn Shaw who said her neighbor was threatening her with a knife.
- There was another call, from Mr. Burnett, who said he just got in from Japan.
  - His jet was at the Colorado Springs airport, and he claims to be from Japan.
  - He said there are fake police trying to evacuate.

July 13, 2023
Re:  Chad Burnett
Page 37

- He said he owned the Broadmoor.
- He then yelled "Get the fuck off my property!" and then disconnected.
- There was a call from Dr. VanNess regarding Mr. Burnett being a Nazi General and threatening to slit the throat of Dr. VanNess.

<u>Jon Price Supplemental Report</u>:
- Information includes Mr. Burnett's personality.
  - His mental state was erratic, switching from friendly to aggressive very quickly.
  - Ms. Shaw was hoping he would receive mental health treatment, but he never did.
- He moved in a couple of years ago.
  - The house belonged to his parents.
  - Ms. Burnett had trouble living in his parent's home.
  - In January, his focus was selling the home and moving to Texas.
- On another occasion, Mrs. Shaw and Mrs. Silver encountered Mr. Burnett near the Shaws' driveway.
  - Mr. Burnett said someone stole Abby, *(his dog)*.
  - Mrs. Silver responded that Abby was right there.
    - He was unable to comprehend that his dog had been returned to him.
  - Mrs. Silver smelled alcohol on him.
- Mrs. Silver observed the police response on the day of his death.
  - The officers were all in uniform.
  - The officers were very patient with Mr. Burnett as they dealt with him.
    - They attempted to speak with him through the front door.
    - They were attempting to coax him outside.
      - He was not willing to come out.
  - Mr. Burnett stated that he was the owner of the Broadmoor and that he is the Borcherts' son.
  - Mr. Burnett threatened the officers that the Broadmoor police would arrest them.
  - The CSPD officers eventually told him that he needed to come in so that they could serve him a ticket for breaking Ms. Maytag's window.
    - He denied doing that.
  - Mr. Silver videoed the Maytag incident on his cellphone.
- They were aware of the HOA cutting down some pine trees which made Mr. Burnett mad saying they were $60,000 Bonsai trees from Japan.
  - That seemed to be the beginning of his erratic behavior.
  - He later accused Luella Jones of having killed her husband and his mother.
  - He went from friendly to aggressive.
  - Two weeks ago, Mr. Burnett accused Mrs. Jones of stealing his Texas Ranger gun.
  - Also, that she killed his mother and her husband.
- Mr. Burnett came out of the house several times and threw things and yelled at the officers.
  - He rolled a bicycle out the front door onto the lawn.
  - He came out with a knife once.
  - He was ordered to drop the knife, which he did.
  - On one occasion he had a short bat and on another he had a long stick.
- On the last time, he attempted to run back into the house.  He couldn't get the door shut.
  - Three officers rammed the door and were able to get inside.

July 13, 2023
Re:  Chad Burnett
Page 38

- A female officer with a taser entered the house.  They didn't know if he was tasered.  Mr. Burnett later came out the front door with handcuffs.  He was talking.  They went back inside the house and Mrs. Silver heard breaking.  Also heard Mr. Burnett screaming.  Later an ambulance came.  They said Mr. Burnett was involved in a lawsuit with some family members.  There's an aunt in Texas.

David Glenn Supplemental Report:
- Officer Fleming noticed a large red sports jersey covering most of the inside of the front window which made it difficult to view the inside of the house.
- Officer Fleming attempted to peer inside the house while Sergeant Inazu contacted Mr. Burnett at the front door.
  - Mr. Burnett was holding a knife in one hand and a beer in the other hand while they spoke with him.
  - There were several other knives laying inside the house within Mr. Burnett's reach.
  - During the contact, Mr. Burnett refused to open the front door but did speak through the door with Sergeant Inazu for a few minutes.
  - He heard Mr. Burnett saying that he was the Pope and they needed authorization from Rome to get him to come outside.
  - Sergeant Inazu spoke to Mr. Burnett in calm tones to deescalate the situation and obtain a statement from Mr. Burnett.
- After several unsuccessful attempts to attain a statement from Mr. Burnett, Sergeant Inazu and Officer Fleming decided to follow up with Officer Daigle to determine the extent of any criminal charges arising from the investigation.
- Mr. Burnett was holding a wooden dowel and was asked to drop it.
  - He complied and went back in the house.
- Officer Fleming indicated he was scared that Mr. Burnett might try to hurt him and placed his hand on his duty weapon as he spoke to Mr. Burnett, but he did not unholster it at that time because Mr. Burnett complied with the order.
- When the officers decided there was enough to arrest Mr. Burnett, there were safety concerns because of his escalating aggressive behavior.
  - They thought it best and most tactically sound to take him into custody.
  - They believed it was necessary to restrain him right away due to his size and irrational behavior and that they would not be able to verbally articulate to Mr. Burnett that he was going to be arrested without him attempting to flee into his home.
  - When they attempted to put him in handcuffs, he pulled away, ran into his house.
  - Officer Fleming ran inside after Mr. Burnett and grabbed his right arm to keep him from fleeing further.
  - Officer Daigle and Sergeant Inazu joined Officer Fleming in trying to restrain him.
  - During the struggle, a taser was used by Officer Barth.  As Mr. Burnett attempted to prevent the officers from getting through the door, he fell through the front door and struck his face on the front steps.
  - Three officers fell on top of him, and he was flailing and resisting arrest.
  - Then he stopped resisting and was nonresponsive.

Jon Price Supplemental Report:
- Officer Price interviewed Pamela Dowdell.

July 13, 2023
Re:  Chad Burnett
Page 39

- On the night of May 23, Mrs. Jones opened her garage door.  Mr. Burnett came out of his house and began to yell.  He asked if Mrs. Jones was dead.  He then went on to say something to the effect of  don't mess with him because he has a gun.  He wasn't making any sense.

