# Exhibit 2

ROBERT E. KLEINMAN, M.D., P.C.                      PSYCHIATRY

Diplomate, American Board of Psychiatry and Neurology

_____

1658 Cole Boulevard, Suite 295
Lakewood, Colorado 80401
Telephone (303) 233 7776
Facsimile (303) 233 2294
kleinmanr@mac.com

August 21, 2023

**SUBJECT TO STIPULATED PROTECTIVE ORDER**

Erik Lamphere
Division Chief-Litigation/Employment
City of Colorado Springs
Erik.lamphere@coloradosprings.gov

RE:     REBUTTAL PSYCHIATRIC RECORD REVIEW (ADDENDUM 1)
          REGARDING: Chad Burnett
          DOB – 08/16/1970
          DATE OF DEATH: 05/24/2020, at 49 years old.
          CIVIL ACTION NUMBER – 21-cv-1708-WJM-MDB
          Estate of Chad Alexander Burnett v. City of Colorado Springs, et. al.

Dear Mr. Lamphere:

At your request, I reviewed additional records regarding Chad Burnett. Those additional records were from the following:

Steven Bird, M.D.
Michael D. Lyman, Ph.D.
John Shaw, Statement (Bates Stamp CITY-DEFS – 000755)

INTRODUCTION

I previously did an extensive analysis of records regarding Mr. Burnett, which I will not repeat here.

Briefly, on 05/24/2020, Mr. Burnett was acutely psychotic. His behavior was out of control and dangerous and he needed police intervention.

Mr. Burnett's history was consistent with not responding to conservative interventions. Prior attempts by the Community Response Team (CRT) were ineffective. CRT personnel, which included a mental health professional, were unable to de-escalate Mr. Burnett even when he was less agitated, less psychotic, and less dangerous than he was on 05/24/2020. They were not even able to convince him of their authenticity. Furthermore, on 05/17/2020, when CRT attempted to talk with Mr. Burnett, he barricaded himself in his house.

August 21, 2023
Re: CHAD BURNETT / Addendum #1
Page 2

CRT's previous attempts at intervention had been unsuccessful. Considering Mr. Burnett's history of barricading himself in his home, and the presence of weapons, predicting the outcome of any further CRT intervention would have been uncertain. Given the presence of weapons and Mr. Burnett's homicidal threats and behavior, the mental health CRT personnel would be exposed to significant risks.

On 05/24/2020, Mr. Burnett did not trust anyone, not his aunt, relatives, or neighbors. He did not respond favorably when his aunt did a welfare check and tried to talk with him. He did not even believe that she was his aunt. On the morning of 05/24/2020, after his neighbor provided Mr. Burnett with assistance, Mr. Burnett threatened to kill him. Mr. Burnett even left a voice mail with his dentist threatening to kill him. He didn't trust his neighbors and thought one of them had killed his mother. He had previously lost confidence in his ex-wife in 2019 and tried to kill himself when she would not get back together with him.

By 05/24/2020, Mr. Burnett's psychotic, manic, out of control behavior had escalated to the point where he was threatening and homicidal. He directly threatened a neighbor with a knife. He was at risk to barricade himself in his home where he had weapons.

Mr. Shaw, who was Mr. Burnett's neighbor, provided a statement that confirmed Mr. Burnett's regressed, psychotic, disorganized, and paranoid thinking on 05/24/2020. It is notable that Mr. Burnett thought that Mr. Sathers had stolen his car, and that Mr. Sathers was going to kill him. With Mr. Burnett being paranoid, and thinking that someone was going to kill him, he was at risk to act preemptively on his paranoid belief, and harm Mr. Sathers. On 05/24/2020, Mr. Burnett required an emergency intervention.

Records and body camera videos indicated that Officer Inazu tried to de-escalate the situation much as CRT personnel would have tried. With Mr. Burnett's psychotic, agitated, and paranoid state, exacerbated by drug and alcohol use, he was unsuccessful. He was not even able to convince Mr. Burnett that he and the officers were authentic police officers. Even as he was being restrained, he did not believe that the police were real.

