# Exhibit 2-A

**Lucas Hennings, MD, FACEP, FAAEM**
**UC Health Memorial Hospital**
**1400 E. Boulder St.**
**Colorado Springs, CO 80909**

10 July 2023

Erik Lamphere
Division Chief – Litigation/ Employment
City of Colorado Springs


Re:  Estate of Burnett vs. City of Colorado Springs

Dear Mr. Lamphere:

I am an emergency physician practicing medicine in the State of Colorado.  I am residency trained and board certified in Emergency Medicine.  I have been practicing emergency medicine for 13 years and currently practice in Colorado Springs.  I am Assistant Clinical Professor of Medicine at University of Colorado School of Medicine and have held various teaching positions in addition to continually reviewing the care of doctors.  Through my own practice, my education and training, and my teaching and review of other physicians, I am very familiar with standards of practice for emergency physicians and what constitutes reasonable versus unreasonable care.

While I have worked in a variety of clinical settings, most of my work in emergency medicine has been at large, urban hospitals.  I have extensive experience evaluating and treating patients who have undergone both respiratory and cardiac arrest. I also have extensive experience evaluating and treating acutely psychotic, agitated, intoxicated, and combative patients.  I commonly assess and treat patients with injuries sustained from various types of trauma.

I have reviewed the documents provided regarding police encounter with Chad Burnett and have formed opinions about the allegations brought forth by the Estate of Chad Burnett.  The documents I have reviewed concerning the case thus far include:

- Body worn camera videos for officers Inazu, Barth, Daigle, and Fleming  (000127-000135)
- Autopsy photos (001225-001385)
- Autopsy report (001104-001110)
- Metro Crime Lab photo documentation (000826-001278)
- CSFD radio (000169)

1                                                              **EXHIBIT 2-A**

- AMR radio (000170)
- CSFD patient report (000583-000586)
- AMR patient report (001035-001043)
- CSFD duty report (000189)
- Barth TASER report (000180-000188)
- Office of District Attorney investigative report (000713-000724)
- First amended plaintiff complaint
- Chad Burnett medical records (000918-000920)
- Chad Burnett dental records (001046-001056)
- Chad Burnett pharmacy records (000919-000921)
- Toxicology reports re Chad Burnett (001111-001113)
- Coroner report (001105-001106)
- Neighbor's cell phone video (000190)
- Aspen Pointe records (000913-000917)
- Chad Burnett death certificate (001088-001089)
- Connexus pharmacy records (001491-001492)
- Diversus Health/Aspen Pointe medical records (001500-001576)
- Hollowbrook dental records (005537-005551)
- Walmart pharmacy records (005593-005607)
- Comfort Dental records (005608-005614)
- Rocky Mountain Men's Clinic records (012102-012152)
- Deposition Millicent Spears
- Deposition Joseph Daigle
- Deposition Matthew Fleming

I anticipate reviewing additional documents. I reserve the right to modify or add to my opinions as more materials are presented to me regarding this case.

After reviewing the above material, I have formed an expert medical opinion that Mr. Burnett's death was not a result or force applied by Colorado Springs police officers. His death was also not caused by medical care provided by the police. These opinions are based on the facts contained in the case material and on my extensive medical experience and education. I hold my opinions, all of which are explained in detail below, to a reasonable degree of medical certainty.

In testifying in this case, I will explain to the jury many concepts in medicine and how those concepts are related to police officers' encounters with individuals in the community. I will discuss the challenges and dangers of taking care of an acutely psychotic and dangerous patient. I will discuss multiple causes of cardiac arrest and their appropriate treatments. I will discuss multiple causes and treatments of respiratory arrest. I will discuss the important differences between respiratory arrest and cardiac arrest. I will discuss the role of trauma and injury in patient outcomes. I will discuss the effects of drugs and alcohol on patient health and

outcome.  I will discuss the role these play in Chad Burnett's encounter with Colorado Springs police officers.

