**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 21-cv-1708-WJM-MDB

ESTATE OF CHAD ALEXANDER BURNETT,

     Plaintiff,

v.

CITY OF COLORADO SPRINGS;
JOSEPH DAIGLE, in his individual capacity;
MICHAEL INAZU, in his individual capacity;
MATTHEW FLEMING, in his individual capacity; and
CAROLINE BARTH, in her individual capacity,

     Defendants.

---

**ORDER DENYING INDIVIDUAL DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

---

The Estate of Chad Alexander Burnett ("the Estate") brings this action under 42
U.S.C. § 1983 for alleged violations of Burnett's constitutional rights against Officer
Joseph Daigle, Sergeant Michael Inazu, Officer Matthew Fleming, and Officer Caroline
Barth individually (the "Officers" or the "Individual Defendants") and the City of Colorado
Springs (the "City") (collectively, "Defendants").

Before the Court is the Individual Defendants' Motion for Summary Judgment
("Motion"). (ECF No. 77.) The Estate filed a response. (ECF No. 89.) The Officers
filed a reply. (ECF No. 101.) For the reasons explained below, the Motion is denied in
its entirety.

# I. BACKGROUND[1]

## A.    Officers Respond to 911 Call

At approximately 9:55 a.m. on May 24, 2020, the Colorado Springs Police Department ("CSPD") received a 911 call concerning a "weapons display" involving Burnett.  (ECF No. 89 at 9 ¶ 1.)  The 911 call was placed by Burnett's elderly neighbors.  (ECF No. 77 at 1 ¶ 2.)  At approximately 9:58 a.m., CSPD dispatched Officers Mathew Fleming and Joseph Daigle to the Broadmoor neighborhood where Burnett resided.  (*Id.* at 2 ¶¶ 3-4; ECF No. 89 at 9 ¶ 1.)

When Officers Fleming and Daigle arrived on scene, Burnett was inside his home.  (ECF No. 89 at 9 ¶ 2.)  They first spoke with a Broadmoor Information and Security ("BIS") officer who told them that, that morning, Burnett had approached a neighbor, raised a knife over his head, and threatened him.  (ECF No. 77 at 2-3 ¶¶ 6, 12; ECF No. 89 at 2 ¶ 12.)  The BIS officer said it had been an "ongoing situation" with Burnett, who had "some family dispute issues."  (ECF No. 77 at 2 ¶¶ 6, 11.)  As the BIS officer put it, the "entire complex ha[d] been harassed by [Burnett] for the last two months" and two residents were seeking a restraining order against Burnett.  (*Id.* at 2 ¶ 11.)  The BIS officer told Officer Fleming that no one else was in the house with Burnett but cautioned that Burnett possibly had firearms in his house.  (*Id.* at 3 ¶ 13; ECF No. 89 at 9 ¶ 3.)

Sergeant Michael Inazu joined Officers Fleming and Daigle on scene shortly after

---

[1] The following factual summary is based on the parties' briefs on the Motion and evidence submitted in support thereof.  The facts set forth herein are undisputed unless attributed to a party or source.  All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

their arrival. (ECF No. 77 at 2 ¶ 7.) Sergeant Inazu was aware that a Crisis Response Team ("CRT")—comprised of a mental health clinician, medically trained firefighter, and police officer—had been to Burnett's residence on a prior occasion, and that Burnett had refused services and/or refused to communicate with CRT. (*Id.* at 2 ¶¶ 8-9.) Sergeant Inazu was also aware that there had been prior calls for service and a Be-On-The-Look-Out ("BOLO") associated with Burnett and his address. (*Id.* at 3 ¶ 14.)

After speaking with the BIS officer, Officer Daigle interviewed three of Burnett's neighbors: John Shaw, Carolyn Shaw, and Linda Silver. (*Id.* at 3 ¶ 15.) They informed Officer Daigle that the incident began when neighbors saw Burnett's dog roaming the neighborhood alone. (*Id.*) Silver retrieved the dog from an unidentified neighbor and took her to the Shaws' house, who she believed to have a good relationship with Burnett. (*Id.*) Around the same time that Silver was delivering the dog to the Shaws, Burnett approached. (*Id.* at 3 ¶ 16.) Burnett tried to hand Shaw "a stack of valuable family items" which he declined to accept. (*Id.* at 3 ¶¶ 16-17.) Burnett became upset, pulled out a knife, raised it over his head, and threatened Shaw. (*Id.*) While Officer Daigle was interviewing the neighbors, Officer Fleming observed Burnett throwing items out of his house. (*Id.* at 3 ¶ 18.)

At approximately 10:29 a.m., Sergeant Inazu and Officer Fleming approached Burnett's front door. (ECF No. 89 at 3 ¶ 4.) According to the Officers, Burnett came to the front door with a beer in hand. (ECF No. 77 at 3 ¶ 19.) Burnett told them, among other things, that he was a Roman Catholic priest, a member of the Dutch army, and a member of Van Halen. (*Id.* at 4 ¶ 22.) Sergeant Inazu and Officer Fleming asked Burnett to open the door, let them come in, or to come out and talk to them

approximately 45 times during this exchange.  (ECF No. 89 at 9 ¶ 5.)  Burnett

repeatedly declined to do so.  (*Id.* at 9 ¶ 6.)  At some point, Burnett picked up and

opened one of two retractable knives sitting on his entryway table.  (ECF No. 77 at 4

¶ 20.)  The Officers' briefing also suggests that Burnett had switched to drinking Scotch

by the end of their interaction.  (*Id.* at 4 ¶ 24.)  Believing his behavior to be escalating,

Sergeant Inazu and Officer Fleming eventually decided to end the interaction with

Burnett.  (*Id.*)

    After leaving Burnett's property, Sergeant Inazu and Officer Daigle discussed

whether they had probable cause to arrest Burnett for felony menacing.  (*Id.* at 4 ¶ 25.)

At that time, they decided they did not.  (*Id.*)  Sergeant Inazu and Officer Fleming then

reapproached Burnett's front door.  (*Id.* at 4 ¶ 26.)  They again asked Burnett to come

out and told him they were going to ticket him in an effort to coerce him to do so.  (*Id.* at

4 ¶ 26; ECF No. 89 at 11 ¶ 18.)  Burnett again refused, and the Officers left the

property.  (ECF No. 77 at 4 ¶ 26.)  Based on the parties' citations to the relevant video

evidence, this initial interaction appears to have lasted approximately 20 minutes.  (*See*

ECF No. 89 at 9 ¶ 5; ECF No. 77 at 4 ¶ 26.)

    Sergeant Inazu then went to speak with the Shaws, from which he learned that

Burnett's alleged crime happened on the Shaws' property.  (ECF No. 77 at 4 ¶ 27; ECF

No. 89 at 9 ¶ 9.)  The Officers seemingly then convened in the cul-de-sac around

Burnett and his neighbors' homes.  (ECF No. 77 at 4 ¶ 27.)  As they stood there,

Burnett reemerged from his house.  (*Id.* at 4-5 ¶ 28.)  The Officers state he threatened a

neighbor who was walking by with her dog, threw knives of out of his house, and

threatened the Officers with a dowel rod.  (*Id.*)  Burnett also instructed the Officers to get

off his property (ECF No. 89 at 9 ¶ 7) and, at some point, called 911 to demand that the

Officers get off his property. (*Id.* at 9 ¶ 8.)[2] The Estate contests that Burnett made any

threat, noting, for instance, that Officer Fleming can be heard stating in the body-worn

camera ("BWC") footage that Burnett was shouting "random nonsense" and that he

perceived the "dowel rod" to be a "stick." (ECF No. 89 at 3 ¶ 28.) Moreover, when

Sergeant Inazu asked Officer Fleming whether Burnett threatened him, Officer Fleming

responded: "Eh. He told me to get off his property or he was gonna . . . I don't know

exactly what he said. Mostly just to get off his property." (*Id.*)

After Burnett ran back into his house, the Officers collected the knives from

Burnett's front yard before again exiting the property. (ECF No. 77 at 5 ¶ 29.) Officer

Daigle and Officer Fleming then recontacted Maytag at her house and explained their

charging decision. (*Id.* at 5 ¶ 30.) Maytag expressed shock over the Officers' inability to

arrest Burnett and concern that Burnett would eventually come out with a gun and kill

someone. (*Id.*) The conversation with Maytag was again interrupted when Burnett

exited his house "ranting." (*Id.* at 5 ¶ 31.) The parties dispute whether Burnett had a

"fire poker in hand" when he did so. (*Id.;* ECF No. 89 at 3 ¶ 31.)

