IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 21-cv-1708-WJM-MDB

ESTATE OF CHAD ALEXANDER BURNETT,

    Plaintiff,

v.

CITY OF COLORADO SPRINGS;
JOSEPH DAIGLE, in his individual capacity;
MICHAEL INAZU, in his individual capacity;
MATTHEW FLEMING, in his individual capacity; and
CAROLINE BARTH, in her individual capacity,

    Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART
CITY OF COLORADO SPRINGS' MOTION FOR SUMMARY JUDGMENT**

---

    The Estate of Chad Alexander Burnett ("the Estate") brings this action under 42 U.S.C. § 1983 for alleged violations of Burnett's civil rights under the U.S. Constitution against Officer Joseph Daigle, Sergeant Michael Inazu, Officer Matthew Fleming, and Officer Caroline Barth, individually (the "Officers" or the "Individual Defendants") and the City of Colorado Springs (the "City") (collectively, "Defendants"). The parties are familiar with the facts of the underlying incident from, among other sources, the Court's Order Denying the Individual Defendants' Motion for Summary Judgment. (*See* ECF No. 110.)

    Before the Court is the City's Motion for Summary Judgment ("Motion") (ECF No. 78). The Estate filed a response (ECF No. 90), to which the City filed a reply (ECF No. 102). For the reasons explained below, the Motion is granted in part and denied in part.

**I. LEGAL STANDARD**

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Andersen v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

**II. ANALYSIS**

A local government unit can be liable for damages under 42 U.S.C. § 1983 only when its "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 694 (1978). The Supreme Court has thus "required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury," thereby "ensur[ing] that a municipality is held liable only for those deprivations resulting from the

decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality," rather than holding the municipality liable simply because it employed a constitutional wrongdoer.  *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403–04 (1997).

The relevant policy or custom can take several forms, including:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (internal quotation marks omitted; alterations incorporated).  But, whatever species of policy or custom is alleged,

> [t]he plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged.  That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Bryan Cnty.*, 520 U.S. at 404.

The Estate asserts municipal liability on two remaining theories: informal custom and failure to train.[1]  The Court finds below that the City is entitled to summary judgment

---

[1] The Court previously dismissed the Estate's *Monell* claim based on a ratification theory.  (ECF No. 44 at 26–27.)

3

on the Estate's municipal liability claim based on an informal custom. However, genuine issues of material fact preclude summary judgment on the Estate's municipal liability claim based on the City's alleged failure to train.

### A.     Informal Custom

"[A]n act performed pursuant to a custom that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Bryan Cnty.*, 520 U.S. at 404 (internal quotation marks omitted); *see also City of St. Louis v. Prapotnik*, 485 U.S. 112, 127 (1988) (establishing an informal policy or custom requires the plaintiff to show that the misconduct was widespread—*i.e.*, that it involved a series of decisions). "With formal, unwritten policies, customs, or practices, the plaintiff can plead a pattern of multiple similar instances of misconduct; 'no set number is required, and the more unique the misconduct is, and the more similar the incidents are to one another, the smaller the required number will be to render the alleged policy plausible.'" *Arakji v. Hess*, 2015 WL 7755975, at *6 (D. Colo. Dec. 2, 2015) (quoting *Griego v. City of Albuquerque*, 100 F. Supp. 3d 1192, 1213 (D.N.M. 2015)).

The Estate relies on three incidents to establish that "Colorado Springs has a widespread practice of unlawful seizures and arrests, excessive use of force restricting breathing, and excessive use of tasers." (ECF No. 90 at 26.) Specifically, it relies on two incidents occurring in 2009 and 2018 to establish that the City "has a custom of excessively tasing citizens without warning." (*Id.; see also id.* at 17 ¶ 54–56, 66.) And it relies on the same incident from 2018 and another from 2015 to support that the City has a custom of excessive use of force. (*Id.* at 17 ¶¶ 54–61, 62–65.)

