IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 21-cv-1708-WJM-MDB

ESTATE OF CHAD ALEXANDER BURNETT,

    Plaintiff,

v.

CITY OF COLORADO SPRINGS;
JOSEPH DAIGLE, in his individual capacity;
MICHAEL INAZU, in his individual capacity;
MATTHEW FLEMING, in his individual capacity; and
CAROLINE BARTH, in her individual capacity,

    Defendants.

---

**ORDER DENYING MOTION TO EXCLUDE AND
LIMIT THE TESTIMONY OF EXPERT STEVEN B. BIRD**

---

Before the Court is Officer Joseph Daigle, Sergeant Michael Inazu, Officer Matthew Fleming, and Officer Caroline Barth, individually (the "Officers" or the "Individual Defendants") and the City of Colorado Springs' (the "City") (collectively, "Defendants") motion to exclude the testimony of Steven B. Bird, M.D., pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) ("Motion") (ECF No. 79). The Estate of Chad Alexander Burnett (the "Estate" or "Plaintiff") filed a response (ECF No. 94), to which Defendants filed a reply (ECF No. 102).

Neither party requests an evidentiary hearing, and the Court finds it does not need one to resolve the Motion. For the reasons explained below, the Motion is denied.

## I. LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 590–91 (1993). "[Rule] 702 imposes upon the trial judge an important 'gate-keeping' function with regard to the admissibility of expert opinions." *Mathis v. Huff & Puff Trucking, Inc.,* 787 F.3d 1297, 1307 (10th Cir. 2015) (citation omitted). When an expert opinion is challenged, "[t]he proponent of the expert testimony bears the burden of showing that its proffered expert's testimony is admissible" by establishing that the admissibility requirements are met by a preponderance of the evidence. *United States v. Nacchio,* 555 F.3d 1234, 1241 (10th Cir. 2009); Fed. R. Evid. 702, advisory committee's note (2000 amendment). To determine whether an expert opinion is admissible, the Court must perform a "two-step analysis." *Roe v. FCA US LLC,* 42 F.4th 1175, 1180 (10th Cir. 2022).

First, the Court must determine whether the expert is qualified by "knowledge, skill, experience, training, or education" to render an opinion. *Roe,* 42 F.4th at 1180 (quoting Fed. R. Evid. 702).

Second, if the expert is sufficiently qualified, the proffered opinions must be assessed for reliability." *Roe,* 42 F.4th at 1180–81; Fed. R. Evid. 702(b)–(d) (requiring that the testimony be "based on sufficient facts or data," be the "product of reliable

2

principles and methods," and reflect a reliable application of "the principles and methods to the facts of the case").  The court must "assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts."  *Dodge v. Cotter Corp.,* 328 F.3d 1212, 1221 (10th Cir. 2003) (citing *Daubert,* 509 U.S. at 592–93).  In assessing an expert's methodology, a court may consider several non-dispositive factors, including "(1) whether the theory can be tested; (2) whether it is subject to peer review and publication; (3) the known or potential error rate; (4) the existence and maintenance of standards; and (5) the general acceptance in the relevant scientific community."  *United States v. Foust,* 989 F.3d 842, 845 (10th Cir. 2021) (citing *Daubert,* 509 U.S. at 593–94); *but see Etherton v. Owners Ins. Co.,* 829 F.3d 1209, 1217 (10th Cir. 2016) (courts have "broad discretion to consider a variety of other factors").

"The court must next assess whether the expert used sufficient facts and data as required by the methodology and whether the expert reliably applied the methodology to the facts of the case."  *In re HomeAvdisor, Inc. Litig.,* 2023 WL 4734718, at *2 (D. Colo. July 25, 2023); *see also Roe,* 42 F.4th at 1181.  "Expert testimony based on experience alone must reveal how the experience led to the expert's conclusion, why the experience is a 'sufficient basis for the opinion,' and how the experience was reliably applied."  *United States v. Martinez,* 88 F.4th 1310, 1314 (10th Cir. 2023) (quoting *United States v. Medina-Copete,* 757 F.3d 1092, 1104 (10th Cir. 2014)).  "Establishing reliability does not require showing that the expert's testimony is 'indisputably correct.'"  *United States v. Pehrson,* 65 F.4th 526, 540 (10th Cir. 2023).  However, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion

evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  *Roe,* 42 F.4th a 1181.  "[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."  *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999).

## II. ANALYSIS

The Estate retained Dr. Bird, a physician trained in emergency medicine and toxicology, as a medical expert to opine on Burnett's cause of death.  (*See* ECF No. 79-1 at 1.)  Defendants seek to exclude four conclusions reached by Dr. Bird in his report:

- "Mr. Burnett certainly developed tremendously elevated concentrations of norepinephrine and epinephrine, placing him at risk for sudden death."

