IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 21-cv-1708-WJM-MDB

ESTATE OF CHAD ALEXANDER BURNETT,

    Plaintiff,

v.

CITY OF COLORADO SPRINGS;
JOSEPH DAIGLE, in his individual capacity;
MICHAEL INAZU, in his individual capacity;
MATTHEW FLEMING, in his individual capacity; and
CAROLINE BARTH, in her individual capacity,

    Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART MOTION
TO EXCLUDE EXPERT TESTIMONY OF LUCAS HENNINGS, MD**

---

Before the Court is the Estate of Chad Alexander Burnett's (the "Estate") Motion to Exclude Expert Testimony of Lucas Hennings, MD ("Motion") (ECF No. 81.) Officer Joseph Daigle, Sergeant Michael Inazu, Officer Matthew Fleming, and Officer Caroline Barth, individually (the "Officers" or the "Individual Defendants") and the City of Colorado Springs' (the "City") (collectively, "Defendants") filed a response (ECF No. 88), to which the Estate filed a reply (ECF No. 96).

Defendants request a *Daubert* hearing "to the extent necessary to aid the Court's determination." (ECF No. 88 at 8.) The Court finds it does not need one to resolve the Motion. For the reasons explained below, the Motion is granted in part and denied in part.

## I. LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 590–91 (1993). "[Rule] 702 imposes upon the trial judge an important 'gate-keeping' function with regard to the admissibility of expert opinions." *Mathis v. Huff & Puff Trucking, Inc.,* 787 F.3d 1297, 1307 (10th Cir. 2015) (citation omitted). When an expert opinion is challenged, "[t]he proponent of the expert testimony bears the burden of showing that its proffered expert's testimony is admissible" by establishing that the admissibility requirements are met by a preponderance of the evidence. *United States v. Nacchio,* 555 F.3d 1234, 1241 (10th Cir. 2009); Fed. R. Evid. 702, advisory committee's note (2000 amendment). To determine whether an expert opinion is admissible, the Court must perform a "two-step analysis." *Roe v. FCA US LLC,* 42 F.4th 1175, 1180 (10th Cir. 2022).

First, the Court must determine whether the expert is qualified by "knowledge, skill, experience, training, or education" to render an opinion. *Id.* (quoting Fed. R. Evid. 702).

Second, if the expert is sufficiently qualified, the proffered opinions must be assessed for reliability. *Roe,* 42 F.4th at 1180–81; Fed. R. Evid. 702(b)–(d) (requiring that the testimony be "based on sufficient facts or data," be the "product of reliable

principles and methods," and reflect a reliable application of "the principles and methods to the facts of the case").  "Expert testimony based on experience alone must reveal how the experience led to the expert's conclusion, why the experience is a 'sufficient basis for the opinion,' and how the experience was reliably applied."  *United States v. Martinez,* 88 F.4th 1310, 1314 (10th Cir. 2023) (quoting *United States v. Medina-Copete,* 757 F.3d 1092, 1104 (10th Cir. 2014)).  "Establishing reliability does not require showing that the expert's testimony is 'indisputably correct.'"  *United States v. Pehrson,* 65 F.4th 526, 540 (10th Cir. 2023).  However, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  *Roe,* 42 F.4th a 1181.  "[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."  *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999).

       The court must also ensure that the proffered testimony is relevant and will assist the trier of fact.  *Id.* at 156; *United States v. Rodriguez-Felix,* 450 F.3d 1117, 1122–23 (10th Cir. 2006).  "Relevant expert testimony must logically advance[] a material aspect of the case and be sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."  *United States v. Garcia,* 635 F.3d 472, 476 (10th Cir. 2011) (quotations and citations omitted).  In assessing whether expert testimony will assist the trier of fact, a court should also consider "whether the testimony 'is within the juror's common knowledge and experience,' and 'whether it will usurp the juror's role of evaluating a witness's credibility.'"  *Id.* at 476–77 (quoting *Rodriguez-Felix,* 450 F.3d at

1123).