*MORE BACKGROUND*

Courtney McCormack Supplemental Report:

- Officer McCormack spoke with Eugene Griffith, a close friend of Mr. Burnett's stepfather.
  - He knew Mr. Burnett since Mr. Burnett was 13 years old.
  - Mr. Burnett has struggled with drug use and alcohol use throughout his life.
    - Over the past few years, he had gotten clean and was working in a bicycle shop.
  - In 2019, stepfather John Borchert passed away.  Mr. Burnett's mother passed away a few days later.
  - After both deaths, Mr. Burnett received a large estate.
    - After this occurred, Mr. Burnett left his job at the bike shop and attempted to establish several different businesses that were unsuccessful.
    - Mr. Burnett would contact Mr. Griffith fairly regularly telling him what was going on.
    - Mr. Burnett was in a constant financial battle over the estate.
    - Mr. Burnett also discussed his Aunt Kay Spears and niece residing in Texas.
  - Mr. Burnett contacted Mr. Griffith about 3 weeks before his death.
    - At that time, he claimed his ex-wife had stolen his shotgun.
    - Mr. Griffith told Mr. Burnett that he needed to report it to Law Enforcement and asked if he knew the serial number for it.  Mr. Burnett explained that he did not know the number but there was an old photo of his stepfather and his friends out shooting with the gun.  Mr. Griffith suggested the photo may have the serial number in it.
    - The conversation was continued on and off.
    - Mr. Griffith was worried that Mr. Burnett may have been using drugs and alcohol again.
  - A few weeks later, Mr. Burnett again called Mr. Griffith and was not making any sense during the conversation.
    - Three days before his death, Mr. Griffith received a few family photos via Messaging.
    - He believed Mr. Burnett had recently returned to Colorado Springs from Texas a few weeks before the incident.

*[Interim Assessment:  After the death of his parents his mental state deteriorated.*
- *He was under stress due to having to deal with the estate.*
- *He lacked structure after giving up his job.*
- *With money, he had access to drugs and alcohol.*
  - *Mr. Burnett has a lifelong history of drug use and mental illness.*
- *He lacked responsibility since he did not have to look after his parents.*
- *He lacked consequences since he did not have to report to his parents.*
- *He was not compliant with medication.*
- *He was getting psychotic and was not on an antipsychotic.]*

July 13, 2023
Re:  Chad Burnett
Page 40

<u>Bradley Whitehead Supplemental Report</u>:

- Interview with Mr. Burnett's <u>ex-wife Kathryn</u> via telephone.
  - She said he had medical problems with circulatory issues due to being tall.
    - She said he was secretive about his health.
  - She said he was diagnosed with bipolar disorder with psychotic tendencies.
    - She thought Mr. Burnett was seeing a therapist but didn't know who.
    - Nevertheless, his newest therapist was only treating him for depression and felt that wasn't enough.
    - She said he had bipolar 1 disorder with auditory hallucinations.
  - He wasn't in a good state of mind.
    - Due to COVID 19, he wasn't seeing his therapist and she was afraid he wasn't taking his medication and isolated himself.
    - She said she blew up on him a couple of weeks ago and he unfriended everyone on social media.
    - He ceased contact with her 2 weeks ago.
    - His state of mind wasn't good.
  - His mother died from a lung issue and his father died from a heart issue.
    - Mother was disabled, in a wheelchair and bedridden.  She then said she wasn't sure what his mother died from.
    - Something about a knife and something about his mother being murdered.
  - Mr. Burnett's aunt was Kay Spears.
    - They had an issue between them.
    - She said Mr. Burnett thought that Kay was using him for money.
    - He was living with her and didn't like the living conditions, so he returned home.
  - Mr. Burnett was a member of AA.
    - She didn't know if he had a relapse.
    - He used to use meth.
    - In 2012, he fell off the wagon and was using cocaine.
- <u>Kay Spears</u> was interviewed by phone.
  - She's his only living relative.
  - She called in the welfare checks.
  - She knew that the Crisis Response Team tried to talk with him, but he wouldn't speak with them either.
  - He lived with her in Texas and was going to live with her until COVID 19 settled down.
  - She talked about how small of a town she lived in and there weren't many cases being reported there.
  - After about a week, he returned to Colorado the first week of April 2020.
    - She said he was picking a fight with her and felt she couldn't say anything right to him.
    - They talked about his mother and stepfather dying within a week of each other in January 2019.
  - Since then, she estimated that they talked about twice a week.
    - He was paranoid regarding neighbors.
    - She thought he quit his medications before he left her house.
  - She said in the last 6 – 8 months, he was training for bicycling events.  He was eating and cooking well.

- His wife, Kathryn, had mental health issues.
  - They met at Pikes Peak Mental Health 25 or 30 years ago.

  *[Interim Assessment:  COVID was hard for Mr. Burnett.  If he had been training for bicycle events before,  and they were called  off, that led to less structure.  Then an attempt to live with Mrs. Spears did not work out.*

  *Ms. Spears thought that he had already quit his medications before he left her house in Texas.*

  *She was aware that he was paranoid when he returned to Colorado.]*

- A search of Mr. Burnett's home revealed several knives located around the home.
  - Some of them appeared to be stabbed into tables and other objects in the home.

<u>Lisa Montville Supplemental Report</u>
- Detective Montville conducted a follow-up on this case.
- She reviewed a press release published by the 4th Judicial District Attorney's office.  The press release stated that the 4th Judicial District Attorney's office had reviewed the case and determined the use of force by officers during the arrest of Chad Burnett was reasonable and appropriate.
- No criminal charges were filed in this case.
- (See <u>News from the Office of the District Attorney</u>)

*BODY CAMERA VIDEO 05/24/2020*

Officer Alvey:
- Officer Alvey arrived after Mr. Burnett's death.

Officer Barth:
- Footage of attempting to restrain Mr. Burnett.
- Mr. Burnett was screaming.
  - He was resisting attempts to have him leave the house, even became unresponsive.
  - AMR Ambulance arrived.

Officer Carroll:
- Body camera footage when Mr. Burnett was already unresponsive.
- Attempts to resuscitate.

Officer Daigle:
- Mr. Burnett was resisting and then nonresponsive.
- Officer Daigle interviewing a neighbor.
- Two officers discussing how to approach the situation.  They discussed how to approach him before he got "crazier."
- They discussed the menacing charge.
- This is an interview with another neighbor.

July 13, 2023
Re:  Chad Burnett
Page 42

- Some discussion about how to handle Mr. Burnett.
- Interview with neighbors.

Officer Fleming:
- Almost 2 hours of footage including discussion of how to approach Mr. Burnett.
- Viewing Mr. Burnett through a window.  He was observed drinking a beer.
- Officers asked to enter.
- Attempts to talk with Mr. Burnett begin at 22 minutes into this footage.