Mr. Burnett had shown that he was not going to be talked down. Mr. Burnett was impossible to reason with or deescalate. Considering his psychotic, out of control behavior, homicidal ideation and threats, and access to weapons, he needed to be restrained.

It was apparent that any further attempts at de-escalation, or convincing Mr. Burnett to submit to the police officer's request, were not going to be successful. Mr. Burnett needed to be restrained in order to protect himself and others, most notably his elderly neighbors. Given Mr. Burnett's history of attempted self-inflicted gunshot wounds, if he was left in his home, he would be at risk to kill himself. If he was left in the community, he was at risk to kill others. This was an unsustainable situation and restraints were the least restrictive alternative. On 05/24/2020, he had to be restrained in order to be taken into custody.

## REVIEW OF RECORDS:

*Brackets and italics refer to comments of this examiner; bold refers to emphasis placed by this examiner; bullets added for clarity.*

August 21, 2023
Re:  CHAD BURNETT / Addendum #1
Page 3

John Shaw, Witness Statement

05/23/2020—
- Mr. Burnett came to Mr. Shaw's door saying his Corvette was stolen from his garage last night by Mark Sathers.  His Corvette was parked on Lake Avenue.
- Mr. Shaw went and found that the Corvette had a dead battery.  Mr. Burnett got jumper cables and the car started.
- Mr. Burnett said that Mr. Sathers ran out of "battery juice" causing the car to die.
- During that interaction, Mr. Burnett talked about being a San Diego policeman.  He gave the middle finger to everybody passing by.  That was at 11:15 a.m.
- At 1:00 p.m., Mr. Burnett came to Mr. Shaw's house to sign over the title of the Corvette.  He also brought his mother's wedding ring and pearls.  Mr. Shaw declined to take the items, but Mr. Burnett insisted, at least for safekeeping.
- Mr. Burnett thought that Mark Sathers was going to come over to kill Mr. Burnett that afternoon.
- Carolyn Shaw wrote accepting the car title, his mother's ring, and pearls.

*[Interim Assessment:  This witness statement confirms several things regarding Mr. Burnette. He was paranoid.  He thought that Mark Sathers stole his car and was going to kill him.  That Mr. Burnett was paranoid, thinking that someone was going to kill him, is very dangerous in that Mr. Burnett might act in a first strike thinking that that would save his life.*

*In addition, that he is giving away his Corvette and mother's jewels was either an excessive token of friendship or because he was thinking that he was going to die or kill himself.*

*This statement confirms how disorganized, paranoid, and out of touch with reality Mr. Burnett was on 05/23/2020 and how dangerous the situation was.]*

Steven Bird, M.D.

07/10/2023—
- Dr. Bird is a medical doctor trained as an emergency medicine physician with a specialty in medical toxicology.  Dr. Bird reviewed the medical records and depositions.
- Dr. Bird provided a summary of the events of 05/24/2020.
  - Officers attempted to contact Mr. Burnett.  They noted that Mr. Burnett was holding a knife and a bottle of alcohol.  Mr. Burnett refused to open the door.
  - Officers then contacted witnesses.  After speaking with neighbors, the officers concluded to arrest Mr. Burnett for menacing against his neighbor.
  - When officers went to arrest Mr. Burnett, he ran into the house, but officers were able to prevent the front door from closing and then began to actively restrain him on the floor inside the house.
- Dr. Bird went through the details of the restraint procedures, which included deployment of a taser and handcuffing.
  - During the struggle, Mr. Burnett was heard yelling "help me" and "fake police."
- Dr. Bird went through the results of the autopsy.