After my thorough review of materials provided to me, I will be able to help answer the following questions:

1.  What was Mr. Burnett's true cause of death?
2.  What is the difference between cardiac and respiratory arrest?  What are the appropriate treatments?
3.  What role did Colorado Springs police officers play in Mr. Burnett's death?
4.  What preexisting conditions did Mr. Burnett have that contributed to or caused his death?
5.   Should the police officers have known about the preexisting conditions?
6.  Did the police officers administer timely and appropriate medical care?
7.  Was Mr. Burnett strangled, asphyxiated, or in respiratory distress during his encounter with Colorado Springs police officers?
8.  What role did alcohol and drugs play in Mr. Burnett's death?
9.  Could Mr. Burnett have died from the same cause but with a different inciting event?
10.  What role did the TASER play in Mr. Burnett's death?
11.  Was there evidence that Mr. Burnett was violent and posed a possible immediate threat to others or to himself?
12.  What evidence of significant trauma did the autopsy and Coroner's report show?

**Overview**

Colorado Springs Police Department officers responded to a call regarding a violent person on May 24, 2020.  Chad Burnett's neighbors on Ashgrove Street had noted that he was acting in a threatening and violent manner.  They reported that he had been harassing and screaming at a female neighbor.  Mr. Burnett had acted violently by throwing a metal object and smashing a neighbor's window.  In addition to this, he pulled a knife on his male neighbor and threatened to kill him.  Mr. Burnett would later threaten to kill CSPD officers.  Neighbors expressed concern that he would come after them with a gun.

Chad Burnett had a history of threatening to kill people, including a medical professional.  In addition to this, two of his family members had to get a protective order against him for personal safety.  Furthermore, Mr. Burnett had expressed

3

thoughts and desires to be violent. In previous medical records he was noted to say, "Sometimes I feel like hurting people." During the same time, a previous significant other had said that she recovered four guns that Mr. Burnett had in his possession at the time.

Chad Burnett again displayed significant violence by waving a baton as a weapon and by stabbing a knife into a wooden table. Mr. Burnett was found to have multiple weapons in his house including a loaded and chambered .45 gun and multiple knives. When police first made contact with Mr. Burnett, they noted that he was armed with a knife in hand. He was also holding a bottle of alcohol and had multiple open beer bottles in his home. Mr. Burnett was intoxicated with multiple substances in his system.

CSPD Sergeant Michael Inazu, who has specialized training in crisis management, joined Officers Joseph Daigle and Matthew Fleming in responding to the call. They would later be joined by Officer Caroline Barth.

Sergeant Inazu was nonthreatening in his approach to Mr. Burnett. He spoke calmly with him and gave him many opportunities to discuss the concerns peacefully. The officers continued this approach for approximately an hour. Despite their efforts, Mr. Burnett was not cooperative.

Officers eventually approached Mr. Burnett's door, and he remained uncooperative. They were, unfortunately, only able to take him into custody by using force. Mr. Burnett, standing at 6'7" and over 220 pounds, resisted arrest and ignored multiple requests to comply. Sergeant Inazu reported that Mr. Burnett made an attempt to grab one of the officers' firearms during this struggle. Officer Barth eventually had to deploy her TASER a total of three times. None of these TASER deployments were effective in controlling Mr. Burnett's aggression. Once she deployed her TASER, Officer Barth requested medical help to the scene.

Officers were eventually able to get Mr. Burnett up and attempted to walk him outside. Mr. Burnett again became aggressive and uncooperative. He then threw himself forward and fell to the ground. After getting up he then threw himself back into the house and onto the ground again. Mr. Burnett sustained only minor injuries during these falls, none that would contribute to his eventual death.

Approximately 10 minutes after TASER deployment, Mr. Burnett lost his pulse. Immediately upon identifying this, police officers began appropriate CPR. EMS and fire department personnel arrived and continued resuscitative efforts. Mr. Burnett was found to be in a heart rhythm called ventricular fibrillation. His heart rhythm would then progress to asystole. This progression of cardiac dysrhythmias is significant to his potential causes of death, as I will further

4

explain in this report. Mr. Burnett was not able to be resuscitated and ultimately perished.

The autopsy report ultimately concluded that Mr. Burnett had myocardial hypertrophy, left ventricular hypertrophy, and myocardial fibrosis. This represented a preexisting, significantly diseased heart which led to his death from an abnormal cardiac rhythm. Mr. Burnett was found to have multiple substances in his system, including alcohol and THC. The autopsy report did not show any significant trauma to be a cause of his death. It also noted that his respiratory system was not significantly harmed. This means his cause of death was not from respiratory arrest or from asphyxiation.