### B.    Officers Reevaluate Probable Cause

Sergeant Inazu and Officers Fleming and Daigle again convened in the cul-de-

sac near Maytag's driveway, where they "discussed their understanding of the

underlying interaction and, specifically, the location of the incident." (ECF No. 77 at 5 ¶

33.) At this point, the Officers had been on scene for approximately one hour. (ECF

---

[2] According to the Officers, Burnett told the 911 dispatcher that there were fake police
trying to evacuate a Chad Burnett, but he was Chad Borchert. (ECF No. 101 at 2 ¶ 8.)

No. 89 at 10 ¶ 11.)

Sergeant Inazu told Officers Fleming and Daigle:

> We're pretty much at hot pursuit to a certain extent.
> Although this has been somewhat of a stalemate, so I don't
> think we can articulate it as well.  I told him he's going to be
> under arrest for something.  He's obstructing it with the
> doorway.  We've got a million different ways we can go with
> this.  I think we've got time.  I don't think we need to go hit
> the door right now and grab him, but at the same time, I think
> he's coming with us.

(*Id.*)  Sergeant Inazu instructed Officers Fleming and Daigle to conduct separate

interviews of the Shaws "to better understand the incident between Burnett and the

Shaws."  (ECF No. 77 at 5 ¶ 35.)  He emphasized the significance of finding probable

cause for felony menacing:  "[I]f we do [find probable cause], that absolutely changes

the game in how our approach is going to be with [Burnett]."  (*Id.* at 5 ¶ 34.)  Sergeant

Inazu and Officers Fleming and Daigle agreed that they would use a taser on Burnett as

soon as he was within 21 feet.  (ECF No. 89 at 10 ¶ 15.)  Sergeant Inazu added:

> I would love to say we have some sort of hot pursuit.  He's
> been told he's under arrest and then we kind of . . . move on
> him, and then he retreats back into the house.  But I think
> because of the time we've been here, the courts would not
> look too happily upon that because we've kind of established
> a status quo for our interaction with him.  So, I think all said
> and done, we're probably going to need to get a warrant to
> go in there and grab him if he doesn't fall prey to one of our
> tricks.  So, we are probably going to be here a while.

(*Id.* at 10 ¶ 16.)

While Officers Fleming and Daigle were interviewing the Shaws, Sergeant Inazu

repositioned his patrol vehicle in the middle of the cul-de-sac and readied his shotgun

and ballistic shield.  (*Id.* at 6 ¶ 36.)  He also requested one additional police unit under

"Code 4."  (*Id*.; ECF No. 89 at 12 ¶ 29.)  "Code 4" indicates there is not an immediate or

imminent threat.  (ECF No. 77-19 (Barth Dep.) at 37:3-19.)

As Sergeant Inazu prepared to arrest Burnett, Burnett again exited his house with a bicycle and engaged Sergeant Inazu in conversation.  (ECF No. 77 at 6 ¶ 37.) Burnett told him, "I'm not a criminal."  (*Id.*)  He then pushed the bicycle into the front yard and picked up a knife but dropped it after Sergeant Inazu asked him to do so.  (*Id.* at 6 ¶ 38.)  Burnett then ran back into his house.  (*Id.*)  Sergeant Inazu moved the bike Burnett had left outside closer to the street, hoping to coerce Burnett into coming out of his house by moving his bicycle further away from the door.  (*Id.* at 6 ¶ 39; ECF No. 89 at 11 ¶ 17.)

A short time later, Officer Caroline Barth arrived on scene.  (ECF No. 77 at 6 ¶ 41.)  Sergeant Inazu instructed her to be on the left of Burnett's house and to have her taser ready if Burnett came out of the house.  (ECF No. 89 at 11 ¶ 19.)  By that time, Officer Fleming had completed his interview with Carolyn Shaw.  (*Id.* at 7 ¶ 44.)  He learned that, when Burnett approached, Carolyn Shaw and Silver met Burnett two feet into the cul-de-sac, near the mailboxes.  (*Id.* at 6-7 ¶ 43)  When they declined the items Burnett had attempted to hand to them, Burnett became angry and threw them.  (*Id.*) He then walked over to Maytag's house and threw something at her window, breaking it. (*Id.*)  John Shaw began to pick up the items Burnett had thrown down from a flowerbox on his property.  (*Id.*)  Burnett pulled out a knife from his pocket, raised it up and told John Shaw, who was crouched down, "I'm going to kill you."  (*Id.*)  Based on this, Officer Fleming informed Sergeant Inazu that he believed probable cause existed for felony menacing.  (*Id.*)

### C.    Warrantless Entry

As the three officers spoke in the cul-de-sac, Burnett stepped outside his front

door and onto his front porch.  (ECF No. 89 at 12 ¶ 31.)  At that point, it had been

approximately an hour and a half since the Officers first arrived on scene.  (*Id.*)  Burnett,

now wearing a Toronto Maple Leafs sweatshirt, told Sergeant Inazu that he played for

the team.  (ECF No. 77 at 7 ¶ 48.)  Sergeant Inazu asked Burnett if he could see his

shirt as he began to approach the house, telling Burnett to "[c]ome on over."  (*Id.* at 7

¶ 49; ECF No. 89 at 12 ¶ 32.)  Officers Fleming and Daigle followed Sergeant Inazu up

the driveway, and Officer Barth approached from the house to the left.  (ECF No. 77 at 7

¶ 50.)

Burnett took a few steps toward the Officers, moving from the front steps of his

house to near the middle of a walkway which ran from the driveway to the front door.

(*Id.* at 7 ¶ 51; ECF No. 89 at 12 ¶ 33.)  Sergeant Inazu attempted to continue engaging

Burnett in "casual conversation."  (ECF No. 77 at 7 ¶ 51.)  Burnett then told the Officers

to "stop right there."  (ECF No. 89 at 12 ¶ 34.)  When Sergeant Inazu asked Burnett why

they needed to stop, Burnett holding a packaged shirt, responded, "it's your Miranda as

a San Diego police officer."  (ECF No. 77 at 8 ¶¶ 52-53.)

After confirming with Officer Fleming that his ankle was healthy enough to sprint

towards Burnett, Sergeant Inazu muttered to Officers Fleming and Daigle, "I'm going to

go," and ran directly at Burnett.  (*Id.* at 8 ¶¶ 54-56.)  Officers Fleming, Daigle, and Barth

followed.  (*Id.*)  At the sight of the Officers running toward him, Burnett immediately

turned, sprinted into his house, and attempted to close the front door behind him.  (*Id.* at

8 ¶ 57.)  Sergeant Inazu used his body to prevent the door from fully closing, and the

Officers chased Burnett into the house.  (*Id.* at 8 ¶ 58.)  The Officers did not tell Burnett

that he was under arrest or give him any commands in the moments before forcibly

entering his house.  (ECF No. 89 at 12 ¶ 38.)

> **D.**   **Use of Force**

Once inside the house, Burnett continued to run away from the Officers.  (ECF No. 77 at 8 ¶ 59.)  The Officers ordered Burnett to "get on the ground" three times.  (*Id.* at 8 ¶¶ 60, 62.)  Burnett, still standing, appeared confused and responded, "Dude, what are you doing?" and "No, no" in response to the Officers' commands.  (*Id.* at 8 ¶ 61; ECF No. 89 at 12 ¶ 39.)  Sergeant Inazu, Officer Fleming, and Officer Daigle surrounded Burnett in an effort to get him to the floor.  (ECF No. 77 at 8 ¶ 63.)  Without warning, Officer Barth used her taser on Burnett seconds into the encounter.  (*Id.* at 8 ¶ 64; ECF No. 89 at 13 ¶ 41.)  Burnett uttered, "Ow," in response to being tased and fell to the floor.  (ECF No. 77 at 9 ¶ 65; ECF No. 89 at 9 ¶ 65.)