While these incidents share some factual similarities, the Court is unprepared to

say that two to three incidents over the span of nine years is sufficient to establish a "widespread practice" that is "so permanent and well settled as to constitute a custom or usage with the force of law." *Bryson,* 627 F.3d at 788; *see also Sexton v. Faris*, 530 F. Supp. 3d 1044, 1070 (D. Colo. 2021) ("The Court finds that two alleged incidents, one in 2013 and one in 2019, are insufficient to show a practice so permanent and well settled that it constitutes a custom or usage with the force of law."); *Est. of Kowalski v. Shrader,* 2022 WL 19422, at *20 (D. Colo. Jan. 3, 2022) (two incidents occurring over a span of four to five years insufficient to establish "widespread practice"); *Est. of Reat v. Rodriguez*, 2013 WL 3010828, at *5 (D. Colo. June 17, 2013) (three instances spread over twenty years insufficient to allege pattern); *Abila v. Funk*, 2016 WL 9021834, at *19 (D.N.M. Dec. 14, 2016) (citing cases in support of the statement that "two or three instances will not suffice" to establish practice or custom).

The Court thus concludes there is insufficient evidence to establish a *Monell* claim based on a widespread practice or informal custom of "unlawful seizures and arrests, excessive use of force restricting breathing, and excessive use of tasers." (ECF No. 90 at 26.) For the same reason, the Motion is granted as to the Estate's municipal liability claim based on any alleged informal custom.

    **B.**    **Failure to Train**

The Supreme Court has observed that "[a] municipality's liability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson,* 563 U.S. 51, 61 (2011). Thus, "[t]o satisfy the stringent deliberate indifference standard, '[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary.''" *Waller v. City & Cnty. of Denver,* 932 F.3d 1277, 1285 (10th Cir. 2019) (quoting *Connick,* 563 U.S. at 62.) Nevertheless, the Supreme

5

Court has "reaffirmed single-incident failure-to-train municipal liability 'in a narrow range of circumstances[] [where] a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Bryan Cnty.,* 520 U.S. at 409.

The Estate does not cite "a pattern of constitutional violations" to support its claim that the City is subject to municipal liability because it failed to train its police officers. Coupled with its reliance on *Valdez v. Macdonald,* the Court can only assume that the Estate intends to rely on the single-incident failure-to-train municipal liability theory. 66 F.4th 796, 815–822 (10th Cir. 2023) (analyzing single-incident municipal liability for deficient training). The Court thus analyzes the Estate's claim under the Tenth Circuit's "most recent articulation of the single-incident failure-to-train claim: (1) 'the existence of a [municipal] policy or custom involving deficient training'; (2) an injury caused by the policy that is 'obvious' and 'closely related'; and (3) that the municipality adopted the 'policy or custom with deliberate indifference' to the injury." *Id.* at 816–17 (quoting *Lance v. Morris,* 985 F.3d 787, 800 (10th Cir. 2021)).

The Estate identifies several topics on which it asserts the City deficiently trained Colorado Springs Police Department ("CSPD") officers—namely, (1) "responding to individuals experiencing a mental health crisis," (2) "warrant requirements" and "exigent circumstances and hot pursuit,"[2] (3) "use of tasers," (4) "dangers of prone restraint," and (5) "proper medical assistance for people who have become unresponsive." (ECF No.

---

[2] The Estate identifies "warrant requirements" and "exigent circumstances and hot pursuit" as two separate topics on which the City failed to adequately trained CSPD officers. (*See* ECF No. 90 at 21–22.) Finding them to be interrelated, the Court analyzes those topics in tandem below.

6

90 at 19–20.) As to each of these topics, it is not enough "to show that there were general deficiencies in the [municipality's] training program." *Porro v. Barnes,* 624 F.3d 1322, 1328 (10th Cir. 2010). Rather, the Estate must "identify *how* training was inadequate." *Hughes v. Kvasnicka,* 2014 WL 36627, at *4 (D. Colo. Jan. 6, 2014) (emphasis added).