- "By virtue of the restraint by the officers and the decreased ventilatory capability, Mr. Burnett was unable to maintain pCO2 and pH within values needed to avoid cardiac arrest."

- "The physical exertion of Mr. Burnett during his active whole-body restraint and beating by the officers certainly met or exceeded the exertion in these clinical studies."

- "A metabolic acidosis due to his restraint and struggle killed Mr. Burnett."

(*Id.* at 5–6, 8.)  Defendants do not contest that Dr. Bird is qualified to give these opinions.  Rather, Defendants challenge only the reliability of Dr. Bird's proffered opinions, arguing "Dr. Bird's opinions on the chemical makeup of [] Burnett and the effects on his health are pure speculation and not grounded in any discernible, specific factual basis or reliable scientific method."  (ECF No. 79 at 4.)

Most significantly, Defendants argue Dr. Bird's conclusions are unsupported by data because there is no "medical or laboratory testing demonstrating [] Burnett's norepinephrine, epinephrine or blood potassium levels," nor any blood gas analysis.

4

(*Id.* at 4 n.1, 5.)  Moreover, while Dr. Bird relies on medical literature and studies in reaching his conclusions as to the changes in Burnett's biochemical markers during and after his struggle with the Officers, Defendants argue the studies "have questionable applicability to the underlying facts."  (*Id.* at 5.)

The Estate, however, contends that Defendants have failed to show that Dr. Bird must have Burnett's baseline metabolic measurements in order to render the above-described opinions.  (ECF No. 94 at 6.)  It relies on *Pirolozzi v. Stanbro,* in which the defendants sought to limit the testimony of plaintiffs' medical experts, who opined that the decedent died from compressional asphyxia during a police encounter.  2009 WL 1441070, at *2 (N.D. Ohio May 20, 2009).  In challenging the reliability of the experts' methodology, the defendants argued "there is no scientific experiment supporting the theory of compressional asphyxia in cases like this one, where a subject is held down by police officers."  *Id.* at *3.  The court found the experts' testimony to be admissible nonetheless, reasoning "[t]he simple fact that the experts do not have lab results supporting their theory [of asphyxia] is insufficient to render their testimony unreliable." *Id.* at *4; *see also Kretek v. Bd. of Comms. of Luna Cnty.,* 2014 WL 11621941, at *2 (D.N.M. Feb. 26, 2014) (favorably citing *Pirolozzi* in denying motion to exclude same expert's testimony on positional asphyxiation).

As in *Pirolozzi,* the Court finds Dr. Bird's reliance on peer-reviewed medical literature sufficient to satisfy *Daubert'*s reliability criterion.  *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 593–94 (1993) (identifying whether the theory or technique has been published and subjected to peer review as an indicia of reliability).  To the extent Defendants believe the clinical studies relied upon by Dr. Bird are not sufficiently

5

analogous to the incident at issue in this case, Defendants are free to challenge his reliance on those studies through cross-examination and rebuttal testimony.[1]  "If the jury agrees with the Defendants that the analytical gap cannot be adequately bridged to support [Dr. Bird's] theory, they can choose to believe the Defendants' experts." *Pirolozzi,* 2009 WL 1441070, at *4.  Ultimately, however, "the questions regarding [Dr. Bird] are questions of weight that should be given their testimony, which is the province of the jury to decide, rather than the reliability of the testimony."  *Id.*

### III. CONCLUSION

For the foregoing reasons, Defendants' Motion to Exclude and Limit the Testimony of Steven B. Bird (ECF No. 79) is DENIED.

Dated this 3rd day of February, 2025.

BY THE COURT:

_____
William J. Martinez
Senior United States District Judge

---

[1] Defendants specifically argue that one of the clinical studies relied upon by Dr. Bird to demonstrate the changes in blood pH, lactate, and other biochemical markers during law enforcement "use of force" encounters lacks symmetry to the facts of this case.  (ECF No. 79 at 5–6.)  In that study, subjects were divided into groups, including a group which did "a 150-meter sprint and wall hurdle" to "simulate[] flight from arrest" and a group which underwent "45 seconds of striking a heavy bag" to "simulate[] physical resistance."  Ho J.D., *et al.,* "Acidosis and catecholamine evaluation following simulated law enforcement 'use of force' encounters," ACAD EMERG MED 2010;17:e60–68, at e60.  Defendants argue "[n]o evidence suggests [] Burnett *sprinted* the equivalent of 150 meters or, said differently, over a football field and a half or over 9/10th of a mile."  (ECF No. 79 at 5.)  The Court notes, however, that 150 meters is not 9/10th of a mile but *0.09 miles*—less than 1/10th of a mile.  The factual differences between the challenged study and the facts of this case thus seem to be less drastic than Defendants argue.

6