Finally, Federal Rule of Evidence 403 permits a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

## II. ANALYSIS

Defendants retained Lucas Hennings, MD, an emergency medicine physician (*see* ECF No. 81-1 at 2),[1] to opine on Burnett's cause of death. Dr. Hennings provides 12 opinions on various topics pertaining to Burnett's cause of death in a peculiar and, in the undersigned's experience, unprecedented question-and-answer format, which in the Court's view does not readily grapple with the various factors at issue in *Daubert* and *Kumho Tire* analyses. (*See generally id.* at 3–14.) In any event, Dr. Hennings draws exclusively from the "available records, [his] education, [his] training, and [his] experience." (*Id.* at 15.) The Estate seeks to exclude seven of Dr. Hennings's proffered opinions, as further discussed below.

### A.    Officers' Role in Burnett's Death

The Estate first seeks to exclude Dr. Hennings's opinion pertaining to the Officers' role in Burnett's death:

> **3.    What role, if any, did Colorado Springs police officers play in Mr. Burnett's death?**
>
> Mr. [Burnett's] unfortunate death was not the fault of Colorado Springs police officers. He did die during contact with them, but this does not mean that police officers caused his death. Mr. Burnett went into cardiac arrest from an

---

[1] All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

4

> abnormal heart rhythm.  He was acutely psychotic and
> agitated long before the police officers arrived.  He was
> found to have a heart that was diseased with abnormal
> enlargement and stiffness of the muscles of the heart which
> put him at significant risk of sudden cardiac death.  This is
> regardless of police contact.  He was at significant risk at
> any time, and numerous benign events could have resulted
> in sudden cardiac death.  The evidence shows that the
> police did not strangulate or asphyxiate Mr. Burnett.  The
> evidence also shows that he did not sustain significant
> trauma as a result of police contact.  There is no evidence of
> severe brain bleeding, blood loss, significant traumatic injury
> to vital organs from initial police contact.

(ECF No. 81-1 at 12.)

The Estate first challenges Dr. Hennings's qualifications as an emergency medicine physician to render opinions as to whether Burnett would have died "regardless of police contact," that "he was at risk at any time, and numerous benign events could have resulted in cardiac death," and that Burnett's mental health—*i.e.*, his alleged "acutely psychotic and agitated" state—led to a fatal heart rhythm.  (ECF No. 81 at 4.)  Defendants counter that Dr. Hennings's opinion is based on his years of experience "evaluating and treating acutely psychotic, agitated, intoxicated, and combative patients."  (ECF No. 88 at 4 (quoting No. 81-1 at 2).)

Although Dr. Hennings's description of his expertise is wanting for specificity, the Court agrees with Defendants that his training and practice as an emergency medicine physician qualifies him to testify as to whether Burnett exhibited psychiatric *symptoms*.[2] *See, e.g., Joseph v. Doe,* 542 F. Supp. 3d 433, 438 (E.D. La. 2021) (finding physician whose "training is in emergency medicine and medical toxicology" and "deals with

---

[2] By contrast, the Court does not believe Defendants have established Dr. Hennings is qualified to render any psychiatric *diagnoses* of Burnett and he will be precluded from doing so at trial.

5

patients suffering acute psychosis" was "qualified by training and experience to testify"); *see also In re Picard,* 640 B.R. 545, 552–53 (Bankr. E.D. Pa. 2022) (while not expressly considering admissibility under Rule 702, noting testimony of "expert in diagnosing acute psychiatric conditions in the practice of emergency medicine and emergency treatment"); *Cerbelli v. City of New York,* 600 F. Supp. 2d 405, 427–28 (E.D.N.Y. 2009) (similarly, noting emergency medicine expert's declaration that plaintiff "did not exhibit any signs of psychosis or any symptoms warranting psychiatric consultation or treatment" on summary judgment). The Court also finds that Dr. Hennings's is sufficiently qualified as an emergency medicine physician to opine as to whether a person's psychiatric symptoms or emotional state can exacerbate an emergent heart condition.

Nevertheless, the Estate argues that Dr. Hennings's third opinion "is not the product of reliable principles and methods." (ECF No. 81 at 4.) Specifically, it contends "[h]ow Mr. Burnett *could have* died is speculative and not based on any accepted or reliable methodology." (*Id*.) Defendants counter that Dr. Hennings's observation that Burnett was "acutely psychotic and agitated prior to the struggle was apparent from watching the body-worn camera ['BWC'] footage and," again, "based on years 'evaluating and treating acutely psychotic, agitated, intoxicated, and combative patients.'" (ECF No. 88 at 4 (quoting ECF No. 81-1 at 2).) Defendants also assert that Dr. Hennings's opinion is reliable because it "accounts for alternative explanations" insofar as he "noted a lack of evidence to support . . . strangulation or asphyxia, brain bleeding, blood loss or traumatic injury to vital organs." (ECF No. 88 at 4 (citing ECF No. 81-1 at 12; *Etherton v. Owners Ins. Co.,* 829 F.3d 1209, 1221 (10th Cir. 2016)

6

Case No. 1:21-cv-01708-WJM-MDB   Document 113   filed 02/03/25   USDC Colorado
pg 7 of 19

("This court has recognized that differential diagnosis can reliably determine causation.")).)