Officer Mike Inazu:
- Through the window asking Mr. Burnett to open the door.
- He reassured Mr. Burnett that they were going to talk and be helpful.
- There was continued discussion, but the door wasn't open.
- Then the officers went to interview neighbors.
- At around 1 hr. 27 min into this video, officers approach Mr. Burnett and Mr. Burnett was outside the house.
  - They engaged Mr. Burnett and talked about Hawaii.
  - They talked about the Maple Leafs, a hockey team.
  - Mr. Burnett had a sweatshirt and was saying that he was sponsored by the San Diego Police Department.
  - Mr. Burnett headed back into the house and the police officers got there before he could shut the door.
  - They attempted to take him down.
- Interview with neighbor.
- 44 minutes into this video, Officer Inazu approached Mr. Burnett.
- Officer Inazu coaxes Mr. Burnett to come out further.
  - He is already out of the house out on his sidewalk.
- At Mr. Burnett's door, Mr. Burnett is by his window.
  - Attempts were made to coax Mr. Burnett out.
  - He was told they weren't going to arrest him but just wanted information about what happened that morning.
- Attempts were made by police officers to coax Mr. Burnett to talk about what happened.
- The officers understood the nature of his mental disorder and that he was paranoid.
- Officers discussed how to approach him.
- Attempts were made to approach him.
- Mr. Burnett was observed to be drinking whiskey.

*PHOTOS*

- What appears to be Mr. Burnett's home including books, a Bible, handgun, two folding knives.
- Photo of wooden dowel.
- Photo of knife sheath and knife outside the sheath.
- Photo of knife stabbed into a wooden table and then in an upright position.  The wooden table has multiple stab marks.
- Photo of bottle of carbamazepine and bupropion and doxycycline.

July 13, 2023
Re:  Chad Burnett
Page 43

## POLICE DEPARTMENT DIGITAL VOICE FILES

- Multiple phone calls to 911, including those from Mr. Burnett that are consistent with what has been reported in the interviews.
- Multiple phone calls from various neighbors consistent with their interviews.
- Multiple interviews with various neighbors consistent with the interviews that were provided in the narrative reports.

## DEPOSITION MILLICENT KAY SPEARS

06/13/2023, Deposition—
- Chad Burnett had some behavioral problems while in school.
  - Ms. Spears knew that he switched schools.
  - He went to a boarding school in Arizona.
- He then came back to Colorado.
  - Mr. Burnett lived with his parents until he was about 22.
  - After he moved out from his parents, he got an apartment.
- Work:
  - He worked at Bell's Deli because he had an interest in cooking.
  - He also worked at The Hatch Cover in the kitchen.
  - The next job Ms. Spears knew about was at Colorado Cyclists.  He started in the mail room and sweeping floors.  He then progressed to selling as a sales representative.  Then he moved up to being a buyer.
- During Mr. Burnett's thirties and forties, Ms. Spears would see him probably twice a year and on the phone three times a year.
- Ms. Spears' sister, his mother, mentioned something about substance use when he was in his early twenties.
- **Ms. Spears wrote the obituary from personal knowledge.**
  - **In the obituary there was a lot of information about substance abuse problems, which Ms. Spears learned from him before he died.**
  - **Ms. Spears wrote that Mr. Burnett had a long-time battle with mental illness with symptoms of clinical depression beginning in his teens.**
- From the year 2010 to 2020, when Mr. Burnett was 40 to 50 years old, Ms. Spears knew about Mr. Burnett's activities because her mother would call and talk to Mr. Burnett.  Her mother would tell Ms. Spears that he was doing well.
- Ms. Spears' relationship with Mr. Burnett got closer after Ms. Spears' sister, his mother Sarah, died on 01/10/2019.
- He had been depressed when he was a teenager.
  - For a time, he was inpatient at Pikes Peak Mental Health.
- They discussed this in 2019.  At that time, he was seeing a therapist.  They had that conversation when he visited her in Texas.
- Ms. Spears has an LPC, licensed professional counselor.
  - Ms. Spears worked in various capacities including having a private practice for adults, doing social service work with children, and working for Pikes Peak Mental Health and working on a  locked psychiatric unit.   If a person got agitated, she was always able to talk them

July 13, 2023
Re:  Chad Burnett
Page 44

down.  She never had to call for medications for the patient.  She never had to restrain a patient.

- When a person has a delusion, Ms. Spears said that you do not want to go against it.
  - They are not going to change.  That is their delusion.
  - For those patients, talking might help or medication or a lot of different things.
  - Then there is teaching them to help themselves and being in control of their lives.
  - She did not deal with delusional patients in her private practice.
- Ms. Spears never had a patient who stopped taking medication.
  - She said that she had patients who confided in her that they stopped taking their medicine and then she encouraged them to get back on it.
  - She did not see any behaviors in people who stopped taking their medication that concerned her.
  - She never saw anyone deteriorate from not taking their medications.
- Ms. Spears said that she would not recommend release to a person who was actively delusional with persecution theory that people were wronging them and if they were not taking their medication.
- She would not be in a room with the door shut where the patient who is actively delusional and not compliant with medication and if the delusions were persecutory.
- She believes that an actively delusional person with access to weapons and not compliant with medication can be treated as an outpatient to render them safe.
- Sometimes in an unsafe situation the police are called to render the situation safe.  To render the situation safe, they could take the person in for a 72-hour hold, eliminate weapons, and arresting them if they committed a crime.
- When asked if she could de-escalate someone out of delusions, she said she did not know.
- Ms. Spears has treated someone with bipolar.  When asked if bipolar was more than depression or anxiety, Ms. Spears said no.  She does not remember if she treated someone with bipolar or psychotic features.
- Mr. Burnett moved in with his mother and stepfather in the fall of 2018 because of their health problems and he was helping them.
- Her sister, Mr. Burnett's mother, did not reach out because of her health.
- During one of the visits that Ms. Spears had with Mr. Burnett prior to 2018, he shared with Ms. Spears that he was on drugs for many years before.
  - He had been off drugs when he started getting promoted at Colorado Cyclists.
  - She knows he went to AA.
  - She does not know when he got off drugs.
  - Promotion at Colorado Cyclists gave him context to stay off alcohol.
  - He had been off drugs for a long time so that was not part of the equation.
- Mr. Burnett's mother was homebound from 2010 forward.
  - During the time she was homebound between 2010 and 2019, Ms. Spears saw her twice and those were the only two times that she saw Mr. Burnett.
- After the death of Mr. Burnett's parents, she talked to him by telephone more frequently and texted.
  - Calls with Mr. Burnett were grief related for both of them.  He missed his mother.
  - Calls were usually an hour—he was alone, and Ms. Spears was alone.