- Toxicology screen was positive for marijuana metabolites as well as the presence of ibuprofen and bupropion metabolites.
- The opinion of the medical examiner was that Mr. Burnett died as a result of sudden death associated with physical altercation, taser deployment, cardiac hypertrophy with myocardial fibrosis, and bipolar disorder featuring acute psychotic episode.
- It was later learned that the Colorado Springs Police Department sent their mental health Community Response Team (CRT) to Mr. Burnett's house on two occasions in May 2020.
  - On 05/09/2020, the CRT did a welfare check and spoke to him briefly at the door. They later spoke to him on the phone and advised him about available mental health resources.
  - On 05/18/2020, the CRT attempted another check for a welfare call after a family member expressed concerns. They saw him inside the house and spoke to him briefly. Apparently, the CRT called him and left him voicemails.
- Dr. Bird assessed that Mr. Burnett was killed due to restraint by the Colorado Springs Police Department.
  - Dr. Bird described the phenomenon of "positional asphyxiation," in which patients suffered a cardiac arrest when restrained.
- No drugs of abuse other than marijuana were detected on any blood or urine tests. Alcohol concentration was 76 mg/dl, which is within the legal limits to operate a motor vehicle.
- Dr. Bird wrote that there was nothing noted in the autopsy which indicated that Mr. Burnett was not healthy.
- Dr. Bird opined that a metabolic acidosis due to his restraint and the struggle killed Mr. Burnett.
  - Dr. Bird explained that because people in the throes of an acute mental health disorder may behave strangely, the police are often called.
  - By minimizing the aggressive restraint and with the isolation and/or sedation of these patients, the danger of restraint related metabolic acidosis death will abate without consequence.
- Had the officers properly evaluated Mr. Burnett while breathing or had a pulse since CPR had been performed, that would have made it more likely that he would have survived.
- It was Dr. Bird's opinion that the Colorado Springs Police Department personnel killed Mr. Burnett due to application of restraint and the resultant struggle. No substances were present or affecting Mr. Burnett at the time of his death other than alcohol or marijuana.

*Comments regarding Dr. Bird's opinions:*

*Dr. Bird's opinion that drugs or alcohol did not contribute to Mr. Burnett's death was a medical determination. From a psychiatric perspective, alcohol and marijuana did contribute to his failure to respond to conservative interventions that might have avoided the struggle. He was already acutely psychotic and paranoid with no insight and limited ability to make judgments. Alcohol and marijuana exacerbated his already poor insight and poor judgment.*

Michael D. Lyman, Ph.D.

07/16/2023—
- Dr. Lyman is employed as a litigation consultant in the field of police practices and procedures.
- Dr. Lyman went through the events of 05/24/2020.

August 21, 2023
Re:  CHAD BURNETT / Addendum #1
Page 5

- He noted the first 911 call was placed at 9:55 AM, which indicated that Mr. Burnett had threatened a neighbor with a knife.
- Officers were aware of Mr. Burnett's history of causing problems with neighbors.
- The police Community Response Team (CRT) had been out to the residence recently and offered resources which Mr. Burnett declined.