**Detailed timeline from body cam footage (time marker approximate):**

00:24 Officer responds to Mr. Burnett, "You played for the Maple Leafs?"

00:30 Officer says, "Come on over."

00:34 Officer responds, "Why would I want to kill you, Chad?

00:58 Mr. Burnett claims he is "sponsored by fire station 15 in San Diego."

01:12 Mr. Burnett runs away from police officers.

01:18 Officer commands, "Get on the ground."

01:28 Officer says, "Put your hands behind your back."

01:31 Officer says, "Stop fighting. Stop resisting."

01:34 Officer says, "We are not going to kill you."

01:36 Officer says, "Stop resisting."

02:10 Officer commands, "Put your hands behind your back, Chad. We don't want to hurt you."

03:21 Officers ask Mr. Burnett to stand up.

03:27 Officer says, "Walk this way. We'll explain everything to you."

03:34 Mr. Burnett screams, "No you're not! This my house. Fuck you!"

03:46 Mr. Burnett says, "No you're fucking not."

5

03:57 Mr. Burnett falls to the ground on the front porch and officer says, "Stop resisting."

04:06 Officer says, "You've got to play along, Chad."

04:16 Officer pleas, "You've got to stop fighting us, man."

04:23 Officer explains, "Here's what I want you to do. I want you to breathe and catch your breath. Okay?

04:28 Officer says, "Getting amped up is not going to help you."

04:31 Officer says, "Take a deep breath, slow everything down. You've got to keep it slowed down."

O4:36 Officer pleas, "Help us keep this low key for you."

04:48 Officer states, "I want you to chill out."

04:50 Mr. Burnett says, "I want to make you a hamburger. I'm a chef."

04:58 Officer says, "Alright Chad, let's stand up again." Another officer says, "Let's walk back to my car, Chad."

05:08 Officer instructs, "Stand up and walk with us, okay."

05:27 Officers help Mr. Burnett stand up.

05:31 Mr. Burnett throws himself back into the house.

05:38 Officer states, "I told you to relax."

06:08 Officer says, "Relax, Chad."

06:15 Mr. Burnett screams, "Fake radios. Fake police!"

06:30 Mr. Burnett says, "No, fuck you. No, you're not."

06:38 Officer asks, "Are you still resisting?" Mr. Burnett replies, "Yes." Officer says, "Stop resisting. Stop fighting."

06:50 Mr. Burnett continues to resist. Officer commands, "Stop fighting. Stop resisting."

6

07:39 Officer speaks, "Let's move him out."

07:48 Officer pleas, "Chad, you got chill for us okay buddy?

08:48 Officer asks, "Chad, are you doing alright?"

08:59 Officer says, "Chad, wake up." Officer asks, "Is he breathing?" Officer replies, "Yes, and he has a pulse."

09:02 Officers turn Mr. Burnett onto his right side.

10:06 Officer says, "Yes, he has a pulse."

10:18  Officer notes, "Good, strong pulse. Solid respirations"

10:24 Officer tells others, "I can feel him breathing."

11:25 Officer says, "His eyes are open. He's blinking. That's good."

11:47 Officer says, "Hey Chad, we're sorry this happened, but you have to listen to the police, okay."

12:40 Officer says, "Let's put him on his side."

12:53 Officer notes, "He's holding his own head up."

13:03 Officer says, "He has a good, strong pulse."

14:56 Officer checks pulse, and it is absent. Officer says, "Start compressions."

17:25 Paramedics arrive.

20:05 Paramedic says, "We're in v fib." Paramedics attempt defibrillation.

20:47 Paramedic says, "Let's get a mask on him."

21:50 Paramedic says, "Stop compressions. What is the rhythm? "Still asystole."

22:39 Paramedic says, "V-fib initially."

23:02 Paramedic asks police, "Did he hit his head or anything?"  Officer responds, "Not that we saw."

23:58 Paramedic states, "Still asystole on the monitor."

7

24:07 Paramedic states, "It's time to stop resuscitative efforts."

**Information obtained from AMR patient report:**

Patient has no obvious bruising or bleeding.  Paddles applied and show a shockable rhythm (ventricular fibrillation).  Head and neck atraumatic.  Equal chest rise.  First known rhythm ventricular tachycardia.