Once on the floor, the Officers instructed Burnett at various points to "put your hands behind your back," "stop resisting," and "give us your hands."  (ECF No. 77 at 9 ¶¶ 66, 69.)  Burnett said, "kill me, kill me now."  (*Id.* at 9 ¶ 70.)  The parties dispute the extent to which Burnett physically resisted.[3]  (*Id.* at 9 ¶¶ 67, 72; ECF No. 89 at 4 ¶¶ 67, 72.)  Roughly 20 seconds after Officer Barth initially discharged her taser, she arced her taser for another second.  (ECF No. 77 at 9 ¶ 74.)  And then again, for a total of three discharges.  (*Id.* at 9 ¶¶ 75, 76.)  Burnett grunted and stated, "Goddamn it.  Fuck you." (*Id.* at 10 ¶ 83.)  As the Court understands it, the logs from Officer Barth's taser later showed she interfered with wires during the first arc (*id.* at 10 ¶ 80), the second arc lasted one second and the log showed some connection (*id.* at 10 ¶ 81), and the third

---

[3] According to the Officers, Sergeant Inazu saw Burnett reaching for Officer Fleming's firearm.  (ECF No. 77 at 9 ¶ 68; *see also* ECF No. 89 at 4 ¶ 68 (disputing).)

arc lasted five seconds but the taser probes "only had a good connection for one

second" (*id.* at 9-10 ¶¶ 77-79).  Officer Barth abandoned her use of the taser because

she did not believe that it was having any effect on Burnett.  (*Id.* at 10 ¶ 82.)  She

requested a medical response to the taser deployment.  (*Id.* at 10 ¶ 86.)

    Roughly one minute into their efforts to arrest Burnett, the Officers were able to

place Burnett's arms behind his back and handcuff him.  (*Id.* at 10 ¶¶ 88-90.)  According

to the Estate, Officer Daigle continued to lay on Burnett and placed significant pressure

on Burnett's back and neck as he lay prone.  (ECF No. 89 at 13 ¶ 43; ECF No. 101 at 4

¶ 43 (disputing).)  The Officers brought Burnett to his feet and attempted to walk him

toward the front door.  (ECF No. 77 at 11 ¶ 91.)  Burnett responded "No, you're not

taking me out of my house.  You're not taking me out of my house.  No, you're not.  No,

you're not!  This is my house!  Fuck you!"  (*Id.*)  He became stiff-legged and pushed

back against the Officers' efforts to walk him outside the house.  (*Id.* at 11 ¶¶ 92-94.)

Burnett, along with Officers Fleming and Daigle and Sergeant Inazu, toppled and landed

on the front porch.  (*Id.* at 11 ¶ 95.)  Burnett fell face first onto the concrete and began

bleeding from his head.  (ECF No. 89 at 13 ¶ 44.)  The Estate asserts that, after they fell

over, Officer Daigle laid on Burnett and placed significant bodyweight on Burnett's back

and neck as he lay prone.  (*Id.* at 13 ¶ 45; ECF No. 101 at 4 ¶ 45 (disputing).)  Burnett

can be heard telling the Officers, "Let me, ugh . . . Let me . . . Let me breathe!"  (ECF

No. 89 at 13 ¶ 46.)

    Sergeant Inazu grabbed gloves and flex cuffs from his patrol vehicle.  (ECF No.

77 at 11 ¶ 98.)  In the meantime, Officer Fleming attempted to calm Burnett down,

telling him to "breathe and catch your breath.  Getting amped up is not going to help

you.  I want you to take deep breaths.  Slow everything down.  Alright?  Help us keep this low key for you." (*Id.* at 11 ¶ 99.)  Officers Fleming and Daigle then attempted to bring Burnett to his feet for the second time.  (*Id.* at 11 ¶ 100.)  As they did so, Burnett stated "Just so you know, you're not getting me out of my house.  It's my house.  No. Chad Burnett's house." (*Id.* at 12 ¶ 101.)  The Officers assert Burnett then "launched" back inside the house.  (*Id.* at 12 ¶ 102; ECF No. 89 at 5 ¶ 102 (disputing).)

At the point Burnett forced himself back inside, roughly four minutes had passed since the Officers chased Burnett into his house.  (*See* ECF No. 77 at 12 ¶ 103.) Officer Fleming, while on top of Burnett, stated, "I told you to relax, didn't I?  Didn't I? You didn't want to listen, did you?  So now we're gonna do it our way!  The easy way is over with!" (*Id.* at 12 ¶ 104; ECF No. 89 at 13 ¶ 47.)  Officers Fleming and Daigle attempted to control Burnett's body above his waist.  (ECF No. 77 at 12 ¶ 105.)  Officer Barth used some of her weight on Burnett's legs between his knees and below his hips to control Burnett's legs while Sergeant Inazu attempted to secure his legs in flex cuffs. (ECF No. 77 at 12 ¶ 110.)  Officer Fleming ordered Burnett to stop resisting and delivered two knee strikes to Burnett's torso.  (ECF No. 77 at 13 ¶¶ 114, 118*; ECF No. 89 at 6 ¶¶ 114, 118; *id.* at 14 ¶ 51.)  The parties dispute the extent to which Burnett resisted the Officers' efforts, and the extent to which the Officers placed pressure on Burnett throughout this time.  (*E.g.,* ECF No. 77 at 12 ¶¶ 106-107, 109; ECF No. 89 at 13 ¶ 49, 106, 107; ECF No. 101 at 2 ¶ 107.)

Roughly six minutes after the encounter began, Sergeant Inazu was able to secure Burnett's legs in the flex cuffs.  (ECF No. 77 at 13 ¶ 119.)  The Officers caught their breath and discussed carrying Burnett out of the house.  (*Id.* at 13 ¶ 120.)  During

this time, the Officers state that Officer Daigle was kneeling with one hand on Burnett's
back and another on his right arm, and Officer Fleming was on his feet, crouching, with
his right hand on Burnett's left arm and left hand on his shoulder and later on his back.
(*Id.* at 13 ¶¶ 121-22.)  The parties again dispute the amount of force or pressure placed
on Burnett's back as they did so.  (ECF No. 77 at 13-14 ¶¶ 123-126; ECF No. 89 at 6-7
¶¶ 121-123, 124; ECF No. 101 at 2 ¶ 123, 124.)  According to the Estate, Officers
Fleming and Daigle remained in this position as Burnett lost consciousness, became
unresponsive, made audible gasping and moaning noises, and stopped breathing.
(ECF No. 89 at 14 ¶ 53.)

> **E.    Medical Response**

At some point after Burnett became still and silent, Officer Daigle checked
Burnett's pulse and stated that he was detecting one.  (ECF No. 77 at 14 ¶ 132.)  The
Estate asserts this was two minutes after Burnett stopped breathing.  (ECF No. 89 at 14
¶ 55.)  Officer Fleming was handed a spit sock and placed it on Burnett.  (ECF No. 77 at
14 ¶ 134.)  After some moments, Officer Daigle checked Burnett's pulse again.  (ECF
No. 89 at 14 ¶ 57.)  Officer Daigle stated, "I can feel it.  It's light, but I can feel it."  (ECF
No. 77 at 14 ¶ 135.)  According to the Estate, three minutes had then passed since
Burnett stopped breathing.  (ECF No. 89 at 14 ¶ 57.)

Sergeant Inazu then asked about Burnett's breathing.  (ECF No. 77 at 15 ¶ 136.)
Officer Fleming responded that Burnett had been breathing hard but was not breathing
hard at that moment.  (*Id.*)  Sergeant Inazu asked about a "good strong pulse and solid
respirations."  (*Id.* at 15 ¶ 137.)  Officer Fleming stated that Officer Daigle felt a pulse
but that he had not "noticed breathing."  (*Id.* at 15 ¶ 138.)  Officer Daigle then stated,
"Alright.  Now I can't find it," referring to Burnett's pulse.  (ECF No. 89 at 8 ¶ 139.)  He

announced he believed Burnett was unconscious.  (ECF No. 77 at 15 ¶ 140.)  Sergeant

Inazu responded, "Or he's playing possum."  (ECF No. 89 at 15 ¶ 61.)

Officer Barth moved her police cruiser out of the driveway and into the street so

emergency medical could respond more quickly.  (ECF No. 77 at 15 ¶ 141.)  As they

repositioned Burnett briefly, Sergeant Inazu instructed the other officers to make sure

no weight was placed on Burnett's back.  (*Id.* at 15 ¶ 142.)  Sergeant Inazu felt Burnett's

chest and abdomen and stated that his eyes were open and that he was blinking.  (ECF

No. 77 at 16 ¶ 146.)  He attempted to speak to Burnett, stating "Hey Chad, we're sorry

this happened, but you have to listen to the police, ok?  You understand that?"  (*Id.* at

16 ¶ 147.)  Officer Fleming said to the other officers, "We can always step them up," to

which another officer responded, "They're coming Code 3"—the highest level of

response.  (*Id.* at 16 ¶¶ 148-49.)