Moreover, to satisfy the causation element of its single-incident failure-to-train claim, the Estate must show that "the injury [would] have been avoided had the employee been trained under a program that was not deficient in the identified respect[s]." *City of Canton, Ohio v. Harris,* 489 U.S. 378, 391 (1989). Finally, it must show the Tenth Circuit's three-part test for deliberate indifference is satisfied as to each of the training deficiencies it has identified by demonstrating: "(i) the municipality's policymakers know to a moral certainty that their employees will confront a given situation; (ii) the situation presents the employee with a difficult choice of the sort that training or supervision will make less difficult; and (iii) [t]he wrong choice will frequently cause the deprivation of a citizen's constitutional rights." *Valdez,* 66 F.4th at 817 (citations omitted).

The Court undertakes the three-part analysis for a single-incident failure-to-train claim as to each training deficiency asserted by the Estate below.

### 1. Responding to Individuals Experiencing a Mental Health Crisis

The Estate correctly points out that the City did not move for summary judgment as to the claim that the City inadequately trained officers on responding to individuals experiencing a mental health crisis. (*See generally* ECF No. 78.)[3] Indeed, the City did

---

[3] While the City's Motion mentions officer training on "de-escalation," the Court is not persuaded this is one and the same with responding to an individual experiencing a mental

not address the Estate's claim that officers are inadequately trained on responding to individuals experiencing a mental health crisis until its reply.  (ECF No. 102 at 8–9.)  Those arguments are waived.  *See U.S. v. Harrell,* 642 F.3d 907, 918 (10th Cir. 2021).

As a consequence, the Court concludes the Estate may proceed on a claim that the City failed to adequately train officers on "call[ing] a critical response team to assist with calls involving a mental health crisis," consistent with the opinion provided by the Estate's expert.  (ECF No. 90 at 20; ECF No. 90-2 at 34; *see also* ECF No. 90-4 (Fleming Dep.) at 36:10-17 (testifying the purposes of the Crisis Response Team was "to offer mental health resources to persons in crisis" only "when there is not a criminal aspect at the forefront").)

2. Warrant Requirements and Hot Pursuit

With regard to Fourth Amendment warrant requirements and its exceptions, the Estate specifically contends the City inadequately trained officers on "how to obtain a warrant quickly or under what circumstances a search warrant is needed" and "warrant exceptions, including training on exigent circumstances and the hot pursuit doctrine."  (ECF No. 90 at 21.)

As evidence in support, the Estate submits the expert report of Michael D. Lyman, Ph.D., who opines that CSPD's training materials "fail[] to conform with nationally accepted standards" on "how to obtain a warrant quickly or under what circumstances a search warrant is needed."  (ECF No. 90-2 at 15.)[4]  Although the City's

---

health crisis.  (ECF No. 78 at 12; *see also* ECF No. 44 at 27 (observing the Estate alleged "that CSPD officers were not trained on how to respond to citizens experiencing mental health crises" and, separately, "to deescalate encounters").)

[4] As a preliminary matter, the Court presumes the City and Dr. Lyman's reference to "search warrant[s]" is inadvertent, as the relevant quote in Dr. Lyman's report appears under the

Rule 30(b)(6) witness, Sergeant Marcus VanOoyen, testified that officers are "supposed to be" trained on "the process of obtaining a warrant" (ECF No. 90-1 (VanOoyen Dep.) at 79:10-19), Dr. Lyman opines that the Officers' deposition testimony in this case demonstrates "they did not obtain a warrant because of the amount of time it was going to take" and because they believed "the requirements for obtaining a warrant were so impractical that it was not a serious consideration" (ECF No. 90-2 at 14).  The Court notes that one of the City's policies reviewed by Dr. Lyman states "officers are encouraged to always obtain a warrant *if time and circumstances permit*."  (*Id.* at 15 (emphasis added).)