As noted, "[e]xpert testimony based on experience alone must reveal how the experience led to the expert's conclusion, why the experience is a 'sufficient basis for the opinion,' and how the experience was reliably applied." *Martinez,* 88 F.4th at 1314 (quoting *Medina-Copete,* 757 F.3d at 1104). Here, the Court agrees with the Estate that Dr. Hennings's has failed to "provide a fulsome explanation of how [he] applied his . . . experience or knowledge to the facts at hand." *Lieberenz v. Bd. of Cnty. Comm'rs of Cnty. of Saguache, Colo.,* 2025 WL 35601, at *14 (D. Colo. Jan. 6, 2025); *see also Troudt v. Oracle Corp.,* 369 F. Supp. 3d 1134, 1139 (D. Colo. 2019) ("Experience is not a methodology. Methodology is the process by which the expert relates his experience to the facts at hand in order to reach an expert opinion."). Dr. Hennings has not explained how, based on his experience, he reached the broad conclusion that Burnett's alleged heart condition meant he "was at significant risk at any time, and numerous benign events could have resulted in sudden cardiac death." (ECF No. 81-1 at 12.) Nor has he explained how, based on his experience, he reached the conclusion that Burnett's "acutely psychotic and agitated" state contributed to his "abnormal heart rhythm." (*Id.*) These analytical gaps in Dr. Hennings's proffered opinion are simply "too broad for [his] testimony to endure under the strictures of *Daubert* and Rule 702." *Mitchell v. Gencorp Inc.,* 165 F.3d 778, 783 (10th Cir. 1999).

The Motion is therefore granted to the extent that Dr. Hennings will be precluded from testifying at trial that (1) "[Burnett] was at significant risk at any time, and numerous benign events could have resulted in sudden cardiac death" "regardless of police

7

contact;" and (2) Burnett's "acutely psychotic and agitated" state contributed to his abnormal heart rhythm. (ECF No. 81-1 at 12.) The Motion is denied as to all other portions of Dr. Hennings's third opinion.

**B.      Whether Preexisting Conditions Contributed to Burnett's Death**

The Estate also seeks to exclude the second paragraph of Dr. Hennings's fourth opinion concerning whether Burnett had any preexisting conditions which contributed to his death:

> 4.    What preexisting conditions did Mr. Burnett have that contributed to or caused his death?
>
> . . .
>
> Mr. Burnett was . . . previously diagnosed with bipolar disorder. He was clearly manic, agitated, and combative prior to any police interaction. His bipolar with acute psychosis already resulted in a very agitated state, and most likely caused his heart to race rapidly. This combined with the myocardial fibrosis and cardiac hypertrophy was a dangerous combination, leading to a fatal heart rhythm.

(ECF No. 81-1 at 13.)

As to the Estate's assertion that Dr. Hennings "is not qualified to render opinions on whether [] Burnett's mental health contributed to his ultimate death" (ECF No. 81 at 5), the Court adopts the reasoning set forth above with respect to Dr. Hennings's third opinion.

The Estate also challenges Dr. Hennings's fourth opinion as "speculative" and "not based on reliable methods or data nor evidence in the record." (ECF No. 81 at 5.) Specifically, the Estate contends "[t]here is no reliable data or other basis for Dr. Hennings'[s] opinion that [] Burnett's bipolar disorder and purported acute psychosis 'most likely caused his heart to race rapidly.'" (ECF No. 81 at 5 (quoting ECF No. 81-1

8

at 13).)  Defendants counter that Dr. Hennings appropriately drew from his review of medical records, which indicated that "Burnett was . . . previously diagnosed with bipolar disorder," his own review of the BWC footage, and "the condition of [Burnett's] heart after his passing."  (ECF No. 81-1 at 13.)  Based on this evidence and his experience "evaluating and treating acutely psychotic, agitated, intoxicated, and combative patients," Dr. Hennings concluded "that Burnett's agitated state would increase his heart rate to a deadly level."  (ECF No. 88 at 5.)