July 13, 2023
Re:  Chad Burnett
Page 45

- When Ms. Spears came to visit in June 2019, he disclosed his lifelong troubles with mental health.
- **She also knew about his mental health struggles when he was at Foothills—Pikes Peak Mental Health in 1993 —and she visited him there.**
  - **She does not know why he was there and that was many years ago.  She did not want to know because it was his life.**
  - **It was her belief that he was hospitalized for a diagnosis of bipolar and then he confirmed that in 2019.**
- Ms. Spears went to see Mr. Burnett in June 2019 and stayed for a couple of weeks before she needed to go back home.  He then said that he would go back with her, so he went to Texas.  He was together with Ms. Spears for about five weeks total.  He was in Texas for a couple of weeks.
- Mr. Burnett told Ms. Spears that he tried to kill himself in 2019 leading to the hospitalization.
  - He tried to shoot himself because he was very depressed, and that Kathryn's behavior was stressing him out.
    - He was ambivalent about getting back together with her and then she said that they were not getting back together.
    - Ms. Spears believes that he was mentally manipulated by her.
- They talked about grief.
- He had retired while he was living with them.  He stopped working because he was taking care of his parents.

  *[Interim Assessment:  So there is grief related to the loss of his mother, the loss of his father, the lack of commitment from his ex-wife to reconnect, and not working.]*

- Regarding the Borchert family, Renny died leaving his estate to Mr. Burnett's mother.  Then Mr. Burnett was the only beneficiary of his mother's estate.  There were a lot of things he did not understand.  There was quite a bit of money involved.
  - Mr. Burnett told Ms. Spears that Mark Sather was pressuring Mr. Burnett about the estate and Mr. Sather never thought of Mr. Burnett as part of the family.
  - Mr. Burnett called Ms. Spears three or four days after his mother died and said that Mr. Sather came with a truck to take everything out of the house because Mr. Burnett was still there.  Mr. Burnett thought that was pretty crass.  Mr. Burnett did not let him and slammed the door in his face and then called his lawyer.
- In the obituary, it said that Mr. Burnett said that neither he nor his mother felt welcomed to the Borchert family, which included his step-grandparents and then lists everyone else.  Ms. Spears said that she included that in the obituary, speaking for Mr. Burnett—he had been treated poorly from the time he was 9 years old until he died when he was 49.
- On her way to Colorado, driving on the road, she called probate regarding her sister's estate.
- Ms. Spears talked to the husband and wife that Mr. Burnett threatened with a knife.
  - They did not talk about his increasingly erratic behavior.
  - They said they were never afraid of Mr. Burnett.  The wife did call 911.
- Regarding the suicide attempt in 2019:
  - He shot himself but he flinched after the gun went off.  He then came to his senses and realized that he really did not want to die.  He called his ex-wife to take him to AspenPointe.

July 13, 2023
Re: Chad Burnett
Page 46

- Regarding the suicide attempt, apparently his ex-wife told him that she wanted to get back together with him and then all of a sudden, she did not, and he was feeling despondency about that.
- Regarding weapons:
  - Mr. Burnett told Ms. Spears about a few rifles that he had. They went to Kathryn's house for a while but were back in his house after he was released from the hospital.
  - Regarding the weapons in the house after his suicide attempt, Ms. Spears said that she trusted him because he was more suicidal than homicidal.
  - She then said that he did not have any ammunition.
  - She trusted him because it was her understanding he had a suicide contract.
- She believed that he was taking medication because he told her that he was.
  - She saw him take one medication but did not monitor him.
- He was in therapy and stopped for a number of weeks while he was in Texas.
- During that time, Ms. Spears did not sense anything from him was delusional.
- When Mr. Burnett was in Texas with Ms. Spears:
  - He was doing chores around the house including cleaning the yard, throwing stuff away, and caulking the bathtub.
  - He did a lot of bike riding.
  - He took his dog, Abby, for walks.
  - He also did vacuuming.
  - He was frustrated with the lack of cleanliness of the house. Mr. Burnett did like things to be clean and tidy.
- Before he died, he was upbeat, planning the rest of his life, in great shape, eating well, and enjoyed cooking.
- After he died, Ms. Spears learned that he had been drinking again. She saw bottles in his house of hard liquor.
  - Ms. Spears did not know what he was using, and it surprised her that he had marijuana and alcohol in his system on the day of his death.
- When he went to Texas, it was because they were both alone. It was also during the time of the COVID quarantine, which was open-ended. There was some anxiety about the isolation of quarantine.
- Mr. Burnett's being in Texas at Ms. Spears' house caused him to be anxious because things were not organized and had to be gotten rid of. Anxiety presented itself as him being a little short. They were doing fine until one morning he decided he was going to go back to his house. He said he just wanted to be by himself. He did not seem delusional.
- When Mr. Burnett was in Texas at Ms. Spears' house, she knew that Mark Sather and/or Pauline Sisson were fighting Mr. Burnett being the personal representative of his mother's estate. They were fighting that the estate was going to go to Mr. Burnett.
- On a few occasions, Ms. Spears called from Texas to Colorado to do a welfare check.
  - On one occasion, she reported that he was off his medication, though during this deposition she said she does not know that specifically.
  - She mentioned to the police that there were guns.
  - One call to check on Mr. Burnett's welfare, when he finally answered the phone, he refused to believe that it was Ms. Spears calling him. She believed that that was an indication of delusional behavior. She thought he was off his medication because of his delusional

July 13, 2023
Re:  Chad Burnett
Page 47

behavior and that he was not taking her calls.  He hung up on her so she could not convince him that it was her. That was the last time she talked with him.
- Ms. Spears called the police again on 05/18/2020 with concerns that he was bipolar, paranoid, and off his medication.  She knew that law enforcement had been out to the house.
- In one of the calls, she mentioned something that made her consider paranoia.
- Regarding some of the incidents that occurred prior to Mr. Burnett's death, Ms. Spears did not hear about it until after his death.  That includes some of his delusional behavior and paranoid behavior.
- Regarding Mr. Burnett going into Mark Sather's home and encountering Mr. Sather's wife in the kitchen and being charged with Class 5 felony criminal trespassing, she said that the context of that was in his childhood because that is the home where his stepfather grew up so while he is having these delusions, he went in that way.
- When Ms. Spears went into the house after his death, there were over a dozen knives, all over the house.
- Mr. Burnett started his business, and it was up and running a month before it closed down due to COVID.