- Dr. Lyman went through the circumstances of Mr. Burnett being restrained, handcuffed, and tased.
- Dr. Lingamfelter with the coroner's office concluded that Mr. Burnett died as a result of sudden death associated with physical altercation, taser deployment, cardiac hypertrophy, mild cardiofibrosis, and bipolar disorder featuring acute psychotic episode. The most likely of these factors was heart failure due to severe heart disease and rapid heart rate brought on by agitation from the stress of a physical altercation with the officers.
- Dr. Lyman wrote that the forceful and warrantless entry by Colorado Springs police officers into the private residence of Mr. Burnett for the purpose of arresting him was improper, lacked justification, and unnecessarily escalated the encounter.
- Dr. Lyman believes that the officers involved made an improper warrantless entry into the private residence of Mr. Burnett for the purpose of arresting him.
- Dr. Lyman was of the opinion that the use of force, including Officer Barth's numerous taser deployments, were excessive, unnecessary, and served to needlessly escalate the encounter between Mr. Burnett and the officers.
- Dr. Lyman went through the Colorado Springs Police Department general order regarding use of force, which indicated that officers use only the force that is reasonably necessary to effectively bring an incident under control.
- Dr. Lyman wrote that despite the clear violation of what is written in several Colorado Springs Police Department policies, the Internal Affairs investigation into the encounter with Mr. Burnett on 05/24/2020 concluded that the officers' actions were within Colorado Springs Police Department policies and training.
- Dr. Lyman concluded that Sergeant Inazu failed to summon the Community Response Team for Mr. Burnett whom he knew to experience mental health crises.  He failed to summon the departmental CRT to assist in de-escalation and control the incident involving Chad Burnett.
- He wrote that the IACP (International Association of Chiefs of Police) stated that responding officers must take action to contact mental health professionals to assist in the call.  He wrote that where there is reason to believe that the individual is in a crisis situation, officers should request any specialized crisis intervention assistance available.
- In addition to calling for mental health professionals, the IACP recommends calling people who might be trusted by the individual.  When time permits, family members or friends of the individual can often lend some insight into the person's background and specifics about his behavior.
- The importance of de-escalation is emphasized in modern day police training venues.
- CSPD officers were aware from the onset that Mr. Burnett had mental issues. Had the Community Response Team been summoned and had CSPD officers at the scene observed nationally recognized protocols for dealing with the mentally ill, it is likely that Mr. Burnett would have been taken into custody safely and without incident.
- Sergeant Inazu's failures included failure to summon officers from the Community Response Team; improperly authorizing entrance into a home without a warrant; improperly fabricating an exigency to justify the warrantless entry; failing to direct Officer Barth to cease the numerous

deployments of the taser; improperly approving Mr. Burnett to remain in a prone restraint; failing to direct officers to provide medical care; failing to intervene and stop unnecessary and excessive use of force.

*Comments regarding Dr. Lyman's opinion:*

*Mr. Burnett did not trust anyone. He was out of touch with reality and paranoid.*

*Dr. Lyman's opinion that if the CRT was called, or that if family and friends got involved, the outcome might have been different is misguided. There was reason to believe that neither would have been effective with Mr. Burnett.*

*Attempts by his aunt to intervene had been unsuccessful in the past. Interventions by the CRT were unsuccessful in the past.*

*The officers attempted to deescalate Mr. Burnett, much as CRT would have. It became apparent that further attempts to convince Mr. Burnett to submit to the police department's request, were not going to be successful.*

*Mr. Burnett needed to be restrained in order to protect himself and others. Given Mr. Burnett's history of self-inflicted gunshot wounds, if he was left in his home, he would be at risk to kill himself. If he was left in the community, he was at risk to kill others. This was an unsustainable situation and restraints were the least restrictive alternative.*

## CONCLUSION:

Mr. Burnett's mental illness over-determined the events of 05/24/2020. His mental illness and substance use led to the events of 05/24/2020.

Mr. Burnett had a Bipolar I Disorder, which was severe, chronic, and deteriorating. His episode of mania included mood instability, agitation, increased energy, inflated self esteem, grandiosity, and involvement in activities with a high potential for painful consequences.

With worsening manic illness, characterized by increased grandiosity, paranoia, and agitation, as his condition deteriorated, his likelihood of seeking treatment diminished even further. This was evident in his response to the CRT team's urging for him to get treatment, as well as his failure to respond to his aunt's welfare check, indicating his unwillingness to engage with any form of intervention.

On 05/24/2020, Mr. Burnett was psychotic with paranoia, loss of touch with reality, no insight, and impaired judgment. His mood and thought disorder were exacerbated by his use of substances, further impairing his judgment, and increasing his paranoia.

Mr. Burnett did not trust anyone. Mr. Burnett would not have favorably responded to the Community Response Team. Prior welfare conducted by the Community Response Team were ineffective. The Community Response Team could not convince him to get treatment. He was

paranoid and did not believe that they were authentic and became more agitated and on one occasion he barricaded himself in his house.