**Autopsy evidence and Coroner report highlights:**

Sudden death associated with physical altercation, TASER deployment, cardiac hypertrophy with myocardial fibrosis, and bipolar disorder featuring acute psychotic episode.  Remote myocardial infarction intraventricular septum.

Blunt force injuries: Bilateral temporalis muscular hemorrhage.  Left frontal temporal subscapular hemorrhage.  General abrasions and contusion of the face.

Findings consistent with resuscitative efforts including anterior fracture of the right seventh and eighth ribs, left third through fifth ribs and left seventh and eighth ribs.  In addition, the liver has a subscapular hematoma.

Multiple superficial contusions and abrasions throughout the body. TASER barb injuries to the right lateral abdomen.

The scalp and skull are unremarkable and uninjured.  On cross-section of the brain there is no evidence of trauma.  The cervical spinal column is stable.  There is no internal hemorrhage.

Neck: the hyoid bone and larynx are intact.  The airway is patent.

Cardiovascular system: myocardial hypertrophy, left ventricular hypertrophy, coronary arteries are free of significant atherosclerosis.

Lungs: The major bronchi are unremarkable.  The parenchyma appears edematous.

Gastrointestinal system: unremarkable without findings of significant trauma.

Microscopic examination. Heart: myocyte hypertrophy and marked fibrosis/scarring within the interventricular septum.  Brain: no significant histopathology.

**Toxicology report:**

Ethanol 91 mg/dL.  THC positive.  Bupropion probable.  Ibuprofen metabolites present.  THC 12.4 ng/mL

**Pertinent medical and psychiatric history:**

Mr. Burnett had been diagnosed with bipolar disorder. His known prescriptions included Tegretol (Carbamazepine), Wellbutrin (Bupropion), and Testosterone. Records from Aspen Pointe indicate that he had been placed on a psychiatric hold in the past due to being a threat to himself.

**Office of the District Attorney Fourth Judicial District investigative report highlights:**

Dr. Lingamfelter, County Coroner, stated that it was not the specific application of any particular force or technique, but rather the effect of an upsetting episode on Mr. Burnett's heart rate.  This led Dr. Lingamfelter to opine that the physical altercation contributed to the sudden death.  He also informed that other intense physical situations or events (like running a 5K run, or a tussle with other people on the street, basically anything that gets a heart racing) could have similarly elevated Mr. Burnett's heart rate to the point where it could have contributed to heart failure.

Dr. Lingamfelter characterized Mr. Burnett's heart disease as severe.

Dr. Lingamfelter felt that the TASER would not likely have caused Mr. Burnett's death.  Dr. Lingamfelter agreed that there is also the factor of a time lapse of 9 to 10 minutes between the deployment of the TASER and Mr. Burnett becoming unresponsive which also helped place the TASER lower on the list of possible causes of death.  Also noted was that Mr. Burnett became involved in an altercation after the deployment of the TASER, indicating that the TASER was not causative of the abnormal heart rhythm.

Dr. Lingamfelter said there were no signs of significant pressure to the chest, neck, or face to indicate any elements of asphyxia.

**Analysis and Opinions**

1. **What was Mr. Burnett's true cause of death?  What is the importance of his initial cardiac rhythm?**

The evidence supports that Mr. Burnett died due to an abnormal heart rhythm causing cardiac arrest.  The evidence does not support respiratory arrest, asphyxiation/strangulation, or significant trauma to be the cause of his death.

9

Chad Burnett was found to have ventricular fibrillation as his initial heart rhythm. This heart rhythm is when the lower part of the heart is quivering and is not effectively pumping blood to the rest of the body. This means that oxygen is not effectively going to vital organs including the brain, lungs, and even back to the heart itself. This eventually can cause the heart to stop completely, resulting in death. This is called asystole, also known as "flat line."

Ventricular fibrillation is seen as a heart rhythm when there is lack of good blood flow to the heart coming from either a heart attack or from another abnormal heart rhythm. It can also be caused by abnormal electrolytes, although much less common. It is important to note that this rhythm is not seen in causes of respiratory arrest such as strangulation, asphyxiation, or primary abnormalities with the lungs.

The autopsy evidence, AMR report, coroner report, and assessment of bodycam footage show that Mr. Burnett did not sustain trauma that would have resulted in death. They also show that the problem was with his heart, not with his lungs or other areas of the airway.