One of the officers asked again if they saw a chest rise and placed their hands

on Burnett's back and abdomen.  (*Id.* at 16 ¶ 150.)  Officer Fleming stated that Burnett

was holding his head up (*id.* at 16 ¶ 152), but then stated, "unless it's just how you're

holding his shoulder" (ECF No. 89 at 8 ¶ 152).  Officer Fleming shined a flashlight in

Burnett's eyes and observed his pupils dilated and did not constrict with light.  (ECF No.

77 at 16 ¶ 155.)  The Officers checked for Burnett's pulse twice more before they

started chest compressions.  (*Id.* at 17 ¶¶ 156-161).  According to the Estate, Officer

Fleming started chest compressions eight minutes after Burnett had stopped breathing,

and four minutes and 40 seconds after Officer Fleming announced that Burnett was

unconscious.  (ECF No. 89 at 15 ¶ 62.)  Officer Fleming continued chest compressions

until emergency medical took over.  (ECF No. 77 at 17 ¶¶ 162-163.)  Burnett died in the

entryway of his home.  (ECF No. 89 at 15 ¶ 63.)

## II. LEGAL STANDARD

1.    <u>Rule 56</u>

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the

movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Andersen v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A fact is "material" if, under the

relevant substantive law, it is essential to proper disposition of the claim.  *Wright v.*

*Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  An issue is "genuine" if

the evidence is such that it might lead a reasonable trier of fact to return a verdict for the

nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and

all reasonable inferences therefrom in the light most favorable to the nonmoving party.

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita*

*Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In addition, the

Court must resolve factual ambiguities against the moving party, thus favoring the right

to a trial.  *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

2.    <u>Qualified Immunity</u>

"Qualified immunity shields federal and state officials from money damages

unless a plaintiff pleads facts showing (1) that the official violated a statutory or

constitutional right, and (2) that the right was 'clearly established' at the time of the

challenged conduct."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).  "The judges of the

district courts . . . [may] exercise their sound discretion in deciding which of the two

prongs of the qualified immunity analysis should be addressed first in light of the

circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Once the qualified immunity defense is raised, the burden shifts to the plaintiff to demonstrate that the law was clearly established at the relevant time. *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014). "A right is clearly established in this circuit when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." *Id.* (internal quotation marks omitted). Nonetheless, the clearly established prong

> involves more than a scavenger hunt for prior cases with precisely the same facts. The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation. The Supreme Court has cautioned [lower] courts not to define clearly established law at a high level of generality, but to focus on whether the violative nature of particular conduct is clearly established.

*Perea v. Baca*, 817 F.3d 1198, 1204 (10th Cir. 2016) (internal quotation marks and citations omitted).

## III. ANALYSIS

The Officers argue they are entitled to qualified immunity as a matter of law on Burnett's remaining claims that the Officers (1) entered Burnett's home without a warrant in violation of the Fourth Amendment (ECF No. 29 at ¶¶ 133-147), (2) used excessive force to effect Burnett's arrest in violation of the Fourteenth Amendment (*id.* at ¶¶ 148-166), and (3) failed to ensure Burnett's safety and provide him with adequate medical care in violation of the Fourth Amendment or Fourteenth Amendment (*id.* at ¶¶

167-183).[4]  The Court considers the Officers' entitlement to qualified immunity for each

alleged constitutional violation in turn, using the two-prong test established by the

Supreme Court.  *al-Kidd*, 563 U.S. at 735.

### A.    Warrantless Entry

"It is a basic principle of Fourth Amendment law that searches and seizures

inside a home without a warrant are presumptively unreasonable."  *Payton v. New York,*

445 U.S. 573, 586 (1980) (citation omitted).  Notwithstanding, if "police have probable

cause for an arrest, the existence of certain exigent circumstances may 'overcome the

presumption of unreasonableness . . . .'"  *Mascorro v. Billings,* 656 F.3d 1198, 1205

(10th Cir. 2011) (citations omitted).

The Court previously found the Officers had probable cause to believe Burnett

had committed felony menacing based on the "two [911] calls from Burnett's neighbors

reporting that he had threatened a neighbor with a knife."  (ECF No. 44 at 9.)  The

Officers urge the Court to also find that their "warrantless entry was lawful" based on the

hot pursuit exigency.  (ECF No. 77 at 19.)  "The burden is on the government to

demonstrate the existence of exigent circumstances that overcome the presumption of

unreasonableness that attaches to all warrantless home arrests."  *Mascorro,* 656 F.3d

at 1205.  "That burden is especially heavy when the exception must justify the

warrantless entry of a home."  *U.S. v. Najar,* 451 F.3d 710, 717 (10th Cir. 2006).

### 1.    Hot Pursuit

Under the "hot pursuit" doctrine, "police who attempt to arrest [a] felon outside

[her] home may pursue her if she takes refuge inside."  *United States v. Cruz,* 977 F.3d

---

[4] The parties dispute the proper Amendment under which to analyze this claim.

998, 1009 (10th Cir. 2020) (quoting *U.S. v. Aquino,* 836 F.2d 1268,1271 (1988))

(alterations in original).  "In other words, 'a suspect may not defeat an arrest which has

been set in motion in a public place.'"  *Cruz,* 977 F.3d at 1009 (quoting *U.S. v. Santana,*

427 U.S. 38, 43 (1976)).  While "hot pursuit means some sort of chase," it "need not be

an extended hue and cry in and about (the) public streets."  *Santana,* 427 U.S. at 42-43.

Still, the officer must be "in 'immediate or continuous pursuit' of a suspect from the

scene of a crime."  *Id.* (quoting *Welsh v. Wisconsin,* 466 U.S. 740, 753 (1984)).

The Court previously denied Defendants' motion to dismiss the Estate's unlawful

arrest claim based on the application of the hot pursuit doctrine because, taking the

allegations in the Amended Complaint as true, "Burnett remained in the curtilage of his

home for the entirety of the encounter with the Officers . . . ."  (ECF No. 44 at 10.)

Defendants relied—and indeed continue to rely—on *Santana* to support the application

of the hot pursuit doctrine.  In that case, the Supreme Court held the hot pursuit doctrine

justified the officers' warrantless entry into Santana's home where the chase began

while Santana was standing in the threshold of her home—a "public place" for Fourth

Amendment purposes—before she retreated into the home's vestibule.  *Santana,* 427

U.S. at 42.

Despite *Santana's* apparent similarities, the Court reasoned the hot pursuit

doctrine did not warrant dismissal of the Estate's warrantless entry claim because

Supreme Court precedent established that curtilage is "part of the home itself for Fourth

Amendment purposes."  *Florida v. Jardines,* 569 U.S. 1, 6 (2013).  Thus, to the extent

Burnett was in his front yard immediately in front of his home when the chase began,

there was no "pursuit that began in a public place and immediately continued into

private property." *Attocknie v. Smith,* 798 F.3d 1252, 1257-58 (10th Cir. 2015).  That is,

the Officers' pursuit of Burnett began on private property protected by the Fourth

Amendment and ended on private property protected by the Fourth Amendment.

The Court must now reconsider this reasoning in view of the Officers' citation to

*Soza v. Demisch,* 13 F.4th 1094, 1097 (10th Cir. 2021).  In that case, the criminal

defendant was arrested on the front porch of his residence after police officers came to

believe he was involved in a nearby home invasion.  *Id.* at 1104.  Soza argued the

officers violated his Fourth Amendment rights by entering his front porch without a

warrant to seize him.  *Id.*  The Tenth Circuit observed that "much concerning this issue

is clearly established," including that "[t]he front porch . . . is undoubtedly curtilage" and

"a warrantless *search* of curtilage is unconstitutional."  *Id.* at 1105.  Nonetheless, "all

cases in the Tenth Circuit and Supreme Court addressing *seizures* only involve

warrantless entry into a suspect's *home itself*, rather than the curtilage of the home."  *Id.*

The Circuit "found no case that addresses both 1) warrantless entry onto a front porch

or other curtilage, rather than into the home, for 2) the purpose of a seizure, rather than

a search—except, arguably one: *United States v. Santana,* 427 U.S. 38 (1976)."  *Id.*

While noting that "*Santana's* foundation has been eroded by subsequent

curtilage cases like *Jardines,* its decision upholding the constitutionality of a warrantless

seizure at the threshold of a suspect's home remains binding Supreme Court

precedent."  *Id.* at 1107.  "At the very least," the Circuit reasoned, "considering *Santana,*

we hold that reasonable minds could differ as to the constitutionality of a warrantless

front porch seizure and we cannot say the law was clearly established in []Soza's favor."