Moreover, the Officers' testimony suggests they had a conflicting understanding of how they may be able to obtain a warrant under more time-sensitive circumstances. (ECF No. 90-3 (Daigle Dep.) at 40:9-11 (testifying obtaining an arrest warrant "could have taken up to several hours"); ECF No. 90-4 (Fleming Dep.) at 79:1-4 ("I would say when—under an hour, I think is a safe bet for hearing back from an on-call judge.  I haven't done it a ton of times.").)  The City argues the Estate's argument in this regard "does not identify training on an alternate process to procure a warrant, only criticism that the current practice should be quicker."  (ECF No. 102 at 10.)  However, Officer Fleming's deposition testimony suggests a quicker process *did* exist.  (*See* ECF No. 90-2 at 14 ("Officer Fleming testified that had they chosen to seek a warrant, it could have been approved by a judge in less than an hour.").)

---

heading, "Failure to train on obtaining arrest warrants" in the report of the Estate's expert.  (ECF No. 90-2 at 15.)  To eliminate any doubt, the Estate's claim with respect to warrants will be limited to the topic of arrest warrants, as the Court does not understand the failure to obtain a search warrant to be at issue in this case.

9

Specifically with respect to hot pursuit, Dr. Lyman also opines that "[t]raining on hot pursuits must teach officers that there needs to be an immediate and continuous pursuit of a fleeing suspect from the scene of a crime if an arrest has been set in motion." (ECF No. 90-2 at 18.)[5]  But "CSPD's training materials on exceptions to the warrant requirements, including for hot pursuit, are so general that they fail to train officers on the contents of the law." (*Id.* at 15.)  Indeed, "[n]one of the City's training materials explain immediate or continuous pursuit in the context of hot pursuit." (ECF No. 90 at 21; *see also* ECF No. 90-1 (VanOoyen Dep.) at 102:5-7 (training materials do not include "any explanation of immediate or continuous pursuit").)  The City does not know whether it is otherwise discussed by individual instructors during academy classes, (ECF No. 90-1 (VanOoyen Dep.) at 105:7-13), nor if it is covered in reality-based scenario training (*id.* at 109:3-5 ("Q: Do any of the scenarios involve chasing a person into a house? / A: Not that I'm aware of.")).

Viewing these facts in the light most favorable to the Estate, the Court concludes there is a genuine issue of material fact as to whether the City inadequately trained CSPD officers as to (1) whether the time and impracticability of obtaining a warrant alone are adequate to give rise to a warrant exception, (2) the process for obtaining an arrest warrant on an expedited basis, and (3) the constitutional boundaries of the hot

---

[5] The City challenges Dr. Lyman's opinions in part because they "are not grounded in any specialized knowledge." (ECF No. 102 at 11.)  The City provides no further explanation for this point, nor has it filed a motion to exclude Dr. Lyman's opinions under Federal Rule of Civil Procedure 702.  The Court does not otherwise need to determine at the summary judgment stage whether he is qualified to testify under Rule 702.  *Mountain Food, LLC v. Sentry Ins. a Mutual Co.*, 636 F. Supp. 3d 1307, 1313 (D. Colo. 2022); *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016) (noting that evidence at the summary judgment stage does not need to be submitted in a form that is admissible at trial; only the underlying content or substance of the evidence must be admissible); *Matthiesen v. Banc One Mortg. Corp.*, 173 F.3d 1242, 1247 (10th Cir. 1999).

pursuit exception to the warrant requirement.