The Court finds there is a sufficient basis for Dr. Hennings's observation that Burnett was previously diagnosed with bipolar disorder to the extent it is documented in the medical records reviewed by Dr. Hennings.  But here again, the Court is troubled by the lack of explanation Dr. Hennings has provided for the analytical leap between his observations of Burnett's "bipolar [disorder] with acute psychosis" and "very agitated state" with his conclusion that Burnett had "a fatal heart rhythm."  (ECF No. 81-1 at 13.)  In other words, Dr. Hennings's opinion wholly lacks an explanation of the *reasoning* for his opinion that Burnett's psychiatric or emotional state negatively impacted his heart rate.  Rather, his proffered opinion on the cause of Burnett's "fatal heart rhythm" "is connected to existing data only by the *ipse dixit* of the expert."  Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

The Motion is therefore granted to the extent that Dr. Hennings seeks to testify that Burnett's "bipolar [disorder] with acute psychosis already resulted in a very agitated state, and most likely caused his heart to race rapidly," which "combined with the myocardial fibrosis and cardiac hypertrophy was a dangerous combination, leading to a fatal heart rhythm."  (ECF No. 81-1 at 13.)

9

**C.      Officers' Knowledge of Preexisting Conditions**

The Estate seeks to exclude Dr. Hennings's opinion pertaining to whether the Officers should have known about Burnett's alleged preexisting heart condition:

> **5.      Should the police officers have known about the preexisting condition?**
>
> The answer to this question is no.  There was nothing in Mr. Burnett's prior medical records that indicated his heart disease.  This could not have been known by his outward appearance or behavior.  There is no way that police officers could have known that he had an enlarged and stiff heart.

(ECF No. 81-1 at 13.)

The Estate asserts that Dr. Hennings's fifth opinion "is outside the scope of [his] expertise" and that "testimony about what the defendant officers should or should not have known is not relevant and is confusing to the jury." (ECF No. 81 at 5.) Specifically, the Estate asserts Dr. Hennings's fifth opinion confuses "the issue of whether [] Burnett was unconscious and not breathing, and therefore required medical attention," on the one hand, "with whether he had an enlarged heart and therefore needed medical attention," on the other.  (ECF No. 81 at 5.)

The Court agrees that Dr. Hennings's fifth opinion is inadmissible to the extent it seeks to establish whether certain information was within the Officers' personal knowledge.  Apart from the fact that as an after-the-fact record review expert Dr. Hennings would have no basis to know the extent of the Officers' personal knowledge, such a statement would in any event be a statement of fact, and not an opinion which would require Dr. Hennings's "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702(a).

The Court is also reluctant to permit Dr. Hennings to testify as to whether there were any outwardly detectable symptoms associated with Burnett's alleged heart condition in large part because Defendants have failed to establish its relevance. Defendants argue only that "[w]hether and when officers knew or should have known [] Burnett was experiencing a medical event brought about by cardiac arrest is a disputed issue in this suit." (ECF No. 88 at 5.) But Dr. Hennings's fifth opinion does not speak to whether Burnett exhibited detectable symptoms of a "medical event brought about by cardiac arrest" in the minutes before his death[3]—or as the Estate asserts in its Amended Complaint, whether "[t]he deterioration in Mr. Burnett's condition was so obvious that any officer should have recognized it." (ECF No. 29 at ¶ 167.) Rather, Dr. Hennings opines on whether the Officers should have known Burnett had a latent heart condition before any emergent "medical event" even occurred. The Court does not understand any claim in this case to turn on that issue.[4] And to the extent it has some marginal relevance, the Court agrees with the Estate that it is likely to cause confusion for the jury. *See* Fed. R. Evid. 403.

For these reasons, the Motion is granted as to Dr. Hennings's fifth opinion in its entirety.[5]

---

[3] Notably, the Estate also contests that the issue before the jury is "whether [] Burnett was 'experiencing a medical event brought by cardiac arrest' and therefore needed medical attention." (ECF No. 96 at 3.) Instead, it characterizes the relevant issue as "whether [] Burnett was unconscious and not breathing, and therefore required medical attention." (*Id.*)

[4] Indeed, the Estate appears to contest whether Burnett even had any preexisting heart condition. (*See generally* ECF No. 79-1.)