*[Interim Assessment:  The information from Ms. Spears' deposition varies somewhat from the information obtained during the police interview but does confirm that Mr. Burnett had lifelong mental illness.  He was depressed and suicidal when he was hospitalized in or around 1993.  He was diagnosed with a bipolar disorder.*

*It also confirms that Mr. Burnett had lifelong substance use issues with alcohol and cannabis.*

*In 2019 Mr. Burnett's mental health deteriorated after the death of his parents, then quitting his job, and then his ex-wife decided not to get back together.  That was further exacerbated by the use of substances.  Then he then had a suicide attempt by gunshot.  After the suicide attempt, he was not compliant with recommendations of medications and therapy.  He also did not abstain from substances.*

*Ms. Spears was aware that in 2020 he was delusional, off his medications, and had weapons at home.  She called for welfare checks.]*

*DEPOSITIONS OF POLICE OFFICERS*

<u>Officer Joseph Daigle</u>

05/10/2023, Deposition—
- Officer Daigle was asked about 05/24/2020 when they were called by Broadmoor Security to respond to the incident with Mr. Burnett.
- They were informed that he may have weapons in the house.
- The call was for felony menacing with a deadly weapon and that the neighbors were victims.
- The neighbor reported the incident, including that Mr. Burnett produced a knife and held it over to the neighbors—above the neighbor as he was bending down and picking up items. He said he was going to kill the neighbor.  Officer Daigle never observed Mr. Burnett holding a knife.

July 13, 2023
Re:  Chad Burnett
Page 48

- While interviewing the neighbors, he heard Mr. Burnett coming out and yelling.  He also saw Mr. Burnett throwing items towards the officers who were trying to talk with Mr. Burnett.  Mr. Burnett threw knives outside.  He saw things thrown in the yard.
- He had not known about Mr. Burnett's mental illness.
  - The officers did not know if Mr. Burnett was on some kind of substance or under the influence of alcohol or what was going on.
  - He knew that Mr. Burnett did not seem normal.
- The neighbors were terrified of him.
- After talking to the neighbors, Sergeant Inazu and Officer Daigle determined that they had probable cause.
  - After having probable cause, they had to make an arrest and they tried to talk him into handcuffs.
- After the officers entered the house and Mr. Burnett was tased and then restrained, they tried to walk him out of the house.
  - On the front porch, just out the front door, he had thrown himself on the ground and thrown Officer Fleming and Officer Daigle onto the ground as well.
  - He threw himself on the ground by kicking his feet out from under him and he fell on the ground while the officers were holding onto him.  Mr. Burnett fell forward.
  - As they were walking him to the patrol car, he went back into the house while the officers were still holding onto him.  He shoved Officer Daigle into the wall and then threw himself on the ground again and the officers fell on the ground again with Mr. Burnett.  During this time he was handcuffed.  He shoved the officers with his whole-body weight.
- Sergeant Inazu was the sergeant on the scene, the supervisor.
- At the time of the attempted arrest, Mr. Burnett was struggling and then calming and then struggling again and then calming again.

Officer Matthew Fleming

06/12/2023, Deposition—
- Officer Fleming did field training, which is on-the-job training for recruits.
- Officer Flaming taught a class on interactions with persons with disabilities.
  - That included physical disabilities, mental disabilities, developmental disabilities, mental illness, chronic illness, and vision and hearing impaired.
  - Officer Fleming is now in the role of academy instructor.
- They discussed the incident of 05/24/2020.
  - They were called out on a weapons display.  That is a male suspect pulled a knife on one of his neighbors.
  - Mr. Burnett had thrown stuff on the ground.
  - At some point he pulled a knife and threatened the neighbors.
  - The officers got more information, including ongoing irrational behavior, and the problems that the neighbors have been having.
- Taken at face value, Officer Fleming said that pulling a knife on somebody is very likely felony menacing.
  - It is a violent felony when you add unstable irrational behavior and that it is causing problems for the entire neighborhood.
- They had some history about Mr. Burnett having been acting irrationally.

July 13, 2023
Re:  Chad Burnett
Page 49

- Officer Fleming referenced the CRT.
  - There had been mental health concerns and Mr. Burnett had previously been given resources, but Mr. Burnett had not availed himself of those resources and CRT was unable to get him help.
  - There was history of irrational and escalating …unstable behavior.
  - Officer Fleming did not recall if there was discussion of calling CRT at that time.
- Officer Fleming explained that CRT is a team comprised of a mental health clinician, a medical person, and a police officer who arrived in tandem.
  - Their purpose is to offer mental health resources to persons in crisis when there is not a criminal aspect at the forefront.  The officer is there for security purposes providing security for the clinician and the medical person who is from the fire department.  Their role is not enforcement.  It is to connect people with resources.
  - Therefore, when you have a call involving someone who has  committed or is suspected of committing a crime of violence or is armed or possess a potential serious hazard, CRT probably is not going to be your first resource.  A lot of times they will not come to calls if the person is armed.  That is not what they are there for.  When a person is potentially armed or violent, you have to take care of safety and law enforcement functions first and criminal issues trump the mental health issues.
  - Mental health issues are not ignored, but they are handled afterwards.
- There was a decision to charge Mr. Burnett for criminal menacing.  Since they were unsure, they conducted more interviews.
- At some point, Mr. Burnett was yelling things and not making a lot of sense.
  - At multiple times, he came out of the house and did certain behaviors and threw stuff in the yard.
  - He made a statement that he was the Pope and that the officers needed to call Rome and there was reference to the Dutch Army—just irrational things.  That confirmed the report that he was behaving irrationally.
  - There was consideration of whether the irrationality was due to substance use or mental illness.
  - After further discussion with the neighbors, it was decided to arrest Mr. Burnett because he pulled the knife in a manner consistent with felony menacing.
- After he was handcuffed, during the process of trying to escort him out to the patrol car, he ended up falling to the ground just outside the doorway of his front door.
  - He was flailing his legs around and catching himself on corners making it very difficult to control him.
  - His momentum ended up pulling the officers down along with him.
- On Page 146, there was discussion of sudden Custody Death Syndrome.
- Mr. Burnett's behavior was irrational, bizarre, and aggressive.
- There was information that he was paranoid having made statements about a fake police.
- He made irrational statements.
- There was violence.
- At one point, he asked not to be shot and that he did not want to die.
- These symptoms occurred, but not contemporaneously.
- The officers did not have a profound concern that he might die.
- Mr. Burnett was advised that he was going to be charged with criminal mischief and the police officers referenced a summons.  Getting a summons is an arrest.