Mr. Burnett did not trust his relatives, friends, or neighbors. He would not have responded favorably if they were involved in the intervention on 05/24/2020, and more likely they would have caused Mr. Burnett to get more agitated. Recall that he threatened to cut the throat of his dentist. Recall that he threatened to kill his neighbor who had just helped him. Recall that when his aunt attempted to talk with him previously, he did not believe she was authentic.

Mr. Burnett had just made homicidal threats and gestures. He had access to weapons. He had a history of attempting to shoot himself in 2019. Mr. Burnett was dangerous to himself and others due to acute on chronic mental illness. On 05/24/2020, Mr. Burnett was irrational, acutely manic, and psychotic. He was grandiose, out of touch with reality, and agitated. That led to menacing and threatening behavior. He made homicidal threats and gestures. Leaving Mr. Burnett either alone in his home, potentially barricaded in his home, or loose in the community, would have been an unacceptable risk to Mr. Burnett and the community.

## OPINION:

It is my opinion, within a reasonable medical certainty, that—

My opinion as stated in my initial report remains the same.

The officers involved attempted an intervention to deescalate the situation, much as the CRT team would have. That was futile. After that failed, Mr. Burnett needed to be restrained.

The presence of a mental health professional, family, or friends would not have changed the outcome.

Further rebuttal to Dr. Bird and Dr. Lyman:

- It was Mr. Burnett's agitated, irrational state with violent and threatening behavior that led to the events of 05/24/2020. On 05/24/2020, Mr. Burnett was so influenced by delusions, paranoia, and psychosis, which were a manifestation of his severe psychotic manic state, and confounded by the use of substances, that he did not respond to less restrictive police intervention. Attempts were made to de-escalate the situation but were futile and Mr. Burnett needed to be restrained.

- Though Dr. Bird pointed out that drugs of abuse were not influential in the cause of his death, drugs of abuse, including alcohol and cannabis, did exacerbate his mental illness further impairing his judgment and worsening his already deteriorated mental state. That made Mr. Burnett less likely to respond to conservative interventions.

- Dr. Lyman's suggestion that a CRT intervention should have been tried does not seem to take into consideration that they had tried several times already and that Mr. Burnett responded poorly to those encounters. He did not believe that the CRT personal were authentic. On one occasion, during a CRT intervention, he barricaded himself inside his home. Furthermore,

August 21, 2023
Re:  CHAD BURNETT / Addendum #1
Page 8

    officers on the scene attempted to deescalate My Burnett, much like the CRT would have tried, and were not successful.

- Though Dr. Lyman believed that if a trusted individual was present, Mr. Burnett might have de-escalated, that would not have been helpful.  First, Mr. Burnett did not trust anyone.  Recall that Mr. Burnett's aunt had previously tried to intervene but was unsuccessful.  Not only did he refuse to talk with her, but on at least one occasion he did not believe that it was even her.  In addition, recall that his neighbor was being supportive and helpful to Mr. Burnett the morning of 05/24/2020 and that was followed by Mr. Burnett's threatening to kill him while holding a knife.  Also recall that Mr. Burnett believed that his mother was murdered by a neighbor.  In addition, recall that another person of trust, Mr. Burnett's dentist, received a voicemail from Mr. Burnett when Mr. Burnett threatened to cut his throat.

- CRT intervention or attempts to intervene by a person of trust would not have changed the outcome of Mr. Burnett needing to be physically restrained.

- On 05/24/2020, Mr. Burnett needed to be restrained.  Lesser interventions were ineffective.  A mental health professional would have come to the same conclusion.

I reserve the right to update or amend this report if new information becomes available. Additional information could lead to changes in my opinions or the formation of new opinions.

If you have any further questions, please contact me.

Respectfully submitted,

Robert E. Kleinman, M.D.
   Level-II Accredited, Colorado Division of Workers' Compensation

REK/tbd/File 702_1863