### 2. What is the difference between cardiac and respiratory arrest? What are the appropriate treatments?

Cardiac arrest is when the heart stops efficiently pumping blood to the rest of the body. This can be caused by a heart attack, which is blockage in the arteries of the heart and results in the heart not getting its own effective blood supply. Cardiac arrest can also be caused by an abnormal heart rhythm, where the heart does not beat efficiently. This results in a lack of efficient blood flow to the rest of the body.

Respiratory arrest, on the other hand, is caused by lack of oxygenation and ventilation. Ventilation is most commonly known as breathing in humans. This is bringing in oxygen through the mouth or nose which ultimately goes to the lungs. Oxygenation is when the lungs provide oxygen to the blood that is sent from the heart to the lungs. The oxygenated blood then goes back to the heart, and the heart pumps the oxygenated blood to the entire body.

Problems with oxygenation and ventilation are usually combined. Examples of these problems which lead to respiratory arrest are asphyxiation/strangulation, severe infections, fluid in the lungs, muscle weakness, severe lung disease such as COPD or asthma, blood clots in the arteries of the lungs, poor blood flow to the lungs from other abnormalities such as sepsis, drug overdose causing decreased respiratory drive, trauma to the respiratory system, among other possible causes.

Respiratory arrest can, but does not always, result in cardiac arrest. It is important to determine what the primary cause is. Cardiac or respiratory? In Mr. Burnett's case, it is clear that his primary cause was cardiac and not respiratory.

The appropriate treatment for cardiac arrest is CPR. When someone is not in a hospital setting this typically involves only chest compressions and possible defibrillation. The police officers performed chest compressions as indicated. Defibrillation is when a shock is given to the heart in an attempt to help restore the normal heart rhythm. This can only be done with an appropriate machine called a defibrillator. The police officers reportedly did not have access to a defibrillator. When somebody is in cardiac arrest and loses a pulse, it is impossible to tell what heart rhythm they are in by checking for a pulse. A machine that shows the heart rhythm is needed. For example, it is impossible to tell the difference between ventricular fibrillation and pulseless electrical activity by checking a pulse. Sometimes medications are given during cardiac arrest. The police did not have access to these medications. There is no indication for rescue breathing if there is no obvious abnormality to the airway, which in Mr. Burnett's case there was not.

### 3. What role, if any, did Colorado Springs police officers play in Mr. Burnett's death?

Mr. Bennett's unfortunate death was not the fault of Colorado Springs police officers. He did die during contact with them, but this does not mean that police officers caused his death. Mr. Burnett went into cardiac arrest from an abnormal heart rhythm. He was acutely psychotic and agitated long before the police officers arrived. He was found to have a heart that was diseased with abnormal enlargement and stiffness of the muscles of the heart which put him at significant risk of sudden cardiac death. This is regardless of police contact. He was at significant risk at any time, and numerous benign events could have resulted in sudden cardiac death. The evidence shows that the police did not strangulate or asphyxiate Mr. Burnett. The evidence also shows that he did not sustain significant trauma as a result of police contact. There is no evidence of severe brain bleeding, blood loss, significant traumatic injury to vital organs from initial police contact.

### 4. What preexisting conditions did Mr. Burnett have that contributed to or caused his death?

Chad Burnett was found to have a significantly diseased heart. This was not a result of the police contact, but rather existed prior to his encounter with the police. He had a severely enlarged heart, he had abnormal enlargement of the left ventricle, and he had myocardial fibrosis. Myocardial fibrosis causes the heart to be very stiff and noncompliant. This combined with a significant enlargement of the heart put him at serious risk of developing abnormal heart rhythm that could result

in sudden cardiac death.  This abnormal heart condition was not known prior to his death.

Mr. Burnett was also previously diagnosed with bipolar disorder.  He was clearly manic, agitated, and combative prior to any police interaction.  His bipolar with acute psychosis already resulted in a very agitated state, and most likely caused his heart to race rapidly.  This combined with the myocardial fibrosis and cardiac hypertrophy was a dangerous combination, leading to a fatal heart rhythm.

## 5.  Should the police officers have known about the preexisting conditions?

The answer to this question is no.  There was nothing in Mr. Burnett's prior medical records that indicated his heart disease.  This could not have been known by his outward appearance or behavior.  There is no way that police officers could have known that he had an enlarged and stiff heart.