*Id.*  For the same reason, the Circuit held the officers "could have reasonably relied on

*Santana* for the proposition that warrantless entry onto a front porch for the purpose of detaining a suspect is constitutional." *Id.*

The Officers argue that, based on *Soza*, "[t]he driveway and walkway where the chase began was in a public place." (ECF No. 101 at 7.) The Court agrees that *Soza* at least compels the finding that it was not clearly established as of May 2020 that hot pursuit cannot justify a warrantless entry where the chase began in the curtilage of the suspect's home.

This finding does not, however, end the inquiry. In order to find the hot pursuit doctrine justified the Officers' warrantless entry into Burnett's home, the Officers must still show the pursuit was immediate or continuous from the scene of a crime as a matter of law. *Attocknie,* 798 F.3d at 1257. The Court concludes that genuine issues of fact preclude it from finding this condition was satisfied.

*Welsh* is instructive on the application of the hot pursuit doctrine here. There*,* police officers learned from a witness that Welsh had driven his car off the road and then left the scene, presumably because he was drunk. 466 U.S. at 742-43. Acting on that tip, the officers went to Welsh's home without a warrant, entered without consent, and arrested him for driving while intoxicated. *Id.* The Supreme Court rejected the State's assertion of the hot pursuit doctrine, reasoning its invocation was "unconvincing because there was no immediate or continuous pursuit of [Welsh] from the scene of a crime." *Id.* at 753.

The crime for which the Officers arrested Burnett was felony menacing of his neighbor(s) with a knife. (ECF No. 77 at 6-7 ¶ 43.) The Officers do not appear to dispute that this crime occurred on or near his neighbors' property—not Burnett's. (*E.g.,*

ECF No. 89 at 9 ¶ 9.)  In their response to the Estate's recitation of material facts, the
Officers nonetheless counter that the location of the "scene of a crime" is a legal
determination, not a fact, and that "the 'scene' of a crime may include areas where
evidence of the crime is found."  (ECF No. 101 at 2 ¶ 10.)  The Officers do not, however,
direct the Court to any relevant legal authority to support this point.  And even assuming
the Officers' assertion is true, they also do not explain to the Court what "evidence of
the crime" was found at Burnett's home such that the Court should find it was the
"scene of a crime" as a matter of law.

The Court thus concludes a reasonable jury could find the relevant "scene of a
crime" was the Shaws' property.  And like in *Welsh,* by the time the Officers arrived,
Burnett had already left the immediate scene of the crime and returned to the confines
of his own home, such that there was no "immediate or continuous pursuit from the
scene of a crime."  466 U.S. at 742-43.  Even if Burnett's home was just a short
distance from the Shaws' property, in the Court's view, this distinction is meaningful.  *Cf.*
*Santana,* 427 U.S. at 40–43 (hot pursuit justified chase of suspect from the threshold of
her home into its vestibule where the crime at issue occurred *inside the home*).

Still, the Officers argue this "restrictive, hyper technical" application of the hot
pursuit doctrine is "unsupported by Tenth Circuit and Supreme Court precedent."  (ECF
No. 101 at 6.)  But in the Court's view, it is the case law upon which the Officers rely
that is distinguishable.  For instance, in *Cruz,* surveilling officers observed a suspect
emerge from his home and wait on the street (the scene of the crime) to meet a
participant in an arranged drug deal.  977 F.3d at 1002-03.  When the officers began to

approach the suspect on the street, he fled, and they pursued him into his home.[5] *Id.*
That is unlike here, where the facts support that Burnett was arrested after he had been
home for at least an hour and a half after completing the crime for which he was
ultimately arrested at another location. *Cf. Attocknie,* 798 F.3d at 1257 ("[The officer]
appears to believe that once a person has committed a felony, he is fair game for 'hot
pursuit' whenever he is spotted. This is a gross misunderstanding of the law.")

The Officers also rely on *United States v. Martin,* 613 F.3d 1295 (2010), *United
States v. Najar,* 451 F.3d 710 (2006), and *United States v. Aquino,* 836 F.2d 1268 (10th
Cir. 1988). However, those decisions are inapposite, as they concerned whether the
warrantless entries at issue were justified by exigent circumstances *other* than hot
pursuit—specifically, officer or third-party safety concerns and the destruction of
evidence. *Martin,* 613 F.3d at 1303-05 (finding "imminent and genuine officer safety
concerns gave rise to exigent circumstances sufficient to justify the officers' entry");
*Najar,* 451 F.3d at 717 (analyzing whether "circumstances posed a significant risk to the
safety of a police officer or a third party" to justify warrantless entry); *Aquino,* 836 F.2d
at 1273 (finding officers had "sufficient reason to believe that criminal evidence would
be destroyed if the police did not immediately enter").

The Court also readily finds that, at the time of the Officers' warrantless entry,
"clearly established law on hot pursuit required an 'immediate or continuous' pursuit of a
suspect from the crime scene." *Attocknie,* 798 F.3d at 1257. The Officers rely on
*Santana* as clearly established law supporting the notion that their warrantless entry

---

[5] Notably, the officers stated they chased the suspect because they were concerned that
he was going to destroy evidence, although the Tenth Circuit concluded that hot pursuit was
alternative grounds justifying their warrantless entry. 977 F.3d at 1003, 1009-10.

*was* supported by hot pursuit, but that case, too, involved a pursuit that began while the suspect was *at the crime scene*.  427 U.S. at 40.  Indeed, the scene of the crime—a drug transaction—was the suspect's house itself.  *See id.*  Thus, *Santana* does not undercut the Supreme Court's finding in *Welsh* that there was "no immediate or continuous pursuit of [a suspect] from the scene of a crime" where the suspect had already left the scene of the crime and returned to his home before the officers' pursuit even began.  466 U.S. at 740; *see also Stanton v. Sims,* 1354 S. Ct. 3, 6 (2013) (confirming that there had been no hot pursuit in *Welsh*).

In sum, the Court finds there are sufficient facts in the record upon which a jury could find there was no "'immediate or continuous' pursuit of [Burnett] from the crime scene."  *Attocknie,* 798 F.3d at 1257; *Welsh,* 466 U.S. at 753.

2.    Public and Officer Safety Concerns

The final paragraph of the Officers' argument on hot pursuit begins with the sentence, "Public and officer safety concerns also supported the entry."  (ECF No. 77 at 19-20.)  The Officers proceed to recite a series of facts from the record in apparent support, before ending the paragraph with what appears to be still further argument on hot pursuit.  (*See id.* at 20 ("When Burnett walked outside on his own accord and engaged Sgt. Inazu in conversation moments later, Sgt. Inazu saw an opportunity to bring order to the situation.  He and the other officers were not required to end their foot chase at the front door.  Rather, Burnett could not defeat his arrest by retreating into the home.")).  The Officers' lone citation is to the Supreme Court's broad holding in *Welsh* that "an important factor to be considered when determining whether *any* exigency exists is the gravity of the underlying offense for which the arrest is being made."  466 U.S. at 753 (emphasis added).

22

Observing the same deficiencies, the Estate argues in response that the Officers have failed to "meaningfully develop an argument with respect to any exigency other than hot pursuit," including because "they do not cite any relevant authority . . . ."  (ECF No. 89 at 21.)  The Estate further argues that the record does not, in any case, support that at least one of the essential elements of the exigency is satisfied—*i.e.,* that "the officers have an objectively reasonable basis to believe there is an *immediate need* to protect the lives or safety of themselves or others."  (ECF No. 89 at 21 (quoting *Najar,* 451 F.3d at 717).  The Officers do not rebut these arguments in reply.  (*See generally* ECF No. 101.)  Indeed, the officer and public safety exigency exception to the warrant requirement is wholly unmentioned in the Officers' reply brief.  (*Id.*)

To the extent the Officers intend to assert that "officer or public safety concerns" were an independent, alternative exigency to hot pursuit justifying their warrantless entry, the Court agrees with the Estate that the Officers have not meaningfully developed the argument.  To demonstrate that officer or public safety justifies a warrantless entry, "the government must show, '(1) the officers had an objectively reasonable basis to believe that there was an immediate need to enter to protect the safety of themselves or others, and (2) the conduct of the entry was reasonable.'"  *U.S. v. Reeves,* 524 F.3d 1161, 1169 (10th Cir. 2008) (quoting *U.S. v. Walker,* 474 F.3d 1249, 1253 (10th Cir. 2007)).