With respect to causation, the Officers argue that "the failure to obtain a warrant would not have led to a different outcome." (ECF No. 102 at 10.) However, the relevant injury in this context is not Burnett's death but the violation of his Fourth Amendment rights. Had the Officers obtained a warrant, there would, of course, have been no warrantless entry and no such Fourth Amendment violation. For similar reasons, the Court concludes a factfinder could reasonably infer that violations of citizens' Fourth Amendment rights would inevitably result from a failure to train officers (1) that time and impracticability considerations are alone insufficient to circumvent the warrant requirement, (2) on available procedures for obtaining a warrant on an expedited basis where the circumstances call for it, and (3) on the boundaries of the hot pursuit exigency exception to the warrant requirement. *See also City of Canton,* 489 U.S. at 390 n. 10 ("city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons").

Notwithstanding, given that the only recognized warrant exception remaining at issue is whether the Officers' warrantless entry was justified by hot pursuit (*see* ECF No. 110), the Court finds causation is *not* satisfied to the extent the Estate intends to argue the City failed to adequately train officers on *other* categories of exigencies. Moreover, as the Court does not understand the Estate to be proceeding on a claim that the Officers violated Burnett's Fourth Amendment rights by conducting an illegal protective sweep, the Estate may not base its failure to train claim on this basis either. (*See* ECF No. 90 at 22.)

Nonetheless, for the reasons set forth above, the City's Motion is denied to the

11

extent that genuine issues of material fact preclude summary judgment on the Estate's *Monell* claim that the City failed to adequately train officers on (1) whether the time required to obtain a warrant is itself a justification for warrantless entry, absent other constitutionally recognized exigent circumstances; (2) the City's then-existing process for obtaining a warrant on an expedited basis through an on-call judge; and (3) the constitutional boundaries of the hot pursuit exigency.

### 3. Use of Tasers

The Estate next asserts that the City "failed to train officers on the proper use of a [t]aser." (ECF No. 90 at 22.)

Specifically, the Estate asserts the fact that Sergeant Inazu—"a supervising sergeant with over twenty years of experience"—directed Officer Fleming and Officer Daigle that they could tase Burnett if he came within 21 feet and directed Officer Barth to sneak around Burnett's house and tase him is itself evidence the City "trained Sergeant Inazu that it was proper to tase suspects without warning." (*Id.*; *see also* ECF No. 77-1 at 5:15-5:20; ECF No. 77-7 at 18:40-18:50, 40:00-40:15.)[6] The City counters that Officer Barth was trained on the use of a taser, including that she "completed at least eight hours of training at the academy" to "receive [her] certification to operate a taser." (ECF No. 78-7 at ¶ 11.) However, none of the evidence cited by the City supports the position that Officer Barth—nor any of the other Officers—were trained on the legality of tasing a suspect without warning. The Court remains mindful that just because the City provides *some* training on the operation of a taser "does not meant

---

[6] The Estate cites to "Ex. A" and "Ex. G," which the Court understands to be Exhibit A and Exhibit G to the Individual Defendants' Motion for Summary Judgment (ECF No. 77).

12

there is no need for more or different training."  *Valdez,* 66 F.4th at 818 (internal quotation marks omitted).

The Court thus agrees with the Estate there is sufficient evidence to create a genuine issue of material fact as to whether the City failed to train CSPD officers on the use of a taser without providing warning to the suspect, or first attempting to obtain compliance by use of a lesser amount of force, such as verbal commands.  (*See also* ECF No. 110.)  To the extent the jury finds such a training deficiency exists, it could also reasonably conclude its causal connection to the Estate's claim that the Officers used excessive force in violation of Burnett's Fourth Amendment rights by, in part, tasing him without warning or providing him an opportunity to peaceably submit to an arrest is obvious and closely related.  (*See id.* at 30–31.)

The Court is further convinced that a reasonable factfinder could determine the City's policymakers knew to a moral certainty in May 2020 that its officers would be faced with situations in which they must decide whether to use a taser, and if they are not trained on the circumstances in which they must provide a warning to suspects before doing so, "[t]he wrong choice will frequently cause the deprivation of a citizen's constitutional rights" through the use of excessive force.  *Lance,* 985 F.3d at 802.