[5] The Court does not reach the issue of whether Dr. Hennings's opinion is "based on reliable data and methodology." (ECF No. 81 at 5.)

11

**D.      Role of Alcohol and Drugs in Burnett's Death**

The Estate next seeks to exclude Dr. Hennings's opinion concerning the role of alcohol and drugs in Burnett's death:

> 8.      What role did alcohol and drugs play in Mr. Burnett's death?
>
> Mr. Burnett had evidence of alcohol and marijuana in his system.  These alone could elevate his heart rate and cause agitation resulting in sudden death.  While unlikely that they alone would have caused his death, they have a very high likelihood of being contributing factors to the overall state that led to sudden cardiac death.

(ECF No. 81-1 at 14.)

The Estate argues that "Dr. Henning[s] is not a toxicologist or forensic pathologist and is therefore not qualified to render an opinion on whether alcohol or marijuana played a role in [] Burnett's death."  (ECF No. 81 at 6.)  Defendants counter that "Dr. Hennings does not need to be a toxicologist or a forensic pathologist to opine that alcohol and marijuana could elevate a heart rate, cause agitation, and could have been 'contributing factors' to [] Burnett's overall state."  (ECF No. 88 at 6.)  Defendants again rely on Dr. Hennings's general description of his "extensive experience evaluating and treating acutely psychotic, agitated, intoxicated, and combative patients" as sufficient to establish his qualifications.  (ECF No. 81-1 at 2.)

Dr. Hennings's description of his qualifications to testify on this issue are, once again, frustratingly bare.  Nonetheless, the Court assumes that Dr. Hennings's 13 years of experience as a practicing emergency medicine physician, during which he has treated many "intoxicated" patients, renders him sufficiently qualified to render an opinion on this issue.  *See Lurry v. City of Joliet,* 2023 WL 2138763, at *3 (N.D. Ill. Feb. 21, 2023) (finding physician trained in emergency medicine and forensic medicine

12

qualified to testify as to whether narcotics contributed to decedent's death).

Even so, Dr. Hennings's eighth opinion is still unreliable. Defendants argue only that his opinion is reliable because "[t]he autopsy report, which Dr. Hennings reviewed, noted the presence of both substances." (ECF No. 88 at 6.) But Dr. Hennings's does not explain *why* his experience led him to the conclusion that the presence of alcohol and marijuana in Burnett's system "could elevate his heart rate and cause agitation resulting in sudden death," and the Court is not inclined to take his word for it. *Roe,* 42 F.4th at 1181 ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert"). The Court is also troubled that Dr. Hennings does not even attempt to tether his conclusions to the known *amount* of either substance detected in Burnett's system, particularly in view of Burnett's stature.[6] In sum, the Court again finds "there is simply too great an analytical gap between the data and the opinion proffered." *Id.*

For these reasons, with respect to Dr. Henning's eighth opinion, the Motion is granted to the extent that Dr. Henning seeks to testify that the alcohol and marijuana detected in Burnett's system "alone could elevate his heart rate and cause agitation resulting in sudden death" or that "[w]hile unlikely that they alone would have caused his death, they have a very high likelihood of being contributing factors to the overall state that led to sudden cardiac death." (ECF No. 81-1 at 14.)

---

[6] The Court acknowledges that Defendants moved to exclude various opinions proffered by the Estate's medical expert on the ground that his opinions were not based on any lab results measuring Burnett's biochemical markers. (*See generally* ECF No. 79.) But here, the amount of ethanol and THC detected in Burnett's system was readily available to Dr. Hennings. Indeed, he noted those figures in his "Overview" of the case. (ECF No. 81-1 at 10.)

**E.     Whether a Different Inciting Event Could Have Caused Burnett's Death**

The Estate next seeks to exclude Dr. Hennings's opinion that Burnett's death could have been caused by a "different inciting event":

> **9.     Could Mr. Burnett have died from the same cause but with a different inciting event?**
>
> Yes, in fact, the list of potential events that could lead to abnormal cardiac rhythm and sudden cardiac death in Mr. Burnett are quite literally endless.  Anything that could elevate his heart rate could have resulted in deterioration with his preexisting heart condition.  Examples include but are not limited to running, engaging in sports, having an argument with somebody, having a psychotic event, drugs or alcohol, high elevation, and infections or other illnesses.  Mr. Burnett was an avid cyclist and reportedly loved hockey. Engaging in the very activities that he loved could have caused him to develop a fatal heart dysrhythmia as well.