July 13, 2023
Re:  Chad Burnett
Page 50

- It was unclear whether Mr. Burnett had barricaded himself in the house.  He was coming in and out of the house but did refuse to exit the house.
- CRT had already been at the house previously and this time it was not a pertinent response.

Lieutenant Michael Inazu, Deposition

06/23/2023—
- Lieutenant Inazu listed elements of crisis including Mr. Burnett's deteriorating mental state, potential fatality due to weapons and physical threats, availability of potential victims including elderly neighbors, and Mr. Burnett's access to weapons.
- Duties of a patrol sergeant include administrative oversight for report review, use of force reviews, internal complaints that are filed, and any assigned tasks.
- The call to Mr. Burnett's residence was related to a citizen in that area who is experiencing some increasing mental health instability.
- Prior to going on the call, Lieutenant Inazu was aware that CRT had been out and Mr. Burnett refused services or refused to communicate with them.
- Lieutenant Inazu recalled Mr. Burnett drinking.  He saw knives.  He recalled Mr. Burnett making strange statements.
- Lieutenant Inazu thought there was probable cause and then went to collect more information.
- Lieutenant Inazu was confident that there was a case for menacing.  Also, based on his deteriorating mental health status, which justified placing him on an involuntary hold and taking him to a hospital. Lieutenant Inazu had no intent of leaving him there in the cul-de-sac or in his residence if he could avoid it.
- The neighbor described the threats of violence, the knife, and lethality of the encounter that morning with Mr. Burnett.
- Lieutenant Inazu said they needed to take him into custody because he threatened to kill his neighbor with a knife.  They were not going to leave.  He is a continued threat.
- In the course of the interactions with Mr. Burnett, he is not surrendering and does not appear to be de-escalating.  He went back and forth between cordial and approachable even though irrational, to violent and threatening.  That pattern of behavior and the unpredictable nature of his behavior was actually the status quo and the officers were not making headway.  Lieutenant Inazu was mostly concerned that his behavior with weapons, the stick, the poker, the knives, the threats that he had made, in addition to his irrational thinking and his kind of nonsensical statements made it even more unpredictable.  Going against someone like that, including going into his residence, especially if he is allowed to retreat back into the residence, is very dangerous.  So the preference is to arrest him outside his house.
- There was a discussion on Sudden Custody Death Syndrome.
- There was a discussion of excited delirium.  That was associated with Sudden Custody Death Syndrome.  Lieutenant Inazu was concerned that based on his mental status, the struggle, and the potential level of substances in his body, that he could die.

Officer Caroline Barth (Romine), Deposition

06/28/2023—
- Officer Barth used a taser.

July 13, 2023
Re:  Chad Burnett
Page 51

- Officer Barth Romine got the call.  She knew it was for a disturbance, involving neighbors, with a weapon.  She heard it was a disturbance in which Mr. Burnett had threatened one of the neighbors with a knife, throwing some books, and threw weapon-type objects.
- She believes Sergeant Inazu recommended that there should be a taser available as an option if the situation did not de-escalate.
- When she followed the officers into the house, she had information that there had been what appeared to be a violent disturbance involving a deadly weapon, involving this individual.
- She was not sure if there was anyone else in the house.
- During the altercation, she used her taser.  She believes there was contact with Mr. Burnett and the taser probes.  The taser was not effective.  The taser is meant to create neuromuscular incapacitation (NMI).  In other words, it locks up the muscles in a way that would allow the officers to be able to effectively and faithfully gain control of the individual.  It was not effective as Mr. Burnett continued to resist the control of the three officers.  In total, she attempted to use the taser three times.  She then abandoned the taser as an option.

*LEGAL RECORDS RELATED TO ESTATE*

02/26/2019:  District Court El Paso County in the Matter of the Estate of Sarah Francis Borchert:

- Sarah Borchert died 01/10/2019 at the age of 72.
- On or around 02/25/19 applicant stated that the estate was approximately $450,000.

05/15/2019:  District Court El Paso County in the Matter of the Estate of Sarah Francis Borchert:

- Attorney Quimby believes his client, Mr. Burnett, may have diminished capacity at this time.
- He is requesting the appointment of a guardian ad litem for the personal representative, Chad Burnett, and he suggests the appointment of Kristin Hoffecker.
- Attorney Quimby requested to withdraw from this matter.

10/03/2019:  District Court El Paso County Regarding the Estate of John Reynolds Borchert

- Estimated to be $5,500.00.

05/18/2020:  District Court in the Matter of the Estate of Sarah Francis Borchert, Emergency Petition to Remove Personal Representative.

- Petitioner Pauline Sisson and Marc Sather are petitioning to change the Personal Representative.
- On September 12, 2019, an amended inventory was filed for the estate which reports an estate valued at almost $4 million dollars.
  - That does not include several unclaimed life insurance policies and undervalues the personal property of the estate.
  - The bulk of the estate's assets are held in investment accounts.
  - There is also $500,000 in cash.

July 13, 2023
Re:  Chad Burnett
Page 52

- On 05/15/2020, Attorney Cody Christian, counsel for the Personal Representative, filed a motion of intent withdraw and appointment of a guardian ad litem for Chad Alexander Burnett.
  - She indicated that she believed her client was of diminished capacity.
- Neighbors of Mr. Burnett indicated some troubling concerns about Mr. Burnett's recent behavior.
  - 05/02/2020:
    - Mr. Burnett verbally attacked 2 members of the Spring Grove Homeowner's Association.
    - He accused them of taking and stealing his trees and threatened to sue.
  - 05/04/2020:
    - Mr. Burnett reported to another neighbor that he was a Texas Ranger.
    - He just returned from a weeklong trip to visit family in Texas.
  - 05/06/2020:
    - Mr. Burnett screamed at another neighbor from his home unprovoked, cussing at her and saying that he was going to run her out of here and that she didn't own anything around here.  He said that he owned the area.
    - He yelled and said he was going to get rid of her.
  - 05/06/2020:
    - He verbally accosted an 82-year-old neighbor for stealing his Texas Ranger gun and killing his mother and killing her own husband.
  - 05/06/2020:
    - He charged into Petitioner Marc Sather's home uninvited and without notice when he wasn't home.
    - Mr. Sather's wife called the police and Mr. Burnett was arrested for criminal trespass early the morning of 05/07/2020.
    - Due to the COVID pandemic, he was not detained but released with a summons to appear in court.
    - Following the entry into Mr. Sather's home, Ms. Sisson watched him drive past her home revving the engine of his Corvette.
  - 05/07/2020:
    - He contacted a close friend and insisted that Ms. Sisson was not owning the property she lived in.
    - He asked that person to contact the police, but when that person declined, he asked him to go to park in the driveway of Ms. Sisson's home in order to scare her.
    - He made inquiry about whether he knew the location of a firearm owned by his stepfather and that he was looking for it.
  - 05/11/2020:
    - Permanent Protection Order Hearing was set.
- The behavior of Mr. Burnett over the recent 2 weeks is not behavior of a reasonable person and not appropriate behavior for a fiduciary.