## 6.  Did the police officers administer timely and appropriate medical care?

Yes, the police officers administered timely and appropriate medical care.  They are criticized for not administering CPR sooner.  These criticisms are unfounded.  The evidence shows that once they identified that Mr. Burnett had lost his pulse that they immediately started chest compressions.  This is the correct time to start CPR.  It is not medically appropriate to perform CPR on somebody who still has a pulse.  CPR performed on an unconscious person who still has a pulse is wrong and does not save lives.  In fact, it can be dangerous.  CPR commonly causes broken ribs.  CPR can also cause significant internal damage to vital organs like the liver and spleen.  Most importantly, it is not indicated and is not medically beneficial to perform CPR on a person with a pulse.

## 7.  Was Mr. Burnett strangulated, asphyxiated, or in respiratory distress during his encounter with Colorado Springs police officers?

No, he was not.  There was no evidence of strangulation or asphyxiation.  The autopsy report noted no significant trauma to the neck.  Corner report noted that there were no findings of the body showing excessive pressure in the back, neck, face, or airways.  The patient's abnormal heart rhythm indicated a heart condition and not a respiratory condition.  Despite the repeated theme of the plaintiff's complaint, Mr. Burnett did not have a breathing problem during his encounter with the police.

### 8. What role did alcohol and drugs play in Mr. Burnett's death?

Mr. Burnett had evidence of alcohol and marijuana in his system. These alone could elevate his heart rate and cause agitation resulting in sudden death. While unlikely that they alone would have caused his death, they have a very high likelihood of being contributing factors to the overall state that led to sudden cardiac death.

### 9. Could Mr. Burnett have died from the same cause but with a different inciting event?

Yes, in fact, the list of potential events that could lead to abnormal cardiac rhythm and sudden cardiac death in Mr. Burnett are quite literally endless. Anything that could elevate his heart rate could have resulted in deterioration with his preexisting heart condition. Examples include but are not limited to running, engaging in sports, having an argument with somebody, having a psychotic event, drugs or alcohol, high elevation, and infections or other illnesses. Mr. Burnett was an avid cyclist and reportedly loved hockey. Engaging in the very activities that he loved could have caused him to develop a fatal heart dysrhythmia as well.

### 10. What role did the TASER play in Mr. Burnett's death?

There is no evidence that the TASER played a role in Mr. Burnett's death. Notably, there was a significant time lapse between the time he was tased and when he went into cardiac arrest. There is also evidence showing that the TASER was not fully effective. It is extremely unlikely that the TASER contributed to the sudden cardiac death. This is also supported by the coroner's report.

### 11. Was there evidence that Mr. Burnett was violent and posed a possible immediate threat to others or to himself?

Yes, the evidence is overwhelming that Mr. Burnett was acutely violent and threatening. He posed an immediate and significant risk to other people and to himself. He was physically and verbally aggressive. He damaged a neighbor's property. He had multiple weapons on hand. He was threatening to kill multiple people. He had a history of violent behavior. Neighbors expressed concern for their lives.

### 12. What evidence of significant trauma did the autopsy and Coroner's report show?

The autopsy evidence and Coroner's report indicated that Mr. Burnett had mild injuries only. There was no internal bleeding within the brain. There was not a broken skull or broken facial bones. There was not significant trauma to vital

13

organs (except that sustained during CPR). There was no sign of significant blood loss.

There was noted to be injury to the liver and to the ribs. This is extremely common in patients who undergo CPR. These injuries certainly were sustained during CPR and not from falling or by any other physical contact with the police. There were superficial abrasions, but these do not indicate significant injury. There was swelling to the face and evidence of bruising in the muscles of the face, but this does not indicate severe trauma or any injury significant enough to result in death.

**Summary**

Based upon all available records, my education, my training, and my experience, it is my opinion with a reasonable degree of medical certainty that Mr. Burnett's cause of death was precipitated by an abnormal heart rhythm in a preexisting diseased heart.

The medical evidence does not support asphyxiation, respiratory arrest, trauma, or effect of Taser deployment as a cause of his death.

Furthermore, it is my opinion that the responding police officers involved are not at fault for this unfortunate event.

Sincerely,


Lucas Hennings, MD, FACEP, FAAEM
Assistant Clinical Professor of Medicine
University of Colorado School of Medicine