The Officers do not even articulate this standard in their opening brief—let alone explain how the facts they list (many of which are disputed) demonstrate that each of these elements is satisfied as a matter of law.  (*See generally* ECF No. 77.)  The Court thus declines to consider it.  *See Rapid Transit Lines, Inc. v. Wichita Developers, Inc.,*

435 F.2d 850, 852 (10th Cir. 1970) (a party's failure to cite any authority "suggests

either that there is no authority to sustain its position or that it expects the court to do its

research").  In addition or in the alternative, the Court finds the Officers have abandoned

the argument by failing to address the Estate's arguments in reply. [6]  *See In re FCC 11-*

*161,* 753 F.3d 1015, 1100-01 (10th Cir. 2014) (rejecting petitioners' argument because

their reply brief was silent on an issue and made no attempt to rebut respondents'

argument); *Cayetano-Castillo v. Lynch,* 630 F. App'x 788, 794 (10th Cir. 2015) (holding

that an appellant, who does not respond to an argument in its reply brief, "waives, as a

practical matter anyway, any objections not obvious to the court to specific points urged

by the appellee" because the court is not "required to do his work for him and dissect

[the appellee's] plausible argument").

            3.    Point of Burnett's Seizure

        In denying Defendants' earlier motion to dismiss, the Court agreed with the

Estate that the timing of Burnett's seizure was relevant because "[a] factor that develops

post-seizure cannot be used to justify exigency."  *Reeves,* 524 F.3d at 1169.  The

Estate argued at that time—and reasserts in its briefing on the Motion—"that Burnett's

seizure for Fourth Amendment purposes occurred long before the Officers chased him

into his home," such that "any exigency resulting from that chase cannot support their

warrantless entry into his home."  (ECF No. 44 at 10; ECF No. 89 at 19-20.)

---

[6] The Court reiterates that, "[w]hile the defense of qualified immunity places the burden on the plaintiff to demonstrate that the defendant violated his clearly established constitutional rights, the Tenth Circuit looks to the criminal context and shifts the burden back to the defendant when exigent circumstances are alleged."  *French v. City of Cortez,* 361 F. Supp. 3d 1101, 1029 n.12 (D. Colo. 2019) (citing *Mascorro,* 656 F.3d at 1205; *Lundstrom v. Romero,* 616 F.3d 1108, 1124 (10th Cir. 2010); *Armijo v. Peterson,* 601 F.3d 1065, 1070 (10th Cir. 2010)).

The Court acknowledges that its prior order found that *Reeves* and *Flowers* were clearly established law "that coercive police conduct directed at people within their homes can effect a seizure upon them, even if they open the door in response to a show of authority." (ECF No. 44 at 13.)  Nonetheless, the Officers' point is well-taken that neither of those cases arose in the context of hot pursuit. (ECF No. 101 at 10); *see Reeves,* 524 F.3d at 1170 ("The government argues exigent circumstances were supported by officer and victim safety."); *U.S. v. Flowers,* 336 F.3d 1222, 1231 (10th Cir. 2003) ("According to the government, this created a set of exigent circumstances for the safety of the officers and the public as well as the potential for destruction of evidence.").

The Estate cites no other case in its briefing where a suspect was deemed "seized" due to a show of police authority even before any arguable hot pursuit ending in the suspect's home had occurred and, as a result, law enforcement was precluded from relying on the hot pursuit exigency to avoid liability for its warrantless entry into the suspect's home.  Thus, the Court concludes the Estate has not met its burden to show the law was clearly established in the same regard.

Nonetheless, as the other fact issues discussed above separately preclude the Court from finding the Officers are entitled to qualified immunity on the Estate's Fourth Amendment warrantless entry claim, the Officers' Motion is denied as to that claim.

**B.    Excessive Force**

"[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ."  *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis removed).  To determine

whether force used in a particular case is excessive "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396. The ultimate "question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Morris v. Noe*, 672 F.3d 1185, 1195 (10th Cir. 2012).

Applying this standard "requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *see also Lundstrom v. Romero*, 616 F.3d 1108, 1126 (10th Cir. 2010) (referring to the *Graham* factors as the "three, non-exclusive factors relevant to [an] excessive force inquiry"). The Court previously found the first *Graham* factor weighed in favor of the Officers because they had probable cause to believe Burnett had committed felony menacing. (ECF No. 44 at 14-15). The Court thus considers only whether the second and third *Graham* factors are sufficient to create a genuine issue of material fact in favor of the Estate.

The Tenth Circuit has expressed that "the second [*Graham*] factor—whether there is an immediate threat to safety—'is undoubtedly the most important . . . factor in determining the objective reasonableness of an officer's use of force.'" *Est. of Valverde by and through Padilla v. Dodge,* 967 F.3d 1049, 1060-61 (10th Cir. 2020) (quoting *Pauly v. White,* 874 F.3d 1197, 1216 (10th Cir. 2017)) (internal quotation marks omitted). "That is particularly true when the issue is whether an officer reasonably

believed that he faced a threat of serious physical harm." *Est. of Valverde,* 967 F.3d at 1061.  The third *Graham* factor—whether Burnett actively resisted arrest or attempted to evade arrest by flight—is properly considered in light of whether "the officers' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force."  *Cordova v. Aragon*, 569 F.3d 1183, 1188 (10th Cir. 2009) (internal quotation marks and citation omitted).

With these principles in mind, the Court next considers (1) Officer Barth's use of a taser and (2) the Officers' use of force after Burnett was restrained.

### 1.    Officer Barth's Use of Taser

Here, the facts surrounding the moments before Burnett's arrest are relevant to whether there was "an immediate threat to safety" and the Officers' "own reckless or deliberate conduct" contributed to the need for Officer Barth to deploy her taser—to the extent any such need existed.  It is undisputed that the encounter began when Burnett, wearing a Toronto Maple Leafs sweatshirt and holding a packaged shirt, emerged from his home and stopped on the walkway running from his front porch to the driveway, some distance away from the Officers, who were then standing in the cul-de-sac.  (ECF No. 89 at 12 ¶ 31; ECF No. 77 at 7 ¶¶ 47-48.)  Viewing this in the light most favorable to the Estate, a reasonable jury could find that, at least in *that* moment, Burnett was unarmed and otherwise appeared non-threatening.

Burnett then began speaking to Sergeant Inazu and Officers Fleming and Daigle, telling them that he was a Toronto Maple Leafs player.  (ECF No. 77 at 7 ¶ 48.)  The record supports the notion that Officer Barth observed at least part of this exchange from the front yard of Burnett's next-door neighbor.  (*See generally* ECF No. 77-1.)  Based on at least this comment, a jury could find that a reasonable officer in Officer

Barth's position should have ascertained that Burnett was a person with an obvious

mental illness—claiming as he did to be a professional hockey player.  *See Estate of*

*Ceballos v. Husk,* 919 F.3d 1204, 1217 (10th Cir. 2019) (where "responding officers

knew Ceballo's capacity to reason was diminished, whether the underlying reason might

have been . . . . a jury might reasonably find that an objective officer in Husk's position

should have recognized that as well and would have taken those facts into account

before provoking a fatal encounter"); *Perea,* 817 F.3d at 1204 ("It is not reasonable for

an officer to repeatedly use a taser against a subdued arrestee they know to be

mentally ill . . . ."); *Allen,* 119 F.3d at 839 (genuine issue of material fact as to officers'

reasonableness precluded qualified immunity on excessive force where decedent was

threatening suicide prior to encounter with police).  The Officers "do[] not allege and no

evidence indicates that [Officer Barth] altered the manner or level of [her] use of force

based on [Burnett's] obvious mental health struggles."  *French v. City of Cortez,* 361 F.

Supp. 3d 1011, 1036 (D. Colo. 2019).  The Officers argue, conversely, that "[n]o

evidence indicates officers failed to take his mental state into account" (ECF No. 101 at

11).  But the Court is not persuaded this bare assertion negates any dispute of fact.

As the Officers began to walk up Burnett's driveway, Sergeant Inazu engaged

Burnett in what the Officers describe as "casual conversation" and told him to "come on

over."  (ECF No. 77 at 7 ¶ 51; ECF No. 89 at 12 ¶ 33.)  While the Court may not

consider the Officers' subjective intent, the Officers' behavior in this manner does not

suggest that they perceived any immediate threat to their safety in that moment.

Moreover, there is no indication that Burnett made any aggressive movement toward

the Officers.  To the contrary, he told them to "[s]top right there."  (ECF No. 89 at 12 ¶

34.)  Rather, it was the Officers that charged Burnett, without warning, and chased him

into the house.  (ECF No. 77 at 8 ¶¶ 54-56.)  Thus, as pertinent to the third *Graham*

factor, Burnett also "did not initiate the physical struggle with the officers."  *French,* 361

F. Supp. 3d at 1034.  To the extent any force was needed thereafter, the Officers'

decision to take Burnett by surprise and then forcibly enter and apprehend him, "rather

than employing other means, were certainly principal causes."  *Id.* at 1033.