The City's Motion is thus denied to the extent that genuine issues of material fact preclude summary judgment on the Estate's *Monell* claim that the City failed to adequately train officers on when tasing a suspect is a proportional use of force—specifically, by failing to train officers on when they should give an arrestee an opportunity to comply with a lesser use of force and/or provide a warning to the suspect prior to using a taser on him or her.

13

4. <u>Prone Restraint</u>

The Estate next asserts the City "failed to train its officers on the extreme dangers of prone restraint." (ECF No. 90 at 22.)

Here again, the Estate relies on expert evidence to support that "the officers are not properly trained on the dangers of prone restraint." (ECF No. 90-2 at 27.) Dr. Lyman opines that "[a] reasonably trained officer would know that as soon as restraints are placed on an arrestee, they should not be permitted to remain in a face down prone position." (*Id.*) "Rather, they should be positioned in a 'recovery position' which means they should be rolled on their side or sat up to permit them the ability to breathe." (*Id.*) Based on the Officers' conduct at issue in this case, it is Dr. Lyman's opinion that they "failed to follow the required policy and training to minimize the use of a prone restraint and bring [] Burnett to a 'Recovery position.'" (*Id.*)

The City counters that officers are trained on topics like its sudden custody death policy, positional asphyxia, sudden death syndrome, and "the dangers of placing an individual on their stomach for prolonged periods of time and respiratory compromise." (ECF No. 102 at 12.) However, even the City's Rule 30(b)(6) witness, Sergeant VanOoyen, testified at deposition that it is in the officers' discretion to decide when to move an arrestee into a recovery position "based on the totality of the circumstances when they believe it is safe to do so." (ECF No. 90-1 (VanOoyen Dep.) at 142:1-11; *see also* ECF No. 90-5 (Inazu Dep.) at 119:1-7 (testifying he was trained on the "[r]ecovery position" but "when to do that, there's some subjectivity based on the totality of the circumstances"); ECF No. 90-4 (Fleming Dep.) at 121:24-125:5 ("Q: Do you have any training . . . based on how long a person . . . who's in a prone position should be there before they're moved? / [objection from counsel] / A: I don't recall, like, a specific

14

number of minutes, or anything like that.").)

Based on the foregoing evidence, the Court concludes there is a genuine issue of material fact as to whether the City failed to train officers on (1) the importance of minimizing the length of time an arrestee is in prone restraint, (2) timely bringing them into a recovery position, and (3) the appropriate handling of an arrestee in prone restraint to minimize the risk of positional asphyxia. To the extent the jury concludes such training failures occurred, the Court finds there is also sufficient evidence for the jury to conclude it was causally related to the Estate's claim that the Officers violated Burnett's constitutional rights by using excessive force while he was in a prone position (*see* ECF No. 110 at 9–12), as well as to the Estate's claim that the Officers provided inadequate medical care to Burnett in violation of his Fourteenth Amendment rights—particularly to the extent the jury finds the Officers' use of prone restraint increased the risk of harm to Burnett. *See Est. of Booker v. Gomez,* 745 F.3d 405, 432 (10th Cir. 2014) (as relevant to the subjective component of the claim, taking into consideration whether "Defendants were responsible for placing Mr. Booker in his vulnerable state and engaged in activity . . . that could produce foreseeable, rapid, and deadly consequences").

The Court also concludes there are sufficient facts for the jury to find deliberate indifference, including because the City's policymakers knew to a moral certainty that officers would confront situations where they must decide whether to place an arrestee in a prone restraint, at what point they should be moved to a recovery position, and the appropriate type or level of additional force to use while the arrestee is in a prone restraint.

For these reasons, the City's Motion is denied as to the Estate's claim that the City failed to adequately train officers on (1) minimizing the use of prone restraint, particularly after other restraints (*e.g.*, handcuffs) have been applied; (2) timely transitioning an arrestee into a recovery position after other restraints have been applied; and (3) the appropriate type or level of additional force to use while the arrestee is in a prone restraint.