(ECF No. 81-1 at 14.)

The Estate challenges Dr. Hennings's opinion "that there is a 'literally endless' amount of potential causes of [] Burnett's death" on multiple grounds, including that it "is not based on sufficient facts or data," it "does not utilize any specialized or scientific knowledge to help with the trier of fact or determine any issue," it is "not the product of reliable principles and methods[] as it is purely speculative," and its "probative value, if any, of the opinion is outweighed by confusing the issues and misleading the jury." (ECF No. 81 at 6–7.)  Of all these points, the Court is most persuaded by the Estate's argument that the opinion would not be helpful to the jury because it is not based on any scientific or specialized knowledge.

Under Rule 702, scientific knowledge "implies a grounding in the methods and procedures of science" which must be based on actual knowledge and not "subjective belief or unsupported speculation."  *Daubert,* 509 U.S. at 590.  Defendants argue Dr.

14

Hennings's opinion "that any activity 'that could elevate [Burnett's] heart rate could have resulted in deterioration with his preexisting heart condition'" was "drawn on the specific condition of Mr. Burnett's heart" and "an understanding of the types of activities which would trigger a fatal cardiac dysrhythmia . . . ."  (ECF No. 88 at 7 (quoting ECF No. 81-1 at 14).)  But Dr. Hennings's does not tether his opinion that "[a]nything that could elevate his heart rate" *could have caused* Burnett's death to any specialized knowledge. (ECF No. 81-1 at 14.)  While absolute certainty is not required, conjecture or speculation is inadmissible.  *Goebel v. City of Denver & Rio Grande W. Ry. Co.,* 346 F.3d 987, 991 (10th Cir. 2003).

For these reasons, the Motion is granted as to Dr. Hennings's ninth opinion in its entirety.

F.     **Role of TASER in Burnett's Death**

The Estate seeks to exclude Dr. Hennings's opinion pertaining to whether Officer Barth's use of a TASER played a role in Burnett's death:

> **10.     What role did the TASER play in Mr. Burnett's death?**
>
> There is no evidence that the TASER played a role in Mr. Burnett's death.  Notably, there was a significant time lapse between the time he was tased and when he went into cardiac arrest.  There is also evidence showing that the TASER was not fully effective.  It is extremely unlikely that the TASER contributed to the sudden cardiac death.  This is also supported by the coroner's report.

(ECF No. 81-1 at 14.)

The Estate first challenges Dr. Hennings's qualifications to opine on whether the TASER played a role in Burnett's death.  Notably, Defendants do not respond to this point.  (*See generally* ECF No. 88 at 7.)  Nor does Dr. Hennings's report establish that

15

he has *any* experience relating to TASERS or other electric weapons.  *Cf. Suarez v. City of Hollywood,* 2018 WL 11351533, at *2 (S.D. Fla. Nov. 9, 2018) (permitting emergency medicine physician to testify as to his opinion "that the use of the Taser did not contribute to Tyson's death" where he had prior experience in "the physiologic effects of TASER Electronic Control Devices [] on humans"); *Bussey-Morice v. Kennedy,* 2013 WL 12149551, at *2 (M.D. Fla. Jan. 23, 2013) (cardiovascular, thoracic, and trauma surgeon was "qualified to render a medical causation opinion . . . as to the effects of tasering on the human body, particularly the heart" where he "ha[d] extensive experience in operating other devices that transmit electrical shocks to a person" and had "some knowledge of the effects of a taser, basic cardiac physiology and basic knowledge in electrophysiology of a body").