*[Interim assessment:  Mr. Burnett was already having trouble dealing with his parents' death and the subsequent changes.  He was getting grandiose and paranoid.  Dealing with the estate led to even more paranoia.  Then, as he deteriorated, and with his attorney withdrawing and other relatives wanting him removed from fiduciary responsibility, his paranoia was further exacerbated.  He had no one he trusted.]*

July 13, 2023
Re:  Chad Burnett
Page 53

## County Court, El Paso County, Order Granting Emergency Petition to Remove Personal Representative

05/21/2020.
- Ms. Sisson and Mr. Sather have filed an emergency petition to remove the Personal Representative.
- There is imminent risk of substantial harm to the financial interest of the estate and emergent and exigent circumstance in this estate for an emergency procedure.

   *[Interim Assessment:  With Mr. Burnett's degrading mental health and increasing paranoia, he would likely have become more paranoid following this emergency petition.]*

12/04/2020:  District Court in the Matter of the Estate of Sarah Francis Borchert

- Mrs. Borchert died 01/10/2019.
- Her spouse pre-deceased her.
- Chad Burnett died 05/24/2020 and had no issues.
- Chad Burnett's estate should be distributed to Ann Win Sather.  She passed away 03/07/2019 leaving 2 adult children.
- Mrs. Sisson and Mr. Sather have been interested parties in the estate and are now the sole beneficiaries to receive the estate.

*LEGAL RECORDS RELATED TO PROTECTIVE ORDERS*

Petitions for Civil Protection Order/Citations and temporary protection orders

05/11/20—
- Marc Sather, address 3 Lake Avenue, citation and temporary civil protection order.
- Incident of 05/06/2020 where Mr. Burnett trespassed into Mr. Sather's house.  Mr. Burnett scared his wife.
- Mr. Burnett was issued a citation for a felony.
- Mr. Burnett called a family friend, Rob Middleton, to scare Mr. Sather's sister, Ms. Sisson.

05/11/2020—
- Ms. Pauline Sisson filed a petition.
- On 05/07/2020 Mr. Burnett threatened neighbors and unlawfully entered her brother's house.
- He drove by her house with road rage.
- On 05/07/2020 Mr. Burnett called a family friend, Rob Middleton, to scare her.
- On 05/06/2020 Mr. Burnett cussed at anyone who was on the street.  He threatened.  He mentioned a gun in some of these threats.

July 13, 2023
Re:  Chad Burnett
Page 54

## ASSESSMENT:

Mr. Burnett's medical and mental health over determined the events of 05/24/2020.  It was his comorbid conditions of medical illness, mental illness, and substance use that led to the events of 05/24/2020.

Mr. Burnett had a Bipolar I disorder.  Bipolar I Disorder indicates a severity of illness that includes manic episodes.  Symptoms of a manic episode include:
- Mood disturbance.
- Increased energy.
- Inflated self-esteem.
- Grandiosity.
- Excessive involvement in activities that have a high potential for painful consequences.

Manic episodes can be treated, but since Mr. Burnett was grandiose and out of touch with reality, he did not believe he needed to be treated.  With grandiosity he felt rich.  With paranoia he did not believe that the police were really police.  He did not see a need to comply with law enforcement intervention.

The use of cannabis and alcohol further disrupted his thinking and with this comorbid condition, his insight and judgment deteriorated to the extent that he could not be reasoned with.

Over the course of Mr. Burnett's life, his mood disorder seemed to wax and wane.  It was not surprised that it deteriorated after his mother and stepfather died.  Before they died, he was living with them.  That provided structure and responsibility.  After his stepfather died on 01/02/2019 and his mother died on 01/10/2019 he regressed.  He no longer had the responsibility of looking after them.  He was not accountable.  He gave up his job.  He awaited an inheritance.  He didn't trust anyone.  He was grieving.  He was isolated.  He apparently was talking with his ex-wife about getting back with her, but she declined, which was another loss.

In June 2019 Mr. Burnett was had a suicide attempt by gunshot and placed on a mental health hold and hospitalized.  The discharge note indicated that he was prescribed an antidepressant and a mood stabilizer.  He was to continue with those medications after discharge though he was not compliant.  He did not continue with psychotherapy as directed.

Without treatment he became more irrational, agitated, and paranoid.  He was less trusting.  With increased grandiosity, he saw less need for treatment.  He also didn't see the need to comply with law enforcement interventions.  Without treatment he spiraled out of control.

In the spring of 2020, Mr. Burnett was irrational, acutely manic, and psychotic.  That led to menacing, trespassing, and threatening.  He thought that he was being persecuted and that his mother was murdered by a neighbor.  His attempt to get structure by going to Texas to live with his aunt failed.  He became more paranoid and psychotic.  Over the course of the several months leading up to his death, he was increasingly unstable.  He was grandiose, paranoid, manic, agitated, and psychotic.

July 13, 2023
Re:  Chad Burnett
Page 55

In the spring of 2020, there were an increasing number of calls for welfare checks and law enforcement intervention.  His aunt tried to talk to him, but on one occasion he did not believe that it was actually her on the phone.  There was more erratic behavior as he became less coherent and more irrational.

The Community Response Team (CRT), which has a mental health professional on the team, attempted to intervene but were not successful.  On one of their attempts at intervention, Mr. Burnett barricaded himself in his house.  On one of the attempts, he did not believe who they were.  He was given resources but failed to comply.

In May 2020 Mr. Burnett was acting on his paranoid and delusional beliefs.  He was manic, agitated, disruptive, and not coherent.  He was in the throes of an untreated manic psychotic episode with almost no reality testing and no insight.  There were threats of violence and the presence of weapons.

The night before the day of his death, Mr. Burnett was incoherent.  He talked about a gun.  On the day of his death, he was brandishing a knife, and raised it over his head, threatening to kill his neighbor.