In response to the Officers chasing him into the house and surrounding him, and

again viewing the facts in the light most favorable to the Estate, the record supports the

notion that Burnett initially showed signs not of resistance, but of confusion, saying,

"Dude, what are you doing?"  (ECF No. 89 at 12 ¶ 39.)  One or more of the Officers

swiftly commanded Burnett to get on the ground, and Officer Barth tased Burnett

virtually immediately afterward.  (ECF No. 77 at 8 ¶¶ 60, 64; ECF No. 89 at 13 ¶ 41.)  A

reasonable jury could find that Officer Barth did not "give [Burnett] a chance to submit

peacefully to an arrest."  *Casey v. City of Federal Heights,* 509 F.3d 1278, 1282 (10th

Cir. 2007).

Only roughly 20 seconds passed before Officer Barth tased Burnett for the

second and third time.  (ECF No. 77 at 9 ¶ 73.)  Between Officer Barth's initial discharge

of her taser and the second and third discharge, Burnett repeatedly stated, "kill me," "kill

me now" (*Id.* at 9 ¶ 70)—"not commonly the words of a combative individual."  *French,*

361 F. Supp. 3d at 1034.  The Officers, of course, dispute the extent to which Burnett

resisted the Officers' efforts to arrest him.  But even to the extent Burnett did show any

signs of resistance in these moments, such resistance "could have been a less than

voluntary reaction to being thrown to the ground and tased," drawing all inferences in

his favor.  *Id.* at 1034; *see also Casey,* 509 F.3d at 1280 (where suspect testified that "he kept trying to get up" during encounter with police).  Burnett's "actions must also be considered in light of the fact that he was not informed why he was being arrested, nor was he given any warnings regarding use of the Taser."  *French,* 361 F. Supp. 3d at 1035.

While the Officers may point to other facts at trial to support their theory that the second and third *Graham* factors weigh in Officer Barth's favor, the Court readily finds that at least the foregoing considerations are sufficient to create a genuine issue of material fact as to whether Officer Barth's use of force was objectively reasonable under the circumstances.

The Court also finds it was clearly established at the time of the incident in May 2020 that "it is excessive to use a Taser to control a target without having any reason to believe that a lesser amount of force—or verbal command—could not exact compliance."  *Casey,* 509 F.3d at 1286.  The Tenth Circuit reaffirmed this finding in *Cavanaugh v. Woods Cross City,* holding an officer may not use a "Taser against a non-violent misdemeanant who appeared to pose no threat and who was given no warning or chance to comply with the officer's demands."  625 F.3d 661, 662-63 (10th Cir. 2010); *see also Lee v. Tucker,* 904 F.3d 1145, 1150 (10th Cir. 2018) ("defendants violated *Cavanaugh*'s dictate by repeatedly advising a Taser without warning, despite the fact that Lee was not resisting the officers and had not been advised that he was being detained").

The Officers assert that, "[c]onfronted with an actively resistive felony suspect, Officer Barth was not required to warn Burnett."  (ECF No. 77 at 22.)  However, the

Officers cite no authority to support this position. Moreover, as discussed above, the

extent to which Burnett resisted in the moments before he was tased is a fact very much

in dispute. And while the Tenth Circuit's cases concerning the use of a taser without

warning concerned "non-violent misdemeanants," this does not preclude the Court from

finding the law was sufficiently clearly established to place Officer Barth on notice. *See*

*also French,* 361 F. Supp. 3d at 1037 (finding *Casey, Cavanaugh,* and *Perea* were

clearly established law in case where suspect "was tased even though he did not initiate

the physical engagement, was not threatening or attempting to flee, and received no

warning or explanation" and was ultimately charged with "attempted murder, felony

criminal mischief, felony obstruction, reckless endangerment, and menacing").

The Court will further note that not all of the suspects in the Tenth Circuit's

previous cases were accused of "non-violent" crimes—even if misdemeanors. In

*Cavanaugh,* for instance, the suspect ultimately pleaded guilty to "assault-domestic

violence and intoxication," and the suspect's husband had informed police before the

encounter that he believed her to be armed with a kitchen knife. 625 F.3d at 663.

In any case, the severity of the crime at issue is just one factor to be considered

under *Graham.* Excessive force claims require assessing the totality of the

circumstances, and not simply tallying factors on two sides of a ledger. *Weigel v.*

*Broad*, 544 F.3d 1143, 1151–52 (10th Cir. 2008). Based on this record, a reasonable

jury could find Officer Barth's use of a taser on Burnett without a prior warning was

disproportionately excessive in view of the totality of the circumstances under clearly

established law.

2.    Use of Force After Burnett Was Restrained

The Estate next argues that the "[O]fficers unjustifiably continued to use force on

[] Burnett" "[a]fter Burnett was handcuffed—and after his resistance ended or he no longer posed any threat." (ECF No. 89 at 24.) Viewing the facts in the light most favorable to the Estate, the Court agrees that the record evidence shows that the Officers at times used force while Burnett was in a face-down prone position after he was handcuffed, a determination that a jury could find constitutes excessive force under the circumstances.

First, as the Officers were handcuffing Burnett, the BWC footage supports a finding that Burnett was in a face down position, and Officer Daigle laid or leaned across Burnett's upper torso for approximately 50 seconds. (ECF No. 77-2 at 2:17-3:07; *see also* ECF No. 89 at 13 ¶ 43.) During these seconds, Burnett can be heard saying, "Help me," but otherwise appears to be motionless. (*See id.*) It is difficult to discern from the BWC footage the extent to which Burnett was resisting the Officers in the seconds immediately before. And since that fact is otherwise in dispute, the Court declines to resolve it in the Officers' favor at this stage. (ECF No. 89 at 13 ¶ 43.) Moreover, as discussed above, even to the extent Burnett did show signs of resistance in these seconds, such resistance "could have been a less than voluntary reaction" to have just been "thrown to the ground and tased," drawing all inferences in his favor. *Id.* at 1034; *see also Casey,* 509 F.3d at 1280 (where suspect testified that "he kept trying to get up" during encounter with police).

Second, after Burnett fell face forward onto his front porch, the BWC footage supports a finding that Officer Daigle laid or leaned across Burnett's upper torso for roughly 15 seconds, while Burnett, still handcuffed, laid motionless. (ECF No. 77-2 at 4:00-4:14.) Officer Daigle then rose to his knees, but it appears his right hand remained

on Burnett's upper torso, although it is out of frame, such that the Court cannot tell how long this continued. (*See id.*) There can be little dispute, however, that, based on the BWC footage, Burnett fell onto his porch due to his resistance to the Officers' efforts to remove him from his house. (ECF No. 77 at 11 ¶¶ 91-95.) Still, Burnett's "actions must . . . be considered in light of the fact that he was not informed why he was being arrested . . . ." *French,* 361 F. Supp. 3d at 1035. Moreover, a reasonable jury could interpret the fact that Burnett was attempting to *stay* inside the house as inconsistent with a finding that Burnett was attempting to flee or evade arrest. *Cf. Casey,* 509 F.3d at 1282 ("If anything, by returning to the courthouse rather than to his truck Mr. Casey would have made himself easier to capture, not harder.").

Third, after Burnett had forced his way back into the house and the Officers returned him to a face-down prone position, the BWC footage shows that there was consistently a hand placed on Burnett's upper neck and back area for approximately three minutes. (ECF No. 77-2 at 5:39–8:49.) The Court cannot discern from the BWC footage the extent of the pressure placed on Burnett, and the parties otherwise dispute this fact. (ECF No. 89 at 7 ¶ 124.) During this time, Officer Daigle also delivered—or at least attempted to deliver—two knee strikes to Burnett's torso. (ECF No. 77 at 13 ¶¶ 114, 118.) Here again, the Court acknowledges that, after the Officers brought Burnett to his feet for the second time, Burnett stiffened his legs and resisted the Officers efforts to escort him away from the house. But it also appears that, even after Burnett's feet were secured and he fell silent, the Officers kept their hands on Burnett's upper back and neck area for just under two minutes. *Cf. Weigel,* 544 F.3d at 1152-53 (finding sufficient evidence to support excessive force claim where evidence supported that

Weigl was maintained on his stomach with pressure imposed on his upper back for roughly three minutes).  The Estate contends they did so despite the fact that "Burnett was audibly in respiratory distress, and even asked officers to let him breathe."  (ECF No. 89 at 24; *id.* at 13 ¶¶ 45-49.)