### 5. Providing Medical Assistance

Finally, the Estate asserts the City fails to adequately train officers "on examining detainees for signs of acute medical distress, including agonal breathing, proper positioning of restrained individuals, timely calls for expedited medical response, and when to begin appropriate life-saving measures such as CPR."  (ECF No. 90 at 22-23.)

The Estate cites its expert's opinion that the "officers' testimony in this case indicates a lack of proper training as to the options available to provide medical attention to a person who is no longer breathing."  (ECF No. 90-2 at 28.)  Dr. Lyman further opines that "the officer's failure to step medical up sooner indicates that they are not properly trained to identify a need for more emergent medical care."  (*Id.; see also* ECF No. 90-3 (Daigle Dep.) at 153:14-16 ("Q:  Are you trained on identifying it, agonal breathing? / A: Not that I recall, no.").)

The City counters that all CSPD officers are CPR certified (ECF No. 78 at ¶ 34) and trained to observe an individual from head-to-stomach for signs of breathing (ECF No. 78 at ¶ 47.)  Indeed, there appears to be no dispute that the officers were CPR certified and trained in first aid.  (*See, e.g.,* ECF No. 90-2 at 28 (similarly observing the Officers "were provided CPR and first aid training in their state mandated basic academy").)  Nonetheless, the Estate contends the Officers' CPR training on monitoring

16

an arrestee's breathing, for example, is inadequate because it is limited to observing a chest rise and fall.  (ECF No. 90-3 at 81:12–20 ("Q: And what is the training on checking someone's breathing? / A: You verify if you can see the chest rise and fall. / Q: Do you check – for breathing, do you check anything else other than the chest rise and fall? / A: Chest rise and fall and the pulse, and that's all, from what I remember from CPR training.").)

      Based on the foregoing, the Court finds there is sufficient evidence to create a genuine issue of fact as to whether the City fails to train officers on providing "[p]roper medical assistance [to] people who have become unresponsive" after arrest.  (ECF No. 90 at 22.)  In the Court's view, a reasonable factfinder could also find such training failures are causally related to the Estate's claim that the Officers failed to provide Burnett with adequate medical care pursuant to the Fourteenth Amendment.  (*See* ECF No. 110.)  However, here, the Estate's claim will be limited to a failure to train officers on providing appropriate medical assistance to detainees when they become unresponsive in close temporal proximity to a struggle with police.  For instance, to the extent the Estate contends the City failed to train officers on "examining detainees for signs of acute medical distress" other than agonal breathing, any such "signs of acute medical distress" should be limited to those the Estate contends were exhibited by Burnett during the incident at issue.

      In this way, the jury could find that the City's policymakers acted with deliberate indifference by failing to train officers on monitoring detainees and providing them with appropriate emergency medical assistance when they become unresponsive after a struggle with police, as the officers' failure to respond emergently in such situations will

17

frequently cause the deprivation of citizens' constitutional right to adequate medical care while in custody.

For all these reasons, the Motion is denied as to the Estate's *Monell* claim based on the City's failure to train officers on examining detainees for signs of acute medical distress after a police struggle and providing an appropriate emergent medical response when faced with any such signs.

### III. CONCLUSION

For the foregoing reasons, the City's Motion for Summary Judgment (ECF No. 78) is GRANTED IN PART and DENIED IN PART as follows:

1. The Motion is GRANTED as to the Estate's *Monell* claim based on any informal custom;

2. The Motion is otherwise DENIED as more fully set forth above; and

3. This case remains set for a Final Trial Preparation Conference on **April 25, 2025** at **2:00pm** and a 9-day Jury Trial to commence on **May 12, 2025** at **8:30am** in **Courtroom A 801**.

Dated this 23rd day of January, 2025.

BY THE COURT:

_____
William J. Martinez
Senior United States District Judge

18