The Court observes that another court in this District has held the fact that an expert "does not have prior experience relating to the specific effects of TASERS" did not "alone . . . automatically render him unqualified to proffer an opinion on the physiological effects of a Taser charge."  *Wilson v. City of Lafayette,* 2010 WL 728336, at *4 (D. Colo. Feb. 25, 2010).  But the proponent there had minimally established the expert's "expertise in the areas of cardiology and clinical electrophysiology," as well as biomedical engineering and electrical engineering, and the expert had "researched the medical literature surrounding TASERs . . . ."  *Id.* at *4–5; *id.* at *5 n.5.  By contrast, here there is no evidence that Dr. Hennings has prior experience with or attempted to educate himself on the impact of TASERs on humans.  *Cf. Neal-Lomax v. Las Vegas Metro. Police Dep't,* 574 F. Supp. 2d 1193, 1203 (D. Nev. Sept. 2, 2008) (in products liability case, excluding pathologist's opinion that TASER was a contributing cause of

death because "[d]espite his relative unfamiliarity with Tasers, [the expert] did not educate himself on the Taser through reference materials").[7] Without more, the Court is unprepared to say that Dr. Hennings's experience as an emergency medicine physician is alone sufficient.

Given all this, the Court finds that Defendants have failed to establish Dr. Hennings's qualifications to render an opinion as to whether the TASER contributed to Burnett's death. *See Ralston v. Smith & Nephew Richards, Inc.,* 275 F.3d 965, 970 n.4 (10th Cir. 2001) (the proponent "[bears] the burden of demonstrating to the district court that [the expert] [is] qualified to render an expert opinion").

The Motion is therefore granted as to Dr. Hennings's tenth opinion and he shall be precluded from testifying at trial as to its contents.

## G. Whether Burnett Posed a Threat

Finally, the Estate seeks to exclude Dr. Hennings's opinion as to whether Burnett was "violent" or posed a "possible immediate threat to others or to himself":

> **11. Was there evidence that Mr. Burnett was violent and posed a possible immediate threat to others or to himself?**
>
> Yes, the evidence is overwhelming that Mr. Burnett was acutely violent and threatening. He posed an immediate and significant risk to other people and to himself. He was physically and verbally aggressive. He damaged a neighbor's property. He had multiple weapons on hand. He

---

[7] Dr. Hennings's opinion differs here insofar as he takes the opposite position—that is, he opines "[i]t is extremely unlikely that the TASER contributed to the sudden cardiac death." (ECF No. 81-1 at 14.) Nonetheless, the Court notes that courts in this District have excluded expert opinion concerning TASERs as a potential cause of death where the opinion was "based almost exclusively on the temporal proximity between the TASER charge and [the decedent's] death." *Wilson,* 2010 WL 728336, at *10. The Court similarly concludes here that, even were Dr. Hennings qualified, evidence of the temporal proximity between the TASER and Burnett's death is "not of the sort requiring [Dr. Hennings's] proffered testimony on that specific issue." *Id.* at *10 n.12.

17

> was threatening to kill multiple people. He had a history of
> violent behavior. Neighbors expressed concern for their
> lives.

(ECF No. 81-1 at 14.)

The Estate contends that this is not a proper expert opinion and "[w]hether Burnett was a threat to himself or others should be determined by a jury." (ECF No. 81 at 8.) Defendants counter that Dr. Hennings's opinion would be helpful to the jury because it shows that Burnett met the criteria of Colorado Revised Statute ("C.R.S.") § 27-65-106(1)(a)(II)—a statute pertaining to when an "intervening professional" may authorize a person experiencing a mental health disorder to be taken into protective custody and placed under an emergency mental health hold.

Defendants' argument as to the relevance of Dr. Hennings's eleventh opinion is far-fetched. As far as the Court is aware, the Colorado statute upon which Defendants rely has never been raised in this lawsuit previously. Nor does any claim in this case turn on whether Burnett should have been placed under an emergency mental health hold in accordance therewith. The jury may determine for themselves whether Burnett was "violent" and "posed a possible immediate threat to others or to himself." *See Thompson v. State Farm Fire & Cas. Co.,* 34 F.3d 932, 941 (10th Cir. 1994) ("where . . . expert testimony is offered on an issue that a jury is capable of assessing for itself, it is plainly within the trial court's discretion to rule that testimony inadmissible because it would not even marginally 'assist the trier of fact'").

The Motion is therefore also granted as to Dr. Hennings's eleventh opinion in its entirety.

## III. CONCLUSION

For the foregoing reasons, the Estate's Motion to Exclude Expert Testimony of Lucas Hennings, MD (ECF No. 81) is GRANTED IN PART and DENIED IN PART as more fully set forth above.

Dated this 3rd day of February, 2025.

BY THE COURT:

_____
William J. Martinez
Senior United States District Judge