The police were called to intervene because of the unfolding dangerous situation.  Due to mental illness, accompanied by substance use, Mr. Burnett could not be de-escalated, coaxed, or persuaded to go with the police.  Mr. Burnett's behavior spiraled despite police attempts to de-escalate the situation.  Recall that since he was paranoid, he didn't trust anyone; since he was grandiose, he did not think that he needed to abide by what he was told.  At one point he said that he was the Pope and they needed authorization from Rome to get him to come outside.

Mr. Burnett was a danger in the community.  It was a very volatile and dangerous situation.   He was brandishing a knife threatening to kill a neighbor.  There was a risk that he would again barricade himself in the house.  There was a risk to the person who he thought murdered his mother.  He threatened to cut the throat of his dentist.

With increased agitation, lack of reality testing, threats with weapons, and his failure to de-escalate, he needed to be detained.  It was determined that there were grounds for arrest.  When he resisted the police officers' requests to go with them quietly, he had to be restrained.  The use of substances complicated the situation.  While struggling with the police, his heart failed.

## DIAGNOSIS:

Based upon a review of the records provided, Mr. Burnett had the following diagnoses:

- Bipolar I Disorder, manic, severe, with psychotic features.
- Cannabis use disorder, current.
- Alcohol use disorder, using alcohol.
- Polysubstance use disorder, by history.

July 13, 2023
Re:  Chad Burnett
Page 56

## OPINION:

Based upon a review of the records provided, it is my opinion, within a reasonable degree of medical certainty, that—

- Mr. Burnett had lifelong mental illness, specifically Bipolar 1 disorder.

- Mr. Burnett had a history of polysubstance use disorder.

- Mr. Burnett had a cannabis use disorder and was using cannabis at the time of his death.

- Mr. Burnett had an alcohol use disorder and was using alcohol at the time of his death.

- Mr. Burnett's mental illness deteriorated in 2019 and 2020, triggered by several factors including but not limited to:
  - After the death of his mother and stepfather:
    - He lost purpose since he had been caretaking for his parents.
    - He lacked responsibility since he did not have to look after his parents.
    - He lacked consequences since he did not have to report to his parents.
    - He was not held accountable to be compliant with medication.
    - He thought that he was going to inherit $5,000,000.
      - He was under stress due to having to deal with the estate.
      - He grieved the loss.
    - He gave up his job.
      - He lacked structure after giving up his job.
    - He was more isolated without his parents and then without his job.
    - He was more isolated because of the COVID quarantine.
    - He had access to drugs and alcohol.
    - He felt paranoid as if people were after his money.
    - That was exacerbated when a petition was filed that he be removed as personal representative of the estate.
    - He thought that his aunt was after his money.
    - He had no one to trust after not getting along with his aunt.
    - His attorney withdrew from the estate case.
  - His ex-wife did not want to get back together with him.
  - He was not taking his psychiatric medications as directed.
  - The use of substances confounded his presentation.

- Mr. Burnett had an exacerbation of his Bipolar I disorder in the months before his death.
  - Despite a psychiatric hospitalization in 2019, he continued to deteriorate.
  - He was not compliant with treatment.
  - He was paranoid, delusional, and psychotic.
  - He was irrational and unstable.
  - The frequency of erratic behavior and threats increased and were increasing.
  - The intensity of his threats increased and were increasing.

July 13, 2023
Re:  Chad Burnett
Page 57

- He did not respond to the attempts by his aunt to provide support.
- He did not respond to the attempts by the police and the Community Response Team to get him to modulate and control his behavior.

- Mr. Burnett's agitated, irrational state with violent and threatening behavior led to the events of 05/24/2020.
  - Mr. Burnett's presentation on 05/24/20 was influenced by delusions, paranoia, and psychosis, which were manifestations of his severe psychotic manic state.
    - He was in the throes of an untreated, severe, manic episode.
    - He didn't sleep the night before his death.
    - He was psychotic, grandiose, manic, and agitated.
    - He was unable to test reality.
    - He was without insight.
    - He could not be relied upon to be safe to himself or others.
    - That was confounded by his use of substances--cannabis and alcohol.
  - It was because of Mr. Burnett's severe manic psychotic state that he could not distinguish reality from his delusions.
  - It was because of Mr. Burnett's severe manic psychotic state that he was threatening and dangerous.

- On 05/24/2020 Mr. Burnett was so influenced by delusions, paranoia, and psychosis, which were a manifestation of his severe psychotic manic state, and confounded by the use of substances, that he did not respond to less restrictive police intervention.
  - Police were called to intervene after Mr. Burnett threatened to kill his neighbor while brandishing a knife.
    - He was known to have a gun and more knives in the house.
  - The police officers tried but were unable to talk him down or de-escalate him.
  - It was because of Mr. Burnett's severe manic psychotic state, accompanied by substances of abuse, that he did not respond to less restrictive police intervention and could not be de-escalated.

- Attempts to de-escalate the situation were futile.
  - Mr. Burnett's delusions were firm and fixed, and he could not relinquish them.
  - After Sergeant Inazu tried to deescalate the situation for about an hour, Sergeant Inazu properly assessed that Mr. Burnett was not going to respond to less restrictive intervention and more forceful intervention was necessary.
  - Because of Mr. Burnett's agitated mental state accompanied by threatening and dangerous behaviors, Mr. Burnett needed to be restrained.
  - The Colorado Springs Police Department Officers appropriately intervened using the minimal force required to restrain Mr. Burnett.

- A mental health intervention on 05/24/20 would not have changed the outcome.
  - Prior to 05/24/2020, his aunt had tried to intervene but was unsuccessful.
    - He refused to talk with her on at least one occasion, not believing it was her.
  - On 05/24/2020 his neighbor was being supportive and helpful, but Mr. Burnett threatened to kill that person.

July 13, 2023
Re:  Chad Burnett
Page 58

- Prior to the intervention on 05/24/2020, he had several welfare checks including by the CRT, which had a mental health professional on the team.
  - Those interventions were unsuccessful.
  - He refused to talk with the CRT mental health professional or police officers on that team.
    - He thought that they were imposters.
    - He barricaded himself in the house.
  - CRT did not respond to the 05/24/20 incident as Mr. Burnett was involved in the felony menacing incident, which was beyond the mandate of the CRT.
- A mental health professional would have come to the same conclusion as the police:  that Mr. Burnett needed to be restrained.


If you have any further questions, please contact me.

Respectfully submitted,

Robert E. Kleinman, M.D.

REK/km/File 702_1766,1767; REK/tbd/File 702_1845,1846