Ultimately, it will be up to the jury to decide if the Officers' use of force after Burnett was handcuffed and in a prone position was proportionate based on the degree to which they find Burnett "posed an immediate threat to the safety of the officers or others" and "actively resisted arrest or attempted to evade arrest by flight."  The Court reiterates that the latter factor must be viewed in light of whether "the officers' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force."  *Cordova,* 569 F.3d at 1188.  Thus, while evidence of Burnett's resistance is certainly relevant, it must be considered in context, among other things, of the Officers' own conduct.  Moreover, the same considerations discussed above regarding Burnett's mental illness bear on this inquiry.  *See* Section III.B.1 *supra.*  In all*,* "[a] review of the facts in the light most favorable to [the Estate] persuades [the Court] they give rise to a jury question regarding whether the officers acted reasonably."  *Weigel,* 544 F.3d at 1152.

The Court further finds that "*Dixon, Casey,* and *Weigel* clearly establish[ed] that the Fourth Amendment prohibits the use of force without legitimate justification, as when a subject poses no threat or has been subdued."  *McCoy v. Meyers,* 887 F.3d 1034, 1052 (10th Cir. 2018); *see also Martin v. City of Albuquerque,* 147 F. Supp. 3d 1298, 1332 (D.N.M. 2015) (citing *Casey* in concluding a reasonable jury might find officer's use of force was excessive where he "did not inform Martin that he was under arrest

before pushing him up against the truck and administering a knee strike). And particularly with respect to the use of pressure on a suspect's back, the Tenth Circuit held in *Estate of Booker v. Gomez* that placing significant or substantial weight on a suspect's back "while he was handcuffed on his stomach" is excessive. 745 F.3d 405, 424 (10th Cir. 2014); *see also id.* at 429 ("*Weigel* (pressure on back) . . . put Defendants on notice that use of such force on a person who is not resisting and who is restrained in handcuffs is disproportionate."). As the Court previously noted, the law does not require that cases be "factually identical" to find clearly established law. *McCoy,* 887 F.3d at 1052. These cases are sufficiently "factually analogous" to place the Officers on notice that their use of force was excessive, should the jury find that the second and third *Graham* factors weigh in the Estate's favor.

For all these reasons, the Officers' Motion is denied with respect to the Estate's excessive force claim.

### C.    Failure to Provide Medical Care

#### 1.    Constitutional Violation

The parties continue to dispute which Constitutional Amendment applies to the Estate's inadequate medical care claim. As the Court previously observed, this disagreement is not purely academic; the standard that applies under each amendment is different. *Lanman v. Hansen*, 529 F.3d 673, 679–80 (10th Cir. 2008). Under the Fourth Amendment, the "objectively unreasonable" standard applies, and under the Fourteenth Amendment, the "deliberate indifference" standard applies. *Id.* Traditionally, the "deliberate indifference" standard includes both an objective and subjective element—and therefore presents a higher bar for a plaintiff to clear. *See Strain v. Regalado*, 977 F.3d 984, 989–90 (2020), *cert. denied*, 142 S. Ct. 312 (2021).

Although an unpublished decision, the Court observes that the Tenth Circuit recently analyzed a claim that the officers had failed to provide adequate medical care when the decedent-suspect was shot in the course of an arrest pursuant to the Fourteenth Amendment.  *Crittenden v. City of Tahlequah,* 786 F. App'x 795 (10th Cir. 2019).  In the absence of any binding precedent to the contrary, the Court will follow the Tenth Circuit's lead in *Crittenden* and apply the Fourteenth Amendment deliberate indifference standard to the Estate's claim.

The Tenth Circuit explained the two-prong test as below:

> The objective inquiry asks whether "the harm suffered rises to a level sufficiently serious to be cognizable under the Cruel and Unusual Punishment Clause of the Eighth Amendment."  *Id.* (quoting *Mata v. Saiz,* 427 F.3d 745, 752–53 (10th Cir. 2005) (quotation marks omitted)).  The subjective inquiry, in turn, asks whether "the defendants knew [the detainee] faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it."  *Id.* (quoting *Callahan,* 471 F.3d at 1159 (quotation marks omitted)).

*Quintana v. Santa Fe Cnty. Bd. Comm'rs*, 973 F.3d 1022, 1029 (2020) (quoting *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009)).

The Court finds that the Estate easily satisfies the objective prong.  A "medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Quintana,* 973 F.3d at 1029 (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (alteration in original).  As the Estate correctly points out, Burnett's death is certainly "sufficiently serious" to meet the objective component.  *Burke v. Regalado,* 935 F.3d 960, 992 (10th Cir. 2019) ("We have held that death is, without doubt, sufficiently serious to meet the objective

component); *see also Booker,* 745 F.3d at 430-31 (same); *Martinez,* 563 F.3d at 1088-89 (same).

To satisfy the subjective prong, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Quintana*, 973 F.3d at 1029 (noting "the Supreme Court has insisted upon actual knowledge"). A factfinder may conclude an official "'knew of a substantial risk from the very fact that the risk was obvious' . . . to the so-called 'reasonable man.'" *Id.*; *accord Mata*, 427 F.3d at 752. As the Court has already observed:

> [W]hen someone stops breathing, it is obvious that there is a problem. A reasonable jury could find that when Burnett showed visible signs he was no longer breathing, there existed a substantial risk to Burnett's health that was so obvious that the Officers had actual knowledge of the risk.

(ECF No. 44 at 20.) The Officers contend "[t]he precise moment Burnett stopped breathing is unknown." (ECF No. 77 at 28.) Even so, the Estate points out that the Officers acknowledged they did not see Burnett's chest rise and fall (*e.g.,* ECF No. 77 at 15 ¶ 138), at one point commenting that he might be "playing possum" (ECF No. 89 at 15 ¶ 61).

Drawing all inferences in favor of the Estate, the record thus supports a finding that the Officers detected visible signs Burnett was no longer breathing. Despite this, Officer Daigle placed a "spit sock" over Burnett's head. (*Id.* at 14 ¶ 56.) Moreover, the Estate asserts that between the time that Officer Daigle announced he believed Burnett to be unconscious, a minute and a half elapsed before the Officers "accelerated" a medical response, and four minutes and forty seconds elapsed before Officer Fleming started chest compressions. (*Id.* at 15 ¶ 62.) Particularly if the jury determines "the

Defendants were responsible for placing [Burnett] in his vulnerable state and engaged

in activity . . . that could produce foreseeable, rapid, and deadly consequences," even

"[a] brief delay in care is particularly problematic."  *Booker,* 745 F.3d at 432.  Thus, the

Court concludes these facts are sufficient to create a genuine issue of material fact as

to whether the Officers knew of a substantial risk of harm.

> ### 2.    Clearly Established

The Court previously held that *Estate of Booker* clearly established failing to

check Burnett's breathing, perform CPR, or seek medical care while he was limp,

unconscious, and not breathing for three and a half minutes because of their use of

force was a violation of Burnett's rights.  (ECF No. 44 at 23 (citing 745 F.3d at 434)).

The Officers nonetheless argue they had no duty to provide CPR based on *Wilson v.*

*Meeks,* 52 F.3d 1547 (10th Cir. 1995), as abrogated by *Crittenden v. City of Tahlequah,*

786 F. App'x 795 (10th Cir. 2019).  However, *Crittenden* distinguished *Estate of Booker*

as a case that was "so materially different from the case at hand that the decision could

not sufficiently put the individual officers on notice that their actions violated Crittenden's

constitutional rights."  786 F. App'x at 803.  Here, the Court rejects the Officers'

contention that *Estate of Booker* is so factually dissimilar that it could not have provided

them with notice of the constitutional violation at issue.  The Officers point, for example,

to the "dissimilarity in force used."  (ECF No. 77 at 30.)  But the Court has already held

the fact that a carotid neck hold, for example, was used in *Booker* does "not preclude a

finding that the Officers were on notice that their conduct violated Burnett's rights."

(ECF No. 44 at 23.)

Therefore, the Court finds that genuine issues of material fact preclude summary

judgment on the Officers' qualified immunity defense as to the Estate's claim that they

failed to provide adequate medical care under the Fourteenth Amendment.

## IV. CONCLUSION

For the reasons set forth above, the Individual Defendants' Motion for Summary

Judgment (ECF No. 77) is DENIED.

Dated this 10th day of January, 2025.

BY THE COURT:

_____

William J. Martinez
Senior United States District Judge